UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 11 Cases |
| VITAL PHARMACEUTICALS, INC., *et al*., | Case No. 22-17842 (PDR) |
| | (Jointly Administered) |
| Debtors.[1] | |

_____/

| | |
|---|---|
| VPX LIQUIDATING TRUST, by and through its Liquidating Trustee, | |
| Plaintiff, | |
| | Adv. Pro. No. 24-01009 (PDR) |
| v. | |
| JOHN H. OWOC, MEGAN ELIZABETH OWOC, JONATHAN W. OWOC, BRANDEN SHAW, DAVID RUNNEBAUM, JWO REAL ESTATE INVESTMENT I, LLC, JWO REAL ESTATE INVESTMENT II LLC, JW OWOC ENTERPRISES, LLC, 167 SPYGLASS LN LLC, 120 SPYGLASS LN LLC, 3 PELICAN DR LLC, TROPICAL SUNSET 117 LLC, STAG DEVELOPMENT LLC, SHAW INVESTMENTS & REALTY, INC., ELITE ISLAND LLC, JHO GA-1 INVESTMENT, LLC, JHO NV-1 INVESTMENT LLC, SHERIDAN REAL ESTATE INVESTMENT A, LLC, SHERIDAN REAL ESTATE INVESTMENT B, LLC, and SHERIDAN REAL ESTATE INVESTMENT C, LLC, | |
| Defendants. | |

_____/

---

[1] The address of the Debtors is 1600 N. Park Drive, Weston, FL 33326. The last four digits of the Debtors' federal tax identification numbers are: (i) Vital Pharmaceuticals, Inc. (8430); (ii) Bang Energy Canada, Inc. (5454); (iii) JHO Intellectual Property Holdings, LLC (0010); (iv) JHO Real Estate Investment, LLC (9394); (v) Quash Seltzer, LLC (6501); (vi) Rainbow Unicorn Bev LLC (2254); and (vii) Vital Pharmaceuticals International Sales, Inc. (8019).

# AMENDED COMPLAINT

VPX Liquidating Trust, by and through its Liquidating Trustee (the "Liquidating Trust" or "Plaintiff"), the liquidating trust in the above-captioned chapter 11 bankruptcy cases (the "Chapter 11 Cases") established pursuant to the *Debtors' Second Amended Joint Plan of Liquidation* [Case No. 22-17842-PDR, Dkt. 1905] (the "Plan"), by and through its undersigned counsel, for its Amended Complaint in the above-captioned action against defendants John H. Owoc ("Jack Owoc"), Megan Elizabeth Owoc ("Megan Owoc"), Jonathan W. Owoc ("Jon Owoc"), Branden Shaw ("Shaw"), David Runnebaum ("Runnebaum"), JWO Real Estate Investment I, LLC ("JWO I"), JWO Real Estate Investment II LLC ("JWO II"), JW Owoc Enterprises, LLC ("JW Enterprises"), 167 Spyglass Ln LLC ("167 Spyglass"), 120 Spyglass Ln LLC ("120 Spyglass"), 3 Pelican Dr LLC ("3 Pelican"), Tropical Sunset 117 LLC ("Tropical Sunset"), Stag Development LLC ("Stag"), Shaw Investments & Realty, Inc. ("Shaw Investments," and together with Jon Owoc, Shaw, Runnebaum, JWO I, JWO II, JW Enterprises, 167 Spyglass, 120 Spyglass, 3 Pelican, Tropical Sunset, and Stag, the "Real Estate Enterprise Defendants"), Elite Island LLC ("Elite Island"), JHO GA-1 Investment, LLC ("JHO GA"), JHO NV-1 Investment LLC ("JHO NV"), Sheridan Real Estate Investment A, LLC ("Sheridan A"), Sheridan Real Estate Investment B, LLC ("Sheridan B"), and Sheridan Real Estate Investment C, LLC ("Sheridan C") (collectively, "Defendants"), alleges as follows:

## INTRODUCTION[2]

1.       This is an action to recover hundreds of millions of dollars in damages inflicted on the above-captioned debtors (the "Debtors" or the "Company") as a result of the boundless greed and unlawful actions of their founder, former Chief Executive Officer ("CEO"), sole director and managing member, and purported "Chief Science Officer," Jack Owoc, and his self-dealing regime that caused the Company's demise.

2.       During the two decades before the Petition Date, Jack Owoc had exclusive control of the Company and all aspects of its operations.  During that time, the Company quickly grew to become a leading energy drink manufacturer in the United States as a direct result of the success of its flagship product, the Bang energy drink (the "Bang Drink"), the sales of which comprised the majority of the Company's profits.

3.       After the launch of the Bang Drink in 2012, the Company appeared highly profitable on paper—racking up hundreds of millions of dollars of revenue from the sale of "Bang"-marketed products.

4.       Despite the outward appearance of profitability, the Company's success was entirely based on the misappropriation of the "Bang" trademark and countless false claims about the Bang Drink.

5.       In 1971, decades prior to when the Company's use of the "Bang" mark commenced, another beverage company, Orange Bang, Inc. ("OBI"), obtained a trademark to use the "Bang" mark in connection with non-alcoholic beverages, including energy drinks.

6.       In 2009, after the Company started using the "Bang" mark, OBI sued it for trademark infringement.

---

[2]    Capitalized terms not defined in this Introduction section have the meaning ascribed to them in this Amended Complaint.

7.     OBI and the Company resolved the trademark infringement lawsuit by entering into a "stay-in-your-lane" settlement agreement in 2010 that placed clear and unambiguous sales and marketing restrictions on the sale of certain of the Company's products (the "2010 Settlement Agreement").

8.     Under the 2010 Settlement Agreement, the Company was only permitted to use the "Bang" mark under two limited and defined circumstances: (1) the Company could use the "Bang" mark to sell "creatine-based" dietary supplements and nutritional products sold in any location; and (2) the Company could use the "Bang" mark to sell beverages that were not "creatine-based" so long as it only did so in nutritional supplement stores and nutritional supplement sections of stores that sold a broader variety of products.

9.     While Jack Owoc was intimately involved in negotiating the 2010 Settlement Agreement and signed it on behalf of the Company, he failed to inform any of the Company's employees, distributors, and retailers of the various go-forward restrictions when it came to using the "Bang" mark.

10.     He also steadfastly refused to stay in his lane.  Instead, to evade the restrictions imposed by the 2010 Settlement Agreement and dupe the public, Jack Owoc and those hired by him and under his control devised an ingredient called "Super Creatine," the inclusion of which would purportedly exclude the Bang products from certain of the 2010 Settlement Agreement restrictions.

11.     But "Super Creatine" is actually a functionally useless compound, made-up by Jack Owoc—a former high school science teacher with no bona-fide scientific credentials or product-development experience—that the body metabolizes as waste.

12.     In other words, Jack Owoc sold garbage to the public, while at the same time claiming it had health benefits, and then profited off his lies.

13.     As part of his scheme, Jack Owoc began marketing the Company's products as containing "Super Creatine" in order to use the "Bang" mark and sell the Company's products in traditional retail spaces unrestricted, even though "Super Creatine" does not contain the creatine molecule (the "Super Creatine Scheme").

14.     But Jack Owoc's lies and the Company's false advertising could not withstand scrutiny forever.  Unsurprisingly, the Super Creatine Scheme and Jack Owoc's willful and deliberate misconduct in violation of the 2010 Settlement Agreement were eventually uncovered, and the Company became mired in bet-the-company litigation as a result of its longtime CEO's continuous, self-interested, and short-sighted actions.

15.     In addition to litigations filed in 2018 and 2020 related to the Super Creatine Scheme and the Company's marketing and labeling of its Bang Drink, the Company was also subject to a litany of other litigations and threatened lawsuits stemming from Jack Owoc's additional forms of reckless behavior and misconduct.

16.     Rather than ensure that the Company set aside any cash reserves for the inevitable adverse decisions, Jack Owoc continued lining his own pockets with the fruits of his unlawful acts, abusing the corporate form, and breaching his fiduciary duties to the Company by, among other things, transferring valuable intellectual property assets away from the Company and funneling hundreds of millions of dollars out of the Company to fund nearly all of his personal expenses, ranging from a few hundred dollars for his monthly home utility bills, to multi-million dollar tax bills and tens of millions of dollars to start a real estate business (the "Owoc Real Estate Enterprise") with his son, Jon Owoc, and some of Jon Owoc's friends.

17.     By September 2022, the Company was facing over $500 million in litigation judgments and settlement obligations that were the direct result of Jack Owoc's perpetuation of false advertising related to the Super Creatine Scheme, trademark infringement, and breach of a distribution agreement.

18.     In addition to the $500 million in litigation judgments and settlement obligations, the Company was battling various other pending lawsuits that exposed the Company to over $600 million in additional potential liabilities.

19.     The litigation judgments brought the Super Creatine Scheme, infringing use of the "Bang" mark, and fraudulently earned profits to light and, coupled with the other potential litigation liabilities, left the Company with no choice but to file for bankruptcy relief on October 10, 2022 (the "Petition Date").

20.     This adversary proceeding (the "Adversary Proceeding") is brought pursuant to, *inter alia*, Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), sections 105(a), 501, 502, 510, 542, 544, 547, 548, 550 and 551 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), Fla. Stat. §§ 726.105, 726.106, 726.107, 726.108, and 726.109, and other applicable federal, state, and common law, seeking a judgment:

    (a)    that Jack Owoc breached his fiduciary duties of care, loyalty, and good faith owed to the Debtors and their creditors by:

        i.    perpetuating the Super Creatine Scheme, falsely advertising the Bang Drink, and taking the actions giving rise to the False Advertising Judgment against both Jack Owoc, individually, and the Company;

        ii.    selling Bang products in the general beverage section of retail stores in violation of the 2010 Settlement Agreement and taking the actions causing the OBI/Monster Judgment against the Company;

        iii.    funneling hundreds of millions of dollars out of the Company to pay a wide variety of personal expenses, including taxes, and to operate the Owoc Real Estate Enterprise using the Debtors' funds and by utilizing the Company's employees for personal purposes;

    iv.   terminating the Pepsi Distribution Agreement arbitrarily and without good cause, forcing the Company to enter into the Pepsi Settlement Agreement; and

    v.   engaging in an ongoing and repeated pattern of misconduct during the course of the Chapter 11 Cases;

(b)    that the Real Estate Enterprise Defendants aided and abetted Jack Owoc's breaches of fiduciary duty;

(c)    that Elite Island aided and abetted Jack Owoc's breaches of fiduciary duty;

(d)    that Jack Owoc and Megan Owoc were unjustly enriched by their improper use of the Company's employees for their personal benefit;

(e)    avoiding and recovering fraudulent transfers of property of the Debtors to, or for the benefit of, Jack Owoc pursuant to Fla. Stat. §§ 726.105(1)(b) and 726.108, or in the alternative, pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 550; or Fla. Stat. §§ 726.105(1)(a) and 726.108 or 11 U.S.C. §§ 548(a)(1)(A) and 550;

(f)    avoiding and recovering preferential transfers to Jack Owoc and Megan Owoc pursuant to 11 U.S.C. §§ 547(b) and 550;

(g)    avoiding and recovering fraudulent transfers of property of the Debtors to, or for the benefit of, Jack Owoc and each of the Commercial LLCs in connection with the acquisition of commercial real property pursuant to Fla. Stat. §§ 726.105(1)(b) and 726.108, or in the alternative, pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 550; or Fla. Stat. §§ 726.105(1)(a) and 726.108, or 11 U.S.C. §§ 548(a)(1)(A) and 550;

(h)    avoiding and recovering fraudulent transfers of property of the Debtors to, or for the benefit of, Elite Island in connection with the acquisition of commercial real property pursuant to Fla. Stat. §§ 726.105(1)(b) and 726.108, or in the alternative, pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 550; or Fla. Stat. §§ 726.105(1)(a) and 726.108, or 11 U.S.C. §§ 548(a)(1)(A) and 550;

(i)    avoiding and recovering fraudulent transfers of property of the Debtors to, or for the benefit of, Tropical Sunset, Jack Owoc, Jon Owoc, and Stag (or in the alternative, the Real Estate Enterprise Defendants) in connection with the acquisition of commercial real property pursuant to Fla. Stat. §§ 726.105(1)(b) and 726.108, or in the alternative, pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 550; or Fla. Stat. §§ 726.105(1)(a) and 726.108, or 11 U.S.C. §§ 548(a)(1)(A) and 550;

(j)    declaring that the properties owned by the Real Estate LLCs are, in fact, the property of the Debtors' Estates and that the Debtors are entitled to the proceeds, if any, from the sale of the properties;

(k)    declaring that the property owned by JHO NV is, in fact, the property of the Debtors' Estates and that the Debtors are entitled to the proceeds, if any, from the sale of the property;

(l)    declaring that any claims held by the Commercial LLCs are limited to the amounts and priorities set forth in the Scheduled Claims;

(m)    declaring that the Disputed Sheridan Funds belong to the Plaintiff;

(n)    declaring that JHO Real Estate LLC is neither a claimant nor a creditor in these Chapter 11 Cases;

(o)    disallowing and expunging any claims filed or held by Jack Owoc or the Commercial LLCs pursuant to 11 U.S.C. § 502;

(p)    disallowing and expunging the Late Claims, the Owoc Unliquidated Claim, the Rent-Related Claims, and the Asserted Admin Claim pursuant to 11 U.S.C. § 502;

(q)    recharacterizing the Late Claims, the Owoc Unliquidated Claim, the Rent-Related Claims, the Asserted Admin Claim, and the Scheduled Claims as equity pursuant to 11 U.S.C. §§ 105(a) and 502(b)(1);

(r)    providing for the equitable subordination of the Late Claims, the Owoc Unliquidated Claim, the Rent-Related Claims, the Asserted Admin Claim, and the Scheduled Claims pursuant to 11 U.S.C. § 510(c);

(s)    that Plaintiff is entitled to prejudgment interest on its successful claims;

(t)    that Plaintiff is entitled to recover from Defendants its costs incurred in the prosecution of this Adversary Proceeding; and

(u)    granting such other and further relief as the Court deems just and equitable.

## JURISDICTION

21.    This is a proceeding arising under or relating to the bankruptcy petitions filed by the Debtors under chapter 11 of the Bankruptcy Code.  As a result, this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334(b) and Bankruptcy Rule 7001.

22.    Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

23.    This Adversary Proceeding is a "core" proceeding pursuant to 28 U.S.C. §§ 157(a) and (b)(2)(A), (B), (C), (F), (H), and (O).

24.     In the event that any portion of this Adversary Proceeding is found to be "non-core," Plaintiff consents to the entry of final orders and judgments by this Court pursuant to Bankruptcy Rule 7008.

25.     Declaratory relief is appropriate pursuant to both Bankruptcy Rule 7001 and 28 U.S.C. §§ 2201 and 2202 (the "Declaratory Judgment Act").

26.     As set forth below, an actual legal controversy exists with respect to the declaratory relief requested herein.

27.     This Court has personal jurisdiction over each Defendant pursuant to Bankruptcy Rule 7004.

## **PARTIES**

28.     Plaintiff is the Liquidating Trustee appointed pursuant to the Plan that became effective on November 21, 2023.  Pursuant to Article 2.2 of that certain *Liquidating Trust Agreement* (the "Liquidating Trust Agreement"), which was incorporated into the Plan and approved in all respects by the Confirmation Order, the Liquidating Trust was substituted as the party-in-lieu of the Debtors in all matters and pending proceedings inside and outside of the Bankruptcy Court.

29.     Prior to the Petition Date, Debtor Vital Pharmaceuticals, Inc. ("Vital") was a Florida corporation with its principal place of business in Weston, Florida.

30.     Prior to the Petition Date, Debtor Bang Energy Canada, Inc. ("Bang Canada") was a Florida corporation with its principal place of business in Weston, Florida.

31.     Prior to the Petition date, Debtor JHO Intellectual Property Holdings, LLC ("JHO IP") was a Florida limited liability company with its principal place of business in Weston, Florida.

32.     Prior to the Petition Date, Debtor JHO Real Estate Investment, LLC was a Florida limited liability company with its principal place of business in Weston, Florida.

33.     Prior to the Petition Date, Debtor Quash Seltzer, LLC ("Quash") was a Florida limited liability company with its principal place of business in Weston, Florida.

34.     Prior to the Petition Date, Debtor Rainbow Unicorn Bev LLC was a Florida limited liability company with its principal place of business in Weston, Florida.

35.     Prior to the Petition Date, Debtor Vital Pharmaceuticals International Sales, Inc. was a Delaware corporation with its principal place of business is in Weston, Florida.

36.     Defendant Jack Owoc is the Debtors' former CEO, former purported "Chief Science Officer," and sole former board member and managing member of each of the Debtors.

37.     Jack Owoc is a citizen of Florida.

38.     Jack Owoc is, and at all relevant times was, an insider of the Debtors by virtue of his ownership interests in and control over the Debtors, described in more detail herein.

39.     Defendant Megan Owoc is the Debtors' former Senior Vice President of Marketing and is married to defendant Jack Owoc.

40.     Megan Owoc is a citizen of Florida.

41.     Megan Owoc is, and at all relevant times was, an insider of the Debtors by virtue of the fact that she is a relative of Jack Owoc, a person in control of the Debtors.

42.     Defendant Jon Owoc is Jack Owoc's son, partner in the Owoc Real Estate Enterprise, and a former employee of the Debtors.

43.     Jon Owoc is a citizen of Florida.

44.     Jon Owoc is, and at all relevant times was, an insider of the Debtors by virtue of the fact that he is a relative of Jack Owoc, a person in control of the Debtors.

45.     Defendant Shaw is a partner in the Owoc Real Estate Enterprise.

46.     Shaw is a citizen of Florida.

47.     Defendant Runnebaum is, or was, a partner in the Owoc Real Estate Enterprise.

48.     Runnebaum is a citizen of Florida.

49.     Defendant Tropical Sunset is a Florida limited liability company with its principal place of business in Weston, Florida.  Tropical Sunset's members are Jack Owoc, Jon Owoc, and Stag.

50.     Defendant Stag is a Florida limited liability company with its principal place of business in Fort Lauderdale, Florida.  Stag's members are Jon Owoc and Shaw Investments

51.     Defendant Shaw Investments is a Florida corporation with its principal place of business in Fort Lauderdale, Florida.  Shaw Investments' sole director is Shaw.

52.     Defendant JWO I is a Florida limited liability company with its principal place of business in Cooper City, Florida.  JWO I's sole member is Jon Owoc.

53.     Defendant JWO II is a Florida limited liability company with its principal place of business in Cooper City, Florida.  JWO II's sole member is Jon Owoc.

54.     Defendant JW Enterprises is a Florida limited liability company with its principal place of business in Fort Lauderdale, Florida.  JW Enterprises' sole member is Jon Owoc.

55.     Defendant 167 Spyglass is a Florida limited liability company with its principal place of business in Fort Lauderdale, Florida.

56.     Upon information and belief, 167 Spyglass' sole member, as reflected in its Articles of Organization, is Jon Owoc.  Tropical Sunset is 167 Spyglass' parent company, and Tropical Sunset and its members have treated 167 Spyglass as if it is owned by Tropical Sunset.

57.     Defendant 120 Spyglass is a Florida limited liability company with its principal place of business in Fort Lauderdale, Florida.

58.     Upon information and belief, 120 Spyglass' sole member, as reflected in its Articles of Organization, is Jon Owoc.  Tropical Sunset is 120 Spyglass' parent company, and Tropical Sunset and its members have treated 120 Spyglass as if it is owned by Tropical Sunset.

59.     Defendant 3 Pelican is a Florida limited liability company with its principal place of business in Fort Lauderdale, Florida.  Upon information and belief, 3 Pelican's sole member, as reflected in its Articles of Organization, is Jon Owoc.

60.     Tropical Sunset is 3 Pelican's parent company, and Tropical Sunset and its members have treated 3 Pelican as if it is owned by Tropical Sunset.

61.     Defendant Elite Island is a Florida limited liability company with its principal place of business in Weston, Florida.  Elite Island's sole member is Jack Owoc.

62.     Defendant JHO GA is a Florida limited liability company with its principal place of business in Weston, Florida.  JHO GA's sole member is Jack Owoc.

63.     Defendant JHO NV is a Florida limited liability company with its principal place of business in Weston, Florida.  JHO NV's sole member is Jack Owoc.

64.     Defendant Sheridan A is a Florida limited liability company with its principal place of business in Weston, Florida.  Sheridan A's sole member is Jack Owoc.

65.     Defendant Sheridan B is a Florida limited liability company with its principal place of business in Weston, Florida.  Sheridan B's sole member is Jack Owoc.

66.     Defendant Sheridan C is a Florida limited liability company with its principal place of business in Weston, Florida.  Sheridan C's sole member is Jack Owoc.

## FACTUAL BACKGROUND

I.  **THE COMPANY'S BUSINESS AND JACK OWOC'S CONTROL OF THE COMPANY.**

67.     The Company was founded by Jack Owoc in 1993 and manufactured, developed, and marketed sports nutrition products and energy drinks.

68.     Initially, the Company produced nutritional supplements marketed toward bodybuilders and fitness enthusiasts.  It transitioned into producing beverages without sugar, calories, carbohydrates, or artificial flavors and with caffeine, electrolytes, and other performance ingredients, including energy drinks.

69.     The Bang Drink, Jack Owoc's brainchild—and hoax—was launched by the Company in 2012 and was the fastest growing beverage in the U.S. non-alcoholic beverage sector in 2018.

70.     At all relevant times, Jack Owoc was each of the Debtor-entities' sole shareholder. The Debtors' operating company, Vital, maintained at all relevant times a Subchapter S corporation election for tax purposes, and, historically, Jack Owoc served as the sole director or member, as applicable, of each of the Debtors and was each of the Debtors' CEO and purported "Chief Science Officer."

71.     In those roles, Jack Owoc had complete control over all decisions made and initiatives pursued by the Company.  Until the Petition Date, Jack Owoc managed the Debtors with an iron fist and without any supervision, direction, or oversight, including that of an independent, or for that matter, any board of directors or members, as applicable.

72.     Jack Owoc personally oversaw all of the Company's operations, including product development, testing, manufacturing, distribution, and marketing.

73.     All decisions related to the Company, including payments to vendors, distributors, and other third parties, required Jack Owoc's express approval.  No one other than Jack Owoc had signatory authority over the Debtors' bank accounts.  All internal and external payments also required Jack Owoc's express approval.

74.     Jack Owoc was also the only person at the Company who had authority to enter into contracts on the Company's behalf.

75.     From 2016 to 2019, the Company demonstrated significant enterprise growth and experienced increased customer demand for its products.

76.     For example, in 2019, the Company achieved approximately $1.2 billion in retail sales, approximately $626 million in net revenue, and approximately $175 million in earnings before interest, taxes, depreciation, and amortization.

77.     From 2017 to 2019, the Company had a 184% compound annual growth rate.

78.     This growth and performance, however, was illusory and based on Jack Owoc's unlawful conduct, including the failure to ensure compliance with, and deliberate disregard of, the 2010 Settlement Agreement.

79.      Indeed, the Company's perceived success was based on its unlawful use of the "Bang" mark and implementation of the Super Creatine Scheme, which was perpetrated by the willful false advertisement of the purported health benefits of Super Creatine in the Bang Drink, the Company's key product responsible for approximately 95% of sales between 2019 and the Petition Date.

80.     Despite this period of strong growth, Jack Owoc's deception and lies led to a multitude of litigations, and ultimately massive monetary judgments, against both Jack Owoc, individually, and the Company.  While the Company and Jack Owoc faced these significant

liabilities, Jack Owoc continued to funnel more and more money out of the Company for himself and his family, using the Company as his personal piggy bank.

81.    At the time the Company sought bankruptcy relief, the Company and Jack Owoc were involved in more than 63 pending or threatened litigations.

82.    Yet, Jack Owoc had no reservations maintaining his lavish lifestyle, flaunting his wealth, and perpetuating the Super Creatine Scheme, all while the Company battled the bet-the-company lawsuits that stemmed from his mismanagement.

## II.    THE COMPANY'S SUCCESS WAS BUILT ON DECEPTION, PUTTING IT IN FINANCIAL PERIL.

### A.    The 2010 Settlement Agreement with OBI.

83.    In 2008, the Company debuted its first product with the word "Bang" in the name: the "Bang Pre-Workout."

84.    In 1971, decades prior to the Company's debut of the Bang Pre-Workout, OBI had obtained a trademark to use the "Bang" mark in connection with non-alcoholic beverages, fruit beverages, energy drinks, and isotonic drinks.

85.    In 2009, after OBI learned that the Company was marketing and selling a product using the "Bang" mark, OBI sent a cease-and-desist letter to the Company.

86.    Ignoring the valid cease-and-desist, Jack Owoc did not stop the Company from marketing or selling the Bang Pre-Workout, and that same year, OBI initiated a trademark infringement lawsuit against the Company in the United States District Court for the Central District of California (the "District Court").

87.    In 2010, OBI and the Company entered into the 2010 Settlement Agreement resolving the lawsuit.

88.     Jack Owoc played an active role negotiating the 2010 Settlement Agreement and signed it on behalf of the Company.

89.     Pursuant to the 2010 Settlement Agreement, the Company was permitted to use the "Bang" mark only if it complied with specific marketing and sales restrictions.

90.     First, the Company was permitted to use the "Bang" mark to market and sell "nutritionally fortified," ***"creatine-based"*** dietary supplement and nutritional products (the "Creatine-Based Product Restriction") in any location.

91.     Second, the Company was permitted to use the "Bang" mark to market and sell "any nutritionally fortified beverage which enhances performance, and which is not creatine-based," so long as it limited itself to selling those products in "vitamin and nutritional supplement stores to include but not limited to GNC, Vitamin Shoppe, other specialty vitamin and nutrition stores, gyms and health clubs or to the vitamin and dietary supplement section only of any convenience or other stores" (the "Location Restriction").

**B.     The Company Continues to Use the "Bang" Mark and Deceives Consumers into Thinking that its Products Contain "Super Creatine"—a Form of Creatine.**

92.     Despite the Company's entry into the 2010 Settlement Agreement, Jack Owoc did absolutely *nothing* to ensure the Company's compliance with the restrictions and failed to take any actions to limit the Company's violations of the agreement.

93.     In fact, Jack Owoc unilaterally decided that the Company would continue using the "Bang" mark without regard to the agreed-upon restrictions and doubled down on that strategy.

94.     Not only did the Company continue using the "Bang" mark, but it expanded its use of the mark, making it a core part of the Company's identity by launching the Bang Drink in 2012 and then rebranding itself as "Bang Energy."  To complete its public transformation from a supplement company to "Bang Energy," in 2019, the Company changed the name of its social

media accounts to incorporate "Bang," including the Company's social media account: @BangEnergyCEO.

95.    In order to avoid the Location Restriction in the 2010 Settlement Agreement and continue selling Bang products in locations other than vitamin and nutritional stores, Jack Owoc feigned compliance with the Creatine-Based Product Restriction by marketing the Bang products as containing "Super Creatine"—an alleged new form of creatine which he claimed to have discovered and to which he attributed significant health benefits.

96.    Creatine is an amino acid that naturally occurs in the human body.

97.    "Super Creatine" is a fundamentally different molecule that has nothing to do with creatine.

98.    Unlike true creatine, "Super Creatine" is functionally useless—the human body metabolizes it as waste.  In other words, Jack Owoc was profiting by selling consumers actual garbage and falsely representing that it had substantial health benefits.

99.    For example, at various points in time, Jack Owoc has claimed:

(a)    "As you age, you have 'Creatine Transport Deficiency Syndrome,' where creatine does not cross the 'Blood Brain Barrier' as well as it does when you are younger. Because of this, as you age you become mentally r*tarded . . . . We have great news though. We could possibly reverse that with these new creatine peptides that I've patented."

(b)    Super Creatine can "reverse Sarcopenia (loss of skeletal muscle)."

(c)    Super Creatine has "anti-depressive effects."

(d)    Super Creatine "increases cell swell which increases protein synthesis."

(e)    Super Creatine can provide "6.9 Pounds of Water-Retention-Free Lean Mass in just 4 Weeks!"

(f)    Super Creatine increases "cognition" and "attention span."

(g)    Super Creatine "increases IGF-1 and satellite cell activation (IGF-1 and satellite cells are essential for muscle growth)."

(h)    Super Creatine can "increase I.Q."

(i)    Super Creatine is "neuroprotective in the brain" and has "antioxidant effects in the brain."

(j)    Super Creatine "helps with all forms of dementia, including Alzheimer's, Parkinson's, Huntington's, and other forms of dementia."

100.    Jack Owoc attempted to defraud consumers into believing that the Company's Bang products, which contained this so-called "Super Creatine," would deliver the benefits of creatine (and more) to those who consumed it.

101.    Jack Owoc's claims, and the Company's marketing, were a lie intended to dupe consumers into purchasing Bang products.

102.    In reality, "Super Creatine" is an intentionally misleading name Jack Owoc made up for the creatyl-L-leucine molecule, which—as Jack Owoc well knew and an arbitrator and court subsequently found—has nothing to do with actual creatine.

103.    These bogus claims by Jack Owoc, the Company's "Chief Science Officer," are unsurprising in light of Jack Owoc's lack of science credentials or expertise.

104.    In fact, Jack Owoc's only scientific experience is limited to his former position as a high school science teacher.

105.    To effectuate the Super Creatine Scheme, the Company invested significant sums of money in its advertising and promotional materials and heavily featured "Super Creatine" throughout its marketing strategy.

106.    Jack Owoc directed the Company and its employees, distributors, and retailers to market and sell the Bang products and Bang Drink for over a decade, despite knowing that such actions were in direct violation of the 2010 Settlement Agreement, infringing on OBI's "Bang" mark, and deceiving the public about the existence and benefits of "Super Creatine."

107.    To that end, prior to the Petition Date, the Company employed over 1,000 influencers who produced and posted content featuring the "Bang" mark and Super Creatine products on their personal Instagram and TikTok accounts.

108.    In addition to its social media marketing, the Company advertised the "Bang" mark and its "Super Creatine" products at live events, on end cap displays in retailers, and in other marketing materials.

109.    "Super Creatine" was also featured prominently on every single domestically-sold can of the Bang Drink.

110.    Jack Owoc caused the Company to spend $7.5 million on advertising in 2017, $11.6 million in 2018, and a whopping $35.9 million in 2019—all to perpetuate the Super Creatine Scheme and artificially boost the Company's sales and profits through misleading and deceptive claims about its products.

111.    The decisions related to compliance with the 2010 Settlement Agreement—such as where the products were sold and the manner in which they were marketed—were solely within Jack Owoc's purview and control.

112.    Jack Owoc (and therefore the Company) purposefully failed to communicate the marketing and sales restrictions to the Company's employees, distributors, or retailers. This enabled Jack Owoc's violations of the 2010 Settlement Agreement and his deception of consumers to continue unabated for several years, increasing the Company's exposure to potential litigation liabilities.

113.    Accordingly, Jack Owoc was solely responsible for the Company's failure to comply with the terms of the 2010 Settlement Agreement and the Company's fraudulent claims regarding the benefits of "Super Creatine."

C. **Jack Owoc's Prepetition Conduct and Perpetuation of the Super Creatine Scheme Causes the Company to Incur Massive Liabilities.**

i. **Monster Files a Bet-the-Company Litigation.**

114.    While there were many lawsuits against the Company since its inception, the Company's most catastrophic legal woes began in 2018.

115.    In September 2018, Monster Energy Company ("Monster") sued the Company and Jack Owoc, individually, in the District Court asserting (among other claims) false advertising claims based on the Super Creatine Scheme (the "Monster Lawsuit").

116.    During the course of the trial, Jack Owoc repeated his false claims that "Super Creatine" functions as creatine in the human body and provides significant health benefits.

117.    Indeed, Jack Owoc contradicted himself over 50 times during his sworn trial testimony in connection with, among other things, his patently absurd and untrue scientific claims about "Super Creatine."

118.    At the conclusion of the trial, the jury found that Jack Owoc lied: the products did not contain *any* creatine, let alone the so-called "Super Creatine" and that Jack Owoc (and the Company, acting through Jack Owoc) was liable for willful and deliberate false advertising.

119.    On September 29, 2022, the jury issued a $293 million verdict in favor of Monster and against the Company and Jack Owoc, who were jointly and severally liable.  More than $271 million of the damages award was for willful and deliberate false advertising in connection with the Super Creatine Scheme.

120.    The jury expressly found that Jack Owoc (and the Company, acting through Jack Owoc) was liable for willful and deliberate false advertising.

121.     The Monster Lawsuit exposed Jack Owoc's lies regarding the purported function and benefits of "Super Creatine," and the judgment against the Company, among other things, led directly to its downfall.

122.     The magnitude of the verdicts against the Company and Jack Owoc reflected the severity of Jack Owoc's misconduct.

123.     On January 11, 2024, the District Court entered a judgment in favor of Monster awarding, among other things, $271,924,174 in damages for willful and deliberate false advertising, plus $16,778,363.10 in attorneys' fees, $5,367,641.74 in costs, $13,786,557.30 in prejudgment interest, and post-judgment interest, which totaled over $307 million (the "False Advertising Judgment").

124.     Prior to the issuance of the adverse jury award in the Monster Lawsuit, and despite Jack Owoc's knowledge that he was falsely advertising the Company's products, the Company did not set aside any cash reserves to be utilized in case of an adverse judgment.

125.     Even after the jury's significant verdict based on the Super Creatine Scheme, ***and*** the Company's bankruptcy filing, Jack Owoc continued to promote the purported benefits of "Super Creatine."

### ii.     OBI Catches Wind of the Violations of the 2010 Settlement Agreement.

126.     As detailed above, Jack Owoc attempted to trick the market into believing that the Company's Bang products contained "Super Creatine" in order to dupe OBI into believing that the Company was in compliance with the Creatine-Based Product Restriction.

127.     Unsurprisingly, OBI eventually caught wind of the Company's breaches of the 2010 Settlement Agreement.

128.    On March 25, 2019, shortly after the Monster Lawsuit was filed, OBI sent a cease-and-desist letter regarding the Company's breaches of the 2010 Settlement Agreement, including the Company's failure to comply with the sales and marketing restrictions.  That letter was ignored.

129.    On August 2, 2019, OBI sent a second cease-and-desist letter to the Company, asserting that the Company continued to violate the sales and marketing restrictions set forth in the 2010 Settlement Agreement.  Again, OBI's letter was ignored.

130.    In September 2019, OBI entered into an assignment agreement with Monster, under which OBI assigned certain rights and interests in the 2010 Settlement Agreement, while OBI continued to hold the relevant trademark.

131.    On June 16, 2020, Monster and OBI jointly demanded arbitration against the Company, wherein Monster asserted breach of contract claims as assignee under the 2010 Settlement Agreement and OBI asserted trademark infringement claims as the continued holder of the "Bang" trademark (the "OBI/Monster Arbitration").

132.    In October 2021, the matter proceeded to arbitration, and the Arbitrator held a two-week hearing.

133.    The crux of the issue during the arbitration was, according to the Arbitrator, whether "the Bang Products, and [the Company]'s other products which make use of the 'Bang' Mark, are 'creatine-based' or not, whether that results in a breach of the Settlement Agreement or not and whether that rises to the level of trademark infringement or not."

134.    During the Arbitration, the Company's own expert witness, testified that "Super Creatine" was not a form of creatine, and there is no evidence to support the efficacy of "Super Creatine."

135.    Following the hearing, the Arbitrator confirmed "creatine was not a fundamental, a main, or a carrying ingredient in the Bang Products at issue."

136.    The Arbitrator further found that the Bang products containing "Super Creatine," *i.e.*, creatyl-L-leucine, did not satisfy the Creatine-Based Product Restriction.  In other words, Jack Owoc was again found to have lied in order to line his own pockets.

137.    In the Arbitrator's view, the "evidence was essentially undisputed that the Company failed to adhere to the sales restrictions" included in the 2010 Settlement Agreement.

138.    Further, the Arbitrator found that Jack Owoc "never bothered to communicate" the existence of the marketing and sales restrictions to the Company's employees, customers, and distributors.

139.    The Arbitrator determined that the Company "shifted from a particularized marketing strategy, a marketing strategy geared at its original niche target audience, athletes and members of the muscle building community to a general marketing strategy based on a 'life-style' brand and it did so in order to attract *mainstream* consumers."

140.    On January 6, 2022, the arbitrator issued an interim arbitration award in favor of Monster and OBI and against Vital and JHO IP (at the time, JHO IP held certain of the Company's intellectual property), pursuant to which Monster and OBI jointly elected: (i) a $175 million disgorgement of profits award on account of OBI's trademark infringement claim; and (ii) certain injunctive relief providing for a royalty payment equal to 5% of net sales of Bang-branded beverages in lieu of the Company discontinuing its use of the "Bang" mark (the "Interim Award").

141.    On April 4, 2022, the arbitrator issued a final award, which provided the same relief granted under the Interim Award plus approximately $9.3 million in fees and costs and further

injunctive relief providing for a royalty payment equal to 5% of net sales of Bang-branded beverages in lieu of Vital discontinuing its use of the "Bang" mark (the "Arbitration Award").

142.    On September 29, 2022, the District Court entered a judgment confirming the Arbitration Award (the "OBI/Monster Judgment").

143.    Like with the Monster Lawsuit, Jack Owoc did not direct the Company's finance department to retain sufficient cash reserves for a potential judgment.  At the same time, he continued to use the Company's assets as his personal piggy bank.

144.    Although the Company's Director of Finance was generally aware of the OBI/Monster Arbitration, she later testified that she was not informed of it in "any detail" as the matter progressed.

145.    In fact, the Company's Director of Finance testified that, had she been aware of either the Monster Lawsuit or the OBI/Monster Arbitration earlier, she would have advised the Debtors' controller and others in the finance department that they needed to start preserving capital to offset the potential liability in the case of an adverse judgment.

III.     **THE COMPANY'S REPEATED EXPOSURE TO LITIGATION STEMMING FROM JACK OWOC'S RECKLESS CONDUCT.**

146.    The OBI/Monster Arbitration and the Monster Lawsuit were not the Company's first foray into litigation.  Jack Owoc's reckless business practices routinely resulted in litigations against the Company.

147.    Between 2012 and 2013, the Company was forced to defend multiple class action lawsuits in connection with certain of the Company's non-Bang products relating to adverse and undisclosed severe negative health effects caused by those products.

148.    For example, one of the Company's products was alleged to contain a controlled substance, an illegal amphetamine analogue, that purported to burn fat for over six hours after consumption.

149.    Another one of these class actions alone resulted in a settlement requiring the Company to make a $5.49 million payment.

150.    The Company also consistently faced legal actions over the past decade—including breach of contract, wrongful termination, and other claims—due to Jack Owoc's unilateral and rash decision-making.

> ### i.    Jack Owoc's Unilateral and Improper Termination of the Pepsi Distribution Agreement.

151.    One critical component of the Company's business strategy was its distribution facilities and networks.  Since its inception, the Company invested hundreds of millions of dollars in distribution facilities across the United States.  The Company's distribution network was critical to the sale of the company's products, including its flagship drink, the Bang Drink.

152.    While historically the Company relied on a decentralized network of regional distributors to deliver its products to consumers, in April 2020, the Company entered into an exclusive distribution agreement (the "Pepsi Distribution Agreement") with PepsiCo, Inc. ("Pepsi").  The Pepsi Distribution Agreement encompassed the distribution of "BANG-branded Licensed Products," as defined in that agreement.

153.    A mere six months later, on October 23, 2020, Jack Owoc, on behalf of the Company, unilaterally terminated the Pepsi Distribution Agreement based on his disagreement with Pepsi's strategies and the parties' varying expectations, without considering the ramifications of the termination and again without directing the finance department to retain cash reserves for any potential liability.

154.    Jack Owoc's unilateral decision to terminate the Pepsi Distribution Agreement mere months after its execution spawned at least seven different lawsuits: (i) *PepsiCo, Inc. v. Vital Pharm., Inc*., No. 01-20-0015-8060 (Am. Arb. Ass'n, filed Nov. 23, 2020); (ii) *Vital Pharm., Inc. v. PepsiCo, Inc.*, No. 0:20-cv-62415-RAR (S.D. Fla., filed Nov. 25, 2020); (iii) *Quash Seltzer, LLC v. PepsiCo, Inc*., No. 21-CV-60191-RAR (S.D. Fla., filed Jan. 26, 2021); (iv) *PepsiCo, Inc. v. Vital Pharm., Inc*., No. 0:22-cv-60805-RAR (S.D. Fla., filed Apr. 27, 2022); (v) *JHO Intell. Prop. Holdings v. PepsiCo, Inc.*, No. 2:22-cv-00353 (D. Ariz., filed Jan. 28, 2022); (vi) *Vital Pharm., Inc. v. PepsiCo, Inc*., No. 2:22-cv-00593 (D. Ariz., filed Apr. 11, 2022); and (vii) *Vital Pharm., Inc. v. PepsiCo, Inc*., No. 2:22-cv-00591 (D. Ariz., filed Apr. 11, 2022) (collectively, the "Pepsi Litigations").

155.    On June 21, 2022, the Company and Pepsi entered into a Confidential Settlement Agreement and General and Special Release of All Claims (the "Pepsi Settlement Agreement"), which resolved all of the Pepsi Litigations.

156.    Pursuant to the Pepsi Settlement Agreement, the Company agreed to pay Pepsi a total of $115,000,000 to address the damages caused by Jack Owoc's improper termination of the Pepsi Distribution Agreement.

157.    In addition, the Company was subsequently required to expend significant resources to re-implement a decentralized network of regional distributors following the demise of the relationship with Pepsi.

158.    Jack Owoc's inexplicable decision plunged the Company into further disarray and closer to financial ruin.

ii.     **A Host of Other Litigations Ensnare the Company.**

159.    Not only did Jack Owoc's conduct result in more than half a billion dollars of indebtedness to Monster, OBI, and Pepsi, Jack Owoc also exposed the Company to at least $1 billion in potential additional liabilities by flouting copyright law and abruptly terminating contracts, including, but not limited to, the following litigations:

(a)     *Southeast Cold Fill, LLC v. Vital Pharm., Inc.*, No. 4:20-cv-00776 (D.S.C. Mar. 24, 2020): complaint filed in 2020 asserting damages for over $309 million in connection with a manufacturing agreement that Jack Owoc unilaterally terminated;

(b)     *Am. Bottling Co. v. Vital Pharm., Inc.*, No. 1:20-cv-01268 (D. Del. Nov. 20, 2020): complaint filed in 2020 asserting damages of over $225.1 million in connection with an alleged breach of a manufacturing agreement that Jack Owoc unilaterally terminated;

(c)     *Dairy Farmers of Am., Inc. v. Vital Pharm., Inc.*, No. 4:20-cv-00760 (W.D. Miss. Sept. 23, 2020): complaint filed in 2020 asserting damages of $14 million in connection with contract fees that Jack Owoc failed to ensure the Company paid under a manufacturing agreement;

(d)     *UMG Recordings, Inc. v. Vital Pharm., Inc.*, No. 0:21-cv-60914 (S.D. Fla. Apr. 28, 2021): complaint filed in 2021 asserting damages of over $22.15 million in connection with, among other things, alleged copyright infringement based on Jack Owoc's repeated unlicensed use of the plaintiff's copyrighted music on the Company's social media accounts, including the @BangEnergy.CEO Instagram account and @bangenergyceo TikTok account;

(e)     *Sony Music Ent. v. Vital Pharm., Inc.*, No. 1:21-cv-22825 (S.D. Fla. Jan. 31, 2022): complaint filed in 2022 asserting damages of over $35.5 million in connection with, among other things, alleged copyright infringement based on Jack Owoc's repeated unlicensed use of the plaintiff's copyrighted music on the Company's social media accounts, including the @BangEnergy.CEO Instagram account and @bangenergyceo TikTok account; and

(f)     *Fischer v. Vital Pharm., Inc.*, No. 22-CV-00136 (E.D. Miss. Feb. 3, 2022): consumer class action lawsuit filed in 2022 asserting damages of over $401 million in connection with, among things, the Super Creatine Scheme.

IV.    **THE COMPANY'S CHRONIC LITIGATION EXPOSURE RENDERS IT FINANCIALLY VULNERABLE AND INSOLVENT.**

160.    As discussed above, Jack Owoc utilized the Super Creatine Scheme to subvert the sales and marketing restrictions in the 2010 Settlement Agreement and trick consumers into purchasing the Bang Drink based on false promises about the benefits of "Super Creatine."

161.    The Super Creatine Scheme went undiscovered for several years.  Following the introduction of the "Super Creatine" products, the Company's sales of Bang products exploded from $70 million in 2016, to $320 million in 2017, and to $1.28 billion in 2019.  Put differently, from 2017 to 2019, the Company had a 184% compound annual growth rate.

162.    The Company's sales of Bang-related products and products that purportedly contained "Super Creatine" were based on Jack Owoc's fraudulent conduct, willful false advertising, and concealment of the terms and restrictions of the 2010 Settlement Agreement.

163.    Although the Company was profitable on paper, those profits were derived from, and reliant on, the Super Creatine Scheme and improper use of the "Bang" mark.

164.    For example, in 2019, the Company's most profitable year in its existence, at least 95% of the Company's sales were based on products using the "Bang" mark and purportedly containing "Super Creatine."

165.    While the Super Creatine Scheme allowed the Company to reap significant profit, it also deepened its insolvency, allowing the Company to continue operating and accruing contingent liabilities as Jack Owoc flouted the obligations in the 2010 Settlement Agreement.

166.    Factoring in the contingent liabilities from the pending litigations reveals the dire nature of the Company's financial condition and insolvency.

### A.  The Debtors Have Been Insolvent Since at Least September 2018.

167.    The Debtors' liabilities have significantly exceeded the Debtors' assets since at least September of 2018, and Jack Owoc and the Debtors never had any plan or ability to repay the Debtors' contingent liabilities, which totaled several hundred million dollars.

168.    On September 4, 2018, the Monster Lawsuit was filed.  The Monster Lawsuit included a claim for damages pursuant to the Lanham Act, which was premised upon, *inter alia*, the Company's willful and intentional misrepresentation of the nature, characteristics, or qualities of products containing "Super Creatine."

169.    Where a plaintiff establishes a willful violation of the Lanham Act, it is entitled to recover the defendant's profits flowing from the unlawful conduct.  Ultimately, the foregoing claim was reduced to a judgment awarding Monster $271,924,174 in damages for willful and deliberate false advertising plus tens of millions of dollars in attorneys' fees, costs, and pre- and post-judgment interest.

170.    At the time the Monster Lawsuit was filed, Jack Owoc and the Company that he controlled knew that the Company had been willfully and intentionally misrepresenting the nature, characteristics, or qualities of products containing "Super Creatine" and, therefore, knew that the contingent liability associated with the Monster Lawsuit was extremely likely to be realized.

171.    The amount of the contingent liability—the Company's profits from sales of products containing "Super Creatine"—was also reasonably estimable.  Accordingly, the Company's balance sheet should have included (but did not) a contingent liability in the amount of $271,924,174 as of September 2018.

172.    The Company's books and records reflect that, as of January 2019, the Company's assets totaled $186,385,114.57, its liabilities (excluding the contingent liability for the Monster Lawsuit) totaled $79,265,396.85, and its assets exceeded its liabilities by $107,119,717.72.

173.    However, factoring in the contingent liability for the Monster Lawsuit that should have been included on the balance sheet, the Company's liabilities exceeded its assets by nearly $165 million.

174.    Accordingly, the Company was balance-sheet insolvent as of January 2019, and, under the principle of retrojection, the Company was also balance-sheet insolvent as of September 2018, at which time the contingent liability for the Monster Lawsuit also should have been reflected on the Company's balance sheet.

175.    The Company's books and records reflect that, as of January 2020, the Company's assets totaled $475,739,893.65, its liabilities (excluding the contingent liability for the Monster Lawsuit) totaled $244,782,573.38, and its assets exceeded its liabilities by $230,957,320.27.

176.    However, factoring in the contingent liability for the Monster Lawsuit that should have been included on the balance sheet, the Company's liabilities exceeded its assets by nearly $41 million.  Accordingly, the Company was balance-sheet insolvent as of January 2020.

177.    The Company's books and records reflect that, as of January 2021, the Company's assets totaled $695,825,059.00, its liabilities (excluding the contingent liability for the Monster Lawsuit) totaled $521,368,192.88, and its assets exceeded its liabilities by $174,456,866.12.

178.    However, factoring in the contingent liability for the Monster Lawsuit that should have been included on the balance sheet, the Company's liabilities exceeded its assets by nearly $97.5 million.  Accordingly, the Company was balance-sheet insolvent as of January 2021.

179.    The Company's books and records reflect that, as of January 2022, the Company's assets totaled $877,313,596.87, its liabilities (excluding the contingent liability for the Monster Lawsuit) totaled $870,158,331.65, and its assets exceeded its liabilities by $7,155,265.22.

180.    However, factoring in the contingent liability for the Monster Lawsuit that should have been included on the balance sheet, the Company's liabilities exceeded its assets by more than $223 million as of January 2022.  Accordingly, the Company was balance-sheet insolvent as of January 2022.

181.    The Company's books and records further reflect that, over the course of 2022 and continuing through the Petition Date, the Company remained insolvent.

182.    The contingent liabilities from the Company's other litigations, including but not limited to the OBI/Monster Arbitration, further contributed to the Company's insolvency.

183.    These contingent liabilities, coupled with the fraudulent sales of Super Creatine products in violation of the 2010 Settlement Agreement, rendered the Company indisputably insolvent.

184.    Despite Jack Owoc's knowledge of his unlawful and fraudulent conduct, coupled with the Company's contingent litigation liabilities, which rendered the Company insolvent, inadequately capitalized, and/or caused it to incur debts beyond its ability to pay as they became due, Jack Owoc unilaterally caused the Company to transfer hundreds of millions of dollars out of the Company to himself and third parties in order to, among other things: (i) acquire certain real property for his and his wife's personal use and benefit, as well as for the benefit of the Owoc Real Estate Enterprise; and (ii) provide salary increases and bonus payments to himself and Megan Owoc.

V.      **JACK OWOC ATTEMPTS TO TRANSFER THE COMPANY'S INTELLECTUAL PROPERTY ASSETS OUT OF ITS CREDITORS' REACH.**

185.    While the Company was facing significant litigations that, among other things, exposed the Super Creatine Scheme and the improper use of the "Bang" mark and threatened the Company's existence, Jack Owoc was busy funneling assets out of the Company and the reach of its creditors.

186.    After Vital entered into the 2010 Settlement Agreement regarding the use of the "Bang" mark, Jack Owoc transferred ownership of the mark to one of his solely-owned entities, JHO IP.

187.    Upon discovery of the transfer, OBI/Monster added JHO IP as a party to the OBI/Monster Arbitration.

188.    After the discovery of the JHO IP transfer, Jack Owoc created two new solely-owned intellectual property holding companies: Quash and Entourage IP Holdings, LLC ("Entourage").

189.    Jack Owoc was the sole owner both Quash and Entourage, and he had exclusive control of both entities.

190.    Quash and Entourage were both pawns in Jack Owoc's intellectual property shell game, and he utilized both entities to attempt to hide the "Bang" mark on several occasions.

191.    For example, during the pendency of the OBI/Monster Arbitration, Jack Owoc directed certain of the Company's employees to register identical trademarks to that of the Company in the name of one of Jack Owoc's newly formed entities in an effort to hide the Company's disputed assets from Monster and OBI.

192.    On another occasion, after JHO IP was brought into the OBI/Monster Arbitration, Jack Owoc caused JHO IP and Entourage to enter into an agreement purportedly permitting

Entourage to use the "Bang" mark. Then, one week later, Entourage granted Quash a license to use the same mark.

193.    With the entry of a permanent injunction against the Company's use of the "Bang" mark all but inevitable, Jack Owoc hoped this improper duplicative trademark registration would shelter the Company's continued use of the intellectual property.

## VI.    JACK AND MEGAN OWOC TREAT THE COMPANY'S RESOURCES AS THEIR OWN.

### A.    Jack Owoc Used the Company as His Personal Piggy Bank.

194.    Jack Owoc's blatant attempts to defraud the Company's future creditors were not limited to shuttling around the Company's intellectual property; they included nearly all other categories of the Company's assets as well.

195.    While the Company was facing significant legal issues and future judgment liabilities from the Monster Lawsuit and the OBI/Monster Arbitration, and while Jack Owoc knew the Company's improper use of the "Bang" mark was in violation of the 2010 Settlement Agreement and the Company was knowingly and willfully false advertising the "Super Creatine" contained in the Company's Bang products, Jack Owoc continued funneling money out of the Company to himself and third parties solely for his personal and his family members' benefit.

196.    From January 2019 through the Petition Date, while the Company was insolvent, Jack Owoc caused the Company to transfer over one hundred million dollars from the Company's bank accounts to himself and third parties for purposes that had no relation to the Company's businesses and day-to-day operations, including for his personal use, such as for his personal taxes.

197.    The Company's Director of Finance described the "distribution" process at the Company as "different" than other companies she was familiar with and had worked at previously. In her experience, at other companies, there was a scheduled time where the partners would have

agreed to take distributions, for example, quarterly or annually, and the distributions would be processed at that time.   At the Company, however, according to the Company's Director of Finance, Jack Owoc would "take distributions whenever he needed" or "ask for money from his company to be sent to him."

198.    According to the Company's Director of Finance, if Jack Owoc "had a need of any type, or to fund his personal account, he would ask for distribution.  So it could be once a month, or it could be three times a month, or it could be whenever.  Whenever there was a need," the finance department would send funds to wherever Jack Owoc directed them.

199.    The Company's Director of Finance also "never questioned Jack Owoc on his decision making.  When he asked for distributions, if it was just the ask to replenish his personal bank account, then that was it.  That's what we wrote into the form that we would fill out internally just to know distribution.  Other times, Jack Owoc would tell us what the—where the money is going, if he was asking us to pay a third party or send a deposit for something, and then we would book it as a distribution to Jack Owoc, although we send it directly to whomever he was doing business with."

200.    In the Director of Finance's view, Jack Owoc felt that the Company's bank accounts and his bank accounts "were one and the same."

201.    Many of these transfers were made directly to bank accounts owned or controlled by Jack Owoc, but the vast majority were made to third parties on Jack Owoc's behalf.

202.    These transfers included, for example, down payments on real property, payments to law firms, architects, interior designers, and other costs related to the Owoc Real Estate Enterprise.

203.    In addition to transfers to fund the Owoc Real Estate Enterprise, Jack Owoc also transferred funds to third parties for routine personal expenses.  By way of example, payments were sent to fund Jack Owoc's home gym renovation, for new speakers in his Southwest Ranches home, for a fishing trip, and for political and religious donations.

204.    These transfers were in addition to Jack Owoc's compensation, over which Jack Owoc had sole and complete discretion.

205.    Megan Owoc knew that Jack Owoc was utilizing the Company's money and resources to fund their lavish lifestyle, including, the aforementioned renovations on their Southwest Ranches home.

206.    In Megan Owoc's view, Jack Owoc could transfer funds from the Company whenever he wants "for whatever he wants."

207.    From January 2019 through February 11, 2022, Jack Owoc received an annual salary of approximately $750,000, which was paid to him on a biweekly basis.

208.    In 2019, Jack Owoc directed the Company to pay him a bonus for 2019 in the amount of $14,430,000, even though Jack Owoc knew of the Company's enormous liabilities based on the unlawful use of the "Bang" mark and the Super Creatine Scheme.

209.    In February 2022, Jack Owoc unilaterally more than doubled his own salary to an annual amount of approximately $1,790,530 mere months before the inevitable entry of massive judgments against himself and the Company.

210.    Jack Owoc's salary, however, pales in comparison to the value of the transfers he caused the Company to make to him or for his benefit, which only increased in number and amount as the Company's legal struggles mounted.

211.     In 2018, Jack Owoc caused the Company to transfer a total of at least $13 million out of the Company to himself and his third-party affiliates, which amounted to approximately 16% of the Company's net income.

212.     In 2019, Jack Owoc caused the Company to transfer a total of at least $35.2 million out of the Company to himself and his third-party affiliates, which amounted to approximately 21% of the Company's net income.

213.     In 2020, Jack Owoc caused the Company to transfer a total of at least $47.2 million out of the Company to himself and his third-party affiliates, which amounted to 876% of the Company's net income.

214.     In 2021, the Company operated at a loss, and, yet, Jack Owoc caused the Company to transfer a total of at least $11.5 million out of the Company to himself and his third-party affiliates.

215.     Vital operated as a subchapter S-Corporation, which permitted it to pass taxable income, credits, deductions, and losses directly to its shareholders.  The corporation's sole shareholder, Jack Owoc, was then responsible for the tax liabilities due.

216.     No written agreement exists, or ever existed, between the Company and Jack Owoc that required the Company to pay for Jack Owoc's personal tax liabilities.

217.     However, Jack Owoc caused the Company to pay the amounts due in connection with his and Megan Owoc's personal tax liabilities, which they filed jointly, to the Internal Revenue Service ("IRS"), totaling at least $47 million during the years 2017 to 2022.

218.     Jack Owoc also directed the Company to transfer tens of millions of dollars out of the Company to pay himself and third parties for his own personal benefit (the "Jack Owoc Transfers"), unrelated to the Company's business (excluding the Company's transfers in

connection with Owoc Real Estate Enterprise, which are discussed further in section VII.A. below).

219.   Megan Owoc was aware of and participated in facilitating some of these transfers.

220.   All of the aforementioned transfers were made by the Company at Jack Owoc's direction and while the Company was insolvent.

221.   Despite the looming litigation liabilities, Jack Owoc continued to unilaterally increase his salary and bonuses, while the Company's finance department was wholly unaware of the impending judgments that would soon bring about the Company's demise.

**B.   Jack and Megan Owoc Used the Company's Employees as Their Personal Staff.**

222.   In addition to treating the Company's money as his own—despite mounting litigation costs, contingent liabilities, and judgments—Jack Owoc used the Company's employees to facilitate all manners of his personal affairs and transactions.

223.   Jack Owoc required Company employees to assist him and Megan Owoc with anything they needed, even if the requests had nothing to do with the employees' normal role within the Company.

224.   For example, for nearly a decade leading up to August 2021, members of the Company's finance department managed Jack and Megan Owoc's personal finances, which included Jack Owoc directing Company employees to pay his personal credit card bills, prepare his mortgage statement, manage his personal financial accounts, and Jack Owoc and Megan Owoc emailed with Company employees to arrange for completion of their personal taxes by a third-party accounting company.

225.    Jack Owoc and Megan Owoc also routinely used the Company's in-house legal personnel to represent them in various personal legal matters, wholly unrelated to the Debtors' business.

226.    Indeed, Jack Owoc's own former attorney, during a deposition, acknowledged that "[t]here were numerous times that the Bang Energy and the Vital legal team represented Jack Owoc in his individual capacity for years."

227.    For example, the Company's general counsel represented Jack Owoc and Megan Owoc in a 2022 lawsuit against the company that installed motorized blinds in their Southwest Ranches home; a 2021 lawsuit against their children's former nanny; and a 2020 lawsuit against an interior designer hired to renovate their Southwest Ranches home.

228.    In July 2018, Jack Owoc directed the Company's then-general counsel to coordinate with a church and assess the most tax-advantageous structure for Jack Owoc's potential personal donation.

229.    Likewise, in November 2020, Jack Owoc required the Company's in-house counsel to draft a loan agreement for a loan between Jack Owoc and his brother, which was unrelated to the Company's business.  Then Jack Owoc made the Company fund the loan.

230.    In addition, in April 2021, Jack Owoc tasked the Company's Director of Finance with coordinating with a bank and preparing Jack Owoc's personal financial statements for him to apply for a home equity line of credit.

231.    In 2021, Megan Owoc began operating a personal YouTube page, then-titled "Bang Energy Family" (which has since been rebranded as the "Owoc Family"), which showcased her and Jack Owoc's lifestyle.  Megan Owoc utilized employees in the Company's marketing department to film and edit the videos for the family's personal YouTube page.

232.     Jack Owoc and Megan Owoc treated the Company's employees like their personal staff and routinely tasked them with duties wholly unrelated to the Company's business operations.

## VII.   JACK OWOC USED THE COMPANY TO FUND THE OWOC REAL ESTATE ENTERPRISE AND CONTINUED TO FUNNEL EVEN MORE MONEY OUT OF THE COMPANY.

### A.   The Owoc Real Estate Enterprise.

233.     Starting in 2018, Jack Owoc began transferring money out of the Company for more than just his personal expenses.

234.     In or around 2018, Jack Owoc and his oldest son, Jon Owoc, who decided to leave his job as a police officer, started a new venture: a residential real estate business.

235.     This residential real estate business was wholly unrelated to the Debtors' beverage business.

236.     The Owoc Real Estate Enterprise began with Jon Owoc, at Jack Owoc's direction, acquiring residential properties and parcels of land in South Florida, renovating or constructing new homes on the properties, and then selling them.

237.     Jon Owoc had some experience renovating houses and had friends who were involved in the real estate industry.  Jon Owoc's best friend, Shaw, was successful in the real estate business, and they became business partners with Jack Owoc and Runnebaum in furtherance of the Owoc Real Estate Enterprise.

238.     Nearly every single dollar used to fund the Owoc Real Estate Enterprise was transferred from the Company and paid with Jack Owoc's express approval and authorization.

239.     Jon Owoc was aware that the Company's funds were being utilized to operate the Owoc Real Estate Enterprise.

240.     Shaw was aware that the Company's funds were being utilized to operate the Owoc Real Estate Enterprise.

241.    Runnebaum was aware that the Company's funds were being utilized to operate the Owoc Real Estate Enterprise.

242.    Jon Owoc received the funds to purchase the Owoc Real Estate Enterprise's first property from the Company.  Jon Owoc reached out to Jack Owoc to see whether he would be interested in "funding some of these houses."

243.    Jack Owoc agreed to provide the funds (which he transferred from the Company), and they worked out a profit-sharing agreement that was never formally documented in which Jack Owoc would be a silent partner and Jon Owoc, Shaw, and Runnebaum would do the "sweat equity."

244.    Jon Owoc, Shaw, and Runnebaum provided the "sweat equity" by being responsible for identifying and vetting potential properties and coordinating with vendors and service providers to design and renovate the properties.

245.    Runnebaum and Shaw—both licensed real estate agents—were often responsible for scouting potential residential real estate for their business partners Jack Owoc's and Jon Owoc's consideration.

246.    Under the verbal profit-sharing arrangement related to the Owoc Real Estate Enterprise, Jack Owoc was supposed to receive 60% of the profits, and Jon Owoc, Shaw, and Runnebaum would split the remaining 40%.  While the parties attempted to negotiate an operating agreement to formalize this agreement, it was never signed.

247.    Pursuant to the profit-sharing arrangement, Shaw received his portion of the profits and was reimbursed for expenses that he personally incurred in connection with the Owoc Real Estate Enterprise through Shaw Investments.

248.    Megan Owoc was aware that Jack Owoc and Jon Owoc were utilizing the Company's funds to acquire residential real estate related to the Owoc Real Estate Enterprise.

249.    In fact, Megan Owoc posted YouTube videos to her "Bang Energy Family" YouTube page advertising the Owoc Real Estate Enterprise and its "extravagant homes and commercial properties ranging from $5,000,000 to $100,000,000."

250.    Megan Owoc also assisted Jon Owoc with the design of the logo for Stag.

251.    Employees in the Company's finance department were also aware that Jack Owoc had established a real estate business with his son that was wholly unrelated to the Company's business.

252.    In fact, Jack Owoc directed the Company's employees to help jumpstart the father-son duo's foray into real estate, including through a consultation with the Company's Director of Finance to obtain accounting advice.

253.    On September 9, 2019, the Company's Director of Finance emailed an accounting firm seeking "advi[c]e on a new business venture."  She explained:

> Jack Owoc is partnering with his son Jon Owoc, and a friend, Branden Shaw on real estate transactions.  The operations of the Joint venture is to purchase property, and flip them after some improvements.  We have established an LLC that would purchase the properties, and hold them until renovations are made and property sold.  Jack Owoc is providing the cash for the transactions.  I[s] there anything that we need to take into consideration that would negatively impact Jack Owoc? Is there special consideration needed when we write the operating agreement with the partners? I have copied Jon and Branden on the email.

254.    Upon receiving the accounting firm's response, Jon Owoc and the Company's Director of Finance continued to exchange emails about the partnership structure necessary to achieve Jon Owoc and Jack Owoc's respective goals in connection with their residential real estate business, which was entirely unrelated to the Company's day-to-day operations.

255.     The Company's Director of Finance was not the only Company employee instrumental in setting up the Owoc Real Estate Enterprise.  The Company's then General Counsel was tasked (by Jack Owoc) with drafting a partnership agreement in connection with establishing the Owoc Real Estate Enterprise.

256.     Over the course of the next nine months—from September 2019 to May 2020—the Company's General Counsel, the Company's Director of Finance, Jack Owoc, Jon Owoc, and Shaw exchanged numerous emails and drafts of the partnership agreement and sought to create a structure that was designed to provide the greatest tax advantage to Jack Owoc.

257.     After the Owoc Real Estate Enterprise commenced, Jon Owoc, Shaw, and Runnebaum routinely emailed the Company's employees in order to obtain the funds for the real estate acquisitions.

258.     In such emails, Jon Owoc, Shaw, and Runnebaum would identify the entity or individuals to which the Company's funds should be transferred and provide the wire transfer information.

259.     Also, on at least one occasion, Runnebaum communicated with the Debtors' then-General Counsel regarding a promissory note and seller financing agreement in connection with the acquisition of at least one of the residential real properties.

260.     They knew the Company's money was being used to fund the Owoc Real Estate Enterprise as their requests were to the Company's employees for wire transfers, which required Jack Owoc's express sign off.

261.     Further, Runnebaum, Shaw, and Jon Owoc received wire confirmations from various individuals in the Company's accounting department, evidencing that the Company's

funds were being transmitted to third parties to fund the acquisition and renovation of the real estate for the Owoc Real Estate Enterprise.

262.    In furtherance of the Owoc Real Estate Enterprise, Jack Owoc directed the Company to transfer tens of millions of dollars out of the Company to pay third parties identified by Jon Owoc, Shaw, and Runnebaum, such as architects, interior designers, and title companies.

263.    These funds were used to acquire and renovate real property that was then titled in the name of one of the following entities: JWO I, JWO II, JW Enterprises, 167 Spyglass, 120 Spyglass, 3 Pelican, Tropical Sunset, and Stag (collectively, the "Real Estate LLCs").

264.    Pursuant to their oral arrangement, Jack Owoc, Jon Owoc, and Shaw treated Tropical Sunset as the parent company of the other Real Estate LLCs.

265.    In total, the Real Estate LLCs acquired at least the following twelve properties using the Company's funds:

    (a)    3 Pelican Drive, Ft. Lauderdale, FL (the "3 Pelican Property") (titled in the name of 3 Pelican)

    (b)    528 Coconut Isle Drive, Ft. Lauderdale, FL (the "528 Coconut Property") (titled in the name of 3 Pelican)

    (c)     520 San Marco Drive, Ft. Lauderdale, FL (the "520 San Marco Property") (titled in the name of JWO I)

    (d)    32 Pelican Drive, Ft. Lauderdale, FL (the "32 Pelican Property") (titled in the name of JW Enterprise)

    (e)    167 Spyglass Lane, Jupiter, FL (the "167 Spyglass Property") (titled in the name of 167 Spyglass)

    (f)    528 Riviera Drive, Ft. Lauderdale, FL (the "528 Riviera Property") (titled in the name of JWO I)

    (g)    120 Spyglass Lane, Jupiter, FL (the "120 Spyglass Property") (titled in the name of 120 Spyglass)

(h)    821 Bamboo Lane, Delray Beach, FL (the "821 Bamboo Property") (titled in the name of JWO II)

(i)    6850 Melaleuca Road, Southwest Ranches, FL (the "6850 Melaleuca Property") (titled in the name of JW Enterprise)

(j)    15963 SW 16th Street, Pembroke Pines, FL (the "15963 Southwest Property") (titled in the name of 3 Pelican)

(k)    2209 NE 2nd Street, Pompano Beach, FL (the "2209 Northeast Property") (it is unclear which entity or individual took title to the 2209 Northeast Property)

(l)    17301 SW 52nd Court, Southwest Ranches, FL (the "17301 Southwest Property") (titled in the name of Jon Owoc)

(m)    a 10-unit property in Pompano Beach, FL (the "Pompano Property") (it is unclear which entity or individual took title to the Pompano Property)

266.    Upon information and belief, all of the real properties purchased in connection with the Owoc Real Estate Enterprise were acquired using the Company's funds at Jack Owoc's express direction and with Shaw, Runnebaum, and Jon Owoc facilitating the acquisitions and identifying the counterparties and/or professionals to whom the Company's funds should be transferred.

267.    In addition, pursuant to instructions from Jon Owoc, Shaw, and Runnebaum, Jack Owoc then would direct the Company to transfer funds in connection with the maintenance and improvement of these properties, including, for example, contractor renovation work, property taxes, and utilities.

268.    The Company's books and records do not always clearly identify which transfers were made on behalf of each Real Estate LLC.

269.    For example, the Owoc Real Estate Enterprise utilized the same architecture company, building company, roofing company, and interior designer for many of its real estate projects and, at times, made a single transfer from the Debtors to each vendor for multiple projects.

270.     Additionally, at times, Jon Owoc, Runnebaum, or Shaw would pay an expense—or multiple expenses—and receive a wire transfer from the Debtors as reimbursement for the expense paid.

271.     Due to the manner in which the aforementioned wire transfers were made, the Debtors' poor record-keeping, and the fact that multiple expenses were often paid simultaneously, it is impossible for Plaintiff to precisely determine which transfers were for the benefit of a particular Real Estate LLC.

272.     Although there are at least eight Real Estate LLCs currently comprising the Owoc Real Estate Enterprise, the bulk of those entities do not have their own bank accounts.

273.     Rather, the Owoc Real Estate Enterprise initially relied solely on funds transferred from the Company to third parties to fund the Real Estate LLCs' acquisitions of new properties and renovation costs.

274.     At some point, however, as Shaw and Jon Owoc began selling some of the renovated properties, those funds were placed in one of two bank accounts held in the name of two of the Real Estate LLCs:  JWO I and JWO II.

275.     These bank accounts were used as the operating accounts for the Real Estate LLCs.

276.     The profits from the sales of the properties were also transferred into one of the two aforementioned operating accounts.

277.     At no point were funds ever reimbursed or repaid to the Company.

278.     Some of the real properties acquired for the Owoc Real Estate Enterprise have since been sold.  The following properties were each sold for a profit: the 3 Pelican Property; the 32 Pelican Property; the 821 Bamboo Property; the 6850 Melaleuca Property; the Pompano Property; the 17301 Southwest Property; the 520 San Marco Property; and the 528 Coconut Property.

279.     Upon information and belief, the following five properties acquired for the Owoc Real Estate Enterprise are still held by the Real Estate Enterprise Defendants: the 528 Riviera Property; the 120 Spyglass Property; the 167 Spyglass Property; the 15963 Southwest Property; and the 2209 Northeast Property.

280.     The profits from the sale of the real properties—with one exception[3]—were either rolled into the operating accounts for the Owoc Real Estate Enterprise, used to acquire additional real properties, and fund renovation costs or were used to pay distributions to Jon Owoc, Runnebaum, or Shaw.

281.     Despite having wholly funded the acquisitions and renovation costs for the subject properties, the Company did not receive any of the proceeds from the sale of the real properties comprising the Owoc Real Estate Enterprise.

282.     To the extent Jack Owoc received any profits, he kept the profits for himself rather than giving them to the Company, putting his own interests over that of the Company yet again.

**B.     Jack Owoc's Solo Real Estate Holdings.**

283.     In addition to the properties acquired for the father-son Owoc Real Estate Enterprise, Jack Owoc also used the Company's funds to acquire real property for a separate real estate venture on his own.

284.     On August 26, 2020, Jack Owoc formed defendant Elite Island—a Florida limited liability company of which he is the sole managing member and 100% membership interest owner. As such, Elite Island can only act through Jack Owoc, its member-manager.

---

[3] A dispute has arisen regarding the operation of the Real Estate LLCs which is the subject of a receivership action pending in Florida state court styled, *Stag Development, LLC v. Tropical Sunset 117, LLC*, Case No. CACE 2024-2312 (Fla. Cir. Ct., Broward Cnty.) (the "Receivership Action").  Pursuant to a court order in the Receivership Action, the 3 Pelican Property was sold for approximately $18 million in or around April 2024, and the funds are being held by the court-appointed receiver.

285.    Elite Island's sole asset is a piece of property in the Florida Keys: 72100 Overseas Highway, Islamorada, Florida 33035 (the "Overseas Highway Property").

286.    Elite Island has no finances or bank account of its own.

287.    The Overseas Highway Property was purchased by Elite Island on August 31, 2020 for $8.3 million.  The entire $8.3 million purchase was funded using money from the Company's bank account.  On the day of the closing, the Company—at Jack Owoc's direction—wired the entire purchase price to the closing agent in order for Elite Island to acquire the Overseas Highway Property.

288.    Not only was Elite Island's sole asset acquired using the Company's funds, but upkeep, maintenance, and renovations were also funded by the Company at Jack Owoc's direction. For example, the 2020 property taxes on the Overseas Highway Property—more than $25,000— were paid by the Company.

289.    In total, Jack Owoc directed the Company to transfer $1,091,747 to various third parties to pay for expenses associated with the Overseas Highway Property.

290.    Although Jack Owoc is Elite Island's sole member and manager, he does not "manage" Elite Island but rather admitted that he uses the Company's "huge legal and financial department to manage all of that."  The Company's then General Counsel managed the real estate transaction for Elite Island.  In addition, other Company employees were directed by Jack Owoc to assist and facilitate the Overseas Highway Property transaction in their capacity as Company employees using their Company email accounts.

291.    In addition, in or about 2017, Jack Owoc caused the John H. Owoc Revocable Trust to acquire real property located at 16720 Stratford Court, Southwest Ranches, Florida 33331,

which was a component of a four-acre lot acquired at this same time (together, the "Southwest Ranches Property").

292. Jack Owoc used the Southwest Ranches Property as his personal residence until, upon information and belief, he purchased a $40 million waterfront mansion in Fort Lauderdale, Florida in October 2023.

293. In total, Jack Owoc directed the Company to transfer at least $1.6 million to various third parties to pay for expenses associated with the Southwest Ranches Property, including, but not limited to, home gym renovations for Jack Owoc's self-proclaimed "World's Dopest Gym," property taxes, and homeowners' insurance.

## VIII. JACK OWOC CREATES SOLELY-OWNED ENTITIES TO HOLD THE COMPANY'S COMMERCIAL REAL ESTATE AND DEFRAUD ITS FUTURE CREDITORS.

294. Jack Owoc did not just limit himself to acquiring residential properties with the Company's resources. He also acquired commercial properties using the Company's funds and then secreted them outside the reach of creditors by placing them in the names of entities that Jack Owoc created and solely owned.

295. While the Company was in dire financial condition and facing significant litigations that exposed the Super Creatine Scheme and improper use of the "Bang" mark and threatened the Company's existence, Jack Owoc continued to move the Company's assets around like puzzle pieces in order to hide them from potential creditors. Jack Owoc knew the Company could fail as a result of his own misconduct and wanted to plunder as much as he could while he still had time.

296. Between 2018 and 2020, Jack Owoc created a series of new entities, including Sheridan A, Sheridan B, Sheridan C, JHO NV, and JHO GA (together, the "Commercial LLCs"), to acquire certain commercial properties that would function as the Company's manufacturing,

distribution, and storage facilities.  Jack Owoc was the 100% owner of each of the Commercial LLCs.

297.    Although the properties owned by the Commercial LLCs were acquired using the Company's funds and intended to serve a business purpose, Jack Owoc titled them in the name of the Commercial LLCs to keep them out of reach of creditors and retain them for his own personal benefit.

### A.    The Company's Sheridan A Property.

298.    On December 12, 2018, just a few months after Monster initiated the Monster Lawsuit, Vital purchased the commercial property located at 20311 Sheridan Street, Pembroke Pines, Florida (the "Sheridan A Property") from an unaffiliated third party for a purchase price of $35,000,000.  Jack Owoc signed the purchase agreement on behalf of Vital.

299.    On February 11, 2019, Jack Owoc established Sheridan A, of which he is the sole member and 100% membership interest owner, and caused Vital to transfer ownership of the Sheridan A Property from Vital to Sheridan A.

300.    To ensure sufficient financing for the acquisition of the Sheridan A Property and to fund Jack Owoc's plans for the acquisition of additional commercial properties, Vital and Sheridan A entered into a promissory note for $75,000,000 (the "Promissory Note") with Brunswick Bank and Trust, the predecessor of Truist Bank ("Truist") on February 14, 2019.  $35,000,000 of the funds from the Promissory Note were used for the purchase of the Sheridan A Property.

301.    For a period of time, the Sheridan A Property was used by the Company to manufacture certain of its products and also housed the Company's financial department.

302.    However, no lease or written agreement between the Company and Sheridan A exists or has ever existed.

303.    In addition to Vital, Quash, which manufactured and distributed Vital's alcoholic seltzer products, also leased space in the Sheridan A Property.

304.    Jack Owoc, as the sole person on both sides of the transaction, caused Quash to enter into a lease agreement dated January 1, 2021, whereby Quash "agreed" to pay monthly rent of $35,000 to Sheridan A.

305.    In reality, neither Jack Owoc nor Sheridan A collected rent from Vital or Quash for their use of the Sheridan A Property.  Likewise, Vital and Quash never paid rent to Jack Owoc or Sheridan A.

306.    Jack Owoc declared rental income on his federal tax returns from the Sheridan A Property in the amount of $2,171,267 for 2021 despite the lack of actual rent payments being paid to Sheridan A during this time period.

307.    In July 2023, Sheridan A and Sheridan C sold the Sheridan A Property and Sheridan C Property (discussed in further detail below) to an unaffiliated third party for a sale price of $59,844,000.

308.    Approximately $51.1 million of the sale proceeds were paid to Truist to reduce the Company's outstanding secured indebtedness.

309.    Jack Owoc received approximately $8 million of the sale proceeds.

310.    From the acquisition date through July 2023, the Company paid for all carrying costs of the Sheridan A Property, including utilities, maintenance costs, and property taxes, and the Company was never required to, nor did, pay any rent.

311.    At the closing of the sale of the Sheridan A Property, the Company (then Debtors in the Chapter 11 Cases) requested payment of $2,191,042.53 (the "Disputed Sheridan Funds") from Sheridan A in connection with postpetition outstanding carrying costs and an insurance

adjustment pursuant to the DIP Order (as defined below), broken down into the following three categories: (i) $653,797.99 for operating expenses; (ii) $666,985.08 for insurance expenses; and (iii) $872,378.06 for property taxes.

312.    Pursuant to the DIP Order, the Debtors were authorized and required to pay all postpetition carrying costs for JHO GA, JHO NV, Sheridan A, and Sheridan C.  The DIP Order also required that, upon any sale of the Lithia Springs Property (as defined below) owned by JHO GA, the Wagon Trail Property (as defined below) owned by JHO NV, the Sheridan A Property owned by Sheridan A, or Sheridan C Property owned by Sheridan C, the Prepetition Agent (as defined below) would deliver or cause to be delivered cash proceeds to reimburse the Debtors for the postpetition carrying costs referenced above.

313.    At the time of the closing, however, Sheridan A and Jack Owoc refused to pay the Disputed Sheridan Funds.

314.    As a result of Jack Owoc's refusal to pay the Disputed Sheridan Funds on behalf of Sheridan A to the Debtors (and then the Liquidating Trust) and facilitate the sale closing, the Debtors agreed to the escrow of the Disputed Sheridan Funds by the escrow agent, First American Title Insurance Company, subject to release from the escrow upon further joint written instructions by Sheridan A and the Debtors.

**B.    The Company's Sheridan B Property.**

315.    In January 2020, Jack Owoc created Sheridan B, of which he is the sole member and 100% membership interest owner, to acquire another commercial property on behalf of the Company.

316.     In 2020, Sheridan B entered into a purchase agreement for the commercial property located at 20351 Sheridan Street, Pembroke Pines, Florida (the "Sheridan B Property") for a purchase price of $40,632,549.

317.     While Sheridan B held legal title to the property, the purchase of the Sheridan B Property was also fully funded with proceeds that the Company received under the Promissory Note in 2019.

318.     On December 15, 2021, Sheridan B sold the Sheridan B Property to an unaffiliated third party for a sale price of $58,250,000 and leased back the Sheridan B Property for a thirty-six (36) month period.  Jack Owoc signed the sale agreement on behalf of Sheridan B, as seller, and on behalf of Vital, as a guarantor to certain of Sheridan B's obligations set forth therein.

319.     Certain of the sale proceeds of the Sheridan B Property were paid to Truist to reduce the Company's outstanding secured indebtedness.

320.     From the acquisition date through December 2021, the Company paid for all carrying costs of the Sheridan B Property, including utilities, maintenance costs, and property taxes, and the Company was never required to nor paid any rent.

321.     The Debtors' books and records do not clearly distinguish between the carrying costs for Sheridan A, Sheridan B, or Sheridan C.

**C.     The Company's Sheridan C Property.**

322.     During the same month that he created Sheridan B, Jack Owoc also created Sheridan C, of which he is the sole member and 100% membership interest owner, to acquire yet another property on behalf of the Company.

323.    In or around March 2020, Sheridan C entered into a purchase agreement for a commercial property located at 20421 Sheridan Street, Pembroke Pines, Florida (the "Sheridan C Property") for a total purchase price of $32,993,286.

324.    While Sheridan C held legal title to the property, the purchase of the Sheridan C Property was fully funded by the Company with the proceeds of another $25,000,000 note payable (the "March 2020 Loan") and an additional $7,500,000 paid by the Company.

325.    As described above, in July 2023, Sheridan C sold the Sheridan C Property to an unaffiliated third party.

326.    From the acquisition date through July 2023, the Company paid for all carrying costs of the Sheridan C Property, including utilities, maintenance costs, and property taxes, and the Company was never required to nor paid any rent.

**D.    The Company's Wagon Trail Property.**

327.    At the same time that Jack Owoc was creating Sheridan B and Sheridan C, on January 7, 2020, Vital entered into a purchase agreement for a commercial property located at 4117 Wagon Trail Avenue, Las Vegas, Nevada 89118 (the "Wagon Trail Property") for a purchase price of $1,230,015.99.

328.    Vital paid the entire purchase price in cash.

329.    On February 27, 2020, Jack Owoc created JHO NV, a new holding company of which he is the sole member and 100% membership interest owner and caused Vital to transfer ownership of the Wagon Trail Property from Vital to JHO NV—even though the Wagon Trail Property was acquired using the Company's funds.

330.    Like the Sheridan A Property, Jack Owoc, as the sole person on both sides of the transaction, caused Quash to enter into a lease agreement, whereby Quash "agreed" to pay monthly

rent of $38,961 to JHO NV, even though the Company paid for all upkeep and maintenance of the Sheridan A Property, including utilities and property taxes.

331.    In reality, neither Jack Owoc nor JHO NV collected rent from Quash for its use of the Wagon Trail Property.  Likewise, Quash never paid rent to Jack Owoc or JHO NV.

332.    Jack Owoc declared rental income on his federal tax returns from the Wagon Trail Property in the amount of $36,612 for 2020 and $43,935 for 2021, despite the lack of actual rent payments being made to JHO NV during this time period.

333.    During the relevant times, the Company paid for all carrying costs of the Wagon Trail Property, including utilities, maintenance costs, and property taxes.

**E.    The Company's Lithia Springs Property.**

334.    The same year as the Company's acquisitions of the Sheridan A Property, Sheridan B Property and Sheridan C Property, Jack Owoc created JHO GA, of which he is the sole member and 100% membership interest owner, to acquire yet another commercial property on behalf of the Company.

335.    In or about September 2020, JHO GA entered into a purchase agreement for the real property located at 7705 Staples Drive, Douglasville, Georgia 30122 (the "Lithia Springs Property") for a purchase price of $41,061,950.

336.    The Company fully funded the purchase of the Lithia Springs Property.

337.    Like the Sheridan A Property and Wagon Trail Property, the Company used the Lithia Springs Property for its operations through early 2023.

338.    Neither Jack Owoc nor JHO GA collected rent from the Company for its use of the Lithia Springs Property.  Likewise, the Company never paid rent to Jack Owoc or JHO GA.

339.    Jack Owoc declared rental income on his federal taxes from the Lithia Springs Property in the amount of $590,370 for 2020 and $3,542,220 for 2021, despite the lack of actual rent payments being paid to JHO GA during this time period.

340.    On March 21, 2023, JHO GA sold the Lithia Springs Property to an unaffiliated third party for a sale price of $87,500,000.

341.    Approximately $71.8 million of the sale proceeds was paid to Truist to reduce the Company's outstanding secured indebtedness.

342.    Jack Owoc received approximately $10 million of the sale proceeds.

343.    From the acquisition date through March 2023, when the property was sold, the Company paid for all carrying costs of the Lithia Springs Property, including utilities, maintenance costs, and property taxes.

344.    Unlike the Sheridan A Property, Jack Owoc signed the closing statement for the Lithia Springs Property sale and agreed to pay the Company $901,378.38 to reimburse the Company for the postpetition carrying costs associated with the Lithia Springs Property in accordance with the unambiguous terms of the DIP Order.

## IX.    THE COMPANY'S PREPETITION CAPITAL STRUCTURE.

345.    In 2020, desperate for liquidity in the face of the massive litigation liabilities incurred at the hands of Jack Owoc, the Company sought financing.

346.    Vital, as borrower, and certain subsidiaries and affiliates of Vital, as guarantors, and the lenders from time to time party thereto (the "Prepetition Secured Lenders"), and Truist, as administrative agent (in such capacity, the "Prepetition Agent"), swingline lender (in such capacity, the "Prepetition Swingline Lender"), and issuing bank (in such capacity, the "Prepetition Issuing Bank" and, together with the Prepetition Secured Lenders, the Prepetition Agent, and the Prepetition Swingline Lender, the "Prepetition Secured Parties") were parties to the *Amended and*

*Restated Revolving Credit and Term Loan Agreement*, dated as of August 12, 2020 (as amended by five amendments thereto, dated as of June 15, 2021, June 30, 2021, December 31, 2021, June 30, 2022, and August 8, 2022, and as further modified, amended, or supplemented from time to time, the "Prepetition Credit Agreement").

347.    The Prepetition Credit Agreement provided for two separate credit facilities, each maturing August 14, 2025: (i) a revolving credit facility (the "Prepetition Revolving Credit Facility"); and (ii) a term loan (the "Prepetition Term Loan Facility," and together with the Prepetition Revolving Credit Facility, the "Prepetition Loans").

348.    In connection with the Prepetition Credit Agreement, the parties executed the *Amended and Restated Security and Pledge Agreement*, dated as of August 14, 2020 (as amended, supplemented, or otherwise modified from time to time, the "Prepetition Security Agreement"). Under the Prepetition Security Agreement, the Prepetition Loans were secured by first-priority liens on certain collateral (as defined therein, the "Prepetition Collateral").

349.    In connection with the Company's acquisition of the Sheridan A Property, Sheridan B Property, Sheridan C Property, Wagon Trail Property, and Lithia Springs Property, each of the Commercial LLCs guaranteed certain extensions of credit provided to Vital under the Prepetition Credit Agreement through one or more amendments thereto and pledged its respective commercial real property to secure the Prepetition Loans.

350.    By March 2022, the Company's perilous financial condition resulted in a default under the Prepetition Credit Agreement for, among other things, failure to satisfy certain financial covenants.

X.        **THE DEBTORS' CHAPTER 11 CASES.**

351.    In April 2022, Jack Owoc, on behalf of the Company, engaged an investment banker, Rothschild & Co US Inc. ("Rothschild"), to commence a financing process in pursuit of a capital raise transaction or other alternative transaction.

352.    In the months leading up to the Chapter 11 Cases, Jack Owoc approved a number of changes to the Debtors' corporate governance including the appointment of John C. DiDonato ("DiDonato") of Huron Consulting Services LLC ("Huron") as the Debtors' Chief Transformation Officer.

353.    On October 10, 2022, the Debtors each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Florida (the "Court"), commencing the Chapter 11 Cases.

354.    Following the bankruptcy filing, Jack Owoc could no longer rule the Debtors by fiat.    While Jack Owoc was the sole Board member or managing member, as applicable, of each of the Debtor entities prior to the Petition Date, the Debtors were required to immediately implement changes to their corporate governance structure as a condition to obtain up to $355 million of debtor-in-possession financing (the "DIP Financing") from certain lenders (the "DIP Lenders") pursuant to the terms and conditions of the *Superpriority Secured Debtor-in-Possession Credit Agreement* (the "DIP Credit Agreement").

355.    As required by the DIP Credit Agreement, Jack Owoc expanded the size of the board of directors or managers of each of the Debtor entities (as applicable, the "Board") to include five directors, consisting of: (a) two Company executives, Jack Owoc and Kathleen Cole ("Cole"), who also served as the Company's Chief Operating Officer; (b) two purportedly independent members, Dr. Guillermo Escalante and Eric Hillman; and (c) Steve Panagos ("Panagos"), a restructuring advisor who also served as the sole member of the Debtors' restructuring committee.

# XI.    JACK OWOC'S MISMANAGEMENT CONTINUED POST BANKRUPTCY FILING.

356.    Less than one month after the Petition Date, Jack Owoc continued his pattern of destructive behavior by acting unilaterally (and in contravention of the Debtors' best interests) and continuing to use the Debtors' resources for his own personal gain.

## A.    The Refusal to Cede Control of the Debtors.

357.    Prior to the Court's final approval of the DIP Credit Agreement, on December 1, 2022, Cole resigned from the Company as the Debtors' Chief Operating Officer and Board member as a result of Jack Owoc's directives that jeopardized her ability to maintain her fiduciary duties to the Debtors and their creditors.

358.    On December 15, 2022, the DIP Lenders and the Official Committee of Unsecured Creditors (the "Committee") approved Bob Dickinson's ("Dickinson") appointment to the Board to replace Cole, as Dickinson's service as a Board member was essential to securing the DIP Financing on a final basis.

359.    That same day, just hours after the DIP Lenders and the Committee approved Dickinson's appointment, Jack Owoc unilaterally purported to fire Dickinson from the Board without any justification or authority from the Board.

360.    In the wake of Cole's resignation and Jack Owoc's purported termination of Dickinson, the DIP Lenders required assurances that Jack Owoc would not attempt to challenge the Board's authority in connection with obtaining approval of the DIP Financing on a final basis. As a result, the Court's Order [Dkt. 638] (the "DIP Order"), providing final approval of the DIP Financing, required that:

> Each Debtor's board of directors or managers (or other equivalent governing body) shall at all times: (i) be composed of five (5) individuals at least three (3) of whom (A) do not have a relationship by blood (to the second (2nd) degree of consanguinity), marriage or

adoption to John Henry Owoc, (B) are not employees, officers, managers or consultants of, or independent contractors or advisors to, any Debtor (other than in respect of service on such board or other equivalent governing body) and (C) are otherwise acceptable to the Creditors' Committee and the Required DIP Lenders (including, without limitation, in respect of independence and restructuring experience), it being understood that Bob Dickinson, Stephen S. Gray and Steven G. Panagos are acceptable to the Creditors' Committee and the Required DIP Lenders; and (ii) include a restructuring committee (the "Restructuring Committee") composed solely of one (1) individual reasonably acceptable to the Creditors' Committee and the Required DIP Lenders, it being understood that Steven G. Panagos is reasonably acceptable to the Creditors' Committee and the Required DIP Lenders; provided, that, upon the death, incapacity or resignation (but, for the avoidance of doubt, not the removal) of any individual serving on the board of directors or managers (or equivalent governing body) of any Debtor or serving on the Restructuring Committee, there shall not occur a breach of this paragraph 62(b) if a replacement therefor that satisfies the criteria set forth in this paragraph 62(b)(i) or (ii) case may be, shall have been appointed within seven (7) days after such death, incapacity or resignation, and, upon such appointment, such replacement is vested with the same scope of authority held by his or her predecessor. For the avoidance of doubt, as of the First Amendment Effective Date, the Debtors' boards of directors or managers (or equivalent body) shall be composed of John H. Owoc, as Chairman of the Board, Eric Hillman, Bob Dickinson, Stephen S. Gray and Steven G. Panagos.

DIP Order at 68–69 (emphasis added).

361.    Among other changes, the by-laws, operating agreements, and certain other organizational documents for each of the Debtors were also amended to provide that the Debtors' directors and managers, as applicable, could only be removed by a majority vote of the Board.

362.    Notwithstanding, Jack Owoc continued to breach his fiduciary duties by acting unilaterally, without authority from the Board and against the Debtors' and their estates' best interests.

363.    Jack Owoc's misconduct required the time and attention of the Debtors' employees, Board members, and the professionals employed by the Debtors, DIP Lenders, and the Committee,

which, in addition to materially increasing the costs of the Chapter 11 Cases, diverted their respective attention away from performing their duties and responsibilities in connection with the Chapter 11 Cases.

364.    Between December 2022 and January 2023, even after Jack Owoc was made aware that all issues regarding the Debtors' retained professionals needed to be handled by the Board, Jack Owoc threatened to fire and/or purported to fire certain of the Debtors' retained professionals, including Huron, Rothschild, and Latham & Watkins LLP, without Board approval on multiple occasions.

365.    When Jack Owoc was unsuccessful in terminating certain professionals, he tried to hamstring the retained professionals' ability to work efficiently by demanding that certain members of their respective teams be removed from the Debtors' engagement.

366.    For example, as a direct result of Jack Owoc's instruction that the Huron team not receive certain information, including information in connection with cash disbursements, the Debtors inadvertently processed over $200,000 in excess of the Court-approved payments under the Court's Order [Dkt. 108] authorizing the Debtors to maintain and administer customer programs.

367.    Likewise, on January 24, 2023, Jack Owoc purported to fire DiDonato, the Company's Chief Transformation Officer, for the second time, and the Huron team who was providing DiDonato support in that role with the Company without any justification or authority from the Board.

368.    If any of Jack Owoc's attempted firings had been valid, it would have resulted in an immediate default under the DIP Credit Agreement.

## B.    Jack Owoc's Social Media-Related Misconduct.

369.    Jack Owoc's reckless postpetition use of the Debtors' social media accounts exposed the Debtors to potential liability on multiple occasions and needlessly commanded the time and resources of the Board and the Debtors' retained professionals.

370.    For example, on or about November 4, 2022, not even one month into the Chapter 11 Cases, and within two months of the jury verdict determining that Jack Owoc willfully and deliberately falsely advertised "Super Creatine," Jack Owoc posted a long video to the Debtors' various social media accounts titled "Bang Energy & Super Creatine:  All You Need to Know."

371.    Jack Owoc's video was exactly how it sounds—Jack Owoc preaching to the Debtors' audience about "Super Creatine" and its purported benefits to further deceive the public to the detriment of the Debtors.  The video post remained on the Debtors' @bangenergy.ceo Instagram account for months and was only removed after the Board demanded its removal.

372.    On another occasion during the pendency of the Chapter 11 Cases, Jack Owoc posted to the Debtors' @bangenergy.ceo Instagram account and announced that "Bang is currently working to launch an IPO" and solicited investments in the Debtors.  The Board and Debtors' counsel advised Jack Owoc on multiple occasions to take down the post given the severe consequences under securities laws of the United States of making such false statements.  Jack Owoc declined to comply with advice of Debtors' counsel, and he told the Board that there was an initial public offering underway.

373.    Jack Owoc only modified the Instagram post to remove the blatantly false language after the Debtors' advisors repeatedly confronted and advised him that such misleading statements by the CEO of a company risked costly investigation and potential liability.

C.    **Jack Owoc's Unauthorized Postpetition Misappropriation of the Debtors' Assets.**

374.    Jack Owoc also acted against the best interests of the Debtors by directing the Debtors' employees to file, and who have filed, applications for intellectual property rights to be vested in Jack Owoc's solely-owned non-Debtor entities, despite the Debtors' Employee Handbook's clear mandate that such intellectual property was "work made for hire" and belonged to the Debtors.

375.    For example, on or about November 9, 2022, the Debtors' employees, at Jack Owoc's direction, applied for certain rights in the "Fuel Your Destiny" mark that was at that time used by the Debtors in connection with the Bang Drink to, among other things, replace the "Super Creatine" marking on the label.

376.    The application filed with the United States Patent and Trademark Office (the "USPTO") at Jack Owoc's direction identified Fun Energy, LLC ("Fun Energy"), a non-Debtor entity wholly owned by Jack Owoc, as the owner of that mark.

377.    Jack Owoc's actions in connection with the improper registration and purported transfer of the Debtors' intellectual property to Fun Energy were in direct violation of the Debtors' Employee Handbook and in breach of his fiduciary duties.  In addition, Jack Owoc's purported transfer of the Debtors' intellectual property to a non-Debtor entity was an attempted improper and unauthorized postpetition transfer of an estate asset that additionally risked interference with the ongoing sale process.

378.    By way of another example, on or about January 26, 2023—the day before the Debtors filed their motion to establish procedures for selling substantially all of the Debtors' assets—the Debtors' general counsel executed a *Consent to Register* (the "Consent Agreement") on behalf of Debtor JHO IP and Entourage pursuant to Jack Owoc's instructions.

379.     The Consent Agreement provided JHO IP's purported consent for Entourage to use and register the mark "B" logo, despite the Debtors' registration for what the USPTO had previously stated was "the same stylized B."  Jack Owoc's actions resulting in the purported transfer of the Debtors' intellectual property rights were without Board approval or Court authorization and risked diluting the value of the Debtors' intellectual property assets, which were a key component of the sale process.

380.     On January 26, 2023, the Board sent a letter to Jack Owoc (the "January 26 Letter"), demanding that any and all intellectual property related to the Debtors and its products or business and developed by the Debtors and its employees, including by Jack Owoc, be immediately transferred back to a Debtor entity.  Jack Owoc did not comply with the Board's demands, and, as a result, the Debtors were given no option but to seek recovery of the improperly registered intellectual property through an adversary complaint against Jack Owoc and Entourage that remains pending [Adv. Pro. No. 23-01125].

**D.     Countless Other Reckless Actions Committed by Jack Owoc.**

381.     In addition to the above-referenced postpetition misconduct, Jack Owoc continuously drained the estates' limited resources.

382.     Even after advice from counsel and a Board directive to the contrary, Jack Owoc directed that in-house legal personnel continue to represent him in his personal legal matters.

383.     The Board authorized, and the Court approved, only one sale process in the Chapter 11 Cases, which was being overseen by the Board and run by Rothschild.  Jack Owoc was advised by the Debtors' professionals that running a separate additional sale process was a violation of the Company's exclusive engagement with Rothschild and not authorized by the Board and the Court.

384.    Nevertheless, during the Court-approved sale process, Jack Owoc made public statements alluding to an ongoing "parallel process" Jack Owoc and others were purportedly running separate and apart from the financing and sale process being overseen by the Board and run by the Debtors' retained and Court-approved professionals, including Rothschild.

385.    Jack Owoc made representations to the Board during meetings of the Board and Restructuring Committee held on January 20 and 24, 2023 that there was no such parallel process, yet he continued to publicly communicate that there was indeed some "parallel process" underway and that he was running it.

386.    For example, on January 25, 2023, Jack Owoc sent an email stating "I am running a parallel process."  Jack Owoc was either running an unauthorized parallel sale process or was making false allegations that were disruptive, confusing to the market and potential bidders, and value-destructive.

387.    Also in connection with the Debtors' sales process, Jack Owoc unilaterally hired Kroll, LLC ("Kroll") to prepare a valuation of the Debtors, without the required Board authorization, which Kroll subsequently retracted after being made aware that such request for a valuation was unauthorized by the Debtors.

388.    On March 5, 2023, Jack Owoc also sent an email (the "March 5 Email") to three members of the Board, including Panagos, Gray, and Dickinson, purporting to terminate them from the Board and demanding that they cease all communications with the Debtors' employees and anyone else involved in the sales process.

389.    The purported terminations in the March 5 Email were not authorized by the Board and in violation of this Court's DIP Order and, had they been valid terminations, would have constituted an immediate default under the DIP Credit Agreement.

390.    In addition, despite advice of Debtors' counsel to the contrary, Jack Owoc continually included his personal counsel at the time, Paul Battista, Esq. ("Battista"), on privileged Company emails and invited Battista to meetings of the Board and Restructuring Committee without any approval.  This conduct, among other things, exposed the Debtors to claims that the Company's privilege may have been waived.

391.    All of Jack Owoc's aforementioned misconduct needlessly increased professional fees incurred by the estates, including those incurred by professionals retained by the Debtors, Committee, and DIP Lenders.

## XII.    THE BOARD WAS FORCED TO TERMINATE JACK OWOC AND MEGAN OWOC IN ORDER TO PROTECT THE COMPANY.

392.    On March 9, 2023, the Board voted to terminate Jack Owoc's and Megan Owoc's employment with the Company and voted to remove Jack Owoc from the Board for cause.

393.    Following Jack Owoc's termination, DiDonato of Huron, who had been serving as the Debtors' Chief Transformation Officer, was appointed by the Board as the Debtors' Interim CEO.

## XIII.    THE OWOC CLAIMS IN THE CHAPTER 11 CASES.

394.    The Debtors scheduled general unsecured claims for each of the Commercial LLCs are as follows:

(a)    Quash scheduled JHO GA in the amount of $517,370.00;

(b)    Vital scheduled JHO NV in the amount of $495,864.08;

(c)    Vital scheduled Sheridan A in the amount of $528,775.72;

(d)    Vital scheduled Sheridan B in the amount of $3,219.61; and

(e)    Vital scheduled Sheridan C in the amount of $111,944.85 (collectively, the "Scheduled Claims").

395.    On October 14, 2022, the Court entered an Order [Case No. 22-17842, Dkt. 114] that established December 19, 2022 as the deadline for creditors to file proofs of claim against the Debtors for claims that arose prior to the Petition Date (the "Bar Date").

396.    On December 19, 2022, Jack Owoc filed proofs of claim, in his individual capacity, against each of the Debtors for general unsecured claims in unspecified amounts [Claim Nos. 639, 653, 654, 655, 656, 657, and 664] (collectively, the "Original Owoc Claims"), which each affixed an identical *Attachment to Proof of Claim for John H. Owoc* (the "Attachment").

397.    Each of the Original Owoc Claims lists "John H. Owoc" as the creditor and is signed by Jack Owoc.

398.    On December 19, 2022, Jack Owoc filed a proof of claim, in his individual capacity, against Debtor Bang Canada in an unliquidated amount [Claim No. 663] (the "Owoc Unliquidated Claim") and attached the exact same Attachment as was included with the Original Owoc Claims.

399.    The Attachment sets forth Jack Owoc's purported individual claims relating to: (i) indemnification, contribution, and reimbursement in connection with seven prepetition litigations; (ii) the reasonable value for the Company's alleged use of Jack Owoc's home; (iii) certain amounts in connection with Jack Owoc's income taxes; and (iv) proceeds in connection with the sale or liquidation of assets belonging to Jack and/or any of Jack Owoc's non-Debtor solely-owned entities.

400.    Notably, the Original Owoc Claims, the Owoc Unliquidated Claim, and the Attachment failed to mention any of the Commercial LLCs or any of those entities' purported claims.

401.    Almost seven months after the Bar Date, on July 12, 2023, Jack Owoc filed proofs of claim amending the Original Owoc Claims [Claim Nos. 767, 768, 769, 770, 771, and 772] (collectively, the "Late Claims").

402.    The Late Claims were not timely filed and improperly purport to be filed by "John H. Owoc on behalf of himself and his wholly owned subsidiaries."

403.    The Late Claims list each of the Commercial LLCs and "JHO Real Estate LLC" [4] as the creditor.

404.    Each of the Late Claims asserts, for the first time, a secured claim in the amount of $163,424,411.61.

405.    The Late Claims also each affix an *Addendum in Support of Amended Proof of Claim of John H. Owoc on Behalf of Himself and His Wholly-Owned Entities JHO GA-1 Investment, LLC, JHO NV-1 Investment, LLC, Sheridan Real Estate Investment A, LLC, Sheridan Real Estate Investment B, LLC, Sheridan Real Estate Investment C, LLC, and JHO Real Estate, LLC* (the "Addendum").

406.    Pursuant to the Addendum, Jack Owoc, on behalf of himself, each of the Commercial LLCs, and "JHO Real Estate LLC," asserts the same claims on behalf of Jack Owoc that were contained in the Original Owoc Claims and improperly adds the following alleged claims for the first time (the "Commercial LLCs' Claims"):

(a)    Sheridan B's claims under section 502(e)(1) of the Bankruptcy Code and principles of equitable reimbursement under Florida law; and

(b)    subrogation claims for the Commercial LLCs to the extent any of their real properties were sold and proceeds used to pay Truist, including JHO GA, Sheridan A, Sheridan C, and JHO NV's claims under section 509(a) of the Bankruptcy Code and equitable subrogation under Florida Law.

---

[4] "JHO Real Estate LLC" does not appear in the Debtors' books and records and does not otherwise exist as a legal entity.

407.    None of the Commercial LLCs' Claims relate back to the Original Owoc Claims.

408.    However, two of the Late Claims tack on even more ludicrous requests.

409.    In addition to the Commercial LLCs' Claims, the Late Claim against Vital [Claim No. 767] (the "First Rent-Related Claim") also asserts that Jack Owoc, on behalf of himself, Sheridan A, and "JHO Real Estate LLC," has claims for the following: (i) an administrative priority claim in the amount of $4,973,345.65 for postpetition unpaid rent (the "Postpetition Rent"); and (ii) $23,672,008.29 for prepetition unpaid rent (the "Prepetition Rent").

410.    The Late Claim against Quash [Claim No. 770] (the "Second Rent-Related Claim," and together with the First Rent-Related Claim, the "Rent-Related Claims") asserts that Jack Owoc, on behalf of himself and Sheridan A, has claims for (i) postpetition unpaid rent in the amount of $310,756.85 that was included as part of the Postpetition Rent in the First Rent-Related Claim, and (ii) prepetition unpaid rent in the amount of $744,493.15 that was included as part of the Prepetition Rent in the First Rent-Related Claim.

411.    Jack Owoc has not established that there is any basis for the Debtors to pay him, Sheridan A, or "JHO Real Estate LLC" for any unpaid rent.

412.    At the time the Rent-Related Claims were filed, which in part assert administrative claims for the Postpetition Rent, no administrative claim bar date had been established, so the proper means to assert a claim for unpaid postpetition rent would have been through filing of a motion for payment of an administrative expense claim.

413.    The Rent-Related Claims were based in part on alleged unpaid rent in connection with the Debtors' property located at 1635 S. 43rd Avenue, Phoenix, Arizona 85009 (the "AZ Property").

414.     Neither Jack Owoc nor "JHO Real Estate LLC" are entitled to pre or postpetition rent for the AZ Property because the AZ Property is owned by Debtor JHO Real Estate Investment LLC and is property of the estates.  If an intercompany claim was owed, only an individual with authority to bind one of the Debtors could have filed such claim, and Jack Owoc had already been terminated by the Board at the time the claim was filed.

415.     Plaintiff disputes the claim amounts, the allegations of secured, administrative, and/or priority status alleged by Jack Owoc in the Late Claims, and any purported right to payment on account of any of the claims.

416.     Jack Owoc has also not established that the alleged use of his Southwest Ranches home was for the Company's benefit.  If anything, his insistence on using his home for corporate purposes was for his own benefit, as he often refused to leave his home and actually travel to the corporate headquarters.

417.     In fact, Jack Owoc rarely showed up to the Company's offices at all and regularly demanded business meetings at his home, telling employees, "the king doesn't come to you.  You come to the king."

418.     In addition, Jack Owoc has not established that there is any basis for the Company to pay for his obligations related to income taxes.  No agreement exists, or ever existed, requiring the Company to pay for Jack Owoc's personal tax liabilities.

419.     Moreover, the assets held by the Commercial LLCs were paid for by the Company at Jack Owoc's direction.

420.     At Jack Owoc's direction, the Sheridan A Property and Wagon Trail Property were transferred from the Company to the respective Commercial LLCs for no consideration.

421.     Similarly, Jack Owoc caused Sheridan B, Sheridan C, and JHO GA to receive and hold legal title to the Sheridan B Property, Sheridan C Property, and Lithia Springs Property, respectively, despite the fact that the Company's funds and/or financing was used to acquire the properties.  The Company received no consideration in connection with the acquisition of these properties.

422.     Further, neither Jack Owoc nor the Commercial LLCs are entitled to any sale proceeds in connection with the sale of any of the Commercial LLCs' assets.

423.     In addition, Jack Owoc has not provided any documents establishing a right of payment in connection with the Unliquidated Owoc Claim.

424.     Finally, Jack Owoc did not act in good faith and knowingly acted contrary to the best interests of the Company in connection with the litigations—products of his own misconduct for which he seeks indemnification, contribution, and reimbursement.

## XIV.     SHERIDAN A'S ADMINISTRATIVE CLAIM.

425.     On October 13, 2023, Jack Owoc and Sheridan A filed an application [Dkt. 1998] (the "Sheridan Application") for an administrative expense claim in the aggregate amount of $2,665,702.17 [Claim No. 885] (the "Asserted Admin Claim"), pursuant to sections 365(d)(3) and 503(b)(1)(A) of the Bankruptcy Code.

426.     The Postpetition Rent, asserted as an administrative priority claim in the First Rent-Related Claim, includes all of the same amounts asserted in the Asserted Admin Claim.

427.     The Sheridan Application alleges that Vital and Quash have used and occupied the Sheridan A Property postpetition without paying rent to Sheridan A and asserts a total obligation in the amount of $1,915,137.93.

428.     The amounts sought in the Sheridan Application overlap with the amounts asserted in the Rent-Related Claims.

429. The Sheridan Application further alleges that the Debtors are obligated to reimburse Sheridan A for payment of postpetition real estate taxes due on the Sheridan A Property in the amount of $410,075.40.

430. According to the Sheridan Application, on January 1, 2021, Jack Owoc, as sole shareholder of both Sheridan A and Quash, caused both entities to enter into a lease with Sheridan A as the landlord and Quash as the tenant.

431. Jack Owoc executed the Sheridan A lease on behalf Sheridan A and Quash.

432. No documented agreement between Vital and Sheridan A exists in connection with Vital's use of the Sheridan A Property.

433. Monthly rent payments in connection with Vital's and Quash's use of the Sheridan A Property were never paid.

434. Likewise, monthly rent payments in connection with Vital's and Quash's use of the Sheridan A Property were never collected by Sheridan A or Jack Owoc.

435. Jack Owoc does not have standing to bring the Asserted Admin Claim, as he is neither party to the Sheridan A lease nor does he individually own the Sheridan A Property.

436. As set forth above, the Debtors paid all pre and postpetition carrying costs of the Sheridan A Property. Pursuant to the DIP Order, the sale proceeds of the Sheridan A Property were to be used to reimburse the Debtors for all postpetition carrying costs and expenses, not to provide Jack Owoc a windfall.

437. The Disputed Sheridan Funds remain in escrow.

## COUNT ONE

### BREACH OF FIDUCIARY DUTY

*(Against Jack Owoc – Issuance of "Distributions" and Misappropriation of Company Assets and Employees)*

438.    Plaintiff repeats and realleges each of the allegations set forth in Paragraphs 70-74, 159-184, and 194-282 above as if fully set forth herein.

439.    At all times relevant hereto, Jack Owoc was the CEO and sole board/managing member of each of the Debtors.

440.    When a corporation or limited liability company is insolvent, its officers and directors owe fiduciary duties to the corporation and its creditors.  The Debtors were insolvent at all times material hereto.

441.    As such, in his capacity as an officer and sole board/managing member of each of the Debtors, Jack Owoc owed the Debtors and their creditors fiduciary duties, including the duties of care, loyalty, and good faith.

442.    As an officer and the sole board/managing member, Jack Owoc had an obligation to discharge his duties in good faith with the care an ordinarily prudent officer in a like position would exercise and in a manner reasonably believed to be in the best interests of the Debtors and their creditors and to consider all material information reasonably available in making business decisions.

443.    Jack Owoc exercised a conscious, grossly negligent, and/or reckless disregard for the best interests of the Debtors and their creditors by placing his own financial interests above the interests of the Debtors and their creditors by causing, authorizing, and/or allowing the Debtors to transfer millions of dollars to third parties, including himself and his family members— characterized in the Debtors' books and records as "distributions" to Jack Owoc, at a time when the Debtors were insolvent.

444. From October 2018 to the Petition Date, Jack Owoc directed the Company to transfer at least $37.9 million to third parties to fund the Owoc Real Estate Enterprise and characterize the transfers as "distributions."

445. From October 2017 to the Petition Date, Jack Owoc also directed the Company to make the Jack Owoc Transfers, totaling at least $30 million—money that was funneled from the Company for his personal use, unrelated to the Owoc Real Estate Enterprise, including to renovate his personal residence, fund his personal bank account, and other miscellaneous personal and household expenses, in the form of "distributions."

446. Between 2017 and 2022, Jack Owoc caused the Company to transfer at least $47 million to the IRS in connection with Jack Owoc's personal tax liabilities, in the form of "distributions."

447. Jack Owoc's actions in directing the purported "distributions" were contrary to the best interests of the Debtors and their creditors and were neither intended to confer, nor conferred, any benefit upon the Debtors.

448. In addition to funneling money out of the Debtors, Jack Owoc also utilized the Company's employees for personal purposes wholly unrelated to the Debtors' businesses, including in furtherance of the Owoc Real Estate Enterprise, his personal tax plannings, and maintenance of his and Megan Owoc's personal finances.

449. As a direct and proximate result of Jack Owoc's breach of his fiduciary duties of care, loyalty, and good faith, the Debtors have suffered millions of dollars in damages in the form of (i) transfers to, or for the benefit of, himself, his family members, and third parties, and (ii) diverting the Debtors' employees for his own personal use.

<u>**COUNT TWO**</u>

**BREACH OF FIDUCIARY DUTY**

*(Against Jack Owoc – Post-Petition Misconduct Causing Harm to the Debtors' Estates)*

450.    Plaintiff repeats and realleges each of the allegations set forth in Paragraphs 70-74, 159-184, and 356-393 above as if fully set forth herein.

451.    At all times relevant hereto, Jack Owoc was the CEO and sole board/managing member of each of the Debtors.

452.    When a corporation or limited liability company is insolvent, its officers and directors owe fiduciary duties to the corporation and its creditors.  The Debtors were insolvent at all times material hereto.

453.    As such, in his capacity as an officer and sole board/managing member of each of the Debtors, Jack Owoc owed the Debtors and their creditors fiduciary duties, including the duties of care, loyalty, and good faith.

454.    As an officer and the sole board/managing member, Jack Owoc had an obligation to discharge his duties in good faith with the care an ordinarily prudent officer in a like position would exercise and in a manner reasonably believed to be in the best interests of the Debtors and their creditors.

455.    Between the Petition Date and March 9, 2023—when the Board was forced to terminate Jack Owoc for cause—Jack Owoc engaged in an ongoing and repeated pattern of misconduct during the course of the Chapter 11 Cases, which resulted in him breaching his fiduciary duties to the Debtors by:

> (a)    unilaterally purporting to fire various Board members without any justification or authority from the Board, which if valid, would have constituted an immediate default under the DIP Credit Agreement;

(b)  barring certain key managerial employees of the Debtors from engaging with Huron and frustrating Huron's ability to perform the services for which they were retained in the Chapter 11 Cases;

(c)  unliterally purporting to fire DiDonato and Huron without any justification or authority from the Board;

(d)  flouting the judgment in the Monster Lawsuit by posting a video regarding Super Creatine on the Debtors' social media accounts that could have resulted in material administrative claims against the Debtors;

(e)  falsely representing that the Debtors were working to launch an IPO and exposing the Debtors to a potential violation of federal securities laws;

(f)  directing in-house legal personnel to continue to represent him in his personal legal matters against the advice of Debtors' professionals and Board's directives;

(g)  including Battista, his personal legal counsel, on privileged Company emails, inviting Battista to meetings of the Board and Restructuring Committee without prior approval, and consequently exposing the Debtors to potential waiver of their corporate attorney-client and work-product privileges; and

(h)  hiring Kroll to prepare a valuation of the Debtors that was subsequently withdrawn due to a lack of Board authorization.

456.    As a direct and proximate result of Jack Owoc's breach of his fiduciary duties of care, loyalty, and good faith, the Debtors have suffered, among other harms, millions of dollars in damages stemming from needlessly increased professional fees incurred by the estates during the Chapter 11 Cases, including those incurred by the professionals retained by the Debtors, Committee, and the DIP Lenders.

## COUNT THREE

## BREACH OF FIDUCIARY DUTY

### *(Against Jack Owoc – Conduct Giving Rise to the False Advertising Judgment)*

457.    Plaintiff repeats and realleges each of the allegations set forth in Paragraphs 70-74 and 83-184 above as if fully set forth herein.

458.    At all times relevant hereto, Jack Owoc was the CEO and sole board/managing member of the Debtors.

459.    When a corporation or limited liability company is insolvent, its officers and directors owe fiduciary duties to the corporation and its creditors.  The Debtors were insolvent at all times material hereto.

460.    As such, in his capacity as an officer and sole board/managing member of each of the Debtors, Jack Owoc owed the Debtors and their creditors fiduciary duties, including the duties of care, loyalty, and good faith.

461.    As an officer and sole board/managing member, Jack Owoc had an obligation to discharge his duties in good faith with the care an ordinarily prudent officer in a like position would exercise and in a manner reasonably believed to be in the best interests of the Debtors and their creditors and to consider all material information reasonably available in making business decisions.

462.    As the Debtors' CEO, "Chief Science Officer," and  sole board/managing member, Jack Owoc had complete and total control over the Company's marketing decisions prior to the Petition Date.

463.    Jack Owoc exercised a conscious, grossly negligent, and/or reckless disregard for the best interests of the Debtors and their creditors by perpetuating the Super Creatine Scheme through advertising the Company's flagship Bang products as containing "Super Creatine."

464.    The Super Creatine Scheme, a fraud perpetuated by Jack Owoc in violation of his fiduciary duties to the Company, was thwarted by the OBI/Monster Arbitration and the Monster Lawsuit, which resulted in over $400 million in judgments and settlement obligations against the Company.

465.    Prior to those lawsuits, the Super Creatine Scheme permitted the Company to stay in business longer than it otherwise would have by fraudulently boosting the Company's sales.

466.    The Super Creatine Scheme caused harm to the Debtors' creditors by permitting the Company to stay in business longer and deepening its insolvency, when it would have been in the best interest of the creditors for the Company to rebrand the Company's Bang-marked products or cease business and liquidate before the Super Creatine Scheme was unveiled.

467.    As a direct and proximate result of Jack Owoc's breach of his fiduciary duties of care and good faith, the Debtors have suffered over $300 million in damages as a result of the False Advertising Judgment.

468.    As a result of these breaches of fiduciary duty, Jack Owoc should be solely and wholly responsible for the False Advertising Judgment.

## COUNT FOUR
## BREACH OF FIDUCIARY DUTY
### *(Against Jack Owoc – Conduct Giving Rise to the OBI/Monster Judgment)*

469.    Plaintiff repeats and realleges each of the allegations set forth in paragraphs 70–74, and 83-184 above as if fully set forth herein.

470.    At all times relevant hereto, Jack Owoc was the sole board/managing member of each of the Debtors.

471.    When a corporation or limited liability company is insolvent, its officers and directors owe fiduciary duties to the corporation and its creditors.  The Debtors were insolvent at all times material hereto.

472.    As such, in his capacity as an officer and sole board/managing member of each of the Debtors, Jack Owoc owed the Debtors and their creditors fiduciary duties, including the duties of care, loyalty, and good faith.

473.    As an officer and board/managing member, Jack Owoc had an obligation to discharge his duties in good faith with the care an ordinarily prudent officer in a like position

would exercise and in a manner reasonably believed to be in the best interests of the Debtors and their creditors and to consider all material information reasonably available in making business decisions.

474.    Pursuant to the 2010 Settlement Agreement, the Debtors agreed to the Creatine-Based Production Restriction and Location Restriction.

475.    As the Debtors' CEO, sole board managing/member, and sole decision-maker, Jack Owoc was responsible for ensuring the Company's compliance with the 2010 Settlement Agreement.

476.    Yet, Jack Owoc did nothing to ensure the Company's compliance with the restrictions.  Indeed, Jack Owoc (and therefore the Company) did not communicate the marketing and sales restrictions to the Company's employees, distributors, or retailers, which resulted in the violations of the 2010 Settlement Agreement.

477.    Further, despite receiving cease-and-desist letters from OBI in 2019 regarding the violations of the 2010 Settlement Agreement, Jack Owoc did nothing to change the Company's course of conduct and continued selling Bang products in the general beverage section of retail stores in violation of the 2010 Settlement Agreement.

478.    Jack Owoc exercised a conscious, grossly negligent, and/or reckless disregard for the best interests of the Debtors and their creditors by refusing to comply with the Creatine-Based Product Restriction and Location Restriction included in the 2010 Settlement Agreement.

479.    As a direct and proximate result of Jack Owoc's breach of his fiduciary duties of care and good faith, the Debtors suffered millions of dollars in damages, and had the OBI/Monster Judgment issued against them which provided for $175 million in disgorgement of profits, $9.3

million in fees and costs, and a perpetual royalty to OBI/Monster at the rate of 5% of the Company's net sales.

480.    As a result of these breaches of fiduciary duty, Jack Owoc should be held solely and wholly responsible for the full amount of the OBI/Monster Judgment.

## COUNT FIVE
## BREACH OF FIDUCIARY DUTY
### *(Against Jack Owoc – Conduct Giving Rise to Breach of Pepsi Distribution Agreement)*

481.    Plaintiff repeats and realleges each of the allegations set forth in Paragraphs 70–74 and 151–184 above as if fully set forth herein.

482.    At all times relevant hereto, Jack Owoc was the CEO and sole board/managing member of each of the Debtors.

483.    When a corporation or limited liability company is insolvent, its officers and directors owe fiduciary duties to the corporation and its creditors.  The Debtors were insolvent at all times material hereto.

484.    As such, in his capacity as an officer and sole board/managing member of each of the Debtors, Jack Owoc owed the Debtors and their creditors fiduciary duties, including the duties of care and good faith.

485.    As an officer and sole board/managing member, Jack Owoc had an obligation to discharge his duties in good faith with the care an ordinarily prudent officer in a like position would exercise and in a manner reasonably believed to be in the best interests of the Debtors and their creditors and to consider all material information reasonably available in making business decisions.

486.    As the Debtors' CEO and sole board/managing member, Jack Owoc had sole and exclusive authority to enter into contracts on behalf of the Debtors.

487.    In April 2020, Jack Owoc exercised that authority by entering into the Pepsi Distribution Agreement—an exclusive distribution arrangement which was intended to last a minimum of three years.  Yet, merely six months letter, Jack Owoc arbitrarily and unilaterally terminated the Pepsi Distribution Agreement, which resulted in the Pepsi Litigation.

488.    Jack Owoc exercised a conscious, grossly negligent, and/or reckless disregard for the best interests of the Debtors and their creditors by terminating the Pepsi Distribution Agreement arbitrarily and without good cause.

489.    As a direct and proximate result of Jack Owoc's breach of his fiduciary duties of care and good faith, the Debtors have suffered millions of dollars in damages and agreed to pay Pepsi $115 million.

490.    As a result of these breaches of fiduciary duty, Jack Owoc should be held solely and wholly responsible for the $115 million due to Pepsi.

<u>**COUNT SIX**</u>

**BREACH OF FIDUCIARY DUTY**

***(Against Jack Owoc – Corporate Waste)***

491.    Plaintiff repeats and realleges each of the allegations set forth in Paragraphs 70–74, 159–184, and 184–293 above as if fully set forth herein.

492.    At all times relevant hereto, Jack Owoc was the CEO and sole board/managing member of the Debtors.

493.    When a corporation or limited liability company is insolvent, its officers and directors owe fiduciary duties to the corporation and its creditors.  The Debtors were insolvent at all times material hereto.

494.     As such, in his capacity as an officer and the sole board/managing member of each of the Debtors, Jack Owoc owed the Debtors and their creditors fiduciary duties, including the duties of care, loyalty, and good faith.

495.     As an officer and sole board/managing member, Jack Owoc had an obligation to discharge his duties in good faith with the care an ordinarily prudent officer in a like position would exercise and in a manner reasonably believed to be in the best interests of the Debtors and their creditors and to consider all material information reasonably available in making business decisions.

496.     In 2020, Jack Owoc paid himself a bonus of more than $14 million.

497.     In February 2022, Jack Owoc doubled his own salary from an annual amount of $750,000 to approximately $1,790,530.

498.     Between 2018 and 2022, Jack Owoc caused the Company to transfer millions of dollars directly to himself, which he directed the Company to characterize as "distributions."

499.     Jack Owoc paid himself these excessive salary payments, bonuses, and "distributions," despite the fact that the Company was battling massive lawsuits in multiple forums.

500.     The company received no benefit from Jack Owoc's excessive compensation, and Jack Owoc—who unilaterally approved his own compensation—did not exercise any business judgment in approving it.

501.     Jack Owoc breached his fiduciary duties to the Company and its creditors by paying himself these massive salaries, bonuses, and "distributions."

502.     As a direct and proximate result of Jack Owoc's breach of his fiduciary duties of care and good faith, the Debtors suffered more than $14 million in damages.

## COUNT SEVEN

### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

#### *(Against Jon Owoc)*

503.    Plaintiff repeats and realleges each of the allegations set forth in Paragraphs 70-74, 159-184, 194-203, and 233-282 above as if fully set forth herein.

504.    At all times relevant hereto, Jack Owoc was the CEO and sole board/managing member of each of the Debtors.

505.    As set forth above, Jack Owoc owed fiduciary duties to the Company, by virtue of his positions, and breached those duties by siphoning money out of the Company in the form of "distributions," directing the Company to transfer tens of millions of dollars to third parties to fund the Owoc Real Estate Enterprise, and using Company employees, including the Company's Director of Finance and General Counsel, to facilitate the operation of the Owoc Real Estate Enterprise.

506.    As alleged herein, Jon Owoc—a non-fiduciary of the Company—had actual knowledge of, and gave substantial assistance or encouragement to, the breaches of fiduciary duty committed by Jack Owoc by, among other things:

(a)    causing the Real Estate LLCs to enter into real estate transactions with the knowledge that that the funds for those transactions would be paid utilizing funds Jack Owoc siphoned from the Company in breach of his fiduciary duties;

(b)    hiring contractors, interior designers, architects and other vendors with the knowledge that their services would be paid for utilizing funds Jack Owoc siphoned from the Company in breach of his fiduciary duties; and

(c)    requesting the transfers from the Company, which were then made to the Real Estate Enterprise Defendants, or to third parties, for their benefit.

507.    At all relevant times, Jon Owoc was aware that Jack Owoc was acting in breach of his fiduciary duties to the Company.

508.     Jon Owoc's assistance or encouragement of the Real Estate Enterprise Defendants proximately caused damage to the Debtors and their creditors in the amount of approximately $37.5 million transferred to third parties to fund the Owoc Real Estate Enterprise.

## COUNT EIGHT
### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### *(Against Shaw)*

509.     Plaintiff repeats and realleges each of the allegations set forth in Paragraphs 70-74, 159-184, 194-203, and 233-282 above as if fully set forth herein.

510.     At all relevant times, Jack Owoc was the CEO and sole board/managing member of each of the Debtors.

511.     As set forth above, Jack Owoc owed fiduciary duties to the Company, by virtue of his positions, and breached those duties by siphoning money out of the Company in the form of "distributions," directing the Company to transfer tens of millions of dollars to third parties to fund the Owoc Real Estate Enterprise, and using Company employees, including the Company's Director of Finance and General Counsel, to facilitate the operation of the Owoc Real Estate Enterprise.

512.     As alleged herein, Shaw—a non-fiduciary of the Company—had actual knowledge of, and gave substantial assistance or encouragement to, the breaches of fiduciary duty committed by Jack Owoc by, among other things:

(a)     sourcing properties for the Owoc Real Estate Enterprise with the knowledge that those properties would be acquired using funds Jack Owoc siphoned from the Company in breach of his fiduciary duties;

(b)     causing the Real Estate LLCs to enter into real estate transactions with the knowledge that that the funds for those transactions would be paid utilizing funds Jack Owoc siphoned from the Company in breach of his fiduciary duties;

     (c)    hiring contractors, interior designers, architects, and other vendors with the knowledge that their services would be paid for utilizing funds Jack Owoc siphoned from the Company in breach of his fiduciary duties; and

     (d)    requesting the transfers from the Company, which were made to the Real Estate Enterprise Defendants, or to third parties, for their benefit.

513.    At all relevant times, Shaw was aware that Jack Owoc was acting in breach of his fiduciary duties to the Company.

514.    Shaw's assistance or encouragement proximately caused damage to the Debtors and their creditors in the amount of approximately $37.5 million transferred to third parties to fund the Owoc Real Estate Enterprise.

## COUNT NINE

### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

### *(Against Runnebaum)*

515.    Plaintiff repeats and realleges each of the allegations set forth in Paragraphs 70-74, 159-184, 194-203, and 233-282 above as if fully set forth herein.

516.    At all times relevant hereto, Jack Owoc was the CEO and sole board/managing member of each of the Debtors.

517.    As set forth above, Jack Owoc owed fiduciary duties to the Company, by virtue of his positions, and breached those duties by siphoning money out of the Company in the form of "distributions," directing the Company to transfer tens of millions of dollars to third parties to fund the Owoc Real Estate Enterprise, and using Company employees, including the Company's Director of Finance and General Counsel, to facilitate the operation of the Owoc Real Estate Enterprise.

518.    As alleged herein, Runnebaum—a non-fiduciary of the Company—had actual knowledge of, and gave substantial assistance or encouragement to, the breaches of fiduciary duty committed by Jack Owoc by, among other things:

(a)  sourcing properties for the Owoc Real Estate Enterprise with the knowledge that those properties would be acquired using funds Jack Owoc siphoned from the Company in breach of his fiduciary duties; and

(b)  requesting the transfers from the Company, which were made to the Real Estate Enterprise Defendants, or to third parties, for their benefit.

519.   At all relevant times, Runnebaum was aware that Jack Owoc was acting in breach of his fiduciary duties to the Company.

520.   Runnebaum's assistance or encouragement of the Real Estate Enterprise Defendants proximately caused damage to the Debtors and their creditors in the amount of approximately $37.5 million transferred to third parties to fund the Owoc Real Estate Enterprise.

<u>**COUNT TEN**</u>

**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**

***(Against Real Estate LLCs)***

521.   Plaintiff repeats and realleges each of the allegations set forth in Paragraphs 70-74, 159-184, 194-203, and 233-282 above as if fully set forth herein.

522.   At all times relevant hereto, Jack Owoc was the CEO and sole board/managing member of each of the Debtors.

523.   At all times relevant hereto, Jack Owoc, Jon Owoc, and Shaw had an ownership interest in each of the Real Estate LLCs.

524.   As set forth above, Jack Owoc owed fiduciary duties to the Company, by virtue of his positions, and breached those duties by siphoning money out of the Company in the form of "distributions," directing the Company to transfer tens of millions of dollars to third parties to fund the Owoc Real Estate Enterprise, and using Company employees, including the Company's Director of Finance and General Counsel, to facilitate the operation of the Owoc Real Estate Enterprise.

525.     As alleged herein, the Real Estate LLCs—non-fiduciaries of the Company—had actual knowledge of, and gave substantial assistance or encouragement to, the breaches of fiduciary duty committed by Jack Owoc.

526.     This knowledge and substantial assistance occurred through the actions of the Real Estate LLC's members and their affiliates—Jack Owoc, Jon Owoc, and Shaw—through which the Real Estate LLCs each:

    (a)     sourced properties for the Owoc Real Estate Enterprise with the knowledge that those properties would be acquired using funds Jack Owoc siphoned from the Company in breach of his fiduciary duties;

    (b)     entered into real estate transactions with the knowledge that that the funds for those transactions would be paid utilizing funds Jack Owoc siphoned from the Company in breach of his fiduciary duties;

    (c)     took actions to have the properties titled in the name of the Real Estate LLCs rather than the name of the Company, despite knowing that the Company funded the purchase of the properties;

    (d)     hired contractors, interior designers, architects, and other vendors with the knowledge that their services would be paid for utilizing funds Jack Owoc siphoned from the Company in breach of his fiduciary duties; and

    (e)     requested the transfers from the Company, which were made to the Real Estate Enterprise Defendants, or to third parties, for their benefit.

527.     At all relevant times, each of the Real Estate LLCs (by virtue of the knowledge of their principals, Jack Owoc, Jon Owoc, and Shaw) was aware that Jack Owoc was acting in breach of his fiduciary duties to the Company.

528.     The Real Estate LLCs' assistance or encouragement of the Real Estate Enterprise Defendants proximately caused damage to the Debtors and their creditors in the amount of approximately $37.5 million transferred to third parties to fund the Owoc Real Estate Enterprise.

## COUNT ELEVEN

### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

### *(Against Elite Island)*

529.    Plaintiff repeats and realleges each of the allegations set forth in Paragraphs 70-74, 159-184, 194-203, and 233-282 above as if fully set forth herein.

530.    At all times relevant hereto, Jack Owoc was the CEO and sole board/managing member of each of the Debtors.

531.    At all times relevant hereto, Jack Owoc was the sole member and manager of Elite Island.  As such, Elite Island could only act through Jack Owoc.

532.    As set forth above, Jack Owoc owed fiduciary duties to the Company, by virtue of his positions, and breached those duties by directing: (i) the Company to transfer millions of dollars for the acquisition and maintenance of the Overseas Highway Property, and (ii) the use of the Company's employees to help facilitate that transaction.

533.    As alleged herein, Elite Island—a non-fiduciary of the Company—had actual knowledge of (by virtue of its member-manager Jack Owoc's knowledge), and gave substantial assistance or encouragement to, Jack Owoc in his actions, as the transfers were made for its benefit by, among other things:

(a)    executing the closing documents for the acquisition of the Overseas Highway Property; and

(b)    providing wire instructions to the Company's employees through its manager and owner, Jack Owoc, for each of the transfers at issue.

534.    Elite Island (by virtue of the knowledge of its principal, Jack Owoc) was aware that Jack Owoc was acting in breach of his fiduciary duties to the Company.

535.    The assistance or encouragement of Elite Island proximately caused damage to the Debtors and their creditors in the amount of approximately $9.7 million.

## COUNT TWELVE

### UNJUST ENRICHMENT

#### *(Against Jack Owoc and Megan Owoc)*

536.    Plaintiff repeats and realleges each of the allegations set forth in Paragraphs 70–74, 159–184, 194-282, and 392-393 above as if fully set forth herein.

537.    During his tenure as the Company's CEO and sole board member/manager, Jack Owoc utilized the Company's employees as his personal staff in order to manage his family finances and the Company's in-house counsel to pursue personal lawsuits unrelated to the Company's business and enlisted various Company employees to assist with the Owoc Real Estate Enterprise.

538.    Megan Owoc also utilized the Company's employees as her personal staff in order to manage the family's finances, used the Company's in-house counsel to pursue personal lawsuits unrelated to the Company's business, and enlisted various Company employees to produce videos for her personal YouTube page.

539.    In doing so, the Company conferred a benefit on defendants Jack Owoc and Megan Owoc.

540.    Jack Owoc and Megan Owoc were aware of the benefits and voluntarily accepted and retained the benefits conferred.

541.    At the time the benefits were conferred, Jack Owoc was in breach of his fiduciary duties to the Company and took actions that exposed the Company to more than $1 billion in potential litigation liabilities.

542.    Under the circumstances, it would be inequitable for Jack Owoc and Megan Owoc to retain the benefit of the Company's employees' services, and Plaintiff has no adequate remedy at law.

543.     Therefore, Plaintiff is entitled to restitution from Jack Owoc and Megan Owoc and reimbursement of all of benefits, incentives, and other things of value obtained by them as a result of the unjust conduct set forth above.

### COUNT THIRTEEN

**AVOIDANCE AND RECOVERY OF CONSTRUCTIVE FRAUDULENT TRANSFERS UNDER FUFTA §§ 726.105(1)(b) AND 726.108 AND 11 U.S.C. § 550**

*(Against Jack Owoc)*

544.     Plaintiff repeats and realleges each of the allegations set forth in Paragraphs 70–74 and 159–293 above as if fully set forth herein.

545.     Pursuant to Florida Uniform Fraudulent Transfer Act ("FUFTA") Section 726.105(1)(b), any transfer made or obligation incurred by a debtor within four years before the date of the filing of the petition may be set aside as fraudulent if the transfer was made (1) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and (2) was made when the debtor intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

546.     Jack Owoc directed the Company to make the transfers set forth in **Exhibit A**, totaling approximately $123,321,962, out of the Company's bank accounts to himself, or to third parties for his benefit, and such transfers were actually made during the four-year period prior to the Petition Date.

547.     These were transfers of property of the Company to, or for the benefit of, Jack Owoc.

548.     The Company did not receive reasonably equivalent value in exchange for the transfers.

549.     Further, at the time of the transfers, the Company was insolvent or intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due.

550.     As a result of this conduct, Plaintiff can avoid the transfers pursuant to Sections 726.105(1)(b) and 726.108 of the FUFTA and recover the value thereof for the benefit of the Debtors' estates pursuant to 11 U.S.C. § 550.

<div align="center">

**COUNT FOURTEEN**

**AVOIDANCE AND RECOVERY OF CONSTRUCTIVE FRAUDULENT TRANSFERS UNDER 11 U.S.C. §§ 548(a)(1)(B) and 550**

*(Against Jack Owoc – in the alternative to Count Thirteen)*

</div>

551.     Plaintiff repeats and realleges each of the allegations set forth in Paragraphs 70–74 and 159–293 above as if fully set forth herein.

552.     Pursuant to 11 U.S.C. § 548(a)(1)(B), Plaintiff may avoid any transfer (including any transfer to, or for the benefit of, an insider under an employment contract) of an interest of the debtor in property or any obligation (including any obligation to, or for the benefit of, an insider under an employment contract) incurred by the debtor that was made or incurred on or within two years before the date of the filing of the petition if the debtor voluntarily or involuntarily (1) received less than a reasonably equivalent value in exchange for such transfer or obligation and (2) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; or was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

553.     Jack Owoc directed the Company to make the transfers set forth in **Exhibit B**, totaling approximately $29,900,086, out of the Company's bank accounts to himself, or to third parties for his benefit, and such transfers were actually made during the two-year period prior to the Petition Date.

554.     These were transfers of property of the Company to, or for the benefit of, Jack Owoc.

555.     The Company did not receive reasonably equivalent value in exchange for the transfers.

556.     Further, at the time of the transfers, the Company was insolvent, inadequately capitalized, or intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due.

557.     As a result of this conduct, Plaintiff can avoid the transfers pursuant to 11 U.S.C. § 548(a)(1)(B) and recover the value thereof for the benefit of the Debtors' estates pursuant to 11 U.S.C. § 550.

### COUNT FIFTEEN

**AVOIDANCE AND RECOVERY OF ACTUAL FRAUDULENT TRANSFERS UNDER FUFTA §§ 726.105(1)(a) AND 726.108 AND 11 U.S.C. § 550**

***(Against Jack Owoc – in the alternative to Count Thirteen)***

558.     Plaintiff repeats and realleges each of the allegations set forth in Paragraphs 70–74 and 159–293 above as if fully set forth herein.

559.     Pursuant to FUFTA Section 726.105(1)(a), any transfer made or obligation incurred by a debtor within four years before the date of the filing of the petition may be set aside as fraudulent if the transfer was made with actual intent to hinder, delay, or defraud any creditor of the debtor.

560.    Jack Owoc directed the Company to make the transfers set forth in **Exhibit A**, totaling approximately $123,321,962, out of the Company's bank accounts to himself, or to third parties for his benefit, and such transfers were actually made during the four-year period prior to the Petition Date—just as the soon-to-be issued litigation judgments against the Company were looming.

561.    These were transfers of property of the Company to, or for the benefit of, Jack Owoc so that he could hinder, delay, or defraud the Company's potential creditors.

562.    These transfers were made at a time when the Company was facing a multitude of lawsuits.

563.    These transfers were concealed in the Company's books and records and characterized, at Jack Owoc's direction, as "distributions" to Jack Owoc.

564.    The Company did not receive reasonably equivalent value in exchange for the transfers.

565.    Further, at the time of the transfers, the Company was insolvent or intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due.

566.    As a result of the circumstances surrounding the transfers, Plaintiff can avoid the transfers pursuant to Sections 726.105(1)(a) and 726.108 of the FUFTA and recover the value thereof for the benefit of the Debtors' estates pursuant to 11 U.S.C. § 550.

## COUNT SIXTEEN

### AVOIDANCE AND RECOVERY OF ACTUAL FRAUDULENT TRANSFERS UNDER 11 U.S.C. §§ 548(a)(1)(A) AND 550

*(Against Jack Owoc – in the alternative to Count Thirteen)*

567.    Plaintiff repeats and realleges each of the allegations set forth in Paragraphs 70–74 and 159–293 above as if fully set forth herein.

568.     Pursuant to 11 U.S.C. § 548(a)(1)(A), Plaintiff may avoid any transfer (including any transfer to, or for the benefit of, an insider under an employment contract) of an interest of the debtor in property or any obligation (including any obligation to, or for the benefit of, an insider under an employment contract) incurred by the debtor that was made or incurred on or within two years before the date of the filing of the petition if the debtor voluntarily or involuntarily made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted.

569.     Jack Owoc directed the Company to make the transfers set forth in **Exhibit B**, totaling approximately $29,900,086, out of the Company's bank accounts to himself, or to third parties for his benefit, and such transfers were actually made during the two-year period prior to the Petition Date, just as the soon-to-be issued litigation judgments against the Company were looming.

570.     These were transfers of property of the Company to, or for the benefit of, Jack Owoc, so that he could hinder, delay, or defraud the Company's potential creditors.

571.     These transfers were made at a time when the Company was facing a multitude of lawsuits.

572.     These transfers were concealed in the Company's books and records and characterized, at Jack Owoc's direction, as "distributions" to Jack Owoc.

573.     The Company did not receive reasonably equivalent value in exchange for the transfers.

574.    Further, at the time of the transfers, the Company was insolvent, inadequately capitalized, or intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due.

575.    As a result of the circumstances surrounding the transfers, Plaintiff can avoid the transfers pursuant to 11 U.S.C. § 548(a)(1)(A) and recover the value thereof for the benefit of the Debtors' estates pursuant to 11 U.S.C. § 550.

<u>COUNT SEVENTEEN</u>

**AVOIDANCE AND RECOVERY OF CONSTRUCTIVE FRAUDULENT TRANSFERS UNDER FUFTA §§ 726.105(1)(b) AND 726.108 AND 11 U.S.C. § 550**
***(Against Jack Owoc and the Commercial LLCs)***

576.    Plaintiff repeats and realleges each of the allegations set forth in Paragraphs 70–74, 159–184, and 294–344 above as if fully set forth herein.

577.    Pursuant to FUFTA Section 726.105(1)(b), any transfer made or obligation incurred by a debtor within four years before the date of the filing of the petition may be set aside as fraudulent if the transfer was made (1) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and (2) when the debtor intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

578.    As outlined above, Jack Owoc is the sole owner of each of the Commercial LLCs.

579.    Jack Owoc directed the Company to make the transfers in **Exhibit C**, totaling approximately $115,924,743, to acquire or maintain property, which was then titled in, or transferred to, the name of the Commercial LLCs, and such transfers were actually made during the four-year period prior to the Petition Date.

580.    These transfers or obligations incurred were to, and/or for the benefit of, Jack Owoc and the Commercial LLCs.

581.    With respect to the property taxes, maintenance, and other carrying costs for each of the Commercial LLCs, the Company's books and records do not clearly identify which transfers were made in connection with each Commercial LLC.

582.    The Company did not receive reasonably equivalent value in exchange for the transfers.

583.    Further, at the time of the transfers, the Company was insolvent or intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due.

584.    As a result of the conduct surrounding the transfers, Plaintiff can avoid the transfers pursuant to Sections 726.105(1)(b) and 726.108 of the FUFTA and recover the value thereof for the benefit of the Debtors' estates pursuant to 11 U.S.C. § 550.

<u>COUNT EIGHTEEN</u>

**AVOIDANCE AND RECOVERY OF CONSTRUCTIVE FRAUDULENT TRANSFERS UNDER 11 U.S.C. §§ 548(a)(1)(B) and 550**

*(Against Jack Owoc and the Commercial LLCs – in the alternative to Count Seventeen)*

585.    Plaintiff repeats and realleges each of the allegations set forth in Paragraphs 70–74, 159–184, and 294–344  above as if fully set forth herein.

586.    Pursuant to 11 U.S.C. § 548(a)(1)(B), Plaintiff may avoid any transfer (including any transfer to, or for the benefit of, an insider under an employment contract) of an interest of the debtor in property or any obligation (including any obligation to, or for the benefit of, an insider under an employment contract) incurred by the debtor that was made or incurred on or within two years before the date of the filing of the petition if the debtor voluntarily or involuntarily (1) received less than a reasonably equivalent value in exchange for such transfer or obligation; and (2) was insolvent on the date that such transfer was made, or such obligation was incurred, or became insolvent as a result of such transfer or obligation; or was engaged in business or a

transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

587.    As outlined above, Jack Owoc is the sole owner of each of the Commercial LLCs.

588.    Jack Owoc directed the Company to make the transfers in **Exhibit D**, totaling approximately $5,540,824, to acquire or maintain property, which was then titled in, or transferred to, the name of the Commercial LLCs, and such transfers were actually made during the two-year period prior to the Petition Date.

589.    These transfers or obligations incurred were to, and/or for the benefit of, Jack Owoc and the Commercial LLCs.

590.    With respect to the property taxes, maintenance, and other carrying costs for each of the Commercial LLCs, the Company's books and records do not clearly identify which transfers were made in connection with each Commercial LLC.

591.    The Company did not receive reasonably equivalent value in exchange for the transfers.

592.    Further, at the time of the transfers, the Company was insolvent, inadequately capitalized, or intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due.

593.    As a result of this conduct, Plaintiff can avoid the transfers pursuant to 11 U.S.C. § 548(a)(1)(B) and recover the value thereof for the benefit of the Debtors' estates pursuant to 11 U.S.C. § 550.

## COUNT NINETEEN

### AVOIDANCE AND RECOVERY OF ACTUAL FRAUDULENT TRANSFERS UNDER FUFTA §§ 726.105(1)(a) AND 726.108 AND 11 U.S.C. § 550

*(Against Jack Owoc and the Commercial LLCs – in the alternative to Count Seventeen)*

594. Plaintiff repeats and realleges each of the allegations set forth in Paragraphs 70–74, 159–184, and 294–344 above as if fully set forth herein.

595. Pursuant to FUFTA Section 726.105(1)(a), any transfer made or obligation incurred by a debtor within four years before the date of the filing of the petition may be set aside as fraudulent if the transfer was made with actual intent to hinder, delay, or defraud any creditor of the debtor.

596. As outlined above, Jack Owoc is the sole owner of each of the Commercial LLCs.

597. Jack Owoc directed the Company to make the transfers in **Exhibit C**, totaling approximately $115,924,743, to acquire or maintain property, which was then titled in, or transferred to, the name of the Commercial LLCs, and such transfers were actually made during the four-year period prior to the Petition Date.

598. These transfers or obligations incurred were to, and/or for the benefit of, Jack Owoc and the Commercial LLCs so that they could hinder, delay, or defraud the Company's potential creditors.

599. With respect to the property taxes, maintenance, and other carrying costs for each of the Commercial LLCs, the Company's books and records do not clearly identify which transfers were made in connection with each Commercial LLC.

600. These transfers were made at a time when the Company was facing a multitude of lawsuits.

601.    The Company did not receive reasonably equivalent value in exchange for the transfers.

602.    Further, at the time of the transfers, the Company was insolvent or intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due.

603.    As a result of the circumstances surrounding the transfers, Plaintiff can avoid the transfers pursuant to Sections 726.105(1)(a) and 726.108 of the FUFTA and recover the value thereof for the benefit of the Debtors' estates pursuant to 11 U.S.C. § 550.

## COUNT TWENTY

### AVOIDANCE AND RECOVERY OF ACTUAL FRAUDULENT TRANSFERS UNDER 11 U.S.C. §§ 548(a)(1)(A) AND 550

#### *(Against Jack Owoc and the Commercial LLCs – in the alternative to Count Seventeen)*

604.    Plaintiff repeats and realleges each of the allegations set forth in Paragraphs 70–74, 159–184, and 294–344 above as if fully set forth herein.

605.    Pursuant to 11 U.S.C. § 548(a)(1)(A), Plaintiff may avoid any transfer (including any transfer to, or for the benefit of, an insider under an employment contract) of an interest of the debtor in property or any obligation (including any obligation to, or for the benefit of, an insider under an employment contract) incurred by the debtor that was made or incurred on or within two years before the date of the filing of the petition if the debtor voluntarily or involuntarily made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted.

606.    Jack Owoc directed the Company to make the transfers in **Exhibit D**, totaling approximately $5,540,824, to acquire or maintain property, which was then titled in, or transferred

to, the name of the Commercial LLCs, and such transfers were actually made during the two-year period prior to the Petition Date.

607.    These transfers or obligations incurred were to, and/or for the benefit of, Jack Owoc and the Commercial LLCs so that they could hinder, delay, or defraud the Company's potential creditors.

608.    With respect to the property taxes, maintenance, and other carrying costs for each of the Commercial LLCs, the Company's books and records do not clearly identify which transfers were made in connection with each Commercial LLC.

609.    These transfers were made at a time when the Company was facing a multitude of lawsuits.

610.    The Company did not receive reasonably equivalent value in exchange for the transfers.

611.    Further, at the time of the transfers, the Company was insolvent, inadequately capitalized, or intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due.

612.    As a result of the circumstances surrounding the transfers, Plaintiff can avoid the transfers pursuant to 11 U.S.C. § 548(a)(1)(A) and recover the value thereof for the benefit of the Debtors' estates pursuant to 11 U.S.C. § 550.

## COUNT TWENTY-ONE
### AVOIDANCE AND RECOVERY OF PREFERENTIAL TRANSFERS UNDER 11 U.S.C. §§ 547 AND 550
### *(Against Jack Owoc and Megan Owoc)*

613.    Plaintiff repeats and realleges each of the allegations set forth in Paragraphs 70-74, 159-184, 194-282, and 392-393 above as if fully set forth herein.

614.     Jack Owoc was the CEO and sole board/managing member, as applicable, of the each of the Debtor entities and had control of the Debtors.  Accordingly, he is an "insider" of the Debtors pursuant to 11 U.S.C. § 101(31)(B)(i)–(iii).

615.     Megan Owoc is the wife of Jack Owoc, a person in control of the Debtors, and, therefore, she is also an "insider" of the Debtors pursuant to 11 U.S.C. § 101(31)(B)(vi).

616.     As set forth in **Exhibit E**, in the year prior to the Petition Date, the Company made approximately $2,142,455 in payments for the benefit of Jack and Megan Owoc.

617.     These payments include salary, vehicle payments, and AMEX credit card payments that the Company made on Jack Owoc and Megan Owoc's behalf.  For example, the Company:

    (a)     made $33,954.15 in vehicle payments for the benefit of Jack Owoc and Megan Owoc;

    (b)     made various AMEX credit card payments for the benefit of Jack Owoc and Megan Owoc, totaling $457,983.86;

    (c)     paid Jack Owoc $1,499,213.16 in salary; and

    (d)     paid Megan Owoc $151,303.97 in salary.

618.     These payments constitute transfers of property of the Company made within one (1) year before the Petition Date:

    (a)     to, or for the benefit of, Jack Owoc and Megan Owoc who, at all relevant times, were creditors of the Company due to obligations to pay salary;

    (b)     for, or on account of, an antecedent debt owed by the Company to Jack Owoc and Megan Owoc before such payments were made; and

    (c)     while the Company was insolvent.

619.     These payments to Jack Owoc and Megan Owoc enabled them to receive more than they would have received:

    (a)     in a case filed by the Debtors under Chapter 7 of the Bankruptcy Code;

    (b)     had the payments had not been made; and

(c)    if the defendant received payment of its debt to the extent provided by the Bankruptcy Code.

620.    By reason of the foregoing, the payments to, or for the benefit of, Jack Owoc and Megan Owoc are avoidable pursuant to 11 U.S.C. §§ 547(b) and 550.

## COUNT TWENTY-TWO

### AVOIDANCE AND RECOVERY OF CONSTRUCTIVE FRAUDULENT TRANSFERS UNDER FUFTA §§ 726.105(1)(b) AND 726.108 AND 11 U.S.C. § 550
### *(Against Tropical Sunset, Jack Owoc, Jon Owoc, and Stag)*

621.    Plaintiff repeats and realleges each of the allegations set forth in Paragraphs 70-74, 159-184, 194-203, and 233-283 above as if fully set forth herein.

622.    Pursuant to FUFTA Section 726.105(1)(b), any transfer made or obligation incurred by a debtor within four years before the date of the filing of the petition may be set aside as fraudulent if the transfer was made (1) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and (2) when the debtor intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

623.    Tropical Sunset, Jack Owoc, Jon Owoc, and Stag acquired and renovated at least twelve properties using the Company's funds.

624.    For each property, the Company funded the acquisition and (at least some of) the renovation costs for the properties.

625.    Jack Owoc directed the Company to make the transfers identified in **Exhibit F**, totaling approximately $37,590,382, to acquire, renovate, and/or maintain the properties that are titled in the name of the Real Estate LLCs, and such transfers were actually made during the four-year period prior to the Petition Date.

626.     Upon information and belief, Tropical Sunset is the parent company of each of the Real Estate LLCs.

627.     These transfers or obligations incurred were to, and/or for the benefit of, Tropical Sunset and its owners, Jack Owoc, Jon Owoc, and Stag.

628.     The Company did not receive reasonably equivalent value in exchange for the transfers.

629.     Further, at the time of the transfers, the Company was insolvent or intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due.

630.     As a result of the conduct surrounding the transfers, Plaintiff can avoid the transfers pursuant to Sections 726.105(1)(b) and 726.108 of the FUFTA and recover the value thereof for the benefit of the Debtors' estates pursuant to 11 U.S.C. § 550.

**COUNT TWENTY-THREE**

**AVOIDANCE AND RECOVERY OF CONSTRUCTIVE FRAUDULENT TRANSFERS UNDER 11 U.S.C. §§ 548(a)(1)(B) and 550**

*(Against Tropical Sunset, Jack Owoc, Jon Owoc, and Stag – in the alternative to Count Twenty-Two)*

631.     Plaintiff repeats and realleges each of the allegations set forth in Paragraphs 70-74, 159-184, 194-203, and 233-283 above as if fully set forth herein.

632.     Pursuant to 11 U.S.C. § 548(a)(1)(B), Plaintiff may avoid any transfer (including any transfer to, or for the benefit of, an insider under an employment contract) of an interest of the debtor in property or any obligation (including any obligation to, or for the benefit of, an insider under an employment contract) incurred by the debtor that was made or incurred on or within two years before the date of the filing of the petition if the debtor voluntarily or involuntarily (1) received less than a reasonably equivalent value in exchange for such transfer or obligation and

(2) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; or was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or made such transfer to or for the benefit of an insider, or incurred such obligation to, or for the benefit of, an insider, under an employment contract and not in the ordinary course of business.

633.     Tropical Sunset, Jack Owoc, Jon Owoc, and Stag acquired and renovated at least twelve properties using the Company's funds.

634.     For each property, the Company funded the acquisition and (at least some of) the renovation costs for the properties.

635.     Jack Owoc directed the Company to make the transfers identified in **Exhibit G**, totaling approximately $6,962,557, to acquire, renovate, and/or maintain the properties that are titled in the name of the Real Estate LLCs, and such transfers were actually made during the two-year period prior to the Petition Date.

636.     Upon information and belief, Tropical Sunset is the parent company of each of the Real Estate LLCs.

637.     These transfers or obligations incurred were to, and/or for the benefit of, Tropical Sunset and its owners, Jack Owoc, Jon Owoc, and Stag.

638.     The Company's books and records do not clearly identify which transfers were made in connection with each Real Estate LLC.

639.     The Company did not receive reasonably equivalent value in exchange for the transfers.

640.     Further, at the time of the transfers, the Company was insolvent, inadequately capitalized, or intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due.

641.     As a result of this conduct, Plaintiff can avoid the transfers pursuant to 11 U.S.C. § 548(a)(1)(B) and recover the value thereof for the benefit of the Debtors' estates pursuant to 11 U.S.C. § 550.

<u>**COUNT TWENTY-FOUR**</u>

**AVOIDANCE AND RECOVERY OF ACTUAL FRAUDULENT TRANSFERS UNDER FUFTA §§ 726.105(1)(a) AND 726.108 AND 11 U.S.C. § 550**

***(Against Tropical Sunset, Jack Owoc, Jon Owoc, and Stag – in the alternative to Count Twenty-Two)***

642.     Plaintiff repeats and realleges each of the allegations set forth in Paragraphs 70-74, 159-184, 194-203, and 233-283 above as if fully set forth herein.

643.     Pursuant to FUFTA Section 726.105(1)(a), any transfer made or obligation incurred by a debtor within four years before the date of the filing of the petition may be set aside as fraudulent if the transfer was made with actual intent to hinder, delay, or defraud any creditor of the debtor.

644.     Tropical Sunset, Jack Owoc, Jon Owoc, and Stag acquired and renovated at least twelve properties using the Company's funds.

645.     For each property, the Company funded the acquisition and (at least some of) the renovation costs for the properties.

646.     Upon information and belief, Tropical Sunset is the parent company of each of the Real Estate LLCs.

647.     Jack Owoc directed the Company to make the transfers identified in **Exhibit F**, totaling approximately $37,590,382, to acquire, renovate, and/or maintain the properties that are

titled in the name of the Real Estate LLCs, and such transfers were actually made during the four-year period prior to the Petition Date.

648.    These transfers or obligations incurred were to, and/or for the benefit of, Tropical Sunset and its owners, Jack Owoc, Jon Owoc, and Stag.

649.    The Company's books and records do not clearly identify which transfers were made in connection with each Real Estate LLC.

650.    The Company did not receive reasonably equivalent value in exchange for the transfers.

651.    Further, at the time of the transfers, the Company was insolvent or intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due.

652.    As a result of the circumstances surrounding the transfers, Plaintiff can avoid the transfers pursuant to Sections 726.105(1)(a) and 726.108 of the FUFTA and recover the value thereof for the benefit of the Debtors' estates pursuant to 11 U.S.C. § 550.

<u>COUNT TWENTY-FIVE</u>
**AVOIDANCE AND RECOVERY OF ACTUAL FRAUDULENT TRANSFERS UNDER 11 U.S.C. §§ 548(a)(1)(A) AND 550**
*(Against Tropical Sunset, Jack Owoc, Jon Owoc, and Stag – in the alternative to Count Twenty-Two)*

653.    Plaintiff repeats and realleges each of the allegations set forth in Paragraphs 70-74, 159-184, 194-203, and 233-283 above as if fully set forth herein.

654.    Pursuant to 11 U.S.C. § 548(a)(1)(A), Plaintiff may avoid any transfer (including any transfer to, or for the benefit of, an insider under an employment contract) of an interest of the debtor in property or any obligation (including any obligation to, or for the benefit of, an insider under an employment contract) incurred by the debtor that was made or incurred on or within two

years before the date of the filing of the petition if the debtor voluntarily or involuntarily made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted.

655.    Tropical Sunset, Jack Owoc, Jon Owoc, and Stag acquired and renovated at least twelve properties using the Company' funds.

656.    For each property, the Company funded the acquisition and (at least some of) the renovation costs for the properties.

657.    Upon information and belief, Tropical Sunset is the parent company of each of the Real Estate LLCs.

658.    Jack Owoc directed the Company to make the transfers identified in **Exhibit G**, totaling approximately $6,962,557, to acquire, renovate, and/or maintain the properties that are titled in the name of the Real Estate LLCs, and such transfers were actually made during the two-year period prior to the Petition Date.

659.    These transfers or obligations incurred were to, and/or for the benefit of, Tropical Sunset and its owners, Jack Owoc, Jon Owoc, and Stag.

660.    The Company's books and records do not clearly identify which transfers were made in connection with each Real Estate LLC.

661.    The Company did not receive reasonably equivalent value in exchange for the transfers.

662.    Further, at the time of the transfers, the Company was insolvent, inadequately capitalized, or intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due.

663.    As a result of the circumstances surrounding the transfers, Plaintiff can avoid the transfers pursuant to 11 U.S.C. § 548(a)(1)(A) and recover the value thereof for the benefit of the Debtors' estates pursuant to 11 U.S.C. § 550.

### COUNT TWENTY-SIX[5]

**AVOIDANCE AND RECOVERY OF CONSTRUCTIVE FRAUDULENT TRANSFERS UNDER FUFTA §§ 726.105(1)(b) AND 726.108 AND 11 U.S.C. § 550**

*(Against Real Estate Enterprise Defendants – in the alternative to Counts Twenty-Two through Twenty-Five)*

664.    Plaintiff repeats and realleges each of the allegations set forth in Paragraphs 70-74, 159-184, 194-203, and 233-283 above as if fully set forth herein.

665.    Pursuant to FUFTA Section 726.105(1)(b), any transfer made or obligation incurred by a debtor within four years before the date of the filing of the petition may be set aside as fraudulent if the transfer was made (1) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and (2) when the debtor intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

666.    The Real Estate Enterprise Defendants acquired and renovated at least twelve properties using the Company's funds.

667.    For each property, the Company funded the acquisition and (at least some of) the renovation costs for the properties.

668.    Jack Owoc directed the Company to make the transfers identified in **Exhibit H**, totaling approximately $37,590,382, to acquire, renovate, and/or maintain the properties that are

---

[5] During the course of the Receivership Action, Plaintiff has become aware that Tropical Sunset is purportedly the parent company of each of the Real Estate LLCs pursuant to an oral arrangement between Jack Owoc, Jon Owoc, Shaw, and Stag.  Plaintiff asserts Counts Twenty-Six through Twenty-Nine of the Amended Complaint in the alternative to Counts Twenty-Two through Twenty-Five in the event this Court, or the Florida state court overseeing the Receivership Action, determines that the Real Estate LLCs are not in fact wholly-owned subsidiaries of Tropical Sunset.

titled in the name of the Real Estate LLCs, and such transfers were actually made during the four-year period prior to the Petition Date.

669.    These transfers or obligations incurred were to, and/or for the benefit of, the Real Estate Enterprise Defendants.

670.    The Company's books and records do not clearly identify which transfers were made in connection with each Real Estate Enterprise Defendant.

671.    The Company did not receive reasonably equivalent value in exchange for the transfers.

672.    Further, at the time of the transfers, the Company was insolvent or intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due.

673.    As a result of the conduct surrounding the transfers, Plaintiff can avoid the transfers pursuant to Sections 726.105(1)(b) and 726.108 of the FUFTA and recover the value thereof for the benefit of the Debtors' estates pursuant to 11 U.S.C. § 550.

## COUNT TWENTY-SEVEN

### AVOIDANCE AND RECOVERY OF CONSTRUCTIVE FRAUDULENT TRANSFERS UNDER 11 U.S.C. §§ 548(a)(1)(B) and 550

*(Against Real Estate Enterprise Defendants – in the alternative to Counts Twenty-Two through Twenty-Five)*

674.    Plaintiff repeats and realleges each of the allegations set forth in Paragraphs 70-74, 159-184, 194-203, and 233-283 above as if fully set forth herein.

675.    Pursuant to 11 U.S.C. § 548(a)(1)(B), Plaintiff may avoid any transfer (including any transfer to, or for the benefit of, an insider under an employment contract) of an interest of the debtor in property or any obligation (including any obligation to, or for the benefit of, an insider under an employment contract) incurred by the debtor that was made or incurred on or within two

years before the date of the filing of the petition if the debtor voluntarily or involuntarily (1) received less than a reasonably equivalent value in exchange for such transfer or obligation and (2) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; or was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or made such transfer to or for the benefit of an insider, or incurred such obligation to, or for the benefit of, an insider, under an employment contract and not in the ordinary course of business.

676.    The Real Estate Enterprise Defendants acquired and renovated at least twelve properties using the Company's funds.

677.    For each property, the Company funded the acquisition and (at least some of) the renovation costs for the properties.

678.    Jack Owoc directed the Company to make the transfers identified in **Exhibit I**, totaling approximately $6,962,557, to acquire, renovate, and/or maintain the properties that are titled in the name of the Real Estate LLCs, and such transfers were actually made during the two-year period prior to the Petition Date.

679.    These transfers or obligations incurred were to, and/or for the benefit of, the Real Estate Enterprise Defendants.

680.    The Company's books and records do not clearly identify which transfers were made in connection with each Real Estate Enterprise Defendant.

681.    The Company did not receive reasonably equivalent value in exchange for the transfers.

682.    Further, at the time of the transfers, the Company was insolvent, inadequately capitalized, or intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due.

683.    As a result of this conduct, Plaintiff can avoid the transfers pursuant to 11 U.S.C. § 548(a)(1)(B) and recover the value thereof for the benefit of the Debtors' estates pursuant to 11 U.S.C. § 550.

## COUNT TWENTY-EIGHT

**AVOIDANCE AND RECOVERY OF ACTUAL FRAUDULENT TRANSFERS UNDER FUFTA §§ 726.105(1)(a) AND 726.108 AND 11 U.S.C. § 550**

*(Against Real Estate Enterprise Defendants – in the alternative to Counts Twenty-Two through Twenty-Five)*

684.    Plaintiff repeats and realleges each of the allegations set forth in Paragraphs 70-74, 159-184, 194-203, and 233-283 above as if fully set forth herein.

685.    Pursuant to FUFTA Section 726.105(1)(a), any transfer made or obligation incurred by a debtor within four years before the date of the filing of the petition may be set aside as fraudulent if the transfer was made with actual intent to hinder, delay, or defraud any creditor of the debtor.

686.    The Real Estate Enterprise Defendants acquired and renovated at least twelve properties using the Company's funds.

687.    For each property, the Company funded the acquisition and (at least some of) the renovation costs for the properties.

688.    Jack Owoc directed the Company to make the transfers identified in **Exhibit H**, totaling approximately $37,590,382, to acquire, renovate, and/or maintain the properties that are titled in the name of the Real Estate LLCs, and such transfers were actually made during the four-year period prior to the Petition Date.

689.     These transfers or obligations incurred were to, and/or for the benefit of, the Real Estate Enterprise Defendants.

690.     The Company's books and records do not clearly identify which transfers were made in connection with each Real Estate Enterprise Defendant.

691.     The Company did not receive reasonably equivalent value in exchange for the transfers.

692.     Further, at the time of the transfers, the Company was insolvent or intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due.

693.     As a result of the circumstances surrounding the transfers, Plaintiff can avoid the transfers pursuant to Sections 726.105(1)(a) and 726.108 of the FUFTA and recover the value thereof for the benefit of the Debtors' estates pursuant to 11 U.S.C. § 550.

## COUNT TWENTY-NINE

**AVOIDANCE AND RECOVERY OF ACTUAL FRAUDULENT TRANSFERS UNDER 11 U.S.C. §§ 548(a)(1)(A) AND 550**

*(Against Real Estate Enterprise Defendants – in the alternative to Counts Twenty-Two through Twenty-Five)*

694.     Plaintiff repeats and realleges each of the allegations set forth in 70-74, 159-184, 194-203, and 233-283 above as if fully set forth herein.

695.     Pursuant to 11 U.S.C. § 548(a)(1)(A), Plaintiff may avoid any transfer (including any transfer to, or for the benefit of, an insider under an employment contract) of an interest of the debtor in property or any obligation (including any obligation to, or for the benefit of, an insider under an employment contract) incurred by the debtor that was made or incurred on or within two years before the date of the filing of the petition if the debtor voluntarily or involuntarily made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity

to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted.

696.    The Real Estate Enterprise Defendants acquired and renovated at least twelve properties using the Company's funds.

697.    For each property, the Company funded the acquisition and (at least some of) the renovation costs for the properties.

698.    Jack Owoc directed the Company to make the transfers identified in **Exhibit I**, totaling approximately $6,962,557, to acquire, renovate, and/or maintain the properties that are titled in the name of the Real Estate LLCs, and such transfers were actually made during the two-year period prior to the Petition Date.

699.    These transfers or obligations incurred were to, and/or for the benefit of, the Real Estate Enterprise Defendants.

700.    The Company's books and records do not clearly identify which transfers were made in connection with each Real Estate Enterprise Defendant.

701.    The Company did not receive reasonably equivalent value in exchange for the transfers.

702.    Further, at the time of the transfers, the Company was insolvent, inadequately capitalized, or intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due.

703.    As a result of the circumstances surrounding the transfers, Plaintiff can avoid the transfers pursuant to 11 U.S.C. § 548(a)(1)(A) and recover the value thereof for the benefit of the Debtors' estates pursuant to 11 U.S.C. § 550.

## COUNT THIRTY

### DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. § 2201

*(The Properties Titled in the Name of the Real Estate LLCs, or the Proceeds from the Sales of The Properties Belong to Plaintiff)*

704.     Plaintiff repeats and realleges each of the allegations set forth in Paragraphs 70-74, 159-184, 194-203, and 233-283 as if set forth fully herein.

705.     The Real Estate LLCs acquired at least twelve properties using the Company's funds.

706.     The Company funded the acquisition and (at least some of) the renovation costs for the properties, but the Company does not hold legal title to the properties.

707.     Instead, at Jack Owoc's direction, the Real Estate LLCs took legal title instead of the true owner, the Company.

708.     Upon information and belief, the Real Estate Enterprise Defendants still own the following properties that were acquired using the Company's funds:

    (a)     167 Spyglass Property;

    (b)     528 Riviera Property;

    (c)     120 Spyglass Property;

    (d)     15963 Southwest Property; and

    (e)     2209 Northeast Property.

709.     Upon information and belief, the Real Estate Enterprise Defendants acquired the following properties—which have since been sold—using the Company's funds:

    (a)     3 Pelican Property;

    (b)     32 Pelican Property;

    (c)     821 Bamboo Property;

    (d)     528 Coconut Property;

    (e)    6850 Melaleuca Property;

    (f)    Pompano Property;

    (g)    17301 Southwest Property; and

    (h)    520 San Marco Property.

710.    Thus, an actual, substantial, and justiciable controversy exists as to whether the Plaintiff is the rightful owner of the properties at issue, which it fully funded, and whether it is entitled to any existing or future sale proceeds resulting from the sale or the potential sale of the properties.

711.    This controversy is of sufficient immediacy to warrant judicial relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202.

712.    Plaintiff is entitled to a declaratory judgment that Plaintiff was, or is, the rightful owner of the real properties at issue and is therefore entitled to any sale proceeds (received or to be received) from the sale of the properties titled in the name of the Real Estate LLCs.

## COUNT THIRTY-ONE

### DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. § 2201

**(*The Wagon Trail Property, or Proceeds from Any Sale of the Property, Belong to Plaintiff*)**

713.    Plaintiff repeats and realleges each of the allegations set forth in Paragraphs 70-74, 159-166, and 313-319 above as if fully set forth herein.

714.    In 2020, Jack Owoc caused the Company to transfer funds to purchase the Wagon Trail Property for $1,230,015.99.

715.    The Company also paid all of the carrying cost for the Wagon Trail Property.

716.    Although the Company paid the entire purchase price in cash and all of the carrying costs of the Wagon Trail Property, the property was titled in the name of JHO-NV rather than the Company.

717.    Upon information and belief, JHO-NV still holds title to the Wagon Trail Property.

718.    Thus, an actual, substantial, and justiciable controversy exists as to whether the Plaintiff is the rightful owner of the Wagon Trail Property, which it fully funded, and whether it is entitled to proceeds arising from any future sale of the Wagon Trail Property.

719.    This controversy is of sufficient immediacy to warrant judicial relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202.

720.    Plaintiff is entitled to a declaratory judgment that Plaintiff was, or is, the rightful owner of the real property at issue and is therefore entitled to proceeds (received or to be received) from any sale of the Wagon Trail Property.

## COUNT THIRTY-TWO
### AVOIDANCE AND RECOVERY OF CONSTRUCTIVE FRAUDULENT TRANSFERS UNDER FUFTA §§ 726.105(1)(b) AND 726.108 AND 11 U.S.C. § 550
### *(Against Elite Island)*

721.    Plaintiff repeats and realleges each of the allegations set forth in Paragraphs 70–74, 159–184, and 283–293 above as if fully set forth herein.

722.    Pursuant to FUFTA Section 726.105(1)(b), any transfer made or obligation incurred by a debtor within four years before the date of the filing of the petition may be set aside as fraudulent if the transfer was made (1) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and (2) when the debtor intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

723.    Elite Island acquired the Overseas Highway Property using the Debtors' funds.

724.    Although the Debtors funded the entire purchase price for the property and paid for the maintenance of the property, the Debtors do not hold legal title to the property.

725.    Instead, at Jack Owoc's direction, Elite Island holds legal title to the Overseas Highway Property instead of the true owner, the Debtors.

726.    Jack Owoc directed the Company to make the transfers identified in **Exhibit J**, totaling approximately $9,748,240, to acquire, renovate, and/or maintain the Overseas Highway Property, and such transfers were actually made during the four-year period prior to the Petition Date.

727.    These transfers or obligations incurred were to, and/or for the benefit of, Elite Island.

728.    The Company did not receive reasonably equivalent value in exchange for the transfers.

729.    Further, at the time of the transfers, the Company was insolvent or intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due.

730.    As a result of the conduct surrounding the transfers, Plaintiff can avoid the transfers pursuant to Sections 726.105(1)(b) and 726.108 of the FUFTA and recover the value thereof for the benefit of the Debtors' estates pursuant to 11 U.S.C. § 550.

<u>**COUNT THIRTY-THREE**</u>

**AVOIDANCE AND RECOVERY OF CONSTRUCTIVE FRAUDULENT TRANSFERS UNDER 11 U.S.C. §§ 548(a)(1)(B) and 550**

*(Against Elite Island – in the alternative to Count Thirty-Two)*

731.    Plaintiff repeats and realleges each of the allegations set forth in Paragraphs 70–74, 159–184, and 283–293 above as if fully set forth herein.

732.    Pursuant to 11 U.S.C. § 548(a)(1)(B), Plaintiff may avoid any transfer (including any transfer to, or for the benefit of, an insider under an employment contract) of an interest of the debtor in property or any obligation (including any obligation to, or for the benefit of, an insider

under an employment contract) incurred by the debtor that was made or incurred on or within two years before the date of the filing of the petition if the debtor voluntarily or involuntarily (1) received less than a reasonably equivalent value in exchange for such transfer or obligation and (2) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; or was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or made such transfer to, or for the benefit of, an insider, or incurred such obligation to, or for the benefit of, an insider, under an employment contract and not in the ordinary course of business.

733.    Elite Island acquired the Overseas Highway Property using the Company's funds.

734.    Although the Company funded the entire purchase price for the property and paid for the maintenance of the property, the Company does not hold legal title to the property.

735.    Instead, at Jack Owoc's direction, Elite Island holds legal title to the Overseas Highway Property instead of the true owner, the Company.

736.    Jack Owoc directed the Company to make the transfers identified in **Exhibit K**, totaling approximately $1,067,866, to renovate and/or maintain the Overseas Highway Property, and such transfers were actually made during the two-year period prior to the Petition Date.

737.    These transfers or obligations incurred were to, and/or for the benefit of, Elite Island.

738.    The Company did not receive reasonably equivalent value in exchange for the transfers.

739.    Further, at the time of the transfers, the Company was insolvent, inadequately capitalized, or intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due.

740.    As a result of this conduct, Plaintiff can avoid the transfers pursuant to 11 U.S.C. § 548(a)(1)(B) and recover the value thereof for the benefit of the Debtors' estates pursuant to 11 U.S.C. § 550.

### COUNT THIRTY-FOUR

**AVOIDANCE AND RECOVERY OF ACTUAL FRAUDULENT TRANSFERS UNDER FUFTA §§ 726.105(1)(a) AND 726.108 AND 11 U.S.C. § 550**
*(Against Elite Island – in the alternative to Count Thirty-Two)*

741.    Plaintiff repeats and realleges each of the allegations set forth in Paragraphs 70–74, 159–184, and 283–293 above as if fully set forth herein.

742.    Pursuant to FUFTA Section 726.105(1)(a), any transfer made or obligation incurred by a debtor within four years before the date of the filing of the petition may be set aside as fraudulent if the transfer was made with actual intent to hinder, delay, or defraud any creditor of the debtor.

743.    Elite Island acquired the Overseas Highway Property using the Company's funds.

744.    Although the Company funded the entire purchase price for the property and paid for the maintenance of the property, the Company does not hold legal title to the property.

745.    Instead, at Jack Owoc's direction, Elite Island holds legal title to the Overseas Highway Property instead of the true owner, the Company.

746.    Jack Owoc directed the Company to make the transfers identified in **Exhibit J**, totaling approximately $9,748,240, to acquire, renovate, and/or maintain the Overseas Highway Property, and such transfers were actually made during the four-year period prior to the Petition Date.

747.    These transfers or obligations incurred were to, and/or for the benefit of, Elite Island.

748.    The Company did not receive reasonably equivalent value in exchange for the transfers.

749.    Further, at the time of the transfers, the Company was insolvent or intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due.

750.    As a result of the circumstances surrounding the transfers, Plaintiff can avoid the transfers pursuant to Sections 726.105(1)(a) and 726.108 of the FUFTA and recover the value thereof for the benefit of the Debtors' estates pursuant to 11 U.S.C. § 550.

<div align="center">

**COUNT THIRTY-FIVE**

**AVOIDANCE AND RECOVERY OF ACTUAL FRAUDULENT TRANSFERS UNDER 11 U.S.C. §§ 548(a)(1)(A) AND 550**

***(Against Elite Island – in the alternative to Count Thirty-Two)***

</div>

751.    Plaintiff repeats and realleges each of the allegations set forth in Paragraphs 70–74, 159–184, and 283–293 above as if fully set forth herein.

752.    Pursuant to 11 U.S.C. § 548(a)(1)(A), Plaintiff may avoid any transfer (including any transfer to, or for the benefit of, an insider under an employment contract) of an interest of the debtor in property or any obligation (including any obligation to, or for the benefit of, an insider under an employment contract) incurred by the debtor that was made or incurred on or within two years before the date of the filing of the petition if the debtor voluntarily or involuntarily made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted.

753.    Elite Island acquired the Overseas Highway Property using the Company's funds.

754.    Although the Company funded the entire purchase price for the property and paid for the maintenance of the property, the Company does not hold legal title to the property.

755.    Instead, at Jack Owoc's direction, Elite Island holds legal title to the Overseas Highway Property instead of the true owner, the Company.

756.    Jack Owoc directed the Company to make the transfers identified in **Exhibit K**, totaling approximately $557,090, to renovate and/or maintain the Overseas Highway Property, and such transfers were actually made during the two-year period prior to the Petition Date.

757.    These transfers or obligations incurred were to, and/or for the benefit of, Elite Island.

758.    The Company did not receive reasonably equivalent value in exchange for the transfers.

759.    Further, at the time of the transfers, the Company was insolvent, inadequately capitalized, or intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due.

760.    As a result of the circumstances surrounding the transfers, Plaintiff can avoid the transfers pursuant to 11 U.S.C. § 548(a)(1)(A) and recover the value thereof for the benefit of the Debtors' estates pursuant to 11 U.S.C. § 550.

## <u>COUNT THIRTY-SIX</u>

## DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. § 2201

### *(Limiting the Claims of the Commercial LLCs to the Amounts and Priorities of the Scheduled Claims)*

761.    Plaintiff repeats and realleges each of the allegations set forth in Paragraphs 70–74, 283–344, and 394–424 above as if fully set forth herein.

762.    The Commercial LLCs assert a right to payment in these Chapter 11 Cases.

763.    However, each of the Commercial LLCs failed to file a proof of claim.

764.    Therefore, the Commercial LLCs are limited to the amounts and priorities of the Scheduled Claims.

765.    The Late Claims, which were filed six (6) months after the Bar Date, amend the Original Owoc Claims and purport to assert claims on behalf of the Commercial LLCs.

766.    However, the Original Owoc Claims were filed by Jack Owoc solely in his individual capacity and did not include the Commercial LLCs' Claims.

767.    Even if the Late Claims are determined to have been properly filed on behalf of the Commercial LLCs, the Late Claims—as they relate to the Commercial LLCs—were untimely because they were filed months after the Bar Date.

768.    Additionally, the Commercial LLCs' claims contained in the Late Claims set forth wholly new grounds of liability and, for the first time, assert secured status and, therefore, do not relate back to the Original Owoc Claims.

769.    All of the Debtors' creditors are or will be prejudiced by the filing of the Late Claims.

770.    Thus, an actual, substantial, and justiciable controversy exists as to whether the Commercial LLCs filed valid and timely proofs of claim through Jack Owoc's filing of the Late Claims.

771.    This controversy is of sufficient immediacy to warrant judicial relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202.

772.    The Plaintiff is entitled to a declaratory judgment that the Commercial LLCs' Claims on account of prepetition debts against the Debtors' estates are limited to the amounts and priorities of the Scheduled Claims.

773.    Plaintiff expressly reserves its right to supplement or amend this objection to the Scheduled Claims.  Plaintiff hereby reserves all objections and defenses to the Scheduled Claims.

## COUNT THIRTY-SEVEN

## DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. § 2201
### *(The Disputed Sheridan Funds Belong to Plaintiff)*

774.    Plaintiff repeats and realleges each of the allegations set forth in Paragraphs 70–74, 298–314, 425–437 above if fully set forth herein.

775.    In the Sheridan Application, Sheridan A and Jack Owoc assert that they are entitled to the Disputed Sheridan Funds.

776.    However, the Company's funds were used to purchase the Sheridan A Property.

777.    The Company also paid for all carrying costs, including real property taxes, related to the Sheridan A Property.

778.    The DIP Order required the Debtors to pay postpetition obligations related to the Sheridan A Property and that, upon the sale closing of the Sheridan A Property, the sale proceeds were required to be used to reimburse the Debtors for the postpetition carrying costs.

779.    Thus, an actual, substantial, and justiciable controversy exists as to whether the Plaintiff is the rightful owner of the Disputed Sheridan Funds.

780.    This controversy is of sufficient immediacy to warrant judicial relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202.

781.    Plaintiff is entitled to a declaratory judgment that Plaintiff owns, and is therefore entitled to control over, the Disputed Sheridan Funds and that Sheridan A and Jack Owoc have no right to the Disputed Sheridan Funds.

## COUNT THIRTY-EIGHT

## DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. § 2201
### *(JHO Real Estate LLC is Not a Claimant)*

782.    Plaintiff repeats and realleges each of the allegations set forth in Paragraphs 283–344 and 394-424 above as if fully set forth herein.

783.    The Late Claims purport to assert a claim on behalf of "JHO Real Estate LLC."

784.    No such entity exists.

785.    No such entity appears on the Claims Register or on the Debtors' Schedules.

786.    Thus, an actual, substantial, and justiciable controversy exists as to whether the JHO Real Estate LLC is a claimant in these Chapter 11 Cases.

787.    This controversy is of sufficient immediacy to warrant judicial relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202.

788.    The Plaintiff is entitled to a declaratory judgment that JHO Real Estate LLC is not a claimant or creditor in these Chapter 11 Cases.

## COUNT THIRTY-NINE

## DISALLOWANCE OF CLAIMS UNDER 11 U.S.C. § 502(d)
### *(Against Jack Owoc and the Commercial LLCs)*

789.    Plaintiff repeats and realleges each of the allegations set forth in Paragraphs 70-74, 159-184, 70-74, 283-344, and 394-424 above as if fully set forth herein.

790.    The Debtors listed the Scheduled Claims on behalf of the Commercial LLCs.

791.    On December 19, 2022, Jack Owoc filed the Owoc Unliquidated Claim [Claim No. 663] and the Original Owoc Claims [Claim Nos. 639, 653, 654, 655, 656, 657, and 664] on behalf of himself.

792. On July 12, 2023, Jack Owoc filed the Late Claims [Claim Nos. 767, 768, 769, 770, 771, and 772] purportedly on behalf of himself, the Commercial LLCs, and "JHO Real Estate LLC."

793. On October 13, 2023, Jack Owoc and Sheridan A also filed the Asserted Admin Claim.

794. Jack Owoc and the Commercial LLCs (which includes Sheridan A) are transferees of transfers avoidable under 11 U.S.C. §§ 547 and/or 548 (the "Avoidable Transfers"), which property is recoverable under 11 U.S.C. § 550.

795. Jack Owoc has not paid back the amount of the Avoidable Transfers, or turned over such property, for which he is liable under 11 U.S.C. § 550.

796. The Commercial LLCs have not paid back the amount of the Avoidable Transfers, or turned over such property, for which they are liable under 11 U.S.C. § 550.

797. Pursuant to 11 U.S.C. § 502(d), the Owoc Unliquidated Claim, the Original Owoc Claims, the Late Claims, and the Asserted Admin Claim against the Debtors' estates must be disallowed until such time as Jack Owoc pays back to the Plaintiff an amount equal to the aggregate amount of the Avoidable Transfers that he received, plus interest thereon and costs.

798. Pursuant to 11 U.S.C. § 502(d), the Late Claims against the Debtors' estates and the Scheduled Claims must be disallowed until such time as the Commercial LLCs pay back to the Plaintiff an amount equal to the aggregate amount of the Avoidable Transfers that they received, plus interest thereon and costs.

799. Pursuant to 11 U.S.C. § 502(d), the Asserted Admin Claim against the Debtors' estates must be disallowed until such time as Sheridan A pays back to the Plaintiff an amount equal to the aggregate amount of the Avoidable Transfers that it received, plus interest thereon and costs.

800.    For all of the reasons stated herein, the Owoc Unliquidated Claim, the Original Owoc Claims, the Late Claims, the Asserted Admin Claim, and the Scheduled Claims should be disallowed and expunged in their entirety pursuant to 11 U.S.C. § 502(d).

## COUNT FORTY

### DISALLOWANCE OF THE AMENDED AND SUPERSEDED ORIGINAL OWOC CLAIMS

#### *(Claim Nos. 639, 653, 654, 655, 656, 657, and 664)*

801.    Plaintiff repeats and realleges each of the allegations set forth in Paragraphs 70-74, 159-184, 70-74, 283-344, and 394-424 above as if fully set forth herein.

802.    On July 12, 2023, Jack Owoc filed the Late Claims.

803.    Each of the Late Claims indicate that they amend a previously-filed claim in the Chapter 11 Cases.

804.    All of the Original Owoc Claims were amended and superseded by the Late Claims.

805.    Accordingly, each of the Original Owoc Claims should be disallowed and expunged in its entirety.

## COUNT FORTY-ONE

### DISALLOWANCE OF THE LATE CLAIMS PURSUANT TO 11 U.S.C. § 502(b), (e), AND (j)

#### *(Claim Nos. 767, 768, 769, 770, 771, and 772)*

806.    Plaintiff repeats and realleges each of the allegations set forth in Paragraphs 70-74, 159-184, 70-74, 283-344, and 394-424 above as if fully set forth herein.

807.    Jack Owoc filed the Late Claims, which purported to amend the Original Owoc Claims and add claims purportedly held by himself and the Commercial LLCs, in the Chapter 11 Cases.

808.    The Commercial LLCs failed to file any proofs of claim prior to the Bar Date.

00820070.DOCX 4                                                -125-

809.    The Commercial LLCs' Claims were not timely asserted and do not relate back to the claims asserted in the Original Owoc Claims because the Late Claims set forth wholly-new grounds of liability and, for the first time, assert secured status.

810.    The litigations for which Jack Owoc and/or the Commercial LLCs seek indemnity were either (i) caused by Jack Owoc's own bad acts, or (ii) Jack Owoc was the cause of the harms asserted in the litigations, and for certain litigations, Jack Owoc was found jointly and severally liable.

811.    Further, as alleged herein, Jack Owoc committed multiple breaches of his fiduciary duties owed to the Company, including the duty to act in good faith, in connection with, but not limited to, the Super Creatine Scheme, the False Advertising Judgment, the OBI/Monster Judgment, the establishment of the Owoc Real Estate Enterprise, the Commercial LLC property scheme, and postpetition misconduct and unauthorized transfers of the Debtors' assets, including its intellectual property assets.

812.    Ultimately, Jack Owoc was terminated as the Debtors' CEO on March 9, 2023 on account of his misconduct and related breaches of his fiduciary duties of loyalty and good faith.

813.    Because of this misconduct and his repeated breaches of his fiduciary duties, Jack Owoc is not entitled to payment on account of the Late Claims.

814.    The Debtors also have no obligation to reimburse Jack Owoc or the Commercial LLCs for any use of Jack Owoc's Southwest Ranches home, as any use of the home was pursuant to Jack Owoc's directives and not for the benefit of the Company.

815.    Further, the Debtors have no obligation to pay Jack Owoc's income tax liabilities, as Jack Owoc is not a party to any tax sharing agreement or the like that would create such obligation for the Company.

816.     In addition, all assets currently and formerly held by the Commercial LLCs were paid for, and maintained by, the Company and transferred to, or acquired by, the Commercial LLCs at Jack Owoc's direction for no consideration, and neither Jack Owoc nor the Commercial LLCs are entitled to any of the sale proceeds related to any of the Commercial LLCs' assets.

817.     Jack Owoc and the Commercial LLCs did not provide any documents to establish the amount or priority—secured or otherwise—of the Late Claims.

818.     Moreover, Jack Owoc and the Commercial LLCs did not provide any support or evidence that they have any subrogation rights.

819.     Therefore, the Late Claims should be disallowed under 11 U.S.C. § 502(b), (e), and (j).

820.     Plaintiff expressly reserves its right to supplement or amend this objection to the Late Claims.  Plaintiff hereby reserves all objections and defenses to the Late Claims.

### COUNT FORTY-TWO
### DISALLOWANCE OF THE OWOC UNLIQUIDATED CLAIM PURSUANT TO 11 U.S.C. § 502(b), (e), AND (j)
#### *(Claim No. 663)*

821.     Plaintiff repeats and realleges each of the allegations set forth in Paragraphs 70-74, 159-184, 70-74, 283-344, and 394-424 above as if fully set forth herein.

822.     The litigations for which Jack Owoc seeks indemnity were either (i) caused by Jack Owoc's own bad acts, or (ii) Jack Owoc was the cause of the harms asserted in the litigations, and for certain litigations, Jack Owoc was found jointly and severally liable.

823.     Further, Jack Owoc committed multiple breaches of his fiduciary duties to the Company, including the duty to act in good faith, in connection with, but not limited to, the Super Creatine Scheme, the False Advertising Judgment, the OBI/Monster Judgment, the establishment of the Owoc Real Estate Enterprise, the Commercial LLC property scheme, and postpetition

misconduct and unauthorized transfers of the Debtors' assets, including its intellectual property assets.

824.    Ultimately, Jack Owoc was terminated as the Debtors' CEO on March 9, 2023 on account of his misconduct and related breaches of his fiduciary duties of loyalty and good faith.

825.    Because of this misconduct and his repeated breaches of his fiduciary duties, Jack Owoc is not entitled to payment on account of the Owoc Unliquidated Claim.

826.    The Debtors also have no obligation to reimburse Jack Owoc for any use of Jack Owoc's Southwest Ranches home, as any use of the home was pursuant to Jack Owoc's directives and not for the benefit of the Company.

827.    Further, the Debtors have no obligation to pay Jack Owoc's income tax liabilities, as Jack Owoc is not party to any tax sharing agreement or the like that would create such obligation for the Company.

828.    All assets currently and formerly held by the Commercial LLCs were paid for, and maintained by, the Company and transferred to, or acquired by, the Commercial LLCs at Jack Owoc's direction for no consideration, and neither Jack Owoc nor the Commercial LLCs are entitled to any funds in connection with the sale proceeds of any of the Commercial LLCs' assets.

829.    Therefore, the Owoc Unliquidated Claim should be disallowed under 11 U.S.C. § 502(b), (e), and (j).

830.    Plaintiff expressly reserves its right to supplement or amend this objection to the Owoc Unliquidated Claim.  Plaintiff hereby reserves all objections and defenses to the Owoc Unliquidated Claim.

## COUNT FORTY-THREE

### DISALLOWANCE OF THE RENT-RELATED CLAIMS PURSUANT TO
### 11 U.S.C. § 502(b), (d), (e), AND (j)

#### *(Claim Nos. 767 and 770)*

831.    Plaintiff repeats and realleges each of the allegations set forth in Paragraphs 70-74, 159-184, 70-74, 283-344, and 394-424 above as if fully set forth herein.

832.    Jack Owoc filed the Late Claims, which purported to amend the Original Owoc Claims, in the Chapter 11 Cases.

833.    Two of the Late Claims contain the Rent-Related Claims, which assert that Jack Owoc, on behalf of himself, Sheridan A, and "JHO Real Estate LLC," has claims for the Postpetition Rent and the Prepetition Unpaid Rent.

834.    "JHO Real Estate LLC" does not appear to be a legal entity.

835.    The Rent-Related Claims were not timely asserted and do not relate back to the claims asserted in the Original Owoc Claims because the Rent-Related Claims set forth wholly-new grounds of liability.

836.    Jack Owoc, Sheridan A, and "JHO Real Estate LLC" have no entitlement to any purported pre or postpetition unpaid rent in connection with the AZ Property or the Sheridan A Property.

837.    The Rent-Related Claims assert in part administrative claims but were filed prior to the establishment of any administrative claim bar date, and no motion for payment of an administrative claim was filed.

838.    The AZ Property is property of the Estates, and neither Jack Owoc nor "JHO Real Estate LLC" have established that they are entitled to pre or postpetition rent for the property.

839.    Only parties with the proper authority may assert intercompany rent obligations.

840. At the time the Rent-Related Claims were filed, Jack Owoc did not have the authority to assert an intercompany rent obligation.

841. Further, Jack Owoc committed multiple breaches of his fiduciary duties owed to the Debtors, including the duty to act in good faith, in connection with, but not limited to, the Super Creatine Scheme, the False Advertising Judgment, the OBI/Monster Judgment, the establishment of the Owoc Real Estate Enterprise, the Commercial LLC property scheme, and postpetition misconduct and unauthorized transfers of the Debtors' assets, including its intellectual property assets.

842. Ultimately, Jack Owoc was terminated as the Debtors' CEO on March 9, 2023 on account of his misconduct and related breaches of his fiduciary duties of loyalty and good faith.

843. Because of this misconduct and his repeated breaches of his fiduciary duties, Jack Owoc is not entitled to payment on account of the Rent-Related Claims.

844. Jack Owoc and the Commercial LLCs did not provide any documents to establish the amount or priority of the Rent-Related Claims.

845. Therefore, the Rent-Related Claims should be disallowed under 11 U.S.C. § 502(b), (e), and (j).

846. Plaintiff expressly reserves its right to supplement or amend this objection to the Rent-Related Claims.  Plaintiff hereby reserves all objections and defenses to Rent-Related Claims.

## COUNT FORTY-FOUR

### DISALLOWANCE OF THE ASSERTED ADMIN CLAIM PURSUANT TO 11 U.S.C. § 502(b), (e), AND (j)

### *(Dkt. 1998 and Claim No. 885)*

847.    Plaintiff repeats and realleges each of the allegations set forth in Paragraphs 70-74, 159-184, 70-74, 283-344, and 394-424.

848.    Jack Owoc and Sheridan A purport to be claimants with a right to payment on account of the Asserted Admin Claim.

849.    Jack Owoc does not have, and has never had, legal title to the Sheridan A Property.

850.    The Sheridan A Property was purchased using the Company's funds and monies borrowed by the Company from Truist.

851.    The Company paid for all of the pre and postpetition carry costs for the Sheridan A Property.

852.    Pursuant to the unambiguous terms of the DIP Order, the sale proceeds are required to be used in part to reimburse the Debtors for the postpetition costs and expenses related to the Sheridan A Property.

853.    The DIP Order similarly provided that a portion of the sale proceeds for the Lithia Springs Property would be used to reimburse the Company for postpetition carrying costs associated with that Property.

854.    Unlike the Sheridan A Property, Jack Owoc in fact signed the closing statement for the like Lithia Springs Property, and the Debtors received the anticipated funds.

855.    For all of the reasons stated herein, the Asserted Admin Claim should be disallowed and expunged in its entirety pursuant to 11 U.S.C. § 502(b), (e), and (j).

856.    Plaintiff expressly reserves its right to supplement or amend this objection to the Asserted Admin Claim.  Plaintiff hereby reserves all objections and defenses to the Asserted Admin Claim.

## COUNT FORTY-FIVE
## RECHARACTERIZATION OF THE LATE CLAIMS
### *(Claim Nos. 767, 768, 769, 770, 771, and 772)*

857.    Plaintiff repeats and realleges each of the allegations set forth in Paragraphs 70-74, and 83-424 if fully set forth herein.

858.    At all relevant times, Jack Owoc was the CEO, sole shareholder, and sole board/managing member of each of the Debtors and in control of the Debtors and the Commercial LLCs.

859.    At all relevant times, there was an unmistakable identity of interest between the Debtors and the Commercial LLCs.

860.    At the time that the alleged obligations were incurred, the Debtors were insolvent and/or in a precarious financial condition, due to the inevitable and impending discovery of the Super Creatine Scheme, the establishment of the Owoc Real Estate Enterprise, and the contingent liabilities from the Company's pending litigations, including but not limited to, the Monster Lawsuit and the OBI/Monster Arbitration.

861.    The Debtors were undercapitalized at the time when the Late Claims purportedly arose.

862.    No disinterested lender would have made a loan to the Debtors under the circumstances at the time that the Late Claims purportedly arose.

863.    For all of the reasons stated herein, the Late Claims should be recharacterized as equity pursuant to 11 U.S.C. §§ 105(a) and 502(b)(1).

## COUNT FORTY-SIX

## RECHARACTERIZATION OF THE OWOC UNLIQUIDATED CLAIM

### *(Claim No. 663)*

864.    Plaintiff repeats and realleges each of the allegations set forth in Paragraphs 70-74, and 83-424 if fully set forth herein.

865.    At all relevant times, Jack Owoc was the CEO, sole shareholder, and sole board/managing member of each of the Debtors and in control of the Debtors and the Commercial LLCs.

866.    At all relevant times, there was an unmistakable identity of interest between the Debtors and the Commercial LLCs.

867.    At the time that the alleged obligations were incurred, the Debtors were insolvent and/or in a precarious financial condition, due to the inevitable and impending discovery of the Super Creatine Scheme, the establishment of the Owoc Real Estate Enterprise, and the contingent liabilities from the Company's pending litigations, including but not limited to, the Monster Lawsuit and the OBI/Monster Arbitration.

868.    The Debtors were undercapitalized at the time when the Late Claims purportedly arose.

869.    No disinterested lender would have made a loan to the Debtors under the circumstances at the time that the Late Claims purportedly arose.

870.    For all of the reasons stated herein, the Owoc Unliquidated Claim should be recharacterized as equity pursuant to 11 U.S.C. §§ 105(a) and 502(b)(1).

## COUNT FORTY-SEVEN

## RECHARACTERIZATION OF THE RENT-RELATED CLAIMS

### *(Claim Nos. 767 and 770)*

871.    Plaintiff repeats and realleges each of the allegations set forth in Paragraphs 70-74, and 83-424 if fully set forth herein.

872.    At all relevant times, Jack Owoc was the CEO, sole shareholder, and sole board/managing member of each of the Debtors and in control of the Debtors and the Commercial LLCs.

873.    At all relevant times, there was an unmistakable identity of interest between the Debtors and the Commercial LLCs.

874.    At the time that the alleged obligations were incurred, the Debtors were insolvent and/or in a precarious financial condition, due to the inevitable and impending discovery of the Super Creatine Scheme, the establishment of the Owoc Real Estate Enterprise, and the contingent liabilities from the Company's pending litigations, including but not limited to, the Monster Lawsuit and the OBI/Monster Arbitration.

875.    The Debtors were undercapitalized at the time when the Late Claims purportedly arose.

876.    No disinterested lender would have made a loan to the Debtors under the circumstances at the time that the Late Claims purportedly arose.

877.    For all of the reasons stated herein, the Rent-Related Claims should be recharacterized as equity pursuant to 11 U.S.C. §§ 105(a) and 502(b)(1).

## COUNT FORTY-EIGHT

## RECHARACTERIZATION OF THE ASSERTED ADMIN CLAIM

### *(Dkt. 1998 and Claim No. 885)*

878.    Plaintiff repeats and realleges each of the allegations set forth in Paragraphs 70-74, and 83-424 if fully set forth herein.

879.    No documentation exists, nor ever existed, showing any purported obligation by Vital to pay rent to Sheridan A for the use of the Sheridan A Property.

880.    The lease "agreement" providing for rent payments for the use of the Sheridan A Property between Quash and Sheridan A was signed solely by Jack Owoc as the person on both sides of the transaction.

881.    In addition to paying for the Sheridan A Property, at all relevant times, the Company paid all carrying costs for the Sheridan A Property.

882.    At all relevant times, Jack Owoc was CEO, sole shareholder, and sole board/managing member of each of the Debtors and in control of the Debtors and Sheridan A.

883.    At all relevant times, there was an unmistakable identity of interest between the Debtors and Sheridan A.

884.    At the time that the alleged obligations were incurred, the Debtors were insolvent and/or in a precarious financial condition, due to the inevitable and impending discovery of the Super Creatine Scheme, the establishment of the Owoc Real Estate Enterprise, and the contingent liabilities from the Company's pending litigations, including but not limited to, the Monster Lawsuit and the OBI/Monster Arbitration.

885.    The Debtors were undercapitalized at the time when the Late Claims purportedly arose.

886.    No disinterested lender would have made a loan to the Debtors under the circumstances at the time that the Late Claims purportedly arose.

887.    For all of the reasons stated herein, the Asserted Admin Claim should be recharacterized as equity pursuant to 11 U.S.C. §§ 105(a) and 502(b)(1).

## COUNT FORTY-NINE

### RECHARACTERIZATION OF THE SCHEDULED CLAIMS

888.    Plaintiff repeats and realleges each of the allegations set forth in Paragraphs 70-74, and 83-424 if fully set forth herein.

889.    At all relevant times, Jack Owoc was the CEO, sole shareholder, and sole board/managing member of each of the Debtors and in control of the Debtors and the Commercial LLCs.

890.    At all relevant times, there was an unmistakable identity of interest between the Debtors and the Commercial LLCs.

891.    At the time that the alleged obligations were incurred, the Debtors were insolvent and/or in a precarious financial condition, due to the inevitable and impending discovery of the Super Creatine Scheme, the establishment of the Owoc Real Estate Enterprise, and the contingent liabilities from the Company's pending litigations, including but not limited to, the Monster Lawsuit and the OBI/Monster Arbitration.

892.    The Debtors were undercapitalized at the time when the Late Claims purportedly arose.

893.    No disinterested lender would have made a loan to the Debtors under the circumstances at the time that the Late Claims purportedly arose.

894.    For all of the reasons stated herein, the Scheduled Claims should be recharacterized as equity pursuant to 11 U.S.C. §§ 105(a) and 502(b)(1).

## COUNT FIFTY

### EQUITABLE SUBORDINATION OF THE LATE CLAIMS
### PURSUANT TO 11 U.S.C. § 510(c)

***(Claim Nos. 767, 768, 769, 770, 771, and 772)***

895.    Plaintiff repeats and realleges each of the allegations set forth in Paragraphs 70-74, and 83-424 if fully set forth herein.

896.    The equities in these Chapter 11 Cases demand that the amounts allegedly owed to Jack Owoc and his wholly-owned Commercial LLCs should be subordinated to all other claims, except those of equity interest holders under 11 U.S.C. § 510(c).

897.    At all times relevant hereto, Jack Owoc and the Commercial LLCs were either a statutory "insider" of the Debtors, as such term is defined in 11 U.S.C. § 101(31), or alternatively, a de facto insider of the Debtors.

898.    Jack Owoc, as an insider with effective control over the Debtors and the Board and in his capacity as an alleged creditor, has engaged in substantial value destructive and inequitable misconduct, both pre and postpetition, that specifically harmed the Debtors and all of their key stakeholders, including, but not limited to:

> (a)    Concealment of the key terms and provisions contained in the 2010 Settlement Agreement from the Debtors and their employees, distributors, retailers, and the like;
>
> (b)    Causing the Debtors to perpetrate a fraud on the public and knowingly infringe on OBI's intellectual property for over a decade;
>
> (c)    Willfully and deliberately engaging in the Super Creatine Scheme in violation of the Lanham Act and causing the Debtors to do the same;
>
> (d)    Treating the Debtors' resources as his own including, for example, through the use of the Debtors' employees to do personal tasks for his sole benefit;
>
> (e)    Funneling money out of the Debtors while they were in a severely compromised financial condition and/or insolvent, including by transferring title of commercial real property belonging to the Debtors to the Commercial

LLCs and acquiring residential real property in the name of non-Debtor affiliates using the Debtors' funds;

(f)  Attempting to move the Company's intellectual property assets, such as the "Bang" mark, between various entities in order to shield such valuable assets from potential creditors;

(g)  Unilaterally causing the Debtors to breach their agreements with distributors, vendors, and other contract counter-parties, including Pepsi;

(h)  Causing assets of the Debtors' estates to be transferred to third parties without Court authority or the requisite Board approval; and

(i)  Attempting to thwart the Debtors' management and their professionals' efforts during the Chapter 11 Cases to maximize the value of the Debtors' assets for the benefit of all stakeholders.

899.    As a result of Jack Owoc's misconduct, all creditors in these Chapter 11 Cases have been materially harmed.  Without subordination, Jack Owoc and the Commercial LLCs would unfairly benefit over the interest of other creditors.

900.    Equitable subordination of the Late Claims to all other claims, except those of equity interest holders, is consistent with the provisions of the Bankruptcy Code.  Jack Owoc and the Commercial LLCs should not be permitted to profit from his fraud on the public and an illicit scheme to funnel money out of the Debtors that Jack Owoc willingly and intentionally wrought upon the Debtors and their creditors, in violation of his fiduciary duties and to the detriment of the Debtors' estates and creditors.

901.    For all of the reasons stated herein, the Late Claims should be equitably subordinated to all other claims, except those of equity interest holders under 11 U.S.C. § 510(c).

## COUNT FIFTY-ONE

## EQUITABLE SUBORDINATION OF THE OWOC UNLIQUIDATED CLAIM PURSUANT TO 11 U.S.C. § 510(c)

### *(Claim No. 663)*

902.    Plaintiff repeats and realleges each of the allegations set forth in Paragraphs 70-74, and 83-424 if fully set forth herein.

903.    The equities in these Chapter 11 Cases demand that the amounts allegedly owed to Jack Owoc should be subordinated to all other claims, except those of equity interest holders under 11 U.S.C. § 510(c).

904.    At all times relevant hereto, Jack Owoc was either a statutory "insider" of the Debtors, as such term is defined in 11 U.S.C. § 101(31), or alternatively, a de facto insider of the Debtors.

905.    Jack Owoc, as an insider with effective control over the Debtors and the Board and in his capacity as an alleged creditor, has engaged in substantial value destructive and inequitable misconduct, both pre and postpetition, that specifically harmed the Debtors and all of their key stakeholders, including, but not limited to:

    (a)    Concealment of the key terms and provisions contained in the 2010 Settlement Agreement from the Debtors and their employees, distributors, retailers, and the like;

    (b)    Causing the Debtors to perpetrate a fraud on the public and knowingly infringe on OBI's intellectual property for over a decade;

    (c)    Willfully and deliberately engaging in the Super Creatine Scheme in violation of the Lanham Act and causing the Debtors to do the same;

    (d)    Treating the Debtors' resources as his own including, for example, through the use of the Debtors' employees to do personal tasks for his sole benefit;

    (e)    Funneling money out of the Debtors while they were in a severely compromised financial condition and/or insolvent, including by transferring title of commercial real property belonging to the Debtors to the Commercial

-139-

LLCs and acquiring residential real property in the name of non-Debtor affiliates using the Debtors' funds;

(f)     Attempting to move the Company's intellectual property assets, such as the "Bang" mark, between various entities in order to shield such valuable assets from potential creditors;

(g)     Unilaterally causing the Debtors to breach their agreements with distributors, vendors, and other contract counter-parties, including Pepsi;

(h)     Causing assets of the Debtors' estates to be transferred to third parties without Court authority or the requisite Board approval; and

(i)     Attempting to thwart the Debtors' management and their professionals' efforts during the Chapter 11 Cases to maximize the value of the Debtors' assets for the benefit of all stakeholders.

906.    As a result of Jack Owoc's misconduct, all creditors in these Chapter 11 Cases have been materially harmed.  Without subordination, Jack Owoc would unfairly benefit over the interest of other creditors.

907.    Equitable subordination of the Owoc Unliquidated Claim to all other claims, except those of equity interest holders, is consistent with the provisions of the Bankruptcy Code.  Jack Owoc should not be permitted to profit from the results of his fraud on the public and an illicit scheme to funnel money out of the Debtors that Jack Owoc willingly and intentionally wrought upon the Debtors and their creditors, in violation of his fiduciary duties and to the detriment of the Debtors' estates and creditors.

908.    For all of the reasons stated herein, the Owoc Unliquidated Claim should be equitably subordinated to all other claims, except those of equity interest holders under 11 U.S.C. § 510(c).

**COUNT FIFTY-TWO**

**EQUITABLE SUBORDINATION OF THE RENT-RELATED CLAIMS
PURSUANT TO 11 U.S.C. § 510(c)**

*(Claim Nos. 767 and 770)*

909.     Plaintiff repeats and realleges each of the allegations set forth in Paragraphs 70-74,

and 83-424 if fully set forth herein.

910.     The equities in these Chapter 11 Cases demand that the amounts allegedly owed to

Jack Owoc and Sheridan A should be subordinated to all other claims, except those of equity

interest holders under 11 U.S.C. § 510(c).

911.     At all times relevant hereto, Jack Owoc and Sheridan A were either a statutory

"insider" of the Debtors, as such term is defined in 11 U.S.C. § 101(31), or alternatively, a de facto

insider of the Debtors.

912.     Jack Owoc, as an insider with effective control over the Debtors and the Board and

in his capacity as an alleged creditor, has engaged in substantial value destructive and inequitable

misconduct, both pre and postpetition, that specifically harmed the Debtors and all of their key

stakeholders, including, but not limited to:

    (a)    Concealment of the key terms and provisions contained in the 2010
        Settlement Agreement from the Debtors and their employees, distributors,
        retailers, and the like;

    (b)    Causing the Debtors to perpetrate a fraud on the public and knowingly
        infringe on OBI's intellectual property for over a decade;

    (c)    Willfully and deliberately engaging in the Super Creatine Scheme in violation
        of the Lanham Act and causing the Debtors to do the same;

    (d)    Treating the Debtors' resources as his own including, for example, through
        the use of the Debtors' employees to do personal tasks for his sole benefit;

    (e)    Funneling money out of the Debtors while they were in a severely
        compromised financial condition and/or insolvent, including by transferring
        title of commercial real property belonging to the Debtors to the Commercial

LLCs and acquiring residential real property in the name of non-Debtor affiliates using the Debtors' funds;

(f)     Attempting to move the Company's intellectual property assets, such as the "Bang" mark, between various entities in order to shield such valuable assets from potential creditors;

(g)     Unilaterally causing the Debtors to breach their agreements with distributors, vendors, and other contract counter-parties, including Pepsi;

(h)     Causing assets of the Debtors' estates to be transferred to third parties without Court authority or the requisite Board approval; and

(i)     Attempting to thwart the Debtors' management and their professionals' efforts during the Chapter 11 Cases to maximize the value of the Debtors' assets for the benefit of all stakeholders.

913.    As a result of Jack Owoc's misconduct, all creditors in these Chapter 11 Cases have been materially harmed.  Without subordination, Jack Owoc and Sheridan A would unfairly benefit over the interest of other creditors.

914.    Equitable subordination of the Rent-Related Claims to all other claims, except those of equity interest holders, is consistent with the provisions of the Bankruptcy Code.  Jack Owoc and Sheridan A should not be permitted to profit from the results of his fraud on the public and an illicit scheme to funnel money out of the Debtors that Jack Owoc willingly and intentionally wrought upon the Debtors and their creditors, in violation of his fiduciary duties and to the detriment of the Debtors' estates and creditors.

915.    For all of the reasons stated herein, the Rent-Related Claims should be equitably subordinated to all other claims, except those of equity interest holders under 11 U.S.C. § 510(c).

## COUNT FIFTY-THREE

### EQUITABLE SUBORDINATION OF THE ASSERTED ADMIN CLAIM PURSUANT TO 11 U.S.C. § 510(c)

#### *(Dkt. 1998 and Claim No. 885)*

916.    Plaintiff repeats and realleges each of the allegations set forth in Paragraphs 70-74, and 83-424 if fully set forth herein.

917.    The equities in these Chapter 11 Cases demand that the amounts allegedly owed to Jack Owoc and Sheridan A should be subordinated to all other claims, except those of equity interest holders under 11 U.S.C. § 510(c).

918.    At all times relevant hereto, Jack Owoc and Sheridan A were either a statutory "insider" of the Debtors, as such term is defined in 11 U.S.C. § 101(31), or alternatively, a de facto insider of the Debtors.

919.    Jack Owoc, as an insider with effective control over the Debtors and the Board and in his capacity as an alleged creditor, has engaged in substantial value destructive and inequitable misconduct, both pre and postpetition, that specifically harmed the Debtors and all of their key stakeholders, including, but not limited to:

    (a)    Concealment of the key terms and provisions contained in the 2010 Settlement Agreement from the Debtors and their employees, distributors, retailers, and the like;

    (b)    Causing the Debtors to perpetrate a fraud on the public and knowingly infringe on OBI's intellectual property for over a decade;

    (c)    Willfully and deliberately engaging in the Super Creatine Scheme in violation of the Lanham Act and causing the Debtors to do the same;

    (d)    Treating the Debtors' resources as his own including, for example, through the use of the Debtors' employees to do personal tasks for his sole benefit;

    (e)    Funneling money out of the Debtors while they were in a severely compromised financial condition and/or insolvent, including by transferring title of commercial real property belonging to the Debtors to the Commercial

LLCs and acquiring residential real property in the name of non-Debtor affiliates using the Debtors' funds;

(f)     Attempting to move the Company's intellectual property assets, such as the "Bang" mark, between various entities in order to shield such valuable assets from potential creditors;

(g)     Unilaterally causing the Debtors to breach their agreements with distributors, vendors, and other contract counter-parties, including Pepsi;

(h)     Causing assets of the Debtors' estates to be transferred to third parties without Court authority or the requisite Board approval; and

(i)     Attempting to thwart the Debtors' management and their professionals' efforts during the Chapter 11 Cases to maximize the value of the Debtors' assets for the benefit of all stakeholders.

920.    As a result of Jack Owoc's misconduct, all creditors in these Chapter 11 Cases have been materially harmed.  Without subordination, Jack Owoc and Sheridan A would unfairly benefit over the interest of other creditors.

921.    Equitable subordination of the Asserted Admin Claim to all other claims, except those of equity interest holders, is consistent with the provisions of the Bankruptcy Code.  Jack Owoc and Sheridan A should not be permitted to profit from the results of his fraud on the public and an illicit scheme to funnel money out of the Debtors that Jack Owoc willingly and intentionally wrought upon the Debtors and their creditors, in violation of his fiduciary duties and to the detriment of the Debtors' estates and creditors.

922.    For all of the reasons stated herein, the Asserted Admin Claim should be equitably subordinated to all other claims, except those of equity interest holders under 11 U.S.C. § 510(c).

## COUNT FIFTY-FOUR

### EQUITABLE SUBORDINATION OF THE SCHEDULED CLAIMS
### PURSUANT TO 11 U.S.C. § 510(c)

923.    Plaintiff repeats and realleges each of the allegations set forth in Paragraphs 70-74, and 83-424 if fully set forth herein.

924.    Jack Owoc is the sole shareholder and member of each of the Commercial LLCs.

925.    The equities in these Chapter 11 Cases demand that the amounts owed to Commercial LLCs in the Scheduled Claims should be subordinated to all other claims, except those of equity interest holders under 11 U.S.C. § 510(c).

926.    At all times relevant hereto, Jack Owoc and the Commercial LLCs were either a statutory "insider" of the Debtors, as such term is defined in 11 U.S.C. § 101(31), or alternatively, a de facto insider of the Debtors.

927.    Jack Owoc, as an insider with effective control over the Debtors and the Board and in his capacity as an alleged creditor, has engaged in substantial value destructive and inequitable misconduct that specifically harmed the Debtors and all of their key stakeholders including, but not limited to:

(a)    Concealment of the key terms and provisions contained in the 2010 Settlement Agreement from the Debtors and their employees, distributors, retailers, and the like;

(b)    Causing the Debtors to perpetrate a fraud on the public and knowingly infringe on OBI's intellectual property for over a decade;

(c)    Willfully and deliberately engaging false advertising by engaging in the Super Creatine Scheme in violation of the Lanham Act and causing the Debtors to do the same;

(d)    Treating the Debtors' resources as his own including, for example, the use of the Debtors' employees to do personal tasks for his sole benefit;

(e)    Funneling money out of the Debtors while in a severely compromised financial condition and/or insolvent, including by transferring title of commercial real property belonging to the Debtors to the Commercial LLCs

and acquiring residential real property in the name of non-Debtor affiliates using the Debtors' funds;

(f)     Attempting to move the Company's intellectual property assets, such as the "Bang" mark, between various entities into order to shield such valuable assets from potential creditors;

(g)     Unilaterally causing the Debtors to breach their agreements with distributors, vendors, and other contract counter-parties, including Pepsi;

(h)     Causing assets of the Debtors' estates to be transferred to third parties without Court authority or the requisite Board approval; and

(i)     Attempting to thwart the Debtors' management and their professionals' efforts during the Chapter 11 Cases to maximize the value of the Debtors' assets for the benefit of all stakeholders.

928.     As a result of Jack Owoc's misconduct, all creditors in these Chapter 11 Cases have been materially harmed.  Without subordination, the Commercial LLCs, and therefore Jack Owoc, would unfairly benefit over the other creditors.

929.     Equitable subordination of the Scheduled Claims to all other claims, except those of equity interest holders, is consistent with the provisions of the Bankruptcy Code.

930.     For all of the reasons stated herein, the Scheduled Claims should be equitably subordinated to all other claims, except those of equity interest holders under 11 U.S.C. § 510(c).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court enter an order:

(a)     finding that Jack Owoc breached his fiduciary duties of care, loyalty, and good faith owed to the Debtors and their creditors by:

i.     perpetuating the Super Creatine Scheme, falsely advertising the Bang Drink, and taking the actions giving rise to the False Advertising Judgment against Jack Owoc, individually, and the Company;

ii.     selling Bang products in the general beverage section of retail stores in violation of the 2010 Settlement Agreement and taking the actions causing the OBI/Monster Judgment against the Company;

iii.     funneling hundreds of millions of dollars out of the Company to pay a wide variety of personal expenses, including income taxes and to operate

the Owoc Real Estate Enterprise using the Debtors' funds and by utilizing the Company's employees for personal purposes;

    iv.   terminating the Pepsi Distribution Agreement arbitrarily and without good cause, forcing the Company to enter into the Pepsi Settlement Agreement; and

    v.   engaging in an ongoing and repeated pattern of misconduct during the course of the Chapter 11 Cases;

(b)    finding that the Real Estate Enterprise Defendants aided and abetted Jack Owoc's breaches of fiduciary duty;

(c)    finding that Elite Island aided and abetted Jack Owoc's breaches of fiduciary duty;

(d)    finding that Jack Owoc and Megan Owoc were unjustly enriched by their improper use of the Company's employees for their personal benefit;

(e)    avoiding and recovering fraudulent transfers of property of the Debtors to, or for the benefit of, Jack Owoc pursuant to Fla. Stat. §§ 726.105(1)(b) and 726.108, or in the alternative, pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 550; or Fla. Stat. §§ 726.105(1)(a) and 726.108 or 11 U.S.C. §§ 548(a)(1)(A) and 550;

(f)    avoiding and recovering preferential transfers to Jack Owoc and Megan Owoc pursuant to 11 U.S.C. §§ 547(b) and 550;

(g)    avoiding and recovering fraudulent transfers of property of the Debtors to, or for the benefit of, Jack Owoc and each of the Commercial LLCs in connection with the acquisition of commercial real property pursuant to Fla. Stat. §§ 726.105(1)(b) and 726.108, or in the alternative, pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 550; or Fla. Stat. §§ 726.105(1)(a) and 726.108, or 11 U.S.C. §§ 548(a)(1)(A) and 550;

(h)    avoiding and recovering fraudulent transfers of property of the Debtors to, or for the benefit of, Elite Island in connection with the acquisition of commercial real property pursuant to Fla. Stat. §§ 726.105(1)(b) and 726.108, or in the alternative, pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 550; or Fla. Stat. §§ 726.105(1)(a) and 726.108, or 11 U.S.C. §§ 548(a)(1)(A) and 550;

(i)    avoiding and recovering fraudulent transfers of property of the Debtors to, or for the benefit of, Tropical Sunset, Jack Owoc, Jon Owoc, and Stag (or in the alternative, the Real Estate Enterprise Defendants) in connection with the acquisition of commercial real property pursuant to Fla. Stat. §§ 726.105(1)(b) and 726.108, or in the alternative, pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 550; or Fla. Stat. §§ 726.105(1)(a) and 726.108, or 11 U.S.C. §§ 548(a)(1)(A) and 550;

(j)    declaring that the properties owned by the Real Estate LLCs are, in fact, the property of the Debtors' Estates and that the Debtors are entitled to the proceeds, if any, from the sale of the properties;

(k)    declaring that the property owned by JHO NV is, in fact, the property of the Debtors' Estates and that the Debtors are entitled to the proceeds, if any, from the sale of the properties;

(l)    declaring that any claims held by the Commercial LLCs are limited to the amounts and priorities set forth in the Scheduled Claims;

(m)    declaring that the Disputed Sheridan Funds belong to the Plaintiff;

(n)    declaring that JHO Real Estate LLC is neither a claimant nor a creditor in these Chapter 11 Cases;

(o)    disallowing and expunging any claims filed or held by Jack Owoc or the Commercial LLCs pursuant to 11 U.S.C. § 502;

(p)    disallowing and expunging the Late Claims, the Owoc Unliquidated Claim, the Rent-Related Claims, and the Asserted Admin Claim pursuant to 11 U.S.C. § 502;

(q)    recharacterizing the Late Claims, the Owoc Unliquidated Claim, the Rent-Related Claims, the Asserted Admin Claim, and the Scheduled Claims as equity pursuant to 11 U.S.C. §§ 105(a) and 502(b)(1);

(r)    providing for the equitable subordination of the Late Claims, the Owoc Unliquidated Claim, the Rent-Related Claims, the Asserted Admin Claim, and the Scheduled Claims pursuant to 11 U.S.C. § 510(c);

(s)    finding that Plaintiff is entitled to prejudgment interest on its successful claims;

(t)    finding that Plaintiff is entitled to recover from Defendants reasonable costs incurred in the prosecution of this Adversary Proceeding; and

(u)    granting such other and further relief as the Court deems just and equitable.

Dated: June 7, 2024

<div style="display: flex;">

**LOWENSTEIN SANDLER LLP**

Jeffrey L. Cohen, Esq.
Eric Chafetz, Esq.
Michael A. Kaplan, Esq.
Markiana J. Julceus, Esq.
Erica G. Mannix, Esq.
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 262-6700
Facsimile: (212) 262-7402
Email: jcohen@lowenstein.com
Email: echafetz@lowenstein.com
Email: mkaplan@lowenstein.com
Email: mjulceus@lowenstein.com
Email: emannix@lowenstein.com

**BAST AMRON LLP**

By:    */s/ Peter J. Klock, II*
Brett M. Amron (FBN 0148342)
Peter J. Klock, II (FBN 103915)
One Southeast Third Avenue, Suite 2410
Miami, Florida 33131
Telephone: (305) 379-7904
Facsimile: (786) 206-8740
Email: bamron@bastamron.com
Email: pklock@bastamron.com

</div>

*Counsel to the Liquidating Trust and Liquidating Trustee*