UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 11 Cases |
| VITAL PHARMACEUTICALS, INC., *et al.*,[1] | Case No.: 22-17842-PDR |
| Debtors. | (Jointly Administered) |

_____/

VPX LIQUIDATING TRUST, by and through its
Liquidating Trustee,

       Plaintiff,

v.                                                                            Adv. Pro. No. 24-01009-PDR

JOHN H. OWOC, MEGAN ELIZABETH OWOC,
JONATHAN W. OWOC, BRANDEN SHAW,
DAVID RUNNEBAUM, JWO REAL ESTATE
INVESTMENT I, LLC, JWO REAL ESTATE
INVESTMENT II LLC, JW OWOC
ENTERPRISES, LLC, 167 SPYGLASS LN LLC,
120 SPYGLASS LN LLC, 3 PELICAN DR LLC,
TROPICAL SUNSET LLC, STAG
DEVELOPMENT LLC, SHAW INVESTMENTS
& REALTY, INC., ELITE ISLAND LLC, JHO
GA-1 INVESTMENT, LLC, JHO NV-1
INVESTMENT LLC, SHERIDAN REAL
ESTATE INVESTMENT A, LLC, SHERIDAN
REAL ESTATE INVESTMENT B, LLC, and
SHERIDAN REAL ESTATE INVESTMENT C,
LLC,

       Defendants.

_____/

## LIQUIDATING TRUST'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNT THREE OF SECOND AMENDED COMPLAINT

---

[1] The address of the Debtors is 1600 N. Park Drive, Weston, FL 33326. The last four digits of the Debtors' federal tax identification numbers are: (i) Vital Pharmaceuticals, Inc. (8430); (ii) Bang Energy Canada, Inc. (5454); (iii) JHO Intellectual Property Holdings, LLC (0010); (iv) JHO Real Estate Investment, LLC (9394); (v) Quash Seltzer, LLC (6501); (vi) Rainbow Unicorn Bev LLC (2254); and (vii) Vital Pharmaceuticals International Sales, Inc. (8019).

The Liquidating Trust in the above-captioned chapter 11 bankruptcy cases (the "Liquidating Trust" or "Plaintiff"), by and through its undersigned counsel, hereby moves for partial summary judgment against Defendant John H. Owoc ("Jack Owoc") on Count Three of the Second Amended Complaint (Dkt. No. 148) (the "Complaint"),[2] and, in support thereof, states as follows:

## I.    INTRODUCTION

Over the course of more than a decade leading up to their long-overdue bankruptcy filings, Vital Pharmaceuticals, Inc.'s ("VPX") sole director, member, Chief Executive Officer ("CEO"), and self-proclaimed "Chief Science Officer," Defendant Jack Owoc, went to great lengths in his efforts to deceive consumers about the efficacy of VPX's products and to enrich himself and his family members at their expense.  To that end, Jack Owoc devised and executed, *inter alia*, a years-long false advertising scheme that resulted in meteoric growth in profitability of VPX while simultaneously generating hundreds of millions of dollars in liability in resulting litigation for false advertising claims.  Effectuating his scheme included creating a functionally useless compound to include in VPX's Bang products, which he dubbed – and caused VPX to intentionally falsely advertise as – "Super Creatine" (the "Super Creatine Scheme").

The Super Creatine Scheme ultimately resulted in Monster Energy Company ("Monster") filing suit against VPX and Jack Owoc, individually, for, *inter alia*, intentional false advertising in violation of the Lanham Act (the "Monster Litigation").  Following the trial in the Monster Litigation, a jury found that VPX and Jack Owoc had willfully and deliberately engaged in false advertising in violation of the Lanham Act (the "False Advertising Judgment").  Indeed, as

---

[2] The Liquidating Trust anticipates seeking summary judgment on an additional claim or claims in this matter.

determined by the Court of Appeals for the Ninth Circuit, the key issue at trial was "whether Monster had shown that Jack Owoc's advertisement of BANG as containing Super Creatine was false advertising under the Lanham Act."

As a matter of law, Jack Owoc's years-long willful and deliberate perpetuation of the Super Creatine Scheme, which resulted in nearly $300 million in damages to VPX in connection with the False Advertising Judgment, amounted to – at the very least – gross negligence and a breach of his duty of care to VPX. Accordingly, there can be no genuine dispute over whether Owoc breached his fiduciary duties to VPX by advertising VPX's flagship Bang products as containing Super Creatine, as alleged in Count 3 of the Complaint, and Plaintiff is therefore entitled to summary judgment on Count 3.

## II.    UNDISPUTED FACTS

1.    In 2018, Monster filed suit against Jack Owoc and VPX for, among other things, making false and misleading statements of fact about the Bang energy drink, including various purported health benefits and the claim that it contained some form of creatine. Ex. 1, *Plaintiff Monster Energy Company's First Amended Complaint*, at ¶ 122.[3]

2.    More specifically, Monster alleged, among other things, that:

   a.    Jack Owoc and VPX falsely claimed that Super Creatine, an ingredient in the Bang energy drink, can "reverse . . . loss of skeletal muscle," "has anti-depressive effects," "increases cell swell which increases protein synthesis," "increases cognition and attention span," "can increase [users'] I.Q.," and is "neuroprotective in the brain," *id.* at ¶ 46;

---

[3] As set forth in Plaintiff's *Motion to take Judicial Notice of Certain Filings in Monster Energy Co. v. Vital Pharms, Inc. in Support of Motion for Summary Judgment* (Dkt. No. 365), the Court may take judicial notice of Exhibits 1–4 to this motion.

b. "Super Creatine is not creatine," *id.* at ¶ 51;

c. Super Creatine is actually "creatyl-L-leucine, which is a fundamentally different molecule," *id.*;

d. "[T]here is no creatine in Bang," *id.* at ¶ 52;

e. "[T]he Super Creatine compound is functionally useless . . . [because] it passes through the body largely unutilized," *id.* at ¶ 53; and

f. "[E]ven when the Super Creatine compound is exposed to acidity levels in which it can break down . . . [it] transforms directly in a waste compound . . .—which VPX has described as a 'useless substance,'" *id.*

3. Monster alleged that Jack Owoc and VPX knew that their claims about the Bang energy drink were false, misleading, and deceptive. *Id.* at ¶¶ 2–3, 53–54, 56, 63–66, 70, 124.

4. Monster alleged also that the foregoing conduct violated Section 43(a) of the Lanham Act, 15 U.S.C. § 1125. *Id.* at ¶¶ 121–28.

5. On August 29, 2022, following the trial in the Monster Litigation, the jury returned a verdict in which it:

a. found Jack Owoc and VPX liable for false advertising under the Lanham Act, *see* Ex. 2, *Verdict Form*, at ¶ 1;

b. found that VPX and Jack Owoc's false advertising was willful and deliberate; *id.*, ¶ 3; and

c. awarded Monster $271,924,174 in damages "for VPX's and/or [Jack] Owoc's false advertising[,]" *id.,* ¶ 2.

6. Additionally, Monster was awarded nearly $21,000,000 in attorneys' fees and more than $6,000,000 in non-taxable costs. Ex. 3, *Order (1) DENYING Defendants' Motion for New*

*Trial, Judgment Notwithstanding the Verdict, or Remittitur (Dkt. No. 921); (2) GRANTING-IN-PART Plaintiff's Motion for Equitable Relief, Fees, and Costs (Dkt. No. 928); (3) DENYING Defendant's Request for Clarification (Dkt. No. 1035); and (4) DENYING Defendant's Application to File Supplemental Opposition Under Seal (Dkt. No. 1038)*, at 31 & 33 [hereinafter *Order Denying Motion for New Trial*].

7.      In its Order Denying Motion for New Trial, the District Court for the Central District of California noted,

> The jury determined that Defendants [Jack Owoc and VPX] are liable for false advertising under the Lanham Act and that their false advertising was willful and deliberate. In so deciding, the jury necessarily found that Defendants' advertising of Super Creatine (1) is false or misleading; (2) deceives or is likely to deceive consumers; (3) is material to consumers' purchasing decisions; and (4) injured Monster.

*Id.* at 18.

8.      Additionally, on April 12, 2023, Jack Owoc and VPX were permanently enjoined "from falsely or deceptively claiming that Super Creatine is creatine, that Bang contains creatine, and that Bang or Super Creatine provide the physical, mental, health, or other benefits of creatine." *Id.*

9.      Finally, in disposing of Jack Owoc's appeal taken from the final judgment in the Monster Litigation, the Ninth Circuit Court of Appeals noted that the subject of the Monster Litigation was, *inter alia*, Monster's claim:

> That the Defendants had violated Section 43(a) of the Lanham Act by falsely advertising that their energy drink BANG contained "Super Creatine" when, in fact, it did not contain creatine—let alone some super version of it—and did not provide any of the health benefits associated with creatine.

Ex. 4, *Memorandum*, at 2. And the Ninth Circuit also found that the "key issue at trial" was "whether Monster had shown that Owoc's advertisement of BANG as containing Super Creatine was false advertising under the Lanham Act." *Id.* at 5.

### III.    LEGAL STANDARD

The Federal Rules of Civil Procedure provide that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

> The moving party has the burden of showing the absence of a genuine issue as to any material fact, and in deciding whether the movant has met this burden the court must view the movant's evidence and all factual inferences arising from it in the light most favorable to the nonmoving party.

*Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

"[O]nce the moving party has met that burden by presenting evidence which, if uncontradicted, would entitle it to a directed verdict at trial, [the burden] shifts to the non-moving party . . . of presenting specific facts showing that such contradiction is possible."  *Walker v. Darby*, 911 F.2d 1573, 1576 (11th Cir. 1990).  In opposing summary judgment, a party cannot rely upon mere allegations or denials and must instead set forth specific facts showing that there is a genuine issue for trial.  *Id.* at 1576–77.  "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party."  *Id.* (citing *Anderson v. Liberty Lobby*, 477 U.S. 242 (1986)); *see also Whitehead v. BBVA Compass Bank*, 979 F.3d 1327, 1329 (11th Cir. 2020).

### IV.    ARGUMENT

In Count 3 of the Complaint, the Liquidating Trust alleges that Jack Owoc breached his fiduciary duties to VPX by advertising VPX's Bang products as containing Super Creatine.[4] Specifically, the Liquidating Trust alleges that Jack Owoc devised a functionally useless compound that he named "Super Creatine," which contains no creatine and offers no health benefits, marketed Bang energy drinks in violation of the Lanham Act by making false claims

---

[4]  *See* Complaint, at ¶¶ 10–13, 93–114.

about Super Creatine (including that it is a new form of creatine with significant health benefits), and caused VPX to incur nearly $300 million in damages as a result of his conduct.[5]  There can be no question that – factually – Jack Owoc engaged in the conduct described in Count 3. That issue was already litigated and determined in the Monster Litigation and the resulting False Advertising Judgment, and Jack Owoc is precluded from re-litigating it under the doctrine of collateral estoppel. *See In re 160 Royal Palm, LLC*, No. 22-12901, 2023 WL 2733533, at *2 (11th Cir. Mar. 31, 2023) ("Collateral estoppel bars a party from relitigating an issue already decided in a prior suit.").

To wit, the Supreme Court established long ago that collateral estoppel may be used "offensively" to preemptively preclude an opposing party from relitigating factual issues previously determined against them. *Parklane Hosier Co. v. Shore*, 439 U.S. 322, 337 (1979). Collateral estoppel applies when an issue is (1) identical to one previously litigated, (2) actually litigated in the prior proceedings, (3) critical and necessary to the judgment in the earlier proceedings, and (4) the estopped party must have had a full and fair opportunity to litigate the issue in the prior proceeding. *In re MDL-1824 Tri-State Water Rts. Litig.*, 644 F.3d 1160, 1202 (11th Cir. 2011).  With respect to Jack Owoc's willful and deliberate perpetuation of the Super Creatine Scheme, each requirement is easily met here.

First, the willful false advertising in violation of the Lanham Act vis-à-vis Super Creatine described in the Complaint is identical to that which was the subject of the Monster Litigation. *Compare, e.g.,* Ex. 1, at ¶¶ 46, 51–53 *with* Complaint, at ¶¶ 10–13, 93–114.  Second, "whether . . . [Jack] Owoc's advertisement of BANG as containing Super Creatine was false advertising" was thoroughly litigated in the Monster Litigation – the Ninth Circuit Court of Appeals described it as

---

[5]  *Id.*

"the key issue at trial." Ex. 4 at 5.  Third, the jury's determination that Jack Owoc's advertising of Super Creatine was false or misleading was necessary to its determination of liability on the Lanham Act claim.  *See* Ex. 3 at 18.[6]  Fourth, Jack Owoc had a full and fair opportunity – and every incentive – to litigate the truth or falsity of his claims about Super Creatine.  At stake was not only his personal liability under the Lanham Act, but the future of his company, VPX.  And Jack Owoc not only defended the Lanham Act claim all the way through trial, but he also fully exercised his appellate rights.  *See* Ex. 4.  Accordingly, the doctrine of collateral estoppel bars Jack Owoc from re-litigating the factual basis of Count 3 – whether he engaged in false advertising related to Super Creatine and caused harm to VPX.

Moreover, there can be no question that the conduct described in Count 3 constitutes a breach of Jack Owoc's fiduciary duty to VPX.  Under Florida law, the elements necessary to state of cause of action for breach of fiduciary duty are: 1) existence of a fiduciary duty; 2) a breach of that duty; and 3) damage proximately caused by that duty. *Gracey v. Eaker*, 837 So. 2d 348, 353 (Fla. 2002).

As an initial matter, officers and directors of a corporation owe the duties of care and loyalty to the corporation, and Jack Owoc was the sole director and CEO of VPX.  *See Taubenfeld v. Lasko*, 324 So. 3d 529, 538 (Fla. 4th DCA 2021).  Second, Jack Owoc breached his duty of care to VPX.  The duty of care is well understood to require that directors "use that amount of care which ordinarily careful and prudent men would use in similar circumstances" and "consider all material information reasonably available." *In re TOUSA, Inc.*, 437 B.R. 447, 462 (S.D. Fla. 2010).[7]  The applicable legal standard for a breach of the duty of care is gross negligence, which

---

[6]  *See* Part II, ¶ 7, above.

[7]  While the *In re TOUSA* court was interpreting Delaware state law, Florida courts (and federal courts applying Florida law) regularly consult Delaware cases on matters of corporate law. *See, e.g., Taubenfeld*

"appears to be synonymous with 'engaging in an irrational decision making process.'" *Id.* (citing *In re Greater Southeast Cmty. Hosp. Corp.,* 353 B.R. 324, 339 (Bankr. D. Col. 2006)). A corporate strategy fails to meet that standard of care if it reflects "a knowing and deliberate indifference to the potential risk of harm to the Company." *Id.* (citing *Boles v. Filipowski (In re Enivid, Inc.),* 345 B.R. 426, 451 (Bankr. D. Mass. 2006)).

In this case, it is beyond dispute that Jack Owoc willfully and deliberately engaged in false advertising related to Bang products and Super Creatine, *see* Ex. 2, and, therefore, the strategy that he caused VPX to adopt reflected his knowing and deliberate indifference to the risk of harm to the company, and the magnitude of the damages he caused were so great that they directly contributed to VPX's seeking protection under Chapter 11 of the Bankruptcy Code. *See* Main Case Dkt. No. 26 at ¶ 41 ("The Company commenced these cases in order to (a) obtain 'breathing room' from pending litigation, including the OBI Judgment and F[alse] A[dvertising] A[ction] Verdict . . . ."). Thus, Jack Owoc breached his duty of care to VPX and caused hundreds of millions of dollars in damages to VPX. Accordingly, the Liquidating Trust is entitled to summary judgment on Count 3 of the Complaint.

## V.    CONCLUSION

WHEREFORE, based on the foregoing, the Liquidating Trust respectfully requests that this Court enter an Order granting: (i) partial summary judgment on Count 3 of the Complaint and (ii) any other and further relief that the Court deems just and proper.

---

*v. Lasko*, 324 So. 3d 529, 538–39 (Fla. 4th DCA 2021) (describing contours of duty of care under Florida law by reference to Delaware law); *see also Williams v. Stanford*, 977 So. 2d 722, 727-28 (Fla. 1st DCA 2008); *see also Int'l Ins. Co. v. Johns*, 874 F.2d at 1459 n.22 (11th Cir. 1989) ("We rely with confidence upon Delaware law to construe Florida corporate law. The Florida courts have relied upon Delaware corporate law to establish their own corporate doctrines.").

Dated: December 23, 2025

**LOWENSTEIN SANDLER LLP**

Jeffrey L. Cohen, Esq. (*admitted pro hac vice*)
Eric Chafetz, Esq. (*admitted pro hac vice*)
Michael A. Kaplan, Esq. (*admitted pro hac vice*)
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 262-6700
Facsimile: (212) 262-7402
Email: jcohen@lowenstein.com
Email: echafetz@lowenstein.com
Email: mkaplan@lowenstein.com

**BAST AMRON LLP**

By: */s/ Peter J. Klock, II*
Brett M. Amron (FBN 0148342)
Peter J. Klock, II (FBN 103915)
One Southeast Third Avenue, Suite 2410
Miami, Florida 33131
Telephone: (305) 379-7904
Facsimile: (786) 206-8740
Email: bamron@bastamron.com
Email: pklock@bastamron.com

*Counsel to the Liquidating Trust*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing is being served on all parties registered to receive electronic notifications in this case via CM/ECF on this 23rd day of December, 2025.

/s/ *Peter J. Klock, II*
Peter J. Klock, II

# EXHIBIT 1

John C. Hueston, State Bar No. 164921
jhueston@hueston.com
Moez M. Kaba, State Bar No. 257456
mkaba@hueston.com
Steven N. Feldman, State Bar No. 281405
sfeldman@hueston.com
HUESTON HENNIGAN LLP
523 West 6th Street, Suite 400
Los Angeles, CA 90014
Telephone:   (213) 788-4340
Facsimile:   (888) 775-0898

Attorneys for Plaintiff
MONSTER ENERGY COMPANY, a Delaware
Corporation

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MONSTER ENERGY COMPANY, a Delaware corporation,<br><br>Plaintiff,<br><br>vs.<br><br>VITAL PHARMACEUTICALS, INC., d/b/a VPX Sports, a Florida corporation; and JOHN H. OWOC a.k.a. JACK OWOC, an individual,<br><br>Defendants. | Case No. 5:18-cv-1882<br><br>**PLAINTIFF MONSTER ENERGY COMPANY'S FIRST AMENDED COMPLAINT FOR:**<br><br>**1. Violation of the Lanham Act**<br>**2. Unfair Competition**<br>**3. False Advertising**<br>**4. Trade Libel**<br>**5. Intentional Interference with Contractual Relations**<br>**6. Intentional Interference with Prospective Economic Advantage**<br>**7. Conversion**<br>**8. Larceny**<br>**9. False Patent Marking**<br>**10. Violation of the California Uniform Trade Secrets Act**<br>**11. Violation of the Defend Trade Secrets Act**<br>**12. Violation of the Computer Fraud and Abuse Act**<br><br>**DEMAND FOR JURY TRIAL** |

- 1 -

5521379

Plaintiff Monster Energy Company ("Monster") brings this action against Defendants Vital Pharmaceuticals, Inc., d/b/a VPX Sports ("VPX"), and John H. Owoc a.k.a. Jack Owoc ("Owoc") (collectively, "Defendants") and alleges as follows:

## I. INTRODUCTION

1.      Fueled by flagrant consumer deception and systematic anti-competitive businesses practices, BANG energy drink has experienced significant market growth. Monster brings this suit to halt these practices, and hold Defendants VPX and Owoc accountable.

2.      VPX and Owoc's bad acts are damaging, dangerous, and despicable. Defendants lie to consumers, promising that BANG, for example, will build lean muscle and improve brain function.  They cheat government regulators, ignoring health and safety laws that provide essential protections to the public.  They steal from competitors, rewarding employees for poaching valuable in-store shelf space to which competitors have a contractual right.  And they brazenly misappropriate confidential and trade secret information, promising Monster employees jobs and high incomes if they bring Monster's proprietary information to VPX.

3.      In fact, BANG's main pitch to consumers is a hoax.  The product's chief marketing draw is its "Super Creatine," a chemical compound that Owoc claims can, among other things, fight depression and reverse "mental retardation."  As it turns out, BANG's "Super Creatine" compound is neither "super" nor "creatine."  In fact, despite what Bang prominently claims on its cans, ***there is no creatine in BANG***. And even VPX's own research shows that unlike real creatine, the "Super Creatine" compound is essentially useless when ingested by consumers.

4.      Aside from being false, Defendants' claims about what Super Creatine can do also directly violate U.S. Food and Drug Administration ("FDA") regulations prohibiting manufacturers from making unauthorized health claims about their products.

PLAINTIFF MONSTER ENERGY COMPANY'S FIRST AMENDED COMPLAINT

5521379

5.     But Defendants' unfair conduct doesn't stop with false advertising and illegal labeling.  They have also systematically interfered with competitors'—chiefly, Monster's—sales and contractual rights, by rewarding employees and distributors for stealing valuable in-store shelf space.  Monster's shelf space is BANG's primary target.

6.     Defendants know that this shelf space is not theirs to take.  In the beverage industry, shelf space is often determined by contract between retailers and product vendors.  Those contracts are extremely valuable, impact consumer behavior, and typically take years to earn.  By short-circuiting this normal competitive process, VPX is not only stealing a contractual right from Monster, it is also effectively stealing sales and goodwill.

7.     VPX and Owoc are also attempting to steal Monster's trade secrets and employees.  Recently, a VPX manager for the BANG product offered a long-time Monster employee a job with one express precondition: steal Monster's confidential information, including proprietary pricing data.  When the Monster employee stopped the conversation and told the VPX manager that his request was unethical, the VPX manager terminated the phone call.

8.     While VPX's tactics were repelled on that occasion, other attempts by VPX to steal Monster's trade secrets and employees appear to have succeeded.  VPX recently hired three Monster employees, and in one instance, Monster discovered that the former employee had not only lied about returning his Monster-issued electronic devices and proprietary documents, but had also downloaded five USB sticks of confidential and proprietary information shortly before his departure.  That former employee had no legitimate business reason to download or store those reams of data and did so contrary to Monster policy and his contractual obligations.

9.     Monster has also confirmed that the former employee accessed and likely used the stolen data for VPX's gain.  Metadata analysis has shown that he continued to open the stolen files after he departed Monster and ***even after*** he began

5521379

1   working at VPX.

2       10.    VPX and Owoc's unfair conduct related to BANG is part of a larger

3   pattern of rule breaking. Over the years, VPX and Owoc have been reprimanded by

4   the FDA for putting dangerous and untested chemicals in their products; censured by

5   the Better Business Bureau for making false claims about their products' potency;

6   credibly accused of creating sham "studies" to prove up their products; and sued over

7   a hundred times for conduct ranging from wage-and-hour violations to unlawful

8   discrimination to shirking on debts.

9       11.    The most unfortunate part of Bang's wide-ranging illegal scheme is that

10   it appears to have worked. VPX's refusal to play by the rules has artificially boosted

11   its sales at the expense of competitors and consumers alike. This suit will put an end

12   to these practices, and protect Monster, its consumers, and the public.

13                                **II.  PARTIES**

14       12.    Monster is a Delaware corporation with its principal place of business at

15   1 Monster Way, Corona, California 92879. Monster develops, markets, and sells

16   energy drinks. Monster's products are sold throughout the United States, including

17   California, and more than 150 other countries. Monster is the best-selling energy

18   drink brand in the United States by both unit count and dollar value. Since 2002,

19   Monster has spent over $5 billion advertising, promoting, and marketing its brand

20   and products.

21       13.    Defendant VPX is a Florida corporation with its principal place of

22   business at 1600 North Park Drive, Weston, Florida 33326. VPX also develops,

23   markets, sells, and distributes energy drinks.

24       14.    Defendant John H. Owoc is the founder, CEO, Chief Scientific Officer,

25   and owner of VPX. He is a citizen of Florida.

26

27

28

### III.  JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction because the parties are diverse and the amount in controversy exceeds $75,000.  *See* 28 U.S.C. § 1332. Additionally, the Court has subject matter jurisdiction because the case involves federal law (the Lanham Act, 35 U.S.C. § 292, 18 U.S.C. § 1836 *et. seq*, and 18 U.S.C. § 1030 *et. seq.*) and related state claims (such as California's Unfair Competition Law).  *See* 28 U.S.C. §§ 1331, 1338.

16.     This Court has personal jurisdiction over VPX because it conducts business in the State of California.  Among other things, VPX sells and distributes BANG to California residents and businesses through a network of fifteen direct store distributors in California, retailers, direct sales on the internet (*e.g.*, www.bang-energy.com), and other means; VPX advertises and promotes BANG to California residents and businesses through the internet, social media, BANG labels, and other forms of marketing; VPX has employees and/or independent contractors in California; and VPX has instructed employees to interfere with Monster's contractual rights to in-store shelf space at California retail locations.[1]

17.     California is a particularly important market for VPX.  An industry publication recently reported that while BANG holds only a 4% market share nationally, it is approaching a 10% share in West Coast markets.

18.     This Court has jurisdiction over Owoc because he has directed the VPX activities described above and herein.  As VPX's founder, CEO, and Chief Scientific Officer, Owoc personally oversees all of its corporate operations, including product development, testing, quality control, manufacturing, distribution, marketing, media, and sales.  Owoc is an integral part of VPX's day-to-day operations and has been

---

[1] Based on Monster's initial investigation, it appears that Defendants have tortiously interfered with Monster's contractual rights throughout California, including in Sacramento, Woodland, Roseville, Yuba City, Orangeville, Studio City, Culver City, Watsonville, Escalon, Fresno, Los Angeles, Rio Linda, Auburn, Oceanside, Livermore, Fremont, King City, Hayward, Garden Grove, Anaheim, Fremont, Rocklin, and Corona.

5521379

1    since its inception.  Moreover, as shown below, Owoc personally appears in many of

2    VPX's advertisements and aggressively promotes BANG on his own social media

3    accounts, including @bangenergy.ceo on Instagram.  Owoc also serves as a director

4    on the board of Virun, Inc., which is headquartered in Pomona, California.

5         19.    Venue is proper because a substantial portion of the events or omissions

6    giving rise to this action occurred and are occurring in this District.  *See* 28 U.S.C.

7    §§ 1391(b)-(c).

## IV.    FACTUAL BACKGROUND

9    *A.    VPX's and Owoc's History of Flouting the Rules*

10        20.    VPX began producing dietary supplements in 1993.  Starting with its

11   very first products, VPX has recklessly shot first and asked questions later.  As an

12   early profile of the company explained: "A drug company, like Pfizer or Merck,

13   typically needs eight years to get a product from the lab to the consumer.  In a mere

14   two months, a VPX energy drink can go from Owoc's brain to machines that each

15   churn out 230 bottles a minute—and then to store shelves."  VPX's company ethos

16   was as follows: "Get something to market, get it there fast, and make sure it tingles."

17        21.    VPX's decision to follow that mantra has proven disastrous for

18   consumers.  VPX "exploded to prominence with the help of energy and weight-loss

19   products containing ephedra"—an unsafe supplement later banned by the FDA after

20   it was "conclusively linked to cases of healthy adults suddenly falling ill or even

21   dying."  *See* HARVARD MED. SCH., *Why The FDA Banned Ephedra* (March 2004).

22   Even after the fallout from the FDA ban, Owoc was unapologetic for including this

23   deadly supplement in his products.  When asked about the tragic case of a 23-year-

24   old professional athlete who died after taking ephedra, Owoc was dismissive of

25   ephedra's impact: "[He] was a fat guy exercising in the heat."  Never mind that the

26   autopsy said otherwise.[2]

27   _____

28   [2] Murray Chase, *Pitcher's Autopsy Lists Ephedra as One Factor*, N.Y. TIMES (March
     14, 2003).

PLAINTIFF MONSTER ENERGY COMPANY'S FIRST AMENDED COMPLAINT

5521379

22.     After the ban on ephedra, VPX turned its attention to its Redline drink—a product designed to induce involuntary shivering as a means to lose weight. "It is a physiological fact that when you shiver, your body releases a large amount of stored body fat in an attempt to bring body temperature back to normal," explained VPX in Redline's marketing material.

23.     In 2015, VPX earned a Warning Letter from the FDA for selling adulterated and illegal dietary supplements.  The FDA had discovered that VPX was selling products containing a synthetic stimulant called DMBA that had never been studied in humans and could pose "a significant or unreasonable risk of illness or injury."  The FDA ordered VPX to "immediately cease" all distribution.

24.     VPX has continued to put untested and potentially dangerous chemicals in its products.  VPX products are the subject of a current enforcement action by the Oregon Attorney General.  That action alleges that several VPX products contain BMPEA—a synthetic chemical "similar to amphetamine," "never studied in humans," linked to "hemorrhagic stroke," and banned by the World Anti-Doping Agency.  Despite the Oregon enforcement action, those VPX products are still offered for sale.

### B.     *VPX and Owoc's Track Record of Consumer Deception*

25.     VPX has engaged in consumer deception from the start.  Even its name is deceptive: Vital *Pharmaceuticals* is **not** a pharmaceutical company.

26.     VPX's company logo and nickname are likewise designed to confuse consumers.  The VPX mark mimics the well-known R symbol for prescription drugs:



PLAINTIFF MONSTER ENERGY COMPANY'S FIRST AMENDED COMPLAINT

5521379

In Owoc's words, "the acronym VP(x) actually stands for Vital Pharmaceuticals with the X appearing lower than VP similar to how it appears in RX." The FDA has explained why this misleads: "use of the prescription drug symbol 'Rx' . . . may deceive consumers into thinking they are purchasing a prescription drug without a prescription."

27. VPX's deceptive tactics do not end with its name. VPX's entire business is built around making bold—but false—claims about the health benefits of its products.

28. Indeed, a cornerstone of VPX and Owoc's deception is weaponized faux "science," designed to impress and confuse the public. They have gone to great lengths to manufacture an image as a "science" company. In their early years, VPX even included a "syringe-like device with some products to lend a hard-core feel."

29. VPX's basic formula is to make an impressive-sounding proclamation about the benefits of a product, then cite official-looking "studies" that VPX itself funded as purported proof of that claim. Given that the VPX studies are illegitimate, VPX apparently assumes that consumers either won't bother reading the studies or don't have the scientific acumen to understand them.

30. VPX's marketing ploy has been denounced by the National Advertising Division (NAD)—an independent investigative arm of the Better Business Bureau—on three separate occasions.

31. In 2010, for example, the NAD reviewed VPX's claims that its "Meltdown" product was the "World's 1st Fat Burning Drink" and was "University Proven To Burn Fat for 6+ and Increase Fat Utilization by 56%." VPX had also claimed that "a study presented at the June 2008 International Society of Sports Nutrition Conference . . . left scientists scratching their heads" about how "Meltdown is over 273% better than the infamous caffeine plus ephedrine stack."

32. None of that was true. The NAD found that VPX "overstated the results of the research," misleadingly drew comparisons to "unrelated studies," and used

- 8 -
5521379

1   data "insufficiently reliable to support the claims."

2       33.     As another example, Owoc often touts the "unprecedented 27 Double-

3   Blind Placebo Controlled Gold Standard University Human Test Subject Studies

4   validating [VPX's] products' safety and effectiveness" available on VPX's website

5   (*see* https://bang-energy.com/vpx-university-studies/).   This entire paragraph is

6   false.

7       34.     Every study listed on the website was funded by VPX—hardly the

8   independent and "unprecedented" validation Owoc's statement implies.  Moreover,

9   there are only 24 studies (all VPX funded), not 27.  Three of the studies listed on

10  VPX's website are duplicates, included either out of disregard for details or a

11  conscious attempt to inflate the purported body of research supporting VPX

12  products.

13      35.     Moreover, all but three of the studies on VPX's website are published

14  by the so-called "International Society of Sports Nutrition" (ISSN).  In 2008, when

15  VPX first began publishing with the ISSN, ISSN's "CEO" was Jose Antonio.  Mr.

16  Antonio also happened to be a paid employee of VPX and held the title of "Sports

17  Science Director."  He remained on the VPX payroll through at least 2013.   During

18  this time, VPX ran 20 "studies" with ISSN.  To this day, the ISSN website

19  prominently lists VPX as one of the organization's sponsors.  Mr. Antonio also

20  continues to affiliate with VPX, and recently appeared in multiple videos on Owoc's

21  Instagram page to promote a new "study" regarding BANG that ISSN apparently

22  intends to publish.

23

24

25

26

27

28

PLAINTIFF MONSTER ENERGY COMPANY'S FIRST AMENDED COMPLAINT

5521379

36.     Another critical part of VPX's consumer deception is the myth it has created about Owoc.  As noted above, Owoc is the founder, CEO, "Chief Scientific Officer," and owner of VPX.  Owoc directs VPX's business activities, purportedly "invents" its products, and plays a key role in VPX's marketing efforts.  Defendants have used Owoc's control over VPX to further mislead consumers, portraying him as a credentialed scientist who consumers can trust for health advice:



37.     In VPX's own words: "VPX is orchestrated by the world's leading authority, author, and developer of performance enhancing supplementation and physique-altering nutrition, Founder and CEO, Jack Owoc."

38.     Another VPX press release suggests that consumers should trust Owoc's "unrivaled scientific acumen," because he has "9 years of teaching, 6 different science disciplines, 7 issued patents, and 27 university studies under [his] belt."

39.     In fact, Owoc's lone "scientific" credential is having been a (substitute) teacher in a local school district.  Owoc does not appear to hold a degree in any scientific discipline.  Nor has he held a position at any research university, worked as a research scientist, or presided over any university studies.

- 10 -

PLAINTIFF MONSTER ENERGY COMPANY'S FIRST AMENDED COMPLAINT

5521379

40. Owoc holds views that would be, to say the least, unconventional for a world-leading scientist. He is part of the anti-vaccination movement, having posted a list on Facebook of "30 Scientific Studies Showing the Link between Vaccines and Autism." He also believes that microwaves pose an urgent health risk, imploring his followers to "Destroy your Microwave before it Destroys YOU!" (Microwaves apparently cause "a breakdown of the human 'life-energy field.'")

41. Owoc's representations that he is an "author" are equally misleading. At one time or another, he has claimed to have written at least six books: "SUPER CREATINE," "BANG: The Death of Concentrates," "BANG: Bodybuilding Blueprint," "BANG: The Future of Muscle Appearance & Performance Enhancement," "Meltdown Body Redesign," and "The Meltdown Anti-Diet" (sometimes called the "Bang Anti-Diet"). These books do not exist. Or if they do, they are locked up where only VPX and Owoc can read them. Owoc has now been promising to release his "Anti-Diet" book for over three years.

### C. *VPX and Owoc's Promotion of BANG*

42. Owoc and VPX save their most deceptive marketing for their most popular product: the BANG energy drink.[3]

43. BANG is labeled and marketed as "potent brain and body fuel." According to VPX and Owoc, Bang will "beef up [both] your muscles and your brain." For example, VPX and Owoc claim that BANG can simultaneously provide "an 11.2% increase in the collegiate athlete's ability to perform repetitions" and also deliver "ingredients [that] have been proven to improve brain function."

---

[3] VPX began selling BANG to consumers in 2012. VPX currently produces and sells over a dozen flavors of BANG, including caffeine-free flavors.

PLAINTIFF MONSTER ENERGY COMPANY'S FIRST AMENDED COMPLAINT

5521379

44.    VPX attributes most of the health benefits in BANG to one ingredient: Super Creatine.  "Super Creatine" is VPX's marketing name for a creatyl-L-leucine molecule, and VPX identifies it as BANG's primary draw.  The words "Super Creatine" are prominently placed at the top of each BANG can and are nearly as conspicuous as the BANG brand name itself:

PLAINTIFF MONSTER ENERGY COMPANY'S FIRST AMENDED COMPLAINT

5521379

45.     Owoc tells consumers that Super Creatine is what sets BANG apart from competitors.  On social media, Owoc offered to answer consumer questions as part of his effort to do "#CEO stuff" (Owoc's words).  He was asked: "What's the benefit of drinking bang over Monster zero or other sugar free energy drinks?"  His first answer? "***Super Creatine*** which is a patented creatine-amino acid peptide that's stable [in] water."

46.     According to Owoc and VPX, the Super Creatine compound is an elixir.  Here are some of the things they have claimed about it:

- Super Creatine can "reverse Sarcopenia (loss of skeletal muscle)."
- Super Creatine has "anti-depressive effects."
- Super Creatine "increases cell swell which increases protein synthesis."
- Super Creatine can provide "6.9 Pounds of Water-Retention-Free Lean Mass in just 4 Weeks!"
- Super Creatine increases "cognition" and "attention span."
- Super Creatine "increases IGF-1 and satellite cell activation (IGF-1 and satellite cells are essential for muscle growth)."
- Super Creatine can "increase [users'] I.Q."
- Super Creatine is "neuroprotective in the brain" and has "antioxidant effects in the brain."

Or as Owoc sums it all up, Super Creatine "can make you ripped like Rambo and smart like Picasso."

47.     All of those claims, however, pale in comparison to this one: that Super Creatine "helps with all forms of dementia, including Alzheimer's, Parkinson's, Huntington's, and other forms of dementia."  The cure to these tragic diseases has evaded the medical profession for decades.  It isn't hiding in a can of BANG.

PLAINTIFF MONSTER ENERGY COMPANY'S FIRST AMENDED COMPLAINT

5521379

48.     Owoc uses junk science to support these claims.  As he explained on YouTube: "As you age, you have 'Creatine Transport Deficiency Syndrome,' where creatine does not cross the 'Blood Brain Barrier' as well as it does when you are younger.  Because of this, as you age you become mentally retarded. . . .  We have great news though.  *We could possibly **reverse that** with these new creatine peptides that I've patented*."[4]



49.     Owoc in fact asserts that his "patented" Super Creatine compound "can cross the 'Blood Brain Barrier' 20 times more efficiently than regular creatine," which is what makes it so effective at fighting "Alzheimer's, Parkinson's, Huntington's, and other forms of dementia."

---

[4] https://www.youtube.com/watch?v=_hYcTX9jYr0&feature=youtu.be

- 14 -

PLAINTIFF MONSTER ENERGY COMPANY'S FIRST AMENDED COMPLAINT

### D. *Super Creatine Provides No Health Benefit to Consumers*

50.     If Owoc's promises about BANG's Super Creatine sound too good to be true, that's because they are.  BANG's Super Creatine has proven to have three scientific flaws—any one of which renders the Super Creatine in BANG impotent and VPX's advertising misleading.

51.     *First*, Super Creatine is not creatine.  Creatine is an amino acid that naturally occurs in the human body.  Athletes commonly take creatine supplements in the form of creatine monohydrate.  Super Creatine—a marketing name that VPX created—refers to creatyl-L-leucine, which is a fundamentally different molecule.

52.     And contrary to statements on BANG's label, ***there is no creatine in BANG***.  Dr. Neil Spingarn—a pharmacologist with a Ph.D. from Yale University and more than 40 years of experience—has tested multiple formulations of BANG to determine its creatine content.  Each time, Dr. Spingarn could not detect any amount of creatine in BANG.  *See* Exhibit A.

53.     *Second*, the Super Creatine compound is functionally useless.  Studies show that Super Creatine does not break down at the acidity levels of stomach acid, meaning it passes through the body largely unutilized. [5]  And even when the Super Creatine compound is exposed to acidity levels in which it can break down, it does not release creatine.  Research has instead demonstrated—and VPX's own data supports—that the Super Creatine compound transforms directly into a waste compound called creatinine (not creatine)[6]—which VPX has described as a "useless substance."

---

[5] Reddeman, R., et al. "A Toxicological Assessment of Creatyl-L-Leucine," 37 INT. J. TOXICOLOGY 171-187 (2018) at 171 (citing Owoc, J., et al. "Effect of Pepsin on Creatyl L-Glutamine (CLG), 2014, unpublished data).

[6] *See, e.g.*, Burov, S, *et al.* "Creatinyl Amino Acids – New Hybrid Compounds with Neuroprotective Activity," 17 J. PEPTIDE SCI. 620-626 (2011) at Figure 5; *see also* Reddeman, R., et al. "A Toxicological Assessment of Creatyl-L-Leucine," 37 INT. J. TOXICOLOGY 171-187 (2018) at 179.

(Continued...)

54.   *Third*, even if Super Creatine could break down into creatine, there is not enough of it in BANG to materially impact the body.  While VPX conceals how much Super Creatine is in BANG, product testing shows that there are fewer than 40 *milligrams* in one can.  That is roughly ***100 times less than the amount of creatine necessary to provide a measurable health benefit***.[78]  VPX knows this.   It advises consumers that "researchers found that athletes looking to get the most gains in size and strength should include 4-6 grams [4,000 to 6,000 milligrams] of creatine before and 4-6 grams [4,000 to 6,000 milligrams] of creatine after exercise."  Moreover, VPX cited studies in its patent application that analyze creatine supplementation regimens at even higher levels—some of which were ***500 times*** the dose included in BANG.[9]

55.   VPX's marketing of "Super Creatine" is misleading for all of the independent reasons above.  When consumers hear "*Super* Creatine," they reasonably expect to receive all the benefits of creatine and possibly more.  But in truth, those consumers receive no health benefit whatsoever from Super Creatine.

---

[7] *See* https://efsa.onlinelibrary.wiley.com/doi/pdf/10.2903/j.efsa.2011.2303 ("The Panel considers that in order to obtain the claimed effect, 3 g of creatine should be consumed daily.");
https://ods.od.nih.gov/factsheets/ExerciseAndAthleticPerformance-HealthProfessional/

[8] This value is a weight-to-weight comparison of creatyl-L-leucine in a can of BANG versus the beneficial daily dose of creatine.  When compared using a molecule-to-molecule basis, BANG performs even worse, having about ***165 times*** fewer molecules of creatyl-L-leucine than the amount of creatine molecules required for a beneficial effect.

[9] Rawson et al., *Effects of Creatine Supplementation and Resistance Training on Muscle Strength and Weightlifting Performance*, J. OF STRENGTH & CONDITIONING RESEARCH, 2003, Vol. 17(4), 822-831; Buford et al., *International Society of Sports Nutrition position stand: creatine supplementation and exercise*, J. OF THE INT'L SOCIETY OF SPORTS NUTRITION, Aug. 2007, Vol. 4(6).

- 16 -

56.     VPX contributes to this confusion by purposefully conflating the worthless "Super Creatine" compound with real creatine.  Each can of BANG states: "Power up with BANG's potent brain & body-rocking fuel: *Creatine*, Caffeine, CoQ10 & BCAAs," even though there is no actual creatine in BANG:



57.     Similarly, in an article published by VPX entitled "*The Benefits of Taking Super Creatine Pre- and Post-Workout*," VPX cites studies and research about regular creatine yet claims those health effects for the Super Creatine compound.  On Defendants' social media, most posts about BANG end with the hashtag "#creatine" or "#IceColdCreatine."

58.     VPX further stokes this confusion by referring to BANG as a "pre-workout" drink.  Many BANG energy drink advertisements, for example, include the hashtag #PreWorkout.  But as VPX's own studies and products show, pre-workout

PLAINTIFF MONSTER ENERGY COMPANY'S FIRST AMENDED COMPLAINT

5521379

drinks typically contain thousands of milligrams of real creatine, not dozens of milligrams of a different, worthless chemical.

59.     Consumers care about the quantity of the active ingredients in their pre-workout drinks.  They have asked Owoc on social media how much "Super Creatine" is in BANG.  He doesn't respond.  "Unfortunately, that is proprietary information," Owoc says.

### E.     *VPX and Owoc Falsely Mark BANG as "Patented"*

60.     Keeping with their pattern of using weaponized faux "science" to confuse the public, VPX and Owoc rely heavily on the false claim that the "Super Creatine" in BANG is patented technology.  Owoc often directs consumers to U.S. Patent Number 8,445,466 (the "'466 patent"), which Owoc claims is his patent on the Super Creatine compound.  Owoc says that he and "many others" believe that patent to be "the most important patent ever awarded" in the "history of sports nutrition," and gloats that "Monster has no answer to contend with Jack Owoc's Patented Super Creatine."

61.     VPX and Owoc print the '466 patent number on each can of BANG—*twice*.  They also include on each can substantially the entire title of the '466 patent and an image of the U.S. patent seal.  This is far more than what is required under 35 U.S.C. § 287(a) for sufficient patent marking and reflects VPX and Owoc's intentional use of the '466 patent number as part of a broader marketing campaign.

62.     By printing the '466 patent number on each can of BANG, VPX and Owoc represent that the beverage actually practices the '466 patent.  It does not and stating that it does is false.

63.     Each claim of the '466 patent requires "***a biologically active* form of creatine**."  Although the term "biologically active" is not defined in the '466 patent, the context of the '466 patent—which describes at length the significant health benefits of real creatine—makes clear that a "biologically active" form of creatine must be one that provides at least some health benefit to a person who consumes it.

- 18 -

PLAINTIFF MONSTER ENERGY COMPANY'S FIRST AMENDED COMPLAINT

1   But there is no evidence that Super Creatine carries any health benefit, either by itself

2   or because it breaks down into creatine in the human body.

3       64.    VPX and Owoc can point to no study showing that creatyl-L-leucine

4   provides any health benefit to humans.  Indeed, even the VPX-published January

5   2019 article entitled "The Benefits of Taking Super Creatine Pre and Post-Workout"

6   pointed to no such evidence, and instead relied on studies about real creatine—not

7   "Super Creatine."  Presumably, if Defendants had *any* evidence supporting the claim

8   that creatyl-L-leucine carries health benefits, they would have cited the evidence in

9   that article.

10       65.    In fact, VPX's own data suggests that creatyl-L-leucine provides no

11   health benefit.   As part of its unsuccessful bid to persuade the Patent Office that the

12   claims of the '466 patent were valid, VPX disclosed its testing of Super Creatine.[10]

13   That testing showed that when Super Creatine breaks down, it breaks down into

14   useless creatinine—not creatine.[11]  In addition, a study commissioned by VPX that

15   relied on Owoc for information, acknowledged that "the digestive and metabolic fate

16   of CLL [creatyl-L-leucine] is unknown," and described the possibility that "some

17   level of ingested CLL may be digested or catabolized into L-leucine and creatine" as

18   only "a hypothetical potential."[12]

19       66.    It is therefore clear that VPX and Owoc have no reasonable basis to

20   claim, and knew it was false to state, that "Super Creatine" practices the '466 patent.

21   Instead, they make that claim to deceive the public, and as part of a broader

22   marketing scheme to falsely hold VPX out as a company that is scientifically and

23   technologically superior to its competitors.

24   

---

25   [10] *See, e.g.*, Declaration of Liangxi Li in Support of Appeal Brief filed August 29,
2018 in Re-Exam Application No. 90/013,933, Exhibit C.

26   [11] *See id.*

27   [12] Reddeman, R., et al. "A Toxicological Assessment of Creatyl-L-Leucine," 37 INT.
J. TOXICOLOGY 171-187 (2018) at 179; *see also id.* at 184 ("[I]t is unknown whether

28   CLL is digested to creatine in the digestive tract or absorbed and metabolized to
creatine in vivo, and if so, to what extent.").

PLAINTIFF MONSTER ENERGY COMPANY'S FIRST AMENDED COMPLAINT

5521379

67. But there's more: the patent upon which Owoc and VPX rely so heavily **has been finally rejected by the U.S. Patent Office during a reexamination proceeding**. In February 2018, a panel of three patent examiners finally rejected all pending claims in the '466 patent as "obvious" in light of prior disclosures by other inventors, and in March 2019, the U.S. Patent Trial and Appeals Board affirmed the final rejection of all pending claims in the '466 patent.

68. Yet that has not stopped VPX or Owoc from continuing to mark each can of BANG with the '466 patent number. Even the flavors of BANG that were released *after* the Patent Office rejected the Super Creatine patent are marked with it. This is the back of the "FROSE ROSE" can, released February 14, 2019:



69. Nor did the final rejection of the '466 patent's claims stop VPX from including the '466 patent in its marketing materials. In December 2018, for example, Owoc posted on social media that his "[competitors] wouldn't have a clue as to what small changes to make in order to create an epic and brilliant tasting beverage innovation with cutting-edge patented ingredients like Super Creatine." And on January 24, 2019, Owoc again referred consumers to "my patented super creatine."

70. In fact, VPX and Owoc have continued to advertise the '466 patent today even after the patent's *final* rejection on March 5, 2019 by the U.S. Patent Trial

PLAINTIFF MONSTER ENERGY COMPANY'S FIRST AMENDED COMPLAINT

5521379

1   and Appeals Board.  On March 18, 2019, for example, Owoc advertised a BANG

2   product as "fast, potent, effective, and delicious" and containing "☑Patented Super

3   Creatine." And VPX's website continues to provide the following description of a

4   BANG product: "The very definition of BANG® screams scientific

5   BREAKTHROUGH! Infused with Patented water-stable SUPER CREATINE® —

6   BANG® triggered a major PARADIGM SHIFT among the performance and

7   bodybuilding authorities and has now become the most disruptive scientific

8   innovation in the 30-year history of Sports Nutrition!"

9         71.    One informed consumer recently asked Owoc on Instagram:  "Really

10  interested in the US Patent office canceling the Super Creatine patent. Tell me that's

11  bullshit . . . "  Once again, when faced with a hard question, Owoc didn't respond.

12        *F.*    *VPX and Owoc Ignore Health and Safety Regulations*

13        72.    There's a reason VPX's health claims about its "magnificent invention"

14  have stood out in the marketplace.  Other retailers refrain from making such claims

15  because they're illegal.

16        73.    Congress and the FDA have enacted comprehensive protections

17  governing the production and distribution of food.  21 U.S.C. § 301 *et seq.*   These

18  laws and regulations are essential to protect the public.  VPX and Owoc not only

19  ignore them, they have put their antipathy towards these regulations on the record.

20  Following the defeat of a federal dietary supplement statute in 2010, Owoc posted on

21  the VPX website: "The fact is that American consumers love their dietary

22  supplements and want less, not more regulation. . . Therefore I declare all

23  organizations and individuals who threaten the great Dietary Supplement Industry as

24  UNAMERICAN! WE THE PEOPLE DEMAND AN END TO YOUR

25  TOMFOOLERY!"

26        **1.    Super Creatine is Not "Generally Recognized as Safe"**

27        74.    One critical FDA regulation ensures that dangerous new chemicals can't

28  make their way into foods.  *See* 21 CFR 170.30.  That regulation requires that any

PLAINTIFF MONSTER ENERGY COMPANY'S FIRST AMENDED COMPLAINT

5521379

substance deliberately added to food receive pre-clearance from the FDA *unless* that substance is "Generally Recognized as Safe" (GRAS) by qualified experts.  To qualify as GRAS, a product must be proven safe under the conditions of its intended use with the same quality and quantity of scientific evidence required to obtain FDA preclearance.  *Id.*

75.     Super Creatine is not GRAS.  Even the single study published about Super Creatine[13], which was paid for by VPX, is at best equivocal about Super Creatine's safety.[14]  The authors noted, for example, that the Super Creatine compound is a "novel ingredient" whose "metabolic fate . . . is unknown."  In other words, the study acknowledges that no one is sure how the Super Creatine compound reacts with the body.

76.     The authors also noted that "no formal toxicological, pharmacokinetic, or human studies on the combined compound have been published."  Therefore, the authors wrote that "[f]uture investigations of CLL in pharmacokinetics and nonrodent species would be valuable additions to the currently available research."  But the time for safety studies on "nonrodent species" was years ago—*before* VPX put Super Creatine in BANG.

77.     Moreover, the study uncovered several "statistically significant" adverse health effects associated with Super Creatine use.  Rodents exposed to the Super Creatine compound suffered, among other things, negative impacts on their "organ weight to brain ratio," "organ weight to body ratio," and blood composition (including decreases in "mean hemoglobin" and "platelet count").

---

[13] *See* Reddeman *supra* n. 5.

[14] GRAS status cannot be based on non-public information.  *See* Final Rule on GRAS Substances, 81 Fed. Reg. 54960, 54966 (Aug. 17, 2016) ("[T]here could be no basis for a conclusion of GRAS status if trade secret information (or other non-public information) is necessary for qualified experts to reach a conclusion that the notified substance is safe under the conditions of its intended use.").

PLAINTIFF MONSTER ENERGY COMPANY'S FIRST AMENDED COMPLAINT

5521379

## 2. VPX and Owoc Make Unlawful Health Claims

78.     Other FDA regulations prevent consumers from being misled about their health.  To that end, the FDA generally prohibits food manufacturers from claiming that their product can treat or reduce the risk of a disease or a health-related condition.  *See* 21 C.F.R. § 101.14.  The FDA provides a narrow exception to this general prohibition: it authorizes certain "Health Claims" when a clear scientific relationship has been proven between a substance and a disease.  To illustrate, the FDA allows claims about Calcium and Osteoporosis, *see* 21 C.F.R. § 101.72, and about some vegetables and coronary heart disease, *see* 21 CFR § 101.77.

79.     VPX and Owoc flout these regulations.  Ignoring the fact that the FDA does not authorize Health Claims for creatine—much less "Super Creatine" (which does not include creatine)—Owoc and VPX repeatedly claim that Super Creatine can, among other things, "reverse Sarcopenia," help fight depression, and reverse "mental retardation."[15]

80.     The FDA likewise does not authorize any Health Claims for Alzheimer's, Parkinson's, Huntington's, or dementia.[16]  Those currently incurable diseases are entirely off limits.

81.     In a recent update to consumers, the FDA described why Health Claims like the ones made by Owoc and VPX about Alzheimer's are both incorrect and insidious.[17]  The FDA explained that products claiming to "prevent, treat, delay, or even cure Alzheimer's disease . . . fly in the face of true science."  What that true

---

[15] *See* FDA, Authorized Health Claims That Meet the Significant Scientific Agreement (SSA) Standard (last accessed March 26, 2019), *available at* https://www.fda.gov/food/labelingnutrition/ucm2006876.htm (listing the approved Health Claims).

[16] *Id.*

[17] *See* FDA, Watch Out for False Promises About So-Called Alzheimer's Cures (last accessed March 26, 2019), *available at* https://www.fda.gov/ForConsumers/ConsumerUpdates/ucm631046.htm.

(Continued...)

PLAINTIFF MONSTER ENERGY COMPANY'S FIRST AMENDED COMPLAINT

5521379

science shows is that "no cure or treatment has been shown to stop or reverse the progression of the disease." Anyone claiming otherwise is a "scam artist" taking "advantage of people when they are most vulnerable and looking for a miracle cure."[18]

82.     Much of the FDA consumer update on Alzheimer's could have been written about Owoc and VPX:

| FDA Guidance | Owoc's Statement |
| --- | --- |
| "Question any product that also claims to be a 'scientific breakthrough.'" | "People, this is a magnificent invention! Remember, take your BANG drink!" |
| "Another red flag is that many of the claims made by these companies about the supposedly curative powers of their products are often not limited to Alzheimer's disease." | Super Creatine "increases cognition, it delays mental fatigue, it has antidepressant effects, and has antioxidant effects on the brain. *It has all these positive things!*" |
| Companies cannot promise to "reverse mental decline associated with dementia." | "We could possibly reverse [mental retardation] with these new creatine peptides that I've patented." |

### 3.     VPX and Owoc Make Unlawful Structure/Function Claims

83.     The FDA permits truthful and scientifically sound claims that describe the role of a dietary ingredient in the human body. *See* 21 CFR § 101.93. These are called "Structure/Function Claims" and do not require FDA preclearance. For example, a manufacturer may lawfully state that "fiber maintains bowel regularity."

84.     The claims VPX and Owoc make about BANG fall outside these narrow guideposts. Indeed, Owoc goes well beyond describing the connection between basic ingredients and their proven biological properties; instead, he makes specific claims about VPX's unique products. He has stated, for example, that VPX "can

---

[18] *Id.*

PLAINTIFF MONSTER ENERGY COMPANY'S FIRST AMENDED COMPLAINT

5521379

1  possibly reverse [mental retardation] *with these new creatine peptides I've invented*."
2  Other claims flunk the Structure/Function standard because they are not backed by
3  sufficient scientific proof.  For example, VPX's claim that BCAAs are "potent brain
4  . . . fuel" is contradicted by all reputable science.**[19]**

5      *G.*    *VPX and Owoc Falsely Disparage Competing Energy Drinks*

6      85.    VPX and Owoc also falsely disparage their competitors while touting
7  BANG's false and misleading claims.  Again, VPX anchors their false statements in
8  "science."  Printed on every can of BANG is the following: "Make no Mistake –
9  BANG is not your stereotypical high sugar, life-sucking soda masquerading as an
10  energy drink!  High sugar drinks spike blood sugar producing metabolic mayhem
11  causing you to crash harder than a test dummy into a brick wall."

12      86.    In a May 10, 2017 press release entitled "*The BANG Revolution*," Owoc
13  claimed that BANG stands alone as the world's healthiest energy drink.  While
14  promoting BANG's purported—but false—health benefits, Owoc described other
15  energy drinks as "***health robbing***" and "***health destroying***."  Owoc claimed that,
16  with BANG, "no longer do people have to ***sacrifice their health*** for a great tasting
17  beverage."

18      87.    Owoc and VPX also repeatedly and misleadingly compare BANG—a
19  diet, no-sugar product—with their competitors' non-diet products.  Yet they never
20  disclose to consumers that their comparison involves unlike goods.  Through this
21  apples-to-oranges comparison, Owoc and VPX create the false impression that all
22  other energy drinks are high in sugar and calories.  This impression is false.

23      88.    In fact, more than one-third of Monster-branded energy drink offerings
24  are either low sugar or sugar free.  This includes two of Monster's best-selling and

25

26  **[19]** *See* European Food Safety Authority, Scientific Opinion (last accessed March 26,
27  2019), *available at*
   https://efsa.onlinelibrary.wiley.com/doi/pdf/10.2903/j.efsa.2010.1790 at 3 ("[T]he
   Panel concludes that a cause and effect relationship has not been established between
28  the consumption of BCAA and improvement of cognitive function after exercise.").

PLAINTIFF MONSTER ENERGY COMPANY'S FIRST AMENDED COMPLAINT

5521379

most popular products: Monster Ultra Zero and Lo-Carb Monster Energy.

89.     VPX and Owoc's attacks on Monster have gotten more explicit with time.  In a recent VPX press release entitled "*BANG's JACK OWOC BLASTS MONSTER ENERGY INTO SUBMISSION!*," VPX included the following graphic:



VPX stacked the deck, opting against comparing itself to one of Monster's many no-sugar and no-calorie options, and instead cherry-picking a comparator that competes with different energy drinks entirely (full-sugar energy drinks).

90.    Most recently, Owoc posted an animated video on his Instagram account ("bangenergy.ceo") showing a can of BANG knocking over a can of Monster and declaring in baritone: "*CHECKMATE BITCH!*"  Owoc wrote a comment providing the purported basis for BANG's victory: that "HIGH SUGAR 'ENERGY DRINKS' . . . MAY INCREASE THE RISK OF BREAST CANCER, HEART ♡ DISEASE, OBESITY, BLOOD PRESSURE, METABOLIC SYNDROME, FATTY LIVER, DIABETES, REDUCED ENERGY ETC.!"[20]



91.    Again, none of Owoc's disparaging remarks about Monster are supported by science.  In fact, the only study Owoc cited states the exact opposite—that the consumption of Monster is "***not*** associated with adverse cardiovascular or renal effects in healthy young college-aged students."[21]

---

[20] https://www.instagram.com/p/BupPT4KHonI/

[21] Wilson, T., et al. Effects of Monster Energy Drink on Cardiovascular and Renal Functioning Young Adults. (2016) Int J Food Nutr Sci 3(2): 350-353.

PLAINTIFF MONSTER ENERGY COMPANY'S FIRST AMENDED COMPLAINT

5521379

92.     VPX and Owoc make other false distinctions between BANG and its competition.  For example, Owoc claimed that BANG is the "only" energy drink with "no artificial ingredients."  That's nonsense.  Almost every ingredient in BANG is artificial—including Super Creatine—and the BANG can itself states it contains "artificial flavors."

        *H.      VPX and Owoc Have Deceived Consumers and Harmed Competitors*

93.     Owoc and VPX's efforts to mislead consumers have worked.  VPX started selling BANG in 2012.  Today, sales of BANG account for nearly 4% of the energy drinks sold in the United States.  Owoc claims that BANG is on track to generate more than $2 billion in sales in 2019.  And BANG experienced a 784.2% growth in sales in 2018 alone.

94.     Comments on VPX's own social media sites and other review websites show that BANG's rapid growth is a result of consumer deception, faux science, false patent marking, and false comparisons with Monster and other competitors.

95.     Some consumers are drawn in by VPX's representations that it is a "science" company.  One reviewer of the product wrote: "So if you're trying to work out to gain muscle, become super physically fit, do some hardcore workouts, Bang is going to be right for you.  *I mean it's made by a sports nutritional supplement company so that's what you can expect from it.*"  Another wrote: "This is not a normal energy drink like monster or red bull.  This is a pre-workout system."  Another recommended BANG because it was supported by "*Real Science*" and is "way better for you than *any other energy drink* on the market."  Countless others parrot Owoc in stating that they choose BANG for the "overall healthiness compared to *all* the other energy drinks out there."

96.   Given VPX and Owoc's emphasis on Super Creatine, other consumers are naturally drawn to the product thinking that it contains significant amounts of real creatine.  For example, consumers have said the following about BANG:

- "Want some creatine? Get a bang."
- "It's the best creatine I ever had from the bottom of my heart."
- "Is there really any benefits to Bang over Monster? . . . Bang has Super Creatine."
- "They are packed full of creatine so they make a great preworkout drink."
- "I like this product as a pre workout drink for the gym.  The creatine helps with pumps, gives good energy and have great lifts when taking it."
- "[I]t acts as my creatine supplement too!"
- "I noticed the 'Super-Creatine' around the rim lol I normally take a more traditional pre workout but found these on sale so I figured I'd try them."
- "The creatine in there is actually something very special . . . It is the world's only water stable creatine. . . . It also has a fatty acid chain that makes it easier to cross the blood brain barrier.  The focus of the super creatine is not for muscle function, but for cognition . . . by combining this form of creatine with creatine, it works synergistically for mental focus."
- "They add BCAAs plus something called Super Creatine to this formula so you can feed your muscles. Creatine in a Ready to Go Drink is a big deal because creatine usually cannot survive (stay potent) in water until BANG patented their Super Creatine."

Each and every one of these consumers has been deceived.

PLAINTIFF MONSTER ENERGY COMPANY'S FIRST AMENDED COMPLAINT

5521379

97.   VPX's misconduct has also distorted the retail market.  One online retailer recently announced that it would not carry Monster's performance energy drink because it did not contain "Super Creatine."  That retailer issued the following statement about its decision:

## WHAT IS THE BIGGEST DIFFERENCE?

The new Monster Reign Energy Drink is comparable to VPX Bang Energy, but what is the biggest difference?

**SUPER CREATINE**

That is the number one difference between Bang Energy and Monster Reign Energy Drink. Unfortunately, we will not be selling Monster's Energy Drink but we do have all the flavors of Bang Energy! Try it now!

Buy Bang Energy!

98.   It is therefore clear that VPX's false claims are doing damage in the marketplace.  Or you can just take Owoc's word for it.  He wrote that "Monster has no answer to contend with Jack Owoc's Patented Super Creatine – perhaps the most significant and prestigious invention in the history of the beverage industry."  Put another way, Owoc himself believes that BANG is succeeding because of Super Creatine.

I.   *VPX and Owoc Use "Guerilla Tactics" to Interfere with Monster's Contractual Rights*

99.   Owoc and VPX's illegal tactics are not limited to their marketing, advertising, and labelling.  They have also instructed their representatives across the country to engage in "guerilla tactics" to frustrate the normal competitive process.

100.   One critical way that VPX and Owoc have short-circuited the normal competitive process is by stealing in-store shelf space from competitors.  In the beverage industry, shelf-space is often a matter of contract between retailers and manufacturers.  So when a distributor for Brand X goes to re-stock Store Y, he knows exactly where to place his product in Store Y's cooler.  He also knows where

PLAINTIFF MONSTER ENERGY COMPANY'S FIRST AMENDED COMPLAINT

5521379

1  he cannot put his product.  Stores circulate diagrams of whose drinks go where—

2  called "planograms"—to manufacturers and distributors.

3      101.    It can take a long time to earn prime space in the planogram.  To

4  maximize sales, stores want the best products in the best shelf space.  Thus, products

5  placed at eye level—the location most likely to be noticed by a consumer—are those

6  with track records of success.

7      102.    Product placement is not only reflective of consumer preference, but

8  also influences it.  An eye-level placement is an important signal to a consumer that a

9  given product is proven and popular.  And at a more basic level, eye-level placement

10 ensures that a product will be seen.  Because of these dynamics, shelf-space location

11 materially impacts a product's sales.

12     103.    This all creates powerful incentives for a bad actor to steal a

13 competitor's contractual right to shelf space, and that is exactly what VPX has done.

14 According to former VPX employees, VPX has directed BANG representatives to

15 displace competing energy drinks—primarily Monster—from their contractually

16 guaranteed shelf space and replace it with BANG.  Those BANG representatives

17 were also required to document the theft with photographs, which were then

18 distributed widely within VPX.  Indeed, VPX employees were *rewarded* for taking

19 part in this illegal conduct.

20     104.    According to a former VPX employee, Monster had the biggest target

21 on its back.  Monster has contracts for in-store shelf space with some of the largest

22 retailers in the United States, including Walmart, Circle K, AMPM, and American

23 Gas & Oil, as well as numerous local retailers.  These contracts cost Monster more

24 than $90 million annually.  Not only does Monster have premier shelf space at these

25 locations, it also has the most shelf space to steal because of its popularity.

26     105.    Owoc has essentially admitted to orchestrating this scheme.  He posted

27 on social media: "In life when they tell you there's no shelf space – make your own

28 shelf space! When multibillion-dollar competitors pay for space *retaliate with a*

*vengeance*." Later, he posted a picture of a retail store and commented: "It can be a *hostile takeover* or we can do things nicely – either way the time has cometh upon us to assume control."

106. Across the country, Monster representatives have observed the effects of VPX's tactics. Based on Monster's preliminary investigation, VPX's concerted effort to steal Monster's space has been observed almost daily for several months from coast to coast in the contiguous United States, including in Arkansas, California, Delaware, Florida, Illinois, Louisiana, Maryland, Michigan, Minnesota, Missouri, New Mexico, Nevada, New Hampshire, Ohio, South Carolina, and Texas.[22]

---

[22] In one example, a Monster representative discovered that VPX had replaced half of a shelf of Monster product with BANG. After asking a store employee for information, the Monster representative learned that VPX had transferred all of the displaced Monster product to a storage room and put them in a cardboard box labeled "expired," even though the product was fresh and not expired.

PLAINTIFF MONSTER ENERGY COMPANY'S FIRST AMENDED COMPLAINT

5521379

107. Below are two examples, where VPX snuck BANG into cooler space reserved exclusively for Monster products:





PLAINTIFF MONSTER ENERGY COMPANY'S FIRST AMENDED COMPLAINT

5521379

108.   VPX also designed a cover up for this theft.  According to a former employee, VPX told BANG representatives not to worry about the propriety of these actions, since any violation would be blamed on the store manager.

109.   VPX and Owoc are in line to profit from this rule breaking.  The shelf space that they stole from Monster and other competitors has both short-term and long-term payoffs.  In the short-term, that shelf space converts into increased brand awareness, sales, and profits—all of which have enabled VPX's ill-gotten growth.  In the long-term, VPX can parlay their artificial sales numbers into other benefits.

110.   Planograms, for example, are re-negotiated between retailers and manufacturers annually based largely on the prior year's sales numbers.  Because VPX elbowed its way into significant sales over the last year, VPX is likely to gain a toehold in retail stores across the country when the planograms are re-negotiated. VPX has similarly used its artificial sales numbers to get picked up by a major distribution company—which will compound the effects of VPX's unfair competition for years to come.

### J.   *VPX and Owoc Pirate Monster's Trade Secrets*

111.   Shelf space isn't the only thing that VPX and Owoc steal from competitors.  They steal trade secrets too.

112.   Monster's pricing model—one of its most valuable trade secrets—is the industry's gold standard.  Because of Monster's advanced supply-chain strategies and sophisticated analytics, its pricing data is extremely valuable.  Monster protects this data as confidential and diligently safeguards it from misappropriation.

113.   VPX and Owoc have targeted this valuable data with precision.  They have designed to steal Monster's pricing information by offering Monster employees plum jobs, insisting that they bring Monster's confidential pricing data to VPX as a precondition of employment, and falsely assuring those employees that it is okay to do so.

114.   In fact, VPX has offered Monster employees exorbitant salary increases,

- 34 -

5521379

1  demonstrating that VPX is paying for not just a new employee but also all of the

2  Monster information, including its confidential and proprietary data, that the

3  employee can provide.

4      115.   VPX recently attempted this very scheme.  Late last year, a long-time

5  Monster employee was contacted by Pat McMahon, VPX's National Account

6  Manager for the BANG product.  McMahon's recruiting efforts came with a catch:

7  the Monster employee would be required to steal Monster's pricing information and

8  bring it to VPX.

9      116.   The Monster employee told McMahon that he had crossed the line and

10  halted the conversation.  McMahon insisted that such behavior was acceptable, and

11  in the process admitted that he himself stole Red Bull's pricing information when he

12  moved from Red Bull to VPX earlier in 2018.  Unpersuaded, the Monster employee

13  told McMahon that he would never betray an employer like that.  McMahon then

14  ended the conversation, reaffirming to the Monster employee that stealing Monster's

15  pricing data was a non-negotiable prerequisite.

16      117.   While that one attempt to steal Monster's trade secrets was stymied,

17  other attempts by VPX appear to have worked.  Indeed, Monster has confirmed that

18  at least one of its former employees has misappropriated its trade secrets for VPX's

19  benefit.

20      118.   That former employee's misappropriation was multi-faceted.  He

21  interviewed at VPX on December 4, 2018 and immediately thereafter began

22  forwarding several commercially sensitive Monster e-mails to his personal address.

23  Before leaving Monster, he loaded five USB drives with additional Monster

24  proprietary and confidential data, including valuable pricing-information trade

25  secrets.  And upon his departure, in violation of Monster policy, the employee failed

26  to return his Monster-issued devices—which contained additional commercially

27  sensitive and confidential information—despite representing that he had done so.

28      119.   That former Monster employee has exploited Monster's confidential

5521379

1  data while working at VPX.  After he began work at VPX, his Monster-issued device

2  has been active and in use.  Moreover, a metadata analysis has shown that he

3  continued to open the stolen files on the USB drives after he departed Monster and

4  *even after* he began working at VPX.

5      *K.*    *VPX and Owoc's Illegal Acts Irreparably Harm Monster*

6      120.  By engaging in the false advertising, intentional interference with

7  Monster's contractual rights, and other illegal acts described above, VPX has sold

8  more BANG and taken more market share from competitors—primarily Monster—

9  than it otherwise would have been able to realize.  In 2018 alone, BANG experienced

10  a 784.2% growth in sales.  And a national publication recently reported that BANG's

11  sales increased nearly 900% from mid-February to mid-March 2019, while Monster

12  experienced a 1.7% decrease in sales.  Even according to Owoc, the stakes are

13  substantial and the timing is urgent.  As he recently proclaimed, "Bang Energy is

14  positioned to potentially take over a billion dollars in market share from Monster in

15  2019."

16  **FIRST CAUSE OF ACTION**

17  **(Violation of Section 43(a) of the Lanham Act, 15 § U.S.C.)**

18      121.  Monster incorporates all other allegations in this complaint.

19      122.  Defendants have made false and misleading statements of fact about

20  BANG energy drinks.  Those statements misrepresent the nature, characteristics,

21  and/or qualities of BANG and are expressly false, impliedly false, or both.

22  Defendants have misrepresented the health benefits of BANG.  BANG cannot, for

23  instance, reverse "mental retardation" or treat Alzheimer's.  They have also deceived

24  consumers about BANG's contents.  For example, BANG does not contain *any*

25  creatine, much less some "super" form of it, or provide any of the health benefits

26  associated with creatine.

27      123.  Defendants have knowingly induced and/or caused third parties—

28  including retailers—to engage in additional acts of false advertising by repeating

PLAINTIFF MONSTER ENERGY COMPANY'S FIRST AMENDED COMPLAINT

5521379

Defendants' false statements.

124. Defendants knew or should have known that their advertising activities were false, misleading, and deceptive.

125. Defendants' false and misleading statements have deceived and have the tendency to deceive a substantial segment of their intended audience about matters material to purchasing decisions. Defendants' violations have caused harm to the public and, unless restrained, will further damage the public.

126. Defendants' BANG energy drinks are offered in interstate commerce. Similarly, Defendants' false and misleading statements were and are made in commercial advertising and promotion in interstate commerce.

127. Defendants' violations have proximately harmed Monster. As a result of Defendants' violations, Monster has suffered and will continue to suffer damage to its business and goodwill. Monster has and will lose sales and profits and incur increased advertising and marketing costs.

128. Monster's immediate, irreparable injuries have no adequate remedy at law, and Monster is entitled to injunctive relief and up to three times its actual damages and/or an award of Defendants' profits, as well as costs and Monster's reasonable attorney fees under 15 U.S.C. §§ 1116–17.

## SECOND CAUSE OF ACTION
### (Violation of California's Unfair Competition Law ("UCL") under California Business and Professions Code §§ 17200, *et seq.*)

129. Monster incorporates all other allegations in this complaint.

130. California's UCL provides a private right of action against any person who engages in "unfair competition." Any person who has "suffered injury in fact and has lost money or property as a result of the unfair competition" may bring suit. The UCL has three "prongs," prohibiting any "unlawful," "fraudulent" or "unfair" business act or practice.

131. Defendants have violated the "unlawful prong" because their conduct violates several state and federal laws and regulations. Defendants' marketing of

- 37 -

BANG violates: (1) California's False Advertising Law; (2) the Federal Lanham Act; (3) the Federal Food, Drug, and Cosmetic Act ("FDCA") and implementing regulations; and (4) California's Sherman Food, Drug, and Cosmetic Law, which incorporates the FDCA labelling law into California law.

132.   Defendants have violated the "fraudulent prong" by misleading the public.  Defendants have systematically overstated the health benefits of BANG.  BANG cannot, for instance, reverse "mental retardation" or treat Alzheimer's.  They have also deceived consumers about BANG's contents.  For example, BANG does not contain *any* creatine, much less some "super" form of it, or provide any of the health benefits associated with creatine.

133.   Defendants have violated the "unfair prong" because their conduct violates public policy.  As embodied in California's False Advertising Law and Sherman Law, California has a strong policy in favor of truthful advertising—particularly when public health is on the line.  Defendants' conduct also violates this prong because it is unethical and unscrupulous.  Defendants have implemented a scheme to harm competitors by making false claims about competing products and stealing in-store shelf space.

134.   Defendants' unlawful, unfair, and fraudulent practices have caused and continue to cause substantial and irreparable competitive and commercial injury to Monster.  Monster has lost and will continue to lose sales, profits, goodwill, and advertising as a result of Defendants' conduct.  Monster also has incurred and will incur increased advertising and marketing costs to counteract defendants' unlawful conduct.

135.   These substantial injuries are not outweighed by any countervailing benefits to consumers, particularly because of California's policy in favor of truthful advertising.

136.   Unless restrained, Defendants will continue to cause further competitive and commercial harm to Monster.

5521379

137.    Monster has no adequate remedy at law and is entitled to injunctive relief and restitution under Section 17203 of the California Business and Professions Code.

### THIRD CAUSE OF ACTION
### (Violation of California's False Advertising Law ("FAL") under California Business and Professions Code §§ 17500, *et seq.*)

138.    Monster incorporates all other allegations in this complaint.

139.    California's FAL prohibits "untrue or misleading" statements in "any advertising device . . . or in any other manner or means whatever, including over the internet" concerning "any circumstance or manner of fact" about a product.

140.    Defendants advertise in the state of California and this District with the intent to increase the sale of BANG in California and to induce the public into purchasing BANG.

141.    Defendants conduct violates the FAL.  They have made false and misleading descriptions of fact about BANG energy drinks.  Those statements misrepresent the nature, characteristics, and/or qualities of BANG and are expressly false, impliedly false, or both.  Defendants have systematically overstated the health benefits of BANG.  BANG cannot, for instance, reverse "mental retardation" or treat Alzheimer's.  They have also deceived consumers about BANG's contents.  For example, BANG does not contain *any* creatine, much less some "super" form of it, or provide any of the health benefits associated with creatine.

142.    Defendants knew or should have known that their advertising activities are false, misleading, and deceptive.

143.    Defendants' false and misleading statements have deceived and have the tendency to deceive a substantial segment of their intended audience about matters material to purchasing decisions.

144.    Defendants' violations have proximately harmed Monster.  As a result of Defendants' violations, Monster has suffered and will continue to suffer damage

5521379

1    to its business and goodwill.  Monster has lost and will continue to lose sales and

2    profits and incur increased advertising and marketing costs.

3        145.   Defendants have acted with oppression, fraud, or malice, entitling

4    Monster to an award of punitive damages.

5        146.   Defendants have acted willfully, in bad faith, and with malice.  Unless

6    restrained, Defendants will continue to cause further irreparable competitive and

7    commercial injury to Monster.

8        147.   Monster has no adequate remedy at law and is entitled to injunctive

9    relief and restitution pursuant to Section 17203 of the California Business and

10    Professions Code.

## FOURTH CAUSE OF ACTION
### (Trade Libel)

12        148.   Monster incorporates all other allegations in this complaint by reference.

13        149.   Defendants have published false statements that disparage the quality of

14    Monster's products.  Defendants have claimed, for example, that Monster drinks are

15    "health destroying," have "zero effect on performance," and increase the risk of

16    breast cancer and heart disease.  And they have published false materials that mislead

17    consumers into believing that all Monster drinks are, among other things, "a high

18    sugar, life-sucking soda."

20        150.   Defendants knew or should have known that their statements were false

21    and would be relied on by consumers in making purchasing decisions.  They knew or

22    should have known that consumers would reasonably understand their statements to

23    mean that Monster drinks are inferior to BANG.

24        151.   As a proximate result of Defendants' false statements and consumers'

25    reliance thereon, Monster has suffered direct financial harm. Monster has suffered

26    and will continue to suffer special damages in the form of lost sales and profits, loss

27    of goodwill, and increased advertising and marketing costs.

## FIFTH CAUSE OF ACTION
### (Intentional Interference with Contractual Relations )

152.   Monster incorporates all other allegations in this complaint.

153.   Monster has contractual relations with retailers of energy drinks across the United States, including Walmart, Circle K, AMPM, and American Gas & Oil, as well as with individual stores affiliated with brands like Shell, Chevron, and Harman Star Mart.  These contracts determine what shelf space Monster is entitled to at each retailer.

154.   At all relevant times, Defendants knew or should have known of these contracts.  It is well known in the beverage industry that shelf space is allocated by contract.  Furthermore, the in-store diagrams showing the placement of products—called planograms—are often circulated to all manufacturers and distributors and posted inside retail locations.

155.   Defendants intentionally and improperly have interfered and continue to interfere with Monster's contractual relations with retailers.  They have instructed employees to engage in the "guerilla tactic" of unlawfully converting Monster's contractually guaranteed shelf space for Defendants' own use.

156.   There is no legitimate justification for Defendants' tortious interference with Monster's contractual relations with retailers.

157.   As a proximate result of Defendants' interference, Monster has suffered and will suffer irreparable harm and monetary damages by, among things, (i) losing revenue and profits, (ii) losing sales of its products, (iii) damage to its reputation and goodwill, and (iv) damage to its relationships with retailers.

158.   Defendants have acted willfully, in bad faith, with malice, or with the intent to oppress Monster.  Monster is entitled to injunctive relief, compensatory damages, and punitive damages.

## SIXTH CAUSE OF ACTION
### (Intentional Interference with Prospective Economic Relations)

159.   Monster incorporates all other allegations in this complaint.

PLAINTIFF MONSTER ENERGY COMPANY'S FIRST AMENDED COMPLAINT

5521379

160.   Monster has contractual relations with retailers of energy drinks across the United States, including Walmart, Circle K, AMPM, and American Gas & Oil, as well as with individual stores affiliated with brands like Shell, Chevron, and Harman Star Mart.  These contracts determine what shelf space Monster is entitled to at each retailer.

161.   At all relevant times, Defendants knew or should have known of these contracts and Monster's reasonable business expectancy of the economic benefits arising from such contracts. It is well known in the beverage industry that shelf space is allocated by contract.  It is also well known that these contracts are re-negotiated annually based on the prior year's sales.  Furthermore, the in-store diagrams showing the placement of products—called planograms—are often circulated to all manufacturers and distributors and posted inside retail locations.

162.   Defendants intentionally and improperly have interfered and continue to interfere with Monster's economic relations with retailers.  They have instructed employees to engage in the "guerilla tactic" of unlawfully converting Monster's contractually guaranteed shelf space for Defendants' own use.

163.   There is no legitimate justification for Defendants' tortious interference with Monster's economic relations with retailers.

164.   As a proximate result of Defendants' interference, Monster has suffered and will suffer irreparable harm and monetary damages by, among things, (i) losing revenue and profits, (ii) losing sales of its products, (iii) damage to its reputation and goodwill, and (iv) damage to its relationships with retailers.

165.   Defendants have acted willfully, in bad faith, with malice, or with the intent to oppress Monster.  Monster is entitled to injunctive relief, monetary damages to compensate for the loss benefits of its reasonable business expectancies, consequential damages caused by Defendants' intentional interference, compensatory damages, and punitive damages.

## SEVENTH CAUSE OF ACTION
### (Conversion)

166.    Monster incorporates all other allegations in this complaint.

167.    At all relevant times, Monster had and continues to have a property interest in its contractual right to occupy shelf space in certain retail stores across the country.

168.    Without Monster's consent, Defendants have intentionally and substantially interfered with Monster's property right.  Defendants have unilaterally taken possession of Monster's shelf space, prevented Monster from accessing it, and used it for their own product.

169.    As a result of Defendants' interference, Monster has suffered and will suffer irreparable harm and monetary damages by, among things, (i) losing revenue and profits, (ii) losing sales of its products, (iii) damage to its reputation and goodwill, and (iv) damage to its relationships with retailers.

170.    Defendants have acted with oppression, fraud, or malice, entitling Monster to an award of punitive damages.

## EIGHTH CAUSE OF ACTION
### (Violation of California Penal Code Section 496)

171.    Monster incorporates all other allegations in this complaint.

172.    California Penal Code section 496 provides that "[e]very person who . . . receives any property that has been stolen or that has been obtained in any manner constituting theft or extortion, knowing the property to be so stolen or obtained, or who conceals, . . . or aids in concealing . . . any property from the owner, knowing the property to be so stolen or obtained," is liable to the property owner for "three times the amount of the actual damages, . . . cost of suit, and reasonable attorney's fees."

173.    At all relevant times, Monster had and continues to have property interests in its contractual right to occupy shelf and cooler space in certain retail stores across the country.

174.   As alleged herein, Defendants have knowingly stolen or taken Monster's property.  Defendants have also concealed property from Monster that they knew had been stolen from Monster.  After stealing Monster's property, Defendants schemed to prevent Monster from learning of the theft by blaming store managers.

175.   Defendants have used Monster's property for Defendants' benefit. Defendants did so with the intent to not only take away Monster's contractual rights, but also to divert Monster's sales and goodwill to Defendants.

176.   As a result, Monster has suffered and will suffer irreparable harm and monetary damages by, among things, (i) losing revenue and profits, (ii) losing sales of its products, (iii) damage to its reputation and goodwill, and (iv) damage to its relationships with retailers.

177.   Defendants acted with oppression, fraud, malice, and in conscious disregard of Monster's property rights.  Monster is entitled to compensatory damages, treble damages under Penal Code section 496(c), and punitive damages.

## NINTH CAUSE OF ACTION
### (False Patent Marking under 35 U.S.C § 292)

178.   Monster incorporates all other allegations in this complaint.

179.   35 U.S.C. § 292(a) and (b) provide that "[w]hoever marks upon, or affixes to, or uses in advertising in connection with any unpatented article, the word 'patent' or any word or number importing that the same is patented, for the purpose of deceiving the public" shall be liable to "[a] person who has suffered a competitive injury as a result" for "damages adequate to compensate for the injury."

180.   Defendants have claimed and continue to claim that the "Super Creatine" in BANG practices the '466 patent, both by marking BANG cans with the patent number and by referencing the patent in BANG-related advertising.

181.   The claim that "Super Creatine" practices the '466 patent is false: "Super Creatine" is not "biologically active," as required by the patent claims.

PLAINTIFF MONSTER ENERGY COMPANY'S FIRST AMENDED COMPLAINT

5521379

182. At all relevant times, Defendants have had no basis for claiming that "Super Creatine" is "biologically active," and instead made those claims for the purpose of deceiving the public.

183. As a result of Defendants' false claims, Monster has suffered and will suffer competitive injury including: (i) lost revenue and profits, (ii) lost sales of its products, and (iii) damage to its reputation and goodwill.

## **TENTH CAUSE OF ACTION**
### **(Violation of the California Uniform Trade Secrets Act Under Cal. Civ. Code § 3426 *et seq*.)**

184. Monster incorporates all other allegations in this complaint.

185. Monster's has developed numerous valuable and protectable trade secrets, including its confidential and proprietary pricing information and data.

186. These trade secrets, including but not limited to Monster's confidential and proprietary pricing information and data, derive independent economic value from not being generally known to the public or to other persons who can obtain value from their disclosure or use.

187. Monster undertakes reasonable efforts—such as the use of employee confidentiality agreements and the implementation of security technology—to maintain the secrecy of its trade secrets.

188. Monster permits use of these trade secrets only for authorized business purposes by authorized employees. Any other use is not permitted.

189. Defendants willfully and intentionally misappropriated Monster's trade secrets by requiring former Monster employees to bring these trade secrets to VPX as a precondition of employment. Moreover, Defendants misled these former Monster employees by falsely assuring them that it was permissible to steal Monster's trade secrets

190. Upon information and belief, Defendants have used Monster's trade secrets to, among other things, improve their pricing analytics and supply-chain strategies, thus causing Monster a competitive harm.

PLAINTIFF MONSTER ENERGY COMPANY'S FIRST AMENDED COMPLAINT

5521379

191.   Defendants have acted with oppression, fraud, or malice, entitling Monster to an award of punitive damages.

## ELEVENTH CAUSE OF ACTION
### (Violation of the Defend Trade Secrets Act ("DTSA") under 18 U.S.C. § 1836 *et seq.*)

192.   Monster incorporates all other allegations in this complaint.

193.   Monster has developed numerous valuable and protectable trade secrets, including its confidential and proprietary pricing information and data.

194.   These trade secrets, including but not limited to Monster's confidential and proprietary pricing information and data, derive independent economic value from not being generally known to the public or to other persons who can obtain value from their disclosure or use.

195.   Monster undertakes reasonable efforts—such as the use of employee confidentiality agreements and the implementation of security technology—to maintain the secrecy of its trade secrets.

196.   Monster permits use of these trade secrets only for authorized business purposes by authorized employees. Any other use is not permitted.

197.   Defendants willfully and intentionally misappropriated Monster's trade secrets by requiring former Monster employees to bring these trade secrets to VPX as a precondition of employment.  Moreover, Defendants misled these former Monster employees by falsely assuring them that it was permissible to steal Monster's trade secrets

198.   Upon information and belief, Defendants have used Monster's trade secrets to, among other things, improve their pricing analytics and supply-chain strategies, thus causing Monster a competitive harm.

199.   Defendants have acted with oppression, fraud, or malice, entitling Monster to an award of punitive damages.

5521379

**TWELFTH CAUSE OF ACTION**
**(Violation of the Computer Fraud and Abuse Act ("CFAA")**
**18 U.S.C. § 1030 *et seq.*)**

200.   Monster incorporates all other allegations in this complaint.

201.   Defendants, by and through their current employees, have intentionally accessed and/or attempted to access Monster's computers, which were used in or affected interstate and/or foreign commerce or communication.  Defendants did so without Monster's authorization and/or by exceeding any authorization as was granted.

202.   As a result of Defendants' unauthorized access, they have furthered a scheme to obtain Monster's trade secrets and have in fact gained access to Monster's valuable trade secrets.

203.   Defendants have gained—and Monster has lost—more than $5,000 in value since the time of Defendants' unauthorized access, which occurred within a year of the filing of this complaint.

204.   Defendants have acted with oppression, fraud, or malice, entitling Monster to an award of punitive damages.

**PRAYER FOR RELIEF**

Monster requests the following relief:

1.  A preliminary and permanent injunction barring Defendants from engaging in the unlawful conduct described above;

2.  Judgment in favor of Monster and against Defendants on all claims;

3.  Compensatory and punitive damages to be proven at trial;

4.  A declaration that this is an "exceptional case" due to the willful nature of Defendants' unlawful conduct, and awarding damages and attorneys' fees and costs to Monster pursuant to 15 U.S.C. § 1117, and any other damages including treble damages and attorneys' fees to the full extent allowable under the law;

5.  Treble damages, costs of suit, and attorneys' fees pursuant to California

PLAINTIFF MONSTER ENERGY COMPANY'S FIRST AMENDED COMPLAINT

5521379

Penal Code section 496(c);

6. An injunction of both actual and threatened misappropriation of Monster's trade secrets pursuant to California Civil Code § 3426.2(a).

7. Reasonable costs and expenses incurred in this action, including attorneys' fees and costs of the suit, to the full extent permitted by law;

8. Pre-judgment interest on all such damages, monetary, or otherwise; and

9. All other relief, legal or injunctive, as this Court finds appropriate.

## JURY DEMAND

Monster demands a trial by jury on all claims for which trial by jury is proper.

Dated:  April 3, 2019        Respectfully submitted,

**HUESTON HENNIGAN LLP**

By: */s/ John C. Hueston*

John C. Hueston
Moez M. Kaba
Steven N. Feldman
Attorneys for Plaintiff
MONSTER ENERGY COMPANY,
a Delaware Corporation

5521379

# EXHIBIT A

# *S & N LABS*

| 2021 E. Fourth Street | Santa Ana, California  92705 | (714) 543-2211 |

2 April 2019

| Job Number: | 22903 |

Hueston Hennigan LLP
523 West Sixth Street, Suite 400
Los Angeles, California  90014

## REPORT

Four cans of Bang Root Beer Blaze with best-by date code 042619 were purchased on 23 January 2019.  Cans of two other Bang flavors were obtained on 21 March 2019.  The contents of these products were tested for several components.  The methods used and results are summarized in the table below.

### Composition (all values in mg/can)

| Analyte | Method | Root Beer Blaze | Blue Razz | Lemon Drop |
|---|---|---|---|---|
| Creatine (mg/can) | HPLC | ND < 0.06 | ND < 0.3 | ND < 0.15 |
| Creatinine (mg/can) | HPCL | 0.41 | TR < 0.4 | TR < 0.1 |
| Creatyl-L-leucine (mg/can) | HPLC | 34 | (NA) | (NA) |
| CoQ10 (mg/can) | HPLC | 0.5 | (NA) | (NA) |
| Leucine (mg/can) | HPLC | 79 | (NA) | (NA) |
| Isoleucine (mg/can) | HPLC | 18 | (NA) | (NA) |
| Valine (mg/can) | HPLC | 27 | (NA) | (NA) |
| Total BCAA (mg/can) | (calculation) | 124 | (NA) | (NA) |

ND = not detected; TR = trace, below the detection limit stated; NA = not analyzed

*/s/ Neil E. Spingarn*

Neil E. Spingarn, Ph.D.
President

# EXHIBIT 2

REDACTED

FILED
CLERK, U.S. DISTRICT COURT

09/29/2022

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ NP _____ DEPUTY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MONSTER ENERGY COMPANY, a Delaware corporation,<br><br>Plaintiff,<br><br>vs.<br><br>VITAL PHARMACEUTICALS, INC., d/b/a VPX Sports, a Florida corporation; and JOHN H. OWOC a.k.a. JACK OWOC, an individual,<br><br>Defendants. | Case No. 5:18-cv-1882-JGB-SHK<br><br>*Honorable Jesus G. Bernal*<br><br>**VERDICT FORM** |

WE THE JURY unanimously find as follows:

## **FALSE ADVERTISING – LANHAM ACT**

1. Are Defendants Vital Pharmaceuticals, Inc. ("VPX") and/or John H. "Jack" Owoc liable for false advertising under the Lanham Act?

    (a) **VPX:**    Yes (for Monster)  ✗    No (for VPX) _____

    (b) **Owoc:**    Yes (for Monster)  ✗    No (for Owoc) _____

*(If you answered "Yes" to Question 1(a), 1(b), or both, continue to Question 2. Otherwise, skip to Question 4.)*

2. We award Monster the following damages sustained by Monster for VPX's and/or Owoc's false advertising:

    $271,924,174

*(Continue to Question 3.)*

3. Was VPX's and/or Owoc's false advertising willful and deliberate?

    (a) **VPX:**    Yes (for Monster)  ✗    No (for VPX) _____

    (b) **Owoc:**    Yes (for Monster)  ✗    No (for Owoc) _____

*(Continue to Question 4.)*

- 1 -

## INTENTIONAL INTERFERENCE WITH CONTRACT – CALIFORNIA COMMON LAW

4. Did VPX and/or Owoc intentionally interfere with Monster's contracts with Circle K, AM PM, and/or Wal-Mart?

### Circle K

    (a) **VPX:**    Yes (for Monster) _X_    No (for VPX) _____

    (b) **Owoc:**    Yes (for Monster) _____    No (for Owoc) _X_

### AM PM

    (a) **VPX:**    Yes (for Monster) _X_    No (for VPX) _____

    (b) **Owoc:**    Yes (for Monster) _____    No (for Owoc) _X_

### Wal-Mart

    (a) **VPX:**    Yes (for Monster) _X_    No (for VPX) _____

    (b) **Owoc:**    Yes (for Monster) _____    No (for Owoc) _X_

*(If you answered "Yes" to any of the above, continue to Question 5. Otherwise, skip to Question 7.)*

- 2 -

5.  We award Monster the following damages for VPX's and/or Owoc's intentional interference with Monster's contracts with Circle K, AM PM, and/or Wal-Mart:

$18,000,000

*(Continue to Question 6.)*

6.  Did VPX and/or Owoc act maliciously, oppressively, fraudulently, or in reckless disregard of Monster's rights by intentionally interfering with Monster's contracts with Circle K, AM PM, and/or Wal-Mart?

(a)  **VPX:**   Yes (for Monster) __X__   No (for VPX) _____

(b)  **Owoc:**   Yes (for Monster) _____   No (for Owoc) __X__

*(Continue to Question 7.)*

- 3 -

## TRADE SECRET MISAPPROPRIATION

7.  Did VPX misappropriate Monster's claimed trade secrets in violation of the Defend Trade Secrets Act?

Yes (for Monster) ✗_____     No (for VPX) _____

*(Continue to Question 8.)*

8.  Did VPX misappropriate Monster's claimed trade secrets in violation of the California Uniform Trade Secrets Act?

Yes (for Monster) ___✗___     No (for VPX) _____

*(If you answered "Yes" to **either of** Questions 7 or 8, continue to Question 9. Otherwise, skip to Question 11.)*

9.  We award Monster the following damages for VPX's misappropriation of Monster's trade secrets:

___# 3,000,000_____

*(Continue to Question 10.)*

10. Did VPX maliciously and willfully misappropriate Monster's trade secrets?

Yes (for Monster) ✗_____     No (for VPX) _____

*(Continue to Question 11.)*

- 4 -

## COMPUTER FRAUD AND ABUSE ACT

11. Did VPX violate the Computer Fraud and Abuse Act?

Yes (for Monster) ✗        No (for VPX) _____

*(If you answered "Yes" to Question 11, continue to Question 12.  Otherwise, skip to the Concluding Instructions.)*

12. We award Monster the following damages for VPX's violation of the Computer Fraud and Abuse Act:

$15,587

*(Continue to the Concluding Instructions.)*

### Concluding Instructions

You have now reached the end of the verdict form. Review it to ensure it accurately reflects your unanimous decisions. The Presiding Juror should then sign and date the verdict form in the spaces below and notify the Court personnel that you have reached a verdict. The Presiding Juror should retain possession of the verdict form and bring it when the jury is brought back into the courtroom.

Dated: _September 29_, 2022

PRESIDING JUROR

# EXHIBIT 3

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **EDCV 18-1882 JGB (SHKx)** | Date | October 6, 2023 |
|---|---|---|---|

| Title | ***Monster Energy Company v. Vital Pharmaceuticals, Inc., et al.*** |
|---|---|

Present: The Honorable    JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

Proceedings:    **Order (1) DENYING Defendant's Motion for New Trial, Judgment Notwithstanding the Verdict, or Remittitur (Dkt. No. 921); (2) GRANTING-IN-PART Plaintiff's Motion for Equitable Relief, Fees, and Costs (Dkt. No. 928); (3) DENYING Defendant's Request for Clarification (Dkt. No. 1035); and (4) DENYING Defendant's Application to File Supplemental Opposition Under Seal (Dkt. No. 1038) (IN CHAMBERS)**

     Before the Court are two post-trial motions: (1) Defendant Vital Pharmaceuticals, Inc's motion for a new trial, judgment notwithstanding the verdict, or remittitur ("New Trial Motion," Dkt. No. 921); and (2) Plaintiff Monster Energy Company's motion for equitable relief, fees, and costs ("Fees Motion," Dkt. No. 928) (jointly, "Motions"). The Court finds these matters appropriate for resolution without a hearing. See Fed. R. Civ. P. 78; L.R. 7-15. After considering the papers filed in support of and in opposition to the Motions, the Court **DENIES** the New Trial Motion and **GRANTS-IN-PART and DENIES-IN-PART** the Fees Motion.

# I. BACKGROUND

     The parties are familiar with the extensive factual and procedural history of this case; the Court relates only the background necessary to understand the Motions.

     On September 4, 2018, Plaintiff Monster Energy Company ("Plaintiff" or "Monster") initiated this action against Defendants Vital Pharmaceuticals, Inc. ("Vital" or "VPX") and John H. Owoc ("Mr. Owoc") (jointly, "Defendants"). ("Complaint," Dkt. No. 1.) On April 3, 2019,

Monster filed a first amended complaint alleging twelve causes of action. ("FAC," Dkt. No. 61.) On May 20, 2019, the Court granted-in-part Defendants' motion to dismiss the FAC and dismissed the fourth, seventh, eighth, and ninth causes of action. ("MTD Order," Dkt. No. 95.)

On April 19, 2022, the Court (1) denied Monster's motion for partial summary judgment on its false advertising claim under the Lanham Act, 11 U.S.C. § 1125(a); (2) granted-in-part Vital's motion for summary judgment on the Lanham Act claim only with respect to false statements about the '466 Patent, granted Vital's motion on Monster's intentional interference of prospective economic advantage claim, and denied Vital's motion on all other claims; and (3) granted Mr. Owoc's motion for summary judgment on Monster's claims for intentional interference of prospective economic advantage, violation of the California Uniform Trade Secrets Act ("CUTSA"), Cal. Civ. Code § 3426, et seq., violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, et seq., and violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, et seq., and denied Mr. Owoc's motion on all other claims. ("MSJ Order," Dkt. No. 740.)

On August 25, 2022, a jury trial began on Monster's remaining claims. (Dkt. No. 820.) On September 29, 2022, the jury returned a verdict for Monster. ("Verdict," Dkt. No. 890.) With respect to the false advertising claim, the jury found that Defendants are liable for false advertising under the Lanham Act, awarded $271,924,174 in damages to Monster, and found that Defendants' false advertising was willful and deliberate. (Id.) With respect to the intentional interference with contract claim, the jury found that Vital intentionally interfered with Monster's contracts with Circle K, AM PM, and Wal-Mart; awarded $18,000,000 in damages to Monster; and found that Vital acted maliciously, oppressively, fraudulently, or in reckless disregard of Monster's rights by intentionally interfering with Monster's contracts. (Id.) The jury found that Mr. Owoc did not intentionally interfere with Monster's contracts with Circle K, AM PM, and Wal-Mart. (Id.) With respect to the trade secret misappropriation claims, the jury found that Vital misappropriated Monster's trade secrets in violation of the DTSA and CUTSA, awarded $3,000,000 in damages to Monster, and found that Vital maliciously and willfully misappropriated Monster's trade secrets. (Id.) Finally, with respect to the CFAA claim, the jury found that Vital violated the CFAA and awarded $15,587 in damages to Monster. (Id.)

On December 8, 2022, Monster filed a motion for permanent injunction to enjoin Defendants' false advertising of "Super Creatine" and "creatine." ("PI Motion," Dkt. No. 901.) On April 12, 2023, the Court granted the PI Motion. ("PI Order," Dkt. No. 964.)

## A. Defendants' Post-Trial Motion

On February 23, 2023, Vital filed a motion for a new trial pursuant to Federal Rule of Civil Procedure 59(a) ("Rule 59(a)"), or in the alternative, judgment notwithstanding the verdict pursuant to Federal Rule of Civil Procedure 50(b) ("Rule 50(b)"), or in the alternative, remittitur. (New Trial Motion.) On the same day, Mr. Owoc joined the New Trial Motion. (Dkt. No. 922.) In support of its New Trial Motion, Vital submitted a declaration of David Muth

with attached exhibits. ("Muth Decl.," Dkt. No. 923; "New Trial Motion Exs.," Dkt. Nos. 923-1–68.)

On March 23, 2023, Monster opposed the New Trial Motion. ("New Trial Opposition," Dkt. No. 950.) In support of its opposition, Monster submitted a declaration of Amber Munoz with attached exhibits. ("Munoz Decl.," Dkt. No. 950-1; "New Trial Opp. Exs.," Dkt. Nos. 950-1–54.)

On April 10, 2023, Vital replied. ("New Trial Reply," Dkt. No. 957.) In support of its reply, Vital submitted a supplemental declaration of David Muth with attached exhibits. ("Muth Supp. Decl.," Dkt. No. 958; "New Trial Reply Exs.," Dkt. Nos. 958-1–16.)

## B. Plaintiff's Post-Trial Motion

On February 23, 2023, Monster filed a motion for equitable relief, fees, and costs. (Fees Motion.) In support of its Fees Motion, Monster submitted a declaration of Allison L. Libeu with attached exhibits. ("Libeu Decl.," Dkt. No. 929; "Fees Motion Exs.," Dkt. Nos. 929-1–121.) In addition, Monster filed an unopposed application for leave to file under seal certain documents relating to the Fees Motion.[1] (Dkt. No. 930.)

On March 23, 2023, Vital opposed the Fees Motion. ("Vital Fees Opposition," Dkt. No. 945.) In support of its opposition, Vital submitted a declaration of David Muth with attached exhibits. ("Muth Fees Decl.," Dkt. No. 946; "Fees Opp. Exs.," Dkt. Nos. 946-1–98.) In addition, Vital filed an application for leave to file under seal certain documents relating to the opposition. (Dkt. No. 947.) Monster submitted a declaration of Amber Munoz in support of the application to seal certain documents relating to the opposition. (Dkt. No. 952.)

On April 10, 2023, Monster replied. ("Fees Reply," Dkt. No. 959.) In support of its reply, Monster submitted a declaration of Amber Munoz with attached exhibits. ("Munoz Fees

---

[1] The parties apply to seal various documents filed in support of and in opposition to Monster's Fees Motion. (See Dkt. Nos. 930, 947, 961.) The parties apply to seal two categories of information. The first category includes Hueston Hennigan's negotiated billing rates for Monster that "are competitively sensitive and not publicly known." Mine O'Mine, Inc. v. Calmese, 2012 WL 1279827, at *4 (D. Nev. Apr. 16, 2012); see E & J Gallo Winery v. Proximo Spirits, Inc., 2012 WL 1635190, at *1 (E.D. Cal. May 8, 2012). "Disclosure of these rates would harm Hueston Hennigan by providing current and prospective clients—and potentially its competitors—nonpublic information about its negotiated fee agreements for" Monster. (Dkt. No. 930.) The second category is Monster's confidential and proprietary business information. (See Dkt. Nos. 947, 952, 961); see, e.g., Coffelt v. Kroger Co., 2018 WL 6016133, at *2 (C.D. Cal. June 21, 2018) (sealing "sensitive business information" that "implicates policies, procedures, business practices, agreements, processes, and pricing information"). The Court has previously sealed the same or similar documents. (See, e.g., Dkt. No. 899). Accordingly, the Court **GRANTS** the applications to seal. (Dkt. Nos. 930, 947, 961.)

Decl.," Dkt. No. 960; "Fees Reply Exs.," Dkt. Nos. 960-1–9.) In addition, Monster filed an application for leave to file under seal certain documents relating to the reply. (Dkt. No. 961.)

On July 31, 2023, the Court became aware of news reports indicating that Monster may acquire some of Vital's assets. ("July 31, 2023 Order," Dkt. No. 988.) The Court ordered the parties to inform the Court in writing whether each party will withdraw their pending motion. (Id.) On August 7, 2023, Monster and Vital stated that they do not intend to withdraw their motions. ("Joint Statement," Dkt. No. 999.) On August 8, 2023, Mr. Owoc stated that he does not intend to withdraw his joinder to Vital's New Trial Motion. (Dkt. No. 1001.)

On August 30, 2023, Mr. Owoc requested clarification from the Court regarding its July 31, 2023 Order. ("Request for Clarification," Dkt. No. 1035.) In the Request for Clarification, Mr. Owoc explained that he did not anticipate that Vital and Monster would file a joint statement in response to the Court's July 31, 2023 Order. (Id.) "As it appears that Vital and Monster are cooperating, Mr. Owoc is concerned that Vital may reverse its position and withdraw the [New Trial] Motion." (Id.) Vital did not withdraw the New Trial Motion. (See Joint Statement.) The Court **DENIES** Mr. Owoc's Request for Clarification.

On August 8, 2023, Mr. Owoc opposed the Fees Motion. ("Owoc Fees Opposition," Dkt. No. 1002.) In support of his opposition, Mr. Owoc submitted a declaration with attached exhibits. ("Owoc Decl.," Dkt. No. 1029; "Owoc Exs.," Dkt. Nos. 1029-1–3.) On August 15, 2023, Monster responded to Mr. Owoc's opposition to the Fees Motion, arguing that it is untimely. ("Response to Owoc," Dkt. No. 1030.) In support of its response, Monster submitted a declaration of Allison L. Libeu with attached exhibits. ("Libeu Resp. Decl.," Dkt. No. 1030-1; "Owoc Resp. Exs.," Dkt. Nos. 1030-2–12.)

On September 13, 2023, Mr. Owoc filed a supplemental opposition to the Fees Motion ("Owoc Supplemental Fees Opposition," Dkt. No. 1038-2) and applied to file it under seal ("Owoc Application to Seal," Dkt. No. 1038.) In support of his application to seal his supplemental opposition, Mr. Owoc submitted a declaration (Dkt. No. 1039) and Monster submitted a declaration of Amber Munoz (Dkt. No. 1041). On September 20, 2023, Monster filed a response to Mr. Owoc's supplemental opposition, arguing that it is untimely. (Dkt. No. 1042.) The Court agrees with Monster that Mr. Owoc's opposition and supplemental opposition are untimely.[2] Thus, the Court **DECLINES** to consider the Owoc Fees Opposition and Owoc Supplemental Fees Opposition, and **DENIES** the Owoc Application to Seal.

---

[2] On December 12, 2022, the Court set a briefing schedule for the parties' post-trial motions. ("Briefing Schedule," Dkt. No. 910.) Pursuant to the Briefing Schedule, the parties' opposition briefs were due on March 23, 2023. (Id.) Mr. Owoc filed an opposition to Monster's Fees Motion more than *four months* after the Court's deadline, and inexplicably, a *supplemental* opposition one month after that. See L.R. 7-12 ("The Court may decline to consider any memorandum or other document not filed within the deadline set by order[.]"); Mpoyo v. FIS Mgmt. Servs., LLC, 840 F. App'x 307, 308–09 (9th Cir. 2021) ("The district court did not abuse its discretion by striking [pro se plaintiff's] untimely opposition to the motion for summary

## II.   LEGAL STANDARD

### A.  Rule 59(a)

Federal Rule of Civil Procedure 59(a) authorizes new trials "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). A court generally "must uphold a jury verdict if it is supported by substantial evidence." Guy v. City of San Diego, 608 F.3d 582, 585 (9th Cir. 2010). Substantial evidence is evidence "adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion." Id. (quoting Pavao v. Pagay, 307 F.3d 915, 918 (9th Cir. 2002)). Further, a court must uphold a jury's damages award unless the amount is "clearly not supported by the evidence, or only based on speculation or guesswork." Id. (quoting L.A. Mem'l Coliseum Comm'n v. Nat'l Football League, 791 F.2d 1356, 1360 (9th Cir. 1986)).

However, a court may grant a new trial if "the verdict is contrary to the clear weight of the evidence, or is based upon evidence which is false, or to prevent . . . a miscarriage of justice." United States v. 4.0 Acres of Land, 175 F.3d 1133, 1139 (9th Cir. 1999) (quoting Oltz v. St. Peter's Cmty. Hosp., 861 F.2d 1440, 1452 (9th Cir. 1998)). In considering a Rule 59(a) motion, the court is "not required to view the trial evidence in the light most favorable to the verdict." Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd., 762 F.3d 829, 842 (9th Cir. 2014). Instead, the court "can weigh the evidence and assess the credibility of the witnesses." Id.

### B.  Rule 50(b)

Under Federal Rule of Civil Procedure 50(b), courts may enter judgment as a matter of law after a jury trial if "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." See Fed. R. Civ. P. 50(a)(1). "The test applied is whether the evidence permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." E.E.O.C. v. Go Daddy Software, Inc., 581 F.3d 951, 961 (9th Cir. 2009) (quoting Josephs v. Pac. Bell, 443 F.3d 1050, 1062 (9th Cir. 2006)). In considering a Rule 50(b) motion, unlike a Rule 59(a) motion, the court may not weigh the evidence or make credibility determinations. Id. (citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)). The court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. Josephs, 443 F.3d at 1062.

Procedurally, a Rule 50(b) motion is "a renewed Rule 50(a) motion." E.E.O.C., 581 F.3d at 961. A party must first make a Rule 50(a) motion "before the case is submitted to the jury." Fed. R. Civ. P. 50(a)(2). If the court denies or defers ruling on the motion for judgment as a matter of law, and if the jury then returns a verdict against the moving party, the party may renew its motion under Rule 50(b). Fed. R. Civ. P. 50(b). Because a Rule 50(b) motion is a renewed motion, a party "cannot raise arguments in its post-trial motion that it did not raise in its

---

judgment . . . ."). Mr. Owoc's excuses are not enough to justify his extraordinary delay. (See Owoc Decl. ¶ 24; Response to Owoc at 1–3.)

pre-verdict Rule 50(a) motion." Freund v. Nycomed Amersham, 347 F.3d 752, 761 (9th Cir. 2003) (citing Fed. R. Civ. P. 50 advisory committee's note to 1991 amendment). The renewed Rule 50(b) motion "may include an alternative or joint request for a new trial under Rule 59." Fed. R. Civ. P. 50(b).

## C. Attorneys' Fees

In general, courts apply the "American Rule," where "each party in a lawsuit ordinarily shall bear its own attorney's fees unless there is express statutory authorization to the contrary." Hensley v. Eckerhart, 461 U.S. 424, 429 (1983). The Lanham Act authorizes an award of reasonable attorneys' fees to the prevailing party "in exceptional cases." 15 U.S.C. § 1117(a). An "exceptional case" is "one that stands out from others with respect to the substantive strength of a party's litigating position . . . or the unreasonable manner in which the case was litigated." SunEarth, Inc. v. Sun Earth Solar Power Co., 839 F.3d 1179, 1180 (9th Cir. 2016) (quoting Octane Fitness, LLC v. ICON Health & Fitness, Inc., 572 U.S. 545, 554 (2014)). The prevailing party must prove its entitlement to attorneys' fees by a preponderance of the evidence. See id. at 1181. The DTSA and CUTSA authorize an award of attorneys' fees to the prevailing party for willful and malicious trade secret misappropriation. See 18 U.S.C. § 1836(b)(3)(D); Cal. Civ. Code § 3426.4.

Once a party establishes its entitlement to attorneys' fees, "[i]t remains for the district court to determine what fee is 'reasonable.'" Hensley, 461 U.S. at 433. District courts use the lodestar method to determine the reasonableness of attorneys' fees. See Camacho v. Bridgeport Fin., Inc., 523 F.3d 973, 978 (9th Cir. 2008). To calculate the lodestar, a court multiplies "the number of hours the prevailing party reasonably expended on the litigation by a reasonable hourly rate." Id. (quoting Ferland v. Conrad Credit Corp., 244 F.3d 1145, 1149 n.4 (9th Cir. 2001)). In most cases, the lodestar figure is presumptively a reasonable fee award. See United Steelworkers of Am. v. Phelps Dodge Corp., 896 F.2d 403, 406 (9th Cir. 1990). "The district court may then adjust [the lodestar] upward or downward based on a variety of factors." Moreno v. City of Sacramento, 534 F.3d 1106, 1111 (9th Cir. 2008); Ketchum v. Moses, 24 Cal. 4th 1122, 1132 (2001) (same). These factors include: "(1) the novelty and difficulty of the questions involved, (2) the skill displayed in presenting them, (3) the extent to which the nature of the litigation precluded other employment by the attorneys, (4) the contingent nature of the fee award." Ketchum, 24 Cal. 4th at 1132; see also Kerr v. Screen Extras Guild, Inc., 526 F.2d 67, 69–70 (9th Cir. 1975), abrogated on other grounds by City of Burlington v. Dague, 505 U.S. 557 (1992) (listing factors). "The burden is on the party seeking attorney fees to prove that the fees it seeks are reasonable." Vines v. O'Reilly Auto Enter., LLC, 289 Cal. Rptr. 3d 310, 318 (Cal. Ct. App. 2022) (internal alteration, quotation marks, and citation omitted).

//
//
//
//
//

## III.  DISCUSSION

### A.  Motion for New Trial, Judgment Notwithstanding Verdict, or Remittitur

Defendants move for a new trial on the grounds that the jury's verdict is "completely irrational, grossly excessive, and would create a miscarriage of justice if allowed to stand." (New Trial Motion at 9.)  Alternatively, Defendants move to reduce the jury's damages award to $828,530 for the false advertising claims and $1 in nominal damages for the tortious interference and trade secret claims.  (Id.)  Alternatively, Defendants move for judgment notwithstanding the verdict ("JNOV") as to the false advertising and tortious interference claims.  (Id.)  For the reasons below, the Court **DENIES** Defendants' New Trial Motion in its entirety.

#### 1.  New Trial

Defendants argue that the Court should grant a new trial because it improperly excluded certain evidence.  However, a "new trial is only warranted on the basis of an incorrect evidentiary ruling if the ruling ***substantially prejudiced*** a party."  United States v. 99.66 Acres of Land, 970 F.2d 651, 658 (9th Cir. 1992) (emphasis added).  Defendants do not meet this standard.  The Court's exclusion of certain evidence was neither erroneous nor substantially prejudicial.

##### a.  InfoScout Surveys

First, Defendants vigorously dispute the Court's ruling regarding the InfoScout surveys. (See New Trial Motion at 12–17.)  In 2018, InfoScout, a market research firm, conducted surveys about Bang Energy consumers' preferences.  (See New Trial Opposition at 4.)  InfoScout asked over four hundred shoppers what they believed was Bang's "most important" attribute.  (Id.) The most popular answers were "0 sugar, 0 calories, 0 carbs" (23% of respondents) and "healthier alternative to energy drinks" (18% of respondents).  (Id.)  Three percent of respondents identified Super Creatine as the most important attribute.  (Id.)  Defendants' consumer expert, Dr. Larry Chiagouris ("Dr. Chiagouris"), relied in part on the InfoScout surveys to form his opinions.

Before trial, Monster moved in limine to exclude any argument or evidence of third-party market research conducted by InfoScout.  (See Dkt. No. 622.)  Monster argued in part that the InfoScout surveys are inadmissible hearsay and that Defendants failed to meet their burden to show that the surveys were reliable.  (See id. at 4–7.)  On August 2, 2022, the Court agreed that the InfoScout surveys "contain hearsay" and lacked "sufficient guarantees of trustworthiness." (See "MIL Order," Dkt. No. 798, at 17.)  As the proponent of the evidence, Defendants had the burden to establish that the surveys were conducted "in accordance with generally accepted survey principles."  (Id.); see Keith v. Volpe, 858 F.2d 467, 480 (9th Cir. 1988).  Yet Defendants had not identified a single witness who could testify about the surveys' design or methodology. Accordingly, the Court excluded "standalone evidence" of the InfoScout surveys, but allowed the parties to use the surveys "to examine the basis of an expert's opinion."  (MIL Order at 18.)

Specifically, the Court held that the surveys "are admissible to examine Dr. Chiagouris on the basis of his opinions." (Id. at 16.)

During trial, Defendants attempted to introduce the InfoScout surveys through Dr. Chiagouris's direct examination. (See New Trial Motion Exs. 16 (9/21 Trial Tr.), 17 (9/22 Trial Tr.), 18 (9/23 Trial Tr.).) Monster objected. On September 21, 2022, Defendants explained that "[i]t was our understanding of the Court's motion in limine ruling that an expert who relied upon that data to form opinions, which Dr. Chiagouris did, would be entitled to explain the basis for the opinions." (New Trial Motion Ex. 16 (9/21 Trial Tr.) at 234:19–22.) Monster responded that the Court's MIL Order only allowed the parties to use the InfoScout surveys on cross-examination to question the basis of an expert's opinion. (See id. at 235:24–236:4.) Since the InfoScout surveys are inadmissible hearsay, Monster argued, Dr. Chiagouris may not introduce the evidence to the jury unless Defendants can show that the surveys' probative value substantially outweighs their prejudicial effect. (See id. at 236:5–11, 237:22–238:1.) The Court tentatively agreed with Monster: "[U]ltimately you cannot elicit hearsay statements from your own expert. You can examine the other side's expert on hearsay, but you can't elicit hearsay statements from your own expert." (Id. at 238:9–18.) Nevertheless, the Court granted the parties leave to file supplemental briefs on the scope of Dr. Chiagouris's direct examination. (See Dkt. Nos. 856, 857, 859.)

On September 22, 2022, after considering the parties' supplemental briefs, the Court upheld its tentative ruling:[3] "[I]nadmissible evidence does not come in by the proponent of the expert witness unless [the proponent] can establish that it's substantially more probative than prejudic[ial]." (See New Trial Motion Ex. 17 (9/22 Trial Tr.) at 5:1–20.) FRE 703 provides:

An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

Fed. R. Evid. 703. Although an expert witness may **rely** on inadmissible evidence, he may not **disclose** such evidence to the jury unless the evidence's probative value in helping the jury evaluate the expert's opinion substantially outweighs its prejudicial effect. (See New Trial Opposition at 7.) The InfoScout surveys are unquestionably inadmissible hearsay. The Court correctly found that the surveys' probative value in helping the jury evaluate Dr. Chiagouris's opinion does **not** substantially outweigh their prejudicial effect. The Court noted that "because

---

[3] A ruling on a motion in limine is always preliminary. (See New Trial Opp. Ex. 7 (9/23 Trial Tr.) at 104:1–4.) In its MIL Order, the Court stated that "[r]egardless of its initial decision on a motion in limine, a court may revisit the issue at trial." (MIL Order at 7); see also, e.g., Luce v. United States, 469 U.S. 38, 41–42 (1984); Massok v. Keller Indus., Inc., 147 F. App'x 651, 656 (9th Cir. 2005).

of [the evidence's] lack of reliability, [ ] it's not that probative." (New Trial Motion Ex. 17 (9/22 Trial Tr.) at 5:6–9.)

Further, the Court explained that "[t]he limitation against disclosure applies only to the proponent of the expert. Rule 703 does not restrict an opposing party [from] presenting those facts or data on cross-examination or from the proponent . . . using those facts or data on redirect examination after those facts have been revealed on cross-examination." (Id. at 5:14–20.) As such, the Court allowed the parties to introduce statements about the InfoScout surveys on cross-examination of an expert. (See MIL Order at 16–18; New Trial Motion Ex. 18 (9/23 Trial Tr.) at 105:8–25 ("It wasn't on my mind that the whole InfoScout study or the details of it would be introduced except on cross-examination because that's where hearsay statements can come in.").) Although the Court acknowledged that the MIL Order "could have been more clear" (New Trial Motion Ex. 18 (9/23 Trial Tr.) at 105:22), the Court did not "ignore[]," "contraven[e]," or "reconsider" its ruling during trial (New Trial Motion at 13–15). The Court correctly held that the InfoScout surveys were not admissible through Dr. Chiagouris's ***direct*** examination. See, e.g., Wi-LAN Inc. v. Sharp Elec. Corp., 992 F.3d 1366, 1374–76 (Fed. Cir. 2021) (FRE 703 does not allow a party to use its expert as a substitute for a fact witness to circumvent the rules of evidence to admit otherwise inadmissible evidence); Marvel Characters, Inc. v. Kirby, 726 F.3d 119, 136 (2d Cir. 2013) (FRE 703 does not allow a party to "call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony" (citation omitted)); United States v. Mest, 789 F.2d 1069, 1074 (4th Cir. 1986) (FRE 703 "does not compel the admission of any evidence desired by a litigant simply because that otherwise inadmissible evidence can be styled by one expert witness as something he relied upon in reaching his opinion"). Defendants could have used the InfoScout surveys to cross-examine Monster's ***expert*** witnesses, but chose not to do so.[4] (See New Trial Opposition at 6.)

Even if the Court erred in its interpretation of FRE 703, Defendants cannot show that they were substantially prejudiced. Defendants repeatedly told the jury that Monster commissioned a pre-litigation survey which revealed that only 3% of respondents believed Super Creatine was Bang's most important attribute. (See New Trial Opposition at 10–12.) For example, Dr. Chiagouris testified extensively that "there was no difference in the presence of or the absence of the word 'Super Creatine' on the can in terms of either group's expressed interest in . . . purchasing and consuming a can of Bang Energy drinks." (New Trial Opp. Ex. 6 (9/22 Trial Tr.) at 13:7–20.) When asked whether his conclusion was "corroborated by the non-litigation Monster survey research that you reviewed," he said, "It was corroborated, yes." (Id. at 13:21–24.) The Court explicitly allowed this testimony: "You can mention that [Dr. Chiagouris] relied on surveys including, if he knows, surveys conducted internally by Monster and that they form the basis for his opinion." (Id. at 8:11–13.) Dr. Chiagouris and

---

[4] Instead, Defendants attempted to introduce the InfoScout surveys on cross-examination of Monster's lay witnesses. (See New Trial Opposition at 8–9.) None of Monster's lay witnesses recalled the InfoScout surveys. (See id. at 9; New Trial Opp. Ex. 2 (Chad Henry) at 216:18–217:9; id. Ex. 3 (Mario Suarez) at 173:12–20; id. Ex. 4 (Emelie Tirre) at 62:23–63:22.)

Vital's damages expert, Mr. Drew Voth ("Mr. Voth"), both referenced and used the 3% figure in their demonstratives to the jury. (See New Trial Opposition at 11–12.) That Defendants could not introduce the InfoScout surveys themselves does not warrant a new trial. (Id. at 13.)

### b. Rodent Study

Second, Defendants argue that Monster "opened the door" for Defendants to introduce evidence of a rodent study conducted by the Peking Union Medical College ("Rodent Study"). (See New Trial Motion at 17–20.) The "opening the door" doctrine allows parties "to introduce evidence on the same issue to rebut any *false* impression that might have resulted from the earlier admission." United States v. Sine, 493 F.3d 1021, 1037 (9th Cir. 2007) (quoting United States v. Whitworth, 856 F.2d 1268, 1285 (9th Cir. 1988)). However, the doctrine is "not so capacious as to allow the admission of *any* evidence made relevant by the opposing party's strategy, without regard to the Federal Rules of Evidence." Id.

On July 13, 2023, weeks before trial and more than a year after the close of expert discovery, Defendants disclosed the existence of the Rodent Study in a supplemental report of their expert, Dr. Keykavous Parang ("Dr. Parang"). (See Dkt. No. 788.) The Court found Defendants' decision to not inform Monster or the Court of the Rodent Study until after Dr. Parang had reviewed it and drafted a supplemental report a "flagrant breach[]" of the Federal Rules of Civil Procedure and "impermissible gamesmanship." (Id.) Before trial, on July 28, 2022, the Court excluded Dr. Parang's supplemental report and any testimony regarding the Rodent Study as untimely. (See id.)

During trial, Defendants argued that Monster opened the door to the Rodent Study when (1) Monster's counsel stated that the jury will see "[n]o studies proving that Super Creatine is creatine or provides the benefits of creatine" in his opening statement; and (2) when Monster asked Ms. Meg Owoc ("Ms. Owoc") whether she knew of "any studies [that] have been done on Super Creatine." (See New Trial Motion at 18; New Trial Motion Ex. 2 (8/26 Trial Tr.) at 55:11–16; id. Ex. 7 (9/6 Trial Tr.) at 160:17–18.) After a sidebar, Monster withdrew the question and clarified: "At the time that [Vital] posted this on Instagram, you didn't know if any studies had been done on Super Creatine, correct?" (See New Trial Motion Ex. 7 (9/6 Trial Tr.) at 162:19–21.) Ms. Owoc answered, "It's not something that the marketing department worries about. We're not responsible for studies. We do have a lot of studies." (Id. at 162:22–24.)

The Court allowed the parties to file supplemental briefs on whether Monster opened the door to the curative admissibility of the Rodent Study. (See Dkt. Nos. 842, 843, 845, 846, 848.) After considering the parties' submissions, the Court correctly held that Monster had not opened the door. (See New Trial Opp. Ex. 4 (8/31 Trial Tr.) at 81:5–82:8.) The Court observed that Monster's questions "have been very carefully tailored to not elicit impermissible testimony. There were numerous questions in which the plaintiff asked, 'Didn't you previously testify,' or 'Haven't you previously admitted,' or 'At the time of your deposition this or that.'" (Id. at 81:12–16.) The one "not very carefully framed" question to Ms. Owoc was withdrawn, and Defendants could not have been prejudiced by it because Ms. Owoc's "response to that question

did not specifically highlight [the Rodent] Study." (<u>Id.</u> at 81:21–82:3.)  The Court found that Ms. Owoc's answer was "general[] enough to encompass admissible testimony."  (<u>Id.</u> at 82:3–4.)

Defendants now repeat the same arguments they asserted during trial.  (<u>See</u> New Trial Motion at 17–20.)  The Court remains unconvinced that Monster opened the door to the Rodent Study, or that Defendants were substantially prejudiced by the exclusion of the Rodent Study.

### c. Other Forms of Creatine

Third, Defendants claim that the Court erred by excluding evidence of third-party products that contain a "form of creatine."  (<u>See</u> New Trial Motion at 20–22.)  Defendants contend that such evidence would have helped the jury understand that "the market contains many alternative forms of creatine other than creatine monohydrate . . . with a large variance on the molecular structure, makeup, compounds, and efficacy."  (<u>Id.</u>)  Although the Court "permitted the introduction of a few other forms of creatine in the marketplace," Defendants argue that "the inability to include *all* of the proffered forms severely limited Vital's defense." (<u>Id.</u> at 21 (emphasis added).)  This argument has no merit.  Defendants were not entitled to present evidence of all other forms of creatine, which would have resulted in mini-trials regarding the efficacy of each variation.  <u>See, e.g.</u>, <u>United States v. Vazquez-Torres</u>, 92 F. App'x 502, 504 (9th Cir. 2004) ("[T]he district court was duly concerned about the potential to confuse the jury and develop a mini-trial on an ancillary issue.").  Instead, the Court allowed Defendants' expert, Dr. Parang, to testify regarding "specific other forms of creatine."  (<u>See</u> New Trial Opp. Ex. 5 (9/21 Trial Tr.) at 58:3–6, 58:15–59:14; <u>see also</u> <u>id.</u> at 58:5–6 ("Just because he says there [are] other forms doesn't mean he can talk about all the other forms.").)  Defendants also cross-examined Monster's expert, Dr. Richard Kreider ("Dr. Kreider"), on other forms of creatine.  (<u>See</u> New Trial Opp. Ex. 14 (8/31 Trial Tr.) at 163:9–164:24.)  As such, Defendants had sufficient opportunity to convince the jury that there were "numerous creatine-derivatives in the marketplace other than creatine monohydrate, and thus there was nothing false in advertising/marketing a derivative form of creatine in Bang Energy."  (New Trial Motion at 21.)  The jury simply rejected this argument.

### d. Reign as a "Copycat" Product

Fourth, Defendants claim that the Court erred by excluding evidence that Monster's Reign energy drink was a "copy-cat" product of Bang.  (<u>See</u> New Trial Motion at 22–24.)  Defendants contend that Monster developed Reign specifically to compete with Bang, and that Reign has similar attributes as Bang except that Reign does not contain creatine.  (<u>See</u> <u>id.</u> at 22.)  This difference, Defendants argue, proves that Monster *knew* that Super Creatine was not material to Bang consumers.  (<u>Id.</u>)  The Court correctly held that this evidence is not relevant to Monster's false advertising claims.  (<u>See</u> MIL Order at 23–24.)  As the Court reasoned, "This case is about the purported false advertisement of Bang, not Monster's products.  What Monster believed set Bang apart from competitor energy drinks has little relevance to what consumers believed set Bang apart from other energy drinks.  That Monster developed a product with the

goal of matching Bang's caffeine content, as opposed to Bang's Super Creatine, does not tend to show that Super Creatine was not material to Bang purchasers." (Id. at 24.)

During trial, the Court allowed Defendants to present evidence about Reign without arguing that it was a copy-cat product. For example, Defendants elicited testimony from Monster's witnesses acknowledging that Monster developed Reign to compete with Bang. (See New Trial Opp. Ex. 10 (Rodney Sacks) at 39:23–40:1 (admitting that Reign is the "counter to Bang"); id. Ex. 13 (Michael Trento) at 159:7–10 (testifying about a document that stated Reign is meant "to combat Bang in the marketplace"); id. Ex. 4 (Tirre) at 47:5–13 (testifying that Reign has been described as "the answer to Bang").) Defendants also elicited testimony about the similar attributes of Reign and Bang. (See id. Ex. 16 (8/30 Trial Tr.) at 133:19–20 (caffeine content in Reign); Ex. 8 (9/1 Trial Tr.) at 213:2–9 (similarities and differences in ingredients); Ex. 12 (9/8 Trial Tr.) at 146:17–147:6, 175:16–176:16, 205:6–15 (same).) Given that Defendants were able to present some evidence regarding Reign, Defendants cannot show that they were substantially prejudiced by the Court's ruling.

### e.  Monster's Conduct

Finally, Defendants claim that the Court erred by excluding evidence that Monster attempted to scare stores from placing Bang on their shelves due to its high caffeine content. (See New Trial Motion at 24–25.) Defendants argue that the exclusion of this evidence prevented them "from explaining to the jury that Monster's actual motivation in bringing this lawsuit was to prevent an upstart competitor with a wildly successful product from continuing to gain market share." (Id. at 24.) However, Defendants have not shown that this evidence is relevant. (See MIL Order at 25.) Monster's intent in filing this lawsuit has nothing to do with whether Defendants engaged in false advertising. (See New Trial Opposition at 24–25.) Such evidence would have had little, if any, probative value. See U.S. Sec. & Exch. Comm'n v. Collector's Coffee Inc., 2021 WL 965795, at *3 (S.D.N.Y. Mar. 15, 2021) ("[The defendant] has not shown how the SEC's allegedly improper motives in bringing suit could ever be shown to constitute a defense to this action. This is because [the defendant] has not shown how those improper motives prejudiced him in conducting a defense.").

In sum, the Court's evidentiary rulings were neither erroneous nor substantially prejudicial. Thus, the Court **DENIES** Defendants' motion for a new trial.

### 2.  Remittitur

Defendants request that the Court reduce the jury's "grossly excessive" damages award. (See New Trial Motion at 25–35.) "Remittitur is a procedure by which a court reduces the amount of damages awarded by a jury after finding the award to be excessive." Hill Phoenix v. Classic Refrigeration SoCal, Inc., 2021 WL 882085, at *4 (C.D. Cal. Dec. 12, 2021). The Ninth Circuit requires a court to give "substantial deference to a jury's finding of the appropriate amount of damages." Del Monte Dunes at Monterey, Ltd. v. City of Monterey, 95 F.3d 1422, 1435 (9th Cir. 1996). A court "must uphold the jury's finding unless the amount is grossly

excessive or monstrous, clearly not supported by the evidence, or based on speculation or guesswork." Id. If an award is reduced, the award should reflect "the maximum amount sustainable by the proof." Oracle Corp. v. SAP AG, 765 F.3d 1081, 1094 (9th Cir. 2014) (quoting D & S Redi-Mix v. Sierra Redi-Mix & Contracting Co., 692 F.2d 1245, 1249 (9th Cir. 1982)).

### a. False Advertising Damages

To support a damages award in a false advertising case, "there need only be substantial evidence to permit the jury to draw ***reasonable inferences*** and make a ***fair and reasonable assessment***." Skydive Ariz., Inc. v. Quattrocchi, 673 F.3d 1105, 1112 (9th Cir. 2012). "[I]n assessing whether a damages award is grossly excessive, '[t]he fact that the jury may have agreed with [the plaintiff's expert] and rejected the defendant's contentions . . . does not render the verdict "grossly excessive or monstrous."'" Id. at 1115 (alterations in original) (quoting Hemmings v. Tidyman's Inc., 285 F.3d 1174, 1192 (9th Cir. 2002)).

The evidence supports the jury's damages award of $271.9 million for Monster's false advertising claim. Monster's damages expert, Mr. Christian Tregillis ("Mr. Tregillis"), testified that between 2015 and 2022, Vital sold approximately $2.5 billion worth of Bang. (See New Trial Motion Ex. 13 (Tregillis) at 190:11–20.) Due to Defendants' false advertising of Super Creatine, Vital gained $173.8 million in additional profits, while Monster lost $271.9 million in profits. (See id. at 224:3–8.) Mr. Tregillis properly cabined his calculations in several ways: For example, he used a "weighted average" to reflect "the mix of [Monster] products that people actually buy." (See New Trial Opp. Ex. 3 (Tregillis) at 277:17–279:1.) His calculations included Monster products (such as Monster's zero-calorie product) whose sales "would go up" if Defendants had not falsely advertised, and excluded "products that are not mapped to be a potential [Monster] sale" (such as Monster's coffee-flavored beverages).[5] (See id. at 261:7–14.) Further, Mr. Tregillis estimated that only 34.1% of Bang sales are attributable to Defendants' false advertising of Super Creatine.[6] (See id. at 203:20–204:0.) The other 65.9% of sales are attributable to "other reasons, like flavors, zero sugar, zero calories, or other ingredients." (Id. at

---

[5] Contrary to Defendants' assertion that Bang "did not take sales from existing brands," Monster presented evidence that Defendants' false advertising harmed Monster's sales across its product portfolio. (See, e.g., New Trial Opp. Ex. 4 (Tirre) at 121:8–10 ("data from Walmart show[ed] that Bang was eating into Monster's sales"); id. Ex. 2 (Scot De Lorme) at 186:11–22 (Defendants' false advertising created a "disadvantage to everybody else that can't put [Super Creatine] in a product or advertise it on a can").) Vital's internal documents claimed that "Bang took share from Monster and Red Bull." (See, e.g., TX-3689 at 1.)

[6] Monster's survey expert, Dr. Charles Cowan ("Dr. Cowan"), testified that his survey demonstrated that "Super Creatine motivate[s] consumers to purchase Bang." (See New Trial Opp. Ex. 17 (Cowan) at 81:9–83:3.) Monster's marketing expert, Dr. Gregory Carpenter ("Dr. Carpenter"), analyzed consumers' comments and opined that Defendants' advertising of Super Creatine "made Bang Energy drinks more desirable." (See id. Ex. 2 (Carpenter) at 25:7–12, 50:6–13.) To be sure, some consumers purchased Bang for reasons other than Super Creatine, but this is adequately reflected in Mr. Tregillis's calculations.

---

**CIVIL MINUTES—GENERAL**

204:10–16.)  Finally, Mr. Tregillis calculated that only 18.9% of Vital's sales "would have gone to Monster" absent Defendants' false advertising. (Id. at 212:10–24.)  Put differently, Mr. Tregillis excluded more than 80% of Vital's sales from his damages calculations.  (Id. at 200:4–201:7.)

The jury heard all of this testimony at trial.  The jury weighed the credibility of the parties' expert witnesses and ultimately believed Mr. Tregillis.  Based on substantial evidence presented at trial, the jury drew reasonable inferences and made a fair assessment as to the amount of profits that Monster lost due to Defendants' false advertising.  Although the damages award is significant, "[t]he mere fact that plausible arguments could be made that the jury's verdict is too high does not warrant reversal."  Skydive Ariz., 673 F.3d at 1113.  Here, "there is a quantifiable basis for the jury's award based upon [ ] historical sales data and reasonable inferences that [Monster] suffered the loss of some customers . . . ."  See Brighton Collectibles, Inc. v. Coldwater Creek Inc., 2009 WL 10671818, at *14–16 (S.D. Cal. Apr. 22, 2009); see also id. (denying remittitur because "[w]eighing the credibility of conflicting expert witness testimony is the province of the jury" (citation omitted)).  Thus, remittitur is not appropriate for the false advertising damages.

### b.  Tortious Interference Damages

The evidence supports the jury's damages award of $18 million for Monster's intentional interference with contract claim.  Monster presented evidence of its shelf space contracts with Circle K, AM PM, and Wal-Mart, which were each worth tens of millions of dollars.  (See New Trial Opp. Ex. 3 (Suarez) at 150:23–151:17 (Monster paid "around $23 million" per year for shelf space at Circle K); id. (Guillaume Weaver) at 82:24–83:5 (Monster paid $4.8 million per year for shelf space at Wal-Mart); TX-385 (2018 AM PM contract with "Total Funding" of over $200,000); TX-386 (same for 2019 AM PM contract).)[7]  Monster reasonably expected to earn hundreds of millions of dollars in profits from these contracts.  (See New Trial Opp. Ex. 3 (Suarez) at 151:18–23 (Monster expected to profit over $70 million from each Circle K contract); id. Ex. 13 (Robert Salerno) at 10:19–24 (Monster expected to profit over $11 million from each AM PM contract); id. Ex. 3 (Weaver) at 83:13–16 (Monster expected to profit over $100 million from Wal-Mart contract).)

Yet Vital engaged in a "widespread effort" to interfere with Monster's contracted shelf placements.  (See id. Ex. 16 (Eugene Bukovi) at 33:5–6.)  Several witnesses testified at trial about Vital's repeated interference with Monster's shelf space at various retailers.  For example, one Monster employee testified that he saw Bang in Monster's contracted space at AM PM at least five to ten times per month from 2017 to 2019.  (See id. Ex. 13 (Salerno) at 11:17–12:8.)  Another employee testified that he saw Bang in Monster's contracted space at Circle K at least eight to ten times per week in 2018 and 2019.  (See id. Ex. 3 (Suarez) at 152:21–153:3.)  A third employee testified that he saw Bang in Monster's contracted space at Walmart at least once per month. (See id. (Weaver) at 84:24–85:22.)  This testimony likely undercounted the rate at which Vital interfered with Monster's shelf space because there were many "additional instances" reported

---

[7] "TX" refers to exhibits admitted into evidence at trial.

by other employees.  (See id. Ex. 3 (Suarez) at 153:15–18; see also Ex. 13 (Salerno) at 11:13–16 (received "many reports from fellow Monster employees" of interference at AM PM); id. Ex. 3 (Weaver) at 85:16–86:14 ("100 times per month" was a "conservative estimate" of how often Bang occupied Monster's space at Walmart).)

Applying that conservative rate of interference to the profits Monster expected from each contract yielded total damages of over $21 million. (Id. Ex. 11 (9/27 Trial Tr.) at 100:13-23.) The jury did not award Monster's entire requested amount; they awarded $18 million.  This suggests that the jury carefully weighed the evidence and made a fair assessment as to the amount that would compensate Monster for the harm caused by Vital's tortious interference.  See, e.g., Illumina, Inc. v. BGI Genomics Co., 2022 WL 899421, at *20 (N.D. Cal. Mar. 27, 2022) (denying request for remittitur where the jury awarded less than the total damages sought by the plaintiff).  Thus, remittitur is not appropriate for the tortious interference damages.

### c.  Trade Secret Misappropriation Damages

The evidence also supports the jury's damages award of $3 million for Monster's trade secret misappropriation claim.  Monster proved at trial that (1) Monster "possessed a trade secret," (2) Vital "misappropriated the trade secret," and (3) "the misappropriation caused or threatened damage to" Monster.  See InteliClear, LLC v. ETC Glob. Holdings, Inc., 978 F.3d 653, 657–58 (9th Cir. 2020); (see also New Trial Opposition at 34–36).  When a plaintiff seeks an award of a defendant's profits as a remedy for trade secret misappropriation, the plaintiff need only identify the defendant's sales reasonably at issue; the burden then falls on the defendant to establish any portion of the sales not attributable to the trade secret.  See, e.g., SPS Techs., LLC v. Briles Aerospace, Inc., 2021 WL 4913509, at *3 (C.D. Cal. Sept. 8, 2021); BladeRoom Grp. Ltd. v. Facebook, Inc., 2018 WL 1611835, at *2–3 (N.D. Cal. Apr. 3, 2018); see also Restatement (Third) of Unfair Competition § 45, cmt. f (1995) ("The plaintiff has the burden of establishing the defendant's sales; the defendant has the burden of establishing any portion of the sales not attributable to the trade secret and any expenses to be deducted . . . .").

Monster's expert calculated that Vital's sales in Georgia overperformed the rest of the United States by $4.175 million in gross profits after Mr. Stephen Cohen ("Mr. Cohen") joined Vital.  (See New Trial Opp. Ex. 3 (Tregillis) at 221:1–222:15.)  These sales are reasonably at issue because many of the confidential documents Mr. Cohen stole related to Georgia.  (See, e.g., id. at 220:19–22 (many of "the documents appeared to be related to Georgia"); id. Ex. 7 (Voth) at 29:3–5 (admitting that "many of the documents on those USB drives relate specifically to Georgia").)  It was then Vital's burden to prove that the sales at issue were attributable to factors other than the misappropriated trade secrets.  Again, the jury did not award Monster's entire requested amount; they awarded $3 million.  This suggests that the jury carefully weighed the evidence and made a fair assessment as to the amount that would compensate Monster for the harm caused by Vital's trade secret misappropriation.  Thus, remittitur is not appropriate for the unjust enrichment award.

In sum, the Court upholds the jury's damages award. The amount is not grossly excessive or monstrous, is clearly supported by the evidence, and is not based on speculation or guesswork. The Court **DENIES** Defendants' request for remittitur.

### 3. JNOV

Alternatively, Defendants move for JNOV on the false advertising and tortious interference claims. (New Trial Motion at 35–49.) JNOV is proper only "if the evidence permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." Campagnolo S.R.L. v. Full Speed Ahead, Inc., 447 F. App'x 814, 815 (9th Cir. 2011). "A jury's verdict must be upheld if it is supported by substantial evidence," "even if it is also possible to draw a contrary conclusion from the same evidence." Johnson v. Paradise Valley Unified Sch. Dist., 251 F.3d 1222, 1227 (9th Cir. 2001). A court "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." See id. (quoting Reeves, 530 U.S. at 150).

Rule 50(b) imposes a higher standard of proof than Rule 59. For the same reasons that Defendants cannot meet the Rule 59(a) standard for a new trial, they cannot meet the Rule 50(b) standard for JNOV. In addition, the Court rejects Defendants' renewed argument that Monster should be limited to the advertising on the Bang label because Dr. Cowan's survey only asked respondents about the can. (See New Trial Motion at 36–44; see also New Trial Motion Ex. 18 (9/23 Trial Tr.) at 107:6–118:10; Dkt. Nos. 861, 864, 867.) As the Court found on summary judgment and directed verdict, Monster "has sufficient basis in the evidence for them to be able to argue" non-can advertising. (See New Trial Motion Ex. 19 (9/27 Trial Tr.) at 50:16–19.) Dr. Cowan's survey asked respondents questions *before* showing them the Bang label. (See, e.g., New Trial Opp. Ex. 17 (Cowan) at 65:11–67:23 (29% of consumers chose creatine and Super Creatine as important to decision to purchase energy drinks), 68:11–24 (Bang consumers three times more likely to select "creatine" and five times more likely to select "Super Creatine" than non-Bang consumers), 71:11–20 (Bang consumers expect Super Creatine to "help [with] muscle strength," "cognition/brain health," and dementia more than non-Bang consumers).) That more Bang consumers believed Bang provides benefits than non-Bang consumers showed that non-label advertising likely influenced purchasing decisions. (Id. at 72:12–73:8.) Defendants' false claims about creatyl-L-leucine ("CLL") appeared both on the Bang label and in non-label advertisements such that the subject matter overlapped. Viewing the evidence in the light most favorable to the nonmoving party, the Court finds that Monster established all elements of a Lanham Act claim at trial. (See New Trial opposition at 43–46.) The Court **DENIES** JNOV.

//
//
//
//
//
//
//

## B. Motion for Equitable Relief, Fees, and Costs

Monster seeks the following relief:

| Claim | Relief Sought |
|-------|---------------|
| False Advertising in violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, et seq. and California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500, et seq. | Judgment in Monster's favor and against Defendants Vital and Mr. Owoc.<br><br>Permanent injunction as requested in Monster's Motion for Permanent Injunction to Enjoin Defendants' False Advertising of "Super Creatine" and Creatine. |
| False Advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B) | Disgorgement of Defendants' unjust profits in the amount of $77,466,712.<br><br>Enhanced damages in the amount of $56,670,142.75 to date, plus an additional $189,532.25 per day hereafter until Defendants are required to comply with any permanent injunction.<br><br>Prejudgment interest in the amount of $38,877,859.63 to date plus an additional $37,771.39 for every day hereafter until entry of judgment. |
| Intentional Interference with Contracts | Permanent injunction preventing Vital from interfering with Monster's contracted-for shelf space at all retail locations.<br><br>Punitive damages in the amount of $3 million.<br><br>Prejudgment interest in the amount of $507,452.05 to date, plus an additional $3,452.05 per day hereafter through entry of judgment. |
| Trade Secret Misappropriation in violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, et seq., and the California Uniform Trade Secrets Act ("CUTSA"), Cal. Civ. Code § 3426, et seq. | Permanent injunction requiring Vital to identify and quarantine Monster's trade secrets in its possession and preventing Vital from disclosing or using Monster's trade secrets.<br><br>Exemplary damages in the amount of $3 million. |

| | Expert witness expenses in the amount of $101,028.60.<br><br>Prejudgment interest in the amount of $84,574.98 to date, plus an additional $575.34 per day hereafter through entry of judgment. |
|---|---|
| Attorneys' Fees under the Lanham Act, DTSA, and CUTSA | Attorneys' fees in the amount of $20,972,953.90. |
| Costs under all claims | Costs in the amount of $6,709,552.18. |

(Fees Motion.)  For the reasons below, the Court **GRANTS-IN-PART and DENIES-IN-PART** Monster's Fees Motion.

As a preliminary matter, the Court denies Vital's request for a second phase of trial on the equitable claims.  (See Vital Fees Opposition at 3–5.)  Before trial, the Court ordered the parties to present any additional evidence on the equitable issues to the jury.  (See Fees Reply Ex. 7 (8/25 Trial Tr.) at 5:3–9 (Court confirming that the equitable claims will "be presented alongside [the legal claims] because we're not going to have a whole separate trial just for the bench").)  Vital is not entitled to a separate bench trial on the equitable claims.  See Anhing Corp. v. Viet Phu, Inc., 671 F. App'x 956, 958 (9th Cir. 2016) (finding no right to a bench trial).  "Where legal and equitable claims are based on the same set of facts, the Seventh Amendment requires the court to follow the jury's implicit or explicit factual determinations."  Allen v. Hyland's, Inc., 2022 WL 1500795, at *1 (9th Cir. May 12, 2022) (alteration and internal quotation marks omitted) (quoting Sanders v. City of Newport, 657 F.3d 772, 783 (9th Cir. 2011)).  Here, the legal and equitable claims arise from the same facts and involve common issues such that the Court need not consider new evidence.  See Copart, Inc. v. Sparta Consulting, Inc., 339 F. Supp. 3d 959, 973 (E.D. Cal. 2018) ("[T]he court follows Ninth Circuit authority and considers new evidence only 'where the legal and equitable claims do not involve common issues.' (quoting Granite State Ins. Co. v. Smart Modular Techs., Inc., 76 F.3d 1023, 1027 (9th Cir. 1996)).).

1. **False Advertising Claims**

   a. **Injunctive Relief**

The jury determined that Defendants are liable for false advertising under the Lanham Act and that their false advertising was willful and deliberate.  (See Verdict.)  In so deciding, the jury necessarily found that Defendants' advertising of Super Creatine (1) is false or misleading; (2) deceives or is likely to deceive consumers; (3) is material to consumers' purchasing decisions; and (4) injured Monster.  (See Jury Instruction No. 25); see Southland Sod Farms v. Stover Seed Co., 108 F.3d 1134, 1139 (9th Cir. 1997) (elements of a false advertising claim).  "Courts apply the same analysis to Lanham Act, unfair competition, and false advertising claims where, as here,

they are based on the same alleged conduct." (MSJ Order at 20; see also Fees Motion at 9.) Accordingly, Defendants are also liable for false advertising under the UCL and FAL.

On April 12, 2023, the Court issued a permanent injunction under the Lanham Act prohibiting Defendants from falsely or deceptively claiming that Super Creatine is creatine, that Bang contains creatine, and that Bang or Super Creatine provide the physical, mental, health, or other benefits of creatine. (See PI Order at 12–13.) Injunctive relief is also available under the UCL and FAL. See, e.g., Colgan v. Leatherman Tool Grp., Inc., 38 Cal. Rptr. 3d 36, 63–64 (Cal. Ct. App. 2006). The standard for a permanent injunction under California law differs from the federal standard. See Haas Automation v. Denny, 2014 WL 2966989, at *9 (C.D. Cal. July 1, 2014). To qualify for a permanent injunction under California law, "the plaintiff must prove (1) the elements of a cause of action involving the wrongful act sought to be enjoined and (2) the grounds for equitable relief, such as, inadequacy of the remedy at law." Id. (quoting City of South Pasadena v. Dep't of Transp., 35 Cal. Rptr. 2d 113, 120 (Cal. Ct. App. 1994)). Monster satisfies the first prong because the jury found all of the elements for a false advertising claim. (See Verdict.) Monster satisfies the second prong because it suffers the irreparable harm of loss of prospective customers and market share—ongoing harms that cannot be fully compensated by an award of damages. (See PI Order at 3–9.) For the same reasons as stated in the PI Order, the Court orders the same injunctive relief under the UCL and FAL. (See id.)

### b. Disgorgement

Under the Lanham Act, a plaintiff is entitled, "subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a). That is, a "plaintiff may also (and simultaneously) seek a defendant's profits on the basis that the defendant should not be allowed to retain its ill-gotten gains, regardless of the plaintiff's damages." Out of the Box Enter., LLC v. El Paseo Jewelry Exch., Inc., 2012 WL 12893524, at *7 (C.D. Cal. June 27, 2012); see also Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc., 778 F.3d 1059, 1075 (9th Cir. 2015) ("A claim for disgorgement of profits under § 1117(a) is equitable, not legal."). Monster requests that the Court order disgorgement of Vital's unjust profits in the amount of $77,466,712. (See Fees Motion at 12–14.) Monster claims that this is the amount that Defendants gained from their false advertising that was not captured by the jury's award of lost profits. (See Fees Motion Ex. 1 (Tregillis) at 219:7–11, 224:3–8.) Mr. Tregillis testified at trial that he looked "at both sides of the coin, the Monster losses as well as the VPX gains," and that the $77.5 million figure was "deduplicated" from Monster's losses. (See id.)

However, the Lanham Act also provides that "[i]f the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case." 15 U.S.C. § 1117(a). "Such sum in either of the above circumstances shall constitute compensation and not a penalty." Id. The Lanham Act "has been construed to expressly forbid the award of damages to punish an infringer." Skydive Ariz., 673 F.3d at 1114 (citing BASF Corp. v. Old World Trading Co., 41 F.3d 1081, 1096 (7th Cir. 1994)). In BASF Corp., the court

stated that "[t]he variety of circumstances in which a court *may* award disgorgement by no means indicate that the district court is required to award disgorgement." 41 F.3d at 1096 (citing cases). "Contrary to [the plaintiff's] assertions that disgorgement of wrongful profits is the 'norm' in a Lanham Act case, disgorgement is most appropriate if damages are otherwise nominal." Id. (citations omitted). In contrast, the damages in this case are astronomical— $271.9 million—and reasonably compensates Monster for its lost profits. Awarding Monster an *additional* $77.5 million may constitute an inequitable windfall for Monster and an impermissible penalty against Vital. See Stone Creek, Inc. v. Omnia Italian Design, Inc., 808 F. App'x 459, 460–61 (9th Cir. 2020). Indeed, the Ninth Circuit has warned that a "district court ought to tread lightly when deciding whether to award increased profits, because granting an increase could easily transfigure an otherwise-acceptable compensatory award into an impermissible punitive measure." Fifty-Six Hope Rd. Music, 778 F.3d at 1077; see also Stone Creek, 808 F. App'x at 461 (district court did not abuse its discretion in denying disgorgement). Accordingly, the Court **DECLINES** to order disgorgement.

### c. Enhanced Damages

Monster seeks enhanced damages to compensate for its lost profits from April 30, 2022[8] through April 12, 2023, the effective date of the permanent injunction. (See PI Order.) The Lanham Act vests the Court with discretion to enhance the jury's damages award up to "three times such amount." 15 U.S.C. § 1117(a). Monster argues that the Court should award enhanced damages for three reasons: (1) to compensate Monster for lost profits not included in the jury's verdict, such as lost sales between the verdict and entry of a permanent injunction; (2) to compensate Monster for "intangible harms," such as "lingering misimpressions" or "loss of good will"; and (3) because Monster's lost profits calculations likely understated the harm caused by Defendants' misconduct. (See Fees Motion at 14–18.) In short, Monster asserts that enhanced damages will compensate it for its ongoing losses. (See id.)

The Court finds that enhanced damages are not necessary to "ensure that the plaintiff receives compensation." Skydive Ariz., 673 F.3d at 1114 (quoting BASF Corp., 41 F.3d at 1096) (reversing district court's enhancement as punitive). As discussed above, the jury's award of $271.9 million in lost profits reasonably compensates Monster and any enhancement may constitute an impermissible penalty against Vital. See 15 U.S.C. § 1117(a); Skydive Ariz., 673 F.3d at 1114; Vital Pharms. v. PhD Mktg., Inc., 2022 WL 2952495, at *7 (C.D. Cal. July 26, 2022); Brighton, 2009 WL 160235, at *6. Even if Monster has suffered ongoing losses since April 2022, it has not shown how much it has lost. The Court cannot simply presume that Monster's losses have remained the same month over month, especially since Vital represents that its market share has "fallen by more than half since April 2022." (Vital Fees Opposition at 24–25.) As such, the Court cannot determine an amount that would not unduly punish Vital. The Court **DECLINES** to award Monster enhanced damages.

---

[8] For trial, Monster calculated lost profits through April 30, 2022 because that is "the last [sales] information that [Vital] provided." (See Fees Motion Ex. 1 (9/15 Trial Tr.) at 191:5–10.)

### d. Prejudgment Interest

Monster seeks prejudgment interest on the false advertising damages. "While the Lanham Act does not mandate an award of prejudgment interest, 'federal common law authorizes the award of such interest in appropriate cases to victims of violations of federal law.'" Anhing Corp. v. Thuan Phong Co., 2016 WL 6661178, at *3 (C.D. Cal. Jan. 25, 2016) (quoting Cyclone USA, Inc. v. LL&C Dealer Servs., LLC, 2010 WL 2132378, at *1 (C.D. Cal. May 24, 2010)); see also Frank Music Corp. v. Metro-Goldwyn-Mayer Inc., 886 F.2d 1545, 1550 (9th Cir. 1989) ("[C]ourts may allow prejudgment interest even though the governing statute is silent."). "Prejudgment interest compensates the injured party for the loss of the use of money he would otherwise have had." Frank Music Corp., 886 F.2d at 1550. "Whether interest will be awarded is a question of fairness, lying within the court's sound discretion, to be answered by balancing the equities." Wessel v. Buhler, 437 F.2d 279, 284 (9th Cir. 1971).

Monster argues that prejudgment interest should be calculated from the fall of 2015, when Bang with Super Creatine was first sold, using the one-year Treasury rate of 5.07%. (See Libeu Decl. ¶¶ 24–28.) Vital does not dispute that Monster may recover prejudgment interest, but argues that prejudgment interest should be calculated from the date of the jury's verdict at an "annual average rate over the relevant time periods" of 1.17%. (See Muth Fees Decl. ¶¶ 4–5.)

The Court deems it appropriate to award Monster prejudgment interest from the date of the jury's verdict, on September 29, 2022, to the date of the entry of judgment at the current one-year treasury rate. Although Section 3287(a) of the California Civil Code does not govern the calculation of prejudgment interest under the Lanham Act, the Court finds the language and reasoning of the state statute instructive.[9] See Cal. Civ. Code § 3287(a) (a person is entitled to recover interest from the day on which the damages were "made certain"). Here, Monster's damages were not certain until the jury rendered its verdict. Cf. Duale v. Mercedes-Benz USA, LLC, 56 Cal. Rptr. 3d 19, 26 (Cal. Ct. App. 2007) ("[W]here the amount of damages cannot be resolved except by verdict or judgment, prejudgment interest is not appropriate." (citation omitted)). Until the jury accepted Mr. Tregillis's lost profits calculations, Monster had not proven its damages and Vital did not know the extent of its liability. It is equitable that interest should not accrue until the damages were "made certain."

As for the interest rate, the Ninth Circuit has confirmed that courts follow 28 U.S.C. § 1961, "unless the trial judge finds, on substantial evidence, that the equities of the particular case require a different rate." See Barnard v. Theobald, 649 F. App'x 414, 417 (9th Cir. 2016); Herrera v. City of Ontario, 2017 WL 11628154, at *2 (C.D. Cal. June 28, 2017). Section 1961 provides that "interest shall be calculated . . . at a rate equal to the weekly average 1-year constant maturity Treasury yield . . . for the calendar week preceding the date of the judgment."

---

[9] Monster's cited federal cases do not discuss *when* interest should begin to accrue. See Anhing Corp. v. Thuan Phong Co., 2016 WL 6661178, at *5 (ordering supplemental briefing on the amount of prejudgment interest); Fitness Anywhere LLC v. WOSS Enter. LLC, 2018 WL 6069511, at *7 (prejudgment interest was not opposed).

28 U.S.C. § 1961. The equities of this case do not require a different rate. Thus, the Court **AWARDS** Monster prejudgment interest on $271,924,174 as accrued from September 29, 2022 to the date of the entry of judgment at an interest rate of 5.07%. (See Libeu Decl. ¶ 27.) By the Court's calculation ($37,771.39 x 365 days), the prejudgment interest is **$13,786,557.30** as of September 29, 2023. (Id.)

### e. Attorneys' Fees

Under the Lanham Act, a court may award reasonable attorneys' fees to the prevailing party "in exceptional cases." 15 U.S.C. § 1117(a). An "exceptional case" is "one that stands out from others with respect to the substantive strength of a party's litigating position . . . or the unreasonable manner in which the case was litigated." SunEarth, Inc. v. Sun Earth Solar Power Co., 839 F.3d 1179, 1180 (9th Cir. 2016) (quoting Octane Fitness, LLC v. ICON Health & Fitness, Inc., 572 U.S. 545, 554 (2014)).

The Court finds that under the "totality of the circumstances," this case is exceptional. First, the jury unanimously found that Defendants' false advertising was "willful and deliberate," which reflects the substantive strength of Monster's position. (See Verdict.) Second, Defendants litigated this case in an unreasonable manner. During trial, Mr. Owoc refused to cooperate at times and displayed a disrespect for the judicial process. See Taylor Made Golf Co. v. Carsten Sports, Ltd., 175 F.R.D. 658, 663 (S.D. Cal. 1997) (finding that a defendant's lack of cooperation and disrespect for the judicial process constitute exceptional circumstances warranting an award of attorneys' fees). He repeatedly tried to reference documents that the Court had excluded. (See, e.g., Fees Motion Ex. 2 (J. Owoc) at 78:17–23, 110:17–111:9.) He refused to answer straightforward questions during cross-examination, despite admonitions from the Court. (See, e.g., id. at 10:24–11:12, 74:16–75:6, 82:14–24.) He berated Monster's counsel and the Court had to instruct the jury to "disregard any disparaging remarks this witness has made against opposing counsel." (See id. Ex. 28 (J. Owoc) at 171:16–20.) According to Monster's counsel, Mr. Owoc contradicted his prior sworn testimony numerous times and Monster's counsel impeached him over 50 times. (See Libeu Decl. ¶ 38.) Given the strength of Monster's litigating position and the unreasonableness of Defendant's behavior, this case is exceptional. The Court **AWARDS** Monster attorneys' fees, as discussed below.

### 2. Intentional Interference with Contract Claim

### a. Injunctive Relief

The jury unanimously found that Vital intentionally interfered with Monster's shelf space contracts with Circle K, AM PM, and Wal-Mart and awarded $18 million in damages. (See Verdict.) The jury also found that Vital acted "maliciously, oppressively, fraudulently, or in reckless disregard of Monster's rights." (Id.) Monster now seeks injunctive relief to prevent future interference with Monster's contracts. (See Fees Motion at 23–25.) To qualify for a permanent injunction for a claim of tortious interference under California law, "the plaintiff must prove (1) the elements of a cause of action involving the wrongful act sought to be enjoined and

(2) the grounds for equitable relief, such as, inadequacy of the remedy at law." See Haas Automation, 2014 WL 2966989, at *9 (quoting City of South Pasadena, 35 Cal. Rptr. 2d at 120); see also Cal. Civ. Code § 3422 (a final junction may be granted "[w]here pecuniary compensation would not afford adequate relief" and "[w]here the restraint is necessary to prevent a multiplicity of judicial proceedings").

Injunctive relief is appropriate here. Monster satisfied the first prong by prevailing on its claim for intentional interference with contracts at trial. (See Verdict.) Monster satisfies the second prong because monetary damages is an inadequate remedy for Vital's misconduct and an injunction is necessary to prevent a multiplicity of judicial proceedings. (See Fees Motion at 23–25.) During trial, Monster's witnesses testified that Vital's interference hurt not only Monster's performance at specific retailers, but also Monster's brand overall. (See, e.g., Fees Motion Ex. 1 (Weaver) at 91:13–92:4 (testifying that Vital's interference made Monster "look[] like we're not performing well in those stores"); id. (Suarez) at 157:15–21 (testifying that Vital was "interfer[ed] with our ability to provide product to consumers that are looking for it").) Such evidence of threatened loss of prospective customers or goodwill supports a finding that monetary damages are an inadequate remedy for Monster's harm. Cf. Stuhlbarg Int'l Sales Co. v. John D. Brush & Co., 240 F.3d 832, 841 (9th Cir. 2001) (affirming the district court's grant of preliminary injunction where district court found that plaintiff stood to "lose its newfound customers and accompanying goodwill and revenue"); Anhing Corp. v. Thuan Phong Co., 2015 WL 4517846, at *23 (C.D. Cal. July 24, 2015) ("Evidence of intangible injury, such as a loss of customers or damage to a party's goodwill, can constitute irreparable harm."). "Injunctive relief is available to restrain unjustified interference with contractual relations when damages would not afford an adequate remedy." Pac. Gas & Elec. Co. v. Bear Stearns & Co., 791 P.2d 587, 593 n.9 (Cal. 1990) (en banc).

Further, Vital's interference appeared to be a "widespread effort." (Id. Ex. 9 (Bukovi) at 33:5–6.) Several Monster employees personally observed Bang cans in Monster's contracted-for shelf space and heard reports of the same from other employees. (See, e.g., id. Ex 1 (Weaver) at 84:21–23 ("Q. [H]ow did you learn about these instances? A. Some I saw myself, some were emailed to me, or text pictures[.]"); id. (Suarez) at 152:17–20 (learned about interference "through my own seeings out in the market and through my team communicating with me on what was going on"); id. Ex. 34 (Salerno) at 11:13–16 (saw interference "many times personally" and received "many reports from fellow Monster employees").) Since it is impossible to identify every instance where Vital interferes with Monster's contracted-for shelf space, injunctive relief is necessary to prevent future misconduct. Injunctive relief is also necessary to prevent a multiplicity of judicial proceedings arising from every instance of alleged interference. Thus, the Court **GRANTS** Monster's request for a permanent injunction.[10]

---

[10] Federal Rule of Civil Procedure 65(d) requires a proposed injunction to "describe in reasonable detail . . . the act or acts restrained or required." Fed. R. Civ. P. 65(d). Further, the Ninth Circuit requires that the language of the injunction provide "fair and well-defined notice" of whom or what it enjoins. See Reno Air Racing Ass'n, Inc. v. McCord, 452 F.3d 1126, 1132 (9th Cir. 2006). Monster's proposed permanent injunction with respect to the tortious

### b. Punitive Damages

Monster seeks $3 million in punitive damages because the jury found that Vital acted "maliciously, oppressively, fraudulently, or in reckless disregard of Monster's rights by intentionally interfering with Monster's contracts." (See Fees Motion at 25–28; Verdict.) Section 3294(a) of the California Civil Code allows for punitive damages where "it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice." Cal. Civ. Code § 3294(a). In determining the amount of punitive damages to award, courts consider (1) the nature of the misconduct, (2) the amount of compensatory damages, and (3) the defendant's financial condition. See Neal v. Farmers Ins. Exch., 582 P.2d 980, 990 (Cal. 1978); see also Adams v. Murakami, 813 P.2d 1348, 1351 (Cal. 1991) (en banc).

Applying these factors, the Court finds that punitive damages are not warranted because Vital's misconduct was not so egregious as to be despicable. See, e.g., Rivin v. Patrick K. Willis Co., 2021 WL 2980591, at *2 (C.D. Cal. Feb. 23, 2021); Am. Airlines, Inc. v. Sheppard, Mullin, Richter & Hampton, 117 Cal. Rptr. 2d 685, 710 (Cal. Ct. App. 2002) ("The conduct engaged in defendants in this case does not reach the level of despicability in cases in which punitive damages were found to be proper."). The jury found that Vital acted "maliciously, oppressively, fraudulently, **or** in reckless disregard." (See Verdict (emphasis added)). However, "mere reckless disregard or misconduct cannot be enough to sustain an award of punitive damages[.]" Butte Fire Cases, 235 Cal. Rptr. 3d 228, 236 (Cal. Ct. App. 2018). "The central spirit of the exemplary damage statute, the demand for evil motive, is violated by an award founded upon recklessness alone." Id. (quoting Taylor v. Superior Court, 598 P.2d 854, 856 (Cal. 1979)). The Court finds that Vital's conduct was closer to "reckless disregard" than to "malice," especially since Vital offers evidence that Monster may have engaged in similar conduct. (See Vital Fees Opposition at 12–14 (asserting unclean hands defense); see also Fees. Opp. Ex. 26 at 1.) In addition, the Court finds that the jury's compensatory damages award of $18 million sufficiently deters and punishes Vital for its misconduct. See Neal, 582 P.2d at 990 (punitive damages should not "exceed[] the level necessary to properly punish and deter"). Thus, the Court **DECLINES** to award Monster punitive damages on the tortious interference claim.

### c. Prejudgment Interest

Monster also seeks prejudgment interest on the tortious interference damages. (See Fees Motion at 28–29.) Monster is entitled to recover interest from the day on which damages were made certain. Cal. Civ. Code § 3287(a). Monster's damages became certain when the jury rendered its verdict on September 29, 2022. California requires an interest rate of 7% for the calculation of prejudgment interest for tort claims. See, e.g., Naranjo v. Spectrum Sec. Servs., Inc., 509 P.3d 956, 972 (Cal. 2022) ("Prevailing civil parties are entitled to this interest rate in the calculation of prejudgment interest absent a statute specifying a higher rate."); Yoon Chul

---

interference claim meets these requirements. (See also PI Order at 21–23 (approving similar definition of "Enjoined Persons").)

<u>Yoo v. Arnold</u>, 2013 WL 12335872, at *11 (C.D. Cal. Mar. 25, 2013) ("Where tort damages are recovered, courts have generally applied a prejudgment interest rate of 7% per annum."). The Court **AWARDS** Monster prejudgment interest on $18 million as accrued from September 29, 2022 to the date of the entry of judgment at an interest rate of 7%. By the Court's calculation ($3,452.05 x 365 days), the prejudgment interest is **$1,259,998.25** as of September 29, 2023. (<u>See</u> Libeu Decl. ¶ 31.)

### 3. Trade Secret Misappropriation Claims

#### a. Injunctive Relief

The jury unanimously found that Vital misappropriated Monster's trade secrets in violation of the DTSA and CUTSA and awarded $3 million in damages. (<u>See</u> Verdict.) The jury also found that Vital "maliciously and willfully" misappropriated Monster's trade secrets. (<u>Id.</u>) Monster now seeks injunctive relief to "prevent any actual or threatened misappropriation" of trade secrets. <u>See</u> 18 U.S.C. § 1836(b)(3)(A); Cal. Civ. Code § 3426.2(a) ("Actual or threatened misappropriation may be enjoined."). To qualify for a permanent injunction, the plaintiff must prove: (1) irreparable injury; (2) inadequacy of legal remedies; (3) that the balance of hardships favors an injunction; and (4) that the public interest would not be disserved by a permanent injunction. <u>See</u> <u>eBay Inc. v. MercExchange, L.L.C.</u>, 547 U.S. 388, 391 (2006).

All four factors favor a permanent injunction enjoining Vital from using Monster's trade secret information. (<u>See</u> Fees Motion at 31–36.) Vital disputes the first and second factors. (<u>See</u> Vital Fees Opposition at 33–34.) "A finding of misappropriation is generally adequate for a finding of irreparable injury in trade secret cases." <u>Comet Techs. USA Inc. v. XP Power LLC</u>, 2022 WL 4625149, at *2 (N.D. Cal. Sept. 30, 2022). Although the Ninth Circuit has not reached the question of whether a court may presume irreparable harm in trade secret cases, district courts consistently conclude that a plaintiff will suffer irreparable harm if its proprietary information is misappropriated. <u>Id.</u> In this case, given the jury's finding that Vital maliciously and willfully misappropriated Monster's trade secrets, the Court finds that Monster suffers irreparable injury.

A trade secret plaintiff may also demonstrate irreparable injury through a loss in competitive advantage. <u>See, e.g.</u>, <u>Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.</u>, 2013 WL 890126, at *9 (N.D. Cal. Jan. 23, 2013) ("Commercial advantage is grounds for finding irreparable harm under the CUTSA."). As a result of Vital's misappropriation, Monster lost exclusivity of its trade secret information. (<u>See</u> TX-4269 (Mr. Cohen sharing Monster Garage link and password with Vital employee); Fees Motion Ex. 7 (Cohen) at 233:24–234:1, 234:9–12 (testifying that Monster Garage is an internal database for Monster employees that is not publicly available).) By accessing Monster Garage, where "all of [Monster's] vision and strategy" reside, Vital had access to Monster's competitive pricing strategies, innovative ideas, and "institutional knowledge" about Monster's bottlers that Vital could use to its advantage against Monster. (<u>See</u> Fees Motion Ex. 34 (Jeffrey Swift) at 58:8–18, 59:24–60:15; <u>see also</u> <u>id.</u> at 67:10–13, 67:16–22 (testifying that Vital's access to Monster's confidential information could allow it to undercut

Monster's pricing and strategies.).) Vital's use of Monster's trade secret information gives it an unfair advantage in a competitive beverage industry. See Brocade Commc'ns Sys., 2013 WL 890126, at *9. "It is well established that the loss of market position and the disclosure of trade secrets can constitute irreparable harm." WeRide Corp. v. Kun Huang, 379 F. Supp. 3d 834, 853–54 (N.D. Cal. 2019). Monster has established irreparable injury.

Further, the Court finds that the jury's award of monetary damages compensated Monster for Vital's disproportionate success in Georgia, where Mr. Cohen worked, through March 2020. (See Fees Motion Ex. 1 (Tregillis) at 220:7–222:18). However, the damages did not compensate Monster for "the ways in which [Vital] was and is better equipped to sell against Monster having now seen hundreds of Monster's confidential pricing and strategy documents." (Fees Motion at 33.) In other words, the jury's award "did not address ongoing or future harm from the future development of [Vital] products based on [Monster] trade secrets." Comet Techs., 2022 WL 4625149, at *3. An injunction may be used to "eliminate any unfair head start a defendant may have gained by improper use of confidential information" and to place the defendant in the position it would have occupied if the misconduct had not occurred. See Netlist Inc. v. Diablo Techs. Inc., 2015 WL 153724, at *7 (N.D. Cal. Jan. 12, 2015), injunction terminated by 2015 WL 1925114 (N.D. Cal. Apr. 24, 2015).

The balance of hardships also favors a permanent injunction. A permanent injunction "would not work any hardship on [Vital], which has no right to use the information in the first place." Vinyl Interactive, LLC v. Guarino, 2009 WL 1228695, at *8 (N.D. Cal. May 1, 2009); see iBASEt v. Exacore, LLC, 2014 WL 12576816, at *5 ("Defendants cannot claim legitimate hardship resulting from an injunction prohibiting them from engaging in . . . misappropriation of trade secrets."). Finally, a permanent injunction is in the public interest. "Courts in trade secret cases have consistently held that the public interest favors the vindication of intellectual property rights." Comet Techs., 2022 WL 4625149, at *3; see, e.g., WeRide Corp., 379 F. Supp. 3d at 854; Vinyl Interactive, 2009 WL 1228695, at *8. There is no public interest in continuing to allow Vital to access Monster's trade secret information.

In sum, the Court concludes that Monster has shown that (1) it has suffered an irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the balance of hardships between Monster and Vital, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction.

As for the scope of a permanent injunction, a "district court has considerable discretion in fashioning suitable relief and defining the terms of an injunction." Lamb-Weston, Inc. v. McCain Foods, Ltd., 941 F.2d 970, 974 (9th Cir. 1991). Injunctive relief must be tailored to remedy the specific harm alleged. Id. Monster's accompanying proposed permanent injunction requires Vital to search for and quarantine Monster's confidential and proprietary information. (See Fees Motion at 35.) The Court agrees that Vital must "refrain from further access to and use of Monster's trade secrets," and "delete all of Monster's trade secrets." (Id.) However, Monster's proposed permanent injunction is too broad and burdensome. The Court declines to

require Vital to engage an e-discovery vendor to identify and collect Monster's trade secret information from its servers and digital devices. (See id. at 36.) Presumably, Monster would have already collected such information through discovery. Accordingly, the Court modifies the proposed injunction as follows:

> 3. The Enjoined Persons are permanently enjoined from possessing, accessing, reviewing, using, or disclosing Monster's confidential and proprietary pricing, marketing, strategy, and financial information (the "Trade Secret Information"). For avoidance of doubt, the Trade Secret Information includes any information derived from or created by Monster except that which is demonstrably available to persons in the beverage industry.

> 4. VPX is ordered to take the following steps to remove from its possession, custody, or control any Trade Secret Information:

> a. VPX shall engage an e-discovery vendor (the "Vendor") approved by Monster (with such approval not to be unreasonably withheld) to assist with the identification, collection, and removal of any Trade Secret Information;

> b. ~~The Vendor~~ *VPX* shall identify and collect any property or information of Monster from all servers, email servers, computers, hard drives, devices, document management systems, files, and storage media (including, without limitation, USB drives, network-based storage, and cloud-based storage) in the possession, custody, or control of VPX, including, without limitation, any VPX-issued devices in the possession, custody, or control of any employee who joined VPX after working for Monster (the "Collected Information");

> c. Within sixty (60) days of the effective date of this Permanent Injunction, ~~the Vendor~~ *VPX* shall provide Monster's outside counsel of record with a copy of the Collected Information;

> d. Monster's outside counsel of record will review the Collected Information to identify any Trade Secret Information;

> e. Within thirty (30) days of Monster's identification of the Trade Secret Information, ~~the Vendor~~ *VPX* shall: (i) remove all Trade Secret Information from VPX's possession; (ii) quarantine and preserve a copy of the Trade Secret Information to, among other things, preserve data in connection with the obligations of VPX and/or its employees in pending litigations.

**b. Exemplary Damages**

Monster seeks $3 million in exemplary damages because the jury found that Vital maliciously and willfully misappropriated Monster's trade secrets. (See Fees Motion at 36–38;

Verdict); see also 18 U.S.C. § 1836(b)(3)(C) ("if the trade secret is willfully and malicious misappropriated," a court may "award exemplary damages in an amount not more than 2 times the amount of the damages awarded"); Cal. Civ. Code § 3426.3(c) ("If willful and malicious misappropriation exists, the court may award exemplary damages in an amount not exceeding twice any award[.]"). Although exemplary damages are permitted by statute, the Court has an "independent obligation to consider the facts and calculate an equitable and constitutionally sound exemplary damages award[.]" Mattel, Inc. v. MGA Ent., Inc., 801 F. Supp. 2d 950, 953 (C.D. Cal. 2011).

As discussed above, in determining the amount of exemplary damages to award, courts consider (1) the nature of the misconduct, (2) the amount of compensatory damages, and (3) the defendant's financial condition. Neal, 582 P.2d at 990. "The largest exemplary awards are reserved for the most reprehensible acts." Mattel, 801 F. Supp. 2d at 953. To determine if, and to what extent, misconduct is reprehensible, courts consider whether "(1) the misconduct caused physical harm; (2) the misconduct disregarded the health or safety of others; (3) the misconduct targeted a financially vulnerable party; (4) the misconduct was repeated; and (5) the harm resulted from intentional malice, trickery, or deceit, or mere accident." Id. at 953–54.

Applying these factors, the Court finds that exemplary damages are not warranted because Vital's misconduct was not particularly reprehensible. See id. at 956 ("[Defendant's] conduct does not represent the most reprehensible form of trade secret misappropriation imaginable."). The misconduct did not cause physical harm, disregard the health or safety of others, or target a financially vulnerable party. The evidence presented at trial fell short of reprehensible conduct: "It was silly, not evil, and it diminished" after 2019. Id. In addition, the Court finds that the jury's compensatory damages award of $3 million sufficiently deters and punishes Vital for its misconduct. See Neal, 582 P.2d at 990 (punitive damages should not "exceed[] the level necessary to properly punish and deter"). Thus, the Court **DECLINES** to award Monster exemplary damages on the trade secret misappropriation claims.

### c. Prejudgment Interest

Monster also seeks prejudgment interest on the trade secret misappropriation damages. (See Fees Motion at 40); see Cal. Civ. Code § 3287(a). For the same reasons as discussed above, the Court **AWARDS** Monster prejudgment interest on $3 million as accrued from September 29, 2022 to the date of the entry of judgment at an interest rate of 7%. By the Court's calculation ($575.34 x 365 days), the prejudgment interest is **$209,999.10** as of September 29, 2023. (See Libeu Decl. ¶ 34.)

### d. Expert Witness Expenses

The CUTSA permits the prevailing party to recover the sum of "services of expert witnesses, who are not regular employees of any party, actually incurred and reasonably necessary in either, or both, preparation for trial or arbitration, or during trial or arbitration[.]" Cal. Civ. Code § 3426.4. Mr. Tregillis was Monster's damages expert who offered damages

calculations for all of Monster's claims. (See, e.g., Fees Motion Ex. 1 (Tregillis) at 220:7–224:25).) Monster now seeks to recover the cost of Mr. Tregillis's services only as to the CUTSA claim. (See Fees Motion at 49–50.) Monster reasonably estimates that 10% of Mr. Tregillis's total work related to calculating and presenting damages on Monster's trade secret misappropriation claim. (See Libeu Decl. ¶ 22.) Accordingly, the Court **AWARDS** Monster $101,028.60 for Mr. Tregillis's work on the CUTSA claim.

### 4. Attorneys' Fees

The Lanham Act, DTSA, and CUTSA allow awards of reasonable attorneys' fees. See 15 U.S.C. § 1117(a); 18 U.S.C. § 1836(b)(3)(D); Cal. Civ. Code § 3426.4. Monster requests an award of $20,972,953.90 in attorneys' fees. (Libeu Decl. ¶ 19.)

### a. Hours

The Court calculates an award for attorneys' fees using the lodestar method. See Camacho, 523 F.3d at 978. To determine the lodestar, a court "must start by determining how many hours were reasonably expended on the litigation." Moreno, 534 F.3d at 1111. A "reasonable" number of hours is the time that "could reasonably have been billed to a private client." Id. Monster seeks to recover the time Hueston Hennigan actually billed Monster for its work in prosecuting the Lanham Act false advertising and CUTSA and DTSA trade secret claims. (See Fees Motion at 41–44.) Specifically, Monster seeks recovery for hours billed by 20 attorneys and 9 legal professionals between December 2018, when Hueston Hennigan was retained, and January 31, 2023. (See Libeu Decl. ¶¶ 18–20; see also Fees Motion Ex. A (contemporaneous time records)). These contemporaneous time records reflect the hours Hueston Hennigan reasonably expended. Cf. Hensley, 461 U.S. at 437 n.12 (prevailing parties are "not required to record in great detail how each minute of [their] time was expended"). Monster voluntarily removed billing entries that (1) implicate privilege issues; (2) relate solely to Monster's claims for interference with contractual relations and prospective economic advantage: (3) relate solely to the CFAA; (4) relate solely to sugar crash claims; and (5) relate solely to Monster's motion for a preliminary injunction. (Libeu Decl. ¶ 21.)

The Court finds that Hueston Hennigan's requested hours are reasonable. This case was "large and burdensome in scope." Perfect 10, Inc. v. Giganews, Inc., 2015 WL 1746484, at *19 (C.D. Cal. Mar. 24, 2015). Hueston Hennigan drafted and filed the First Amended Complaint in April 2019, the operative complaint in the case, and successfully defended Monster's Lanham Act, DTSA, and the CUTSA claims from dismissal. (Libeu Decl. ¶ 20.) Hueston Hennigan then handled substantial and extensive fact and expert discovery, including 87 depositions, nearly half-a-million produced documents, over 1,000 discovery requests and responses per side, 19 opening and rebuttal expert reports, and numerous discovery disputes with oral and/or written motion practice. (Id.) The parties briefed and argued competing summary judgment motions, including Defendants' two summary judgment motions in which they moved on virtually every element of Monster's claims. (Id.) Preparation for trial was similarly extensive: Hueston Hennigan prepared and filed 13 Daubert motions and motions in limine; over 60 proposed jury

instructions; over 7,000 trial exhibits; deposition designations for over 30 witnesses; and nearly 100 listed witnesses on the parties' witness lists. (Id.) These efforts culminated in a five-week jury trial with more than an hour of opening statements; 32 witnesses, and hundreds of admitted exhibits. (Id.) Since trial, Hueston Hennigan has filed substantial briefing on post-verdict issues. (Id.)

Further, this case was novel and complex. See Chalmers v. City of Los Angeles, 796 F.2d 1205, 1212 (9th Cir. 1986). The Lanham Act claim centered around a proprietary chemical compound, CLL, whose efficacy had not been scientifically tested until litigation. (See Fees Motion at 43.) This forced Monster to commission the first human and animal studies into the efficacy of the compound. (See Fees Motion Ex. 8 (Kreider) at 240:1–241:1.) Similarly, the trade secret claims required forensic investigation and analysis of multiple digital devices. (See Fees Motion Ex. 34 (9/16 Trial Tr.) at 53:16–54:11.)

Ultimately, "the most critical factor in determining a fee award's reasonableness is the degree of success obtained[.]" Farrar v. Hobby, 506 U.S. 103, 103 (1992). This case was well-litigated. The jury unanimously found Defendants liable for false advertising, tortious interference, and trade secret misappropriation. (See Verdict.) The jury also awarded Monster nearly $300 million in damages. Given Monster's resounding victory, it is appropriate for the Court to "defer to the winning lawyer's professional judgment as to how much time he was required to spend on the case; after all, he won[.]" Moreno, 534 F.3d at 1112. In such a large, lengthy, and complex case, Hueston Hennigan reasonably expended tens of thousands of hours. See, e.g., In re Heritage Bond Litig., 2005 WL 1594389, at *9 (C.D. Cal. June 10, 2005) (basing attorneys' fees award on "approximately 35,000 hours of attorney and paralegal time over the three-and-a-half years the action has been pending").

### b. Hourly Rates

Next, the Court multiplies the number of hours expended by the prevailing local rate for an attorney of the skill required to perform the litigation. See Moreno, 534 F.3d at 1111. "In determining the reasonableness of an hourly rate, courts consider the experience, skill, and reputation of the attorney requesting fees." Nguyen v. Regents of Univ. of Cal., 2018 WL 6112616, at *3 (C.D. Cal. May 18, 2018); see Gonzalez v. City of Maywood, 729 F.3d 1196, 1205 (9th Cir. 2013). Reasonable hourly rates are calculated according to the prevailing market rates in the relevant legal community—here, the Central District of California. See Gates v. Deukmejian, 987 F.2d 1392, 1405 (9th Cir. 1992); French v. City of Los Angeles, 2022 WL 2189649, at *18 (C.D. Cal. May 10, 2022).

The Court finds that Hueston Hennigan's hourly rates are reasonable. (See Libeu Decl. ¶¶ 5–13.) These negotiated hourly rates are what Hueston Hennigan actually billed Monster for its work, not mere estimates. See Amphastar Pharms, Inc. v. Aventis Pharma SA, 2020 WL 8680070, at *27 (C.D. Cal. Nov. 13, 2020) ("Gibson's hourly rates are reasonable for the additional reason that Defendants actually paid Gibson the rate Gibson seeks here, after all discounts were applied."); Perfect 10, 2015 WL 1746484, at 18 n.14 ("[E]vidence that an

---

institutional client in a competitive legal market was willing to pay the rates charged without any guarantee of reimbursement is important evidence that the rate was reasonable."). The fact that the fees have been paid "adds weight to the presumption of reasonableness." Sazerac Co. v. Fetzer Vineyards, Inc., 2017 WL 6059271, at *11 (N.D. Cal. Dec. 7, 2017) (quoting Stonebrae, L.P. v. Toll Bros., Inc., 2011 WL 1334444, at *6 (N.D. Cal. Apr. 7, 2011).

Further, Hueston Hennigan's discounted hourly rates fall within the price ranges for similarly skilled attorneys. Hueston Hennigan has been recognized by national publications as one of the leading law firms and trial boutiques in the country. (See Libeu Decl. ¶¶ 2-3, 6–12 (more than half of the Hueston Hennigan attorneys who worked on this case have been individually recognized by industry publications).) The Court recognizes the Wolters Kluwer Real Rate Report ("RRR") as persuasive authority for prevailing market rates. See, e.g., French, 2022 WL 2189649 at *18. Apart from John Hueston's ("Mr. Hueston") rate, all of Hueston Hennigan's requested rates fall below the RRR's top 25% hourly rate in 2021 for partners and associates. (See Fees Motion Ex. W ($1,042 for litigation partners and $806 for associates).) And Mr. Hueston's rate is reasonable because he is a founding partner of a recognized law firm. See, e.g., OpenGov, Inc. v. GTY Tech. Holdings, Inc., 2019 WL 2010707, at *5 (N.D. Cal. May 7, 2019) (approving billing rates of up to $1,500 for partners at Keker, Van Nest & Peters); Fufillium, Inc. v. ReShape Med., Inc., 2018 WL 11343971, at *4 (C.D. Cal. Oct. 9, 2018) (approving billing rate of $1,365 as "not unreasonably high" for a partner at Irell & Manella). In general, Hueston Hennigan's requested rates track the "rate determinations in other cases" in California. See, e.g., In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig., 2017 WL 1047834, at *5 (N.D. Cal. Mar. 17, 2017) (approving billing rates of up to $1,600 for partners, up to $790 for non-partner attorneys, and up to $490 for non-attorney professionals). Indeed, a court in this District recently approved Hueston Hennigan's rates. See Vital Pharms., Inc. v. Orange Bang, Inc., Case No. 5:20-cv-1464-DSF-SHK (C.D. Cal. Apr. 6, 2022).

Overall, the Court concludes that Hueston Hennigan's requested hours and hourly rates are both reasonable. Monster's lodestar figure is $20,972,953.90, which is objectively large. (Libeu Decl. ¶ 19.) "But a fee award is not unreasonable simply because it involves a lot of money. The operative question isn't the dollar amount, the question is whether the rates charged and the hours spent are reasonable in light of the totality of the litigation." Perfect 10, 2015 WL 1746484, at *27. Here, the fee award comports with the Court's sense of "the amount of effort it took to successfully litigate this high-stakes action over the course of four years." Id. The Court **AWARDS** Monster $20,972,953.90 in attorneys' fees.

//
//
//
//
//
//
//

### 5. Costs

#### a. Taxable Costs

Federal courts can award taxable costs based on the "limitations set out in 28 U.S.C. § 1821 and § 1920." Crawford Fitting Co. v. J.T. Gibbons, Inc., 482 U.S. 437, 445 (1987). Monster seeks recovery of the following taxable costs:

- $186,270.47 for deposition transcripts and hearing transcripts (see Libeu Decl. ¶ 22), as authorized by 28 U.S.C. § 1920(2) ("fees for printed or electronically recorded transcripts necessarily obtained for use in the case");

- $74,872.57 in printing costs for exhibits and papers printed for trial (Libeu Decl. ¶ 22), as authorized by 28 U.S.C. § 1920(3) ("fees and disbursements for printing").

Vital does not challenge Monster's taxable costs. Thus, the Court **AWARDS** Monster $261,143.04 in taxable costs.

#### b. Non-Taxable Costs

The Ninth Circuit allows "prevailing plaintiffs to recover non-taxable costs where statutes authorize attorney's fees awards to prevailing parties." Grove v. Wells Fargo Fin. Cal., Inc., 606 F.3d 577, 580 (9th Cir. 2010). The Lanham Act, DTSA, and CUTSA all authorize attorneys' fees to Monster. Monster can thus recover "reasonable out-of-pocket litigation expenses that would normally be charged to a fee paying client, even if the court cannot tax these expenses as 'costs' under 28 U.S.C. § 1920." Id. at 851 (citation omitted); see, e.g., 3M Co. v. Solaryna Energy, 2022 WL 2903160, at *11 (C.D. Cal. June 3, 2022) (awarding "'non-taxable' costs [under Lanham Act]," such as "database costs"); Wyatt Tech. Corp. v. Malvern Instruments, Incorp., 2010 WL 11404472, at *2 (C.D. Cal. June 17, 2010) (awarding non-taxable costs like mediator fees because under Grove, the Lanham Act and CUTSA fees provisions "include recovery of nontaxable expenses if those expenses would normally be charged to the client"). Monster seeks recovery of the following non-taxable costs:

- $4,218,072.21 for monthly data ingestion, hosting, processing, and production of electronic discovery, see, e.g., Mauss v. Nuvasive, Inc., 2018 WL 6421623, at *9 (S.D. Cal. Dec. 6, 2018) (approving costs for "data hosting");

- $119,087.44 for non-transcript deposition court reporting expenses, including costs for video depositions and recordings, see, e.g., Soler v. County of San Diego, 2021 WL 2515236, at *13 (S.D. Cal. June 18, 2021) ("District courts allow recoupment of video deposition expenses if those expenses were reasonably incurred.");

- $2,231.50 in messenger and delivery costs for chambers copies, see, e.g., Wyatt, 2010 WL 11404472, at *3 ("messenger and delivery costs" are recoverable "nontaxable costs");

- $14,496.00 in mediation fees, <u>see, e.g.</u>, <u>Wyatt</u>, 2010 WL 11404472, at *3 ("mediator fees" are recoverable);

- $293,142.60 in costs for room and tax for hotel stays at trial, <u>see, e.g.</u>, <u>Harris v. Marhoefer</u>, 24 F.3d 16, 19–20 (9th Cir. 1994) (affirming award of costs for "hotel bills"); <u>In re Immune Response Sec. Litig.</u>, 497 F. Supp. 2d 1166, 1177–78 (S.D. Cal. 2007);

- $605,690.75 in costs charged by vendor TrialEdge for creating and presenting graphics during depositions and trial, <u>see, e.g.</u>, <u>Cornell Univ. v. Hewlett-Packard Co.</u>, 2009 WL 1405208, at *2 (N.D.N.Y. May 15, 2009) (awarding costs of "outside trial graphics vendor" because it provides "tremendous assistance"); and

- $1,195,688.64 in costs charged by labs that conducted the CLL studies that Monster presented at trial in support of its false advertising claim, <u>see, e.g.</u>, <u>Hernandez v. Spring Charter Inc.</u>, 2020 WL 1171121, at *9 (N.D. Cal. Mar. 11, 2020) (awarding costs for "investigation fees," including consultants who performed investigatory work for party).

In total, Monster's non-taxable costs equal $6,448,409.14. (Libeu Decl. ¶ 22.) The Court finds the above expenses reasonable and necessary such that reimbursement is appropriate. Thus, the Court **AWARDS** Monster $6,448,409.14 in non-taxable costs.

## IV. CONCLUSION

For the reasons above, the Court **DENIES** the New Trial Motion and **GRANTS-IN-PART and DENIES-IN-PART** the Fees Motion. The Court **ORDERS** the following relief:

| Claim | Relief |
|---|---|
| False Advertising in violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, <u>et seq.</u> and California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500, <u>et seq.</u> | Judgment in Monster's favor and against Defendants Vital and Mr. Owoc.<br><br>Permanent injunction as requested in Monster's Motion for Permanent Injunction to Enjoin Defendants' False Advertising of "Super Creatine" and Creatine. |
| False Advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B) | ~~Disgorgement of Defendants' unjust profits in the amount of $77,466,712.~~<br><br>~~Enhanced damages in the amount of $56,670,142.75 to date, plus an additional $189,532.25 per day hereafter until Defendants are required to comply with any permanent injunction.~~ |

| | Prejudgment interest in the amount of ~~$38,877,859.63 to date~~ *$13,786.557.30 to September 29, 2023*, plus an additional $37,771.39 for every day thereafter until entry of judgment. |
|---|---|
| Intentional Interference with Contracts | Permanent injunction preventing Vital from interfering with Monster's contracted-for shelf space at all retail locations. |
| | ~~Punitive damages in the amount of $3 million.~~ |
| | Prejudgment interest in the amount of ~~$507,452.05 to date~~ *$1,259,998.25 to September 29, 2023*, plus an additional $3,452.05 per day thereafter through entry of judgment. |
| Trade Secret Misappropriation in violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, et seq., and the California Uniform Trade Secrets Act ("CUTSA"), Cal. Civ. Code § 3426, et seq. | Permanent injunction requiring Vital to identify and quarantine Monster's trade secrets in its possession and preventing Vital from disclosing or using Monster's trade secrets. |
| | ~~Exemplary damages in the amount of $3 million.~~ |
| | Expert witness expenses in the amount of $101,028.60. |
| | Prejudgment interest in the amount of ~~$84,574.98 to date~~ *$209,999.10 to September 29, 2023*, plus an additional $575.34 per day hereafter through entry of judgment. |
| Attorneys' Fees under the Lanham Act, DTSA, and CUTSA | Attorneys' fees in the amount of $20,972,953.90. |
| Costs under all claims | Costs in the amount of $6,709,552.18. |

The Court **ENJOINS** Defendants as follows:

Defendant Vital Pharmaceuticals, Inc. ("VPX"), and all of VPX's officers, agents, distributors, servants, employees, consultants, representatives, parent companies, owners, subsidiaries, affiliates, attorneys, and other persons acting in

concert with them who receive actual notice of this Permanent Injunction by personal service or otherwise (together, the "Enjoined Persons") are hereby enjoined as follows:

1. The Enjoined Persons are permanently enjoined from:

a. Placing VPX products on or in any shelf, shelving unit, cooler vault, reach-in cooler, barrel cooler, rack, display unit, floor stand, countertop display, checkout display, point-of-sale display, store window display, gondola display unit, sidekick display unit, display case, endcap unit, aisle unit, wobbler, or other retail space (collectively, "Retail Space") that the Enjoined Persons know or have reason to know is secured by Monster through an existing contract;

b. Removing any Monster products from any Retail Space that the Enjoined Persons know or have reason to know is secured by Monster through an existing contract; and

c. Taking any action to conceal, cover up, obscure, hide, block, or otherwise keep from view any Monster products on or in any Retail Space that the Enjoined Persons know or have reason to know is secured by Monster through an existing contract.

2. The Enjoined Persons are permanently enjoined from causing, inducing, or attempting to cause or induce any retailer—including, but not limited to, Circle K, AM PM, and Walmart—and all employees or other persons under their respective direction, supervision, and/or control to:

a. Place VPX products on or in any Retail Space that the Enjoined Persons know or have reason to know is secured by Monster through an existing contract;

b. Remove any Monster products from any Retail Space that the Enjoined Persons know or have reason to know is secured by Monster through an existing contract; and

c. Take any action to conceal, cover up, obscure, hide, block, or otherwise keep from view any Monster products on or in any Retail Space that the Enjoined Persons know or have reason to know is secured by Monster through an existing contract.

3. The Enjoined Persons are permanently enjoined from possessing, accessing, reviewing, using, or disclosing Monster's confidential and proprietary pricing, marketing, strategy, and financial information (the "Trade Secret Information"). For avoidance of doubt, the Trade Secret Information includes any information derived from or created by Monster except that which is demonstrably available to persons in the beverage industry.

4. VPX is ordered to take the following steps to remove from its possession, custody, or control any Trade Secret Information:

a. VPX shall identify and collect any property or information of Monster from all servers, email servers, computers, hard drives, devices, document management systems, files, and storage media (including, without limitation, USB drives, network-based storage, and cloud-based storage) in the possession, custody, or control of VPX, including, without limitation, any VPX-issued devices in the possession, custody, or control of any employee who joined VPX after working for Monster (the "Collected Information");

c. Within sixty (60) days of the effective date of this Permanent Injunction, VPX shall provide Monster's outside counsel of record with a copy of the Collected Information;

d. Monster's outside counsel of record will review the Collected Information to identify any Trade Secret Information;

e. Within thirty (30) days of Monster's identification of the Trade Secret Information, VPX shall: (i) remove all Trade Secret Information from VPX's possession; (ii) quarantine and preserve a copy of the Trade Secret Information to, among other things, preserve data in connection with the obligations of VPX and/or its employees in pending litigations.

5. Within seven (7) business days of the issuance of this Permanent Injunction, VPX shall deliver a copy of this Permanent Injunction to all Enjoined Persons. VPX must deliver a copy of this Permanent Injunction to all new Enjoined Persons within seven (7) business days of the date on which such persons become Enjoined Persons (e.g., hiring).

6. VPX must file a signed, sworn declaration certifying compliance with Paragraphs 4 and 5 of this Permanent Injunction within seven (7) business days after the respective deadlines, with a detailed summary of each step taken to comply with Paragraphs 4 and 5.

Monster is **ORDERED** to submit a proposed judgment consistent with this order, previous orders, and the jury's verdict for the Court's signature no later than **October 13, 2023**.

**IT IS SO ORDERED.**

# EXHIBIT 4

**NOT FOR PUBLICATION**

FILED

UNITED STATES COURT OF APPEALS

APR 15 2025

FOR THE NINTH CIRCUIT

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

MONSTER ENERGY COMPANY, a
Delaware corporation,

        Plaintiff-Appellee,

  v.

VITAL PHARMACEUTICALS, INC.,
DBA VPX Sports, a Florida corporation,

        Defendant,

 and

JOHN H. OWOC, AKA Jack Owoc,

        Defendant-Appellant.

Nos.  23-55451
       24-244

D.C. No.
5:18-cv-01882-JGB-SHK

MEMORANDUM[*]

Appeal from the United States District Court
for the Central District of California
Jesus G. Bernal, District Judge, Presiding

Argued and Submitted April 2, 2025
Pasadena, California

Before: GILMAN[**], M. SMITH, and VANDYKE, Circuit Judges.

---

     [*]     This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

     [**]     The Honorable Ronald Lee Gilman, United States Circuit Judge for the Court of Appeals, 6th Circuit, sitting by designation.

Defendant-Appellant John H. Owoc appeals from a final judgment of the district court in favor of Plaintiff-Appellee Monster Energy Company (Monster), as well as the district court's entry of a permanent injunction against Owoc and Vital Pharmaceuticals, Inc.  We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

Because the parties are familiar with the facts and background of this case, we provide only the information necessary to give context to our ruling.  Monster brought an action against Owoc and Vital Pharmaceuticals alleging, *inter alia*, that the defendants had violated Section 43(a) of the Lanham Act by falsely advertising that their energy drink BANG contained "Super Creatine" when, in fact, it did not contain creatine—let alone some super version of it—and did not provide any of the health benefits associated with creatine.  *See* 15 U.S.C. § 1125(a)(1)(B).  The matter proceeded to trial, with the district court largely granting Monster's requests to exclude three types of evidence: evidence about the results of surveys that Monster originally commissioned, evidence of Monster's own allegedly improper conduct, and evidence from separate lawsuits between the parties about Monster's conduct.

After a jury trial that lasted over five weeks, the jury returned a verdict in favor of Monster, finding, *inter alia*, that Owoc and Vital Pharmaceuticals were liable for false advertising under the Lanham Act.  The jury awarded Monster over $270 million in damages, and the district court entered a permanent injunction

prohibiting Owoc and Vital Pharmaceuticals from advertising that BANG contained creatine or Super Creatine.

Owoc appeals the entry of the judgment in favor of Monster and the entry of the permanent injunction. All of Owoc's challenges relate to the district court's evidentiary rulings and, specifically, its exclusion of evidence.[1] We review the district court's exclusion of evidence for an abuse of discretion.[2] *See Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.*, 52 F.4th 1054, 1063 (9th Cir. 2022).

1. The district court did not abuse its discretion in excluding evidence of surveys (the InfoScout Surveys) that were originally commissioned by Monster but proffered by Owoc. For a survey to be admissible, there must be a "proper foundation for admissibility," and the survey must be "conducted according to accepted principles." *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1263 (9th Cir. 2001); *see also Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1036 (9th Cir. 2010). Thus, although methodological

---

[1] Although Owoc suggests in passing that the injunction is "overbroad," he does not develop overbreadth as an independent argument, and it is clear that his challenge to the permanent injunction rises and falls with his evidentiary arguments.

[2] Owoc argues that we should review the district court's evidentiary rulings de novo because the rulings effectively prevented him from presenting a defense. We are unpersuaded; we review a ruling in limine de novo when that ruling entirely precludes the presentation of a defense, *see, e.g.*, *United States v. Biggs*, 441 F.3d 1069, 1070 n.1 (9th Cir. 2006)—not when, as here, a ruling in limine makes it more difficult for a party to prove their defense.

concerns with a survey go to weight rather than admissibility, "[t]he proponent [of the survey] must show that the survey was conducted in accordance with generally accepted survey principles" in order for it to be admissible. *Keith v. Volpe*, 858 F.2d 467, 480 (9th Cir. 1988); *see also M2 Software, Inc. v. Madacy Ent.*, 421 F.3d 1073, 1087 (9th Cir. 2005).

The district court acted within its discretion in excluding the InfoScout Surveys (and evidence derived from them) because Owoc, the proponent of the evidence, did not show that the surveys were conducted according to generally accepted principles. The evidence at issue was a set of slides summarizing the survey results—not the survey results or data itself. And although Owoc got an extension of time from the district court to depose a witness from InfoScout who could testify about the surveys, he failed to do so. Owoc also failed to identify any other witness who could testify about the surveys' principles, design, or methodology. Contrary to Owoc's counterarguments, even though the surveys were originally commissioned by Monster, he still had the burden to show that they were conducted according to generally accepted principles, and it was his failure to carry this burden that caused the district court to exclude the evidence—not methodological concerns.

2.    The district court did not abuse its discretion in excluding evidence about Monster's own conduct, including evidence about Monster's line of products.

23-55451, 24-244

*First*, Owoc challenges the district court's exclusion of evidence that Monster allegedly made unsupported claims about the health benefits of its existing line of energy drinks. The district court excluded this evidence because it was irrelevant to the merits of Monster's Lanham Act claim or Owoc's affirmative defenses. This was not an abuse of discretion.

Only relevant evidence is admissible, *see* Fed. R. Evid. 402, and evidence is relevant when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *United States v. Curtin*, 489 F.3d 935, 943 (9th Cir. 2007) (quoting Fed. R. Evid. 401). Evidence of the allegedly false claims in Monster's line of existing products was entirely irrelevant to the key issue at trial: whether Monster had shown that Owoc's advertisement of BANG as containing Super Creatine was false advertising under the Lanham Act. *See Skydive Ariz., Inc. v. Quattrocchi*, 673 F.3d 1105, 1110 (9th Cir. 2012) (listing the elements of a Lanham-Act false advertising claim). Indeed, such evidence would likely have created a mini trial on Monster's own advertisements and would have risked confusing the jury. *See Tennison v. Circus Circus Enters., Inc.*, 244 F.3d 684, 690 (9th Cir. 2001).

The district court also acted within its discretion in concluding that the allegedly false advertising in Monster's existing line of products was irrelevant to

Owoc's unclean-hands defense.[3]  "To prevail [on an unclean-hands defense], the defendant must demonstrate that the plaintiff's conduct is inequitable and that the conduct relates to the subject matter of its claims." *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 847 (9th Cir. 1987).  "In applying the doctrine, '[w]hat is material is not that the plaintiff's hands are dirty, but that he dirtied them in acquiring the right he now asserts, or that the manner of dirtying renders inequitable the assertion of such rights against the defendants.'"  *Ellenburg v. Brockway, Inc.*, 763 F.2d 1091, 1097 (9th Cir. 1985) (alteration in original) (quoting *Republic Molding Corp. v. B.W. Photo Utils.*, 319 F.2d 347, 349 (9th Cir. 1963), *as amended on denial of reh'g* (Mar. 22, 1964)), *abrogated on other grounds by Watkins v. Westinghouse Hanford Co.*, 12 F.3d 1517, 1527–28 (9th Cir. 1993).  The district court acted within its discretion in concluding that evidence of Monster's allegedly false marketing of the health benefits of its own products was irrelevant to Owoc's unclean-hands defense because none of Monster's products falsely purported to contain creatine or Super Creatine, which is what is at issue in this case.  *Cf. POM Wonderful LLC v. Coca Cola Co.*, 166 F. Supp. 3d 1085, 1096 (C.D. Cal. 2016).

---

[3]  Although Owoc nominally discusses the affirmative defenses of waiver and laches in his opening brief, he argues only that the district court erred in reasoning that "reliance" is an element of laches or waiver.  He fails to show *how* evidence of Monster's advertisement of its existing line of products would be relevant to the merits of these defenses, and we will not take up his mantle.  *See Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003).

The district court reasonably concluded that evidence that Monster had engaged in a different form of false advertising was simply too far afield to give rise to an unclean-hands defense.

*Second*, due to inadequate appellate briefing, Owoc has waived any challenge to the district court's ruling that evidence that Monster attempted to develop an energy drink containing creatine was (1) relevant to the merits of Monster's Lanham Act claim for the purpose of defining creatine, but (2) irrelevant to Owoc's affirmative defenses.  It is unclear from Owoc's opening brief whether he intended to raise this as a separate argument.  Even if he intended to do so, all he asserts in his brief is that the district court erred in assuming that reliance was an element of each of his affirmative defenses.  Fatally, that is *all* Owoc argues; he makes no effort whatsoever to show how the evidence that Monster attempted to develop a creatine drink could be relevant to any of his affirmative defenses.  In light of this failure, we decline to consider the issue further.[4]  *See Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003).

    3.     The district court did not abuse its discretion in excluding evidence of

---

[4] In any event, testimony *was* presented at the trial that Monster attempted to develop an energy drink containing creatine but was unable to do so.  In light of this, it is hard to see how Owoc could be prejudiced by the district court's ruling in limine. *See Sidibe v. Sutter Health*, 103 F.4th 675, 691–92 (9th Cir. 2024).  Indeed, Owoc has pointed to *no* evidence that he was not permitted to introduce that would have borne on his affirmative defenses.

allegations about Monster that Owoc made in unrelated litigation between the parties—and even if there was error in excluding some of this evidence, it would be harmless.

*First*, the district court did not abuse its discretion in excluding evidence that Reign was purportedly developed as a copycat of BANG minus the "Super Creatine." And even if that evidence should have been admitted, Owoc was not prejudiced by its exclusion.

The district court did not abuse its discretion in concluding that the Reign evidence was irrelevant to the merits of Monster's false-advertising claim. Although reasonable minds could come to different conclusions as to whether this evidence could be relevant to materiality, the district court's reasoning was not "illogical," "implausible" or "without support in inferences that may be drawn from the facts in the record," so there was no abuse of discretion. *Unicolors*, 52 F.4th at 1063 (quoting *United States v. Hinkson*, 585 F.3d 1247, 1263 (9th Cir. 2009) (en banc)).

Nor did the district court abuse its discretion in concluding that the evidence was irrelevant to Owoc's affirmative defenses. The Reign evidence was plainly irrelevant to waiver, as it does not bear on whether there was "the intentional relinquishment of a known right with knowledge of its existence and the intent to relinquish it." *United States v. King Features Ent., Inc.*, 843 F.2d 394, 399 (9th Cir. 1988). It was also irrelevant to estoppel. For a party to establish estoppel, it must

establish that "1) the party to be estopped must know the facts; 2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; 3) the latter must be ignorant of the true facts; and 4) he must rely on the former's conduct to his injury." *Id.* The Reign evidence does not bear on these elements. Moreover, the district court could reasonably have concluded that the evidence was irrelevant to Owoc's unclean-hands defense because evidence about the development of Reign—which does not contain creatine or purport to do so—is not sufficiently related to the claim that Owoc made false advertisements that BANG contained creatine. *See Fuddruckers*, 826 F.2d at 847; *Ellenburg*, 763 F.2d at 1097; *see also POM Wonderful*, 166 F. Supp. 3d at 1095. As to laches, Owoc forfeited this argument by failing to raise it before the district court and raising it for the first time on appeal. *See Hillis v. Heineman*, 626 F.3d 1014, 1019 (9th Cir. 2010). In any event, where, as here, "the plaintiff filed suit within the analogous limitations period, the strong presumption is that laches is inapplicable." *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 835 (9th Cir. 2002).

Moreover, even if the district court did err in concluding that evidence about the development of Reign was irrelevant, that would not justify reversal. The district court also observed that even if the evidence had some probative value, it would still exclude the Reign evidence because such evidence "would only confuse the jury and cause undue delay." The district court acted well within its discretion in concluding

that the minimal—if any—probative value of the Reign evidence was substantially outweighed by the risk of jury confusion.  *See* Fed. R. Evid. 403; *see also City of Long Beach v. Standard Oil Co. of Cal.*, 46 F.3d 929, 938 (9th Cir. 1995).

Additionally, evidentiary errors warrant reversal only if those errors were prejudicial.  *Sidibe v. Sutter Health*, 103 F.4th 675, 691–92 (9th Cir. 2024).  Even assuming that there was error in excluding the evidence that Reign was allegedly developed as a copycat of BANG, Owoc was not prejudiced by the error because substantial evidence was presented to the jury about how Reign was developed to compete with BANG and that the products contained similar ingredients, except for "Super Creatine."  Indeed, Owoc relied on this evidence in arguing that the development of Reign shows that the inclusion of "Super Creatine" was not material to BANG consumer purchasing decisions.

*Second*, the district court did not abuse its discretion in excluding evidence that Monster's products allegedly caused adverse health effects in consumers.  This evidence is irrelevant to the merits of Monster's false-advertising claim, which focuses on the false advertising in Owoc's products, not Monster's.  Nor is it relevant to Owoc's affirmative defenses, including the doctrine of unclean hands.  Moreover—and fatally—even if this evidence had some minimal probative value, the district court acted *well* within its discretion in concluding that the risk of unfair prejudice substantially outweighed that probative value.  *See* Fed. R. Evid. 403.

"Unfair prejudice is an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *United States v. Haischer*, 780 F.3d 1277, 1281 (9th Cir. 2015) (quoting *United States v. Anderson*, 741 F.3d 938, 950 (9th Cir. 2013)). This is a classic case for Rule 403 exclusion. The information sought to be admitted is—at best—of little probative value and could lead the jury to decide the case on an improper ground: namely, that Monster's products are bad for consumers.

*Third*, the district court did not abuse its discretion by excluding evidence purportedly showing that Monster is litigious and has a pattern of filing lawsuits against competitors. But even assuming that this evidence has *some* probative value, the district court acted well within its discretion in excluding it. Evidence regarding a party's litigious nature or proclivity for filing lawsuits is ordinarily excluded unless it reveals that a party has previously made very similar claims and that these claims were fraudulent. *See McDonough v. City of Quincy*, 452 F.3d 8, 20 (1st Cir. 2006); 1 Robert P. Mosteller et al., McCormick on Evidence § 196 (9th ed.), Westlaw (database updated Feb. 2025); *see also D'Lil v. Best W. Encina Lodge & Suites*, 538 F.3d 1031, 1040 (9th Cir. 2008). Contrary to Owoc's position, this is simply not one of the exceedingly narrow circumstances in which evidence of a party's litigious nature is admissible. *Cf. Yates v. Sweet Potato Enters., Inc.*, No. C 11-01950 SBA, 2013 WL 4067783, at *3 (N.D. Cal. Aug. 1, 2013) (unpublished) (admitting such

evidence, subject to a limiting instruction, when a party had filed over one hundred identical lawsuits).

*Fourth*, we see no reversible error in the district court's exclusion of evidence about Monster's purported smear campaign against BANG (including the *Truth About Bang* campaign and the alleged interference with BANG's shelf space).

The district court did not abuse its discretion in concluding that evidence about the smear campaign was irrelevant to the merits of Monster's false-advertising claim. Contrary to Owoc's position, it is hard to see how evidence that Monster engaged in a smear campaign against BANG could bear on the "materiality" element of its false-advertising claim. And although Owoc asserts on appeal that the smear-campaign evidence was relevant to the damages that Monster was due on its Lanham Act claim, he fails to address the district court's ruling that he waived this argument by failing to develop it.

Finally, we turn to whether this evidence was relevant to Owoc's affirmative defenses. The district court did not abuse its discretion in concluding that evidence of the smear campaign was irrelevant to Owoc's unclean-hands defense. Likewise, the district court did not abuse its discretion in concluding that this evidence was irrelevant to the defense of estoppel. *See King Features Ent.*, 843 F.2d at 399 (discussing the elements of an estoppel defense). And even if we were to accept Owoc's argument that this evidence is relevant to the knowledge element of

estoppel, there was no prejudice since there was no way that Owoc would be able to establish the other elements of the defense—including reliance, that Monster intended to engender reliance, and that Owoc was ignorant of the false advertising while Monster was aware of it. *See id.* As to waiver, Owoc fails to adequately develop an argument as to how this evidence could be relevant to waiver. But even assuming that the district court erred in concluding that this evidence was irrelevant to a waiver defense, Owoc was not prejudiced by this ruling. Simply put, Owoc could not establish that Monster somehow waived its rights to bring a false-advertising claim by waging a campaign that, among other things, notified the public that BANG did not contain creatine.

**AFFIRMED.**