

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

In re:
VITAL PHARMACEUTICALS, INC., et al.,
Debtors.

---

VPX LIQUIDATING TRUST,
Plaintiff,

v.

JOHN H. OWOC and MEGAN ELIZABETH OWOC, et al.,
Defendants.

---

Chapter 11
Case No.: 22-17842-PDR
Adv. Pro. No.: 24-01009-PDR

---

## DEFENDANTS' MOTION FOR LEAVE TO FILE EMERGENCY MOTION TO STAY PROCEEDINGS

Defendants John H. Owoc and Megan Elizabeth Owoc (the "Owoc Defendants"), appearing pro se, respectfully move this Court for leave to file their accompanying *Emergency Motion to Stay Proceedings Pending Supreme Court Review of the Super Creatine Judgment*, and state as follows:

1. This request is made in good faith and is not repetitive, vexatious, or intended to harass or burden the Court or the Liquidating Trust.
2. The requested relief is based on extraordinary and supervening circumstances that did not exist at the time of the Court's injunction, including:

   a. the filing of a Petition for Writ of Certiorari before the Supreme Court of the United States seeking vacatur of the Monster Energy false-advertising judgment that forms the foundation of this adversary proceeding;

b. the pendency of the Liquidating Trust's Motion for Partial Summary Judgment relying exclusively on that judgment for dispositive liability and collateral-estoppel purposes;

c. the imminent risk of dispositive rulings based on a judgment now under direct Supreme Court review; and

d. a pending insurance coverage determination that will decide whether any defense can be funded at all.

3. The accompanying Emergency Motion to Stay seeks narrowly tailored, temporary relief based on these new circumstances and does not relitigate any prior rulings or assert repetitive arguments.

4. Absent leave, the Owoc Defendants will suffer irreparable prejudice because dispositive liability issues may be adjudicated based on a judgment that may imminently be vacated by the Supreme Court and before a defense can be funded.

WHEREFORE, the Owoc Defendants respectfully request that the Court grant leave to file the accompanying *Emergency Motion to Stay Proceedings Pending Supreme Court Review of the Super Creatine Judgment*.

Respectfully submitted,

**John H. Owoc**
Defendant, pro se

**Megan Elizabeth Owoc**
Defendant, pro se

6278 N. Federal Hwy #220
Fort Lauderdale, FL 33308
Phone: 954-632-7119
Email: jackowoc.ceo@gmail.com

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

**Chapter 11 cases**

In re:

VITAL PHARMACEUTICALS, INC., et al.,

**Debtors**

Case No. 22-17842 (PDR) (Jointly
Administered)

---

VPX LIQUIDATING TRUST, by and
through its Liquidating Trustee,
**Plaint,**

v.

**JOHN H. OWOC and MEGAN
ELIZABETH OWOC, et al.,**

Adv. Pro. No. 24-01009 (PDR)

---

**DEFENDANTS JOHN H. OWOC AND MEGAN ELIZABETH OWOC EMERGENCY
MOTION TO STAY PROCEEDINGS PENDING SUPREME COURT REVIEW OF THE
SUPER CREATINE JUDGMENT.**

Defendants John H. Owoc and Megan Elizabeth Owoc (the "Owoc Defendants"),

appearing pro se, respectfully move this Court on an emergency basis for entry of an Order staying

all proceedings in this adversary action, including briefing and adjudication of the Liquidating

Trust's Motion for Partial Summary Judgment, pending resolution of Petitioner John H. Owoc's

Writ of Certiorari currently pending before the Supreme Court of the United States. In support, the

Owoc Defendants state as follows:

**INTRODUCTION**

1

This adversary proceeding—based on the Plaintiff Liquidating Trust's 144-page Second Amended Complaint (Doc. 148, filed Sept. 16, 2024) and the Motion for Partial Summary Judgment on Count Three (Doc. 364, filed Dec. 23, 2025), Adv. Pro. No. 24-01009 (PDR)—is entirely predicated on a single asserted factual premise and legal conclusion: that "Super Creatine" was falsely advertised and functionally useless. That premise is not merely relevant to the Trustee's claims; it is the indispensable foundation of the Trustee's entire case. Absent that premise, none of the asserted causes of action, damages theories, or insolvency allegations can survive.

That central premise is not only disputed—it is presently before the United States Supreme Court on a pending Petition for a Writ of Certiorari in Owoc v. Monster Energy Company, seeking review of the judgment of the United States Court of Appeals for the Ninth Circuit (Appeal Nos. 23-55451 and 24-244). The petition requests vacatur of the Ninth Circuit's judgment and the injunctive relief entered below—the very judgment upon which the VPX Liquidating Trust's claims are constructed.

The Liquidating Trust's Motion for Partial Summary Judgment in this adversary proceeding, arising from Chapter 11 Case No. 22-17842 (PDR) (Jointly Administered), expressly relies on the Monster Energy false-advertising judgment and Ninth Circuit affirmance as dispositive proof that: (1) Super Creatine constituted false advertising; (2) Jack Owoc engaged in a so-called "Super Creatine Scheme"; and (3) such conduct, as a matter of law, constituted a breach of fiduciary duty.

Indeed, paragraphs 464 through 468 of Count Three of the Second Amended Complaint (Doc. 148) allege, verbatim, that:

i.      Mr. Owoc exercised grossly negligent or reckless disregard for the Debtors' interests by perpetuating the "Super Creatine Scheme";

2

ii.     That scheme was purportedly "thwarted" by the Monster arbitration and litigation, resulting in more than $400 million in judgments and settlement obligations; The alleged scheme allowed the Company to remain in business longer than it otherwise would have by fraudulently inflating sales;

iii.    The scheme allegedly deepened insolvency and harmed creditors; and

iv.     The Debtors allegedly suffered over $300 million in damages as a direct result of the Monster false-advertising judgment.

All of these allegations—and not merely Count Three—are inextricably tied to the continued validity of the Monster Energy false-advertising judgment now pending before the Supreme Court.

If the Supreme Court grants certiorari and vacates that judgment, the Trustee's Motion for Partial Summary Judgment—and indeed the Trustee's entire theory of liability—necessarily collapses. Proceeding in the interim would risk irreconcilable rulings, waste substantial judicial resources, and inflict irreparable prejudice on the Owoc Defendants.

A stay is therefore not merely appropriate; it is compelled by fundamental principles of judicial economy, fairness, and due process.

Moreover, the Trustee's reliance on the alleged falsity of Super Creatine is not confined to its summary-judgment motion. The entire Second Amended Complaint is expressly constructed around the assertion that Super Creatine was a functionally useless compound, that Mr. Owoc knowingly engaged in false advertising, and that this alleged misconduct caused the Debtors' growth, insolvency, litigation exposure, and ultimate bankruptcy.

The Complaint repeatedly alleges that the Debtors' revenues, profits, contingent liabilities, insolvency, and collapse flowed directly from the alleged "Super Creatine Scheme" and the Monster false-advertising judgment. Every major category of damages and every core cause of action in this adversary proceeding is alleged to derive from the purported falsity of Super Creatine and the asserted collateral-estoppel effect of the Monster judgment.

Accordingly, this is not a case in which a single claim or isolated count turns on the validity of the Super Creatine judgment. Rather, the Trustee's entire theory of liability—across all counts and all defendants—depends on the continued legal viability of a judgment now under review by the Supreme Court of the United States.

If that judgment is vacated or reversed, the factual and legal foundation of this adversary proceeding collapses in its entirety. Under those circumstances, proceeding now would be manifestly inefficient, legally unsound, and fundamentally unfair.

## II. FACTUAL BACKGROUND

1. The Liquidating Trust has filed a Motion for Partial Summary Judgment on Count Three of the Second Amended Complaint.

2. That motion is based entirely on the premise that Jack Owoc engaged in willful false advertising of "Super Creatine," which allegedly caused VPX hundreds of millions of dollars in damages.

3. The Liquidating Trust expressly predicates its entitlement to summary judgment on:

    a. The Monster Energy jury verdict; b. the resulting injunction and damages award; and c. the Ninth Circuit's affirmation of that judgment.

4. The Liquidating Trust further argues that the Monster judgment has collateral-estoppel effect and conclusively establishes falsity, scienter, causation, and breach of fiduciary duty.

4

5.  On January 16th 2026, Petitioner John H. Owoc filed a Writ of Certiorari in the Supreme Court of the United States seeking review and vacatur of the Monster Energy judgment. **EXHIBIT A.**

6.  The Petition presents multiple Questions of exceptional national importance that go to the core legal and factual validity of the Monster false-advertising judgment, including:

    a.  Whether a civil jury may determine the scientific validity, biochemical identity, and physiological efficacy of a patented compound — and impose nationwide prohibitions on its labeling and promotion — in the absence of any regulatory action by the Food and Drug Administration (FDA), thereby substituting judicial verdicts for federal scientific oversight in violation of due process and the separation of powers;

    b.  Whether a court violates due process by excluding critical, reliable defense evidence that goes directly to falsity, materiality, and affirmative defenses in a Lanham Act action, thereby preventing a defendant from presenting a complete defense;

    c.  Whether a court violates federal antitrust law and due process by permitting litigation to proceed where the suit is objectively baseless and brought as a competitive weapon to destroy a rival, thereby stripping it of Noerr-Pennington immunity under the sham-litigation doctrine; and

    d.  Whether a lay jury may impose the largest civil penalty in the history of the Lanham Act based on admitted guesswork and standardless damages determinations, in violation of a court order prohibiting speculation, without violating due process, where the verdict operates as punishment and de facto regulatory action rather than compensation for proven harm.

7.  The Petition squarely challenges the legal validity of the findings that Super Creatine was false, useless, or misleading.

8.  If the Supreme Court grants certiorari and vacates or reverses the Monster judgment:

    a.  the Liquidating Trust's collateral-estoppel argument fails as a matter of law; b. the factual foundation of Count Three fails; and b. the Motion for Partial Summary Judgment becomes legally moot.

9.  The Owoc Defendants have been financially destroyed as a direct result of (i) the bankruptcy of Vital Pharmaceuticals, Inc.; (ii) the loss of their company and livelihoods; (iii) the Monster Energy litigation; and (iv) the entry of a more than $370 million false-advertising judgment entered personally against John H. Owoc.

10. In addition to the Monster judgment, the Owoc Defendants have been subjected to cascading derivative litigation and bankruptcy-related actions — including this adversary proceeding — all arising out of the same Super Creatine allegations.

11. As a result, the Owoc Defendants presently lack the financial ability to retain defense counsel or to self-fund a defense in this adversary proceeding.

12. Until very recently, the Owoc Defendants were not aware that applicable directors and officers ("D&O") insurance policies might provide defense coverage for this adversary proceeding.

13. Once it was brought to their attention that insurance coverage might apply, the Owoc Defendants immediately submitted claims under both potentially applicable policies.

14. On January 7, 2026, the Owoc Defendants submitted a formal notice of claim to Federal Insurance Company ("Chubb") under Policy No. 000082619808.

15. On January 12, 2026, Chubb formally acknowledged receipt of the claim, assigned a claim number and confirmed that the matter was under active review by an Executive Claim Director.

16. On January 14, 2026, Chubb confirmed in writing that it "continue[s] to review this matter" and would be in touch if additional information were required, while reserving all rights under the policy.

17. The Owoc Defendants are presently awaiting Chubb's initial coverage determination and are likewise awaiting a coverage response under a second potentially applicable insurance policy.

18. If insurance coverage is granted, defense counsel will be retained immediately. If coverage is denied, the Owoc Defendants' litigation posture, strategy, and ability to defend this action will be fundamentally and irrevocably altered.

19. Forcing the Owoc Defendants to litigate dispositive liability issues and conduct discovery while Supreme Court is pending resolution and a coverage determination is pending would cause severe and irreparable prejudice and would effectively deprive them of a meaningful opportunity to be heard.

## III. LEGAL STANDARD

Federal courts, including bankruptcy courts, possess inherent authority to stay proceedings to control their dockets and ensure the fair and efficient administration of justice. *Landis v. N. Am. Co.*, 299 U.S. 248, 254–55 (1936). Bankruptcy Rule 8007 requires a party to initially seek a stay pending appeal in the bankruptcy court. See Fed. R. Bankr. P. 8007(a)

The legal principles relevant to a stay motion "have been distilled into consideration of four factors:

'(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.'" *Nken v. Holder*, 556 U.S. 418, 434 (2009) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).

7

The first two factors are the most important in the court's consideration of a request for a stay pending appeal. Id. (citing *Nken v. Holder*, 556 U.S. 418, 434 (2009)). Courts routinely grant stays where a pending appeal or higher-court review may dispose of controlling issues or materially alter the litigation posture.

## IV. ARGUMENT

### I. DEFENDANTS HAVE MADE A STRONG SHOWING THAT THEY ARE LIKELY TO SUCCEED ON THE MERITS

This motion stands on the merits because Defendants have demonstrated they will likely succeed in this proceeding. For a stay pending appeal, the "likelihood of success" element requires a bankruptcy debtor to establish "at a minimum, that they have a substantial case for relief on the merits." *LeivaPerez v. Holder*, 640 F.3d 962, 968 (9th Cir. 2011). "It is not enough that the likelihood of success on the merits is 'better than negligible' or that there is a 'mere possibility of relief.'" *Lair v. Bullock*, 697 F.3d 1200, 1204 (9th Cir. 2012) (quoting Nken, 556 U.S. at 434).

#### a. *Supreme Court's Resolution Will Be Dispositive of the Plaintiff Trustee's Motion for Partial Summary Judgment*

Federal courts possess inherent authority to stay proceedings where the interests of justice so require. *Landis v. N. Am. Co.*, 299 U.S. 248, 254–55 (1936). That authority includes the power to stay adjudication where resolution of a pending appellate proceeding—particularly one before the United States Supreme Court—may substantially affect or entirely dispose of the issues before the court. See *SEC v. Dresser Indus., Inc.*, 628 F.2d 1368, 1375 (D.C. Cir. 1980) (quoting *United States v. Kordel*, 397 U.S. 1, 12 n.27 (1970)).

A stay is especially warranted where, as here, a pending Supreme Court proceeding addresses the precise factual and legal determinations upon which the moving party's claims

8

depend. In such circumstances, proceeding in the interim risks inconsistent rulings, wasted judicial resources, and irreparable prejudice. *Landis*, 299 U.S. at 255.

To establish likelihood of success for purposes of a stay, a movant need only show "a reasonable chance, or probability, of winning." *Revel AC, Inc. v. IDEA Bdwalk, LLC*, 802 F.3d 558, 568 (3d Cir. 2015) (quoting *Singer Mgmt. Consultants, Inc. v. Milgram*, 650 F.3d 223, 229 (3d Cir. 2011)).

That standard is readily met here. The Petition for a Writ of Certiorari pending before the Supreme Court squarely presents a fundamental constitutional and structural question: whether a civil jury may determine the biochemical identity, scientific validity, or physiological efficacy of a patented compound—and impose nationwide prohibitions on its labeling and promotion—in the absence of any regulatory determination by the Food and Drug Administration (FDA). That question implicates due process, separation of power, and the statutory framework Congress established for federal scientific oversight.

The Supreme Court has repeatedly held that determinations concerning chemical identity, safety, efficacy, and permissible labeling are committed by Congress to expert administrative agencies—not to lay juries. See *Weinberger v. Bentex Pharms., Inc.*, 412 U.S. 645, 652–54 (1973); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133–35 (2000). Where resolution of a claim depends on "threshold questions within the peculiar expertise of an administrative agency," courts are required to stay their hand. *Far E. Conf. v. United States*, 342 U.S. 570, 574–75 (1952).

As the Supreme Court explained in *Weinberger*, "[e]valuation of conflicting reports as to the reputation of drugs among experts in the field is not a matter well left to a court without chemical or medical background." 412 U.S. at 654. The same principle applies with even greater

9

force to jury determinations purporting to resolve molecular identity, biochemical function, or physiological efficacy without any FDA action.

Allowing juries to resolve such questions substitutes ad hoc judicial verdicts for uniform federal regulation, violating due process and undermining the statutory scheme governing food, supplements, and biotechnology. See *Ricci v. Chi. Mercantile Exch.*, 409 U.S. 289, 304–06 (1973); see also 21 U.S.C. § 321(s) (GRAS framework).

For these reasons, Defendants have demonstrated at least a reasonable probability that the Supreme Court will grant certiorari and vacate the judgment on which the Trustee relies.

The Liquidating Trust's Motion for Partial Summary Judgment depends wholly on the continued validity of the Monster Energy false-advertising judgment and its affirmance by the Ninth Circuit. The Trustee offers no independent scientific evidence, no FDA findings, and no new regulatory determinations to establish that Super Creatine was falsely advertised or functionally useless.

Instead, the Trustee relies exclusively on collateral estoppel and on the Monster verdict and Ninth Circuit decision—precisely the rulings now under direct review by the United States Supreme Court. If that judgment is vacated, there will be no preclusive effect, no adjudicated finding that Super Creatine constituted false advertising, and no legal foundation for Count Three or for the Trustee's summary-judgment theory. Accordingly, the Supreme Court's resolution will not merely inform this Court's analysis; it will be dispositive of the Trustee's Motion for Partial Summary Judgment.

### b.  *Denial of a Stay Creates a Serious Risk of Inconsistent Judgments*

This adversary proceeding (the "Adversary Proceeding") was commenced pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure and Sections 105(a), 501, 502, 510, 542, 544, 547, 548, 550, and 551 of title 11 of the United States Code. This Court possesses both subject-matter jurisdiction and constitutional authority to enter final orders in this Adversary Proceeding, including orders staying the action itself. *McDermott v. Davis (In re Davis)*, 538 B.R. 368, 370 (Bankr. S.D. Ohio 2015). That authority expressly encompasses the power to stay an adversary proceeding where justice and judicial economy so require. *Levey v. Systems Div., Inc. (In re Teknek, LLC)*, 563 F.3d 639, 648 (7th Cir. 2009).

Accordingly, there can be no dispute that determination of the Motion to Stay falls squarely within this Court's jurisdiction and constitutional authority.

If this Court proceeds to adjudicate the Trustee's Motion for Partial Summary Judgment while Supreme Court review of the underlying Monster Energy judgment remains pending, there is a substantial risk of irreconcilable outcomes. Specifically, this Court could be required to issue a summary-judgment ruling premised on a judgment that is subsequently vacated, issue binding factual or legal determinations that directly conflict with a forthcoming Supreme Court decision, or expend significant judicial resources adjudicating claims that may be rendered legally void. Such a result would create precisely the type of inefficiency, confusion, and procedural instability that federal courts consistently seek to avoid.

Courts routinely stay proceedings where a higher court's decision is likely to affect—or entirely control—the outcome of the case. Proceeding under these circumstances would undermine the orderly administration of justice and expose the parties to the risk of inconsistent judgments and duplicative litigation. Once entered, summary-judgment rulings carry preclusive and practical

11

consequences that cannot be easily undone, even if the legal foundation for those rulings is later eliminated by Supreme Court action.

Here, the Trustee's Motion for Partial Summary Judgment rests entirely on the continued validity of the Monster Energy false-advertising judgment. That judgment is now under direct review by the Supreme Court. If the Supreme Court vacates or reverses it, any summary-judgment ruling issued by this Court premised on that judgment would necessarily be unsound and subject to vacatur. The resulting inefficiency would prejudice the parties, burden the Court, and disrupt the integrity of the adjudicative process.

Federal courts consistently stay proceedings to avoid precisely this scenario. A stay preserves judicial resources, protects the parties from inconsistent obligations, and ensures that this Court's rulings are aligned with controlling Supreme Court precedent. Under these circumstances, denial of a stay would create a serious and unnecessary risk of inconsistent judgments, whereas granting a stay would promote fairness, efficiency, and respect for the hierarchical structure of the federal judiciary.

For these reasons, the Court should stay further proceedings pending resolution of the Supreme Court's review

### c. *The Super Creatine Judgment Is the Central Pillar Supporting the Trustee's Entire Second Amended Complaint, Requiring a Stay of the Entire Adversary Proceeding*

The Liquidating Trust's Second Amended Complaint is not merely informed by the Monster false-advertising judgment — it is architected around it. From the opening paragraphs forward, the Trustee alleges that the Company's flagship product was built on false advertising, that "Super Creatine" was a functionally useless compound, that Jack Owoc willfully and deliberately misled consumers, and that the Company's growth, revenues, and profits were fraudulently generated as

a result of the so-called "Super Creatine Scheme." (Second Amended Complaint ¶¶ 10–15, 79–113).

The Trustee further alleges that the Debtors' growth was "illusory" because it was built on Super Creatine false advertising, that more than 95% of sales were based on products purportedly containing Super Creatine, and that the Company's profits, contingent liabilities, and insolvency were all legally and factually inseparable from the Super Creatine Scheme and the Monster false-advertising judgment. (Second Amended Complaint ¶¶ 79–83, 160–166, 171–183).

The Second Amended Complaint repeatedly alleges that every major liability faced by the Company — including the Monster judgment and the OBI/Monster arbitration award — stemmed directly from the Super Creatine Scheme. It further alleges that the Monster false-advertising judgment exposed the alleged falsity of Super Creatine, triggered massive damages, and directly caused the Company's downfall and bankruptcy filing. (Second Amended Complaint ¶¶ 114–125, 121–123, 140–143, 167–171).

Every core cause of action asserted in the Second Amended Complaint — including breach of fiduciary duty, fraudulent transfer, aiding and abetting, equitable subordination, claim disallowance, recharacterization, and insolvency-based avoidance claims — is expressly premised on the allegation that Super Creatine was false advertising and that the Monster judgment conclusively established that falsity. The Trustee's insolvency, damages, and fiduciary-breach theories all depend on the continued legal validity of that judgment. (Second Amended Complaint ¶¶ 20(a)(i), 79–83, 160–183).

If the Supreme Court vacates or reverses the Monster false-advertising judgment, the factual and legal foundation of the Second Amended Complaint collapses. There would be no adjudicated falsity, no willful false advertising, no Super Creatine Scheme, no collateral-estoppel effect, and

no legally cognizable basis for the Trustee's insolvency, damages, or fiduciary-breach theories as pleaded.

In that event, the Trustee would be unable to sustain the Second Amended Complaint in anything resembling its present form. Proceeding with discovery, motion practice, mediation or adjudication of any claims in this adversary proceeding while Supreme Court review is pending would therefore be not only inefficient, but structurally unsound and fundamentally unjust.

Because the Super Creatine judgment is the central pillar supporting the Trustee's entire case — not merely Count Three or the Motion for Partial Summary Judgment — this Court should stay the entirety of this adversary proceeding pending final resolution of Supreme Court review.

### d. *The Monster Judgment Is Built on a Scientifically False Premise and a Trial Record Deprived of Critical Exculpatory Evidence*

The Monster Energy false-advertising judgment — on which the Liquidating Trust's entire case depends — rests on the central premise that "Super Creatine does not exist," that it is functionally useless, and that no scientific studies demonstrate that it is biologically active or capable of donating creatine in vivo. That premise is not merely disputed. It is demonstrably false.

Super Creatine, chemically known as creatyl-L-leucine, is a patented, covalently bonded amino-acid dipeptide engineered to enhance the solubility and stability of creatine in aqueous solutions. Multiple independent biochemical and pharmacokinetic studies confirm that Super Creatine is real, metabolically active, and capable of functioning as a creatine donor in vivo.

Peer-reviewed studies — including (i) Dr. Shahab Parang's human pharmacokinetic analysis and (ii) a controlled rodent study conducted by Peking University's Biotech Medical School — demonstrate that ingestion of Super Creatine leads to measurable and sustained increases in serum creatine levels. The Peking University study, which tested creatyl-L-leucine

14

twelve separate times, showed a sustained elevation of creatine levels in rodent plasma over a 24-hour period, thereby confirming a real and repeatable biological conversion mechanism.

Dr. Parang's pharmacokinetic study further demonstrated a measurable seven-day half-life of creatine in human plasma following ingestion of Super Creatine, confirming not only conversion but prolonged biological persistence.

Even Monster's own internal study undermined its litigation position. Despite using approximately 67% more molar creatine monohydrate than Super Creatine, Monster's study still found increased creatine levels in human test subjects who consumed Super Creatine. All three studies independently demonstrated increased serum creatine levels following Super Creatine ingestion.

These studies directly refute Monster's core litigation assertion that "Super Creatine does not exist" or that "no studies demonstrate its function." Those assertions formed the foundation of Monster's Lanham Act false-advertising claim and the jury verdict that followed.

Critically, the jury in the Monster litigation was never permitted to see this scientific evidence.

The trial court excluded or materially restricted the admission of the Peking University study, Dr. Parang's pharmacokinetic analysis, and other scientific data directly bearing on falsity, materiality, and affirmative defenses. As a result, the central factual question — whether Super Creatine was real and biologically active — was adjudicated without the jury ever being allowed to see the scientific proof that disproved Monster's theory.

That exclusion of critical, reliable defense evidence fatally compromised the integrity of the trial and is now one of the central constitutional questions presented in the pending Petition for Writ of Certiorari before the Supreme Court of the United States.

Accordingly, the Monster judgment is not merely under routine appellate review. It is under direct Supreme Court scrutiny because it rests on a scientifically false premise and a trial record that deprived the defendant of the ability to present a complete defense.

Under these circumstances, it would be fundamentally unsound for this Court to treat the Monster judgment as a stable or reliable foundation for collateral estoppel, summary judgment, or dispositive liability rulings — or to allow an entire adversary proceeding to move forward on the basis of a judgment whose scientific and constitutional validity is now squarely before the Supreme Court.

### e. The Monster Judgment Is Void Because It Arose from Objectively Baseless Sham Litigation Used as a Competitive Weapon in Violation of Federal Antitrust Law

The Petition further presents the question whether Monster Energy's Lanham Act lawsuit was not a good-faith effort to vindicate truthful advertising concerns, but instead constituted objectively baseless sham litigation brought as a competitive weapon to destroy a rival, thereby stripping Monster of Noerr-Pennington immunity under the sham-litigation doctrine and violating federal antitrust law.

As set forth in the Petition, Monster initiated and prosecuted the Super Creatine litigation not because it reasonably expected to prevail on the merits, but because it could not compete fairly in the marketplace by creating a better product. Instead, Monster weaponized the legal

system to eliminate Bang Energy as a competitor and absorb its market share through predatory litigation.

Under controlling Supreme Court precedent, litigation that is objectively baseless and brought for the purpose of interfering directly with a competitor's business relationships loses First Amendment protection and constitutes an antitrust violation. *Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49 (1993).

The Petition squarely challenges whether Monster's suit satisfied either prong of the Professional Real Estate Investors test and whether the trial court committed reversible error by permitting sham litigation to proceed to judgment.

If the Supreme Court grants certiorari and holds that Monster's lawsuit was sham litigation unprotected by Noerr-Pennington immunity, the Monster judgment would be void as a matter of federal constitutional and antitrust law.

Because the Liquidating Trust's entire adversary case is predicated on the legal validity of that judgment, Supreme Court resolution of this issue would be dispositive not merely of Count Three, but of the Trustee's entire theory of liability.

### *f. The Monster Judgment Is Constitutionally Void Because It Imposed a Record-Breaking Civil Penalty Based on Admitted Jury Guesswork and Standardless Damages in Violation of Due Process and Court Order*

The Petition also presents the question whether a lay jury may constitutionally impose the largest civil penalty in the history of the Lanham Act based on admitted guesswork and standardless damages determinations, in direct violation of a court order prohibiting speculation,

17

without violating due process, where the verdict operates as punishment and de facto regulatory action rather than compensation for proven harm.

As set forth in the Petition, the jury imposed a $271,924,174 verdict without any administrable standards guiding its damages determination. Jurors later admitted that they did not apply any legal, economic, or evidentiary framework, but instead selected Monster's damages number because it was "not zero" and "felt right." One juror explained: *"I got a zero on one hand, and your number, and it obviously isn't zero, so we went with your number."*

Such an unguided and intuitive approach to damages violates the Due Process Clause, which forbids arbitrary and standardless deprivations of property and requires meaningful constraints on jury discretion in imposing severe civil sanctions. See *BMW of N. Am., Inc. v. Gore,* 517 U.S. 559 (1996); *Honda Motor Co. v. Oberg*, 512 U.S. 415 (1994); *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003).

The Petition further challenges whether a civil verdict that destroys a company, reallocates market power, and extinguishes a competitor functions as punishment and de facto regulation rather than compensation for proven harm — thereby triggering heightened substantive due process scrutiny.

If the Supreme Court grants certiorari and vacates the Monster judgment on due-process grounds, the legal foundation of the Trustee's claims, damages theories, insolvency allegations, and collateral-estoppel arguments collapses in full.

Accordingly, Supreme Court resolution of this question will be dispositive of the Trustee's Motion for Partial Summary Judgment and of the continued viability of this adversary proceeding as a whole.

**g.** ***Stay Is Independently Warranted Because the Owoc Defendants Are
Financially Unable to Defend This Action and Are Awaiting a Pending
Insurance Coverage Determination***

The Owoc Defendants have been financially devastated by the bankruptcy of Vital
Pharmaceuticals, Inc., the loss of their company, and the entry of a more than $370 million false-
advertising judgment entered personally against John H. Owoc. They have no present ability to
retain defense counsel or self-fund a defense in this adversary proceeding.

Once it was brought to their attention that applicable D&O insurance policies might provide
defense coverage, the Owoc Defendants immediately submitted claims under both potentially
applicable policies. Chubb has acknowledged receipt of the claim, assigned a claim number, and
confirmed that the matter remains under active review.

## II.    DENIAL OF A STAY WILL CAUSE IRREPARABLE HARM TO THE OWOC DEFENDANTS

Defendants **John H. OWOC and Megan Elizabeth Owoc** have shown that "irreparable
harm is likely [not merely possible] in the absence of [a] [stay]." *Revel,* 802 F.3d at 569 (quoting
*Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 22 (2008)) (emphasis and brackets in Revel).
An irreparable harm refers to "harm that cannot be prevented or fully rectified by a successful
appeal." Id. at 568 (quoting Roland Mach. Coto. v. Dresser Indus., 749 F.2d 380, 386 (7th Cir.
1984)). "To establish irreparable harm, a stay movant must demonstrate an injury that is neither
remote nor speculative, but actual and imminent." Id. at 571 (quoting Tucker Anthony Realty Corp.
v. Schlesinger, 888 F.2d 969, 975 (2d Cir. 1989)) (internal quotations omitted).

19

Absent a stay, the Owoc Defendants face adjudication of dispositive liability issues based on a judgment that may soon be nullified, permanent prejudice through the application of collateral estoppel and adverse factual and legal findings, and coerced litigation positions driven by a legally unstable and potentially void foundation. In addition, absent a stay, the Owoc Defendants will suffer immediate and irreparable harm, including the inability to retain counsel, the risk of waiver of defenses, coerced litigation positions driven solely by lack of funds, permanent prejudice in dispositive motion practice, and the denial of meaningful access to the courts.

By contrast, the Trustee will suffer little or no prejudice from a finite stay pending Supreme Court resolution, and a determination by the Owoc Defendants' insurers as to whether defense coverage will be provided. Forcing the Owoc Defendants to proceed under these circumstances would be fundamentally unfair and incompatible with basic principles of due process. This Court should therefore stay the entirety of this adversary proceeding pending Supreme Court resolution and a determination by the Owoc Defendants' insurers regarding the availability of defense coverage.

These harms cannot be undone after the fact.

## III.    JUDICIAL ECONOMY STRONGLY FAVORS A STAY

If certiorari is granted and the judgment is vacated, this Court's rulings on Count Three will be rendered legally void or erroneous, the Motion for Partial Summary Judgment will become moot, and substantial judicial resources will have been wasted. A finite stay, by contrast, preserves judicial resources and protects the integrity of this Court's rulings.

## IV.    THE BALANCE OF EQUITIES OVERWHELMINGLY FAVORS A STAY

Nevertheless, even if the Court were to conclude that analysis of the remaining stay factors is unnecessary, the balance of the harms and the public interest independently and overwhelmingly support entry of a stay. See *Revel AC, Inc. v. IDEA Bdwalk, LLC*, 802 F.3d 558, 571 (3d Cir. 2015); *S.S. Body Armor I, Inc. v. Carter Ledyard & Milburn LLP*, 927 F.3d 763, 772 (3d Cir. 2019).

In balancing the equities, the Court must weigh the likely harm to the movants absent a stay against the harm to the non-movant if a stay is granted, while also considering where the public interest lies and whether the Court's decision will have consequences beyond the immediate parties. *Revel*, 802 F.3d at 569 (quoting *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 388 (7th Cir. 1984)); *In re Commonwealth Renewable Energy, Inc.*, 2016 WL 1238199, at *7 (Bankr. W.D. Pa. Feb. 10, 2016).

Here, the Liquidating Trust will suffer little or no prejudice from a finite stay pending Supreme Court review. A temporary pause will not impair the Trustee's ability to prosecute its claims if the underlying judgment is affirmed, nor will it result in the loss of evidence, witnesses, or legal rights. At most, the Trustee will experience a modest delay—an insufficient basis to deny a stay where far greater harms are at stake.

By contrast, the Owoc Defendants face severe and irreparable prejudice absent a stay. They would be forced to litigate dispositive liability issues predicated on a judgment that may imminently be vacated, exposing them to adverse rulings, collateral-estoppel effects, and coerced litigation positions that cannot be undone even if the Supreme Court later invalidates the underlying judgment. Such prejudice is not speculative; it is immediate, concrete, and irreversible.

The public interest likewise favors a stay. Allowing this action to proceed while the Supreme Court considers the validity of the very judgment on which the Trustee's claims rest risks inconsistent rulings, wasted judicial resources, and erosion of confidence in the orderly

21

administration of justice. A stay promotes judicial economy, respects the hierarchical structure of the federal courts, and ensures that this Court's rulings are aligned with controlling Supreme Court precedent. These considerations extend well beyond the interests of the immediate parties and implicate the integrity of the judicial process itself.

Accordingly, even under a balancing-of-harms and public-interest analysis, a stay is warranted and should be granted.

## VI. REQUEST FOR RELIEF

WHEREFORE, the Owoc Defendants respectfully request that the Court enter an Order:

1. Staying all proceedings in this adversary action in their entirety, including all discovery, motion practice, mediation, hearings, and deadlines, because the Liquidating Trust's Second Amended Complaint and Motion for Partial Summary Judgment are both legally and factually predicated on the continued validity of the Monster Energy false-advertising judgment now pending before the Supreme Court of the United States;

2. Granting such other and further relief as the Court deems just and proper.

Respectfully submitted,

**John H. Owoc**

Defendant, pro se

**Megan Elizabeth Owoc**

Defendant, pro se

6278 N. Federal Hwy #220

Fort Lauderdale, FL 33308

Phone: 954-632-7119

22

Phone: 954-632-7226

Email: jackowoc.ceo@gmail.com

Email: megliz@superstructures.miami

Email: megliz.legal@gmail.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 27th day of January, 2026, a true and correct copy of the foregoing *Emergency Motion to Stay Proceedings Pending Supreme Court Review of the Super Creatine Judgment* was served on all parties registered to receive electronic service in this case via the Clerk of Court's CM/ECF system.

Respectfully submitted,

**John H. Owoc**
Defendant, pro se

**Megan Elizabeth Owoc**
Defendant, pro se

6278 N. Federal Hwy #220
Fort Lauderdale, FL 33308

# EXHIBIT A

No._____

In The

# 𝔖𝔲𝔭𝔯𝔢𝔪𝔢 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔱𝔥𝔢 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰

---

JOHN H. OWOC a.k.a JACK OWOC, AN
INDIVIDUAL,

Petitioner,

v.

MONSTER ENERGY COMPANY,

Respondent.

---

On Petition for a Writ of Certiorari to the
United States Court of Appeals for the Ninth
Circuit

---

## PETITION FOR A WRIT OF CERTIORARI

---

JOHN H. OWOC
(PETITIONER PRO SE)
6278 N Federal Hwy, #220
Fort Lauderdale, FL 33308
Phone: 954-632-7119
Email: jackowoc.ceo@gmail.com

## QUESTIONS PRESENTED

1. Whether a civil jury may determine the scientific validity, biochemical identity, or physiological efficacy of a patented compound—and impose nationwide prohibitions on its labeling and promotion—in the absence of any regulatory action by the Food and Drug Administration, thereby substituting judicial verdicts for Federal scientific oversight in violation of due process and the separation of powers?

2. Whether a court violates due process by excluding critical, reliable defense evidence that goes to falsity, materiality, and affirmative defenses in a Lanham Act action—thereby preventing a defendant from presenting a complete defense?

3. Whether a court violates federal antitrust law and due process by permitting litigation to proceed where the suit is objectively baseless and brought as a competitive weapon to destroy a rival, thereby stripping it of Noerr-Pennington immunity under the sham-litigation doctrine?

4. May a lay jury impose the largest civil penalty in the history of the Lanham act based on admitted guesswork and standardless damages determinations, in Violation of a Court Order prohibiting speculation, without violating due process, where the verdict operates as punishment and de facto regulatory action rather than compensation for proven harm?

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Supreme Court Rule 29.6, Petitioner John H. Owoc certifies that he is an individual with no parent corporation. No publicly held corporation owns any interest in Petitioner or has a financial interest in the outcome of this litigation.

## PARTIES TO THE PROCEEDING

Petitioner is John H. Owoc, the Defendant in this case and was appellants in the court of appeals.

Respondent is Monster Energy Company, the Plaintiff and is the appellee in the court of appeals.

## RELATED PROCEEDING

- *Hansen Beverage Company (now known as Monster Beverage Corporation) v. Vital Pharmaceuticals, Inc.* Case No. 08-cv-01545-IEG-POR, U.S. District Court for the Southern District of California. Dismissed on November 14, 2011.

- *Monster Energy Company v. Vital Pharmaceuticals, Inc and John H. Owoc,* No.5:18-cv-1882-JGB-SHK, U.S. District Court, Central District of California. Judgement entered September 30th, 2022.

- *Vital Pharmaceuticals, Inc., v. Orange Bang, Inc. and Monster Energy Company,* No. 5:20-cv-1464-DSF-SHK, U.S. District Court Central District of California Eastern Division. Judgement entered April 4th, 2022.

- *Vital Pharmaceuticals, Inc. v. Monster Energy Co.*, No. 19-cv-60809, No. 19-60809-CIV-ALTMAN/HUNT, U.S. District Court Southern District of Florida, Judgement entered August 23rd, 2021.

- *Vital Pharmaceuticals, Inc. v. Monster Energy Co.*, No. 19-cv-61974-CMA, U.S. District Court Southern District of Florida, Dismissed on August 1st, 2023.

iv

*Related Proceeding*

- *Vital Pharmaceuticals, Inc., v. Orange Bang, Inc. and Monster Energy Company,* No. 22-55722, U.S. Court of Appeals for the Ninth Circuit, Dismissed on October 15th, 2023.

- *Monster Energy Company v. John H. Owoc and Vital Pharmaceuticals, Inc.,* Nos. 23-55451, 24-244. U.S. Court of Appeals for the Ninth Circuit. Denied on August 11, 2025

- *3052 N Atlantic Blvd LLC v. John H. Owoc, Megan Owoc, and Monster Energy Company.* No. CACE24008153. Circuit Court of the Seventeenth Judicial Circuit for Broward County, Florida. Judgement entered on May 22nd, 2025.

- In re: VITAL PHARMACEUTICALS, INC., et al. No. 22-17842-PDR. U.S. Bankruptcy Court Southern District of Florida Fort Lauderdale Division. Ongoing.

- *John H. Owoc and Megan E. Owoc v. Blast Asset Acquisition, LLC.* No. 24-12784. U.S. Court of Appeals for the Eleventh Circuit. Ongoing

- *Monster Energy Company v. John H Owoc.* No. 0:24-cv-60357-KMW. U.S. District Court Southern District of Florida. Ongoing.

v

# TABLE OF CONTENTS

*Page*

QUESTIONS PRESENTED...................................i

PARTIES TO THE PROCEEDING......................iii

RELATED PROCEEDING..................................iv

TABLE OF CONTENTS...........................................vi

TABLE OF APPENDICES.......................................xii

TABLE OF AUTHORITIES....................................xiii

PETITION FOR WRIT OF CERTIORARI.................1

OPINIONS BELOW.....................................................1

JURISDICTION...........................................................1

CONSTITUTIONAL PROVISIONS
    INVOLVED...............................................2

STATEMENT OF THE CASE....................................2

REASONS FOR GRANTING THE PETITION.........5

    I.      Weather A Civil Jury May Determine The Scientific Validity, Biochemical Identity, Or Physiological Efficacy Of A Patented Compound, And Impose Nationwide Prohibitions On Its Labeling And Promotion, In The Absence Of Any

Regulatory Action By The Food And Drug Administration, Thereby Substituting Judicial Verdicts For Federal Scientific Oversight In Violation Of Due Process And The Separation Of Powers.......................5

    a. A Civil Jury May Not Substitute Itself for Federal Scientific Regulators by Determining the Biochemical Identity and Physiological Properties of a Patented Compound..........................5

    b. Allowing Juries to Resolve Scientific Identity and Regulatory Classification Violates Due Process.........................7

    c. The Verdict and Injunction Usurp Federal Regulatory Authority and Disrupt the Separation of Powers..............................................8

    d. This Question Is of Exceptional National Importance....................................10

II.    Whether The Court Violates Due Process By Excluding Critical, Reliable Defense Evidence That Goes To Falsity, Materiality, And Affirmative Defenses In A Lanham Act Action—Thereby Preventing A Defendant From Presenting A Complete Defense..............................................11

vii

*Table Of Contents*

*Page*

a.  The Exclusion of Consumer Survey
    Evidence Violated Established
    Precedent and Denied Owoc a Fair
    Trial...............................................11

b.  The Exclusion of Evidence Regarding
    Monster's Comparable Misconduct
    Violated Due Process and Undermined
    Equitable Defenses..........................17

c.  The Exclusion of Peer-Reviewed
    Scientific Evidence Denied Owoc Due
    Process and the Right to Present a
    Complete Defense............................25

d.  The Cumulative Effect of These
    Evidentiary Errors Were Harmful and
    Requires Vacatur of the Judgment and
    Injunction........................................31

III.  Whether The Court Violates Federal
      Antitrust Law And Due Process By
      Permitting Litigation To Proceed Where
      The Suit Is Objectively Baseless And
      Brought As A Competitive Weapon To
      Destroy A Rival, Thereby Stripping It Of
      Noerr-Pennington Immunity Under The
      Sham-Litigation Doctrine.....................33

      a.  Nature of the Error..........................33

viii

*Table Of Contents*

*Page*

b. The Controlling Legal Standard: Sham Litigation Doctrine..........................34

c. Application of the Doctrine to This Case.............................................35

d. The Trial Court's Failure to Apply the Proper Legal Framework Constitutes Reversible Error.............................36

e. The Litigation Violated Federal Antitrust Statutes...........................37

IV. May A Lay Jury Impose the Largest Civil Penalty in the History of The Lanham Act Based on Admitted Guesswork and Standardless Damages Determinations, in Violation of a Court Order Prohibiting Speculation, Without Violating Due Process, Where the Verdict Operates as Punishment and De Facto Regulatory Action Rather Than Compensation For Proven Harm.........................................38

a. Due Process Forbids Arbitrary and Standardless Deprivations of Property...................................38

*Table Of Contents*

*Page*

b.  The Jury Openly Disregarded the
    Court's Express Orders, Rendering
    the Verdict Arbitrary.................39

c.  A Civil Verdict That Functions as
    Punishment    and    De    Facto
    Regulation   Triggers   Heightened
    Due Process Scrutiny.................40

d.  Admitted   Jury   Guesswork   Is
    Incompatible with Due Process....41

e.  The    Lanham    Act    Does    Not
    Authorize Confiscatory, Speculative
    Awards   Untethered   to   Proven
    Harm.......................................42

f.  Evidentiary              Exclusions
    Compounded the Arbitrary Process
    ...............................................42

g.  Monster   Failed   to   Prove   the
    Required   Elements   of   False
    Advertising  Under  the  Lanham
    Act..........................................43

h.  This Case Presents an Important
    and    Recurring    Constitutional
    Question..................................45

x

*Table Of Contents*

*Page*

CONCLUSION.............................................46

xi

## TABLE OF APPENDICES

*Page*

APPENDIX A – UNITED STATES DISTRICT
   COURT'S ORDER GRANTING SEVERAL
   MOTIONS IN LIMINE, ENTERED
   AUGUST 2, 2022......................................2a

APPENDIX B – UNITED STATES DISTRICT
   COURT'S JURY INSTRUCTIONS, FILED
   SEPTEMBER 29,
   2022.........................................................89a

APPENDIX C – UNITED STATES DISTRICT
   COURT'S ORDER GRANTING PERMANENT
   INJUCTION, ENTERED APRIL 12,
   2023....................................................142a

APPENDIX D – UNITED STATES DISTRICT
   COURT'S FINAL JUDGMENT,
   ENTERED JANUARY 11, 2024..............197a

APPENDIX E – NINTH CIRCUIT ORDER
   DENYING PETITION FOR REHEARING
   AND REHEARING EN BANC, ENTERED
   AUGUST 11, 2025................................226a

# TABLE OF AUTHORITIES

*Page*

**Cases**

*Alexander v. Sandoval,*
532 U.S. 275 (2001)...........................................8

*BMW of N. Am., Inc. v. Gore,*
517 U.S. 559 (1996).....................................8, 39

*Bose Corp. v. Consumers Union of U.S., Inc.,*
466 U.S. 485 (1984)...................................18, 33

*Certified Nutraceuticals, Inc. v. Avicenna Nutraceutical, LLC,*
821 F.App'x 701 (9th Cir. 2020)...17, 22, 23, 26

*Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.,*
532 U.S. 424 (2001)...............................41, 46

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
509 U.S. 579 (1993).............................13, 17, 28

*E. & J. Gallo Winery v. Gallo Cattle Co.,*
967 F.2d 1280 (9th Cir. 1992).........................16

*eBay Inc. v. MercExchange, L.L.C.,*
547 U.S. 388 (2006)..........................................32

*Ellenburg v. Brockway, Inc.,*
763 F.2d 1091 (9th Cir. 1985) ........................23

xiii

*Cited Authorities*

Page

*Far Eastern Conference v. United States,*
    342 U.S. 570 (1952).....................................7

*FDA v. Brown & Williamson Tobacco Corp.,*
    529 U.S. 120 (2000)......................................6, 7

*Fenner v. Dependable Trucking Co.,*
    716 F.2d 598 (9th Cir. 1983) .........................45

*Fortune Dynamic, Inc. v. Victoria's Secret Stores*
    *Brand Mgmt.,*
    618 F.3d 1025 (9th Cir. 2010) .................12, 16

*Haddad v. Lockheed Cal. Corp.,*
    720 F.2d 1454 (9th Cir. 1983).......................31

*Harper v. City of Los Angeles,*
    533 F.3d 1010 (9th Cir. 2008) ......................32

*Hetzel v. Prince William Cnty.,*
    523 U.S. 208 (1998).................................42

*Honda Motor Co. v. Oberg,*
    512 U.S. 415  (1994)...................36, 39, 41, 46

*Imax Corp. v. Cinema Techs., Inc.,*
    152 F.3d 1161 (9th Cir. 1998) ......................45

*K&N Eng'g, Inc. v. Spectre Performance,*
    No. 5:09-cv-1900, 2011 WL 13131157 (C.D.
    Cal. May 12, 2011).........................................16

*Cited Authorities*

Page

*Lindy Pen Co. v. Bic Pen Corp.,*
    982 F.2d 1400 (9th Cir. 1993).....................42

*Obrey v. Johnson,*
    400 F.3d 691 (9th Cir. 2005) ...................31, 33

*Old Chief v. United States,*
    519 U.S. 172 (1997)............................18, 24, 25

*Pacific Gas & Elec. Co. v. Bear Stearns & Co.,*
    50 Cal. 3d 1118 (1990) ..............................45

*Pittsburgh Press Club v. United States,*
    579 F.2d 751 (3d Cir. 1978) .....................11, 17

*Pom Wonderful LLC v. Coca-Cola Co.,*
    573 U.S. 102 (2014).........................21, 24, 32

*Pom Wonderful LLC v. Organic Juice USA, Inc.,*
    166 F. Supp.3d 1085 (C.D. Cal. 2016)..........22

*Precision Instrument Mfg. Co. v. Automotive
    Maintenance Machinery Co.,*
    324 U.S. 806 (1945).............................17, 22, 25

*Republic Molding Corp. v. B.W. Photo Utilities,*
    319 F.2d 347 (9th Cir. 1963)..............18,24,25

*Ricci v. Chicago Mercantile Exchange,*
    409 U.S. 289 (1973)..................................7, 9

*Cited Authorities*

*Page*

SEC v. Chenery Corp.,
    318 U.S. 80 (1943) ..........................................32

Southland Sod Farms v. Stover Seed Co.,
    108 F.3d 1134 (9th Cir. 1997).........20, 43, 44

State Farm Mut. Auto. Ins. Co. v. Campbell,
    538 U.S. 408 (2003)........................39, 41, 46

Stonefire Grill, Inc. v. FGF Brands, Inc.,
    987 F. Supp. 2d 1023 (C.D. Cal. 2013)....12, 16

Synergistic Int'l, LLC v. Korman,
    470 F.3d 162 (4th Cir. 2006)......................42

United States v. Abel,
    469 U.S. 45 (1984) ....................................18, 24

United States v. Jimenez,
    525 F.3d 1248 (11th Cir. 2008)................31, 33

United States v. Pang,
    362 F.3d 1187 (9th Cir. 2004) .......................33

Verisign, Inc. v. XYZ.com LLC,
    848 F.3d 292 (4th Cir. 2017) .....................44

Weinberger v. Bentex Pharms., Inc.,
    412 U.S. 645 (1973)................................6, 7

xvi

*Cited Authorities*

*Page*

*Weinberger v. Romero-Barcelo,*
    456 U.S. 305 (1982) .........................................32

xvii

*Cited Authorities*

*Page*

**Statutes, Rules and Other Authorities**

15 U.S.C. §§ 1–2..................................................37

15 U.S.C. §§ 14, 18.............................................37

15 U.S.C. § 1117(a).............................................42

15 U.S.C. § 1125 ......................................2, 37, 43

21 U.S.C. § 321 ..................................................10

28 U.S.C. § 1254(1) .............................................1

Fed. R. Evid. 401 ............................................18, 24

78 Fed. R. Evid. 402 .............................................. 24

Fed. R. Evid. 403 .................................................. 25

*Konstantinos et al., Sugar Rush or Sugar Crash? 101 Neuroscience & Biobehavioral Reviews* 45 (2019)............................................................21

*Nelson et al., J. Int'l Soc'y Sports Nutrition* (2014); Fletcher et al., J. Am. Heart Ass'n (2017).....21

xviii

## PETITION FOR WRIT OF CERTIORARI

JOHN H. OWOC, respectfully petitions the Supreme Court for a writ of certiorari to review the judgment of the United States Court of Appeals for the Ninth Circuit.

### OPINIONS BELOW

The decision by the United States Court of Appeals for the Ninth Circuit denying John H. Owoc's direct appeal was entered on 08/11/2025. (App E)

### JURISDICTION

The decision by the United States Court of Appeals for the Ninth Circuit denying John H. Owoc's direct appeal was entered on 09/10/2025 and the Petition for rehearing on August 11, 2025. Mr. John H. Owoc invokes this Court's jurisdiction under 28 U.S.C. § 1254(1), having timely filed this petition for a writ of certiorari within ninety days of the United States Court of Appeals for the Ninth Circuit Order denying the rehearing.

This court had jurisdiction over Plaintiff-Appellant's statutory claim against Defendant-Appellee United States of America under the Lanham Act.[1]

---

[1] 28 U.S.C. §§ 1331

1

## CONSTITUTIONAL PROVISIONS INVOLVED

### United States Constitution
### Amendment I, V and XIV:

All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and the State wherein they reside. No law shall abridge the freedom of speech, nor shall any State make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny any person within its judication the equal protection of the laws.

## STATEMENT OF THE CASE FACTS

This Petition for a Writ of Certiorari arises from a jury verdict and ensuing judgment resulting from a prolonged campaign of litigation by Monster Energy Company ("Monster"), a manufacturer of "energy" beverages, against its competitor, Vital Pharmaceuticals, Inc., doing business as VPX Sports ("VPX"), also a manufacturer of "energy" beverages, and its founder and Chief Executive Officer, John H. Owoc (also known as "Jack Owoc"), in what became

2

an effort to suppress competition rather than resolve a legitimate commercial dispute.

In the proceedings, Monster Energy Company alleged that VPX and Owoc engaged in false and misleading advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a), and related state law, by marketing Bang Energy Drink as containing a novel compound referred to as "Super Creatine." (4-ER-611–615.) Monster contended that this representation deceived consumers into believing that Bang contained a physiologically effective form of creatine capable of enhancing muscular performance and mental focus—claims Monster asserted were scientifically unsubstantiated.

Owoc and VPX, by contrast, maintained that "Super Creatine" was a legally protected proprietary compound, distinct from creatine monohydrate, and that Monster's lawsuit was not grounded in scientific concern but was rather part of a pattern of anticompetitive litigation designed to suppress Bang's rapid growth and market success. Owoc further argued that Monster's claims lacked proof of actual consumer deception or materiality, both essential elements of a Lanham Act false-advertising claim.

Following a three-week jury trial, the district court permitted Monster to introduce limited survey evidence through its expert, Dr. Cowan, while excluding rebuttal evidence and consumer survey materials proffered by Owoc that tended to negate Monster's claims and support his affirmative defenses. After deliberation, the jury returned a

3

verdict in Monster's favor, finding—among other things—that Owoc and VPX had willfully engaged in false advertising and were jointly and severally liable under the Lanham Act. (2-ER-91–111.)

Relying on that verdict, the district court entered a final judgment ordering VPX and Owoc to pay **$271,924,174** in damages on Monster's Lanham Act claims. (2-ER-100–105.) The court also issued a permanent injunction prohibiting Owoc—and "all persons or entities acting in concert with him"—from "falsely advertising Bang or any other product containing the term 'creatine,'" and mandating the removal of the word "creatine" and "Super Creatine" from all Bang Energy product labels, packaging, marketing, and digital platforms. (Id.)

Owoc timely appealed, arguing that the verdict and injunction rest on legally insufficient evidence and were tainted by multiple evidentiary errors that substantially prejudiced the defense. Despite those errors and the absence of proof of deception, causation, or damages, the Court of Appeals affirmed. The present Petition therefore seeks this Court's review to address a recurring and nationally significant question under the Lanham Act and the Due Process Clause—whether a federal court may uphold a permanent injunction and multi-100-million-dollar damages award in the absence of competent evidence of deception or injury, and where cumulative evidentiary errors deprived the defendants of a fair trial.

Petitioner Owoc asks this Court to review the Ninth Circuit's decision affirming the district court's

4

rulings granting Monster's motions in limine, which excluded evidence central to the elements of Monster's Lanham Act claims and to Owoc's affirmative defenses. (4-ER-600–08.) Because those rulings, together with the court's failure to apply governing constitutional and antitrust standards, produced a judgment and injunction that violate due process and federal law, Petitioner seeks a writ of certiorari to review the judgment, vacate the injunctive relief and damages award, and grant such further relief as justice requires.

The Petitioner Owoc's Petition for panel rehearing and the petition for rehearing en banc are DENIED on 08/11/2025.

### REASON FOR GRANTING WRIT OF CERTIORARI

**I.   Weather A Civil Jury May Determine The Scientific Validity, Biochemical Identity, Or Physiological Efficacy Of A Patented Compound, And Impose Nationwide Prohibitions On Its Labeling And Promotion, In The Absence Of Any Regulatory Action By The Food And Drug Administration, Thereby Substituting Judicial Verdicts For Federal Scientific Oversight In Violation Of Due Process And The Separation Of Powers.**

**A. *A Civil Jury May Not Substitute Itself for Federal Scientific Regulators by Determining the Biochemical Identity and Physiological Properties of a Patented Compound***

5

This case presents a constitutional question: whether a lay jury may determine the scientific validity, biochemical identity, and physiological efficacy of a patented chemical compound—thereby imposing nationwide prohibitions on scientific claims—without any finding or regulatory action by the Food and Drug Administration ("FDA").

The jury was asked not merely whether advertising was misleading, but whether "Super Creatine," creatyl-L-leucine, and related compounds were "creatine," "derivatives," "precursors," or compounds that "provide the physical, mental, [or] health... benefits of creatine." Based on those determinations, the district court permanently barred Petitioners from making such claims and required corrective statements to the public and to retailers nationwide.

In doing so, the court and jury assumed the role of a federal scientific regulator. Congress assigned to the FDA the authority to determine chemical identity, safety, labeling standards, and permissible claims for food, dietary supplement, and beverage ingredients because such determinations require scientific expertise, uniform national standards, and administrative process—not ad hoc verdicts by lay juries. This Court has repeatedly held that scientific determinations regarding chemical identity, safety, and permissible labeling are committed by Congress to expert federal agencies, not lay juries. See *Weinberger v. Bentex Pharms., Inc.,* 412 U.S. 645, 652–53 (1973); *FDA v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 133–35 (2000).

6

This is not ordinary false-advertising adjudication. It is judicial substitution for federal scientific oversight.

Scientific determinations of chemical identity, safety, and permissible claims implicate complex biochemical and regulatory judgments entrusted by Congress to expert agencies, not to courts or juries. *Weinberger v. Bentex Pharms., Inc.*, 412 U.S. 645, 652–53 (1973); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133–35 (2000). As this Court has explained, when cases raise issues "not within the conventional experience of judges" or require the exercise of administrative discretion, they must be routed to the appropriate agency, while "the court stays its hand." *Far Eastern Conference v. United States*, 342 U.S. 570, 574–75 (1952).

### B. Allowing Juries to Resolve Scientific Identity and Regulatory Classification Violates Due Process

Due process requires judgments based on standards capable of principled application. Scientific determinations of molecular identity, biochemical function, and physiological efficacy are not governed by common-law reasonableness or consumer-perception tests; they depend on specialized methodology and agency expertise. *Ricci v. Chicago Mercantile Exchange,* 409 U. S. 289, 409 U. S. 304-306. Evaluation of conflicting reports as to the reputation of drugs among experts in the field is not a matter well left to a court without chemical or medical background." *Weinberger* 412 U. S. 654

7

Here, the jury was asked to determine whether a patented compound metabolizes into creatine, is chemically equivalent to creatine, and provides creatine-related benefits—questions of pharmacokinetics, biochemistry, and regulatory classification. Yet the verdict form supplied no scientific standard, no regulatory benchmark, and no deference to any FDA determination. The jury simply found liability and imposed damages and injunctive relief.

This Court has recognized that when civil liability becomes regulatory in function—imposing industry-wide rules, restricting categories of speech, and compelling corrective statements—constitutional scrutiny is required. A verdict that adjudicates scientific status and enforces that determination nationwide functions not as compensation, but as regulation. Courts may not "create" regulatory enforcement mechanisms Congress did not authorize. *Alexander v. Sandoval,* 532 U.S. 275, 291 (2001).

Such adjudication violates due process because it deprives regulated parties of the uniform standards, notice, and expert review federal law requires. Petitioners were subjected to a nationwide scientific ruling by a body neither trained nor authorized to make regulatory science determinations. *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 574 (1996)

### C. The Verdict and Injunction Usurp Federal Regulatory Authority and Disrupt the Separation of Powers

8

The injunction permanently prohibits Petitioners from stating that their product contains creatine, contains "Super Creatine," or provides creatine-related benefits, and requires removal of labeling and marketing nationwide. This is the type of regulatory mandate Congress assigned to the FDA.

> [I]n cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over. This is so even though the facts, after they have been appraised by specialized competence, serve as a premise for legal consequences to be judicially defined. Uniformity and consistency in the regulation of business entrusted to a particular agency are secured, and the limited functions of review by the judiciary are more rationally exercised, by preliminary resort for ascertaining and interpreting the circumstances underlying legal issues to agencies that are better equipped than courts by specialization, by insight gained through experience, and by more flexible procedure.

*Port of Boston Marine Terminal Assn. v. Rederiaktiebolaget Transatlantic,* 400 U. S. 62, 400 U. S. 68; *Ricci v. Chicago Mercantile Exchange,* supra, at 409 U. S. 304-306.

9

By permitting a jury to define what constitutes creatine, what qualifies as a derivative or precursor, and what benefits may be claimed, the court displaced federal administrative authority with a one-off judicial verdict. This undermines national uniformity and replaces expert oversight with jury-driven classification.

If allowed to stand, the decision authorizes competitors to bypass the FDA and obtain nationwide prohibitions on scientific claims through civil litigation, converting private lawsuits into de facto regulatory enforcement.

### D. This Question Is of Exceptional National Importance

Scientific innovation in food, supplements, pharmaceuticals, and biotechnology depends on predictable, expert-driven oversight. If juries may determine biochemical identity and physiological efficacy without FDA action, innovators face conflicting standards and punitive injunctions that substitute litigation for regulation. 21 U.S.C. § 321(s) (GRAS framework)

Congressional structure: GRAS determinations are scientific judgments governed by FDA standards, not jury findings.

This case squarely presents whether the Constitution permits that result. Super Creatine was lawfully marketed under a self-affirmed GRAS 21 U.S.C. § 321(s) determination reflecting a documented scientific conclusion of safety. The FDA

10

never challenged its regulatory status or labeling. Yet the verdict reclassified a federally lawful ingredient and imposed nationwide restrictions on Petitioners' labeling and speech absent any FDA determination. Allowing a jury to invalidate a lawful ingredient without regulatory action substitutes judicial verdicts for federal scientific oversight and violates due process and the separation of powers.

II.    **Whether The Court Violates Due Process By Excluding Critical, Reliable Defense Evidence That Goes To Falsity, Materiality, and Affirmative Defenses in a Lanham Act Action—Thereby Preventing a Defendant From Presenting a Complete Defense.**

*A. The Exclusion of Consumer Survey Evidence Violated Established Precedent and Denied Owoc a Fair Trial*

i.    *The Ninth Circuit's Affirmance Conflicts with Established Precedent on the Admissibility of Consumer Surveys*

The district court—and by extension the Ninth Circuit—misapplied the law by demanding that Petitioner Jack Owoc demonstrate "sufficient guarantees of trustworthiness" through proof of survey methodology and design before admitting the InfoScout consumer surveys. This standard mirrors

11

the *Third Circuit's* restrictive "circumstantial guarantees of trustworthiness" rule, articulated in *Pittsburgh Press Club v. United States*, 579 F.2d 751 (3d Cir. 1978), and expressly rejected by the Ninth Circuit.

In *Fortune Dynamic*, the Ninth Circuit made clear that criticisms about survey methodology, question phrasing, or sample population go to weight, not admissibility. The Court held that even flawed surveys must be admitted if they are relevant and conducted according to generally accepted principles. Here, the district court did not dispute relevance—it explicitly found that the InfoScout Surveys "tend to show what aspects of Bang are material to its purchasers." Yet, it excluded the same surveys on methodological grounds, applying a heightened "trustworthiness" test foreign to Ninth Circuit precedent.

### 1. *The InfoScout Surveys Met the Ninth Circuit's Established Criteria for Admissibility*

Under *K&N Engineering, Inc. v. Spectre Performance*, No. 5:09-cv-1900, 2011 WL 13131157 (C.D. Cal. May 12, 2011), and *Stonefire Grill, Inc. v. FGF Brands, Inc.*, 987 F. Supp. 2d 1023 (C.D. Cal. 2013), consumer surveys are admissible when they are (1) relevant, and (2) conducted according to accepted principles—including pre-litigation research conducted in the ordinary course of business.

The InfoScout Surveys satisfy **both** elements:

12

1. They were commissioned by Monster Energy Company, not in anticipation of litigation, but to understand *Bang* consumers' motivations and perceptions.
2. They were subsequently relied upon by both parties' experts, including Monster's own marketing experts.
3. They were conducted using accepted commercial survey methodologies, posing neutral questions such as "What is most important to you about VPX Bang?"

Thus, the surveys were not created for litigation, and their pre-litigation origin provided "the most persuasive basis" for reliability, consistent with *Daubert II*, 43 F.3d 1311, 1317 (9th Cir. 1995).

### 2. The District Court's Exclusion of the Surveys Was an Abuse of Discretion and Violated Rule 703

Federal Rule of Evidence 703 expressly allows experts to rely on materials—even those not independently admissible—if they are the kind of data experts in the field reasonably rely upon. The district court initially recognized this principle, holding the surveys "generally admissible" to test the bases of expert opinions. But it then expanded its exclusionary ruling, preventing the surveys from being used for any purpose, including cross-examination.

This categorical exclusion deprived Owoc of critical evidence corroborating consumer motivation and materiality—core issues in a Lanham Act false

13

advertising dispute. By excluding reliable pre-litigation consumer research relied upon by both parties' experts, the court denied Owoc a fair opportunity to present his case.

### 3. The Court's Trial Rulings Contradicted Its Own MIL Order and Prevented Cross-Examination of Experts

The district court's error was compounded when it reversed course on its prior ruling on Monster's Motion in Limine No. 1. In that earlier order, the court held that the InfoScout survey could be used to question expert witnesses about the basis of their opinions. (1-ER-22.) Yet at trial, the court refused to permit Owoc's counsel even to display survey slides while examining Dr. Chiagouris—the expert retained "to address the impact, if any, of the words *Super Creatine* or *Creatine* on cans of *Bang*." (1-ER-70 at 167:15–17, 22–23.) Monster objected, arguing that Owoc "can't establish that it's a reliable survey that meets the requirements of Rule 703," and that its probative value was outweighed by prejudice. (1-ER-75–76 at 235:24–236:11.)

Owoc's counsel reasonably relied on the court's earlier ruling allowing experts "to explain why and how they're relying upon [the survey]," which could not be done "without describing what the underlying evidence shows." (1-ER-77 at 237:1–7.) Counsel further explained that Monster's own commissioned research "was paid for, designed, overseen by Monster itself, and circulated internally in business decisions"—thus highly probative of consumer

14

perception and Monster's state of mind. (1-ER-77 at 237:11–16.) Nonetheless, the court categorically barred any reference to the survey: "He cannot ask about the InfoScout survey. So that's my ruling." (2-ER-163 at 5:12–13; see also 2-ER-163–166 at 5–8.)

### 4. The Court's Ruling Prejudiced Owoc's Entire Trial Presentation

On the final day of evidence, Owoc's counsel sought clarification, emphasizing that the ruling had fundamentally altered the defense's trial strategy:

> "As we were working the case and going through the lay witnesses, we understood Your Honor's ruling to mean that when we got to our experts, they would be allowed to explain to the jury the slide showing that Monster had a survey indicating only 3 percent of participants cared about Super Creatine. Your Honor's rulings did not allow us to do that."
> —(1-ER-56 at 99:11–17)

Counsel further explained that this misunderstanding was genuine and material: "We always believed sincerely that we would get that information in through those experts. We were surprised when we weren't allowed to do it." (1-ER-56–57 at 99:9–100:4.) Without the survey evidence, the jury never saw that "Monster's own non-litigation survey showed no materiality of Super Creatine"— evidence that would have undercut Monster's entire false advertising theory. (1-ER-59 at 102:18–21.)

15

### 5. *The Exclusion Also Prevented Owoc From Supporting His Affirmative Defense of Unclean Hands*

The same survey evidence would have allowed jurors to infer that Monster acted with unclean hands by developing its competing "Reign" energy drink to imitate *Bang*—while later suing Owoc on the claim that *Bang*'s labeling and ingredients were misleading. The InfoScout data, showing Monster's own internal understanding of what motivated *Bang* consumers, would have established that Monster knowingly copied the very attributes it now derides as false. By barring this evidence, the district court prevented Owoc from substantiating his unclean-hands defense to the false advertising claim.

### 6. *The Ninth Circuit's Affirmance Creates an Inter-Circuit Conflict Warranting Certiorari*

By affirming this exclusion, the Ninth Circuit failed to apply its own precedents holding that consumer survey criticisms go to weight, not admissibility. See *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt.*, 618 F.3d 1025, 1037 (9th Cir. 2010) *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1292–93 (9th Cir. 1992); *Stonefire Grill, Inc. v. FGF Brands, Inc.*, 987 F. Supp. 2d 1023, 1038 (C.D. Cal. 2013). Other Ninth Circuit cases confirm that pre-litigation research satisfies the reliability threshold. *K&N Eng'g, Inc. v. Spectre Performance*, No. 5:09-cv-1900, 2011 WL 13131157, at *14 (C.D. Cal. May 12, 2011).

16

The Ninth Circuit's affirmance effectively applied the *Third Circuit's* far stricter "circumstantial guarantees of trustworthiness" standard from *Pittsburgh Press Club v. United States*, 579 F.2d 751, 757–58 (3d Cir. 1978)—in direct conflict with Ninth Circuit law. This inter-circuit conflict on the admissibility standard for consumer surveys alone warrants *certiorari* review to ensure uniform application of Federal Rule 703 and *Daubert* framework.

### B. The Exclusion of Evidence Regarding Monster's Comparable Misconduct Violated Due Process and Undermined Equitable Defenses

#### 8. The District Court Excluded Critical Evidence of Monster's Own Misleading Advertising

This case presents a recurring and nationally significant question: whether a court may exclude evidence of a plaintiff's own misleading advertising and unfair competition in a Lanham Act action when that evidence directly supports the defendant's affirmative defenses and negates elements of the plaintiff's claim.

The Ninth Circuit's approach in this case conflicts with its own precedent (*Certified Nutraceuticals, Pom Wonderful, Republic Molding*) and with this Court's equitable principles articulated in *Precision Instrument* and *Bose Corp.* The ruling permits a litigant engaged in the same misconduct it condemns to invoke federal equitable remedies—contrary to the

foundational rule that equity "will not aid a wrongdoer." *See Republic Molding Corp. v. B.W. Photo Utilities*, 319 F.2d 347, 349–50 (9th Cir. 1963).

Here, the district court excluded critical evidence relating to Monster's own advertising claims regarding the purported health and performance benefits of its "Rehab" and "Reign" beverages—claims such as that its "Rehab drink can bring consumers 'back from the dead' after drinking it," and that its "Reign total body fuel" provided energy benefits despite containing "virtually no calories." (5-ER-911–13). These statements were directly relevant to rebutting Monster's allegations that Owoc's representations regarding Bang energy drinks were false or misleading. Yet, the district court held that "evidence about existing products is irrelevant to Monster's claims or Defendants' affirmative defenses" (1-ER-25–27).

Because the district court's evidentiary rulings distorted application of the Lanham Act, undermined the unclean hands doctrine, and improperly narrowed relevance in violation of Federal Rules of Evidence 401, the exclusive "substantially affected the rights of the parties" and constitutes reversible error. *See Old Chief v. United States*, 519 U.S. 172, 182–83 (1997); *United States v. Abel*, 469 U.S. 45, 51 (1984).

This Court's review is warranted to restore doctrinal uniformity, protect the right to present a complete defense, and reaffirm the principle that "one who seeks equity must do equity." *Precision Instrument*, 324 U.S. at 814.

18

### 9. The District Court's Exclusion of Evidence from the Florida Lawsuits Was Reversible Error

The district court committed reversible error by granting Monster Energy Company's Motion in Limine No. 5 ("MIL 5") to exclude evidence arising from two prior lawsuits between the same parties in the Southern District of Florida—*Vital Pharmaceuticals, Inc. v. Monster Energy Co.*, No. 19-cv-60809, and *Vital Pharmaceuticals, Inc. v. Monster Energy Co.*, No. 19-cv-61974\* (collectively, the "Florida Lawsuits"). See 1-ER-28–30; 4-ER-580–88; 3-ER-319–24.

Those cases involved overlapping factual and legal issues, including allegations that Monster: (1) developed its "Reign" beverage as a "copycat" of Bang Energy; (2) knew its own energy drinks caused adverse health effects; (3) had a longstanding pattern of filing predatory lawsuits to suppress market competition; (4) conducted coordinated "smear campaigns" against VPX (Bang's manufacturer) and Jack Owoc personally. 4-ER-582; 5-ER-827–905.

Evidence from these proceedings—including deposition transcripts, exhibits (e.g., P-0181, P-0185, P-0241), internal Monster documents (MONSTVPX0513584; MONSTVPX0513604; MONSTVPX0012405; MONSTVPX0108997), and VPX's verified complaints—directly contradicted Monster's allegations in this case that Owoc's statements about Bang were false or misleading. See 5-ER-814–21 (VPX Suppl. Resp. 20).

19

### 10. The Excluded Florida Evidence Was Highly Probative on Elements of Monster's Lanham Act Claim

Monster's Lanham Act claim required proof that Owoc made false or misleading statements of fact about Bang's ingredients and health benefits, that such statements deceived consumers, were material, and caused damage. *See Southland Sod Farms v. Stover Seed Co.,* 108 F.3d 1134, 1139 (9th Cir. 1997).

The excluded Florida Lawsuit evidence was highly probative on these elements. Monster's own internal communications admitted that Reign was "intended to compete with Bang" as a "healthier high-performance energy drink" with "0 sugar, 0 calories, 0 carbs, natural caffeine," and identified Bang's "Creatine, Glutamine, BCAAs, [and] CoQ10" as its distinguishing ingredients. 3-ER-490, 501–02, 519. (Monster also copied Bang's label featuring BCAAs and CoQ10 callouts on the rime of the can.) These admissions show Monster knew Bang's representations were substantially true and that creatine content was immaterial to consumer purchasing decisions—undermining the falsity and materiality elements of Monster's claim.

Moreover, VPX's Florida unfair-competition complaint alleged that Monster's own products were linked to "grievous, adverse health effects," citing FDA data and GAO data reporting 102 adverse health events—including 18 deaths and 15 heart attacks—related to Monster's deadly energy drinks. 5-ER-843–44 ¶¶ 50–51 (citing FDA CFSAN Reports; *see also* Konstantinos et al., *Sugar Rush or Sugar Crash?* 101

20

*Neuroscience & Biobehavioral Reviews* 45 (2019); Nelson et al., *J. Int'l Soc'y Sports Nutrition* (2014); Fletcher et al., *J. Am. Heart Ass'n* (2017)). This evidence directly contradicted Monster's assertion that Owoc's representations about the comparative safety of Bang having no reported deaths or heart attacks, were deceptive.

The Florida record also demonstrated that Monster habitually engaged in anti-competitive litigation and public "smear campaigns," including the "Truth About Bang" website, influencer promotions, and coordinated distributor threats—all designed to damage VPX's reputation and market share. 5-ER-836 ¶ 22; 5-ER-847 ¶ 63; 5-ER-849–50 ¶¶ 70–74 (citing *Law360* (Sept. 15, 2014); *Energy Drinks Lawsuit* (Mar. 23, 2016); *Law-Inspiring* (Aug. 6, 2018); *TechDirt* (Sept. 25, 2018)).

Owoc sought to admit these public filings, exhibits, and discovery responses (3-ER-321, 415, 518–23; 5-ER-827–905) to demonstrate (a) Monster's knowledge of Bang's composition; (b) that Monster suffered no cognizable injury; and (c) that Monster filed this case in bad faith as part of a pattern of competitor suppression. *See Pom Wonderful LLC v. Coca-Cola Co.,* 573 U.S. 102, 114 (2014)

### 11. The Ruling Undermines the Equitable Defense of Unclean Hands in Contradiction of Supreme Court and Ninth Circuit Precedent

The unclean hands doctrine, grounded in the equitable maxim that "he who comes into equity must

21

come with clean hands," bars relief to a party engaged in inequitable conduct relating to the subject matter of its claim. *See Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 814 (1945); *Chicago Title Ins. Co. v. Ferraro*, 876 F.2d 896, 900 (9th Cir. 1989).

A valid unclean hands defense exists when: (1) the plaintiff's conduct is inequitable, and (2) the conduct relates directly to the subject matter of the claim. *Pom Wonderful LLC v. Organic Juice USA, Inc.*, 166 F. Supp. 3d 1085, 1092 (C.D. Cal. 2016). Proof of "wrongfulness, willfulness, bad faith, or gross negligence" satisfies the inequity element when shown by clear and convincing evidence. *Pfizer, Inc. v. Int'l Rectifier Corp.*, 685 F.2d 357, 359 (9th Cir. 1982).

The district court acknowledged that "Defendants allege that Monster's hands are dirty because it has engaged in the same kind of activity of which Defendants have been accused" (1-ER-26). Yet, it erroneously deemed such conduct irrelevant. This conclusion conflicts with *Certified Nutraceuticals, Inc. v. Avicenna Nutraceutical, LLC*, 821 F. App'x 701, 703 (9th Cir. 2020), where the Ninth Circuit upheld summary judgment on an unclean hands defense when the plaintiff had "engaged in the same improper conduct for which it faults the defendant—namely, publishing false statements about a product being patented before the patent had issued."

Like the plaintiff in *Certified Nutraceuticals*, Monster's alleged misrepresentations about its products' ingredients and benefits mirror the very claims it leveled against Owoc. Thus, excluding

22

evidence of Monster's own misleading advertising prevented Owoc from establishing that Monster "dirtied its hands in acquiring the right it now asserts" or that "the manner of dirtying renders inequitable the assertion of such rights." *Ellenburg v. Brockway, Inc.*, 763 F.2d 1091, 1097 (9th Cir. 1985).

### 12. The Excluded Evidence Was Also Central to Owoc's Affirmative Defenses

The district court also erred in holding that evidence of Monster's other lawsuits was "irrelevant" to Owoc's defenses of unclean hands, waiver, and estoppel. 1-ER-30. The court itself acknowledged that "Monster's motive for filing lawsuits may be relevant to Defendants' affirmative defenses if the litigation history showed that Monster knew of Defendants' alleged misconduct earlier or unreasonably delayed." *Id.* (emphasis added). Yet, without citing any record evidence or making factual findings, the court concluded "this is not the case here." *Id.* That conclusion was both unsupported and erroneous.

The record shows that Monster had long known of Bang's marketing claims yet delayed filing suit until its own copycat "Reign" energy drink could enter the market. *See* 2-ER-229–30 at 123:12–124:7. This supports the knowledge and delay elements of waiver and estoppel, and the inequitable-conduct nexus necessary for unclean hands. *See Certified Nutraceuticals, Inc. v. Avicenna Nutraceutical, LLC*, No. 17-cv-1354, 2018 WL 3618243, at *5 (S.D. Cal. July 27, 2018)*

23

Similarly, Monster's pattern of anti-competitive suits demonstrated it was "less than equitable in asserting its rights" under the Lanham Act, satisfying the close nexus test articulated in *Republic Molding Corp. v. B.W. Photo Utilities,* 319 F.2d 347, 349–50 (9th Cir. 1963). The district court's refusal to consider this pattern deprived Owoc of the opportunity to prove these defenses fully.

### 13.  The District Court's Ruling Conflicts with Federal Precedent Governing Relevance and Equitable Defenses

The district court held that all categories of prior-lawsuit evidence were "irrelevant" to both Monster's claims and Owoc's defenses. 1-ER-28–30. That ruling misapplied Federal Rules of Evidence 401 and 402, which permit evidence having *any tendency* to make a fact "more or less probable."

This Court has long held that exclusion of relevant context that bears on falsity, intent, or damages is reversible error. *See Old Chief v. United States,* 519 U.S. 172, 182–83 (1997); *United States v. Abel,* 469 U.S. 45, 51 (1984). By stripping the jury of context regarding Monster's own advertising, product development, and litigation practices, the district court deprived Owoc of the ability to present a complete defense under *Pom Wonderful* and the equitable doctrine of unclean hands.

Under *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.,* 324 U.S. 806, 814 (1945), a litigant who engaged in similar

24

misconduct may not obtain equitable relief. Likewise, the Ninth Circuit in *Certified Nutraceuticals, Inc. v. Avicenna Nutraceutical, LLC*, 821 F. App'x 701, 703 (9th Cir. 2020), upheld dismissal where the plaintiff "engaged in the same improper conduct for which it faults the defendant." The district court's contrary exclusion of Monster's comparable misconduct directly conflicts with *Certified Nutraceuticals* and *Republic Molding Corp. v. B.W. Photo Utilities*, 319 F.2d 347, 349–50 (9th Cir. 1963), which forbid a "wrongdoer" from invoking equity.

### *14. The District Court Misapplied Rule 403 and Failed to Conduct the Required Balancing Analysis*

The district court further erred by declaring the litigation-pattern evidence "unfairly prejudicial" without any supporting authority, analysis, or factual findings. 1-ER-30. Under *Fed. R. Evid.* 403, relevant evidence may be excluded only if its probative value is *substantially outweighed* by the danger of unfair prejudice. The court's conclusory ruling lacked the mandatory balancing and contravened the Supreme Court's instruction that exclusion under Rule 403 must be narrowly applied. *See Old Chief v. United States*, 519 U.S. 172, 182–83 (1997).

### *C. The Exclusion of Peer-Reviewed Scientific Evidence Denied Owoc Due Process and the Right to Present a Complete Defense*

25

### 15. The District Court's Exclusion of Scientific Evidence Presents a Recurring Question of National Importance

This case presents an issue of exceptional importance warranting this Court's review: whether a federal court may exclude peer-reviewed scientific evidence that directly rebuts a plaintiff's false-advertising claim—thereby permitting a jury to be misled into believing that no scientific support exists for a challenged product claim. The District Court's exclusion of the Rodent Study and restriction on the testimony of Megan Owoc deprived Defendants of a fair trial under the Lanham Act and violated foundational principles of evidentiary fairness.

### 16. The Scientific Record Confirms That Super Creatine Is Real and Functionally Distinct from Ordinary Creatine

Super Creatine, chemically known as creatyl-L-leucine, is a patented covalently bonded amino acid di-peptide synthesized to enhance the solubility and stability of creatine in aqueous solutions. Peer-reviewed biochemical studies—including the Parang Plasma Study and The Peking Biotech Medical School Rodent Study—confirm that ingestion of Super Creatine leads to detectable increases in serum creatine levels, demonstrating its capacity to function as a creatine donor. The study's methodology, conducted in accordance with accepted pharmacokinetic protocols, revealed measurable creatine conversion in vivo, thereby confirming that

26

the compound's metabolic mechanism is real and
scientifically valid.

This evidence undermines Monster's core
contention that "Super Creatine does not exist" or
that "no studies demonstrate its function." Those
assertions are demonstrably false and formed the
foundation of Monster's false-advertising claim under
the Lanham Act. The trial court's exclusion of the very
scientific data proving the falsity of Monster's
position deprived the jury of essential information
required for a just verdict.

### 17. The Exclusion of the Rodent Study Violated the Principles of Fair Trial and Due Process

By excluding peer-reviewed scientific evidence
while permitting Monster to assert that "no studies
exist," the District Court violated the Due Process
Clause and the fundamental right to present a
complete defense. The Supreme Court has long
recognized that "the right to offer the testimony of
witnesses, and to compel their attendance, if
necessary, is in plain terms the right to present a
defense." *Washington v. Texas,* 388 U.S. 14, 19 (1967).
This principle extends equally to the introduction of
competent scientific evidence when such evidence is
central to a party's case.

Here, the excluded study was not speculative,
unverified, or unreliable. It was a peer-reviewed
scientific publication authored by a qualified research
team, consistent with Federal Rule of Evidence 702

27

and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).

### 18. The District Court Excluded the Rodent Study Despite Monster's "Opening the Door" to Its Admission

The record shows the trial was fatally compromised. The core false advertising claim—whether "Super Creatine" was real or biologically active—was adjudicated without the jury ever seeing the scientific evidence that disproved Monster's theory. The most exculpatory study, conducted by Peking University's Biotech Medical School, demonstrated a sustained rise in creatine levels in rodent plasma over 24 hours. Tested 12 times with undeniable biological results.

Injustice deepened with the exclusion or discounting of two additional studies:

1.    Dr. Shahab Parang's pharmacokinetic analysis showing measurable 7-day half-life of creatine in human plasma after Super Creatine ingestion;

2.    Monster's own rigged study which—despite using 67% more molar creatine monohydrate compared to Super Creatine—still found increased creatine levels in human test subjects who consumed Super Creatine. **All three studies demonstrated increased creatine levels with Super Creatine.**

Despite this undisputed scientific record, the District Court excluded the study and restricted defense witnesses from explaining its findings—even

28

after Monster's counsel "opened the door" to the issue during cross-examination.

During trial, the court ruled that if testimony opened the door to such studies, they would be admitted. That moment came during the cross-examination of Megan Owoc, when Monster's counsel asked:

> To this day, Mrs. Owoc you don't know whether any studies have been done on Super Creatine, correct?
>
> Ms. Owoc answered: Yes, there are studies. (Id. At 160:19.)
>
> During the ensuing sidebar, Vital's counsel argued—correctly—that Monster's question had "opened the door" to evidence of the Rodent Study.
>
> MR. JANSSEN: So if she knows about the Peking rat study, then the door has been opened, correct?
>
> THE COURT: I guess, depending on the answer.(Id. At 161:15-17.)

Despite the Court's comment, and despite Ms. Owoc fully answering the question, the Court refused Vital's request to allow her to explain the Rodent Study after Monster's counsel abruptly withdrew the question. (Id. at 162:4–11.) This left the jury with the misimpression that no Super Creatine studies existed, when in fact Ms. Owoc truthfully testified

29

that there are. Jurors never heard the critical details
of the Rodent Study, which were stricken without
justification. Monster's door-opening questions
created a false narrative that the defense could not
correct.

The District Court had already ruled that
evidence of the Rodent Study would be admissible if
the topic was raised. Once counsel asked and Ms.
Owoc answered, the door was open under established
Ninth Circuit precedent. Her answer was factually
correct, legally relevant, and directly responsive. By
nullifying that sworn testimony and suppressing
exculpatory evidence, the Court committed not
merely an abuse of discretion but an act of judicial
fabrication that gutted the foundation of the defense.

### 19. The Exclusion Violated the "Opening
### the Door" Doctrine and Principles of
### Fair Trial

The Ninth Circuit's refusal to correct the trial
court's error conflicts with longstanding precedent
governing the doctrine of curative admissibility (or
"opening the door" doctrine). Under that rule, when
one party introduces misleading evidence or
testimony, the opposing party must be allowed to
rebut the false impression—even with evidence that
might otherwise be inadmissible. *Microsoft Corp. v.
Motorola, Inc.*, 795 F.3d 1024, n.23 (9th Cir. 2015);
*United States v. Croft*, 124 F.3d 1109, 1120 (9th Cir.
1997).

Here, Monster's counsel affirmatively created a
misleading record by eliciting ,testimony that "no

30

studies exist," thereby opening the door to rebuttal evidence. Once opened, the trial court had no discretion to prevent Defendants from correcting that false impression through introduction of the Rodent Study or through Ms. Owoc's clarification of her testimony. The refusal to permit this rebuttal denied Defendants the opportunity to confront and correct a key misrepresentation before the jury, undermining the fairness of the proceeding and distorting the fact-finding process.

### D.   The Cumulative Effect of These Evidentiary Errors Were Harmful and Requires Vacatur of the Judgment and Injunction

Under *Fed. R. Evid.* 103(a) and well-established appellate precedent, evidentiary errors require reversal if they "more probably than not affected the verdict." *Obrey v. Johnson*, 400 F.3d 691, 701 (9th Cir. 2005) (quoting *Haddad v. Lockheed Cal. Corp.*, 720 F.2d 1454, 1459 (9th Cir. 1983)). When excluded evidence goes to the "heart of a party's case," prejudice is presumed. *United States v. Jimenez*, 525 F.3d 1248, 1251 (11th Cir. 2008).

**That standard is met here.** The court excluded five categories of central defense evidence: Monster's pre-litigation surveys, its anti-competitive litigation and "Smear Campaign," comparable misconduct supporting unclean hands, Florida Lawsuit evidence of knowledge and motive, and peer-reviewed scientific proof refuting Monster's theory of falsity. These rulings removed the defense's core proof of falsity, materiality, intent, and affirmative defenses, leaving

31

the jury with a distorted record. *Washington v. Texas,* 388 U.S. 14, 19 (1967).

By removing this evidence from the jury's consideration, the court prevented Owoc from establishing that Monster's claims were pretextual, motivated by anti-competitive purpose, and unsupported by material deception or damages— elements essential to Lanham Act liability. *See Pom Wonderful LLC v. Coca-Cola Co.,* 573 U.S. 102, 109– 10 (2014) (requiring proof that challenged representations are both false and materially misleading to consumers).

Because the judgment and permanent injunction rest on a verdict tainted by these errors, it cannot stand. *See eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388, 391 (2006); *Harper v. City of Los Angeles,* 533 F.3d 1010, 1022 (9th Cir. 2008). This Court has long held that a judgement founded on a record infected by legal error cannot stand and must be vacated. *See SEC v. Chenery Corp.,* 318 U.S. 80, 94 (1943) ("A judgment founded on a record infected by legal error cannot stand."); *Weinberger v. Romero-Barcelo,* 456 U.S. 305, 312 (1982) (equitable remedies must rest on a sound factual basis and proper application of law).

The errors were not harmless. The excluded evidence went to the heart of the case – truthfulness, materiality, damages, and motive – therefore "raises a presumption of prejudice." United States v. *Jimenez,* 525 F.3d at 1251; *Obrey v. Johnson,* 400 F.3d 691, 701 (9th Cir. 2005); *United States v. Pang,* 362 F.3d 1187, 1192 (9th Cir. 2004). This denial of a full

32

and fair trial contravenes fundamental principles of
due process and evidentiary fairness recognized by
this Court in *Bose Corp. v. Consumers Union of U.S.,
Inc.*, 466 U.S. 485, 511–12 (1984), which holds that
truth-related evidence in commercial-speech cases
must be fully evaluated by the trier of fact.

III.    **Whether The Court Violates Federal
Antitrust Law and Due Process By
Permitting Litigation to Proceed
Where the Suit is Objectively Baseless
and Brought as a Competitive Weapon
to Destroy a Rival, Thereby Stripping
it of Noerr-Pennington Immunity
Under The Sham-Litigation Doctrine.**

The trial court committed reversible error by
allowing sham litigation to proceed to judgment. The
record demonstrates that Monster's lawsuit was not a
good-faith effort to seek redress under the Lanham
Act, but a strategic legal weapon intended to destroy
and eliminate competition in violation of federal
antitrust law.

### A. Nature of the Error

Owoc started by sleeping on an air mattress in his
store while teaching science in the public school
system. He built Bang into the world's third most
successful selling energy drink - a multi-billion-dollar
enterprise employing over 2,000, providing above-
average salaries, and supporting over 1,000 social
media    influencer    contracts,    and    delivering
innovative, health-promoting products to millions of

33

consumers. Monster Energy—the second-largest
energy drink—initiated litigation against Owoc and
Bang not because it sought a legitimate judicial
determination under the Lanham Act, but because it
"could not compete fairly in the marketplace by
creating a better product."

The lawsuit weaponized the legal system to crush
a competitor and absorb its market share through
predatory litigation and market exclusion, not to
obtain a verdict based on truthful advertising
concerns. The trial court's failure to apply the "sham
litigation" doctrine established by the United States
Supreme Court in Professional Real Estate Investors,
Inc. v. Columbia Pictures Industries, Inc., 508 U.S. 49
(1993), constitutes a fundamental misapplication of
law and reversible error.

### B. The Controlling Legal Standard:
### Sham Litigation Doctrine

In *Professional Real Estate Investors vs
Columbia Pictures*, 508 U.S. 49 (1993), the Supreme
Court held that litigation used for competitive
sabotage is not protected under the First
Amendment and constitutes an antitrust violation.
The Court established a two-part test for "sham"
litigation:

> 1. The lawsuit must be objectively baseless—
>    no reasonable litigant could realistically
>    expect success on the merits;
> 2. It must conceal an attempt to interfere
>    directly with a competitor's business

34

relationships through the process itself, rather than its outcome.

When both prongs are met, the suit is deemed a **sham**, losing *Noerr-Pennington* immunity and exposing the filer to liability under the Sherman and Clayton Acts. Here, both prongs are satisfied.

### C. Application of the Doctrine to This Case

#### i. Objective Baselessness

Monster's claims lacked merit from inception. It alleged Bang's "Super Creatine" advertising was false or misleading. However, scientific studies demonstrated that Super Creatine metabolizes into creatine derivatives, rendering the claim plausibly true and supported by credible evidence. No reasonable litigant could have expected to prevail when the contested scientific claims were substantiated by scientific studies.

#### ii. Subjective Intent to Interfere with Competition

Monster's intent was not to obtain a judicial remedy, but to cripple a rival. Record evidence— including statements admitting Monster "could not compete fairly in the marketplace by creating a better product"—shows its real objective was to destroy Bang through costly and protracted litigation.

Such conduct satisfies *Professional Real Estate Investors vs Columbia Pictures*, 508 U.S: litigation

35

designed to hinder a competitor's ability to compete, rather than to vindicate a legal right, is a sham.

### D. The Trial Court's Failure to Apply the Proper Legal Framework Constitutes Reversible Error

A reversible error occurs when a trial court applies the wrong legal standard which affects the outcome of the case. See *King v. Rubenstein,* 825 F.3d 206, 214 (4th Cir. 2016); Ashcroft v. Iqbal, 556 U.S. 662 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007).

Here, the trial court:

Mischaracterized the case as Lanham Act false advertising, rather than recognizing it as predatory conduct with antitrust implications;

Ignored controlling Supreme Court precedent—*Professional Real Estate Investors*, supra—mandating analysis under the sham litigation doctrine; and

Failed to evaluate Monster's anti-competitive intent, allowing an unlawful monopolization under the guise of civil litigation.

Because this error directly produced the judgment against Bang and Owoc, reversal is required.

### E. The Litigation Violated Federal Antitrust Statutes

36

### 1. *The Sherman Antitrust Act (15 U.S.C. §§ 1–2)*

Section 1 prohibits conspiracies that restrain trade. Monster's coordination with distributors, co-packers, and retailers to suppress Bang's market access constitutes an unreasonable restraint of trade.

Section 2 prohibits monopolization or attempted monopolization through anti-competitive conduct. Monster's conduct—using litigation to "destroy" Bang instead of competing on innovation—meets that definition. *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985) – exclusionary refusals to deal violate § 2.

### 2. The Clayton Act (15 U.S.C. §§ 14, 18)

Section 3 forbids exclusive-dealing arrangements that substantially lessen competition. Monster's contracts and distributor incentives effectively foreclosed Bang's market opportunities.

Section 7 prohibits acquisitions tending to create a monopoly. Monster's eventual acquisition of Bang—after driving it into bankruptcy through sham litigation—constitutes an anticompetitive acquisition.

### 3. *The Lanham Act (15 U.S.C. § 1125(a))*

Even under the Lanham Act, Monster's false-advertising allegations were a pretext for anti-

competitive suppression and constitutes bad-faith litigation, unprotected by federal law.

### IV. May A Lay Jury Impose the Largest Civil Penalty in the History of The Lanham Act Based on Admitted Guesswork and Standardless Damages Determinations, In Violation of a Court Order Prohibiting Speculation, Without Violating Due Process, Where the Verdict Operates as Punishment and De Facto Regulatory Action Rather Than Compensation For Proven Harm.

### A. Due Process Forbids Arbitrary and Standardless Deprivations of Property

The Due Process Clause "bars arbitrary deprivations of property." *BMW of N. Am., Inc. v. Gore,* 517 U.S. 559, 574 (1996), especially where a civil judgment operates not as compensation for proven harm, but as punishment or economic annihilation. Id. at 568; *Honda Motor Co. v. Oberg,* 512 U.S. 415, 420–21 (1994).

The judgment imposed the largest monetary award in the history of the Lanham Act—**$271,924,174**—without any administrable standards guiding the jury's damages determination. The jurors themselves admitted that they did not apply any legal, economic, or evidentiary framework, but instead selected Monster Energy's damages number because it was "not zero" and "felt right." Such an unguided and intuitive approach to damages is constitutionally intolerable.

38

The Supreme Court has repeatedly held that "the absence of standards guiding the jury's discretion" in imposing severe civil sanctions violates due process. Honda, 512 U.S. at 432; *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 417 (2003).

### B. The Jury Openly Disregarded the Court's Express Orders, Rendering the Verdict Arbitrary

The constitutional defect is even more stark here because the jury did not merely lack standards—it defied them. The court expressly instructed: **"Your award must be based upon evidence and not upon speculation, guesswork, or conjecture."** (Jury Instruction No. 35.) (App. B, p. 117a)

Yet jurors later admitted that they did exactly what the court forbade. As reported by Law360, Monster's trial counsel Moez M. Kaba stated that jurors told him they were "given a number from [Monster] and basically given a zero from the other side," and that "zero was not a fair place for the jury to go." One juror explained: *"I got a zero on one hand, and your number, and it obviously isn't zero, so we went with your number."*

That is not an evidentiary determination. It is numerical instinct—rejecting zero because it "felt wrong" and adopting the opposing figure because it was non-zero. In other words, the jury **openly disregarded a direct court order** and imposed damages based on the very "speculation, guesswork, or conjecture" the Court prohibited.

39

### C. *A Civil Verdict That Functions as Punishment and De Facto Regulation Triggers Heightened Due Process Scrutiny*

Many verdicts cause harm. This one caused extinction. Although denominated "damages," the verdict here functioned as punishment and regulatory action, not compensation. The consequences were immediate and catastrophic.

Vital Pharmaceuticals was forced into bankruptcy; Founder and CEO Jack Owoc was removed from control; Company assets were sold at pennies on the dollar to the very competitor that obtained the verdict. Mr. Owoc received no proceeds, despite an independent valuation conducted in bankruptcy by Kroll, independently valued the company's worth between $3.2 and $3.7 billion. Mr. Owoc lost his company, his livelihood, emerged burdened with more than $270 million in personal liability, and even lost his family home displacing his 6 young children and wife. This was not compensation for proven harm, but economic annihilation and market reallocation through civil judgment.

Monster itself publicly acknowledged that the verdict was "a devastating blow" that precipitated VPX's bankruptcy and acquisition. The judgment thus reallocated market power and extinguished a competitor, outcomes traditionally reserved for regulatory or antitrust enforcement, not jury speculation in a civil trademark case.

The Supreme Court has emphasized that when civil sanctions serve punitive or deterrent purposes,

40

they must satisfy substantive due process constraints. Gore, 517 U.S. at 568; *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 433–34 (2001). A verdict that destroys a business and confiscates all property interests is "quasi-criminal" in effect and must be supported by clear standards and meaningful judicial review. Honda, 512 U.S. at 432.

### D. *Admitted Jury Guesswork Is Incompatible with Due Process*

The arbitrariness of the award is confirmed by the jurors' own admissions. Reported by Law360, jurors stated that they were "given a number from [Monster] and ... basically given a zero from the other side," and that once liability was found, "zero was not a fair place for the jury to go." One juror explained: "I got a zero on one hand, and your number, and it obviously isn't zero, so we went with your number." Thus, the jury did not apply any legal standard, economic method, or evidentiary framework; it rejected zero because it "felt wrong" and adopted the opposing party's figure because it was non-zero. Such admitted guesswork is incompatible with due process.

The Supreme Court has squarely rejected such reasoning. Due process requires that damages—particularly massive awards—be grounded in "reasonable standards" and "fair notice" of the severity of the penalty. *State Farm*, 538 U.S. at 416–17; *Gore*, 517 U.S. at 574.

A verdict based on the rejection of zero because it "felt wrong" and the adoption of a plaintiff's number

41

because it was non-zero fails every constitutional safeguard: no proportionality, no evidentiary anchor, no guiding principle, and no meaningful constraint on juror discretion.

### E. The Lanham Act Does Not Authorize Confiscatory, Speculative Awards Untethered to Proven Harm

The Lanham Act authorizes recovery of damages "subject to the principles of equity." 15 U.S.C. § 1117(a). Courts have consistently held that Lanham Act damages must bear a rational relationship to actual confusion, unjust enrichment, or proven loss, and may not be speculative or punitive in disguise. See Synergistic Int'l, LLC v. Korman, 470 F.3d 162, 175 (4th Cir. 2006); Lindy Pen Co. v. Bic Pen Corp., 982 F.2d 1400, 1407–08 (9th Cir. 1993).

Where damages lack evidentiary grounding, courts are constitutionally obligated to order remittitur or vacatur. Hetzel v. Prince William Cnty., 523 U.S. 208, 211 (1998). Allowing a jury to impose a record-breaking award based on admitted conjecture converts the Lanham Act from a remedial statute into a weapon of market destruction, a result Congress did not authorize and the Constitution forbids.

### F. Evidentiary Exclusions Compounded the Arbitrary Process

The arbitrary process was compounded by excluding Monster's own InfoScout consumer research showing only 3% of participants cared about Super Creatine—evidence that would have

42

undercut Monster's entire false advertising theory and contrained the jury's damages determination. (1-ER-56 at 99:11–17; 1-ER-59 at 102:18–21.)

### G. Monster Failed to Prove the Required Elements of False Advertising Under the Lanham Act

To prevail under 15 U.S.C. § 1125(a), a plaintiff must prove:

(1) a false or misleading statement of fact in commercial advertising;

(2) that actually deceived or had the tendency to deceive a substantial segment of consumers; (3) that the deception was material;

(4) that the statement entered interstate commerce; and;

(5) that the plaintiff suffered injury as a result.

*Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997).

### a. Monster's proof failed on nearly every element.

**No Evidence of Actual Deception or Materiality.** Monster presented no consumer testimony and no direct evidence of deception. Its expert, Dr. Cowan, conducted only a perception survey regarding Bang's *can label*, which made no claims of efficacy or performance. (9/13 Trial Tr.

43

(Cowan) 184:7–25.) The survey failed to address the challenged advertising materials and was thus irrelevant to materiality or consumer reliance.

**No Proof of Causation.** Monster offered no evidence that any consumer who purchased Bang Energy would have otherwise purchased Monster's products but for the "Super Creatine" label or advertising.

**Flawed Damages Model.** Monster's damages expert, Mr. Tregillis, admitted that his apportionment model relied entirely on Dr. Cowan's flawed survey results. (9/15 Trial Tr. (Tregillis) 195:15–25, 210:16–23.) This single, unreliable survey formed the entire basis of the $272 million Lanham Act award.

Under controlling precedent, this evidence is legally insufficient. *See Verisign, Inc. v. XYZ.com LLC*, 848 F.3d 292, 300–01 (4th Cir. 2017) (requiring proof that challenged advertisements deceived consumers); *Southland Sod Farms*, 108 F.3d at 1146 (damages must be shown with "reasonable certainty").

#### b. The Tortious Interference Verdict Was Unsupported by Any Competent Evidence

Monster's tortious-interference claim failed for lack of proof. It offered no witness testimony, sales data, retailer communications, or records showing any actual breach or disruption of contract, relying instead on speculation that products were occasionally misplaced. California law requires

44

evidence of an "actual breach or disruption," *Pacific Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1131 (1990), and damages may not rest on "speculation or guesswork," *Fenner v. Dependable Trucking Co.*, 716 F.2d 598, 603 (9th Cir. 1983).

### c. *Monster's Trade Secret Claim Failed as a Matter of Law*

Monster likewise failed to identify any trade secret with reasonable particularity or to show misappropriation, use, or resulting harm. Possession of thumb drives containing file names is not evidence of trade secrets or misuse. Because plaintiffs must "identify the trade secrets and carry the burden of showing that they exist," *Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1164 (9th Cir. 1998), the $3 million award on this claim cannot stand.

### H. *This Case Presents an Important and Recurring Constitutional Question*

The question presented is exceptional in both magnitude and principle:

May a lay jury, without administrable standards, impose the largest civil penalty in the history of the Lanham Act based on admitted guesswork, in direct violation of the Court's Order prohibiting speculation, where the verdict operates as punishment and de facto regulation rather than compensation for proven harm?

The constitutional danger is heightened by extreme financial asymmetry; Monster Energy—market

45

capitalization exceeding $75.5 billion—reportedly spent approximately $43 million in fees in this single action.

This Court has repeatedly intervened where civil verdicts exceed constitutional limits, even when nominally authorized by statute. Gore; State Farm; Honda; Cooper Industries. The verdict here represents a paradigmatic due process violation: arbitrary, confiscatory, and destructive of property without lawful standards. *Honda Motor Co. v. Oberg,* 512 U.S. 415, 432 (1994); *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.,* 532 U.S. 424, 433–34 (2001) "Punitive damages pose an acute danger of arbitrary deprivation of property."

## CONCLUSION

For the foregoing reasons, Petitioner John Owoc respectfully requests that this Court grant certiorari, reverse the Ninth Circuit's judgment, vacate the injunction and damages award, and provide such further relief as justice requires.

Respectfully submitted, this 14th day of January 2026.

JOHN H. OWOC
(PETITIONER PRO SE)
6278 N Federal Hwy, #220
Fort Lauderdale, FL 33308
Phone: 954-632-7119
Email: jackowoc.ceo@gmail.com

46