UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 11 Cases |
| VITAL PHARMACEUTICALS, INC., *et al.*,[1] | Case No.: 22-17842-PDR |
| Debtors. | (Jointly Administered) |
| _____/ | |
| VPX LIQUIDATING TRUST, by and through its Liquidating Trustee, | |
| Plaintiff, | |
| v. | Adv. Pro. No. 24-01009-PDR |
| JOHN H. OWOC, MEGAN ELIZABETH OWOC, ELITE ISLAND LLC, JHO GA-1 INVESTMENT, LLC, JHO NV-1 INVESTMENT LLC, SHERIDAN REAL ESTATE INVESTMENT A, LLC, SHERIDAN REAL ESTATE INVESTMENT B, LLC, and SHERIDAN REAL ESTATE INVESTMENT C, LLC, | |
| Defendants. | |
| _____/ | |

**EMERGENCY EX PARTE MOTION OF THE VPX LIQUIDATING TRUST FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AGAINST ELITE ISLAND LLC**

**(Emergency Hearing Requested for April 1, 2026)**

**Basis for Request for Expedited Hearing**

---

[1] The address of the Debtors is 1600 N. Park Drive, Weston, FL 33326. The last four digits of the Debtors' federal tax identification numbers are: (i) Vital Pharmaceuticals, Inc. (8430); (ii) Bang Energy Canada, Inc. (5454); (iii) JHO Intellectual Property Holdings, LLC (0010); (iv) JHO Real Estate Investment, LLC (9394); (v) Quash Seltzer, LLC (6501); (vi) Rainbow Unicorn Bev LLC (2254); and (vii) Vital Pharmaceuticals International Sales, Inc. (8019).

-1-

> The Liquidating Trust respectfully requests the Court conduct an emergency hearing on this Motion within two business days of the filing of this Motion consistent with Local Rule[2] 9013-1(F).  The sole asset owned by defendant Elite Island LLC—real property purchased entirely with VPX corporate funds—is at imminent risk of being encumbered, transferred, dissipated and/or otherwise disposed of.  The threat is concrete and immediate: on March 19, 2026, this Court discharged the lis pendens on the Overseas Highway Property; within forty-eight hours, on March 21, 2026, Jack Owoc reinstated the corporate status of Elite Island—which had been administratively dissolved for six months—with two new members, including a former VPX employee, neither of which had previously appeared in Elite Island's corporate filings; and on March 25, 2026, the Owocs filed a motion expressly confirming their intent to "arrange and close financing" secured by the Overseas Highway Property.  To avoid substantial immediate and irreparable harm, the Liquidating Trust seeks a temporary restraining order (a) prohibiting Elite Island from encumbering, transferring, dissipating, and/or otherwise disposing of the Overseas Highway Property, and (b) granting related relief.  The Liquidating Trust respectfully requests that the Court waive the provisions of Local Rule 9075-1(B), which requires an affirmative statement that a bona fide effort was made to resolve the issues raised in this Motion, as the relief requested herein is urgent in nature and does not lend itself to advance resolution.

Plaintiff, the VPX Liquidating Trust (the "Liquidating Trust" or "Plaintiff") in the above-captioned adversary proceeding (the "Adversary Proceeding"), by and through its undersigned counsel, hereby submits this memorandum of law in support of its *ex parte* motion for a temporary restraining order and preliminary injunction (the "Motion") pursuant to Rule 65 of the Federal Rules of Civil Procedure ("FRCP"), made applicable to these proceedings by Rule 7065 of the Federal Rules of Bankruptcy Procedure ("FRBP"), enjoining Elite Island LLC ("Elite Island") from encumbering, dissipating, transferring, and/or otherwise disposing of the real property

---

[2]   Capitalized terms not defined herein shall have the same meanings as ascribed to them in the second amended complaint, [Adv. Pro. Dkt. 229], (the "Complaint") or later in this Motion.

located at 72100 Overseas Highway, Islamorada, Florida (the "Overseas Highway Property").[3] As grounds for the relief requested in this Motion, Plaintiff relies upon (i) the *Declaration of Zurama Sury Rodriguez* (the "Rodriguez Declaration"), (ii) the *Declaration of Zach Messenger of Lincoln International LLC* (the "Messenger Declaration"), (iii) the *Certification of Michael A. Kaplan, Esq.* (the "Kaplan Certification"), (iv) the *Declaration of Soneet R. Kapila, CPA, CIRA, CFE, CFF* (the "Kapila Declaration"), (v) the *Declaration of Joseph Gioconda, Esq.* (the "Gioconda Declaration"), and (vi) the *Affidavit of Steven Balasiano* (the "Balasiano Affidavit") filed concurrently herewith and respectfully states as follows:

## PRELIMINARY STATEMENT

1. This situation presents a textbook scenario for emergency injunctive relief. Mr. Owoc, the former CEO, sole board member, and 100% equity owner of Vital Pharmaceuticals, Inc. ("VPX" or the "Company"), directed the Company to transfer $9,747,727.82 in corporate funds to acquire and maintain a luxury island property in the Florida Keys (the "Elite Island Transfers")—the Overseas Highway Property—which was titled not in the Company's name, but in the name of Elite Island, an entity Jack Owoc ("Mr. Owoc") previously solely owned and controlled. The Company received nothing in return. The Elite Island Transfers were made while VPX was insolvent, facing enterprise-threatening litigation on multiple fronts, and incurring hundreds of millions of dollars in debt. The Overseas Highway Property—now valued at approximately $8.5 million—is the sole identifiable asset available to satisfy the Liquidating Trust's fraudulent transfer claims against Elite Island, and every indication is that the Owocs intend to place it beyond the Liquidating Trust's reach.

---

[3] This *ex parte* Motion is being filed contemporaneously with a motion to seal based on the exigent nature of the relief sought herein and the magnitude of the imminent and irreparable harm to the Liquidating Trust.

2.      The need for emergency relief is immediate and dire.  On March 19, 2026, this Court discharged the lis pendens on the Overseas Highway Property.  Within two days, Mr. Owoc reinstated the corporate status of Elite Island—which had been administratively dissolved since September 2025—with two new members who had never before appeared in Elite Island's corporate filings.  Six days later, the Owocs filed a motion expressly confirming their intent to mortgage the Overseas Highway Property—Elite Island's only asset—to bankroll their personal defense, and the defense of unrelated entities, against the Liquidating Trust's claims in the Adversary Proceeding.  [*See* Adv. Dkt. Pro. 437 at 2.]  Meanwhile, Elite Island had failed to pay property taxes on the Overseas Highway Property since 2023, forcing the Liquidating Trust to expend $161,941.55 of the Liquidating Trust's funds to prevent a tax deed sale.  The Liquidating Trust moved swiftly upon learning of these developments and now seeks a temporary restraining order and preliminary injunction to prevent Elite Island from encumbering, dissipating, transferring, and/or otherwise disposing of the Overseas Highway Property before this Court can adjudicate the Liquidating Trust's claims against Elite Island on the merits.

3.      The Plaintiff clearly satisfies each of the four requirements for injunctive relief. The Liquidating Trust has a substantial likelihood of success on the merits of its fraudulent transfer claims, supported by undisputed expert insolvency findings.  In fact, Elite Island has not even identified or retained an expert to rebut VPX's insolvency by the deadline to do so.  The threat of irreparable harm is not hypothetical: the Owocs have told this Court, in their own filings and in open court, that they intend to encumber Elite Island's sole asset, the Overseas Highway Property. The balance of harms and the public interest also overwhelmingly favor preserving the status quo and protecting the assets for the benefit of the Liquidating Trust's beneficiaries.

**JURISDICTION AND VENUE**

4.      The Liquidating Trust commenced the Adversary Proceeding vis a vis Elite Island pursuant to sections 502, 542(a), 547, 548, 550, and 105(a) of title 11 of the United States Code (the "Bankruptcy Code") and FRBP 7001(1).

5.      The Court has jurisdiction over the Adversary Proceeding under 28 U.S.C. §§ 157 and 1334.  The Adversary Proceeding is a core proceeding under 28 U.S.C. § 157(b) because it arises under the Bankruptcy Code and arises in a case under the Bankruptcy Code.

6.      Venue of the Chapter 11 Cases and the Adversary Proceeding, as well as adjudication of this Motion, is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

**STATEMENT OF FACTS**

**I.      VPX ACQUIRES THE OVERSEAS HIGHWAY PROPERTY.**

7.      On August 25, 2020, VPX's then-General Counsel, Frank Massabki, sent an email to Sury Rodriguez, who served as VPX's Director of Finance and later as Vice President of Finance, notifying her of the anticipated closing for the purchase of the Overseas Highway Property and providing wire instructions.  [Rodriguez Decl. ¶ 6, Ex. A.]

8.      On August 31, 2020, VPX transferred $8,304,171.78 to Torrens Law Firm PLLC for the closing of the Overseas Highway Property.  [*Id.* ¶ 8, Ex. B.]

9.      Although the purchase price was paid by VPX, the Overseas Highway Property was always titled in the name of Elite Island.  [Kaplan Cert. ¶ 4, Ex. 1.]

10.     Following the purchase, VPX funds were used to pay various expenses in connection with the Overseas Highway Property.  [Rodriguez Decl. ¶ 9, Exs. C, D, and E.]  For example:

a. On October 2, 2020, VPX paid $126,062.72 to KMR Construction Management, Inc. for construction work to be performed on the Overseas Highway Property. [*Id.* ¶ 9(a), Ex. C.]

b. On March 31, 2021, VPX paid the 2020 property taxes on the Overseas Highway Property in the amount of $25,793.10. [*Id.* ¶ 9(b), Ex. D.]

c. In August 2021, Mr. Owoc directed Ms. Rodriguez to process a payment to KMR Construction for windows and doors for Elite Island in the amount of $197,884.55. Mr. Owoc approved the payment by email. [*Id.* ¶ 9(c), Ex. E.]

11. In total, VPX transferred approximately $9,747,727.82 to third parties in connection with Elite Island. [Messenger Decl. ¶ 6, Ex. A.]

12. All of the transfers were made at Mr. Owoc's direction. [Rodriguez Decl. ¶ 10.]

13. Elite Island is not a debtor and has never been part of VPX's corporate structure or operations. [*Id.* ¶ 5.]

14. VPX did not receive any repayment from Elite Island for the $9,747,727.82 transferred. [Messenger Decl. ¶¶ 6–7.]

15. Elite Island's corporate status was administratively dissolved by the Florida Secretary of State in September 2025 and remained in that status until March 21, 2026, when it was reinstated with two new members just two days after this Court discharged the lis pendens. [Kaplan Cert. ¶ 6 Ex. 7.] Under Florida law, an administratively dissolved LLC "may not carry on any business except that necessary to wind up and liquidate its business and affairs." Fla. Stat. § 605.0714(4). Accordingly, Elite Island could not have lawfully obtained financing or conducted business operations during the approximately six months it was dissolved, regardless of the status of the lis pendens.

**II.     THE ADVERSARY COMPLAINT.**

16.     On January 18, 2024, the Liquidating Trust filed its Adversary Complaint [Adv. Pro. Dkt. 1] against the Owoc Entity Defendants, including Elite Island, among others, which was subsequently amended on September 16, 2024.  [*See* Adv. Pro. Dkt. 148].[4]

17.     Plaintiff asserted, among other things, the following claims against Elite Island in the Complaint:

     i.     avoidance and recovery of constructive fraudulent transfers under the Florida Uniform Fraudulent Transfer Act ("FUFTA") sections 726.105(1)(b) and 726.108 and 11 U.S.C. § 550 (Count 28);

     ii.     avoidance and recovery of constructive fraudulent transfers under 11 U.S.C. §§ 548(a)(1)(B) and 550 (Count 29);

     iii.     avoidance and recovery of actual fraudulent transfers under FUFTA sections 726.105(1)(a) and 726.108 and 11 U.S.C. § 550 (Count 30); and

     iv.     avoidance and recovery of actual fraudulent transfers under 11 U.S.C. §§ 548(a)(1)(A) and 550 (Count 31) ((i)–(iv) together, the "Fraudulent Transfer Claims").

18.     On June 21, 2024, Plaintiff recorded a notice of lis pendens against the Overseas Highway Property, which expired on its own terms on January 18, 2025.  [Adv. Pro. Dkts. 106, 433 ¶ 2.]

19.     On October 7, 2024, the Defendants, including Elite Island, while being represented by the Law Office of Robert F. Reynolds, P.A., filed (i) the Answer and Affirmative Defenses of

---

4     On February 7, 2025, the Clerk of the Court filed the redacted version of the Second Amended Complaint, [Adv. Pro. Dkt. 229].

Defendants John H. Owoc, Megan Elizabeth Owoc, Elite Island, JHO GA-1 Investment LLC, JHO NV-1 Investment LLC, Sheridan Real Estate Investment A, LLC, Sheridan Real Estate Investment B, LLC and Sheridan Real Estate Investment C, LLC to the Second Amended Complaint, [Adv. Pro. Dkt. 156], and (ii) the Answer and Affirmative Defenses of Defendants John H. Owoc, Megan Elizabeth Owoc, Elite Island, JHO GA-1 Investment LLC, JHO NV-1 Investment LLC, Sheridan Real Estate Investment A, LLC, Sheridan Real Estate Investment B, LLC and Sheridan Real Estate Investment C, LLC to Second Amended Complaint, [Adv. Pro. Dkt. 157] (together, the "Answer").

20.     At the time the Adversary Complaint was filed, Elite Island's Annual Report, filed with the Florida Secretary of State, listed Mr. Owoc as the registered agent and sole manager, with a principal place of business at 2200 N. Commerce Parkway, Suite 200, Weston, Florida (VPX's headquarters).  [Kaplan Cert. ¶ 8, Ex. 6.]

21.     Mr. Owoc was the only member of Elite Island at that time.  [*Id.*]

**III.     THE TAX SALE**

22.     On February 11, 2026, a Notice of Application for Tax Deed was issued by the Monroe County Clerk of the Circuit Court with respect to the Overseas Highway Property, indicating that a third-party tax certificate holder had filed an application for a tax deed to be issued for Elite Island.  [*Id.* ¶ 4, Ex. 2.]  The notice stated that the Overseas Highway Property would be sold at public auction on March 25, 2026, unless back taxes were paid, and that the amount necessary to redeem the tax deed application was $161,941.55.  [*Id.*]

23.     On February 18, 2026, Mr. Owoc filed an *Emergency Motion to Dissolve the Lis Pendens* on the Elite Island property.  [Adv. Pro. Dkt. 405.]

24.     During a hearing on an unrelated matter, Megan Owoc stated that Elite Island "can't possibly represent itself if it has a lis pendens on the LLC itself, which doesn't allow it to create income for the business in order to represent itself." [Kaplan Cert. ¶ 5, Ex. 3 at 16:23–17:1.]  The

Court asked what Elite Island does, and Mrs. Owoc responded, "It's a real estate company." [*Id.* at 17:2–3.] Mr. Owoc also stated that Elite Island "generates revenue when we build and sell, you know, the property, lease the property, anything like that. It's an island in the Florida Keys." [*Id.* at 17:5–8.]

25.     Mr. Owoc's statements at the March 18, 2026 hearing before this Court further confirm the intent to transact with the Overseas Highway Property.  At that hearing, Mr. Owoc told the Court that "there's a lot of people willing to give a loan on the property" and that the lis pendens had prevented Elite Island from obtaining financing.  [*Id.* ¶ 11, Ex. 9 at 23:24–25.]  Mr. Owoc also stated, "We have at least a dozen people that were interested in giving a loan, but would not give it because of" the lis pendens.  [*Id.* at 25:25–26:2.]  Mr. Owoc further told the Court that because of the lis pendens, "we can't transact any business" and "[w]e can't sell the property." [*Id.* at 10:20–25.]  These statements, made under oath in open court, demonstrate that the Owocs had been actively seeking financing against the Overseas Highway Property and intended to sell, encumber, or otherwise transact with the property as soon as the lis pendens was removed.

26.     On March 19, 2026, this Court entered an Order denying the Owocs' Emergency Motion to Dissolve Lis Pendens as moot, and *sua sponte*, discharged the Notice of Lis Pendens recorded in the Official Records of Monroe County, Florida.  [*Id.* ¶ 7, Ex. 5.]

27.     Just two days later, on March 21, 2026, Elite Island's 2026 Florida Limited Liability Company Reinstatement was filed with the Florida Secretary of State.  [*Id.* ¶ 9, Ex. 7.] Notably, the reinstatement lists two new authorized members of Elite Island: Proprietary Property LLC, located in Albuquerque, New Mexico, and Paul Borrelli, a former employee of VPX, located at the same Fort Lauderdale address as Elite Island.  [*Id.*]  This is the first time that individuals or entities other than Mr. Owoc have appeared as members in Elite Island's corporate filings.

28.     Mr. Borrelli is not an unrelated third party.  Rather, he was an employee of, and one of Mr. Owoc's business partners at VPX, whom Mr. Owoc has publicly credited for the Company's success.  [*See* Main Case Dkt. 1725, Joint Ex. 9, Ex. A at 110 (listing Paul M. Borrelli's employment agreement amongst VPX contracts during the pendency of the Chapter 11 Cases); Martín Caballero, *'Time to Get Out and Play': Ex-Bang CEO Jack Owoc Charts 'Ai'-Driven Future*, BEVNET (Nov. 13, 2024, 3:30 PM), https://www.bevnet.com/news/2024/time-to-get-out-and-play-ex-bang-ceo-jack-owoc-charts-ai-driven-future.]  Mr. Borrelli now works alongside Mr. Owoc at Ai Energy—a new energy drink venture Mr. Owoc launched after his departure from VPX.  *See id.*

29.     On March 23, 2026, the Liquidating Trust paid the outstanding property taxes owed on the Overseas Highway Property to the Monroe County Tax Collector to prevent the property from being sold at the tax deed sale.  [Kaplan Cert. ¶ 10, Ex. 8.]

30.     On March 25, 2026, the Owocs filed a *Motion for Extension of Time to Retain Successor Counsel* (the "Extension Motion"). [Adv. Pro. Dkt. 437].  In the Extension Motion, the Owocs stated that the lis pendens against Elite Island had been "actively impairing the company's ability to obtain financing and conduct ordinary business operations" and that the discharge of the lis pendens was necessary to "secure financing and retain replacement counsel." [*Id*. at 1–2.]  The Owocs explained that they required additional time to: "arrange and close financing" and "complete the wiring of retainer funds and allow for processing and confirmation of receipt." [*Id*. at 2.]  The motion thus confirms that the Owocs intend to obtain financing secured by the Overseas Highway Property in order to fund their legal defense in this Adversary Proceeding—including for entities and individuals other than Elite Island.

31.    As of March 17, 2026, the estimated market value of the Overseas Highway Property was $8.5 million.  [Kaplan Cert. ¶ 6, Ex. 4.]

## ARGUMENT

32.    FRCP 65(a) permits courts to grant preliminary injunctions upon notice to the adverse party where the moving party clearly shows: "(1) a substantial likelihood that it will succeed on the merits; (2) that it will suffer irreparable harm unless the injunction issues; (3) that the potential injury outweighs possible harm to the opposing party; and, (4) that the injunction would not be adverse to the public interest." *Frio Ice, S.A. v. Sunfruit, Inc.*, 918 F.2d 154, 159 (11th Cir. 1990); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).[5]  The movant bears the burden of persuasion as to each element.  *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000).  The standard governing a temporary restraining order ("TRO") is identical to that of a preliminary injunction.  *See Schindler v. Schiavo*, 403 F.3d 1223, 1225–26 (11th Cir. 2005) (per curiam) (outlining same four-factor test for a TRO); *Dell Inc. v. BelgiumDomains, LLC*, No. 07-22674-CIV, 2007 WL 6862342, at *5 (S.D. Fla. Nov. 21, 2007) ("The Eleventh Circuit standards governing a TRO are the same as those for a preliminary injunction.").  Because the Plaintiff can satisfy each of these factors, the Court should grant this Motion.

---

[5]    The Plaintiff also requests that this Court not require any security in connection with the temporary restraining order as permitted under FRBP 7065.  *See* Fed. R. Bankr. P. 7065 ("[Federal] Rule 65 . . . applies in adversary proceedings, except that a temporary restraining order or preliminary injunction may be issued on application of a debtor, trustee, or debtor in possession without compliance with [Federal] Rule 65(c)").  *See, e.g.*, *In re Trafford Distrib. Ctr., Inc.*, 414 B.R. 849, 857 (Bankr. S.D. Fla. 2009) ("Pursuant to the provisions of Bankruptcy Rule 7065, no bond is required."); *In re MV Realty PBC, LLC*, No. 23-17590, 2023 WL 8592795, at *2 (Bankr. S.D. Fla. Dec. 9, 2023) ("Section 105(a) provides that the Court 'may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.' Fed. R. Bankr. P. 7065 incorporates Fed. R. Civ. P. 65 except that the bond requirements of subsection (c) do not apply."); *Areal Plus Grp. v. Fisher Island Invs., Inc.*, No. 1:14-cv-20310, 2014 WL 12535947, at *8 n.10 (S.D. Fla. Sept. 30, 2014) (same).

33.     Moreover, a TRO may be granted on an *ex parte* basis where the movant shows that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition and "the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required."  Fed. R. Civ. P. 65(b)(1)(B); *Commodity Futures Trading Comm'n v. Fingerhut*, No. 20-CIV-21887, 2020 WL 2747448, at *2 (S.D. Fla. May 26, 2020) (citing Fed. R. Civ. P. 65(b)); *see Mayoral v. Salin*, No. 1:21-CV-62074, 2021 WL 4804525, at *2 (S.D. Fla. Oct. 14, 2021).

# I.     PLAINTIFF HAS A SUBSTANTIAL LIKELIHOOD OF SUCCEEDING ON THE MERITS OF ITS FRAUDULENT TRANSFER CLAIM.

34.     "A substantial likelihood of success on the merits requires a showing of only *likely* or probable, rather than *certain*, success."  *Schiavo*, 403 F.3d at 1232 (emphasis in original).  Here, the Plaintiff can easily show a substantial likelihood of success on the merits on account of its claims for actual and constructive fraudulent transfer against Elite Island under the Bankruptcy Code and Florida state law.

35.     Section 544(b) of the Bankruptcy Code permits a bankruptcy trustee to avoid any transfer avoidable under applicable state law.[6]  Here, FUFTA is the applicable state law.  FUFTA claims, "asserted through § 544(b) of the Bankruptcy Code, are analogous 'in form and substance' to their bankruptcy counterparts."  *In re Pearlman*, 515 B.R. 887, 894 (Bankr. M.D. Fla. 2014) (citation omitted) (stating the only material difference between the statutes is the "favorable four-

---

[6]     The existence of one "triggering" creditor with an allowable claim of any amount will suffice for the purposes of Section 544(b) of the Bankruptcy Code.  *See In re McCarn's Allstate Fin., Inc.*, 326 B.R. 843, 853 (Bankr. M.D. Fla. 2005).  Monster and OBI are both "triggering" creditors for purposes of 11 U.S.C. § 544(b) as they have allowed claims under the confirmed *Debtors' Second Amended Joint Plan of Liquidation*, [*see generally* Main Case Dkt. 1905].  At least one "triggering" unsecured creditor exists here, thereby enabling the Liquidating Trust to use FUFTA § 726 to avoid and recover transfers made within four years of the Petition Date.  *See, e.g.*, *id.* (granting summary judgment in favor of trustee on fraudulent transfer claims under 11 U.S.C. § 548 and FUFTA § 726.105).

year look-back period under the Florida law" versus the Bankruptcy Code's two-year look-back period).  As such, the Court may analyze the Fraudulent Transfer Claims under the Bankruptcy Code and the FUFTA contemporaneously.  *See id.*

36.     The Bankruptcy Code defines a "transfer" as "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with – (i) property; or (ii) an interest in property."  11 U.S.C. § 101(54)(D).  Florida's definition of "transfer" is nearly identical.  *See* Fla. Stat. § 726.102(14) (same, and also including "payment of money, release, lease, and creation of a lien or other encumbrance").

37.     Each of the Elite Island Transfers constitutes a constructive and actually fraudulent transfer under both federal and state law as set forth below.

38.     Notably, this is not the typical preliminary injunction scenario where the parties have yet to engage in discovery or develop the factual record.  The Liquidating Trust's likelihood of success on the merits here is not speculative—it is supported by an extensive, undisputed evidentiary record.  *See, e.g.*, *In re Lickman*, 286 B.R. 821, 829 (Bankr. M.D. Fla. 2002) (recognizing that where substantial discovery had been conducted, the court was "in an even better position to evaluate the likelihood of success on the merits than it was when it entered the preliminary injunction").  Fact discovery in this matter closed on February 6, 2026, and the expert disclosure deadline passed on February 10, 2026.  [*See* Adv. Pro. Dkt. 359.]  Elite Island has not identified an expert to rebut the Liquidating Trust's insolvency analysis, nor produced any documents to counter the Liquidating Trust's evidence concerning the transfers at issue.

39.     Indeed, Elite Island is on the precipice of defaulting in this action.  Elite Island has failed to retain counsel despite being given until March 26, 2026 to do so, and the Liquidating Trust has moved to strike its Answer and for entry of default.  [*See* Adv. Pro. Dkt. 444.]  Nor will

retention of new counsel change this calculus.  Discovery is closed.  At the March 18, 2026 hearing, this Court denied the Owocs' emergency motion to extend the discovery deadline, finding that "the record does not support the conclusion that discovery was impossible without counsel.  It supports the conclusion that it just wasn't done." [Kaplan Cert. ¶ 11, Ex. 9 at 97:21–23.]  There is no mechanism by which Elite Island can now introduce evidence that it failed to develop over two years of litigation in this Adversary Proceeding.  Despite being represented by counsel for 23 of the 26 months this Adversary Proceeding has been pending, Elite Island failed to propound a single document request, interrogatory, request to admit, subpoena or deposition notice.  Even if Elite Island were to retain counsel tomorrow, that counsel would inherit an empty record—no discovery, no documents, no experts—with every substantive deadline expired.

40.     In short, the facts underlying the fraudulent transfer claims against Elite Island are, for all practical purposes, undisputed, and the Liquidating Trust will almost inevitably succeed on its claims.

**A.     The Elite Island Transfers Were Constructively Fraudulent Under 11 U.S.C. § 548(a)(1)(B) and FUFTA § 726.105(1)(b).**

41.     The Elite Island Transfers constitute constructive fraudulent transfers that should be avoided.

42.     Under FUFTA, a constructive fraudulent transfer occurs where a debtor makes a transfer or incurs an obligation "[w]ithout receiving a reasonably equivalent value in exchange for the transfer or obligation," and the debtor "[i]ntended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due." Fla. Stat. § 726.105(1)(b).

43.     The Bankruptcy Code similarly provides that a constructive fraudulent transfer occurs when the debtor receives less than "reasonably equivalent value in exchange for such

transfer" and when the debtor was insolvent at the time of transfer, among other circumstances. *See* 11 U.S.C. § 548(a)(1)(B).

44.    Plaintiff is reasonably likely to establish that the Company was insolvent at the time the Elite Island Transfers were made and that the Company did not receive reasonably equivalent value in exchange for any of the transfers.

### 1.    The Company Was Insolvent When It Made the Elite Island Transfers.

45.    Plaintiff can show that the Company was insolvent, inadequately capitalized, or intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due when it made the Elite Island Transfers, establishing that they were constructively fraudulent. [Kapila Decl. ¶¶ 11–19, Ex. 1 ("Insolvency Report").] Under both the Balance Sheet Test (defined herein) and the Cash Flow Test (defined herein), VPX was insolvent throughout the entire period from September 4, 2018 through the Petition Date of October 10, 2022.[7] [*Id.* ¶¶ 16–19.] And in the years the Elite Island Transfers were made, VPX's liabilities exceeded the fair value of its assets by approximately (i) $697.6 million by the end of 2020, (ii) $549 million by the end of 2021, and (iii) $391 million by the 2022 Petition Date. [*See id.* ¶¶ 98, 100, 103.]

46.    Under Florida law, "[a] debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation" (the "Balance Sheet Test") and a "debtor who is generally not paying his or her debts as they become due is presumed to be insolvent" (the "Cash Flow Test"). Fla. Stat. § 726.103(1), (2). The Bankruptcy Code similarly defines insolvency. *See*

---

[7]    Though the Insolvency Report also identifies a third test courts consider, the capital adequacy test, the Balance Sheet Test and Cash Flow Test sufficiently establish the Company's insolvency from September 4, 2018 through the Petition Date of October 10, 2022. [*See* Insolvency Report at Section VIII.]

11 U.S.C. § 101(32)(A) (the Bankruptcy Code's Balance Sheet Test equivalent); 11 U.S.C. § 548(a)(1)(B)(ii)(III) (the Bankruptcy Code's Cash Flow Test equivalent).

47.   Courts in this Circuit consider the Balance Sheet Test to be "the simplest methodology to determine insolvency." *In re Toy King Distribs., Inc.*, 256 B.R. 1, 93 (Bankr. M.D. Fla. 2000).

48.   The Court has "broad discretion when considering evidence to support a finding of insolvency," and may use "any appropriate means" to prove insolvency. *In re Bay Circle Props., LLC*, 646 B.R. 348, 373 (Bankr. N.D. Ga. 2022).  And courts in this Circuit have found that "[a] determination of insolvency should be based on appraisals or expert testimony 'whenever it is possible.'" *Id.* (citation omitted) (discussing how "[s]ome courts have found unaudited financial statements insufficient to rebut a presumption because they do not necessarily reflect the fair value of assets or all liabilities").

49.   Under the Balance Sheet Test, the value of VPX's liabilities materially exceeded the fair value of its assets at the time each of the Elite Island Transfers was made.  [Kapila Decl. ¶ 17.]  VPX remained insolvent on the Petition Date, at which time its bankruptcy schedules reflected approximately $709 million in assets and $1.1 billion in liabilities.  [*Id.* ¶ 18.]  Under the Cash Flow Test, VPX was also insolvent because its business model was dependent on the sale of products marketed through willfully false and misleading advertising, and between 2019 and the Petition Date, approximately 95% of VPX's sales were from its "Super Creatine" products.  [*Id.* ¶¶ 15, 19.]  In light of this, it is reasonably likely that Plaintiff will succeed on its constructive Fraudulent Transfer Claims.  *See, e.g.*, *Hartford Cas. Ins. Co. v. Intrastate Constr. Corp.*, No. 10-61064, 2015 WL 13390523, at *12–13 (S.D. Fla. Apr. 13, 2015) (recommending preliminary injunction on fraudulent transfer claims where court found defendant was insolvent at time of

transfer and multiple badges of fraud were established), *R. & R. adopted*, 2015 WL 13402139 (S.D. Fla. Apr. 21, 2015).

**2.      The Company Made the Elite Island Transfers for Elite Island's Benefit and Did Not Receive Reasonably Equivalent Value in Exchange for the Elite Island Transfers.**

50.      While the Bankruptcy Code and FUFTA do not explicitly define "reasonably equivalent value," courts deciding this issue "generally consider such factors as the 'good faith of the parties, the disparity between the fair value of the property and what the debtor actually received, and whether the transaction was at arm's length.'" *In re Univ. Health Care Grp., Inc.*, 560 B.R. 594, 602 (Bankr. M.D. Fla. 2016) (citation omitted); *see also* 11 U.S.C. § 548(d)(2)(A) (defining "value"); Fla. Stat. § 726.104 (same).

51.      Plaintiff can show that the Company received no value for the Elite Island Transfers made for the benefit of Elite Island.  [*See* Messenger Decl. ¶¶ 6–7.]  Elite Island, through its sole member at the time, Mr. Owoc, acquired the Overseas Highway Property using solely Company funds.  [Rodriguez Decl. ¶¶ 5–6.]  VPX funded the entire $8,304,171.78 purchase price for the Overseas Highway Property and also paid for the maintenance of the property, including construction costs and property taxes.  [*Id.* ¶¶ 5–10, Exs. A–E.]

52.      The table attached as Exhibit A to the Messenger Declaration sets forth each of the $9,747,727.82 in Elite Island Transfers the Company made for the benefit of Elite Island to acquire, renovate, and/or maintain the Overseas Highway Property.  [Messenger Decl. ¶ 6, Ex. A.] The Elite Island Transfers included payments to law firms, property management companies, architects, engineers, and state authorities related to the Overseas Highway Property and were not related to any of the Company's business purposes.  [*See id.*]

53.     Despite making the Elite Island Transfers, VPX does not hold legal title in the Overseas Highway Property, and there is no evidence that the Company was repaid for any of the Elite Island Transfers.  [*Id.* ¶¶ 6–7; *see* Kaplan Cert. ¶ 3, Ex. 1.]

54.     As such, Plaintiff is likely to be successful on the merits of its constructive fraudulent transfer claims under 11 U.S.C. § 548 and FUFTA § 726 (Counts 28 and 29).

**B.      The Elite Island Transfers Were Actually Fraudulent Under 11 U.S.C. § 548(a)(1)(A) and FUFTA § 726.105(1)(a).**

55.     Plaintiff is likewise reasonably likely to succeed on its actual Fraudulent Transfer Claims because it can also show that the Company made the Elite Island Transfers with the "actual intent to hinder, delay, or defraud" creditors of the Company, the showing that is necessary to demonstrate that a transfer was actually fraudulent.  Fla. Stat. § 726.105(1)(a); 11 U.S.C. § 548(a)(1)(A).

56.     To determine the "actual intent" element of an actual fraudulent transfer claim, courts consider certain factors or "badges" of fraud, including whether:

> (a) The transfer or obligation was to an insider.
> (b) The debtor retained possession or control of the property transferred after the transfer.
> (c) The transfer or obligation was disclosed or concealed.
> (d) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.
> (e) The transfer was of substantially all the debtor's assets.
> (f) The debtor absconded.
> (g) The debtor removed or concealed assets.
> (h) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.
> (i) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.
> (j) The transfer occurred shortly before or shortly after a substantial debt was incurred.
> (k) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Fla. Stat. § 726.105(2); *see also In re Model Imperial, Inc.*, 250 B.R. 776, 791 (Bankr. S.D. Fla. 2000).

57.     Courts consider the totality of the circumstances surrounding these factors and "allow fraudulent intent to be proven through circumstantial evidence" because they recognize that "direct evidence of fraud does not always exist." *Model Imperial*, 250 B.R. at 791 (quoting *In re XYZ Options, Inc.*, 154 F.3d 1262, 1271 (11th Cir. 1998)).  Badges of fraud constitute prima facie evidence that the transaction is void.  *See Wiand v. Lee*, 753 F.3d 1194, 1200 (11th Cir. 2014).

58.     Of the badges of fraud, courts consider transfers to or for the benefit of an insider as "one of the most important." *Toy King Distribs.*, 256 B.R. at 128.  "This 'badge of fraud' is *so significant* that in some cases an insolvent debtor's transfer to an insider has caused the court to make a finding of actual fraud in the absence of any other badges of fraud." *Id.* (emphasis added). "Indeed, under Florida law, any transfer made in payment of an antecedent debt to an insider who knew or should have known that the debtor was insolvent at the time of payment is constructively fraudulent." *Id.* (finding transfers to insiders to carry "this badge of fraud").

59.     Here, Plaintiff can show that the Elite Island Transfers were made for the benefit of an insider of the Company, Mr. Owoc, who at the time was Elite Island's sole member and the Company's CEO, sole board member, and 100% equity owner. [Kaplan Cert. ¶ 5, Ex. 3, at 113:13–14; Answer ¶ 38.]  Mr. Owoc's status as an insider therefore constitutes prima facie evidence that the Elite Island Transfers should be avoided.  *See Wiand*, 753 F.3d at 1200; Fla. Stat. § 726.105(2)(a).  Other badges of fraud, however, are also present.  As discussed in more detail below, the Elite Island Transfers were made when the Company was insolvent, [Kapila Decl. ¶¶ 16–19], and they were not repaid to VPX, [Messenger Decl. ¶¶ 6–7]; *see* Fla. Stat. § 726.105(2)(h)–(i).

60.     The Elite Island Transfers were also made when the Company was facing a multitude of "bet the company" lawsuits, including the September 2018 Monster False Advertising Litigation involving Monster Energy, Inc. ("Monster"),[8] and the 2020 OBI Trademark Dispute, involving Orange Bang, Inc. ("OBI"). *See* Fla. Stat. § 726.105(2)(d).  And each of these litigations caused the Company to incur a substantial debt, which constitutes an additional badge of fraud. [*See generally* Giaconda Decl., Ex. 1 (the Monster False Advertising Litigation resulted in a $271,924,174 judgment against the Company; the OBI Trademark Dispute resulted in the Company needing to disgorge $175 million of its profits, make perpetual royalty payments, and pay $9.3 million in attorneys' fees; and the PepsiCo Settlement resulted in the Company owing $115 million to PepsiCo)]; *see* Fla. Stat. § 726.105(2)(j).

61.     The timing of the Elite Island Transfers relative to VPX's escalating litigation exposure is particularly revealing.  On September 4, 2018, Monster initiated the False Advertising Litigation against VPX, alleging willfully false and misleading advertising relating to how Bang Energy drinks contained "Super Creatine"—claims that Joseph Gioconda, an expert in intellectual property law with over twenty-nine years of experience, has opined carried an approximately eighty-five percent (85%) to ninety percent (90%) probability of adverse liability and outcome. [Gioconda Decl. ¶¶ 1, 14.]  With this litigation pending, Mr. Owoc began channeling Company funds into real property investments, including Elite Island, held by and titled to non-debtor insider entities—a pattern that only accelerated as VPX's legal exposure became more acute.  At the time

---

[8]     Indeed, the Court recently granted the Liquidating Trust's Motion for Partial Summary Judgment on Count Three of the Adversary Complaint and found that "VPX would not have been saddled with such [$271.9 million] judgment but for Jack Owoc's conduct." *See* March 24, 2026 *Order Granting Liquidating Trust's Mot. for Partial Summ. J. on Count Three and Denying Def.'s Cross-Mot. for Summ. J.*, [Adv. Pro. Dkt. 435 at 13].

the Elite Island Transfers were made, the False Advertising Litigation had been pending for nearly two years, and VPX had lost a motion to dismiss the claims against it.  [*Id.* ¶ 16.]

62.     On June 16, 2020, Monster and OBI initiated the OBI Trademark Dispute—an arbitration alleging that VPX had breached the 2010 Settlement Agreement governing the use of the BANG mark by distributing products outside the permitted channels of trade and misclassifying its products as "creatine-based."  [*Id.* ¶ 14, Ex. 1 at 31–32.]  Mr. Gioconda opined that this dispute likewise carried an approximately eighty-five percent (85%) to ninety percent (90%) probability of adverse liability, with a combined probability of an unfavorable, enterprise-material outcome of at least eighty-five percent (85%).  [*Id.* ¶¶ 14–15.]

63.     Approximately two months later, in August 2020, the Overseas Highway Property was acquired for approximately $8.3 million entirely using Company funds.  The proximity between the initiation of the OBI Trademark Dispute—which exposed VPX to significant litigation liability—and the acquisition of the Overseas Highway Property is evidence of Mr. Owoc's intent to place Company assets beyond the reach of creditors.

64.     Between March and October 2020—the same period in which the Overseas Highway Property was acquired—VPX also received internal and external warnings that copyrighted music could not be used in commercial social-media content without proper licensing, including communications from platform representatives and rights holders.  [*Id.* ¶ 14, Ex. 1 at 46.]  Despite this notice, VPX allegedly continued posting promotional videos using copyrighted sound recordings, resulting in parallel copyright infringement actions filed by Sony Music Entertainment and UMG Recordings in 2021, with statutory damages exposure of up to $150,000 per infringed work.  [*Id.*, Ex. 1 at 47.]  Mr. Gioconda opined that the copyright disputes carried an approximately eighty-five percent (85%) to ninety percent (90%) probability of adverse liability.

[*Id.* ¶ 14.] Thus, at the very time VPX's funds were being funneled into the Overseas Highway Property, VPX was not only defending the False Advertising Litigation and the newly filed OBI Trademark Dispute, but was also being put on notice of imminent copyright infringement claims—meaning that Mr. Owoc knew or should have known that additional enterprise-threatening litigation was on the horizon.

65. Viewed in the aggregate, the pattern of events reveals a deliberate strategy to divert Company funds to or for the benefit of Elite Island at precisely the time when VPX's litigation exposure was escalating to enterprise-threatening levels. [*See id.* ¶¶ 12–17.] Also, at the time the Elite Island Transfers were made, the probability that at least one dispute would result in an enterprise-material adverse outcome impairing liquidity, operations, or enterprise value exceeded eighty percent (80%) and approached ninety percent (90%) in several instances. [*Id.* ¶¶ 14–17.] Moreover, VPX was insolvent throughout this entire period—September 4, 2018 through the Petition Date—with liabilities exceeding fair value of assets by as much as $697.6 million by December 31, 2020. [Kapila Decl. ¶¶ 16–19.]

66. This sequence of events demonstrates a "general scheme or plan to strip the [Company] of its assets with no regard to the needs of the creditors, [which] can support a finding of actual fraudulent intent." *In re F & C Servs., Inc.*, 44 B.R. 863, 872 (Bankr. S.D. Fla. 1984) (citations omitted) ("A 'clear pattern of purposeful conduct' will support 'a finding of actual intent to defraud.'").

67. With this record, Plaintiff can show the "actual intent" necessary to prevail on claims for actual fraudulent transfer. *See, e.g.*, *Hartford Cas. Ins.*, 2015 WL 13390523, at *10–12 (finding that the movant demonstrated a likelihood of success on its claim that the defendant's transfer was made with intent to hinder, delay, or defraud by finding the following badges of fraud:

the property transfers being made to an insider, the debtors retaining possession and control of the property after the transfer, the time proximity between the transfers and the insurance company's demand for collateral, the indemnitors being insolvent at the time of transfer, and merely two weeks elapsed between when the debt was incurred and the transfers were made); *Model Imperial*, 250 B.R. at 792 (finding concealment, insolvency, existence of substantial debt, and insider status to demonstrate fraudulent intent).

68.    Indeed, that Elite Island was an insider of the Company due to Mr. Owoc's 100% ownership of the entity and role as sole member at the time is proof of fraudulent intent on its own. *See Toy King Distribs.*, 256 B.R. at 128–29.  Furthermore, the totality of the circumstances here, including how there was no reasonably equivalent value as the Elite Island Transfers were not paid back, shows a pattern of conduct where multiple badges of fraud are present.  "[T]his confluence of factors mandates a conclusive presumption of fraudulent intent."  *See Model Imperial*, 250 B.R. at 792.

69.    As such, Plaintiff is likely to be successful on the merits of its actual fraudulent transfer claims under 11 U.S.C. § 548 and FUFTA § 726 (Counts 30 and 31).

**C.    Avoidance and Recovery on the Fraudulent Transfer Claims is Reasonably Likely.**

70.    Because Plaintiff is likely to prevail on its Fraudulent Transfer Claims, the Court should conclude that the Elite Island Transfers are reasonably likely to be avoided and that Plaintiff will be able to recover their value.

71.    "Both 11 U.S.C. § 550 and Fla. Stat. § 726.109 provide that, to the extent that a transfer is avoided, the trustee may recover the property or the value of the property transferred from the initial transferee." *In re Kingsley*, 518 F.3d 874, 877 (11th Cir. 2008).  Under Florida

-23-

law, "the value of the asset transferred may be 'adjusted as the equities may require.'" *Id.* (quoting Fla. Stat. § 726.109(3)).

72. Given that Plaintiff is reasonably likely to succeed on its Fraudulent Transfer Claims, avoidance and recovery of the Elite Island Transfers is equally likely under FUFTA § 726.108 and 11 U.S.C. § 550. *See McCarn's Allstate Fin.*, 326 B.R. at 853 (granting summary judgment in favor of trustee and permitting trustee to recover amounts transferred for the benefit of the debtor's estate under Section 550 of the Bankruptcy Code).

73. As such, Plaintiff is likely to be successful on the avoidance and recovery aspects of their Fraudulent Transfer Claims under 11 U.S.C. § 550 and FUFTA § 726.108.

## II. THE PLAINTIFF WILL SUFFER IRREPARABLE HARM WITHOUT A TEMPORARY RESTRAINING ORDER.

74. "A showing of irreparable injury is 'the sine qua non of injunctive relief.'" *Siegel*, 234 F.3d at 1176 (citation omitted); *see FHR TB, LLC v. TB Isle Resort, LP*, 865 F. Supp. 2d 1172, 1206 (S.D. Fla. 2011) (The "basis for injunctive relief in the federal courts has always been irreparable harms and inadequacy of legal remedies.").

75. In the asset-dissipation context, "courts have found irreparable injury where there is a strong indication that the defendant may dissipate or conceal assets." *Breslow v. Phillips*, No. 23-cv-20727, 2023 WL 5955772, at *4 (S.D. Fla. July 7, 2023) (cleaned up). In *Breslow v. Phillips*, the court found that the plaintiffs had satisfied the irreparable harm element by showing the defendants' pattern of unauthorized transfers of cryptocurrency endowment funds, as well as their failure to comply with prior court orders to unwind those transfers. *Id.* at *3–4. That court concluded that these actions, combined with the defendants' continued easy access to the challenged account through their control of the plaintiffs' authorization keys, demonstrated that

the risk of further dissipation was "actual and imminent," satisfying the Eleventh Circuit's irreparable injury standard. *Id.* at *4.

76.    The Overseas Highway Property is the sole identifiable asset against which the Liquidating Trust can recover on its fraudulent transfer claims against Elite Island, and the magnitude of the potential loss is staggering.    The Liquidating Trust seeks to recover $9,747,727.82 in fraudulent transfers—nearly $1.5 million more than the $8,304,171.78 purchase price for the Overseas Highway Property.  [Rodriguez Decl. ¶ 8, Ex. B; Messenger Decl. ¶ 6, Ex. A.]  If Elite Island is permitted to encumber, dissipate, transfer, and/or otherwise dispose of the Overseas Highway Property, the Liquidating Trust will have no assets against which to satisfy a judgment, rendering the fraudulent transfer claims effectively unenforceable.  The dissipation of the only asset available to be recovered is a paradigmatic example of the type of irreparable harm that injunctive relief is designed to prevent.  *See Breslow*, 2023 WL 5955772, at *4.

77.    On March 25, 2026—just six days after the lis pendens was discharged—the Owocs confirmed in their Extension Motion that they intended to take out a loan secured by the Overseas Highway Property to fund both their legal defense, and the defenses of the other entity defendants owned by Mr. Owoc in this Adversary Proceeding.  [*See* Adv. Pro. Dkt. 437.]  The Owocs have been working swiftly to try and encumber the property.  Mr. Owoc told this Court that he had "at least a dozen people" willing to lend against the Overseas Highway Property.  [Kaplan Cert. ¶ 11, Ex. 9 at 25:25–26:2.]  Taking out a lien or mortgage on the sole asset available to satisfy the Liquidating Trust's fraudulent transfer claims would directly and irreparably impair the Liquidating Trust's ability to recover the full value of the Overseas Highway Property, as any lender's security interest could take priority over or compete with the Liquidating Trust's recovery.

The Owocs' Extension Motion and their statements in open court remove any doubt that the threat of dissipation is imminent and concrete, not merely speculative.

78.    Critically, the value of the Elite Island Transfers far exceed the current value of the Overseas Highway Property.  [*See* Rodriguez Decl. ¶¶ 5–12; Kaplan Cert. ¶ 6, Ex. 4.]  Accordingly, the Liquidating Trust faces a recovery shortfall even if it were to recover the full, unencumbered value of the property.  Any mortgage or lien placed on the property—even one as modest as $1 million—would further reduce the pool of recoverable assets and widen the gap between what is owed to the Liquidating Trust's beneficiaries and what can realistically be recovered.  Because the debt already exceeds the value of the sole recoverable asset, every dollar of encumbrance directly and irreparably impairs the Liquidating Trust's recovery on a dollar-for-dollar basis.  There is no margin for any diminution of the property's value, and no encumbrance—however small—can be treated as *de minimis* when the recovery deficit already runs into the millions.  *See Breslow*, 2023 WL 5955772, at *4 (finding irreparable harm where the challenged conduct substantially risked the dissipation of certain assets).

79.    In addition, the Liquidating Trust has already been compelled to expend $166,258.82 to pay the outstanding property taxes on the Overseas Highway Property to prevent the property from being sold at a tax deed sale.  [Kaplan Cert. ¶ 10, Ex. 8.]  This expenditure underscores both the Liquidating Trust's interest in preserving the property and the ongoing risk that the property may be lost through mechanisms beyond the Liquidating Trust's control if injunctive relief is not granted.

80.    Courts also consider timing to assess the immediacy of harm.  The Eleventh Circuit has explained that "the very idea of a preliminary injunction is premised on the need for speedy and urgent action to protect a plaintiff's rights before a case can be resolved on its merits." *Adams*

*v. Bordeau Metal Southeast, LLC*, No. 24-11572, 2025 WL 1122444, at *4 (11th Cir. 2025) (citation omitted).  The Liquidating Trust acted with urgency here.  The lis pendens was discharged on March 19, 2026, [Kaplan Cert. ¶ 7, Ex. 5]; Elite Island's corporate status was reinstated on March 21, 2026, [*Id.* ¶ 9, Ex. 7]; the Owocs' motion revealing their intent to encumber the property was filed on March 25, 2026, [Adv. Pro. Dkt. 437]; and the Liquidating Trust filed this Motion promptly upon learning of these developments.  This stands in stark contrast to cases where courts have found delay to undermine claims of irreparable harm.  *Contra Seiko Kabushiki Kaisha v. Swiss Watch Int'l, Inc.*, 188 F. Supp. 2d 1350, 1356 (S.D. Fla. 2002) ("Plaintiff's [three-month-long] dilatory prosecution of its rights somewhat vitiates the notion of irreparable harm.  The Court finds that this unexplained delay undercuts any sense of urgency.") (internal citation omitted).

81.     Moreover, Elite Island's historical conduct demonstrates that it has no interest in protecting the Overseas Highway Property and cannot be trusted to preserve it absent judicial intervention.  Elite Island failed to pay property taxes on the property since 2023—before the Liquidating Trust even initiated this Adversary Proceeding—which nearly resulted in the permanent destruction of the asset through a tax deed sale.  But for the Liquidating Trust's intervention, the property would have been sold at a tax deed sale.  [Kaplan Cert. ¶ 10, Ex. 8.] This pattern of willful neglect, combined with the Owocs' stated intention to encumber the Overseas Highway Property and the suspicious reinstatement of Elite Island with new members within forty-eight hours of the lis pendens discharge, demonstrates an imminent and concrete threat of dissipation that demands immediate judicial intervention.

82.     Absent an injunction, the Liquidating Trust will have no assets against which it can recover on its fraudulent transfer claims against Elite Island.  The risk of harm to the Liquidating Trust warrants immediate injunctive relief to preserve the status quo pending

resolution of this Adversary Proceeding. *See, e.g., Hartford*, 2015 WL 13390523, at *12–13 (finding irreparable harm "readily apparent" in an asset transfer attempt, where the Court found that the indemnitors' debts "will need to be satisfied from the[ir] real property and other non-cash assets"); *In re Infolink Grp., Inc., Bankr*. Nos. 10-26423-ALC, 10-26436-AJC, Adv. No. 11-01885, 2011 WL 1655882, at *7 (Bankr. S.D. Fla. 2011) (finding irreparable injury "[b]ased on the deliberate, coordinated nature and multitude of fraudulent transfers of assets rightfully belonging to the Debtors, including transfers after the petition date and after the appointment of a Chapter 11 Trustee"); *In re Willis*, 411 B.R. 783, 786–87 (Bankr. S.D. Fla. 2009) (converting preliminary injunction to permanent injunction and finding irreparable harm where debtor "ha[d] and continue[d] to dissipate non-exempt IRA funds," because without such relief he "might continue to dissipate" same).

## III.    BALANCE OF HARMS WEIGHS GREATLY IN THE PLAINTIFF'S FAVOR.

83.    Next, "the Court must balance the relative hardship to each side." *Fla. Atl. Univ. Bd. of Trs. v. Parsont*, 465 F. Supp. 3d 1279, 1297 (S.D. Fla. 2020). This Court has previously and definitively held that "[t]he dissipation and concealment of assets . . . is considered an irreparable injury," which weighs in favor of affording relief to the moving party as opposed to the remediable monetary damages that weigh in the defendant's favor. *See Breslow*, 2023 WL 5955772, at *4; *see also Hartford*, 2015 WL 13390523, at *13.

84.    Here, the balance of harms tips decidedly in the Plaintiff's favor. The Liquidating Trust seeks to recover nearly $9,747,727.82 in fraudulent transfers that VPX made to acquire and maintain the Overseas Highway Property for the benefit of Elite Island, while VPX was insolvent with liabilities far exceeding the fair value of its assets by hundreds of millions of dollars. [*See* Rodriguez Decl. ¶¶ 5–12; Kapila Decl. ¶¶ 16–18.] The Overseas Highway Property is the sole identifiable asset against which the Liquidating Trust can recover on account of its fraudulent

transfer claims against Elite Island.  Without injunctive relief, Elite Island will be free to encumber, dissipate, transfer, and/or otherwise dispose of the property, leaving the Liquidating Trust—and ultimately the Liquidating Trust's beneficiaries—without meaningful remedy.  The risk of such harm is not speculative.  The Owocs have stated, both in open court and in the Extension Motion, their intention to encumber the Overseas Highway Property.  [Kaplan Cert. ¶ 7, Ex. 5; Adv. Pro. Dkt. 437.]

85.    Moreover, the Liquidating Trust has already expended $166,258.82 in estate/Liquidating Trust funds to pay the outstanding property taxes on the Overseas Highway Property to prevent the property from being sold at a tax deed sale.  [Kaplan Cert. ¶ 10, Ex. 8.] Denying injunctive relief would permit Elite Island to benefit from the Liquidating Trust's expenditure of resources to preserve the property while simultaneously allowing Elite Island to encumber, dissipate, transfer, and/or otherwise dispose of the property—a result that would be contrary to the public interest and fundamentally inequitable to the Liquidating Trust's beneficiaries.

86.    By contrast, the harm to Elite Island from the requested relief is minimal.  The temporary restraining order would simply maintain the status quo by preventing Elite Island and its members—including two new recent members—from encumbering, dissipating, transferring, and/or otherwise disposing of the Overseas Highway Property pending resolution of this Adversary Proceeding.  Elite Island would retain possession and use of the property; it would merely be restrained from encumbering, dissipating, transferring, and/or otherwise disposing of the property.  The requested restraint would be extremely limited in duration.  This case is not in its infancy, but rather, it is approaching final resolution.  Fact discovery closed on February 6, 2026, expert disclosures were due on February 10, 2026, and summary judgment briefing is due

in less than four weeks.  The Liquidating Trust has also moved to strike Elite Island's answer and for entry of default based on Elite Island's failure to retain counsel.  [*See* Adv. Pro. Dkt. 444.]  Accordingly, the merits of the Liquidating Trust's claims will be adjudicated in the near term—whether by summary judgment, default, or, at most, a trial.  Thus, the temporary restraining order would merely preserve the status quo during this brief remaining window, imposing no lasting burden on Elite Island.

87.     To the extent Elite Island (or the Owocs) claim they need to obtain financing against the property to retain successor counsel, this argument only underscores the urgency of the requested relief: the Owocs seek to place a lien on estate-funded/purchased property to pay for their own defense against the Liquidating Trust's claims that those very funds were fraudulently transferred.  The Court should not permit Elite Island to encumber or diminish the value of the sole recovery asset to subsidize litigation against the party seeking its return.  *See, e.g., In re Soundview Elite Ltd.*, 543 B.R. 78, 116-18 (Bankr. S.D.N.Y. 2016) (finding irrperable harm where assets were used for purpose of paying counsel and further disposition of assets would make recovering assets "from diverse transferees may well be impossible—and plainly extraordinarily burdensome and expensive")

88.     Because the Overseas Highway Property was purchased entirely with the Debtors' funds—funds that rightfully belong to the Debtors' and their creditors—Elite Island cannot credibly claim to be harmed by being temporarily prohibited from encumbering, dissipating, transferring, and/or otherwise disposing of the property that was acquired through the very transfers now being challenged as fraudulent.  *See Hartford*, 2015 WL 13390523, at *13 (finding balance of harms favored the movant where the preliminary injunction merely preserved the status quo and the defendants could not demonstrate any concrete harm from the injunction).

Accordingly, the balance of hardships weighs heavily in the Plaintiff's favor, warranting the entry of a temporary restraining order.

## IV.   A TEMPORARY RESTRAINING ORDER WOULD SERVE THE PUBLIC'S INTEREST

89.     Finally, courts in this district have held that, in contexts where the claims involve fraudulent actions, "[i]t is in the public interest to protect against fraud and to make victims of fraud whole, while preventing wrongdoers from benefiting from their deceit." *SEC v. Asset Recovery and Mgmt. Tr., S.A.*, 340 F. Supp. 2d 1305, 1311 (M.D. Ala. 2004); *see also SEC v. Stanley*, No. 20-14097, 2022 WL 4236829, at *2 (S.D. Fla. Apr. 5, 2022) ("The Commission has shown that a preliminary injunction would serve the public interest by preventing the dissipation of assets that could be used to satisfy the Judgment, as well as discouraging Stanley and others from engaging in similar conduct."); *FTC v. Simple Health Plans LLC*, 379 F. Supp. 3d 1346, 1364 (S.D. Fla. 2019) (citing *FTC v. World Wide Factors, Ltd.*, 882 F.2d 344, 347 (9th Cir. 1989) (affirming district court finding that "there is no oppressive hardship to defendants in requiring them to . . . refrain from fraudulent representation or preserve their assets from dissipation or concealment.")).

90.     In this instance, temporary injunctive relief will allow the Liquidating Trust to preserve the Overseas Highway Property—an asset purchased entirely with estate funds totaling $9,747,727.82 [Rodriguez Decl. ¶¶ 5–12; Messenger Decl. ¶ 6, Ex. A]—for the benefit of the Liquidating Trust's beneficiaries while this Court adjudicates the merits of the Fraudulent Transfer Claims in the Adversary Proceeding. *See eCapital Com. Fin. Corp. v. Hitachi Cap. Am. Corp.*, 519 F. Supp. 3d 1129, 1136 (S.D. Fla. 2021) ("Preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing—and no longer—will allow the parties to adjudicate their contractual rights in an orderly setting before any funds are disbursed.").

91.    The public interest is further served by protecting the integrity of the bankruptcy process and ensuring that estate/Liquidating Trust assets are not dissipated before the Court can adjudicate the Liquidating Trust's claims in the Adversary Proceeding on the merits. Permitting Elite Island to encumber, dissipate, transfer, and/or otherwise dispose of the Overseas Highway Property would reward the very conduct that the fraudulent transfer provisions of the Bankruptcy Code and FUFTA were designed to prevent. Further, the Owocs intend to obtain financing against the property to retain successor counsel—effectively asking this Court to countenance the use of estate/Liquidating Trust-funded property to bankroll their defense against the Liquidating Trust's fraudulent transfer claims. Allowing such a result would subvert and pervert the public interest in ensuring that wrongdoers do not benefit from the very misconduct being adjudicated. *See, e.g.*, *id.*

## V.    THE LIQUIDATING TRUST IS ENTITLED TO *EX PARTE* RELIEF

92.    "It is well settled that courts may exercise their broad equitable powers by granting *ex parte* temporary restraining orders before a defendant has been served and given an opportunity to respond." *Commodity Futures Trading Comm'n v. Fingerhut*, No. 20-CIV-21887, 2020 WL 2747448, at *2 (S.D. Fla. May 26, 2020) (citing Fed. R. Civ. P. 65(b)); *see Mayoral v. Salin*, No. 1:21-CV-62074, 2021 WL 4804525, at *2 (S.D. Fla. Oct. 14, 2021) (issuing TRO without notice to defendants because "established specific facts that show an irreparable damage that would be suffered" if defendant was permitting to "dissipate fraudulently obtained funds"). Here, the specific facts demonstrating immediate and irreparable harm are overwhelming and undisputed: (i) at the March 18, 2026 hearing, Mr. Owoc told this Court he had "at least a dozen" prospective lenders and could not "sell the property" or "transact any business" because of the lis pendens [Kaplan Cert. ¶ 11, Ex. 9 at 10:20–25, 25:25–26:2]; (ii) the next day, this Court discharged the lis pendens on March 19, 2026; (iii) within forty-eight hours, Mr. Owoc reinstated the

-32-

administratively dissolved Elite Island and changed its ownership structure by adding two new, previously unknown members; (iv) six days later, the Owocs filed a motion confirming their intent to "arrange and close financing" secured by the Overseas Highway Property, [*see* Adv. Pro. Dkt. 437 at 2–3]; and (v) the Liquidating Trust has reason to believe that providing advance notice of this application would enable Elite Island to encumber, dissipate, transfer, and/or otherwise dispose of the Overseas Highway Property beyond the reach of the Liquidating Trust before the Court could act. [*See* Balasiano Aff. ¶¶ 8–9.] These circumstances satisfy the exacting standard for *ex parte* relief because the compressed timeline and the Owocs' own sworn statements leave no doubt that the Liquidating Trust will suffer immediate and irreparable injury if Elite Island is afforded an opportunity to act before this Court can hear and rule on the Liquidating Trust's application.

## CONCLUSION

For all the foregoing reasons, the Plaintiff respectfully requests that the Court enter an order granting the relief requested in this Motion and such other and further relief as may be just and proper.

[*Signature page follows*]

# (i) *Declaration of Zurama Sury Rodriguez*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**
**www.flsb.uscourts.gov**

| | |
|---|---|
| VPX LIQUIDATING TRUST, by and through its Liquidating Trustee, <br><br> *Plaintiffs*, <br><br> v. <br><br> JOHN H. OWOC, MEGAN ELIZABETH OWOC, JONATHAN W. OWOC, BRANDEN SHAW, DAVID RUNNEBAUM, JWO REAL ESTATE INVESTMENT I, LLC, JWO REAL ESTATE INVESTMENT II LLC, JW OWOC ENTERPRISES, LLC, 167 SPYGLASS LN LLC, 120 SPYGLASS LN LLC, 3 PELICAN DR LLC, TROPICAL SUNSET 117 LLC, STAG DEVELOPMENT LLC, SHAW INVESTMENTS & REALTY, INC., ELITE ISLAND LLC, JHO GA-1 INVESTMENT, LLC, JHO NV-1 INVESTMENT LLC, SHERIDAN REAL ESTATE INVESTMENT A, LLC, SHERIDAN REAL ESTATE INVESTMENT B, LLC, and SHERIDAN REAL ESTATE INVESTMENT C, LLC, <br><br> *Defendants*. | Case No. 22-17842 (PDR) <br> (Jointly Administered) <br><br><br> Adv. Pro. No. 24-01009 (PDR) <br><br><br> **DECLARATION OF** <br> **ZURAMA SURY RODRIGUEZ** |

Under 28 U.S.C. § 1746, Zurama Sury Rodriguez hereby declares as follows under the penalty of perjury:

## I.    BACKGROUND AND QUALIFICATIONS.

1.    I joined Vital Pharmaceuticals, Inc. ("VPX" or the "Company") in May 2018 and served as Director of Finance until May 2022 when I briefly left to look for other, more flexible, employment.  I returned to VPX in June 2022 as Vice President of Finance and held that position

42978/4
03/30/2026 318207521.4

when VPX filed for Chapter 11 bankruptcy protection on October 10, 2022. I continued in that position following the bankruptcy filing, until my departure in July 2023.

2.      The statements in this Declaration are based on my personal knowledge and my work in VPX's finance department.

## II.     RESPONSIBILITIES AND REPORTING STRUCTURE.

3.      My day-to-day responsibilities as the Director of Finance and Vice President of Finance included managing the Company's Accounting Department, which provided a myriad of services to certain debtor entities, including Vital Pharmaceuticals, Inc , Bang Energy Canada, Inc., JHO Real Estate Investment, LLC, Quash Seltzer, LLC, and Vital Pharmaceuticals International Sales, Inc. (collectively, the "Debtors").   While Vital Pharmaceuticals International Sale, Inc. was part of the corporate structure, it did not engage in any transactions requiring the accounting department's expertise.   Aside from Vital Pharmaceuticals, Inc, none of the other debtor entities had their own employees.   The VPX accounting team handled accounting for all the previously mentioned entities.   All the entities were structured as limited liability companies (LLCs) so that costs could be segregated and reported separately.

4.      All financial transactions for the Debtors were recorded in their separate  general ledgers, or as intercompany transactions as part of their ordinary course of business.   The transactions in the ledger were all recorded at or near the time that the transaction at issue occurred, as part of our regular business practices.

## III.    ELITE ISLAND LLC.

5.      Elite Island LLC ("Elite Island") is not, and has never been part of VPX's corporate structure or operations. It was also not one of the Debtors.   As far as I know, Elite Island was not used for any business purpose.   Although Elite Island had no role in VPX's business operations, the money used to purchase the Overseas Highway Property was paid by VPX.

-2-

6.      Jack Owoc directed the use of the Company funds to purchase Overseas Highway Property.  On August 25, 2020, VPX's then-General Counsel, Frank Massabki, notified me of the anticipated closing for the purchase of the Overseas Highway Property by email and provided wire transfer instructions.  Attached as **Exhibit A**, Bates No. VPXTrust_0000006726 is a true and accurate copy of that email.

7.       It was my understanding that Mr. Owoc approved this transfer prior to  Mr. Massabki sending this email because no one at the company was permitted to spend any money without Mr. Owoc's express authorization and approval.

8.      On August 31, 2020, Nilmarie Abreu, another VPX employee, initiated a wire transfer in the amount of $8,304,171.78 from the Company's PNC Bank operating account (Account No. 1219069672) to the escrow account of Torrens Law Firm PPLC at TD Bank for the closing.  At Mr. Owoc's direction, I approved the transaction.  Attached as **Exhibit B**, Bates No. VPXTrust_0000006100, is a true and accurate copy of the wire transfer confirmation.

9.      Following the purchase of the Overseas Highway Property, Mr. Owoc continued to use Company funds to pay various expenses associated with the property, such as construction costs and property taxes.  For example:

    a.      On October 2, 2020, at Mr. Owoc's direction, I approved a wire transfer in the amount of $202,589.66 from VPX's PNC Bank operating account to KMR Construction Management Inc.  Of that total, $126,062.72 was designated for construction work to be performed on the Overseas Highway Property.  Attached as **Exhibit C**, Bates No. VPXTrust_0000041381, is a true and accurate copy of an email I sent with the wire transfer confirmation and other instructions.

b.  On March 31, 2021, at Mr. Owoc's direction, I used VPX's PNC Bank operating account to pay the 2020 property taxes on the Overseas Highway Property to the Monroe County Tax Collector in the amount of $25,793.10. Attached as **Exhibit D**, Bates No. VPXTrust_0000005976, is a true and accurate copy of the emailed receipt from the Monroe County Tax Collector. The email receipt lists the Elite Island's address as 1600 N. Park Dr., Weston, FL. At the time, that was also the address for VPX's corporate office.

c.  In August 2021, Jack Owoc and his personal assistant, Natalia Perez, directed me to process a payment in the amount of $197,884.55 to KMR Construction for the windows and doors for Elite Island. Jack Owoc approved the payment by email. Attached as **Exhibit E**, Bates No. VPXTrust_0000042816, is a true and accurate copy of the email thread.

10.  All of the transfers described above were made at Mr. Owoc's direction. Mr. Owoc would communicate his requests for payment—whether directly to me, through his personal assistant, Ms. Perez, or through his executive assistant Nikki Lavelle—and I or other members of the VPX accounting staff would process the payments from VPX's operating account.

11.  To my knowledge, none of the funds that VPX transferred in connection with Elite Island or the Overseas Highway Property were ever returned to VPX. I am not aware of VPX receiving any repayment or other return of value from Elite Island, Mr. Owoc, or any other party in connection with these transfers.

12.  VPX derived no revenue, business advantage, or other benefit from the Overseas Highway Property or from any of the transfers made in connection with it.

-4-

-5-

I hereby declare the foregoing statements made by me are true. I am aware if any of the statements made by me are willfully false, I may be subject to punishment.

Dated: March 30, 2026          By: _____

DocuSigned by:

*Zurama Rodriguez*

643CCCCFD213476...

ZURAMA SURY RODRIGUEZ

**Sury Rodriguez**

| | |
|---|---|
| **From:** | Frank Massabki |
| **Sent:** | Tuesday, August 25, 2020 12:55 PM |
| **To:** | Sury Rodriguez |
| **Cc:** | M. Scott Kleiman |
| **Subject:** | FW: Wire Instructions |
| **Attachments:** | TD Bank Wiring Instructions(2).pdf |

Sury, hi.  This is just a heads-up regarding the closing of the Craig Key property.  The closing is scheduled for **August 31**.  I'm copying our outside real estate counsel, Scott Kleiman.

**Frank Massabki**
General Counsel
Frank.Massabki@BangEnergy.com

**Vital Pharmaceuticals, Inc.**
1600 North Park Drive
Weston, FL 33326
954.547.8785 ext. 104
www.BangEnergy.com

1



This message and its contents may contain proprietary, business-confidential, and/or privileged material. If you have received this message inadvertently, do not use or rely upon it. Instead, please inform the sender and then delete it. Thank you.

**From:** M Scott Kleiman <skleiman@kaliskleiman.com>
**Sent:** Tuesday, August 25, 2020 12:51 PM
**To:** Frank Massabki <frank.massabki@bangenergy.com>
**Subject:** FW: Wire Instructions

Frank :

Here are the wiring instructions.

2

CONFIDENTIAL

VPX-UCC0000012151
VPXTrust_0000006726

CONFIDENTIAL

# Quick Search by Trace ID Report

PNC

**Initiation Date: Monday, August 31, 2020**

09/01/2020 09:05:15 AM

| Account Summary | 1219069672 | VITAL PHARMACEUTICALS INC OPER | Amount | Count |
|---|---|---|---|---|
| | | Total Debits : | 8,304,171.78 USD | 1 |

| Account | Trace ID | Template ID | Template Name | Type | Value / Send Date | Beneficiary | Amount | Status | Fed Ref No. |
|---|---|---|---|---|---|---|---|---|---|
| 1219069672 | 202008403499 | | | Domestic | 8/31/2020 | Torrens Law Firm PLLC | 8,304,171.78 USD | Confirmed | 013335 |

**Beneficiary Bank**
ID: 031101266
Name: TD BANK, NA
Address: WILMINGTON,DE

**Bank Reference Number**
208VK5644DH77DOX

**External Reference Number**
0831MMQFMPNA013335

**Beneficiary Information**
Account: 4322054026

OBI: File # 20-025A Prop. Location:
72100 Overseas Highway Islamorada FL
33036

**Audit History**
Initiated by: Nilmarie Abreu 08/31/2020 04:46 PM ET
Approved by: Sury Rodriguez 08/31/2020 04:56 PM ET
Received by: BANK 08/31/2020 04:56 PM ET
Confirmed by: BANK 08/31/2020 05:08 PM ET

| Grand Totals | | Amount | Count |
|---|---|---|---|
| | Total Debits : | 8,304,171.78 USD | 1 |

Case 24-01009-PDR Doc 452 Filed 03/31/26 Page 41 of 289

VPX-UCC0000011368
VPXTrust_0000006100

CONFIDENTIAL

# Quick Search by Trace ID Report

**PNC**

**Initiation Date: 08/31/2020**  ·  Return  ·  **08/31/2020 04:46:52 PM**

| Account Summary | 1219069672 | VITAL PHARMACEUTICALS INC OPER | Amount | Count |
|---|---|---|---|---|
| | | Total Debits : | 8,304,171.78 USD | 1 |

| Account | Trace ID | Template ID | Template Name | Type | Value / Send Date | Beneficiary | Amount | Status | Fed Ref No. |
|---|---|---|---|---|---|---|---|---|---|
| 1219069672 | 202008403499 | | | Domestic | 8/31/2020 | Torrens Law Firm PLLC | 8,304,171.78 USD | Pending Approval | |

**Beneficiary Bank**
ID: 031101266
Name: TD BANK, NA
Address: WILMINGTON,DE

**Beneficiary Information**
Account: 4322054026

OBI: File # 20-025A Prop. Location:
72100 Overseas Highway Islamorada FL
33036

**Audit History**
Initiated by: Nilmarie Abreu 08/31/2020 04:46 PM ET

| Grand Totals | | Amount | Count |
|---|---|---|---|
| | Total Debits : | 8,304,171.78 USD | 1 |

JJS
8-31-2020

VPX-UCC00000011369
VPXTrust_000000006101



**TORRENS LAW FIRM, PLLC.**

ATTORNEYS: LUIS TORRENS, ESQ.

# Wire Transfer/ACH Instructions

### Beneficiary Bank

TD Bank, NA
300 Delaware Ave
Wilmington, Delaware 19801

### Domestic Wire Transfer ABA/Routing Number

031101266

### International Wire Transfer Swift Code (US Dollars)

NRTHUS33XXX
For incoming Wire Transfers in a foreign currency
please call for instructions.

### Beneficiary Account Name

Torrens Law Firm PLLC
Escrow Account

### Beneficiary Address

8045 NW 155th Street
Miami Lakes, Florida 33016

### Beneficiary Account Number

4322054026

### 24 Hour Customer Service

1-888-751-9000

www.tdbank.com

You can reach us via E-Mail at: Luis@TorrensLaw.com
Thank You
Luis Torrens

PERSONAL INJURY ● BANKRUPTCY ● REAL ESTATE ● FAMILY LAW
8045 NW 155th Street, Miami Lakes, Florida 33016 (305) 364-4848 (305)356-7167 FAX

CONFIDENTIAL

VPX-UCC0000011370
VPXTrust_0000006102

**From:**        Sury Rodriguez [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP
                 (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=552A4D76E3944A2C937D55E6F4E4EC91-SURY.RODRIG]
**Sent:**        10/2/2020 4:45:03 PM
**To:**          'Michael Rafferty' [mike@kmr.construction]
**Subject:**     RE: KMR Invoice and New Wire Instructions


Hi Mike,

Below, please find wire confirmation.



**Sury Rodriguez**
Director of Finance
Sury.Rodriguez@vpxsports.com

**VPX | REDLINE | BANG**
1600 N. Park Drive Weston, FL 33326
vpxsports.com [vpxsports.com]
**Live Powerfully™**

**From:** Michael Rafferty <mike@kmr.construction>
**Sent:** Friday, October 2, 2020 10:34 AM
**To:** Sury Rodriguez <Sury.Rodriguez@bangenergy.com>
**Subject:** Re: KMR Invoice and New Wire Instructions

Good morning Sury,
Just wanted to make sure you have my cell number. 786 877 4879. Please give me a call so we can confirm wire details.

CONFIDENTIAL

VPX-UCC0000084483
VPXTrust_0000041381

Thanks

On Thu, Oct 1, 2020 at 5:29 PM Sury Rodriguez <Sury.Rodriguez@bangenergy.com> wrote:

Hi Michael,

In order to protect both you and Jack from email interception and fraud,  I will call you tomorrow to confirm the banking information you are asking us to use going forward.

**Sury Rodriguez**

Director of Finance

Sury.Rodriguez@vpxsports.com

**VPX | REDLINE | BANG**

1600 N. Park Drive Weston, FL 33326

CONFIDENTIAL

VPX-UCC0000084484
VPXTrust_0000041382

vpxsports.com

[vpxsports.com]

**Live Powerfully™**



**From:** Michael Rafferty <mike@kmr.construction>

**Sent:** Thursday, October 1, 2020 3:49 PM

**To:** Sury Rodriguez <Sury.Rodriguez@bangenergy.com>

**Cc:** Jack Owoc <CEO@bangenergy.com>; Natalia Perez <Natalia.Perez@bangenergy.com>

**Subject:** Re: KMR Invoice and New Wire Instructions

CONFIDENTIAL

VPX-UCC0000084485
VPXTrust_0000041383

Attached all invoices.

**Michael Rafferty** - Construction Coordinator

Office 954-342-3400 | Cell

786-877-4879

10424 W SR 84 Bay 10 Davie, FL 33324

www.kmr.construction

On Thu, Oct 1, 2020 at 3:41 PM Michael Rafferty <mike@kmr.construction> wrote:

CONFIDENTIAL

VPX-UCC0000084486
VPXTrust_0000041384

Good afternoon Sury,

attached are two invoices and new wire instructions. Please DO NOT wire to the old account number.

**Bank Name:** Wells Fargo Bank, N.A.

**Address:** 420 Montgomery St.

San Francisco, CA 94104

**Routing #:** 121000248

CONFIDENTIAL

VPX-UCC0000084487
VPXTrust_0000041385

**Account #:** 1677750240

**Elite-0001 - $126,062.72** full balance due

**OwocGym-0001 -** $153,053.89 only **50% due now  ($76,526.94)** the other 50% will be due in about 3 weeks.

Any questions please contact me anytime.

VPX-UCC0000084488
VPXTrust_0000041386

Thanks,

**Michael Rafferty** - Construction Coordinator

Office 954-342-3400 | Cell

786-877-4879

10424 W SR 84 Bay 10 Davie, FL 33324

www.kmr.construction

CONFIDENTIAL

VPX-UCC0000084489
VPXTrust_0000041387

[ External Email ]

Phishing emails are a top cybersecurity threat to our company.

If you have reason to believe this email is suspicious, forward it for inspection to

Security@VPXSports.com.

--
Michael Rafferty
Project Manger
KMR Construction Management Inc.
954 342 3400
www.KMR.construction

[ External Email ]
Phishing emails are a top cybersecurity threat to our company.
If you have reason to believe this email is suspicious, forward it for inspection to Security@VPXSports.com.

VPX-UCC0000084490
VPXTrust_0000041388

Successfully checked out.

Thank you for your payment.

An email confirmation will be sent to Sury.Rodriguez@BangEnergy.com.

**Receipt Number**
000-20-00022752

**Payment Date**
03/31/2021 03:55PM

## Order Summary

 PROPERTY TAX

*2020 Annual bill*

**Account 1476846**
ELITE ISLAND LLC
1600 N Park Dr
Weston, FL 33326-3278

$25,793.10

| | | |
|---|---|---|
| Payment | — | $25,793.10 |
| Balance | | $0.00 |

**Transaction Details**

**Using E-Check**
Account ending in 9672

**Paid By**
PNC Bank
Sury.Rodriguez@BangEnergy.com

https://monroe.county-taxes.com/public/cart/receipts/2725290

1/1

CONFIDENTIAL

VPX-UCC0000011244
VPXTrust_0000005976

| | |
|---|---|
| **From:** | Jack Owoc [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=148DA915A819473A9DBE6F691B4C4AB7-CEO] |
| **Sent:** | 8/2/2021 6:11:39 PM |
| **To:** | Natalia Perez [natalia.perez@bangenergy.com] |
| **CC:** | Sury Rodriguez [sury.rodriguez@bangenergy.com]; Michael Rafferty [mike@kmr.construction] |
| **Subject:** | Re: Elite Island Windows and Doors |

Approved

Jack Owoc
Bang Energy CEO, CSO
BangEnergy.com
Potent Brain & Body Fuel


On Aug 2, 2021, at 3:46 PM, Natalia Perez <Natalia.Perez@bangenergy.com> wrote:

Hi Sury,

Please process this payment for the keys windows & doors . The second attachment is a back-up for your reference, please process payment to KMR for the amount of $197,884.55.

Please, let me know if you have any questions.

Thank you.

Natalia Perez
Personal Assistant to Jack Owoc, Chief Executive Officer & CSO
Natalia.Perez@bangenergy.com<mailto:Natalia.perez@bangenergy.com>

BANG | VPX | REDLINE
1600 N. Park Drive Weston, FL 33326

C: 954-649-1203

BangEnergy.com<https://nam12.safelinks.protection.outlook.com/?url=https%3A%2F%2Fbangenergy.com%2F&data=04%7C01%7CCEO%40bangenergy.com%7Cf2ed5d62cc974d9a50d108d955edf2a9%7Ca21eb75ac46e4d82972821913bba98c2%7C0%7C0%7C637635303819975431%7CUnknown%7CTWFpbGZsb3d8eyJWIjoiMC4wLjAwMDAiLCJQIjoiV2luMzIiLCJBTiI6Ik1haWwiLCJXVCI6Mn0%3D%7C1000&sdata=t%2BaCpP7U9mEd8caYPDRyMFeZigpSY22qUdP1rt6BUlQ%3D&reserved=0>

Potent Brain and Body Fuel™

[signature_1791526307]<https://nam12.safelinks.protection.outlook.com/?url=http%3A%2F%2Fwww.bangenergy.com%2F&data=04%7C01%7CCEO%40bangenergy.com%7Cf2ed5d62cc974d9a50d108d955edf2a9%7Ca21eb75ac46e4d82972821913bba98c2%7C0%7C0%7C637635303819985427%7CUnknown%7CTWFpbGZsb3d8eyJWIjoiMC4wLjAwMDAiLCJQIjoiV2luMzIiLCJBTiI6Ik1haWwiLCJXVCI6Mn0%3D%7C1000&sdata=LMUb%2FH0%2BFPBDagpDL0VrqlY%2FOxIMSABSp5SVRtYyecM%3D&reserved=0>

CONFIDENTIAL

VPX-UCC0000086028
VPXTrust_0000042816

From: Jack Owoc <CEO@bangenergy.com>
Date: Tuesday, June 8, 2021 at 6:16 PM
To: Michael Rafferty <mike@kmr.construction>
Cc: Natalia Perez <Natalia.Perez@bangenergy.com>
Subject: Re: Elite Island Windows and Doors

Approved
Jack Owoc
Bang Energy CEO, CSO
BangEnergy.com<https://nam12.safelinks.protection.outlook.com/?url=https%3A%2F%2Fbangenergy.com%2
F&data=04%7C01%7CCEO%40bangenergy.com%7Cf2ed5d62cc974d9a50d108d955edf2a9%7Ca21eb75ac46
e4d82972821913bba98c2%7C0%7C0%7C637635303819985427%7CUnknown%7CTWFpbGZsb3d8eyJWIjoi
MC4wLjAwMDAiLCJQIjoiV2luMzIiLCJBTiI6Ik1haWwiLCJXVCI6Mn0%3D%7C1000&sdata=bjjYHq0vK6
A4dAIqL%2Fr7JpJB%2BiSb59omueLMqGkZQY4%3D&reserved=0>
Potent Brain & Body Fuel


On Jun 8, 2021, at 3:50 PM, Michael Rafferty <mike@kmr.construction> wrote:
Good afternoon Jack,
Attached is the window and door pricing for the Keys house. If I order today we will not be hit with the price
increase.

Before I process it  I just wanted to get your final approval.

Please let me know and call me if you have any questions.

Thanks

[ External Email ]
Phishing emails are a top cybersecurity threat to our company.
If you have reason to believe this email is suspicious, forward it for inspection to Security@BangEnergy.com.
<Elite island windows and doors-06082021151424.pdf>

<Elite Island Windows & Doors Invoice .pdf>
<Elite island windows and doors-06082021151424.pdf>

CONFIDENTIAL

VPX-UCC0000086029
VPXTrust_0000042817

**(ii)** *Declaration of Zach Messenger of Lincoln International LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**
www.flsb.uscourts.gov

| | |
|---|---|
| VPX LIQUIDATING TRUST, by and through its Liquidating Trustee,<br><br>*Plaintiffs*,<br><br>v.<br><br>JOHN H. OWOC, MEGAN ELIZABETH OWOC, ELITE ISLAND LLC, JHO GA-1 INVESTMENT, LLC, JHO NV-1 INVESTMENT LLC, SHERIDAN REAL ESTATE INVESTMENT A, LLC, SHERIDAN REAL ESTATE INVESTMENT B, LLC, and SHERIDAN REAL ESTATE INVESTMENT C, LLC,<br><br>*Defendants*. | Case No. 22-17842 (PDR)<br>(Jointly Administered)<br><br><br>Adv. Pro. No. 24-01009 (PDR) |

**DECLARATION OF ZACH MESSENGER IN SUPPORT OF THE LIQUIDATING TRUST'S EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AGAINST ELITE ISLAND LLC**

Under 28 U.S.C. § 1746, Zach Messenger hereby declares as follows under the penalty of perjury:

1.      I am a Director in the Capital Advisory Group at Lincoln International LLC ("Lincoln"), a financial advisory firm retained by the VPX Liquidating Trust (the "Liquidating Trust") in connection with these chapter 11 cases (the "Chapter 11 Cases"). Lincoln has expertise in operational and financial restructurings, mergers and acquisitions (M&A) and provides capital raising services to stakeholders in stressed and distressed situations.

2.      I submit this declaration ("Declaration") on behalf of the Liquidating Trust and in support of the *Ex Parte Emergency Motion for a Temporary Restraining Order and*

*Preliminary Injunction Against Elite Island LLC* (the "Motion") being simultaneously filed herewith.

3.     Unless otherwise indicated herein, all facts set forth in this Declaration are based upon information learned from my review of relevant documents, information supplied by members of the Debtors' former financial advisors, Huron Consulting Services LLC ("Huron"), other members of Lincoln's engagement team or the Committee of Unsecured Creditors ("the Committee") and/or Liquidating Trust's other advisors, my personal knowledge gleaned during the course of my engagement with the Liquidating Trust, or my opinion informed by my experience, knowledge, and information concerning the Debtors' operations and financial affairs.

4.     If called upon to testify, I could and would testify competently to the facts set forth herein on that basis.

5.     I am not being compensated for this testimony other than through payments received by Lincoln as a professional retained by the Liquidating Trust, and none of those payments are contingent upon the opinions or conclusions I reach, nor the outcome of this Motion.

6.     In connection with my work for the Liquidating Trust and formerly with the Committee, I have reviewed Vital Pharmaceuticals, Inc.'s ("VPX" or the "Company") general ledger (the "General Ledger"), which was maintained in the ordinary course of business by VPX's accounting department. The General Ledger reflects that Elite Island LLC ("Elite Island") related costs, including but not limited to costs associated with the purchase and maintenance of the Overseas Highway Property (as defined in the Motion) were paid using VPX funds. Attached hereto as **Exhibit A** is an excerpt from the General Ledger identifying all of the Elite Island-related transfers made from VPX's accounts.

-3-

7.      Based on my review of the general ledger and other records available to the Liquidating Trust, I am not aware of any repayment or return of value from Elite Island to VPX in connection with the Elite Island-related transfers.  Importantly, the General Ledger does not reflect any such repayment.

8.      In addition, on March 23, 2026, the Liquidating Trust paid $166,258.82 in past-due property taxes owed on the Overseas Highway Property dating back to 2023.  Attached as **Exhibit B** is a true and accurate copy of the receipt for the Liquidating Trust's payment of the property taxes on account of the Overseas Highway Property.

I declare under penalty of perjury under the laws of the United States of America that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Dated: March 29, 2026

Signed by:

5E630B8EC48D4D7...

Zach Messenger

## G/L Accounts - Line Items

| Posting Date | G/L Account | G/L Account (Text) | Journal Entry | Journal Entry Item | Journal Entry Type | Accounting Period | Journal Entry Header Text | Journal Entry Item Text | Source Doc. Date | Source Doc. Item | Offset Customer / Supplier ID | Offset Customer / Supplier ID (Text) | Source Document External Reference | Debit Amount Company Currency | Credit Amount Company Currency |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10/01/2022 | 304000 | Distributions | 200000062722 | 2 | Supplier Invoice | 10 | Water bill-Jacks house-Fl Key | Water bill-Jacks house-Fl Key | 09/29/2022 | 394281-1.1 | 1009968 | Florida Keys Aqueduct Authority | 616573-009378 SEP2022 | 56.04 USD | |
| 08/01/2022 | 304000 | Distributions | 200000050737 | 2 | Supplier Invoice | 8 | Water bill-Jacks house-Fl Key | Water bill-Jacks house-Fl Key | 07/10/2022 | 381339-1.1 | 1009968 | Florida Keys Aqueduct Authority | 616573-009378 JULY2022 | 19.38 | |
| 08/01/2022 | 304000 | Distributions | 200000053866 | 2 | Supplier Invoice | 8 | Water bill-Jacks house-Fl Key | Water bill-Jacks house-Fl Key | 08/10/2022 | 384778-1.1 | 1009968 | Florida Keys Aqueduct Authority | 616573-009378 AUG2022 | 33.19 USD | |
| 07/01/2022 | 304000 | Distributions | 200000047499 | 2 | Supplier Invoice | 7 | Water bill-Jacks house-Fl Key | Water bill-Jacks house-Fl Key | 06/10/2022 | 377842-1.1 | 1009968 | Florida Keys Aqueduct Authority | 616573-009378 JUNE2022 | 18.1 | |
| 05/01/2022 | 304000 | Distributions | 200000028831 | 2 | Supplier Invoice | 5 | Water bill-Jacks house-Fl Key | Water bill-Jacks house-Fl Key | 04/11/2022 | 358173-1.1 | 1009968 | Florida Keys Aqueduct Authority | 616573-009378 APRIL2022 | 17.08 | |
| 05/01/2022 | 304000 | Distributions | 200000038425 | 2 | Supplier Invoice | 5 | Water bill-Jacks house-Fl Key | Water bill-Jacks house-Fl Key | 05/06/2022 | 368024-1.1 | 1009968 | Florida Keys Aqueduct Authority | 616573-009378 MAY2022 | 18.17 USD | |
| 04/01/2022 | 304000 | Distributions | 200000020474 | 2 | Supplier Invoice | 4 | Water bill-Jacks house-Fl Key | Water bill-Jacks house-Fl Key | 03/11/2022 | 349253-1.1 | 1009968 | Florida Keys Aqueduct Authority | 616573-009378 MARCH2022 | 17.13 USD | |
| 02/04/2022 | 304000 | Distributions | 200000008564 | 2 | Supplier Invoice | 2 | Water bill-Jacks house-Fl Key | Water bill-Jacks house-Fl Key | 02/04/2022 | 336864-1.1 | 1009968 | Florida Keys Aqueduct Authority | 616573-009378 FEB2022 | 21.04 USD | |
| 01/01/2022 | 304000 | Distributions | 200000000752 | 2 | Supplier Invoice | 1 | Water bill-Jacks house-Fl Key | Water bill-Jacks house-Fl Key | 12/10/2021 | 314548-1.1 | 1009968 | Florida Keys Aqueduct Authority | 616573-009378 DEC2021 | 17.57 USD | |
| 01/01/2022 | 304000 | Distributions | 200000003097 | 2 | Supplier Invoice | 1 | Water bill-Jacks house-Fl Key | Water bill-Jacks house-Fl Key | 01/07/2022 | 331289-1.1 | 1009968 | Florida Keys Aqueduct Authority | 616573-009378 JAN2022 | 23.65 USD | |
| 12/31/2021 | 304000 | Distributions | 200000081651 | 2 | Supplier Invoice | 12 | Property Taxes receipt for Keys FL | Property taxes Keys FL | 12/31/2021 | 330427-1.1 | 1010376 | Monroe County Tax collector | 1476846*2021 | 25,368.72 USD | |
| 11/24/2021 | 304000 | Distributions | 200000072608 | 2 | Supplier Invoice | 11 | 72100 Overseas HWY ,Matacumbe Key | 72100 Overseas HWY ,Matacumbe Key | 11/24/2021 | 305265-1.1 | 1006332 | KMR Construction Management, Inc. | ELITE-0004 | 531,344.01 USD | |
| 11/01/2021 | 304000 | Distributions | 200000071305 | 2 | Supplier Invoice | 11 | Water bill-Jacks house-Fl Key | Water bill-Jacks house-Fl Key | 10/08/2021 | 303895-1.1 | 1009968 | Florida Keys Aqueduct Authority | 616573-009378 OCT2021 | 73.25 USD | |
| 11/01/2021 | 304000 | Distributions | 200000073327 | 2 | Supplier Invoice | 11 | Water bill-Jacks house-Fl Key | Water bill-Jacks house-Fl Key | 11/05/2021 | 305998-1.1 | 1009968 | Florida Keys Aqueduct Authority | 616573-009378 NOV2021 | 62.92 USD | |
| 10/01/2021 | 304000 | Distributions | 200000065021 | 2 | Supplier Invoice | 10 | Water bill-Jacks house-Fl Key | Water bill-Jacks house-Fl Key | 09/10/2021 | 297075-1.1 | 1009968 | Florida Keys Aqueduct Authority | 616573-009378 SEP 2021 | 49.03 USD | |
| 09/21/2021 | 304000 | Distributions | 200000058457 | 2 | Supplier Invoice | 9 | 20201-72100 Overseas Hwy | 20201-72100 Overseas Hwy | 05/12/2021 | 290233-1.1 | 1006162 | Affiniti Architects Holding, LLC | 15192 | 25,191.00 USD | |
| 08/06/2021 | 304000 | Distributions | 200000048464 | 2 | Supplier Invoice | 8 | 72100 Overseas HWY ,Matacumbe Key | 72100 Overseas HWY ,Matacumbe Key | 08/06/2021 | 279616-1.1 | 1006332 | KMR Construction Management, Inc. | ELITE-0003 | 197,884.55 USD | |
| 08/01/2021 | 304000 | Distributions | 200000048659 | 2 | Supplier Invoice | 8 | Water bill-Jacks house-Fl Key | Water bill-Jacks house-Fl Key | 07/09/2021 | 279814-1.1 | 1009968 | Florida Keys Aqueduct Authority | 616573-009378 JULY 2021 | 31.79 USD | |
| 08/01/2021 | 304000 | Distributions | 200000052570 | 2 | Supplier Invoice | 8 | Water bill-Jacks house-Fl Key | Water bill-Jacks house-Fl Key | 08/06/2021 | 284019-1.1 | 1009968 | Florida Keys Aqueduct Authority | 616573-009378 AUG 2021 | 52.08 USD | |
| 07/01/2021 | 304000 | Distributions | 200000044355 | 2 | Supplier Invoice | 7 | 72100 Overseas Highway | 72100 Overseas Highway | 05/24/2021 | 275260-1.1 | 1010059 | Keys Engineering Services | 5132 | 30,463.00 USD | |
| 06/01/2021 | 304000 | Distributions | 200000035013 | 2 | Supplier Invoice | 6 | Water bill-Jacks house-Fl Key | Water bill-Jacks house-Fl Key | 05/07/2021 | 265123-1.1 | 1009968 | Florida Keys Aqueduct Authority | 616573-009378 MAY 2021 | 36.21 USD | |
| 06/01/2021 | 304000 | Distributions | 200000037762 | 2 | Supplier Invoice | 6 | Water bill-Jacks house-Fl Key | Water bill-Jacks house-Fl Key | 06/04/2021 | 268097-1.1 | 1009968 | Florida Keys Aqueduct Authority | 616573-009378 JUNE 2021 | 16.46 USD | |
| 04/30/2021 | 304000 | Distributions | 361 | 1 | Manual Posting - Journal Entry Voucher | 4 | Reclass Keys House Property Tax | Reclass Keys House Property Tax | 05/12/2021 | 0000000001 | # | Not assigned | # | 25,793.10 USD | |
| 04/27/2021 | 304000 | Distributions | 200000022005 | 2 | Supplier Invoice | 4 | Design Development 72100 Overseas Hwy | Design Development 72100 Overseas Hwy | 03/04/2021 | 251598-1.1 | 1006162 | Affiniti Architects Holding, LLC | 14979 | 75,000.00 USD | |
| 04/09/2021 | 304000 | Distributions | 200000022397 | 2 | Supplier Invoice | 4 | Water bill-Jacks house-Fl Key | Water bill-Jacks house-Fl Key | 04/09/2021 | 252002-1.1 | 1009968 | Florida Keys Aqueduct Authority | 616573-009378 APR 21 | 32.42 USD | |
| 01/22/2021 | 304000 | Distributions | 200000004959 | 2 | Supplier Invoice | 1 | 72100 Overseas Highway | 72100 Overseas Highway | 01/22/2021 | 233666-1.1 | 1010059 | Keys Engineering Services | 4891 | 30,464.00 USD | |
| 01/18/2021 | 304000 | Distributions | 200000001257 | 2 | Supplier Invoice | 1 | 20201-72100 overseas HWY | Completion of Preliminary Plans | 01/18/2021 | 228871-1.1 | 1006162 | Affiniti Architects Holding, LLC | 14778 | 75,000.00 USD | |
| 01/08/2021 | 304000 | Distributions | 200000002319 | 2 | Supplier Invoice | 1 | Water bill-Jacks house-Fl Key | Water bill-Jacks house-Fl Key | 01/08/2021 | 230925-1.1 | 1009968 | Florida Keys Aqueduct Authority | 616573-009378 JAN 21 | 389.43 USD | |
| 12/10/2020 | 304000 | Distributions | 200000092333 | 2 | Supplier Invoice | 12 | Retainer&Preliminary Plans Overseas Hwy | Retainer | 12/10/2020 | 228882-1.1 | 1006162 | Affiniti Architects Holding, LLC | 14664 | 25000 | |
| 12/10/2020 | 304000 | Distributions | 200000092333 | 3 | Supplier Invoice | 12 | Retainer&Preliminary Plans Overseas Hwy | Preliminary Plans | 12/10/2020 | 228882-2.1 | 1006162 | Affiniti Architects Holding, LLC | 14664 | 25,000.00 USD | |

| | A | B | C | D | E | F | G | H | I | J | K | L | M | N | O | P |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | **G/L Accounts - Line Items** | | | | | | | | | | | | | | | |
| 2 | Posting Date | G/L Account | G/L Account (Text) | Journal Entry | Journal Entry Item | Journal Entry Type | Accounting Period | Journal Entry Header Text | Journal Entry Item Text | Source Doc. Date | Source Doc. Item | Offset Customer / Supplier ID | Offset Customer / Supplier ID (Text) | Source Document External Reference | Debit Amount Company Currency | Credit Amount Company Currency |
| 275 | 10/02/2020 | 304000 | Distributions | 200000067710 | 2 | Supplier Invoice | 10 | 72100 Overseas HWY, Lower Matecumbre Key | 72100 Overseas HWY, Lower Matecumbre Key | 10/02/2020 | 200727-1.1 | 1006332 | KMR Construction Management, Inc. | ELITE -0001 | 126,062.72 USD | |
| 292 | 08/31/2020 | 304000 | Distributions | 200000059338 | 2 | Supplier Invoice | 8 | 72100 OVERSEAS HIGHWAY | 72100 OVERSEAS HIGHWAY | 08/31/2020 | 192099-1.1 | 1007759 | Torrens Law Firm PLLC | 72100 OVERSEAS HIGHWAY | 8,304,171.78 USD | |
| 308 | 07/29/2020 | 304000 | Distributions | 200000051776 | 2 | Supplier Invoice | 7 | 72100 OVERSEAS HIGHWAY-Solid Investment | 1099 Compensation | 07/29/2020 | 184263-1.1 | 1005981 | Kalis Kleiman & Wolfe | 72100 OVERSEAS HIGHWAY | 250,000.00 USD | |

**Sam C. Steele**
**Monroe County Tax Collector**
**P.O Box 1129, Key West, FL 33041-1129**

| Transaction # 3754579 | |
|---|---|
| Cashier: | MVK |
| Paid By: VPX LIQUIDATING TRUST | |
| Posted Date: | 03/23/2026 11:12AM |
| Received Via: | Mail |
| Num. Items: | 5 |
| Total Tendered: | $166,258.82 |
| Receipt #: | 116-25-00000479 |
| Batch: | 745814 |
| Drawer: | 116 |
| Status: | Complete |

**Receipt**

| Item | Details | Effective Date | Due | Paid |
|---|---|---|---|---|
| Real Estate | Acc# 1476846 Bill Yr: 2022 Tda Fees Due: 03/31/2023 | 03/23/2026 | $527.93 | $527.93 |
| Real Estate | Acc# 1476846 Bill Yr: 2022 Tda Fees Due: 03/31/2023 | 03/23/2026 | $666.93 | $666.93 |
| Real Estate | Acc# 1476846 Bill Yr: 2023 Regular Due: 03/31/2024 | 03/23/2026 | $57,380.74 | $57,380.74 |
| Real Estate | Acc# 1476846 Bill Yr: 2024 Regular Due: 03/31/2025 | 03/23/2026 | $53,065.51 | $53,065.51 |
| Real Estate | Acc# 1476846 Bill Yr: 2022 Regular Due: 03/31/2023 | 03/23/2026 | $54,617.71 | $54,617.71 |
| | Total: | | $166,258.82 | $166,258.82 |

| Payment | Details | Paid |
|---|---|---|
| Check | Acc#XXXX0 Chk#3230202262 | $166,258.82 |
| | Balance: | $0.00 |

# (iii) *Certification of Michael A. Kaplan, Esq.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**
www.flsb.uscourts.gov

|  |  |
|---|---|
| VPX LIQUIDATING TRUST, by and through its Liquidating Trustee,<br><br>*Plaintiffs*,<br><br>v.<br><br>JOHN H. OWOC, MEGAN ELIZABETH OWOC, ELITE ISLAND LLC, JHO GA-1 INVESTMENT, LLC, JHO NV-1 INVESTMENT LLC, SHERIDAN REAL ESTATE INVESTMENT A, LLC, SHERIDAN REAL ESTATE INVESTMENT B, LLC, and SHERIDAN REAL ESTATE INVESTMENT C, LLC,<br><br>*Defendants*. | Case No. 22-17842 (PDR)<br>(Jointly Administered)<br><br><br>Adv. Pro. No. 24-01009 (PDR)<br><br><br>**CERTIFICATION OF MICHAEL A. KAPLAN, ESQ. IN SUPPORT OF EMERGENCY EX PARTE MOTION OF THE LIQUIDATING TRUST FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AGAINST ELITE ISLAND LLC** |

I, Michael A. Kaplan, hereby certify as follows:

1.    I am a partner of the law firm of Lowenstein Sandler LLP, counsel to the Vital Pharmaceuticals, Inc. ("VPX") Liquidating Trust and the Liquidating Trustee.

2.    I submit this certification in support of the *Emergency Ex Parte Motion of the VPX Liquidating Trust for a Temporary Restraining Order and Preliminary Injunction Against Elite Island LLC* filed simultaneously herewith.

3.    Attached as **Exhibit 1** is a true and correct copy of the Warranty Deed, by and between Solid Investment Group 7 LLC, as grantor, and Elite Island, LLC, as grantee, dated August 31, 2020.

1

4.      Attached as **Exhibit 2** is a true and correct copy of the Notice of Application for Tax Deed, dated February 11, 2026.

5.      Attached as **Exhibit 3** is a true and correct copy of the transcript of the hearing held on February 18, 2026 in the above-captioned Adversary Proceeding.

6.      On March 11, 2026, the Liquidating Trust retained an appraiser to determine the market value of the property.  Attached as **Exhibit 4** is a true and correct copy of an Appraisal of Real Property located at 72100 Overseas Highway, Islamorada, FL 33036, dated March 17, 2026.

7.      Attached as **Exhibit 5** is a true and correct copy of the Order Denying Motion as Moot; Discharging Lis Pendens in the above-captioned Adversary Proceeding, dated March 19, 2026.

8.      Attached as **Exhibit 6** is a true and correct copy of the 2024 Florida Limited Liability Company Annual Report for Elite Island LLC, dated April 29, 2024.

9.      Attached as **Exhibit 7** is a true and correct copy of the 2026 Florida Limited Liability Company Reinstatement for Elite Island LLC, dated March 21, 2026.

10.     Attached as **Exhibit 8** is a true and correct copy of the receipt for the Liquidating Trust's payment of outstanding property taxes owed on real property owned by Elite Island LLC to the Monroe County Tax Collector, dated March 23, 2026.

11.     Attached as **Exhibit 9** is a true and correct copy of the transcript of the hearing held on March 18, 2026 in the above-captioned Adversary Proceeding.

I certify under penalty of perjury that the foregoing information is true and correct to the best of my knowledge, information and belief, and I understand that I am subject to punishment if any of the foregoing statements made by me are willfully false.

Dated:  March 30, 2026

_____

Michael A. Kaplan, Esq.

3

# (iv) *Declaration of Soneet R. Kapila, CPA, CIRA, CFE, CFF*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**
www.flsb.uscourts.gov

| | |
|---|---|
| VPX LIQUIDATING TRUST, by and through its Liquidating Trustee,<br><br>      *Plaintiffs*,<br><br>v.<br><br>JOHN H. OWOC, MEGAN ELIZABETH OWOC, ELITE ISLAND LLC, JHO GA-1 INVESTMENT, LLC, JHO NV-1 INVESTMENT LLC, SHERIDAN REAL ESTATE INVESTMENT A, LLC, SHERIDAN REAL ESTATE INVESTMENT B, LLC, and SHERIDAN REAL ESTATE INVESTMENT C, LLC,<br><br>      *Defendants*. | Case No. 22-17842 (PDR)<br>(Jointly Administered)<br><br><br>Adv. Pro. No. 24-01009 (PDR)<br><br><br>**DECLARATION OF**<br>**SONEET R. KAPILA, CPA, CIRA,**<br>**CFE, CFF** |

Under 28 U.S.C. § 1746, Soneet R. Kapila hereby declares as follows under the penalty of perjury:

1

## I.   BACKGROUND AND QUALIFICATIONS

1.   I am the founding partner of KapilaMukamal, LLP ("KM"), a niche practice focusing on forensic investigative work, creditors' rights, bankruptcy, insolvency, and fiduciary services.

2.   KM was retained as an insolvency expert in this matter by Lowenstein Sandler LLP ("Counsel"), counsel to the Vital Pharmaceuticals, Inc. Liquidating Trust and the Liquidating Trustee, the successors to Vital Pharmaceutical, Inc. ("VPX" or "Company") and its affiliated debtors.  Counsel requested that I determine whether VPX was insolvent during the period from September 4, 2018 through October 10, 2022 (the "Petition Date") and collectively, the "Relevant Period").

3.   I am a Certified Public Accountant (CPA), a Certified Fraud Examiner (CFE), Certified in Financial Forensics (CFF), and a Certified Insolvency and Restructuring Advisor (CIRA).

4.   I am a Fellow of the American College of Bankruptcy, a recognition based on recommendations by peers in the insolvency industry at a national level, invitation by the American College of Bankruptcy, and induction into this College.  I am also the current Chairman and Past President of the American Bankruptcy Institute, the nation's largest multi-disciplinary organization of bankruptcy and insolvency professionals.

5.   I have served as a Federal Bankruptcy Trustee, Bankruptcy Examiner, Chief Restructuring Officer, S.E.C. Corporate Monitor, and Federal and State Court Receiver in numerous matters in the Southern and Middle Districts of Florida and the District of New Jersey.

2

6.      I have been qualified as an expert dozens of times in federal and state courts regarding Ponzi schemes, insolvency, fraudulent transfers, funds and asset tracing, lost profits, damages, and other subject matters.

7.      In rendering my opinion, I am acting as an expert in insolvency issues.

8.      A copy of my expert report dated March 16, 2026 (the "Report") is attached hereto as **Exhibit 1.**

## II.    MATERIALS REVIEWED

9.      My opinion is based on the documents analyzed, reviewed, and enumerated in Exhibit A to the Report.  The materials I reviewed include, among other things: (i) the Second Amended Complaint filed in this adversary proceeding; (ii) VPX's consolidated audited financial statements for the years 2017 through 2019 audited by Daszkal Bolton LLP and for the years 2019 through 2021 audited by Grant Thornton LLP; (iii) VPX's consolidated trial balances for 2018 to 2021; (iv) VPX's chapter 11 voluntary petition, amended bankruptcy schedules, and statement of financial affairs; (v) the Expert Report of Joseph C. Gioconda, Esq. dated March 16, 2026; (vi) the Declaration of John C. DiDonato in Support of Chapter 11 Petitions and First Day Pleadings dated October 10, 2022; (vii) the Declaration of Zurama Sury Rodriguez dated March 13, 2026; (viii) the PepsiCo, Inc. ("PepsiCo") final partial arbitration award; (ix) the Orange Bang, Inc. ("OBI") final arbitration award; and (x) pleadings in the false advertising litigation (the "Monster False Advertising Litigation") initiated by Monster Energy Co. ("Monster"); And (xi) VPX's income tax returns for the years 2018 through 2021.

10.     Further, I relied on my education, training, professional experience in the field of insolvency services, and my expertise and experience in forensic and insolvency accounting matters, fraud investigations, and solvency/insolvency/restructuring issues for over 30 years.

3

## III.    WORK PERFORMED

11.    I analyzed insolvency as defined in the United States Bankruptcy Code and the relevant Florida Statutes under the Balance Sheet Test[1] and the Cash Flow Test.[2]  I determined these two tests were sufficient to demonstrate the insolvency of VPX.

12.    For the Balance Sheet Test, I performed a detailed analysis of VPX's assets and liabilities for the period from December 31, 2017, through the Petition Date, based on the amounts reported in VPX's consolidated audited financial statements and related trial balances.  I adjusted the assets and liabilities to fair value as of each insolvency date.  The unadjusted consolidated financial statements include the assets and liabilities of VPX and its wholly owned subsidiaries, as well as certain Variable Interest Entities ("VIEs") in which VPX is the primary beneficiary.

13.    My fair value adjustments consisted of, among other things: (a) excluding the value of certain VIE real property assets that were acquired using the Company's funds, but titled in the names of VIE entities by Mr. Owoc to keep them out of the reach of creditors; (b) adjusting the value of assets under construction/construction in progress to zero since the underlying construction was made to real property owned by certain VIEs; (c) adjusting the value of leasehold improvements and related accumulated depreciation to zero since the underlying improvements were made to the real estate and/or land owned by certain VIEs, as well as other facilities leased by the Company, and such improvements could not be monetized; (d) adjusting the accumulated depreciation associated with VIE buildings to zero in connection with the exclusion of certain VIE

---

[1]    The Balance Sheet test provides that a debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets, at fair value.

[2]    The Cash Flow Test provides that a debtor is presumed to be insolvent if it is not paying its debts as they come due.

4

real property assets; (e) adjusting upwards from $0 the value of intangible assets to $5 million based on the upper end of the valuation range of $3.5 to $5.0 million provided by Mr. Gioconda; and (f) recognizing contingent liabilities for certain litigations facing VPX.

14.     I also considered the work product of Mr. Gioconda in forming my opinion. Mr. Gioconda opined that VPX faced at least an 80% to 90% risk of substantial, foreseeable, and correlated litigation exposure in connection with certain litigations arising from: (a) the trademark dispute with OBI (the "OBI Trademark Dispute"); (b) the Monster False Advertising Litigation; (d) copyright infringement disputes; and (e) several distributor contract disputes, including with PepsiCo. I adopted the probability factors Mr. Gioconda assigned to each dispute category in recognizing contingent liabilities.

15.     With respect to the Cash Flow Test, I evaluated whether VPX could pay its debts as they became due in the ordinary course of business. I considered that (i) VPX's business model was premised on misrepresentations and false and misleading advertising, and that (ii) between 2019 and the Petition Date, approximately 95% of VPX's sales were from its "Super Creatine" products.

## IV.   OPINIONS

16.     For the reasons more fully set forth in the Report, which is incorporated herein in its entirety by reference, my opinion is that VPX was insolvent starting on September 4, 2018.

17.     Under the Balance Sheet Test, the value of VPX's liabilities exceeded the fair value of its assets by approximately $137.6 million as of December 31, 2018; by approximately $150.6 million as of December 31, 2019; by approximately $697.6 million as of December 31, 2020; and by approximately $549 million as of December 31, 2021.

5

18.    VPX remained insolvent on the Petition Date, at which time its bankruptcy schedules reflected approximately $709 million in assets and $1.1 billion in liabilities.

19.    Under the Cash Flow Test, VPX was also insolvent because its business model was dependent on the sale of products marketed through willfully false and misleading advertising, and, between 2019 and the Petition Date, approximately 95% of VPX's sales were from its "Super Creatine" products.  Had VPX been unable to achieve those sales, it is reasonably likely that VPX would not have been able to meet its operating expenses and debt obligations during the Relevant Period.

I hereby declare the foregoing statements made by me are true and correct.  I am aware that if any of the statements made by me are willfully false, I may be subject to punishment.

Dated: March 27, 2026

By: _____

SONEET R. KAPILA

6

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF FLORIDA
# FORT LAUDERDALE DIVISION
### www.flmb.uscourts.gov

In re:

VITAL PHARMACEUTICALS, INC., et al.,

Debtor.

_____/

VPX LIQUIDATING TRUST, by and through its
Liquidating Trustee,

Plaintiff,

v.

JOHN H. OWOC, et al.

Defendant.

_____/

Chapter 11 Cases

Case No. 22-17842 (PDR)
(Jointly Administered)

Adv. Pro No. 24-01009 (PDR)

# EXPERT REPORT OF
# SONEET R. KAPILA, CPA, CIRA, CFE, CFF
# March 16, 2026



Kapila Mukamal
CPAs, Forensic and Insolvency Advisors

# Table of Contents

**REPORT**

**EXHIBITS**

    Documents Utilized            A

    Insolvency Analysis            B

**QUALIFICATIONS**

    Resume of Soneet R. Kapila

    Case Experience

### I.     OVERVIEW

1.      I and my firm KapilaMukamal (collectively "KM") were retained as forensic accountants and experts in this matter by Lowenstein Sandler LLP ("Counsel"), as Counsel to the VPX Liquidating Trust and the Liquidating Trustee.

2.      In conducting my analyses, I was assisted by other KM professionals with extensive experience in litigation support, forensic and insolvency accounting, working under my direct supervision.   Any references to "I", "my", "KM" or "KapilaMukamal, LLP" within the report incorporate my efforts with the assistance of my co-professionals.

### II.     SCOPE

3.      Counsel requested I determine whether Vital Pharmaceuticals, Inc.[1] ("VPX" or the "Company") was insolvent during the period from September 4, 2018 through October 10, 2022 ("Petition Date"), referred to herein as the "Relevant Period."  In rendering my opinion, I am acting as an expert in insolvency accounting.

4.      My opinion is offered with a reasonable degree of professional certainty based on the materials reviewed and the methodologies described herein.

### III.     OPINION

5.      VPX was insolvent during the period from September 4, 2018 through the Petition Date.

---

[1] Including its wholly owned subsidiaries, Bang Energy B.V.; Bang Jets, LLC; Bang Energy Mexico; Bang Energy Canada, Inc.; Bang Energy Canada ULC; Bang Energy (Australia) Pty, Ltd.; Bang Energy Costa Rica, LTDA; Bang Energy Brazil, LTDA; Bang Energy Chile Spa.  The following Debtor entities are not wholly owned subsidiaries of the Debtor and therefore are not included in the insolvency analysis: JHO Intellectual Property Holdings, LLC; and Rainbow Unicorn Bev, LLC.  *See* discussion in ¶¶ 30–32.

## IV.   BASIS OF OPINION

6.     My opinion is based on documents analyzed, reviewed, and enumerated at *Exhibit A* as of the date of this report.  Further, I relied on my education, training, professional experience in the field of insolvency services, and my expertise and experience in forensic and insolvency accounting matters, fraud investigations, and solvency/insolvency/restructuring issues for over 30 years as set forth in the Qualifications section of this report.

## V.   LIMITATIONS OF REPORT

7.     Additional documents and information may be made available or reviewed, and certain facts currently not available may come to light, which may impact the conclusions and opinions reflected herein.  I reserve the right to supplement or amend these opinions should additional materials or information become available.

8.     This report was prepared solely for use in this matter.  The information and conclusions reached should not be relied upon by any other person nor should any statement in this report be used for any other purpose without written consent from KM.

## VI.   CONSIDERATION OF WORK PRODUCT OF ANOTHER EXPERT

9.     I considered the work product of another independent expert in forming my opinion. I relied on the Expert Report of Joseph C. Gioconda, Esq., dated March 16, 2026.

Mr. Gioconda was asked to opine:

> Whether, during the period from at least September 4, 2018 through and including October 10, 2022 (the "Relevant Time Period"), risks confronting [VPX] were of a nature and magnitude that they should

2

have been treated as material contingent liabilities by corporate fiduciaries?[2]

10.   Mr. Gioconda opined that VPX faced at least an eighty percent (80%) to ninety percent (90%) risk in certain cases of substantial, foreseeable, and correlated litigation exposure arising from:

- A contractual and trademark dispute concerning VPX's compliance with a 2010 trademark coexistence agreement with Orange Bang, Inc. ("OBI") governing use of the BANG mark ("OBI Trademark Dispute");

- False advertising and unfair competition claims relating to "Super Creatine" representations asserted by Monster Energy, Inc. ("Monster"), an aggressive competitor ("False Advertising Litigation," and together with the OBI Trademark Dispute, "Trademark and False Advertising Disputes");

- The downstream risk of consumer-facing false advertising and enforcement actions;

- Copyright infringement disputes; and

- Several distributor contract disputes, including with PepsiCo.[3]

11.   Mr. Gioconda was also asked to assign value to the VPX intangible assets including patents, trademarks, customer data, internet domain names, and social media-driven marketing assets.[4]   Mr. Gioconda opined that VPX's entire intellectual property portfolio was likely valued in the approximate range of $3.5 to $5 million.[5]

---

[2] Expert Report of Joseph Gioconda, Esq., dated March 16, 2026 ("Gioconda Expert Report") at 3.
[3] *See* Gioconda Expert Report at 3–5.
[4] *See* Gioconda Expert Report at 11.
[5] *See* Gioconda Expert Report at 6.

3

## VII.    BACKGROUND[6]

12.    VPX was formed in 1993 by John H. Owoc ("Jack" or "Mr. Owoc") and was engaged in the manufacture, development, and marketing of sports nutrition products and energy drinks.[7]

13.    VPX rose to prominence in the energy drink market through its flagship product, the Bang energy drink ("Bang Energy"), which, by 2019 and through to the Petition Date, accounted for approximately 95% of the Company's sales.[8]

14.    However, the Company's commercial success was built upon a foundation of intellectual property misappropriation and false advertising.[9]

15.    The "Bang" trademark was originally registered by OBI in 1971.[10]

16.    In 2009, OBI sued VPX for trademark infringement, resulting in a settlement agreement executed in 2010 (the "2010 Settlement Agreement").[11]

17.    While Mr. Owoc was involved in negotiating the 2010 Settlement Agreement and signed it on behalf of the Company, he failed to inform any of the Company's employees, distributors, and retailers of the various go-forward restrictions when it came to using the "Bang" mark.[12]

---

[6] The information contained within the "Background" section of this report provides my understanding of the background information in this matter based upon pleadings and other sources referenced herein and is not intended to represent any expert opinion.
[7] *See VPX Liquidating Tr. v. John H. Owoc, et al.*, Adv. Pro. No. 24-01009 (Bankr. S.D. Fla.), Dkt. No. 148 ("Second Amend. Compl.") ¶ 67.
[8] *See* Second Amend. Compl. ¶¶ 2–3, 79.
[9] *See* Second Amend. Compl. ¶ 4.
[10] *See* Second Amend. Compl. ¶ 5.
[11] *See* Second Amend. Compl. ¶¶ 6–7.
[12] *See* Second Amend. Compl. ¶ 9.

4

18. The Company developed a marketing strategy centered around a new ingredient termed "Super Creatine,"[13] which was marketed as a superior form of creatine with significant health benefits.

19. Super Creatine was ultimately found to be functionally useless and to provide no recognized benefits to consumers.[14]

20. The Liquidating Trustee filed a Complaint against Mr. Owoc, amongst other parties, alleging that Mr. Owoc engaged in widespread self-dealing by siphoning off hundreds of millions of dollars from the Company to fund personal expenses and to launch a real estate enterprise involving his son and others.[15]

21. The Complaint alleged that Mr. Owoc directed the Company to transfer approximately $123 million out of the Company's bank accounts to himself or third parties for his benefit during the four-year period prior to the Petition Date.[16]

## VIII. **METHODOLOGY**

22. My analysis and findings are based on the documents and information listed in *Exhibit A*.

23. Chapter 11 of the United States Code ("Bankruptcy Code" or "Code") and section 726.103 of the Florida Statutes ("Florida Statutes") establish the following three tests for measuring insolvency:

- Balance sheet test, which provides that a debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets, at fair value ("Balance Sheet Test").[17]  The Balance Sheet Test under the Code excludes property transferred, concealed, or removed with the intent to hinder, delay, or defraud creditors, or property that may be exempted from

---

[13] *See* Second Amend. Compl. ¶10.
[14] *See* Second Amend. Compl. ¶ 11.
[15] *See* Second Amend. Compl. ¶ 16.
[16] *See* Second Amend. Compl. ¶ 547; *see also* Second Amend. Compl., Ex. A.
[17] *See* 11 U.S.C. § 101(32)(A); *see also* Fla. Stat. § 726.103(1).

5

property of the estate under section 522 of the Bankruptcy Code.[18]  The Florida Statutes exclude property that has been transferred, concealed, or removed with the intent to hinder, delay, or defraud, or has been transferred in a manner making the transfer avoidable under sections 726.101–726.112.[19]

- Cash flow test, which provides that a debtor is presumed to be insolvent if it is not paying its debts as they come due ("Cash Flow Test").[20]

- Capital adequacy test, which seeks to determine whether the debtor has adequate capital following the transfer ("Capital Adequacy Test").[21]

24.  For the purposes of this report, I analyzed insolvency as defined in the Code and the Florida Statutes by conducting the Balance Sheet Test and the Cash Flow Test.  I determined these two tests were sufficient to demonstrate the insolvency of VPX.[22]

25.  The Balance Sheet Test involves determining whether the fair value of the debtor's assets is greater or less than the value of the liabilities.  It requires adjusting the stated value of assets recorded in the entity's accounting records to fair value and recognizing any unrecorded assets or liabilities.  If the aggregate liabilities are greater than the aggregate assets at fair value, the entity is deemed balance sheet insolvent.

26.  The Cash Flow Test involves evaluating whether the debtor can pay debts as they become due in the ordinary course of business.  This test entails evaluating the ability of the debtor to generate sufficient cash flows to meet its ongoing obligations

---

[18] *See* 11 U.S.C. §101(32)(A).
[19] *See* Fla. Stat. § 726.103(4).
[20] *See* 11 U.S.C.§ 548(a)(B)(ii)(III); *see also* Fla Stat. §726.103(2).
[21] *See* 11 U.S.C.§ 548(a)(B)(ii)(II).
[22] Under insolvency accounting, only one test is required.

as they come due.  Indicators of cash flow insolvency include inability to pay vendors or service debt.

27.     These tests are prescribed in the Bankruptcy Code and the Florida Statutes, and I applied them here using accepted and reliable professional methodologies and judgment.

## IX.     ANALYSIS AND FINDINGS – INSOLVENCY TESTS

### A.     Balance Sheet Insolvency Test

28.     To determine if VPX was insolvent during the Relevant Period pursuant to the Balance Sheet Test, I performed a detailed analysis of VPX's assets and liabilities for the period from December 31, 2017 through to the Petition Date.  The assets and liabilities are based on the amounts reported in VPX's consolidated audited financial statements and related trial balances as of the end of each year through December 2021 (the "Consolidated Financial Statements").[23]

29.     The Consolidated Financial Statements include the assets and liabilities of VPX and its wholly owned subsidiaries, Bang Energy B.V.; Bang Jets, LLC; Bang Energy Mexico; Bang Energy Canada, Inc.; Bang Energy Canada ULC; Bang Energy (Australia) Pty, Ltd.; Bang Energy Costa Rica, LTDA; Bang Energy Brazil, LTDA; Bang Energy Chile Spa, investments in which it has direct control through ownership, and entities in which VPX is the beneficiary of the assets and liabilities.

---

[23] *See* Daszkal Bolton, *Vital Pharms., Inc. Consol. Fin. Statements* (Dec. 31, 2018), VPXTrust_0000029859 (the "2018 Financial Statement"), Grant Thornton, *Vital Pharms., Inc. Consol. Fin. Statements and Report of Indep. Certified Pub. Accts.*, (Dec. 31, 2019), VPXTrust0000031740 (the "2019 Financial Statement"), Grant Thornton, *Vital Pharms., Inc. Consol. Fin. Statements and Report of Indep. Certified Pub. Accts.*, (Dec. 31, 2020 and 2019), VPXTrust_0000033153 (the "2020 Financial Statement"), and Grant Thornton, *Vital Pharms., Inc. Consol. Fin. Statements and Report of Indep. Certified Pub. Accts.*, (Dec. 31, 2020 and 2021), VPXTrust0000617273 (the "2021 Financial Statement") (together, the "Consolidated Financial Statements").

7

Such entities are referenced in generally accepted accounting principles ("GAAP") as Variable Interest Entities ("VIEs").[24]

30.    The following Debtor entities are not wholly owned subsidiaries of the Company and therefore are not included in the insolvency analysis: JHO Intellectual Property Holdings, LLC; and Rainbow Unicorn Bev, LLC.[25]  These entities are 100% owned by Mr. Owoc.

31.    The following Debtor entities are not wholly owned subsidiaries of the Debtor but are considered VIEs of the Company for GAAP: Vital Pharmaceuticals International Sales, Inc.,[26] Quash Seltzer, LLC,[27] and JHO Real Estate Investment, LLC.[28][29]  The Company does not have an ownership interest in these entities; they are owned 100% by Mr. Owoc.[30]  However, the Company is the primary beneficiary of the VIEs and the assets and liabilities are included in the Consolidated Financial Statements.[31]  GAAP requires that VIEs be included in the Consolidated Financial Statements of an entity.  I included the VIEs in the insolvency analysis since the Company is the primary beneficiary of each VIE's assets and liabilities.

32.    Consistent with the methodology outlined above in Section VIII, I adjusted the assets and liabilities to fair value as of each insolvency date.  *Exhibit B* contains

---

[24] *See* 2021 Financial Statement at Note 2.
[25] *See Vital Pharms., Inc., et al. v. John H. Owoc and Megan E. Owoc*, Adv. Pro. No. 23-01051-PDR (Bankr. S.D. Fla.), Dkt. No. 26, *Declaration of John C. DiDonato in Support of Chapter 11 Petitions and First Day Pleadings*, dated October 10, 2022 ("DiDonato Decl."), Ex. A.
[26] Vital Pharmaceuticals International Sales, Inc. was classified as a VIE in 2019.
[27] Quash Seltzer, LLC was classified as a VIE in 2020.
[28] JHO Real Estate Investment, LLC was classified as a VIE in 2019 by Grant Thornton.
[29] *See* 2021 Financial Statement at Note 14 and 2020 Financial Statement at Note 13.
[30] *See* DiDonato Decl., Ex. A.
[31] *See* 2020 Financial Statement at Note 13 and 2021 Financial Statement at Note 14.

8

the Balance Sheet Test and reflects insolvency as of each insolvency date as more fully discussed in the following paragraphs.

### 1.    Fair Value Adjustments

#### a.    Property and Equipment

33.    During the Relevant Period, VPX's property and equipment included computers, furniture and fixtures, software, automobiles, and a jet.[32]  The value reflected on the balance sheet is the acquisition cost, net of depreciation.   Since these represent depreciating assets, I did not adjust the value of the assets.   Any adjustment would further increase insolvency.

#### b.    Buildings & Real Estate / Land Owned by Variable Interest Entities

34.    The Company's Consolidated Financial Statements include real estate entities that own the facilities in which the Company operated ("VIE Real Property Assets").[33] These entities include JHO GA-1 Investment, LLC; JHO NV-1 Investment, LLC; Sheridan Real Estate Investment A, LLC; Sheridan Real Estate Investment B, LLC; Sheridan Real Estate Investment C, LLC; and JHO Real Estate Investment (collectively, referred to as "Real Estate VIEs").   The Company is the primary beneficiary of the assets and liabilities of the Real Estate VIEs.[34]  As such, in my opinion, the assets and liabilities of the Real Estate VIEs should be included in the insolvency analysis.

---

[32] *See* Ex. B at Note 5.
[33] *See* 2020 Financial Statement at Note 13 and 2021 Financial Statement at Note 14.
[34] *See* 2020 Financial Statement at Note 13 and 2021 Financial Statement at Note 14.

35.   The Real Estate VIEs lease their buildings to the Company under operating leases.[35]  The Real Estate VIEs guarantee the Company's debt, which is secured by the assets of the Real Estate VIEs.[36]

36.   VPX did not list any owned real estate in its bankruptcy schedules (the "Bankruptcy Schedules").[37]   ***Figure 1*** is an excerpt from the Bankruptcy Schedules that disclosed the buildings, other improved real estate or land in which VPX has an interest; however, all of the property was leased or owned by an affiliate.

---

[35] *See* 2020 Financial Statement at Note 13 and 2021 Financial Statement at Note 14.
[36] *See* 2020 Financial Statement at Note 13 and 2021 Financial Statement at Note 14.
[37] *See In re Vital Pharms., Inc.*, No. 22-17842-PDR (Bankr. S.D. Fla.), Dkt. Nos. 323, 325, 1396.

10

*Figure 1 - Building, Other Improved Real Estate and Land Assets*[38]

**SCHEDULE 55 ATTACHMENT**
Any building, other improved real estate, or land which the debtor owns or in which the debtor has an interest

| Description and Location of Property | Nature of Debtor's Interest in Property | Net Book Value | Valuation Method | Current Value |
|---|---|---|---|---|
| Building Improvements - 1600 North Park Dr, Suite 100 Weston, FL 33326 | Leased | $ 19,823.00 | Net Book Value | $ 19,823.00 |
| Building Improvements - 1635 S 43rd Ave, Phoenix, AZ | Affiliate of Owner | $ 42,211,261.00 | Net Book Value | $ 42,211,261.00 |
| Building Improvements - 6100-T Glen Afton Blvd Concord, NC 28027 | Leased | $ 32,545.00 | Net Book Value | $ 32,545.00 |
| Building Improvements - Lithia Springs Plant | Affiliate of Owner | $ 41,851.00 | Net Book Value | $ 41,851.00 |
| Leasehold Improvements - 12600 NW 115 Ave Medley, FL | Leased | $ 75,620.00 | Net Book Value | $ 75,620.00 |
| Leasehold Improvements - 160 Everman Freeway, Ft. Worth TX | Leased | $ 79,079.00 | Net Book Value | $ 79,079.00 |
| Leasehold Improvements - 1600 North Park Dr, Suite 100 Weston, FL 33326 | Leased | $ 538,457.00 | Net Book Value | $ 538,457.00 |
| Leasehold Improvements - 1601 Wallace Drive, Carrolton, TX 75006 | Leased | $ 292.00 | Net Book Value | $ 292.00 |
| Leasehold Improvements - 1635 S 43rd Ave, Phoenix, AZ | Owned | $ 11,215.00 | Net Book Value | $ 11,215.00 |
| Leasehold Improvements - 4650 Forge Road, Suite 104, Colorado Springs, CO | Leased | $ 128,587.00 | Net Book Value | $ 128,587.00 |
| Leasehold Improvements - 4747 W. Buckeye Rd., Phoenix, AZ | Leased | $ 140,959.00 | Net Book Value | $ 140,959.00 |
| Leasehold Improvements - 6100-T Glen Afton Blvd Concord, NC 28027 | Leased | $ 38,324.00 | Net Book Value | $ 38,324.00 |
| Office (Marketing)-Florida-20351 Sheridan St., Pembroke Pines, FL | Leased | N/A | N/A | Undetermined |
| Office, Mfg., Warehouse-Florida-1600 North Park Dr, Suite 100 Weston, FL 33326 | Leased | N/A | N/A | Undetermined |
| Office, Mfg., Warehouse-Florida-9550 Parksouth Ct. #300,Orlando FL 32837 | Leased | N/A | N/A | Undetermined |
| Office, Warehouse-California-7292 Opportunity Rd, San Diego, CA | Leased | N/A | N/A | Undetermined |
| Office, Warehouse-Texas-11707 S. Sam Houston Pkwy. W., Suite H, Houston. TX 77031 | Leased | N/A | N/A | Undetermined |
| Office, Warehouse-Texas-1601 Wallace Drive, Carrolton, TX 75006 | Leased | N/A | N/A | Undetermined |
| Sublease-North Carolina-5639 Brookshire Blvd Suite C Charlotte, NC | Leased | N/A | N/A | Undetermined |
| Warehouse Distribution-Arizona-4747 W. Buckeye Rd., Phoenix, AZ | Leased | N/A | N/A | Undetermined |
| Warehouse Distribution-Arkansas-600 S 52nd Street Rogers, AR | Leased | N/A | N/A | Undetermined |
| Warehouse Distribution-California -3042 Inland Empire Blvd. Bldg A -3-50 Ontario, CA | Leased | N/A | N/A | Undetermined |
| Warehouse Distribution-California-10100 Aviation Blvd, Los Angeles, CA | Leased | N/A | N/A | Undetermined |
| Warehouse Distribution-California-11130 Sherman Way, North Hollywood, CA | Leased | N/A | N/A | Undetermined |
| Warehouse Distribution-California-9052 Rosencrans Ave., Bellflower, CA 90706 | Leased | N/A | N/A | Undetermined |
| Warehouse Distribution-Colorado-4650 Forge Road, Suite 104, Colorado Springs, CO | Leased | N/A | N/A | Undetermined |
| Warehouse Distribution-Colorado-700 W. 48th Avenue, Unit S, Denver, CO 80216 (aka I-70 Industrial Center) | Leased | N/A | N/A | Undetermined |
| Warehouse Distribution-Florida-1907-1911 US Highway 301 N Suite D160, Tampa, FL | Leased | N/A | N/A | Undetermined |
| Warehouse Distribution-Florida-1907-1911 US Highway 301 N Suites D140,D150, Tampa, FL | Leased | N/A | N/A | Undetermined |
| Warehouse Distribution-Florida-1951 N Commerce Parkway, Suite C, Weston, FL | Leased | N/A | N/A | Undetermined |
| Warehouse Distribution-Florida-3520 Old Metro Parkway, Fort Myers, FL 33916 | Leased | N/A | N/A | Undetermined |
| Warehouse Distribution-Florida-7950 Central Industrial Dr Riviera Beach, FL | Leased | N/A | N/A | Undetermined |
| Warehouse Distribution-North Carolina-6100-T Glen Afton Blvd Concord, NC 28027 | Leased | N/A | N/A | Undetermined |
| Warehouse Distribution-Texas-160 Everman Freeway, Ft. Worth TX | Leased | N/A | N/A | Undetermined |
| Warehouse-Florida-12600 NW 115 Ave Medley, FL | Leased | N/A | N/A | Undetermined |
| Warehouse-Florida-7662 Philips HWY Jacksonville, FL 32256 | Leased | N/A | N/A | Undetermined |
| | Total: | $43,318,013.00 | Net Book Value | $43,318,013.00 |

37.    **Table 1** summarizes the real property related assets reported in the Company's Consolidated Financial Statements as of the end of each year from 2018 through 2021.  These included the VIE Real Property Assets.

---

[38] Schedule 55 Attachment to the Bankruptcy Schedules filed on November 11, 2022, Dkt. No. 323.

11

*Table 1 – Real Property Related Assets*[39]

| Asset | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|
| Leasehold Improvements | $ 2,143,747 | $ 2,368,477 | $ 47,462,423 | $ 47,672,253 |
| Construction In Progress | 897,399 | 58,968,497 | 155,157,397 | 120,794,676 |
| Buildings | - | 74,068,161 | 108,492,839 | 113,336,885 |
| Real Estate / Land | - | 10,709,100 | 50,879,571 | 46,424,728 |
| | $ 3,041,146 | $146,114,235 | $ 361,992,230 | $ 328,228,542 |

38. Assets under construction/construction in progress represent development costs to get the purchased properties purchased by the Real Estate VIEs ready for their intended use.[40]

39. Leasehold improvements include the improvements to the real estate and/or land owned by the Real Estate VIEs as well as other facilities leased by the Company.

40. Buildings and real estate/land are comprised of the buildings and land owned by the Real Estate VIEs.

41. I considered the below facts with respect to determining the fair value of the VIE Real Property Assets during the Relevant Period.

<u>JHO Real Estate Investment, LLC ("JHO")[41]</u>

42. JHO is a debtor entity that acquired a property located at 1635 S. 43rd Ave, Phoenix, AZ ("Arizona Property") in September 2019 for $49,687,532.[42]

---

[39] Also referred to as "Construction in Progress."  *See* 2020 Financial Statement at Note 4 and 2021 Financial Statement at Note 5.

[40] *See* 2020 Financial Statement at Note 4 and 2021 Financial Statement at Note 5.

[41] JHO is a debtor entity, and a VIE.  For purposes of the insolvency analysis, I treated it the same as the other non-debtor VIE entities.  This methodology is appropriate since JHO's assets and liabilities are included in the Consolidated Financial Statements and from an insolvency accounting perspective, it is irrelevant if the VIE is a debtor or non-debtor.  I excluded the value of the VIE Real Property Assets for purposes of fair value.  The Balance Sheet Test under the Code excludes property transferred, concealed, or removed with the intent to hinder, delay, or defraud creditors; or property that may be exempted from property of the estate under section 522 of the Bankruptcy Code.

[42] *See* 2020 Financial Statement at Note 13.

43.   The Company listed the Arizona Property as being owned by an "affiliate" in the Bankruptcy Schedules.[43]

44.   The Arizona Property is included as an asset in the Consolidated Financial Statements.[44]

### Sheridan Real Estate Investment A, LLC

45.   Sheridan Real Estate Investment A, LLC ("Sheridan A"), a Defendant in this proceeding, is a non-debtor entity owned 100% by Mr. Owoc.[45]  In December 2018, VPX acquired a property located at 23011 Sheridan Street, Pembroke Pines, FL in February 2019 for $35,000,000 ("Sheridan A Real Property").[46]

46.   On February 11, 2019, Mr. Owoc established Sheridan A and transferred the Sheridan A Real Property from VPX to Sheridan A.[47]

47.   VPX and Sheridan A executed a promissory note for $75,000,000 with BB&T on February 14, 2019 ("BB&T Promissory Note") and used $35,000,000 of the funds from the Promissory Note for the purchase of the Sheridan A Property.[48]

48.   The Sheridan A Real Property is included as an asset in the Consolidated Financial Statements.[49]

### Sheridan Real Estate Investment B, LLC

49.   Sheridan Real Estate Investment B, LLC ("Sheridan B"), a Defendant in this proceeding, is a non-debtor entity owned 100% by Mr. Owoc.[50]  Sheridan B

---

[43] *See supra*, Figure 1.
[44] *See* 2019 Financial Statement at Note 4.
[45] *See* Second Amend. Compl. ¶¶ 64, 299.
[46] *See* Second Amend. Compl. ¶ 298.
[47] *See* Second Amend. Compl. ¶ 299.
[48] *See* Second Amend. Compl. ¶ 300.
[49] *See* 2019 Financial Statement at Note 4.
[50] *See* Second Amend. Compl. ¶ 65.

13

purchased land and a building at 20351 Sheridan Street, Pembroke Pines, FL for $40,632,549 in January 2020 ("Sheridan B Real Property").[51]

50.   The Sheridan B Real Property was funded with proceeds that the Company received under the BB&T Promissory Note.[52]

51.   The Sheridan B Real Property is included as an asset in the Consolidated Financial Statements.[53]  The Company listed the Sheridan B Property as a "leased" property in the Bankruptcy Schedules.[54]

### Sheridan Real Estate Investment C, LLC

52.   Sheridan Real Estate Investment C, LLC ("Sheridan C"), a Defendant in this proceeding, is a non-debtor entity owned 100% by Mr. Owoc.   Sheridan C purchased land located at 20241 Sheridan Street, Pembroke Pines, FL for $32,993,286 in March 2020 ("Sheridan C Real Property").[55]  The purchase was partially funded with a $25 million note payable.[56]

53.   The Sheridan C Real Property is included as an asset in the Consolidated Financial Statements.[57]

### JHO NV-1 Investment, LLC

54.   JHO NV-1 Investment, LLC ("JHO NV-1"), a Defendant in this proceeding, is a non-debtor entity owned 100% by Mr. Owoc.[58]  In January 2020, VPX purchased real

---

[51] *See* Second Amend. Compl. ¶ 316.
[52] *See* Second Amend. Compl. ¶ 317.
[53] *See* 2020 Financial Statement at Note 13.
[54] *See supra*, Figure 1.
[55] *See* Second Amend. Compl. ¶¶ 66, 322–23.
[56] *See* Second Amend. Compl. ¶ 324.
[57] *See* 2020 Financial Statement at Note 13.
[58] *See* Second Amend. Compl. ¶ 329.

14

property located at 4117 Wagon Trail, Las Vegas, NV for $1,230,002 ("JHO NV-1 Real Property").[59]

55.   On February 27, 2020, Mr. Owoc created JHO NV-1 and VPX transferred the JHO NV-1 Real Property to JHO NV-1.[60]

56.   The JHO NV-1 Real Property is included as an asset in the Consolidated Financial Statements.[61]

JHO GA-1 Investment, LLC

57.   JHO GA-1 Investment, LLC ("JHO GA-1"), a Defendant in this proceeding, is a non-debtor entity owned 100% by Mr. Owoc.

58.   In September 2020, JHO GA-1 purchased a real property located at 7705 Staples Drive, Douglasville, GA for $41,061,950.[62]   The JHO GA-1 Real Property is included as an asset in the Consolidated Financial Statements.[63]

VIE Real Property Fair Value Adjustments

59.   The VIE Entities' assets and liabilities included in the Consolidated Financial Statements are summarized in *Table 2*.

---

[59] *See* Second Amend. Compl. ¶ 327.
[60] *See* Second Amend. Compl. ¶ 329.
[61] *See* 2020 Financial Statement at Note 13.
[62] *See* Second Amend. Compl. ¶ 335.
[63] *See* 2020 Financial Statement at Note 13.

*Table 2 – VIE Entities Assets and Liabilities*[64]

| Assets and Liabilities of VIEs as of December 31, | | | |
|---|---|---|---|
| | 2019 | 2020 | 2021 |
| **Assets** | | | |
| Accounts receivable | $          - | $          - | $    1,540,877 |
| Inventories, net | | | 40,022,981 |
| Other assets | | | 293,320 |
| Property, plant and equipment, net | 84,802,548 | 197,806,111 | 156,110,991 |
| Total assets | 84,802,548 | 197,806,111 | 197,968,169 |
| | | | |
| **Liabilities** | | | |
| Current liabilities | 222,736 | 1,080,789 | 31,611,466 |
| Debt obligations | 33,975,750 | | |
| Amounts due to VPX | 49,969,596 | 197,879,683 | 182,997,215 |
| | 84,168,082 | 198,960,472 | 214,608,681 |
| Equity (deficit) | 634,466 | (1,154,361) | (16,640,512) |
| | | | |
| Total liabilities and deficit | $   84,802,548 | $   197,806,111 | $   197,968,169 |

60.    The VIE Real Property Assets were acquired using the Company's funds, but Mr. Owoc titled them in the name of the VIEs to keep them out of the reach of creditors.[65]  I excluded the value of the VIE Real Property Assets for purposes of fair value.  The Balance Sheet Test under the Code excludes property transferred, concealed, or removed with the intent to hinder, delay, or defraud creditors; or property that may be exempted from property of the estate under section 522 of the Bankruptcy Code.[66]

61.    Since VPX was obligated for the VIEs' debt obligations, I did not make any adjustment for the corresponding liabilities.

---

[64] *See* 2020 Financial Statement at Note 13 and 2021 Financial Statement at Note 14.
[65] *See* Second Amend. Compl. ¶ 297.
[66] *See* 11 U.S.C. §101(32)(A).

16

### c.    Intangible Assets

62.    Intangible assets reported in the Consolidated Financial Statements principally consist of capitalized trademark costs.[67]  However, intangible assets include not only trademarks but also the value of any intellectual property owned by VPX, including customer lists.

63.    VPX only listed two trademarks and a customer list in the Bankruptcy Schedules with an undetermined value.[68]  However, VPX included the following note in its Bankruptcy Schedules:[69]

> *Exclusion of certain intellectual property should not be construed to be an admission that such intellectual property rights have been abandoned, have been terminated or otherwise expired by their terms, or have been assigned or otherwise transferred pursuant to a sale, acquisition, or other transaction.  Conversely, inclusion of certain intellectual property should not be construed to be an admission that such intellectual property rights have not been abandoned, have not been terminated or otherwise expired by their terms, or have not been assigned or otherwise transferred pursuant to a sale, acquisition, or other transaction.*
>
> *The Debtors have not listed the value of certain intangibles and intellectual property because the values reflected in the Debtors' books and records may not accurately reflect such assets' value in the marketplace.  Due to the need to protect confidential information and individual privacy, the Debtors have not furnished any customer lists nor any lists of influencers who market their products on their Schedules.  The Debtors believe the network of distributors and customers who work with Debtors to distribute their products is a valuable intangible asset, but due to the complexity and time involved to determine a value of those assets, the Debtors believe that it would be an inefficient use of estate assets for the Debtors to obtain the current market value of these assets.  Similarly, the Debtors work with a network of influencers who promote Debtors' products. That network of influencers has been developed over many years of effort by the Debtors and represents a valuable asset of the Debtors' estates.  Due to the complexity and time involved to determine a value of that asset,*

---

[67] *See* 2020 Financial Statement at Note 2.
[68] *See In re Vital Pharms., Inc.*, No. 22-17842-PDR (Bankr. S.D. Fla.), Dkt. No. 323 at 16.
[69] *See In re Vital Pharms., Inc.*, No. 22-17842-PDR (Bankr. S.D. Fla.), Dkt. No. 323 at 3-4.

> *the Debtors believe that it would be an inefficient use of estate assets for the Debtors to obtain the current market value of its list of influencers, and thus have not included such asset in these Schedules.*

64. Certain intellectual property was also owned by JHO Intellectual Property Holdings LLC ("JHO IP"), an entity owned 100% by Mr. Owoc.[70]  JHO IP listed trademarks and Internet Domain Names in the Bankruptcy Schedules with an undetermined value.[71]  JHO IP's intangible assets are not included in the Consolidated Financial Statements because JHO IP is not a wholly owned subsidiary of VPX.[72]

65. Mr. Gioconda rendered an opinion on the combined value of the intangible assets that range from $3.5 to $5.0 million during the Relevant Time Period.[73]  Accordingly, I adopted the upper end of the range and adjusted the value of the intangible assets to $5.0 million.  This is conservative since the combined valuation included assets that may not be owned by VPX.

### d.    Contingent Liabilities

66. Contingent liabilities must be considered under the balance sheet insolvency test.  This requires the determination of the contingency and its valuation.  A contingency is an event that is possible, but its outcome cannot be predicted with certainty.  The event may or may not occur.  While one may not be able to predict this result with any reasonable certainty, "[a]bsolute precision . . . is not required."[74]

67. Valuation of the contingent liability requires an estimated measurement based on the probability that the contingency will occur and the liability will become real.  In

---

[70] *See* Second Amend. Compl. ¶ 186.
[71] *See In re JHO Intellectual Property Holdings, LLC*, No. 22-17845-PDR, Dkt. No. 12 at 18–39.
[72] *See generally* 2018 Financial Statement; 2019 Financial Statement; 2020 Financial Statement; 2021 Financial Statement.
[73] *See* Gioconda Expert Report at 6.
[74] *In re Advanced Telecomm. Network, Inc.*, 490 F.3d 1325, 1336 (11th Cir. 2007).

18

determining the value of VPX's contingent liabilities as of September 4, 2018, and through the Petition Date, I considered the contingent liabilities as discussed in the following paragraphs.   I also considered and adopted the probability factors assigned to each dispute category as discussed in the Gioconda Expert Report.[75]

OBI Trademark Dispute

68.    In 1983, OBI applied for trademark registrations for the "BANG" trademark and had established the exclusive right to market and sell Class 32 beverages under the BANG trademark.[76]   Class 32 includes non-alcoholic beverages, fruit beverages and isotonic (sports) drinks.[77]   In 2008, VPX began using the name BANG to sell a pre-workout product.[78]   In 2009, OBI learned that VPX was marketing and selling a product under the name BANG.[79]   OBI filed a trademark infringement action against VPX in the United States District Court for the Central District of California in September 2009.[80]

69.    OBI and VPX then entered into 2010 Settlement Agreement.[81]   Under the 2010 Settlement Agreement, VPX was permitted to continue using the BANG trademark with certain limitations.[82]   Pursuant to the 2010 Settlement Agreement, VPX could use the BANG trademark for nutritionally fortified beverages that were not "creatine-based."[83]

---

[75] *See* Gioconda Expert Report at 3–5, 26.
[76] *See Orange Bang, Inc. v. Vital Pharms., Inc.*, AAA No. 01-20-0005-6081 ("OBI Final Arb. Award") at 8.
[77] *See* OBI Final Arb. Award at 8.
[78] *See* OBI Final Arb. Award at 9–10.
[79] *See* OBI Final Arb. Award at 10.
[80] *See* OBI Final Arb. Award at 10, 15.
[81] *See* OBI Final Arb. Award at 28.
[82] *See* OBI Final Arb. Award at 28.
[83] *See* OBI Final Arb. Award at 28.

19

70.    OBI subsequently assigned certain enforcement rights under the 2010 Settlement Agreement to Monster.[84]  This assignment did not transfer ownership of the BANG trademark itself, but authorized Monster to step into OBI's position for purposes of enforcing the contractual limitations governing VPX's use of the mark.[85]

71.    On June 16, 2020, Monster initiated an arbitration proceeding against VPX alleging that VPX had breached the 2010 Settlement Agreement ("OBI Trademark Dispute").[86]  Monster alleged that BANG products did not qualify as "creatine-based" within the meaning of the 2010 Settlement Agreement and that VPX distributed BANG products outside the specialty channels permitted for non-creatine nutritionally fortified beverages.[87]

72.    On January 6, 2022, the arbitrator issued an interim arbitration award in favor of Monster and OBI, pursuant to which Monster and OBI jointly elected: (i) a $175 million disgorgement of profits award on account of OBI's trademark infringement claim; and (ii) certain injunctive relief providing for a royalty payment equal to five percent (5%) of net sales of BANG beverages in lieu of the Company discontinuing its use of the BANG mark (the "Interim Award").[88]

73.    On April 4, 2022, a final award was issued that provided the same relief granted under the Interim Award plus approximately $9.3 million in fees and costs and providing for a royalty payment equal to five percent (5%) of net sales of BANG

---

[84] *See Orange Bang, Inc. v. Vital Pharms., Inc.*, AAA No. 01-20-0005-6081, Claimants Orange Bang, Inc. and Monster Energy Company's Demand for Arbitration ("OBI Arb. Demand") ¶ 7.
[85] *See* OBI Arb. Demand ¶ 7.
[86] *See generally* OBI Arb. Demand.
[87] *See* OBI Arb. Demand ¶¶ 57, 67.
[88] *See* OBI Final Arb. Award at 175.

20

beverages in lieu of VPX discontinuing its use of the BANG mark (the "Arbitration Award").[89]

74. On September 29, 2022, the district court entered a judgment confirming the Arbitration Award ("OBI/Monster Judgment").[90]

75. Gioconda opined that VPX faced an approximately eighty-five percent (85%) to ninety percent (90%) probability of an adverse liability and outcome determination as of the relevant evaluation dates.[91] Gioconda opined that VPX faced substantial litigation and arbitration risk arising from trademark usage, product classification, channel-of-trade practices, and affirmative marketing practices.[92]

76. VPX did not recognize any contingent liability for the OBI Trademark Dispute in the Consolidated Financial Statements for the year ending December 31, 2020.[93] Since the OBI Trademark Dispute was initiated in June 2020, I recognized a contingent liability of $148,750,000 as of December 31, 2020 to reflect 85% of the $175 million disgorgement of profit award based on the probability factor assigned by Gioconda.[94]

77. Gioconda opined that VPX's use of the BANG trademark immediately constituted trademark infringement once it exceeded contractual limitations.[95]

<u>Monster False Advertising Litigation</u>

78. On September 4, 2018, Monster initiated a case against VPX alleging false and misleading advertising relating to Bang Energy's "Super Creatine" claims ("False

---

[89] *See* OBI Final Arb. Award at 174–77.
[90] *See* Second Amend. Compl. ¶ 140.
[91] *See* Gioconda Expert Report at 4–5.
[92] *See* Gioconda Expert Report at 35.
[93] *See* 2020 Financial Statement at Note 10.
[94] The Company recognized the liability in 2021.
[95] *See* Gioconda Expert Report at 44–45.

21

Advertising Litigation").[96]   Monster alleged that VPX's advertising conveyed to consumers that Bang Energy contained creatine or provided creatine-related benefits, despite the absence of creatine as an ingredient and the lack of sufficient evidence that "Super Creatine" delivered equivalent physiological effects.[97]

79.   The jury found that the VPX products did not contain creatine or deliver creatine-related benefits.[98]

80.   On September 29, 2022, the jury returned a verdict in Monster's favor.[99]   The jury found that VPX's "Super Creatine" advertising was false or misleading, that the misrepresentations were material to consumer purchasing decisions, and that Monster was injured as a result and awarded $271,924,174 in damages to Monster.[100]

81.   Gioconda opined that VPX faced an approximate eighty-five percent (85%) to ninety percent (90%) probability of adverse liability and outcome.[101]

82.   VPX did not recognize a contingent liability for the False Advertising Litigation in the Consolidated Financial Statements for the years ending December 31, 2019, 2020, or 2021.[102]   Accordingly, I recognized a contingent liability of $231,135,548 each year for 85% of the award amount.

---

[96] *See Monster Energy Co. v. Vital Pharms., Inc.*, No. 5:18-cv-01882 (C.D. Cal.), Dkt. No. 1.
[97] *See Monster Energy Co. v. Vital Pharms., Inc.*, No. 5:18-cv-01882 (C.D. Cal.), Dkt. No. 1 ¶¶ 1–2.
[98] *See* Gioconda Expert Report at 32.
[99] *See* Gioconda Expert Report at 32.
[100] *See* Gioconda Expert Report at 32.
[101] *See* Gioconda Expert Report at 4–5.
[102] *See* 2019 Financial Statement at Note 10; 2020 Financial Statement at Note 10; 2021 Financial Statement at Note 10.

PepsiCo Distribution Agreement

83. In March 2020, VPX and PepsiCo entered into a material distribution agreement ("Distribution Agreement") under which PepsiCo agreed to distribute specified Bang Energy products across designated channels in the United States.[103]

84. On October 23, 2020, VPX terminated the Distribution Agreement without cause.[104] Following termination, disputes arose immediately concerning the effect of termination, including PepsiCo's continued assertions of exclusive distribution rights.

85. Since VPX terminated the Distribution Agreement without cause, VPX was obligated to pay a Company Separation Amount.[105]

86. In December 2020, an arbitrator issued an interim arbitration award in favor of PepsiCo.[106] The district court granted PepsiCo's motion and confirmed the interim arbitration award on December 21, 2020.[107]

87. On November 17, 2021, the arbitrators ruled in favor of PepsiCo and determined that the Company Separation Amount of $177 million was payable to PepsiCo on or before January 23, 2024.[108] VPX recorded this amount as consideration due to a customer.[109]

---

[103] *See generally* Channel Transition Agreement Between VPX and Pepsi ("Distribution Agreement") § IV(B), dated March 6, 2020.
[104] *See* 2021 Financial Statement at Note 2.
[105] *See* 2021 Financial Statement at Note 2.
[106] *See* 2021 Financial Statement at Note 2; *see also PepsiCo, Inc., v. Vital Pharms., Inc.*, AAA Case No. 01-20-0015-8060 ("Pepsi Final Partial Award"), dated November 17, 2021.
[107] *See* Gioconda Expert Report at 54.
[108] *See* 2021 Financial Statement at Note 2.
[109] *See* 2021 Financial Statement at Note 2.

88. The parties entered into a Confidential Settlement Agreement, effective June 21, 2022.[110]

89. Gioconda opined that during the Relevant Period, a reasonably prudent fiduciary would have recognized the PepsiCo distribution dispute as a material contingent liability risk affecting liquidity, operational continuity, and enterprise value.[111] Gioconda opined that the probability of an adverse liability determination was 80%.[112]

90. VPX recognized the liability to PepsiCo in the amount of $177 million in its December 31, 2021 financial statements.[113] VPX did not recognize a contingent liability to PepsiCo in the December 31, 2020 financial statements.[114] Since the Distribution Agreement was terminated in October 2020, I recognized a contingent liability to PepsiCo in the amount of $141,600,000 which is 80% of the award amount.

<u>Balance Sheet Insolvency Conclusion</u>

91. As reflected in **Exhibit B**, based on my fair value adjustments, the value of VPX's assets at fair value did not exceed the value of the liabilities during the Relevant Period based on my application of the relevant insolvency accounting and review of the balance sheets and related documents, and appropriate fair value adjustments.

---

[110] *See* Pepsi/VPX Confidential Settlement Agreement, dated June 21, 2022.
[111] *See* Gioconda Expert Report at 58.
[112] *See* Gioconda Expert Report at 56.
[113] *See* 2021 Financial Statement at Note 2.
[114] *See* 2020 Financial Statement at Note 10.

24

<u>December 31, 2018 Insolvency Amount</u>

92. VPX was insolvent during the Relevant Period from September 4, 2018 through the Petition Date on a balance sheet basis.

93. I determined that the value of VPX's liabilities exceeded the fair value of its assets by approximately $137.6 million as of December 31, 2018 based on my application of insolvency accounting, review of the balance sheets and related documents, and appropriate fair value adjustments.

94. The fair value adjustments I made as of December 31, 2018 included:

   **a)** On September 4, 2018, VPX should have recognized a contingent liability in the amount of $231,135,548 for the Monster False Advertising Litigation.

   **b)** Adjusted the value of leasehold improvements ($2.1 million) and related accumulated depreciation ($2 million) to zero since the underlying improvements were made to real property that was leased by VPX, and such improvements do not provide monetizable value.

   **c)** Adjusted the value of the intangible assets to $5 million.

95. In my opinion, to a reasonable degree of certainty under insolvency accounting, VPX was rendered insolvent as of September 4, 2018. I reviewed the audited financial statements as of December 31, 2017 and the related audit workpapers for the years ending both December 31, 2017 and December 31, 2018 and did not note any increase in assets that would have rendered VPX solvent after recognizing the Monster False Advertising Litigation contingency liability.

25

### December 31, 2019 Insolvency Amount

96.     I determined that the value of VPX's liabilities exceeded the fair value of its assets by approximately $150.6 million as of December 31, 2019.

97.     The fair value adjustments I made as of December 31, 2019 included:

   a) Contingent liability of $231,135,548 for the Monster False Advertising Litigation.

   b) Fair value adjustment to reduce the value of the buildings ($74.1 million) and land ($10.7 million) attributable to the VIE Real Property Assets.

   c) Adjusted the value of leasehold improvements ($2.4 million) and the related accumulated depreciation ($2 million) to zero since the underlying improvements were made to real property that was leased by VPX, and such improvements are not something that can be monetized.

   d) Adjusted the value of assets under construction ($59 million) to zero since the underlying construction was made to real property owned by the Real Estate VIEs.

   e) Adjusted the value of the intangible assets to $5 million.

### December 31, 2020 Insolvency Amount

98.     I determined that the value of VPX's liabilities exceeded the fair value of its assets by approximately $697.6 million as of December 31, 2020.

99.     The fair value adjustments I made as of December 31, 2020 included:

   a) Contingent liability of $231,135,548 for the Monster False Advertising Litigation.

   b) Contingent liability of $148,750,000 for the OBI Trademark Dispute.

26

c) Contingent liability of $141,600 for the PepsiCo Settlement.

d) Fair value adjustment to reduce the value of the buildings ($108.5 million) and land ($50.9 million) attributable to the VIE Real Property Assets.  I also adjusted the associated accumulated depreciation for buildings ($2.5 million) to zero.

e) Adjusted the value of leasehold improvements ($47.5 million) and the related accumulated depreciation ($2.2 million) to zero since the underlying improvements were made to real property that was leased by VPX, and such improvements are not something that can be monetized.

f) Adjusted the value of assets under construction ($155.2 million) to zero since the underlying construction was made to real property owned by the Real Estate VIEs.

g) Adjusted the value of the intangible assets to $5 million.

<u>December 31, 2021 Insolvency Amount</u>

100.   I determined that the value of VPX's liabilities exceeded the fair value of its assets by approximately $549 million as of December 31, 2021.

101.   The fair value adjustments I made as of December 31, 2021 included:

a) Contingent liability of $231,135,548 for the Monster False Advertising Litigation.

b) Fair value adjustment to reduce the value of the buildings ($113.34 million) and land ($46.4 million) attributable to the VIE Real Property Assets.  I also adjusted the associated accumulated depreciation for buildings ($4.9 million) to zero.

c) Adjusted the value of leasehold improvements ($47.7 million) and the related accumulated depreciation ($2.4 million) to zero since the underlying improvements were made to real property that was leased by VPX, and such improvements are not something that can be monetized.

d) Adjusted the value of assets under construction ($120.8 million) to zero since the underlying construction was made to real property owned by the Real Estate VIEs.

e) Adjusted the value of the intangible assets to $5 million.

**C.      Petition Date Insolvency**

102. VPX filed for relief under Chapter 11 of the Bankruptcy Code on October 10, 2022.[115] I reviewed VPX's Bankruptcy Schedules, statement of financial affairs, and related attachments.[116] I reviewed the Consolidated Chapter 11 Case Management Summary[117] and the Declaration of John C. DiDonato in Support of Chapter 11 Petitions and Pleadings whereby Mr. DiDonato stated the reason for VPX's Chapter 11 protection was to obtain "breathing room" from the OBI, Monster, and PepsiCo litigation matters.[118]

103. VPX's Bankruptcy Schedules reflected approximately $709 million in assets and $1.1 billion in liabilities.[119]

---

[115] *See In re Vital Pharms., Inc.*, No. 22-17842-PDR (Bankr. S.D. Fla.), Dkt. No. 1.
[116] *See In re Vital Pharms., Inc.*, No. 22-17842-PDR (Bankr. S.D. Fla.), Dkt. Nos. 323, 325, 1396.
[117] *See In re Vital Pharms., Inc.*, No. 22-17842-PDR (Bankr. S.D. Fla.), Dkt. No. 27.
[118] DiDonato Decl. ¶ 41.
[119] *See In re Vital Pharms., Inc.*, No. 22-17842-PDR (Bankr. S.D. Fla.), Dkt. Nos. 323, 325, 1396.

104. Based on my review of these documents, there is no indication that VPX was solvent at any time during the period from December 31, 2021 through October 10, 2022. It remained insolvent on October 10, 2022.

### D.    Cash Flow Insolvency Test

105. The VPX business model was premised on misrepresentations and false and misleading advertising. The success was economically dependent on the creatine-based product, constituting 95% of the sales.[120]  In my opinion, VPX was also insolvent pursuant to the Cash Flow Test, which provides that a debtor is presumed to be insolvent if it is not paying its debts as they come due.[121]

106. VPX's sales were primarily comprised of creatine-based product sales. In his Declaration, Mr. DiDonato stated that VPX's leading product was Bang Energy.[122]

107. Mr. Gioconda opined that a central issue in both the OBI Arbitration and the Monster False Advertising Litigation was whether Bang Energy contained creatine or delivered creatine-related benefits and both proceedings found that they did not.[123]  Mr. Gioconda stated:

> *The record reflects that these determinations were reached independently by different decision-makers applying different legal standards. Nonetheless, the factual findings converged on the same conclusions regarding product composition, ingredient identity, and functional claims.*
>
> *From a factual perspective, this convergence reinforced the conclusion that Bang Energy was not "creatine-based" within the meaning of the 2010 Settlement Agreement and that marketing claims suggesting otherwise were misleading.*[124]

---

[120] *See VPX Liquidating Tr. v. John H. Owoc, et al.*, Adv. Pro. No. 24-01009 (Bankr. S.D. Fla.), Declaration of Zurama Sury Rodriguez, dated March 13, 2026 ("Rodriguez Decl.") ¶ 11.
[121] *See* 11 U.S.C. § 548(a)(B)(ii)(III); *see also* Fla Stat. § 726.103(2).
[122] *See* DiDonato Decl. ¶ 8.
[123] *See* Gioconda Expert Report at 35.
[124] *See* Gioconda Expert Report at 35.

108.    *Table 3* summarizes VPX's income statements for the years 2018–2021.

### *Table 3 – VPX Income Statement Summaries 2018–2021*

| | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|
| Net Sales | $  285,628,832 | $  626,201,321 | $  723,143,323 | $  728,296,049 |
| Cost of goods sold | 118,993,778 | 263,804,615 | 295,714,841 | 383,225,517 |
| **Gross profit** | **166,635,054** | **362,396,706** | **427,428,482** | **345,070,532** |
| Operating expenses | 86,125,644 | 195,397,457 | 412,068,162 | 312,815,220 |
| **Income from operations** | **80,509,410** | **166,999,249** | **15,360,320** | **32,255,312** |
| Other income (expense) | (689,113) | (3,896,238) | (11,754,998) | (189,373,460) |
| Net loss (income) attributable to non-controlling interests | - | (483,368) | 1,788,827 | 15,486,151 |
| **Net income** | **$   79,820,297** | **$   162,619,643** | **$    5,394,149** | **$ (141,631,997)** |

109.    95% of VPX's sales between 2019 and the Petition Date were from "Super Creatine" products.[125]   The VPX business model was dependent on the sales of this product.   Based on Mr. Gioconda's analysis, those sales were based on marketing claims that were misleading.[126]   Based on Mr. Gioconda's analysis, if the Company had not advertised the "Super Creatine" products in the fashion it did, it might not have achieved the level of success in the sale of those products. Had VPX been unable to achieve sales of Bang Energy which comprised such a high volume of sales, it is reasonably likely that VPX would not have been able to meet its operating expenses and debt obligations during the Relevant Period.

************

---

[125] *See* Second Amend. Compl. ¶ 79; Rodriguez Decl. ¶ 11.
[126] *See* Gioconda Expert Report at 32.

**X.    QUALIFICATIONS**

110.    I am a Certified Public Accountant (CPA), a Certified Fraud Examiner (CFE), Certified in Financial Forensics (CFF), and a Certified Insolvency and Restructuring Advisor (CIRA).

111.    I am a Fellow of the American College of Bankruptcy.  This recognition is based on recommendations by peers in the insolvency industry at a national level, invitation by the American College of Bankruptcy, and induction into this College.

112.    I am also the current Chairman, and Past President of the American Bankruptcy Institute (ABI).  ABI is the nation's largest multi-disciplinary organization of bankruptcy/insolvency professionals, of approximately 10,000 members including attorneys, bankers, judges, lenders, professors, turnaround specialists, financial advisors, auctioneers, and others.  Founded in 1982, ABI plays a leading role in providing congressional leaders and the general public with non-partisan reporting and analysis of insolvency and restructuring issues, bankruptcy regulations, laws, and trends.

113.    I am the founding partner of KapilaMukamal.  KM is a niche practice focusing on forensic investigative work, creditors' rights, bankruptcy, insolvency, and fiduciary services.  Several of the core professionals of KM have similar certifications as identified in paragraph above.

114.    I have served as a Federal Bankruptcy Trustee, Bankruptcy Examiner, Chief Restructuring Officer, S.E.C. Corporate Monitor, and Federal and State Court Receiver in numerous matters in the Southern and Middle Districts of Florida and the District of New Jersey.

115. I have served as a Federal Bankruptcy Trustee on the panel of U.S. Bankruptcy Trustees in the Southern District of Florida from approximately 1992 through current time. I have been appointed as a Chapter 11 trustee, Chapter 7 trustee, post-confirmation Liquidating Trustee, and other post-confirmation fiduciary roles. In these roles I have investigated frauds, Ponzi schemes, distressed businesses and their failures, financial affairs of bankruptcy debtors, evaluated asset recoveries, and claims against third parties. The role routinely includes tracing assets and assessing possible fraud and successor businesses. I have also investigated causes of action against management and professionals under Chapter 5 of the Bankruptcy Code. My duties have extended to evaluating, bringing, and overseeing litigation claims. Such claims have included tort litigation against professionals, directors, and officers.

116. As a court-appointed Examiner, I have reported to the Bankruptcy courts on issues whose defined scope of the duties is in the Bankruptcy Court's mandate, investigating the conduct of businesses and management and making recommendations to the Bankruptcy Court.

117. As a Federal court-approved Corporate Monitor appointed by the SEC, I have operated a public company international business and negotiated its sale to a foreign company. I am overseeing the restructuring of a healthcare business of multiple entities in the senior living facilities industry.

32

118.    I have been qualified as an expert dozens of times in federal and state courts regarding Ponzi schemes, insolvency, fraudulent transfers, funds and asset tracing, lost profits, damages, and other subject matters as well as a non-testifying expert in many other cases.

## XI.    COMPENSATION

119.    My current billing rate for this matter is $840 per hour.  The current billing rates of the other members of KM that worked on this engagement range from $190 to $820 per hour.

************

120.    KM reserves the opportunity to revise his opinions and Expert Report based on additional information that may become available prior to him rendering his expert testimony.  KM also reserves the right to prepare charts and demonstratives for trial and rebut any opposing expert's analysis and report if asked.

Dated: March 16, 2026

Soneet R. Kapila, CPA, CIRA, CFE, CFF
KapilaMukamal LLP
1000 S. Federal Hwy. Suite 200
Fort Lauderdale, FL 33330
skapila@kapilamukamal.com

33

# EXHIBIT A

**VITAL PHARMACEUTICALS, INC., ET AL (MAIN CASE NO. 22-17842-PDR - JOINTLY ADMINISTERED**
\*\*\*\*\*
**VPX LIQUIDATING TRUST, BY AND THROUGH ITS LIQUIDATING TRUSTEE**
**V.**
**JOHN H. OWOC, ET AL**
**ADV. PRO. CASE NO. 24-01009-PDR**
**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

**Documents Utilized**

| Reference No. | Description |
|---|---|
| 1 | VPX Liquidating Trust v. John H. Owoc et. al. (Adv. Proc. No. 24-01009 (PDR)) Second Amended Complaint dated February 7, 2025 [ECF 148] |
| 2 | Daszkal Bolton, Vital Pharms., Inc. Consol. Fin. Statements and Report of Indep. CPA, dated for each year-end Dec. 31, 2017 through Dec. 31, 2019 |
| 3 | Grant Thornton, Vital Pharms., Inc. Consol. Fin. Statements and Report of Indep. CPA, dated for each year-end Dec. 31, 2019 through Dec. 31, 2021 |
| 4 | Vital Pharmaceuticals Inc. consolidated trial balances 2018 to 2021. |
| 5 | Expert Report of Joseph Gioconda Esq. dated March 16, 2026 |
| 6 | Declaration of Zurama Sury Rodriguez dated March 13, 2026 |
| 7 | Declaration of John C. Didonato in Support of Chapter 11 Petitions and First Day Pleadings dated October 10, 2022 [ECF 26] |
| 8 | Orange Bang, Inc. v. Vital Pharms., Inc. Final Arbitration Award, AAA No. 01-20-0005-6081 |
| 9 | Orange Bang, Inc. v. Vital Pharms., Inc. Demand for Arbitration (claimants OBI & Monster Inc.), AAA No. 01-20-0005-6081 |
| 10 | Channel Transition Agreement Between VPX and Pepsi ("Distribution Agreement") § IV(B), dated Mar. 6, 2020 |
| 11 | PepsiCo, Inc., v. Vital Pharms. Inc. Final Partial Arbitration Award, AAA Case No. 01-20-0015-8060 dated November 17, 2021 |
| 12 | PepsiCo, Inc./VPX Confidential Settlement Agreement and General and Special Release of All Claims dated June 21, 2022 |
| 13 | In re Advanced Telecomm Network, Inc. 490 F.3d 1325, 11336 (11th Cir. 2007) |
| 14 | In re Vital Pharms. Inc. Bankruptcy Schedules, No. 22-17842-PDR (Bankr. S.D. Fla.) [ECF 323] |
| 15 | Vital Pharms. Inc. Ch. 11 Voluntary Petition, No. 22-17842-PDR (S.D. Fla.) [ECF 1] |
| 16 | Vital Pharms. Inc. Statement of Financial Affairs, No. 22-17842-PDR (Bankr. S.D. Fla.) [ECF 325] |
| 17 | Vital Pharms. Inc. Amended Bankruptcy Schedules, No. 22-17842-PDR (Bankr. S.D. Fla.) [ECF 1396] |

Kapila/Mukamal
CPAs, Forensic and Insolvency Advisors

**VITAL PHARMACEUTICALS, INC., ET AL (MAIN CASE NO. 22-17842-PDR - JOINTLY ADMINISTERED**

\*\*\*\*\*

**VPX LIQUIDATING TRUST, BY AND THROUGH ITS LIQUIDATING TRUSTEE**

**V.**

**JOHN H. OWOC, ET AL**

**ADV. PRO. CASE NO. 24-01009-PDR**

**UNITED STATES BANKRUPTCY COURT**

**SOUTHERN DISTRICT OF FLORIDA**

**FORT LAUDERDALE DIVISION**

### Documents Utilized

| | |
|---|---|
| 18 | Vital Pharms. Inc. Ch. 11 Case Management Summary, No. 22-17842-PDR (Bankr. S.D. Fla.) [ECF 27] |
| 19 | In re JHO Intellectual Property Holdings LLC Bankruptcy Schedules, No. 22-17845-PDR [ECF 12] |
| 20 | Declaration of Elizabeth A. Morris in Support of Debtor's Motion for Summary Judgment and Incorporated Memorandum of Law and Attachments Case No. 23-01031-PDR [ECF 3] |
| 21 | Monster Energy Co. v. Vital Pharms. Inc. Complaint, No. 5:18-cv-01882 [ECF 1] |
| 22 | Monster Energy First Amended Complaint in Case No. 5:18-cv-1882 [ECF 61] |
| 23 | Monster Energy Co. v. Vital Pharmaceuticals, Inc. et al. Verdict Form in Case No. 5:18-1882-JGB-SHK |
| 24 | Monster Energy Co. Judgement - ECF 1050 dated October 6, 2023 in Case No. 5:18-cv-01882 |
| 25 | 2017 and 2018 Daszkal Bolton, LLP Audit Workpapers |
| 26 | Vital Pharmaceuticals, Inc. US Income Tax Returns for an S Corporation 2018-2021 |
| 27 | Fixed Asset Roll Forward Workpapers & Master file |

*SEE EXPERT REPORT DATED MARCH 16, 2026*

Kapila/Mukamal
CPAs, Forensic and Insolvency Advisors

Page 2 of 2

# EXHIBIT B

**VITAL PHARMACEUTICALS, INC., ET AL (MAIN CASE NO. 22-17842-PDR - JOINTLY ADMINISTERED**
*****
**VPX LIQUIDATING TRUST, BY AND THROUGH ITS LIQUIDATING TRUSTEE**
**V.**
**JOHN H. OWOC, ET AL**
**ADV. PRO. CASE NO. 24-01009-PDR**
**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

**Vital Pharmaceuticals Inc.**
**Balance Sheet Test for Insolvency**

**PRELIMINARY DRAFT as of March 14, 2026:**
This is a preliminary draft. It has been prepared based on preliminary information and assumptions. No one may rely on this draft. It is subject to change as additional information becomes available or is clarified.

**Source:** Vital Pharmaceuticals Inc. audited financial statements & trial balances.
**Petition Date:** October 10, 2022

| | Notes | 2017 (Daszkal Bolton LLP) | 2018 (Daszkal Bolton LLP) | Fair Value Adjustments | KM Adjusted Balance | 2019 (Daszkal Bolton LLP as modified by Grant Thornton LLP) | Fair Value Adjustments | KM Adjusted Balance | 2020 (Grant Thornton LLP) | Fair Value Adjustments | KM Adjusted Balance | 2021 (Grant Thornton LLP) | Fair Value Adjustments | KM Adjusted Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | | | | | | | |
| Current assets: | | | | | | | | | | | | | | |
| Cash and cash equivalents | | $ 3,708,458 | $ 29,003,749 | | $ 29,003,749 | $ 86,625,030 | | $ 86,625,030 | $ 27,593,230 | | $ 27,593,230 | $ 18,361,418 | | $ 18,361,418 |
| Restricted cash | | - | - | | | 5,802,529 | | 5,802,529 | 5,803,021 | | 5,803,021 | 56,962,631 | | 56,962,631 |
| Accounts receivable, net | 1 | 9,285,089 | 45,261,203 | | 45,261,203 | 49,330,074 | | 49,330,074 | 35,055,948 | | 35,055,948 | 61,249,350 | | 61,249,350 |
| Inventory, net | 1 | 15,534,309 | 42,897,059 | | 42,897,059 | 99,439,759 | | 99,439,759 | 158,300,388 | | 158,300,388 | 153,579,117 | | 153,579,117 |
| Short-term deposits | | - | - | | | 11,555,582 | | 11,555,582 | 475,155 | | 475,155 | 440,293 | | 440,293 |
| Contract asset - current | | - | - | | - | - | | - | - | | - | 96,416,439 | - | 96,416,439 |
| Prepaids and other assets | | 967,000 | 8,142,713 | | 8,142,713 | 28,011,555 | | 28,011,555 | 25,274,379 | | 25,274,379 | 17,076,519 | | 17,076,519 |
| Total current assets | | 29,494,856 | 125,304,724 | - | 125,304,724 | 280,764,529 | - | 280,764,529 | 252,502,121 | - | 252,502,121 | 404,085,767 | - | 404,085,767 |
| | | | | | | | | | | | | | | |
| Property and equipment, net: | | | | | | | | | | | | | | |
| Computers & Equipment | 5 | 9,799,723 | 11,904,504 | | 11,904,504 | 17,707,680 | | 17,707,680 | 77,868,046 | | 77,868,046 | 115,822,705 | | 115,822,705 |
| Furniture & Fixtures | 5 | 2,828,374 | 2,580,275 | | 2,580,275 | 2,144,054 | | 2,144,054 | 2,865,697 | | 2,865,697 | 3,173,825 | | 3,173,825 |
| Automobiles and Jets | 5 | 2,628,120 | 32,790,666 | | 32,790,666 | 41,627,758 | | 41,627,758 | 46,521,822 | | 46,521,822 | 23,790,166 | | 23,790,166 |
| Leasehold Improvements | 2 | 2,079,197 | 2,143,747 | (2,143,747) | - | 2,368,477 | (2,368,477) | - | 47,462,423 | (47,462,423) | - | 47,672,253 | (47,672,253) | - |
| Assets under Construction | 3 | 1,036,153 | 897,399 | | 897,399 | 58,968,497 | (58,968,497) | - | 155,157,397 | (155,157,397) | - | 120,794,676 | (120,794,676) | - |
| Buildings | 4 | - | - | | - | 74,068,161 | (74,068,161) | - | 108,492,839 | (108,492,839) | - | 113,336,885 | (113,336,885) | - |
| Real Estate / Land | 4 | - | - | | - | 10,709,100 | (10,709,100) | - | 50,879,571 | (50,879,571) | - | 46,424,728 | (46,424,728) | - |
| Software | | 389,656 | 958,598 | | 958,598 | 1,072,692 | | 1,072,692 | 1,415,437 | | 1,415,437 | 1,438,297 | | 1,438,297 |
| Accumulated Depreciation - Buildings | 4 | - | - | | - | - | | | (2,457,863) | 2,457,863 | - | (4,850,729) | 4,850,729 | - |
| Accumulated Depreciation - Leaseholds | 2 | (1,900,563) | (2,027,484) | 2,027,484 | - | (2,083,446) | 2,083,446 | - | (2,216,252) | 2,216,252 | - | (2,398,608) | 2,398,608 | - |
| Accumulated Depreciation - Machinery and Equipment | 5 | - | (7,648,899) | | (7,648,899) | (8,764,762) | | (8,764,762) | (11,283,012) | | (11,283,012) | (17,450,908) | | (17,450,908) |
| Accumulated Depreciation - Furniture, Fixtures & Office Equipment | 5 | (2,235,625) | (2,390,367) | | (2,390,367) | (1,780,493) | | (1,780,493) | (1,937,892) | | (1,937,892) | (2,169,259) | | (2,169,259) |
| Accumulated Depreciation - Automobiles and Jets | 5 | (565,480) | (2,463,855) | | (2,463,855) | (8,804,824) | | (8,804,824) | (16,526,156) | | (16,526,156) | (10,341,924) | | (10,341,924) |
| Accumulated Depreciation - Software | 5 | (381,272) | (583,956) | | (583,956) | (779,688) | | (779,688) | (1,032,308) | | (1,032,308) | (1,179,030) | | (1,179,030) |
| Accumulated Depreciation - Computers & Office Equipment | 5 | (7,251,763) | (235,751) | | (235,751) | (1,289,786) | | (1,289,786) | (3,749,091) | | (3,749,091) | (14,260,354) | | (14,260,354) |
| Adjustment | 6 | - | - | | - | - | | | 593,835 | | 593,835 | - | | - |
| Total Property and equipment, net | | 6,426,520 | 35,924,877 | (116,263) | 35,808,614 | 185,163,421 | (144,030,789) | 41,132,631 | 452,054,493 | (357,318,115) | 94,736,378 | 419,802,722 | (320,979,205) | 98,823,517 |
| | | | | | | - | | - | | | - | | | - |
| Other assets: | | | | | | - | | - | | | - | | | - |
| Deposits | | 171,885 | 209,819 | | 209,819 | 1,068,714 | | 1,068,714 | 1,720,096 | | 1,720,096 | 1,372,499 | | 1,372,499 |
| Contract asset | | - | - | | - | - | | - | - | | - | 69,006,122 | - | 69,006,122 |
| Intangible assets, net | | 146,500 | 122,377 | 4,877,623 | 5,000,000 | 239,543 | 4,760,457 | 5,000,000 | 313,336 | 4,686,664 | 5,000,000 | 702,134 | 4,297,866 | 5,000,000 |
| Total other assets | | 318,385 | 332,196 | 4,877,623 | 5,209,819 | 1,308,257 | 4,760,457 | 6,068,714 | 2,033,432 | 4,686,664 | 6,720,096 | 71,080,755 | 4,297,866 | 75,378,621 |
| | | | | | | | | | | | | | | |
| **Total assets** | | **36,239,761** | **161,561,797** | **4,761,360** | **166,323,157** | **467,236,207** | **(139,270,332)** | **327,965,874** | **706,590,046** | **(352,631,451)** | **353,958,595** | **894,969,244** | **(316,681,339)** | **578,287,905** |
| | | | | | | | | | | | | | | |
| **Liabilities and Stockholder's Equity** | | | | | | | | | | | | | | |
| Current liabilities: | | | | | | | | | | | | | | |
| Accounts payable | | 7,053,057 | 39,005,916 | | 39,005,916 | 64,201,723 | | 64,201,723 | 57,951,202 | | 57,951,202 | 63,762,972 | | 63,762,972 |
| Accrued liabilities | | 2,286,419 | 2,732,996 | | 2,732,996 | 18,223,072 | | 18,223,072 | 15,788,875 | | 15,788,875 | 220,463,086 | | 220,463,086 |
| Loss Contingencies | | 1,576,613 | 2,339,281 | | 2,339,281 | 2,491,282 | | 2,491,282 | 1,694,647 | | 1,694,647 | - | | - |
| Deferred distribution transition revenue - current | | - | - | | - | - | | - | 51,521,134 | | 51,521,134 | 24,923,988 | | 24,923,988 |

Kapila Mukamal

VITAL PHARMACEUTICALS, INC., ET AL (MAIN CASE NO. 22-17842-PDR - JOINTLY ADMINISTERED

\*\*\*\*\*

VPX LIQUIDATING TRUST, BY AND THROUGH ITS LIQUIDATING TRUSTEE

V.

JOHN H. OWOC, ET AL

ADV. PRO. CASE NO. 24-01009-PDR

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF FLORIDA

FORT LAUDERDALE DIVISION

**Vital Pharmaceuticals Inc.**
**Balance Sheet Test for Insolvency**

**PRELIMINARY DRAFT as of March 14, 2026:**
This is a preliminary draft. It has been prepared based on preliminary information and assumptions. No one may rely on this draft. It is subject to change as additional information becomes available or is clarified.

**Source:** Vital Pharmaceuticals Inc. audited financial statements & trial balances.
**Petition Date:** October 10, 2022

| | Notes | 2017 (Daszkal Bolton LLP) | 2018 (Daszkal Bolton LLP) | Fair Value Adjustments | KM Adjusted Balance | 2019 (Daszkal Bolton LLP as modified by Grant Thornton LLP) | Fair Value Adjustments | KM Adjusted Balance | 2020 (Grant Thornton LLP) | Fair Value Adjustments | KM Adjusted Balance | 2021 (Grant Thornton LLP) | Fair Value Adjustments | KM Adjusted Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Customer deposits | | 323,823 | - | | - | - | | - | - | | - | - | | - |
| Notes payable, current portion | | 353,274 | 4,649,371 | | 4,649,371 | 3,069,690 | | 3,069,690 | 22,294,634 | | 22,294,634 | 345,364,033 | | 345,364,033 |
| Capital lease, current portion | | 177,570 | 188,703 | | 188,703 | 93,970 | | 93,970 | - | | - | - | | - |
| Notes Payable - Sheridan | | - | - | | - | 6,475,183 | | 6,475,183 | | | - | | | - |
| Notes Payable - JHO Real Estate Investment | | - | - | | - | 1,892,238 | | 1,892,238 | | | - | | | - |
| BB&T Commercial Loan | | - | - | | - | 6,257,880 | | 6,257,880 | | | - | | | - |
| Line of credit | | - | 701,180 | | 701,180 | - | | - | - | | - | - | | - |
| Other liabilities - current | | - | - | | - | - | | - | - | | - | 26,490,167 | | 26,490,167 |
| Total current liabilities | | 11,770,756 | 49,617,447 | - | 49,617,447 | 102,705,038 | - | 102,705,038 | 149,250,492 | - | 149,250,492 | 681,004,246 | - | 681,004,246 |
| | | | | | | | | | | | | | | |
| Long-term debt: | | | | | | | | | | | | | | |
| Notes payable, net of current portion | | 1,158,328 | 4,685,490 | | 4,685,490 | 5,108,487 | | 5,108,487 | 339,725,291 | | 339,725,291 | 6,320,422 | | 6,320,422 |
| Long Term - PNC Jets | | - | 18,075,556 | | 18,075,556 | 16,768,889 | | 16,768,889 | | | - | | | - |
| Deferred distribution transition revenue | | - | - | | - | - | | - | 38,821,632 | | 38,821,632 | 17,838,325 | | 17,838,325 |
| Deferred rent payable | | 142,138 | 322,120 | | 322,120 | 717,487 | | 717,487 | 2,315,565 | | 2,315,565 | 3,210,854 | | 3,210,854 |
| Capital lease, net of current portion | | 282,673 | 93,970 | | 93,970 | - | | - | - | | - | - | | - |
| Long Term - Sheridan Note Payable | | - | - | | - | 63,299,468 | | 63,299,468 | | | - | | | - |
| Long Term - Notes Payable - JHO Real Estate Investment | | - | - | | - | 33,188,513 | | 33,188,513 | | | - | | | - |
| Long Term - BB&T - Commercial Loan | | - | - | | - | 27,062,120 | | 27,062,120 | | | - | | | - |
| Loan costs | | - | - | | - | (1,438,200) | | (1,438,200) | | | - | | | - |
| Other liabilities | | - | - | | - | - | | - | - | | - | 187,594,359 | | 187,594,359 |
| Total long-term debt | | 1,583,139 | 23,177,136 | - | 23,177,136 | 144,706,764 | - | 144,706,764 | 380,862,488 | - | 380,862,488 | 214,963,960 | - | 214,963,960 |
| | | | | | | | | | | | | | | |
| Contingent liabilities: | | | | | | | | | | | | | | |
| Monster False Advertising Litigation | 7 | - | - | 231,135,548 | 231,135,548 | - | 231,135,548 | 231,135,548 | - | 231,135,548 | 231,135,548 | - | 231,135,548 | 231,135,548 |
| OBI Trademark Dispute | 8 | | | | - | | | - | | 148,750,000 | 148,750,000 | | | - |
| PepsiCo Settlement | 9 | | | | - | | | - | | 141,600,000 | 141,600,000 | | - | - |
| Total contingent liabilities | | - | - | 231,135,548 | 231,135,548 | - | 231,135,548 | 231,135,548 | - | 521,485,548 | 521,485,548 | - | 231,135,548 | 231,135,548 |
| | | | | | | | | | | | | | | |
| **Total liabilities** | | **13,353,895** | **72,794,583** | **231,135,548** | **303,930,131** | **247,411,802** | **231,135,548** | **478,547,350** | **530,112,980** | **521,485,548** | **1,051,598,528** | **895,968,206** | **231,135,548** | **1,127,103,754** |
| | | | | | | | | | | | | | | |
| **Solvency (Insolvency) Total** | | **$ 22,885,866** | **$ 88,767,214** | **$ (226,374,188)** | **$ (137,606,974)** | **$ 219,824,405** | **$ (370,405,880)** | **$ (150,581,475)** | **$ 176,477,066** | **$ (874,116,999)** | **$ (697,639,933)** | **$ (998,962)** | **$ (547,816,887)** | **$ (548,815,849)** |

**VITAL PHARMACEUTICALS, INC., ET AL (MAIN CASE NO. 22-17842-PDR - JOINTLY ADMINISTERED**
*****
**VPX LIQUIDATING TRUST, BY AND THROUGH ITS LIQUIDATING TRUSTEE**
**V.**
**JOHN H. OWOC, ET AL**
**ADV. PRO. CASE NO. 24-01009-PDR**
**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

**Vital Pharmaceuticals Inc.**
**Balance Sheet Test for Insolvency**

**PRELIMINARY DRAFT as of March 14, 2026:**
This is a preliminary draft.  It has been prepared based on preliminary information and assumptions.  No one may rely on this draft.  It is subject to change as additional information becomes available or is clarified.

**Source:** Vital Pharmaceuticals Inc. audited financial statements & trial balances.
**Petition Date:** October 10, 2022

| | Notes | 2017 (Daszkal Bolton LLP) | 2018 (Daszkal Bolton LLP) | Fair Value Adjustments | KM Adjusted Balance | 2019 (Daszkal Bolton LLP as modified by Grant Thornton LLP) | Fair Value Adjustments | KM Adjusted Balance | 2020 (Grant Thornton LLP) | Fair Value Adjustments | KM Adjusted Balance | 2021 (Grant Thornton LLP) | Fair Value Adjustments | KM Adjusted Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **NOTES:** | | | | | | | | | | | | | | |
| Note 1) I did not adjust the value of accounts receivable or inventory for fair value purposes.  Any adjustment would only further increase insolvency. | | | | | | | | | | | | | | |
| Note 2) I adjusted the value of leasehold improvements to zero for fair value purposes since the underlying improvements were made to real property that was leased by VPX and such improvements are not something that can be liquidated for value. | | | | | | | | | | | | | | |
| Note 3) I adjusted the value of construction in progress  to zero for fair value purposes since the underlying improvements were made to real property owned by the VIEs. | | | | | | | | | | | | | | |
| Note 4) Includes Real Property Assets owned by VIEs which are included  in the Consolidated Audited Financials. The VIE Real Property Assets were acquired using the Company's funds, but Owoc titled them in the name of the VIEs to keep them out of the reach of creditors.   I excluded  the value of the VIE Real Property Assets for purposes of fair value. The balance sheet test under the Code excludes property transferred, concealed, or removed with the intent to hinder, delay or defraud creditors; or property that may be exempted from property of the estate under section 522 of the Bankruptcy Code. | | | | | | | | | | | | | | |
| Note 5) The Company's property and equipment included computers, furniture and fixtures, software, automobiles and a jet. The value reflected on the balance sheet is the acquisition cost, net of depreciation. Since these represent depreciating assets, I did not adjust the value of the assets. Any adjustment would further increase insolvency. | | | | | | | | | | | | | | |
| Note 6) The amounts reported in other assets on the consolidated financial statements did not reconcile with the other assets reflected in the trial balance.  The financial statement was $593,835 higher so I included this amount as an adjustment. | | | | | | | | | | | | | | |
| Note 7)  Monster False Advertising case filed September 2018 resulted in an award of $307 million.  Mr. Gioconda assigned an 85% probability factor as of the date the lawsuit was filed. | | | | | | | | | | | | | | |
| Note 8)  OBI and Monster Trademark Infringement Arbitration case filed June 2020 resulted in an award of $182.2 million. Mr. Gioconda signed an 85% probability factor as of the date the claim was filed.  This obligation was recognized in the 2021 financial statements so no adjustment required for that year. | | | | | | | | | | | | | | |
| Note 9)  PepsiCo Distribution Agreement case was canceled in October 2020 and resulted in a $177 million obligation that was recognized by the Debtor in 2021.  Mr. Gioconda assigned an 80% probability factor as of the date the lawsuit was filed.  This obligation was recognized in 2021, so no adjustment needed in that year. | | | | | | | | | | | | | | |

## *(v) Declaration of Joseph Gioconda, Esq.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**
www.flsb.uscourts.gov

| | |
|---|---|
| VPX LIQUIDATING TRUST, by and through its Liquidating Trustee,<br><br>*Plaintiffs,*<br><br>v.<br><br>JOHN H. OWOC, MEGAN ELIZABETH OWOC, ELITE ISLAND LLC, JHO GA-1 INVESTMENT, LLC, JHO NV-1 INVESTMENT LLC, SHERIDAN REAL ESTATE INVESTMENT A, LLC, SHERIDAN REAL ESTATE INVESTMENT B, LLC, and SHERIDAN REAL ESTATE INVESTMENT C, LLC,<br><br>*Defendants.* | Case No. 22-17842 (PDR)<br>(Jointly Administered)<br><br><br>Adv. Pro. No. 24-01009 (PDR)<br><br><br>**DECLARATION OF**<br>**JOSEPH GIOCONDA, ESQ.** |

Under 28 U.S.C. § 1746, Joseph Gioconda, Esq. hereby declares as follows under the penalty of perjury:

## I.    BACKGROUND AND QUALIFICATIONS

1.    I am an attorney licensed to practice law and the principal of Gioconda Law Group PLLC, an intellectual property and commercial litigation boutique law firm. I have practiced in the field of United States intellectual property law, including trademark law, copyright law, unfair competition, false advertising, and commercial litigation, for more than twenty-nine years. My professional experience has focused on disputes and legal issues arising from branding, marketing, product positioning, and intellectual property rights in consumer-facing industries.

1

2.      I have been retained by Lowenstein Sandler LLP ("Counsel"), counsel to the Vital Pharmaceuticals, Inc. Liquidating Trust and the Liquidating Trustee, the successors to Vital Pharmaceutical, Inc. ("VPX" or "Company") and its affiliated debtors, to provide expert opinions in the above-captioned matter.  In connection with this engagement, I have prepared an expert report dated March 16, 2026 (the "Report").  A copy of the Report is attached hereto as **Exhibit 1.**

3.      Throughout my career, I have advised and represented numerous clients in trademark infringement, false advertising, and unfair competition disputes, as well as copyright and commercial litigation matters.  My practice has included primary responsibility for cases before federal and state courts, the United States Patent and Trademark Office, the Trademark Trial and Appeal Board, and arbitration tribunals.  I have represented clients across a wide range of industries, including consumer packaged goods, beverages, dietary supplements, apparel, luxury goods, and technology products.  I have also served as an expert witness in intellectual property matters, offering opinions on issues such as likelihood of confusion, trademark use in commerce, compliance with injunctions, and the marketplace significance of branding and advertising conduct.

4.      I have board-level corporate governance experience involving the evaluation and management of litigation exposure, intellectual property risk, and contingent liabilities affecting operating companies.  In that capacity, I served as Chairman of the Board of New Slice Ventures LLC, a soft drink beverage company, and at various times also served as General Counsel and Secretary of that company.  In those roles, I was responsible for evaluating and managing litigation risk, regulatory exposure, intellectual property disputes, contractual disputes, and other contingent liabilities from a corporate governance perspective.  My board-level experience required real-time decision-making under conditions of uncertainty, without the benefit of hindsight, and required

2

balancing growth initiatives against the need to preserve liquidity, protect enterprise value, and manage downside risk.

5.　　I have practical experience evaluating the commercial value of brand assets and other intangible property in connection with corporate transactions, strategic planning, and due diligence.  I have evaluated intellectual property portfolios associated with consumer products, beverages, dietary supplements, and technology platforms, including analysis of trademark rights, domain name portfolios, and patent assets.

6.　　In reaching my opinions, I relied on my professional experience valuing intellectual property, and as a board-member.

## II.　MATERIALS REVIEWED

7.　　My opinion is based on my professional experience as well as the documents analyzed, reviewed, and enumerated in Section XIII of the Report.  The materials I reviewed include, among other things: (i) bankruptcy and adversary proceeding materials filed in connection with VPX's chapter 11 cases; (ii) arbitration and settlement materials from the trademark arbitration involving Orange Bang, Inc. ("OBI") and VPX (the "OBI Trademark Dispute"); (iii) trial materials, including the verdict form, and appellate proceedings from the false advertising litigation involving Monster Energy, Inc. ("Monster") and VPX (the "False Advertising Litigation"); (iv) materials from the copyright infringement litigations against VPX in the Southern District of Florida; (v) materials from the distribution dispute between PepsiCo, Inc. ("PepsiCo") and VPX; (vi) other commercial litigation materials involving contract manufacturing and distribution disputes; (vii) VPX's consolidated financial statements for the years ending December 31, 2018, 2019, 2020, and 2021; (viii) federal trademark registration materials, bankruptcy

3

schedules, and trademark schedules for the VPX entities; and (ix) various legal authorities, treatises, secondary authorities, and market and industry materials.

8.      I relied on those materials for the limited purpose of understanding the factual record, the positions taken by the parties over time, and the sequence of events known or reasonably knowable to VPX's leadership during the period from at least September 4, 2018 through and including October 10, 2022 (the "Petition Date" and collectively, the "Relevant Time Period").

## III.    WORK PERFORMED

9.      I was asked to opine on two questions: (1) whether, during the Relevant Time Period, the litigation and arbitration risks confronting VPX were of a nature and magnitude that they should have been treated as material contingent liabilities by corporate fiduciaries; and (2) what was the likely range of value of VPX's intellectual property portfolio.

10.      With respect to litigation risk, I applied a governance-based methodology for assessing contingent litigation risk.  That methodology evaluated each dispute category by reference to two interrelated dimensions: the probability of an adverse liability determination in each litigation, and the probability that such a determination would result in enterprise-material consequence on VPX. An enterprise-material consequence is one that severely impacts a company's core business model, financial condition, assets, or operations.  I assessed (a) the OBI Trademark Dispute; (b) the False Advertising Litigation; (c) three copyright infringement disputes; (d) the strategic distribution dispute with PepsiCo; and (e) several other contract manufacturing and distribution disputes. In addition to evaluating the likelihood that any indivdual litigation would pose a risk of an enterprise-material consequence, I also considered the overall impact of the pending litigations collectively.

4

11. With respect to intellectual property valuation, I assessed the potential economic value of VPX's intellectual property assets, including, but not limited to, the international trademark portfolio, domain name portfolio, and the patent portfolio owned by JHO Intellectual Property Holdings, LLC. I applied commonly accepted intellectual property valuation methodologies, including the income approach, the market approach, and the cost approach, and considered distressed brand transaction benchmarks, residual consumer recognition, and secondary patent market data.

## IV. OPINIONS

12. VPX's Consolidated Financial Statements reflect that VPX recorded the value of the trademark portfolio based solely on historical registration costs and related administrative expenses. For example, Notes for Intangible Assets for Fiscal Year ending in 2018 in VPX's Consolidated Financial Statements listed **$372,710** in trademark and patent-related costs185 and for 2019-2020, VPX noted **$648,957** in such costs. In my opinion, these historical costs provide only a very limited reference point when assessing the actual economic value of VPX's Intellectual Property Portfolio. My analysis considered the price that a hypothetical willing buyer would have paid for VPX's Intellectual Property Portfolio in an arm's-length transaction during the Relevant Time Period, not the historical costs.

13. For the reasons more fully set forth in the Report, incorporated herein by reference, my opinion is that VPX's intellectual property assets, VPX's international trademark portfolio, including the associated domain name portfolio, likely possessed a fair market value of approximately $2.5 million to $3.5 million. The patent portfolio owned by JHO Intellectual Property Holdings, LLC likely possessed a fair market value of approximately $1.0 million to $1.4 million, with a potential distressed-sale value of approximately $500,000 to $1 million. In total,

5

VPX's entire intellectual property portfolio, including patents, was likely valued in the approximate range of $3.5 million to $5 million My opinion with respect to the various lawsuits against VPX is that it faced substantial, foreseeable, and correlated litigation exposure arising from conduct central to its core business operations during the Relevant Time Period.

14.     With respect to the OBI Trademark Dispute, VPX faced an approximately 85% to 90% probability of an adverse liability and outcome determination.  For the False Advertising Litigation, VPX faced an approximately 85% to 90% probability of adverse liability and outcome. With respect to the copyright infringement disputes, VPX faced an approximately 85% to 90% probability of an adverse liability determination and outcome.  For the PepsiCo distribution dispute, VPX faced an approximately 80% to 85% probability of adverse liability and outcome. For the contract manufacturing and distribution disputes, VPX faced an approximately 80% to 85% probability of adverse liability and outcome.

15.     A reasonably prudent board evaluating these matters during the Relevant Time Period would have viewed them holistically as substantial, foreseeable, and enterprise-material contingent risks rather than remote contingencies, and there is no question that exposure of this nature and magnitude should have been treated as material contingent liability risks by VPX.

16.     By August 2020, the risks posed by the False Advertising Litigation would have been closer to 90% rather than 85%.  The False Advertising Litigation was filed on September 4, 2018 and proceeded to trial on August 15, 2022.  By August 2020, VPX had filed and lost a motion to strike portions of Monser's first amended complaint and had its motion to dismiss for failure to state a claim granted only in part, with the court sustaining eight of Monster's twelve claims against VPX.

17.     Overall, considering all of the litigations together, the probability that one or more of the disputes would result in an enterprise-material adverse outcome impairing VPX's liquidity, operations, or enterprise value exceeded eighty percent (80%) and approached ninety percent (90%).

I hereby declare the foregoing statements made by me are true and correct.  I am aware that if any of the statements made by me are willfully false, I may be subject to punishment.

Dated:  March 27, 2026

By: _____
      JOSEPH GIOCONDA

7

Docusign Envelope ID: CA8ED9B9-DE24-4C87-088E-98FB1D5ED9CA

### UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF FLORIDA
### FORT LAUDERDALE DIVISION

| | |
|---|---|
| VPX LIQUIDATING TRUST, by and through its Liquidating Trustee, <br><br>                   Plaintiffs, <br><br> v. <br><br> JOHN H. OWOC, MEGAN ELIZABETH OWOC, JONATHAN W. OWOC, BRANDEN SHAW, DAVID RUNNEBAUM, JWO REAL ESTATE INVESTMENT I, LLC, JWO REAL ESTATE INVESTMENT II LLC, JW OWOC ENTERPRISES, LLC, 167 SPYGLASS LN LLC, 120 SPYGLASS LN LLC, 3 PELICAN DR LLC, TROPICAL SUNSET 117 LLC, STAG DEVELOPMENT LLC, SHAW INVESTMENTS & REALTY, INC., ELITE ISLAND LLC, JHO GA-1 INVESTMENT, LLC, JHO NV-1 INVESTMENT LLC, SHERIDAN REAL ESTATE INVESTMENT A, LLC, SHERIDAN REAL ESTATE INVESTMENT B, LLC, and SHERIDAN REAL ESTATE INVESTMENT C, LLC, <br><br>                   Defendants. | Chapter 11 Cases <br><br> Case No. 22-17842 (PDR) <br> (Jointly Administered) <br><br><br> Adv. Pro. No. 24-01009 (PDR) |

<br><br>

### EXPERT REPORT OF JOSEPH GIOCONDA, ESQ.

**MARCH 16, 2026**

**TABLE OF CONTENTS**

I.      EXECUTIVE SUMMARY ..................................................................................1

II.     BACKGROUND, EDUCATION, AND QUALIFICATIONS ...........................5

III.    SCOPE OF ENGAGEMENT ..........................................................................9

IV.     GENERAL LEGAL CONCEPTS AND DEFINITIONS ..................................10

V.      METHODOLOGY: GOVERNANCE-BASED METHODOLOGY FOR ASSESSING CONTINGENT LITIGATION RISK ...............................................................18

VI.     OVERALL PROBABILITY ANALYSIS ........................................................22

VII.    TRADEMARK AND FALSE ADVERTISING DISPUTES RISK ASSESSMENT .......25

VIII.   COPYRIGHT INFRINGEMENT RISK ASSESSMENT ..................................46

IX.     STRATEGIC DISTRIBUTION DISPUTE (PEPSICO) RISK ASSESSMENT ..............50

X.      DISTRIBUTION CONTRACT DISPUTE RISK ASSESSMENT ....................55

XI.     GOVERNANCE CONCLUSIONS ...................................................................60

XII.    HIGH-LEVEL VALUATION ASSESSMENT OF VPX'S NON-PATENT INTELLECTUAL PROPERTY PORTFOLIO ..................................................61

XIII.   HIGH-LEVEL VALUATION OF VPX'S PATENT PORTFOLIO ..................80

XIV.    MATERIALS CONSIDERED ........................................................................85

XV.     END NOTES ...................................................................................................89

## I.    EXECUTIVE SUMMARY

I, Joseph C. Gioconda, Esq., have been retained by Lowenstein Sandler LLP, counsel to the VPX Liquidating Trust and the Liquidating Trustee, to opine on the following questions:

(1)    **Whether, during the period from at least September 4, 2018 through and including October 10, 2022 (the "Relevant Time Period"), risks confronting Vital Pharmaceuticals, Inc. ("VPX" or "the Company")[1] were of a nature and magnitude that they should have been treated as material contingent liabilities by corporate fiduciaries?**

(2)    **What was the likely range of value of VPX's intellectual property portfolio?**

Based on contemporaneous indicators available during the Relevant Time Period, it is my opinion based on my experience, that VPX faced substantial, foreseeable, and correlated litigation exposure arising from:

- A contractual and trademark dispute concerning VPX's compliance with a 2010 trademark coexistence agreement with Orange Bang, Inc. ("OBI") governing use of the BANG mark ("OBI Trademark Dispute");

- False advertising and unfair competition claims relating to "Super Creatine" representations asserted by Monster Energy, Inc. ("Monster"), an aggressive competitor ("False Advertising Litigation," and together with the OBI Trademark Dispute, "Trademark and False Advertising Disputes");

- The downstream risk of consumer-facing false advertising and enforcement actions;

- Copyright infringement disputes; and

- Several distributor contract disputes, including with PepsiCo.

Applying a conservative governance-level assessment, and allowing for correlation among several of the disputes, it is my opinion based on my training and professional experience that during the Relevant Time Period, the probability that at least one dispute would result in an enterprise-material adverse outcome impairing liquidity, operations, and/or enterprise value **was at least eighty percent (80%) and approached ninety percent (90%) in several significant cases.**

The relevant uncertainty confronting VPX during the Relevant Time Period was therefore not whether enterprise-level harm was reasonably possible, but which form that harm would take and when.

These risks were not speculative or remote. They arose from objective product characteristics, documented marketing representations, and established distribution practices affecting VPX's primary revenue-generating products. The foreseeable consequences included significant monetary liability in the hundreds of millions of dollars, injunctive relief, ongoing compliance obligations, additional royalties for existing products, and constraints on future operations.

1

It is important to note that VPX was founded by John H. ("Jack") Owoc ("Mr. Owoc") in 1993 and was engaged in the manufacture, development, and marketing of sports nutrition products and energy drinks. Throughout the entire Relevant Time Period, Mr. Owoc exercised exclusive control over VPX and all aspects of its operations. He served as VPX's founder, Chief Executive Officer ("CEO"), "Chief Science Officer," and principal decision maker, with ultimate authority over VPX's branding and marketing strategy during the Relevant Time Period.

During the Relevant Time Period, VPX had no board of directors and no members other than Mr. Owoc. All corporate decisions, including payments to vendors, distributors, and other third parties, required Mr. Owoc's express approval. No individual other than Mr. Owoc had signatory authority over VPX's bank accounts, and all internal and external payments required his authorization. Mr. Owoc was also the only person with authority to enter contracts on VPX's behalf.

From a governance perspective, this structure was highly unusual. As a result, Mr. Owoc was personally aware of, and responsible for, all material facts and actions described herein both before and during the Relevant Time Period. This Relevant Time Period reflects the minimum timeframe during which known arbitration and litigation risks confronting VPX were sufficiently developed, observable, and foreseeable to permit governance-level assessment of whether such risks should have been recognized as presenting material contingent liability exposure. Many of these risks, however, were known or reasonably knowable to Mr. Owoc, and therefore the Company, before that period. With respect to each litigation, the risk of an adverse liability determination was high based on objective facts known or reasonably knowable to Mr. Owoc both before and during the Relevant Time Period, including the document-driven nature of the claims, the absence of novel legal theories, and the centrality of the challenged conduct to VPX's business model.

There is no question that exposure of this nature and magnitude should have been treated as material contingent liability risks during the Relevant Time Period by VPX. The subsequent judgments, arbitration awards, jury verdicts, and injunctions did not create those risks retroactively. They do confirm that the risks were real, durable, and enterprise-threatening at the time the various litigations were initiated.

With respect to VPX's intellectual property assets, in total, VPX's entire intellectual property portfolio, including patents, was likely valued in the $3.5 million to $5 million range.

### a.    Summary of Opinions and Conclusions

Based on my review of the materials identified in Section XV (Materials Considered), and applying my experience in trademark law, false advertising disputes, copyright enforcement, contract disputes, and enterprise-level risk assessment, it is my opinion that VPX faced substantial, known and/or foreseeable legal exposure during the Relevant Time Period arising from conduct central to its core business operations.

- With respect to OBI Trademark Dispute, I estimate that **VPX faced an approximately eighty-five percent (85%) to ninety percent (90%) probability of an adverse liability and outcome determination as of the relevant evaluation dates.**

2

- For the False Advertising Litigation, **I estimate an approximately eighty-five percent (85%) to ninety percent (90%) probability of adverse liability and outcome.** These elevated probabilities reflect the document-driven nature of the claims, the persistence of the challenged conduct, and the presence of well-resourced enforcement adversaries.

- **With respect to the copyright infringement disputes, I estimate an approximately eighty-five percent (85%) to ninety percent (90%) probability of an adverse liability determination and outcome,** based on objective evidence concerning authorship, access, substantial similarity, and commercial use.

- For the contract manufacturing and distribution disputes, including termination and exclusivity issues, **I estimate an approximately eighty percent (80%) to eighty-five percent (85%) probability of adverse liability and outcome,** reflecting the predominance of written agreements, course-of-performance evidence, and documented termination conduct, rather than unsettled legal doctrines.

In my opinion, based on my training and experience, a reasonably prudent board evaluating these matters during the Relevant Time Period would have viewed them as substantial, foreseeable, and enterprise-material contingent risks rather than remote contingencies. The probability ranges reflected herein are not mathematical calculations, but qualitative risk assessments based on my experience evaluating trademark litigation exposure in complex commercial disputes.

Additionally, based on my review of the materials produced in this matter, it is my opinion from my experience valuing similar assets and a review of other sales involving distressed intellectual property assets, that the intellectual property assets at issue consist of several categories of assets with materially different economic characteristics, including trademarks, domain names, and patents.

First, the international (foreign and domestic) trademark portfolio associated with the Bang brand, including the BANG mark and related marks, likely retained measurable economic value due to brand recognition and potential licensing opportunities. Second, the domain name portfolio likely possesses limited but non-zero value in secondary domain markets.

Third, the patent portfolio owned by JHO Intellectual Property Holdings, LLC possesses measurable value based on observed transaction data for comparable patent assets in secondary patent markets.

Based on the valuation methodology described below, the patent portfolio owned by JHO Intellectual Property Holdings, LLC likely possessed a fair market value during the Relevant Time Period of approximately $1.0 million to $1.4 million, with a potential distressed-sale value of approximately $500,000 to $1 million.

Taking into account the available information and applying commonly accepted intellectual property valuation methodologies, it is my opinion that the intellectual property assets at issue possess the following approximate value ranges during the Relevant Time Period:

3

- International trademark portfolio: $2.5 million to $3.5 million, inclusive of the associated domain name portfolio, which contributes limited but measurable secondary market value.

- The patent portfolio owned by JHO Intellectual Property Holdings, LLC likely possessed a fair market value during the Relevant Time Period of approximately $1.0 million to $1.4 million.

- In total, VPX's entire intellectual property portfolio, including patents, was likely valued in the approximate range of **$3.5 million to $5 million**.

4

## II.    BACKGROUND, EDUCATION, AND QUALIFICATIONS

I am an attorney licensed to practice law and the principal of Gioconda Law Group PLLC, an intellectual property and commercial litigation boutique law firm.  I have expertise in intellectual property and trademark law, commercial litigation, and board-level corporate governance including the evaluation of litigation exposure.  Additionally, I also have expertise in evaluating the commercial value of brand assets, such as IP assets and other intangible property.  A copy of my curriculum vitae outlining my education and qualifications is attached hereto as Appendix A.

I have practiced in the field of United States intellectual property law, including trademark law, copyright law, unfair competition, false advertising, and commercial litigation, for more than twenty-nine years.  My professional experience has focused on disputes and legal issues arising from branding, marketing, product positioning, and intellectual property rights in consumer-facing industries.

My professional qualifications relevant to the opinions expressed in this Report arise from three complementary areas of experience that are directly relevant to the issues addressed in this matter:

- extensive legal experience involving trademark disputes, false advertising, copyright law, and commercial litigation arising from branding and marketing conduct;
- board-level corporate governance experience involving the evaluation and management of litigation exposure, intellectual property risk, and contingent liabilities affecting operating companies; and
- practical experience evaluating the commercial value of brand assets and other intangible property in connection with corporate transactions, strategic planning, and due diligence.

Together, these areas of experience provide both a litigation-focused and governance-focused perspective on how intellectual property risks affect brand assets, enterprise value, and corporate decision-making.

### Litigation Risk and Intellectual Property Experience

Throughout my career, I have advised and represented numerous clients in trademark infringement, false advertising, and unfair competition disputes, as well as copyright and commercial litigation matters.  My practice has included primary responsibility for cases before federal and state courts; the United States Patent and Trademark Office; the Trademark Trial and Appeal Board; and arbitration tribunals.

My work frequently involves disputes in which product classification, ingredient claims, marketing representations, labeling practices, and channel-of-trade decisions play a central role in determining liability exposure and business risk.  In many such matters, the core issues arise not merely from abstract legal doctrine, but from how products are positioned, marketed, distributed, and understood by consumers in the marketplace.

Over the course of my practice, I have represented clients across a wide range of industries, including consumer packaged goods, beverages, dietary supplements, apparel, luxury goods, and

5

technology products. In these matters, litigation risk often carries significant downstream financial consequences, including injunctions restricting product marketing, damages awards, corrective advertising obligations, and disruption of distribution relationships. Such outcomes can materially affect the commercial viability of a brand and the economic value of associated intellectual property assets.

I have also authored numerous professional publications on intellectual property and commercial litigation topics, including articles appearing in legal journals and professional publications.

In addition, I have served as an expert witness in intellectual property matters, offering opinions on issues such as likelihood of confusion, trademark use in commerce, compliance with injunctions, and the marketplace significance of branding and advertising conduct. A list of those matters is included in my curriculum vitae. This work has required careful analysis of how litigation exposure develops over time, how courts evaluate marketing claims and brand positioning, and how adverse findings affect enterprise value, ongoing operations, and strategic decision-making.

## Board-Level Governance and Contingent Liability Experience

In addition to my legal practice, I have served as Chairman of the Board of New Slice Ventures LLC ("New Slice"), a soft drink beverage company, and at various times also served as General Counsel and Secretary of that company.

In these roles, I was responsible for evaluating and managing litigation risk, regulatory exposure, intellectual property disputes, contractual disputes, and other contingent liabilities from a corporate governance perspective.

As Chairman, my responsibilities included assessing how known and emerging legal risks should affect capital allocation, operational strategy, financing decisions, and overall enterprise planning. This included evaluating whether litigation exposure was material, whether adverse outcomes were reasonably possible or probable, and how such risks should influence the company's financial posture and business conduct.

In particular, I managed risks associated with intellectual property disputes and distributor contractual obligations, including threatened and active litigation affecting the company's branding, marketing practices, and commercial relationships.

My board-level experience required real-time decision-making under conditions of uncertainty, without the benefit of hindsight, and required balancing growth initiatives against the need to preserve liquidity, protect enterprise value, and manage downside risk.

## Brand Asset Evaluation and Transaction Experience

As Chairman of the Board of New Slice, I was also responsible for evaluating the commercial acquisition and potential divestiture of brand-related assets within the company's portfolio. In that capacity, I assessed the strategic and economic significance of core brands, ancillary brands, and

6

associated product formulations.  These responsibilities required consideration of factors commonly evaluated in brand valuation, including consumer recognition, marketing investment, distribution opportunities, competitive positioning, and the legal risks associated with brand use and enforcement.

In the course of this work, I have evaluated intellectual property portfolios associated with consumer products, beverages, dietary supplements, and technology platforms, including analysis of trademark rights, domain name portfolios, and patent assets.

In addition, as an attorney and consultant, I have advised and counseled clients regarding the valuation of economic assets in connection with corporate transactions and due diligence investigations.  These engagements have included evaluating how intellectual property rights, marketing practices, regulatory exposure, and pending or threatened litigation may affect the economic value of brand assets and related business opportunities.

My professional work has also involved evaluating the economic significance and potential market value of intellectual property assets in connection with licensing negotiations, brand development, business transactions, and litigation.  This work has included analyzing trademark portfolios, domain name assets, and patent portfolios associated with consumer products and technology platforms, including assessment of comparable intellectual property transactions and market benchmarks.

Through these activities, I have gained practical experience assessing how legal risk, brand strength, market perception, and operational conditions influence the valuation of intellectual property and other intangible assets in real-world commercial transactions.

### Integration of Litigation, Governance, and Valuation Experience

Having served both as trial counsel in numerous trademark and unfair competition cases and as Chairman of a consumer-packaged goods company responsible for brand architecture and enforcement, I evaluate intellectual property risk from both litigation and enterprise-governance perspectives.

These perspectives are directly relevant to the issues addressed in this Report.  Litigation involving trademark and advertising claims can materially affect the commercial viability, licensing potential, and market perception of consumer brands, which in turn affects the economic value of the associated intellectual property assets.

In consumer-facing industries such as beverages and dietary supplements, brand value is often closely tied to consumer perception, marketing claims, and the legal rights associated with trademark use. Adverse legal rulings, injunctions, or findings regarding marketing representations may significantly alter how a brand can be positioned in the marketplace and may reduce the expected future economic benefits associated with the brand.  As a result, the evaluation of litigation risk and legal uncertainty is an important component of assessing the economic value of intellectual property assets.

7

The opinions and conclusions expressed in this Report draw on all three strands of my professional experience.  My litigation background informs my understanding of the nature, seriousness, and foreseeable trajectory of the legal risks confronting Mr. Owoc and VPX during the Relevant Time Period.  My board-level governance experience informs my analysis of how prudent corporate leadership would reasonably recognize, evaluate, and respond to those risks when making strategic, financial, and resource-allocation decisions affecting the enterprise.  My experience evaluating brand assets and intellectual property in transactional contexts informs my assessment of how those risks would reasonably affect the price that a hypothetical purchaser might be willing to pay for VPX's Intellectual Property Portfolio.

The analysis presented in this Report reflects the application of my professional experience to the facts and materials reviewed in this matter, including VPX's financial information, the legal proceedings involving the BANG brand, and publicly available information regarding comparable transactions involving distressed consumer brands.  The opinions expressed herein are based on the principles commonly applied in intellectual property valuation and risk assessment, including consideration of litigation exposure, market conditions, brand recognition, and the economic pathways through which intellectual property assets may generate value.

8

## III.    SCOPE OF ENGAGEMENT

I am offering an expert opinion on (1) the litigation exposure and risk facing VPX during the Relevant Time Period and (2) the economic value of VPX's intellectual property.   My opinions are informed by my professional experience as an intellectual property and commercial litigation attorney, as well as by my experience serving in board-level governance roles within the beverage industry, including my time as Chairman of the Board of New Slice.  Relevant here, in that role, I was responsible for evaluating litigation exposure, regulatory risk, and other contingent liabilities in real time, and for assessing how such risks should affect capital allocation, strategic planning, and governance decisions.   My engagement in this matter included evaluating the potential economic value of the intellectual property assets identified in the bankruptcy schedules and related discovery materials, including trademark portfolios, domain name portfolios, and patent assets owned by JHO Intellectual Property Holdings, LLC.

I do not offer opinions as an accountant or auditor.  Except where otherwise noted, I do not opine on VPX's compliance with Generally Accepted Accounting Principles ("GAAP"), securities laws, or regulatory disclosure requirements, nor do I assess the preparation of VPX's financial statements.  My opinions are limited to governance-level risk recognition and decision-making, evaluated from the perspective of a reasonably prudent board member or of senior management confronting known or reasonably knowable litigation exposure.

I am being compensated at a rate of four hundred thirty-five dollars ($435.00) per hour for my work in this matter, whether testifying or otherwise engaged.  I have no financial interest in the outcome of this proceeding.  I expect to testify at trial regarding the opinions expressed herein if requested to do so by counsel or the Court.

In forming my opinions, I reviewed the materials identified in Section XV (Materials Considered). I relied on those materials for the limited purpose of understanding the factual record, the positions taken by the parties over time, and the sequence of events known or reasonably knowable to VPX's leadership during the Relevant Time Period.   I did not make independent credibility determinations.

Where relevant, I considered the nature of the disputes, the relief sought, procedural posture, interim rulings, and the foreseeable consequences of adverse outcomes as they would reasonably have been understood by senior management and the board during the Relevant Time Period. References to subsequent arbitration awards, jury verdicts, or judgments are used solely to illuminate the nature and magnitude of risks that were already apparent at the time, not to impose hindsight-based standards.

The opinions expressed herein are offered to a reasonable degree of professional certainty based on my training, experience, and review of the materials described above.  I reserve the right to supplement or amend these opinions should additional information become available.

## IV. GENERAL LEGAL CONCEPTS AND DEFINITIONS

### a. Relevant Trademark Principles

A "trademark" is a designation used to identify and distinguish the source of goods and/or services of a person or company.[2] In the United States, the general priority rule means that "first-in-time, first-in-right."[3] That is, the first company or person who uses a trademark in *bona fide* commerce has the right to prevent others from using the same (or confusingly similar) marks on similar goods.

Under its Constitutional authority to regulate interstate commerce, Congress has over the years passed several federal statutes providing for the registration of marks in the United States Patent and Trademark Office ("USPTO"). The federal registration of trademarks is governed by the Trademark Act of 1946, as amended, known as the Lanham Act.

Filing any application for registration in the USPTO on the Principal Register, including an intent-to-use application, constitutes constructive use of the mark, provided the application matures into a registration.[4] If a trademark is the subject of a trademark registration on the Principal Register in the USPTO under the Lanham Act, it is entitled to certain legal presumptions and benefits, described below.

As the U.S. Supreme Court has said about registered trademarks: "The Lanham Act confers important legal rights and benefits on trademark owners who register their marks. Registration on the Principal Register serves as constructive notice of the registrant's claim of ownership of the mark. It also is prima facie evidence of the validity of the registered mark and of the registration of the mark, of the owner's ownership of the mark, and of the owner's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the certificate. And once a mark has been registered for five years, it can become incontestable."[5]

Trademark law's core concern is preventing confusion as to source of the goods or services in the minds of consumers.[6] Sections 32 and 43(a) of the Lanham Act prohibit commercial uses and representations that are likely to cause confusion, mistake, or deception as to the origin, sponsorship, or approval of goods or services. In both the Ninth and the Eleventh Circuits, likelihood-of-confusion analysis expressly evaluates the real-world marketplace context, including the similarity of products, the identity of retail outlets and purchasers, and the identity of advertising media.[7]

### b. Coexistence Agreements

Trademark coexistence agreements are private contractual arrangements in which parties using identical or confusingly similar marks allocate rights of use to reduce the likelihood of consumer confusion. Such agreements typically define permissible use by reference to objective marketplace variables that trademark law itself treats as legally material, including product category, channels of trade, classes of purchasers, geographic territory, and advertising media.[8]

10

Because the touchstone of trademark infringement under the Lanham Act is likelihood of consumer confusion as to source, courts and the USPTO have long recognized coexistence or consent agreements as relevant evidence bearing on that analysis.[9]

Under governing precedent, coexistence agreements are neither per se controlling nor legally irrelevant. Rather, they are evaluated as probative evidence of how knowledgeable market participants believed confusion could be avoided, particularly where the agreement contains concrete restrictions that meaningfully separate the parties' uses in the marketplace.[10]

The weight afforded to such agreements depends on their specificity, the commercial realities they address, and whether their assumptions about consumer perception remain valid over time.[11] Agreements that merely recite conclusions about the absence of confusion, without imposing enforceable market constraints, are generally accorded little evidentiary value.[12]

Contractual coexistence does not immunize trademark use that exceeds agreed-upon boundaries. Once a party uses a mark outside the scope of a coexistence agreement, its conduct is evaluated under ordinary trademark infringement principles.[13] In that circumstance, the agreement may instead function as evidence of the parties' original understanding of confusion risk and of the materiality of the limitations that were negotiated to avoid it.[14]

As a result, coexistence agreements operate not as waivers of trademark rights, but as conditional frameworks whose legal significance depends on continued compliance and alignment with marketplace realities.[15] Because channels of trade and purchaser overlap are confusion drivers under governing law, coexistence agreements that allocate permissible use by product category and channels of trade turn on the same marketplace variables courts themselves treat as legally material to evaluating consumer confusion.[16]

### c.     False Advertising Under Section 43(a) of the Lanham Act

Section 43(a) of the Lanham Act establishes a federal cause of action for false or misleading representations made in commercial advertising or promotion. Unlike Sections 32 and 43(a)(1)(A), which focus on misuse of trademarks as source identifiers, Section 43(a)(1)(B) targets false statements about goods or services themselves, including their nature, characteristics, qualities, or geographic origin. The statute thus addresses marketplace deception whether or not a registered trademark is involved.

To prevail on a false advertising claim under Section 43(a)(1)(B), a plaintiff generally must establish:

11

1.  A false or misleading statement of fact about the defendant's own or another's product;

2.  The statement was made in commercial advertising or promotion;

3.  The statement actually deceived or had a tendency to deceive a substantial segment of its audience;

4.  The deception was material, meaning it was likely to influence purchasing decisions;

5.  The defendant caused the statement to enter interstate commerce; and

6.  The plaintiff was or is likely to be injured as a result, either through diverted sales, loss of goodwill, or reputational harm

While circuits vary slightly in formulation, these elements reflect a consistent national framework distinguishing actionable false statements from non-actionable puffery or opinion.

### d.    Distinction From Trademark Infringement Claims

False advertising claims under Section 43(a)(1)(B) are analytically distinct from trademark infringement claims under Section 32 or Section 43(a)(1)(A), even though both arise under the Lanham Act and frequently appear together in litigation.

Trademark infringement claims are concerned primarily with consumer confusion as to source, sponsorship, or affiliation. The central inquiry is whether the defendant's use of a mark is likely to cause consumers to believe that the defendant's goods originate with, are sponsored by, or are affiliated with the plaintiff. The analysis focuses on the mark as a source-identifying symbol, evaluated through multifactor likelihood-of-confusion tests.

False advertising claims, by contrast, focus on the truthfulness of marketplace representations, not source confusion. The gravamen of the claim is whether the defendant made a factually false or misleading representation about a product's composition, attributes, performance, or benefits, regardless of whether consumers are confused about who made the product. A defendant may accurately identify itself as the source of goods and still violate Section 43(a)(1)(B) if it misrepresents what those goods are or do.

Accordingly, proof of likelihood of confusion is not required for a false advertising claim. Instead, courts examine evidence of falsity, deception, materiality, and competitive injury.

### e.    Relationship and Doctrinal Overlap

Although distinct, false advertising and trademark infringement claims are closely related and often overlap in practice because both protect the integrity of commercial communication and competitive markets.

12

First, both doctrines are rooted in the Lanham Act's overarching purpose of preventing unfair competition and protecting consumers from deception. Where trademark law polices who is behind a product, false advertising law polices what the product is represented to be.

Second, certain branding practices can implicate both doctrines simultaneously. When a word, phrase, or branding element conveys not only source identification but also a specific factual claim about product composition or function, that language may function as both a trademark use and a false advertising representation. In such cases, the same marketplace messaging can support parallel claims, even though the legal theories and evidentiary burdens differ.

Third, courts recognize that misleading product claims can distort trademark meaning itself. If consumers are induced to associate a brand with qualities or ingredients the product does not possess, the resulting consumer perception is not merely confused but affirmatively false. In that sense, false advertising can exacerbate or independently cause the very market distortions trademark law seeks to prevent.

### f.        Practical and Evidentiary Differences

From an evidentiary standpoint, false advertising claims typically require proof of falsity or misleadingness, which may be shown through literal falsity, implied falsity supported by consumer perception evidence, or misleading omissions. Trademark claims, by contrast, rely more heavily on comparative mark analysis, marketplace context, and confusion surveys.

Remedies also differ in emphasis. While both claims may support injunctive relief and monetary recovery, false advertising remedies are typically tied to corrective advertising, disgorgement attributable to deceptive claims, and reputational harm, rather than dilution of trademark distinctiveness or loss of exclusive source identification.

In sum, Section 43(a)(1)(B) false advertising claims and trademark infringement claims serve complementary but distinct functions within the Lanham Act. Trademark law protects the accuracy of source signaling, while false advertising law protects the accuracy of product information communicated to consumers. Where branding language operates as both a source identifier and a factual product claim, the doctrines intersect, allowing courts to address deception comprehensively without collapsing the analytical boundaries between confusion-based and falsity-based theories.

### g.        Consumer False Advertising

Consumer false advertising refers to deceptive or misleading marketing practices that target purchasers directly and distort consumer decision-making. While Section 43(a) of the Lanham Act provides a federal cause of action primarily for competitors harmed by false advertising, consumer false advertising is also regulated through a combination of federal statutes, state unfair competition laws, and consumer protection acts.

At the federal level, the Federal Trade Commission Act prohibits "unfair or deceptive acts or practices" in commerce. Deception exists where a representation, omission, or practice is likely

13

to mislead reasonable consumers acting under the circumstances and is material to their purchasing decisions. Materiality focuses on whether the claim concerns information that consumers consider important in deciding whether to buy a product, such as composition, performance, health effects, or comparative advantages.

At the state level, virtually every jurisdiction has enacted consumer protection statutes, often referred to as "little FTC Acts," which prohibit deceptive or unfair business practices and provide remedies to consumers, including injunctive relief, restitution, statutory damages, and, in some cases, attorneys' fees. These statutes typically do not require proof of competitive injury and are instead centered on consumer harm and marketplace deception.

Consumer false advertising analysis differs from trademark infringement analysis in several respects. The inquiry does not turn on likelihood of confusion as to source, sponsorship, or affiliation. Rather, it focuses on whether the advertising claim itself is false, misleading, or unsubstantiated, and whether consumers were likely to be misled in a way that affected their purchasing behavior. The identity of the advertiser is usually undisputed; the legal question is whether what was said about the product was truthful.

Consumer false advertising is also analytically distinct from Lanham Act false advertising claims brought by competitors. While both address deceptive claims, competitor suits under Section 43(a)(1)(B) require proof of competitive or commercial injury, whereas consumer protection claims often require only proof that consumers were misled or exposed to deceptive practices.

Nonetheless, the doctrines overlap in their treatment of materiality, consumer perception, and substantiation. Claims that are deemed materially misleading to consumers under consumer protection standards frequently overlap with claims that competitors may challenge under the Lanham Act, particularly where the deception confers a competitive advantage by influencing consumer demand.

### h.      Relevant Copyright Law Principles

United States copyright law protects original works of authorship fixed in a tangible medium of expression, including audiovisual works, photographs, marketing content, written copy, and digital media.[17] Copyright protection vests automatically upon creation, and ownership initially resides with the author of the work unless ownership is transferred by written assignment or the work qualifies as a "work made for hire" under the Copyright Act.[18]

A work qualifies as a work made for hire only if it is created by an employee within the scope of employment or if it falls within a statutorily enumerated category and the parties expressly agree in a written instrument signed by both parties that the work shall be considered a work made for hire.[19] Absent satisfaction of these requirements, ownership remains with the creator, even where the work is commissioned or later used by a corporate entity.

Corporate use of copyrighted material therefore requires authorization through ownership, an express license, or, in some circumstances, an implied license arising from the objective circumstances surrounding creation and use. Courts analyzing implied license claims examine

14

factors such as whether the work was created at the request of the user, whether the creator delivered the work with the intent that it be used, and the scope of any permitted use reasonably contemplated by the parties.[20]

Copyright infringement occurs when a party, without authorization, exercises one or more of the exclusive rights reserved to the copyright owner, including reproduction, distribution, public display, or preparation of derivative works.[21]  Liability does not depend on intent or bad faith but turns on objective questions of ownership, scope of authorization, and copying of protected expression.[22]

In commercial settings, disputes frequently arise where marketing or promotional content is created by founders, executives, contractors, or affiliated individuals and later exploited by the company.  In such cases, courts look to contemporaneous agreements, course of dealing, payment arrangements, and control over the creative process to determine whether the company acquired ownership or merely a limited license.[23]

The Copyright Act provides multiple, alternative remedies for infringement, allowing a prevailing plaintiff to elect between actual damages and profits, or statutory damages, subject to statutory limitations.[24]  The choice of remedy can materially affect exposure analysis, particularly where the allegedly infringing works are tied to marketing, branding, or promotional activities rather than direct product sales.

Actual damages are measured by the copyright owner's proven losses attributable to the infringement, which may include lost licensing fees, lost sales, or the fair market value of a license that should have been paid.[25]  In addition, the copyright owner may recover any profits of the infringer that are attributable to the infringement, to the extent such profits are not already taken into account in computing actual damages.[26]  Once the copyright owner establishes gross revenue reasonably related to the infringement, the burden shifts to the infringer to prove deductible expenses and apportionment.[27]

As an alternative to actual damages and profits, a copyright owner may elect statutory damages, which range from $750 to $30,000 per infringed work, and up to $150,000 per work for willful infringement.[28]  Statutory damages are available only if the work was timely registered, and they may be awarded without proof of actual economic loss.  Courts have emphasized that statutory damages may be set at levels designed to deter infringement even where measurable damages are modest.[29]

In addition to monetary relief, courts may award injunctive relief to prevent ongoing or future infringement.[30]  In enterprise settings, injunctive relief may require withdrawal or modification of marketing materials, cessation of certain promotional campaigns, or reconfiguration of branding practices.  Courts may also award attorneys' fees and costs to the prevailing party.[31]

From a governance and contingent-liability perspective, copyright damages analysis therefore extends beyond a single numerical estimate.  Exposure depends on the number of works at issue, the scope and duration of use, the relationship between the copyrighted material and revenue generation, and the availability of injunctive relief that could disrupt ongoing business operations.

### i.    Relevant Commercial Contract Law Principles

Distribution relationships are governed by general principles of contract law, informed by the express terms of the parties' agreements and, where applicable, the Uniform Commercial Code and state common law.  Courts generally enforce unambiguous contractual provisions as written and do not rewrite agreements to relieve a party from the consequences of an unfavorable bargain.[32]

Distribution agreements typically allocate rights and obligations concerning product supply, pricing, territories, channels of trade, marketing responsibilities, brand usage, termination rights, and dispute resolution.  Where such agreements impose exclusivity, channel restrictions, or conditions on continued performance, breach may be established through objective evidence of nonconforming conduct rather than subjective intent.[33]

A material breach occurs when a failure of performance goes to the essence of the agreement and deprives the non-breaching party of the benefit of the bargain.[34]  In the distribution context, material breaches may include unauthorized sales outside permitted channels, failure to comply with branding or marketing restrictions, diversion of product, or violation of termination and notice provisions.  Remedies for material breach may include termination, damages, injunctive relief, or specific performance, depending on the contract and governing law.

Commercial contract disputes frequently involve issues of interpretation, course of performance, waiver, and whether particular conduct was authorized or tolerated over time.[35]  However, where alleged breaches involve ongoing or systemic conduct tied to core revenue-generating activities, courts and counterparties often view the exposure as materially different from isolated or historical deviations.

Damages for breach of distribution agreements and commercial contracts are generally intended to place the non-breaching party in the position it would have occupied had the contract been performed as agreed.[36]  Recoverable damages typically include expectation damages, which may consist of lost profits, lost sales, or other economic losses that were reasonably foreseeable at the time of contracting.

Lost-profit damages must be proven with reasonable certainty and must be traceable to the alleged breach rather than to independent market forces or speculative assumptions.[37]  In distribution disputes, lost profits are often calculated by reference to historical sales data, projected margins, contract pricing terms, and the duration of the alleged breach period.

Where contracts include exclusivity provisions, channel restrictions, or territorial limitations, damages may also include profits lost due to unauthorized sales or diversion of product.  Courts frequently assess whether such damages were within the contemplation of the parties at the time of contracting and whether the claimed losses are sufficiently connected to the breach.[38]

In addition to damages, remedies for material breach may include termination of the agreement and injunctive relief enforcing contractual restrictions.  Courts may issue injunctions to prevent continued unauthorized distribution, enforce channel-of-trade limitations, or prohibit further

16

Docusign Envelope ID: CA8ED9B9-DE24-4C87-888F-98FB1D5ED9CA

misuse of contractual rights.  In certain circumstances, specific performance may be available where monetary damages are inadequate, particularly where the contract governs access to unique markets or distribution channels.

From an enterprise-risk perspective, damages exposure in distribution disputes is often not only confined to retrospective monetary liability.  Termination rights, loss of exclusivity, forced changes to sales practices, or loss of access to key channels can have forward-looking revenue consequences that materially exceed backward-looking damages calculations.  Accordingly, boards and management commonly evaluate such disputes by considering both direct monetary exposure and the operational impact of potential equitable relief.

17

V.    METHODOLOGY:    GOVERNANCE-BASED    METHODOLOGY    FOR
      ASSESSING CONTINGENT LITIGATION RISK

### a.    Overview of the Methodology

The opinions expressed in this Report are based on a governance-level framework for evaluating litigation and arbitration risk as it would reasonably have been assessed by senior management and a board of directors during the Relevant Time Period.  The analysis does not seek to determine whether VPX ultimately was liable, nor does it assume any particular adjudicative outcome. Instead, it evaluates whether known disputes exhibited characteristics that, at the time, should have caused VPX to recognize that they posed a risk of material contingent liability exposure.  Further, as to each dispute, or category of disputes, the Report opines on (1) the likelihood of an adverse outcome in that litigation, and (2) the likelihood that an adverse outcome would, in turn, cause enterprise-material consequences.  As explained in more detail below, an enterprise-material consequence is one that severely impacts a company's core business model, financial condition, assets, or operations.

Of note, throughout the Relevant Time Period, Mr. Owoc exercised exclusive control over VPX and all aspects of its operations.  Mr. Owoc served as VPX's founder, Chief Executive Officer, and principal decision maker (i.e., managing member, or sole board member, as applicable, of each of the companies), with ultimate authority over VPX's branding and marketing strategy during the relevant period.[39]  VPX had no board of directors and no management other than Mr. Owoc.[40]  All corporate decisions, including payments to vendors, distributors, and other third parties, required Mr. Owoc's express approval.[41]  No individual other than Mr. Owoc had signatory authority over VPX's bank accounts, and all internal and external payments required his authorization.  Mr. Owoc was also the only person with authority to enter contracts on VPX's behalf.[42]

In corporate governance practice, Mr. Owoc acted exclusively as the Board and senior management of VPX.  Therefore, he was the sole corporate fiduciary of VPX during the Relevant Time Period.

Risk recognition is inherently forward-looking and probabilistic by senior management.  Senior management are required to assess not only whether liability is possible, but whether the nature of the claims, the evidentiary record, and the remedies sought create a reasonable likelihood of enterprise-material consequences if adverse outcomes occur.

This methodology mirrors how prudent fiduciaries evaluate litigation exposure in real time, without the benefit of hindsight and without requiring certainty as to liability or damages.

### b.    Probability of Adverse Liability Determination

For each category of dispute, I assessed the probability that VPX would face an adverse liability determination based on factors that were known or reasonably knowable to Mr. Owoc, in his capacity as the sole corporate fiduciary of VPX, during the Relevant Time Period.  These factors included, among others:

- whether the claims turned on objective, document-driven facts rather than subjective intent or novel legal theories;

- whether the challenged conduct was ongoing or systemic rather than isolated or historical;

- the extent to which liability depended on disputed legal interpretations versus observable marketplace conduct;

- the procedural posture of the disputes and any interim rulings or developments; and

- the sophistication, resources, and enforcement posture of the opposing parties.

This assessment reflects governance-level judgment, not adjudicative certainty. Senior management routinely treats disputes as presenting high liability risk where claims are grounded in objective evidence and where defenses depend on contested interpretations rather than factual ambiguity.

### c. Probability of Enterprise-Material Consequences

Separately, I assessed whether an adverse liability determination, if it occurred, was reasonably likely to result in consequences material to the enterprise. These consequences include, but are not limited to:

- injunctive or equitable relief affecting product formulation, labeling, marketing claims, or channels of trade;

- monetary liability of a magnitude relevant to liquidity, capital structure, or enterprise value; and

- operational constraints affecting core revenue-generating activities or strategic flexibility.

In governance practice, a dispute may warrant recognition as a material contingent liability even where ultimate liability is uncertain, if the consequences of an adverse outcome would threaten aspects of the business central to value creation or operational continuity.

### d. Enterprise Materiality in a Governance Context

Materiality in this Report is evaluated from an enterprise-risk and governance perspective, not from a technical accounting, disclosure, or auditing standpoint. Reasonably prudent boards assess whether a risk threatens the company's core business model, revenue drivers, or strategic positioning, rather than whether it meets a particular accounting threshold.

Accordingly, my analysis considers whether the disputes implicated:

- significant monetary exposure;

- core product claims, formulations, or classifications;

- central marketing narratives or branding strategies;

19

- distribution models or channels of trade integral to revenue generation; and

- business practices embedded in VPX's operating model.

Where litigation challenges conduct that is peripheral or readily remediable, the probability of enterprise-material consequences may be low even if liability is possible. By contrast, where disputes target conduct embedded in core operations or seek remedies capable of disrupting revenue, the risk of material impact is substantially higher even where outcomes remain uncertain.

### e.        Limits of the Methodology: Inherent Uncertainty of Adjudication

Any assessment of litigation risk involving claims that proceed to a factfinder such as a jury must account for the irreducible uncertainty inherent in decision-making. For example, unlike bench trials or purely legal determinations, jury verdicts reflect collective deliberation by lay factfinders, whose determinations turn on credibility judgments, narrative framing, evidentiary emphasis, and group dynamics that cannot be reliably predicted in advance. Authoritative guidance recognizes that even cases supported by strong documentary records and favorable legal standards remain subject to substantial outcome variance once submitted to a jury.[43]

For this reason, as a matter of litigation practice and enterprise-risk governance, in my experience, sophisticated litigants do not treat any tried claim as more than approximately ninety percent (90%) likely to result in a specific outcome, not because the merits are indeterminate, but because the institutional design of such adjudication imposes a natural ceiling on outcome certainty.

Finally, this methodology does not evaluate whether VPX actually classified, disclosed, reserved for, or otherwise treated the disputes in any particular manner. Nor does it assess compliance with accounting standards, securities laws, or regulatory disclosure obligations. Those questions involve separate legal and accounting analyses and are outside the scope of this Report.

### f.        Application of the Framework

In applying this framework, I evaluated each dispute category by reference to two interrelated dimensions:

- the probability of an adverse liability determination; and

- the probability that such a determination would result in enterprise-material remedies.

The combined probability reflects the likelihood that VPX would face both adverse findings and enterprise-material consequences. This mirrors how boards of directors assess contingent liabilities, focusing not merely on the chance of technical liability, but on whether exposure threatens liquidity, enterprise value, or operational continuity.

20

g.    **Valuation**

The valuation methodologies applied in this report reflect commonly accepted approaches used in intellectual property valuation, including the income approach, the market approach, and the cost approach.    These approaches reflect widely recognized valuation methodologies used by intellectual property valuation professionals and financial experts.

## VI.    OVERALL PROBABILITY ANALYSIS

### a.    Portfolio Level Risk Assessment

Based on observable indicators, available both before and during the Relevant Time Period, I conclude that VPX faced a high-risk litigation posture characterized by exposure in multiple dispute categories.

Individually, each of the following dispute categories presented a substantial probability of adverse liability determinations and enterprise-material remedies:

- OBI Trademark Dispute;

- False Advertising Litigation;

- foreseeable consumer-facing false advertising litigation arising from the same marketing conduct;

- copyright infringement litigation arising from social media and promotional marketing practices; and

- contract manufacturing and distribution disputes affecting VPX's production and distribution infrastructure.

In each category, the probability of an adverse liability determination was high based on objective facts known or reasonably knowable to Mr. Owoc both before and during the Relevant Time Period, including the document-driven nature of the claims, the absence of novel legal theories, and the centrality of the challenged conduct to VPX's business model.

The elevated portfolio-level probability assessed above is grounded in contemporaneous, overlapping facts that were known or reasonably knowable to Mr. Owoc, and therefore to VPX, during the Relevant Time Period and likely before.  It is indisputable that, by September 4, 2018, VPX was defending competitor false advertising litigation (i.e., the False Advertising Litigation) challenging core product claims.

At the same time, BANG products were being distributed predominantly through mainstream retail channels notwithstanding channel-of-trade limitations in a 2010 Settlement Agreement between OBI and VPX (i.e., the OBI Trademark Dispute).

Within the next two years, those same practices gave rise to formal arbitration proceedings asserting trademark breach, destabilization of VPX's national distribution infrastructure following termination of the PepsiCo agreement, and parallel copyright infringement actions arising from VPX's marketing strategy.  These developments were not sequential anomalies, but concurrent manifestations of risk arising from a shared course of conduct.[44]

22

### b.  Probability of Enterprise Material Adverse Outcomes

Applying a conservative governance-level assessment, I conclude that both before and during the Relevant Time Period the probability that a dispute would result in an enterprise-material adverse outcome impairing liquidity, operations, or enterprise value **was at least eighty percent (80%) and approached the ninety percent (90%) range.**

The relevant uncertainty confronting VPX both during and before the Relevant Time Period was therefore not whether enterprise-level harm was reasonably possible, but which form that harm would take and when.

### c.  Interpretation of Probability Ranges

The probability ranges expressed in this Report are not intended to represent precise actuarial calculations or predictions of adjudicated outcomes. They are governance-level assessments reflecting how reasonably prudent fiduciaries evaluate contingent legal exposure when making decisions affecting liquidity, operations, and enterprise value.

In governance practice, risk recognition does not require certainty as to liability or damages. It requires recognition that exposure of sufficient probability and magnitude exists such that failure to account for it would materially distort decision-making and risk management.

### d.  Portfolio-Level Probability Matrix

The table below summarizes my governance-level assessment of VPX's litigation exposure during the Relevant Time Period. The probability ranges reflect *ex ante* **risk recognition**, not adjudicated outcomes, damages findings, or mathematical aggregation of independent events.

For each dispute category, the table separately reflects:

- the probability of an adverse liability determination; and
- the probability that such an adverse determination would result in enterprise-material consequences.

Viewed through that lens, VPX's litigation posture during the Relevant Time Period presented a high likelihood of enterprise-material adverse outcomes that should have been recognized and addressed as such.

23

| Dispute Category | Probability of Adverse Liability Determination | Probability of Enterprise-Material Remedies if Liability Occurred | Combined Probability of an Unfavorable, Enterprise-Material Outcome |
|---|---|---|---|
| OBI Trademark Arbitration | ~85% (Highly Likely) | ~95% (Practically Certain) | ≥ 85% |
| Monster False Advertising Litigation | ~85% (Highly Likely) | ~95% (Practically Certain) | ≥ 85% |
| Copyright Infringement Litigation | ~85% (Highly Likely) | ~90% (Highly Likely) | ≥ 85% |
| PepsiCo Distribution Dispute | ~80% (Highly Likely) | ~85% (Highly Likely) | ≥ 80% |
| Contract Manufacturing and Distribution Disputes | ~80% (Highly Likely) | ~85% (Highly Likely) | ≥ 80% |

### e.    Interpretation of the Overall Probability

The matrix above does not represent a statistical calculation or a mathematical aggregation of independent risks.  Boards do not evaluate litigation exposure in that manner.

**A conservative governance assessment supports the conclusion that, during the Relevant Time Period, the probability that VPX would experience at least one enterprise-material adverse outcome impairing liquidity, operations, or enterprise value exceeded eighty percent (80%) and approached ninety percent (90%) in several instances.**

24

## VII.    TRADEMARK AND FALSE ADVERTISING DISPUTES RISK ASSESSMENT

This section evaluates the nature, scope, and governance significance of the legal risks confronting VPX during the Relevant Time Period arising from the following litigations involving its trademark usage, product classification, channel-of-trade practices, and affirmative marketing representations:

- *Vital Pharms., Inc. v. Orange Bang, Inc.*, Am. Arb. Ass'n ("AAA") Case No. 01-20-0005-6081 (and related proceedings); and

- *Monster Energy Co. v. Vital Pharms., Inc.*, No. 8:18-cv-01882 (C.D. Cal.) (and related proceedings).

### a.    Relevant Facts Concerning the Trademark and False Advertising Disputes

In 1983, OBI first applied for federally registered trademark protection for various trademarks, including marks for "BANG" (date of first use in commerce September 8, 1971), with the exclamation mark, and a word mark for "Bang" (date of first use in commerce August 3, 1973), without the exclamation mark (collectively, the "BANG Mark").[45]

OBI ultimately received federal trademark registrations for the BANG Mark, each in International Class 32.  Class 32 is important in this regard because it not only includes non-alcoholic beverages, but also fruit beverages and isotonic drinks (e.g., sports drinks like Gatorade).  Thus, Class 32 includes energy drinks as well.  In this respect, as of 1983, OBI had established the exclusive right to market and sell Class 32 beverages under the BANG Mark.

In 2008, VPX released a product known as the Bang Pre-Workout ("Bang Pre-Workout").[46]  Bang Pre-Workout was the first VPX product marketed and sold under the name "BANG."[47]  VPX marketed and sold Bang Pre-Workout between 2008 and 2013 as a nutritional supplement.[48]  The back side of the bottle contained a "Supplement Facts" panel, a panel of information about the supplement, which is an indicator that the product was indeed sold as a nutritional supplement.[49]

The Bang Pre-Workout bottle itself declared in capital letters to would-be consumers that this product was the "WORLD'S ONLY STABLE LIQUID CREATINE!"[50]  An early VPX website, dated as of December 4, 2008 likewise described the product as the "world's only stable liquid creatine."[51]  The back of the Bang Pre-Workout bottle listed a "Proprietary Blend" consisting of 13 ingredients—5,842 milligrams ("mg") of some ingredients and 11,648 mg of others—which together comprised this nutritional supplement product (a product which was discontinued in 2013).[52]

In 2009, OBI learned that VPX was marketing and selling a product under the name "BANG".[53]  On February 2, 2009, OBI sent a cease-and-desist letter to VPX.[54]  This first cease and desist letter stated, among other things, that OBI believed there was a likelihood of confusion among consumers in the marketplace.[55]  VPX did not respond to OBI's first cease and desist letter.[56]  OBI then sent a second cease-and-desist letter to VPX, dated March 3, 2009.[57]

25

Following correspondence between the parties concerning VPX's use of the BANG Mark in connection with Bang Pre-Workout, OBI filed a trademark infringement action against VPX in the United States District Court for the Central District of California on or about September 9, 2009 (the "2009 Trademark Infringement Action").[58]

In the 2009 Trademark Infringement Action, OBI claimed it was the senior user and owner of trademark rights in the BANG Mark in connection with beverages.[59]  The existence of this trademark litigation between OBI and VPX prior to 2010 is not contested.[60]

In the 2009 Trademark Infringement Action, OBI asserted senior trademark rights grounded in prior use and alleged that VPX's later use of the BANG Mark on ingestible beverages created a likelihood of consumer confusion as to source, sponsorship, affiliation, or approval in violation of the Lanham Act and other laws prohibiting unfair competition.[61]  The initial dispute arose from the parties' respective commercial activities involving the BANG Mark after OBI sent two cease-and-desist letters to VPX in early 2009; the parties later converged in the broader beverage and energy drink marketplace when VPX released Bang Energy RTD in 2015 and began selling it in convenience stores—the same channel where OBI sold one-third of its products.[62]

OBI apparently viewed VPX's ongoing use of the BANG Mark as particularly problematic because it involved ready-to-consume products that consumers could reasonably perceive as beverages rather than specialized dietary supplements.[63]  This concern implicated traditional trademark and unfair competition principles, including product proximity and consumer perception.

### i.       The 2010 Settlement Agreement Between VPX and OBI

Rather than litigating these trademark infringement claims to final judgment, OBI and VPX elected to resolve their dispute through a fully-negotiated settlement and coexistence agreement executed in 2010 (the "2010 Settlement Agreement").[64]  The 2010 Settlement Agreement reflects that this resolution was intended to define the boundaries of permissible use of the BANG Mark going forward rather than to eliminate one party's use entirely.  The 2010 Settlement Agreement was executed by Mr. Owoc as President/CEO of VPX and approved as to form and content by VPX's outside counsel on August 11, 2010.[65]

From a trademark perspective, the decision to resolve this dispute by such a coexistence agreement reflects those parties' shared recognition that unrestricted concurrent use of the BANG Mark was unacceptable to each, but that limited coexistence would be possible only if carefully cabined by objective criteria tied to product type and market context, as approved by the parties' respective legal counsel.[66]

Under the 2010 Settlement Agreement, VPX was permitted to continue using the BANG Mark only within expressly delineated boundaries tied to product formulation as well as limitations to the channels of trade.[67]  The record reflects no indication that the 2010 Settlement Agreement authorized VPX to use the mark broadly across all beverage categories or without limitation.

26

Trademark coexistence agreements of this type operate as risk-allocation mechanisms, not licenses. Rather than resolving trademark priority disputes in the abstract, they allocate permissible uses in a manner designed to minimize consumer confusion while allowing limited concurrent exploitation of a mark. The structure of the 2010 Settlement Agreement reflects this intent, function and purpose.

Two structural features of the 2010 Settlement Agreement are central from a trademark standpoint and recur throughout the subsequent factual record:

- product classification, particularly the distinction between "creatine-based" products and other nutritionally fortified beverages; and

- channel-of-trade limitations designed to preserve separation between the parties' respective markets.

The 2010 Settlement Agreement itself reflects that both features were treated as substantive conditions of use rather than ancillary provisions.[68] Their stated purpose was apparently to maintain meaningful marketplace separation between OBI's beverages and VPX's products.

### ii.    The "Creatine-Based" Product Category

In the 2010 Settlement Agreement, VPX was permitted to use the BANG Mark on nutritionally fortified products that are "creatine-based."[69] The record reflects that this term was not treated by the parties as a mere marketing label or self-defining designation, but as a substantive product category tied to formulation and functional characteristics.[70]

The factual record demonstrates that the parties were sophisticated, represented by counsel, and negotiated the definitions and meanings of the terms used in the 2010 Settlement Agreement.[71]

The record reflects that after 2010, VPX sought to justify an expanded use of the BANG Mark by invoking creatine-related branding, while OBI and Monster challenged whether the products in fact satisfied the Agreement's product-based conditions. This disagreement over product classification became a central factual issue in the OBI Trademark Dispute.[72]

### iii.    Non-Creatine Nutritionally Fortified Beverages

The 2010 Settlement Agreement outlined separate parameters for VPX's use of the BANG Mark for nutritionally fortified beverages that were not "creatine-based."[73] For those products, VPX's use of the BANG Mark was permitted only if additional restrictions were observed.[74]

Sales of non-creatine nutritionally fortified beverages were limited to specialty channels, including vitamin and nutritional supplement stores, gyms, and health clubs.[75] Mainstream beverage channels such as grocery stores, convenience stores, and mass retail outlets were excluded.[76]

This channel separation was intended to reduce the likelihood that consumers would encounter the parties' respective BANG products in the same purchasing context.[77] By limiting the use of the

27

BANG Mark for non-creatine products to defined specialty channels, the 2010 Settlement Agreement was structured to preserve that separation.[78]  The arbitration record reflects that this channel-based framework formed a central component of the parties' negotiated confusion-avoidance scheme under the Agreement.[79]

### iv.    2010–2018 Evolution

Following execution of the 2010 Settlement Agreement, VPX's BANG products offerings evolved significantly.  The arbitration record reflects a gradual but substantial shift away from narrowly targeted nutritional supplement products toward ready-to-drink energy beverages, specifically its Bang energy drink ("Bang Energy") marketed for general consumer consumption.[80]

This evolution was accompanied by changes in packaging, branding emphasis, and marketing tone. Bang Energy increasingly adopted visual and promotional cues associated with mainstream energy drinks.[81]

As Bang Energy's commercial success increased, VPX expanded the scope and scale of its distribution.  The arbitration record reflects that BANG products were sold through mainstream, mass-market retail channels, including convenience stores and gas stations, which accounted for the majority of Bang Energy sales.[82]  This expansion occurred notwithstanding the channel-of-trade limitations set forth in the 2010 Settlement Agreement for non-creatine nutritionally fortified beverages.

From a factual standpoint, this development marked a significant inflection point in the parties' relationship.  The placement of Bang Energy in mainstream retail beverage channels resulted in direct marketplace proximity between BANG products and other energy and non-alcoholic beverages sold through the same outlets, increasing the likelihood that consumers would encounter those products in the same purchasing context.[83]  Consumers encountering BANG products in these settings would thus do so in retail and advertising contexts materially different from the specialty channels contemplated at the time of settlement.

The record reflects that this expansion was not isolated or temporary.  Rather, Bang Energy was distributed broadly and persistently through mainstream retail channels over an extended period. This sustained expansion contributed to an erosion of the separation that had formed a core premise of the coexistence framework established by the 2010 Settlement Agreement.[84]

An important aspect of VPX's marketing during the 2010 to 2018 time period was VPX's use and marketing of the ingredient "Super Creatine."  As discussed *infra*, an arbitrator later examined detailed factual evidence concerning product formulation, ingredient composition, and physiological functions.

As discussed *infra*, this ongoing representation in the marketplace of VPX's products as containing "Super Creatine" created at least three related risks: (1) contractual/trademark violations of the 2010 Settlement Agreement; (2) risks related to competitors (such as Monster) commencing false advertising litigation; and (3) risks related to consumer class action suits commencing false advertising/product liability claims.

28

### v.    September 4, 2018: Monster False Advertising Litigation

On September 4, 2018, Monster initiated the False Advertising Litigation against VPX under Section 43(a) of the Lanham Act, alleging false and misleading advertising relating to Bang Energy's "Super Creatine" claims.[85]  The False Advertising Litigation focused on the truthfulness and substantiation of VPX's affirmative marketing representations to consumers.[86]

Specifically, Monster alleged that VPX's advertising conveyed to consumers that Bang Energy contained creatine or provided creatine-related benefits, despite the absence of creatine as an ingredient and the lack of sufficient evidence that "Super Creatine" delivered equivalent physiological effects.[87]  These claims were alleged to be material to consumer purchasing decisions and to confer an unfair competitive advantage in the energy drink marketplace.

### 1.    Trial Record and Jury Findings

The claims in the Monster False Advertising Litigation proceeded to trial on August 15, 2022.  The record reflects that Monster presented evidence concerning product formulation, chemical composition, dosage, and consumer perception.

At trial, Monster presented its false advertising case by focusing on specific Bang Energy marketing statements that it contended conveyed objectively verifiable claims about product composition, functionality, and physiological benefits.  Monster identified repeated representations appearing on product labels, packaging, websites, and social media that described proprietary or differentiated ingredients and suggested superior performance or scientific innovation.  The trial presentation emphasized that these statements were not isolated slogans, but consistent, enterprise-wide claims disseminated across multiple consumer-facing channels during the relevant period.

Monster then introduced testimony and exhibits addressing how those advertising claims would be understood by consumers and by scientifically trained audiences.  Witnesses explained that the terminology used in Bang Energy advertising implied distinct chemical properties, biological mechanisms, or performance advantages capable of empirical validation.  This framing placed the dispute squarely on whether the challenged claims were factual in nature rather than subjective or rhetorical, and whether they reasonably communicated measurable attributes to consumers in the competitive energy drink market.

In response, VPX presented testimony from executives and marketing witnesses describing the development and intent of the advertising language.  VPX characterized the challenged statements as branding, aspirational messaging, or industry-standard promotional language rather than literal scientific promises.  VPX witnesses testified regarding internal beliefs about product innovation and differentiation and asserted that the advertising should be understood in context as marketing expression rather than as claims requiring formal substantiation.

The evidentiary focus then turned to substantiation.  Monster elicited testimony showing that VPX did not possess controlled, product-specific scientific studies directly supporting the advertised mechanisms or performance claims at the time the statements were disseminated.  Although VPX

29

offered explanations grounded in ingredient theory, internal research, or post hoc rationales, the trial record reflected a significant gap between the precision and scientific tone of the advertising claims and the level of evidence available to support them when made.

Based on this record, the jury was presented with a false advertising case that did not turn on intent, product safety, or commercial success, but on whether VPX's marketing crossed from promotional puffery into factual representation without adequate substantiation. Monster prevailed because the claims at issue were framed as specific and verifiable, were communicated consistently across platforms, and were supported by evidence showing a mismatch between claim strength and proof. The verdict reflects a determination that the advertising was likely to mislead consumers under the Lanham Act standard, even absent a finding of bad faith or deliberate deception.

Central to the case was the contention that "Super Creatine" was creatyl-L-leucine ("CLL"), a compound chemically distinct from creatine, and that Bang Energy did not contain creatine in any meaningful quantity.

On September 29, 2022, the jury returned a verdict in Monster's favor.[88] The jury found that VPX's "Super Creatine" advertising was false or misleading, that the misrepresentations were material to consumer purchasing decisions, and that Monster was injured as a result.[89] These findings reflect determinations that the challenged claims were likely to deceive consumers acting reasonably under the circumstances.

## 2. Damages

With respect to the false advertising claim, the jury found that Defendants are liable for false advertising under the Lanham Act, awarded **$271,924,174** in damages to Monster, and found that Defendants' false advertising was willful and deliberate.

## 3. Post-Trial Proceedings and Appellate Review

On February 23, 2023, VPX sought post-trial relief, including a motion for a new trial, which the district court denied on October 6, 2023.[90] The court's order denying post-trial relief summarized the evidentiary record and reaffirmed the sufficiency of the evidence supporting the jury's findings. Further, while the district court found the damages award was "astronomical," it confirmed the award and added pre-judgment interest of **$13,786,557.30**.

VPX appealed aspects of the judgment to the United States Court of Appeals for the Ninth Circuit. The appellate proceedings addressed evidentiary and procedural issues but did not vacate the jury's core findings regarding the misleading nature of the "Super Creatine" advertising or the propriety of damages for false advertising or injunctive relief.[91]

## 4. Entry of Permanent Injunction

Following the jury's verdict, on October 6, 2023, the district court entered a permanent injunction against VPX and Mr. Owoc. The injunction prohibited VPX and Mr. Owoc from making claims

that "Super Creatine is creatine," that Bang Energy products "contain creatine," or that Bang Energy or "Super Creatine" provide the benefits of creatine.

From a factual standpoint, the injunction reflects a judicial determination that such claims are misleading and must be barred prospectively to prevent ongoing consumer deception. The scope of the injunction underscores that the prohibited representations concern both ingredient identity and claimed functional benefits.

### vi.    June 2020: The OBI Arbitration

Separately, OBI had also assigned certain enforcement rights under the 2010 Settlement Agreement to Monster. This assignment did not transfer ownership of the BANG trademark itself, but authorized Monster to step into OBI's position for purposes of enforcing the contractual limitations governing VPX's use of the mark.

On June 16, 2020, Monster initiated the OBI Trademark Dispute, i.e. the arbitration proceedings alleging that VPX had breached the 2010 Settlement Agreement. The claims focused on two interrelated categories of conduct. First, Monster alleged that BANG products did not qualify as "creatine-based" within the meaning of the 2010 Settlement Agreement. Second, Monster alleged that VPX distributed BANG products outside the specialty channels permitted for non-creatine nutritionally fortified beverages.

The OBI Trademark Dispute framed the dispute as one turning on objective product characteristics and actual marketplace conduct, rather than on VPX's branding rhetoric or subjective intent. As discussed below, the record reflects that the arbitrator declined to treat marketing language or product naming conventions as dispositive of product classification.

### vii.    Arbitration Findings Concerning Product Composition and Classification

A central focus of the arbitration was whether BANG products were "creatine-based" as that term was used in the 2010 Settlement Agreement. The arbitrator examined evidence concerning product formulation, ingredient composition, and physiological function.[92]

The record reflects that the arbitrator found BANG products did not contain creatine as a principal, fundamental, or carrying ingredient. Instead, the products contained CLL, marketed as "Super Creatine," which the arbitrator found to be chemically distinct from creatine.[93] The arbitrator further found that there was no reliable evidence that CLL breaks down in the body to deliver creatine or creatine-equivalent benefits.[94]

The arbitrator also addressed quantity. The record reflects findings that BANG products contained only a trace or minuscule amounts of CLL, measured in milligrams rather than the gram-level dosages typically associated with creatine supplementation.[95] Based on these findings, the arbitrator concluded that BANG products did not qualify as "creatine-based" within the meaning of the 2010 Settlement Agreement.[96]

31

As a result, the arbitrator finally determined that BANG products fell within the category of non-creatine nutritionally fortified beverages subject to the 2010 Settlement Agreement's channel-of-trade restrictions.[97]

### viii.    Arbitration Findings Regarding Distribution Practices and Breach

Having determined that BANG products were not "creatine-based," the arbitrator turned to VPX's distribution practices.  The record reflects findings that BANG products were sold extensively through mainstream retail channels, including convenience stores and grocery stores, rather than being confined to the specialty outlets permitted under the Settlement Agreement.[98]

The arbitrator characterized the evidence of out-of-channel sales as essentially undisputed.[99]  This finding reflects that the issue was not a close factual question, but rather one established by documentary and testimonial evidence concerning VPX's distribution footprint.

Based on these findings, the arbitrator concluded that VPX had breached the 2010 Settlement Agreement with OBI by distributing non-creatine BANG products outside the permitted channels of trade.

### ix.    Remedies Awarded in the Arbitration

The arbitration did not end with only declaratory findings.  The record reflects that the arbitrator awarded monetary damages to compensate for past breaches of the 2010 Settlement Agreement. The arbitrator also awarded attorneys' fees and costs.[100]

In addition, the arbitrator imposed a running royalty on future net sales of BANG products.  From a factual standpoint, the imposition of a running royalty reflects a determination that VPX's continued use of the BANG Mark conferred ongoing economic value and that past breaches had continuing commercial effects.

On January 6, 2022, the arbitrator had issued an interim arbitration award in favor of Monster and OBI and against VPX and JHO IP (at the time, JHO IP held certain of the Company's intellectual property), pursuant to which Monster and OBI jointly elected: (i) a **$175 million disgorgement of profits award on account of OBI's trademark infringement claim**; and (ii) certain injunctive relief providing for a royalty payment equal to five percent (5%) of net sales of BANG products in lieu of the Company discontinuing its use of the BANG mark (the "Interim Award").[101]

On April 4, 2022, the arbitrator issued a final award, which provided the same relief granted under the Interim Award **plus approximately $9.3 million in fees and costs** and further injunctive relief providing for a **royalty payment equal to five percent (5%) of net sales of BANG** products in lieu of VPX discontinuing its use of the BANG mark (the "Arbitration Award").[102]  On September 29, 2022, the district court entered a judgment confirming the Arbitration Award (the "OBI/Monster Judgment").[103]

32

x.      **Post-Litigation Conduct and Continued Use of the BANG Mark**

Following entry of the permanent injunction in the Monster False Advertising Litigation, Bang Energy continued to be marketed and distributed in commerce. The record reflects that Bang Energy remained present in mainstream retail channels, including convenience stores and grocery stores, notwithstanding the restrictions imposed by the 2010 Settlement Agreement and the findings in the arbitration proceedings.

While the injunction prohibited specific creatine-related claims, it did not prohibit continued use of the BANG Mark itself. As a result, VPX continued to exploit the commercial goodwill associated with the BANG brand in the energy drink marketplace. The record reflects that Bang Energy continued to be positioned as performance-oriented energy beverages.

From a factual standpoint, this period reflects continued commercial use of the BANG Mark under conditions shaped by prior adjudications, rather than a cessation or material narrowing of brand exploitation.

xi.      **Overlapping Findings Across Arbitration and False Advertising Proceedings**

The OBI Arbitration and the Monster False Advertising Litigation addressed different legal theories, but they overlapped significantly in timing and factual subject matter. Both proceedings examined whether Bang Energy contained creatine or delivered creatine-related benefits, and both rejected claims to that effect.

The record reflects that these determinations were reached independently by different decision-makers applying different legal standards. Nonetheless, the factual findings converged on the same conclusions regarding product composition, ingredient identity, and functional claims.

From a factual perspective, this convergence reinforced the conclusion that Bang Energy was not "creatine-based" within the meaning of the 2010 Settlement Agreement and that marketing claims suggesting otherwise were misleading.

b.      **Nature of the Exposure from the Trademark and False Advertising Disputes**

There is no question in my mind that, during the Relevant Time Period, VPX faced substantial litigation and arbitration risk arising from its trademark usage, product classification, channel-of-trade practices, and affirmative marketing representations. These risks were not theoretical before and during the Relevant Time Period. They arose from core branding and advertising decisions embedded in VPX's principal revenue-generating products.

These practices were persistent, enterprise-wide, and central to VPX's branding and revenue model, and were known to Mr. Owoc, and therefore to VPX, before and during the Relevant Time Period.[104]

33

The OBI Arbitration concerning alleged noncompliance with the 2010 Settlement Agreement governing use of the BANG Mark turned on objective, verifiable conduct, including product positioning, branding emphasis, and retail channels of distribution. Liability did not depend on novel legal theories or subjective consumer perception. It depended on documentary evidence and ongoing commercial practices.

In parallel, VPX faced the False Advertising Litigation challenging affirmative "Super Creatine" marketing claims in connection with Bang Energy. Those claims focused on ingredient identity, dosage, and substantiation, not advertising puffery or ambiguous messaging. The alleged misrepresentations were repeated, prominent, and central to VPX's branding and marketing strategy.

The probability assessments set forth herein are therefore supported by objective, contemporaneous indicators. Before the initiation of litigation in September 2018, VPX had already intentionally expanded the Company from a supplement-oriented product into a mass-market ready-to-drink beverage, distributed primarily through convenience stores and grocery outlets, while simultaneously promoting "Super Creatine" as a differentiating ingredient conveying creatine-related benefits despite that Super Creatine did not exist.[105]

Further, the trial record establishes that Mr. Owoc functioned as VPX's founder and 100% equity owner, Chief Executive Officer, and principal decision-maker with ultimate authority over Bang Energy's branding and marketing strategy throughout the relevant period.[106] Mr. Owoc also advertised himself as the Company's "Chief Science Officer," and Owoc testified that he personally controlled formulation and disclosure decisions relating to BANG products, including decisions regarding the amount and promotion of "Super Creatine."[107]

Trial testimony further reflected that Mr. Owoc did not operate as a passive executive but was actively involved in day-to-day management and personally directed labeling, product positioning, marketing messaging, and competitive strategy, including creatine-related claims used to distinguish Bang Energy from Monster Energy.[108] Mr. Owoc agreed the labeling displaying the challenged language was prominently displayed on the can.[109] Mr. Owoc agreed that Super Creatine was described as an "active ingredient."[110]

Throughout his testimony, Mr. Owoc offered material and significant testimony to the jury and the Court that supported an adverse finding.[111]

Expert testimony confirmed that critical formulation decisions, including the decision to include only a nominal amount of Super Creatine, were made by Mr. Owoc himself rather than delegated to scientific or regulatory personnel.[112] The evidence further showed that VPX's marketing personnel and senior employees implemented advertising and labeling initiatives pursuant to Mr. Owoc's direction and relied on his representations regarding Super Creatine without independent scientific validation.[113]

Therefore, both before and during the Relevant Time Period, Mr. Owoc was aware of the risks created by this use of the BANG Mark as well as the false and/or misleading nature of the Super Creatine claims.

34

### c. VPX's own testimony in the False Advertising Litigation testimony was incriminating.

During the jury trial in the False Advertising Litigation, Monster relied on Mr. Owoc's own advertising conduct and statements, as confirmed through testimony and exhibits, to establish that Bang Energy's marketing strategy intentionally capitalized on consumer misunderstanding of creatine and its perceived benefits.

The trial record showed that Bang Energy consumers were statistically significantly more likely to associate "creatine" and "Super Creatine" with muscle and mental performance benefits that were not stated on the can—a difference that the trial evidence attributed to exposure to VPX's broader advertising campaign, including off-can marketing, rather than label disclosures alone.[114]

The Court acknowledged that these benefits were conveyed implicitly rather than expressly ("That was not specific but implied, correct?"), underscoring that VPX's messaging operated through suggestion rather than clarification.[115]

Monster further established that Bang Energy consumers were "more likely to see the other advertising on social media, on the website, and blog posts," and that this off-can advertising materially shaped consumer beliefs about creatine's effects.[116]

Critically, the trial record reflected that consumers who purchased Bang Energy were "statistically significantly more likely to associate benefits from Super Creatine to those other advertising messages that weren't explicitly on the can," demonstrating that Bang's advertising reinforced and leveraged existing consumer assumptions about creatine rather than correcting them.[117]

As argued by Monster at trial and credited by the Court, this advertising strategy materially impacted consumers' decisions to purchase BANG products, tying VPX's promotional messaging directly to consumer deception and commercial effect.[118]

At trial, Monster presented statements from Mr. Owoc in which he expressly articulated an intent to build Bang Energy's marketing strategy around consumer perceptions of creatine, stating that he planned to "convince" consumers that Bang Energy delivered creatine-related benefits because "creatine means something to people."[119]

The jury also heard evidence that Mr. Owoc personally directed the design and messaging of Bang Energy's packaging to reinforce that message.  The can was described as a deliberate "cheat sheet" listing what he wanted consumers to believe were the product's active ingredients, with "Super Creatine" placed "top center of the can" so that "everyone is going to know that we've got Super Creatine" and that Bang Energy had "Creatine in our energy drink and nobody else does."[120]

Monster further emphasized in closing argument that this placement was intentional because the top rim of the can functioned as the product's primary advertising space and was designed to communicate Bang's purported point of differentiation at the moment of purchase.[121]

35

At the same time, the trial record reflected that VPX's witnesses could not identify any scientific evidence substantiating the advertised benefits of Super Creatine, with testimony establishing that there was "no evidence that Super Creatine provides benefits" and no evidence that it delivers creatine or produces the muscle, performance, or cognitive effects attributed to creatine in Bang's advertising.[122]  The jury further heard uncontroverted testimony that no scientist believed Super Creatine was creatine or could accurately be described as providing creatine's benefits, as well as argument that defendants failed to produce even "one study, one piece of evidence" supporting claims equating Super Creatine with creatine.[123]

Consistent with that evidentiary record, Monster emphasized that no witness testified that the claims equating Super Creatine with creatine were true, and that even VPX's own experts conceded the absence of data showing bioavailability, physiological effect, or consumer-relevant benefit.[124]

**These statements and admissions materially undermined VPX's ability to defend against Monster's false advertising claim because they directly linked the challenged advertising to Mr. Owoc's own explanations of marketing intent while simultaneously demonstrating the absence of contemporaneous scientific substantiation for representations presented to consumers as factual.**

**In my opinion, these facts substantially increased the likelihood of an adverse liability determination.  As the sole senior manager and board member before and during the Relevant Time Period, Mr. Owoc was aware or reasonably should have been aware of both what would have been in the evidentiary record regarding intent and the lack of substantiation supporting the challenged claims, as well as the resulting risk of an unfavorable trial outcome.**

> d.    **The term "Super Creatine" was semantically misleading because it misappropriated a known ingredient term to convey a false product meaning to consumers.**

Section 43(a)(1)(B) of the Lanham Act prohibits false or misleading representations of fact made in commercial advertising or promotion.  This provision is designed to protect commercial actors from reputational harm and lost sales proximately caused by deceptive marketplace messaging. The inquiry is therefore not limited to whether a statement is literally false, but whether it conveys a misleading message about a product's nature, composition, or benefits that is likely to influence consumer purchasing decisions.

Where a brand phrase draws upon the semantic field of a widely understood ingredient, such as creatine, and uses that association to communicate claims about composition, functionality, or physiological benefit, trademark and false advertising law treat that language as substantive marketplace communication.  Such messaging is evaluated by considering how reasonable consumers understand ingredient references in the context of performance beverages and supplements.  Courts do not dismiss these representations as mere puffery when they purport to signal concrete product attributes or functional advantages.  Instead, ingredient-based branding is analyzed as a factual claim capable of verification or refutation.

36

That principle is particularly salient here. The record shows that, despite Mr. Owoc's own testimony in the False Advertising Litigation, "Super Creatine" terminology did not operate as an abstract or aspirational slogan divorced from product meaning. Rather, it invoked the established consumer understanding of creatine as a functional ingredient associated with performance, energy, and supplementation. By borrowing that linguistic and conceptual framework, the branding conveyed an implied message regarding product composition and benefit—a message that consumers were entitled to rely upon in evaluating the product.

The record at trial in the False Advertising Litigation supported this fact. The jury's verdict in favor of Monster, and the entry of a final judgment under Section 43(a) of the Lanham Act, is therefore legally significant beyond the immediate false advertising claim. It confirms that the challenged Super Creatine narrative was adjudicated to be a materially misleading representation, not as protected marketing rhetoric or non-actionable puffery.

In my opinion, based on my training and experience, that adjudication reinforces that the phrase communicated a concrete, legally meaningful claim about product identity and function, further undermining any contention that creatine-related branding could satisfy a substantive "creatine-based" product classification through semantics alone. From a governance perspective, this type of ingredient-based misrepresentation magnifies contingent liability because it exposes the company to parallel contractual, statutory, and injunctive risk beyond the immediate Section 43(a) claim.

### e. Bang Energy products were properly treated as non-creatine nutritionally fortified beverages for purposes of the various parties' disputes.

Under Section 43(a) of the Lanham Act, actionable misrepresentations include false or misleading statements concerning a product's composition, characteristics, or functional benefits, where those statements are material to purchasing decisions and are likely to deceive consumers. The statute does not merely police overtly false statements; it also reaches claims that are misleading in context, including claims that imply functional attributes a product does not in fact possess or that exaggerate the significance of an ingredient beyond its actual role in the formulation.

In both the Ninth and Eleventh Circuits, the elements of a Lanham Act false advertising claim require a showing of falsity or misleadingness, capacity to deceive a substantial segment of consumers, materiality, use in interstate commerce, and resulting injury. These standards reflect a consistent doctrinal focus on objective product reality rather than marketing rhetoric. Courts assess whether challenged claims convey an inaccurate message about what the product is or does, and whether that message is likely to influence consumer behavior. Substantiation and product composition therefore matter legally, particularly where functional claims are used to differentiate products in the marketplace.

That framework also has direct relevance in the context of a trademark coexistence agreement that allocates rights based on product category. Where a coexistence agreement uses a functional classification term as a gatekeeping mechanism to determine permissible trademark use and channels of trade, that term must be interpreted in a manner consistent with the same objective standards applied under Section 43(a) of the Lanham Act. A party cannot be permitted to redefine

37

a substantive product boundary through promotional phrasing or ingredient-themed branding while simultaneously relying on that boundary to justify expanded trademark use. Doing so would allow marketing semantics to override both contractual intent and trademark law's consumer-protection principles.

In this case, the successful False Advertising Litigation brought by Monster further confirms that the disputed creatine-related claims were not merely matters of subjective branding interpretation. The jury heard multiple witnesses, including Mr. Owoc, testify about the lack of objective, scientifically accepted empirical data to support VPX's claims.

Consequently, the jury found decisively in favor of Monster in the False Advertising Litigation, and a final judgment was entered against VPX, which was affirmed by the Ninth Circuit Court of Appeals. That verdict reflected findings that VPX's creatine-related representations were indeed false and/or misleading, material to consumers, and injurious in the marketplace. That outcome also validated the arbitrator's independent findings in the OBI Trademark Dispute, rejecting VPX's attempt to justify its expanded BANG trademark use through creatine-centered marketing narratives.

Taken together, the arbitration ruling in the OBI Trademark Dispute and the jury verdict in the False Advertising Litigation establish that VPX's creatine-related claims ultimately failed under both contractual and statutory scrutiny. They demonstrate that the marketplace did not accept creatine branding as a substitute for substantive product composition and that courts and juries alike evaluated the issue through the lens of objective product reality.

In my opinion, those determinations reinforce that the "creatine-based" limitation in the 2010 Settlement Agreement could not properly be satisfied through mere branding constructs alone and instead required meaningful, functional alignment with the product classification the parties negotiated to separate their respective trademark uses.

f.    **The 2010 Settlement Agreement functioned as a trademark coexistence agreement that limited product classification and set forth clear channel-of-trade limitations.**

In my opinion, based on applications of trademark law, the 2010 Settlement Agreement with OBI, signed by Mr. Owoc, functioned as a trademark coexistence agreement in both form and substance. The agreement resolved a prior trademark dispute by allocating permissible use of the BANG Mark through negotiated limitations tied to both product classification and channels of trade. As a matter of trademark practice, such agreements are routinely employed to mitigate likelihood-of-confusion risk where two parties seek to continue using identical or highly similar marks in overlapping commercial space.

The structure of the 2010 Settlement Agreement therefore reflects the core features of a coexistence arrangement. Rather than extinguishing one party's trademark use entirely, the agreement delineated the circumstances under which VPX could safely use the BANG Mark—expressly conditioning that use upon compliance with agreed-upon product characteristics and market channel/placement.

38

These limitations were not ancillary or aspirational; they were the central mechanism by which the parties resolved that trademark dispute and preserved distinct brand spheres. From a trademark perspective, this allocation directly addressed the principal confusion drivers recognized under U.S. trademark law, including product similarity, consumer expectations, and overlapping channels of trade.

Importantly, the 2010 Settlement Agreement expressly tied trademark permission to *objective product classification*, not merely to branding language or marketing claims. The record reflects that VPX's continued right to use the BANG Mark therefore entirely depended on whether products satisfied that Agreement's definitional criteria, including whether products qualified as "creatine-based" and whether they were distributed through approved channels. This type of classification-based limitation is consistent with standard trademark coexistence practice, in which contractual boundaries substitute for the typical confusion analysis by preemptively separating marketplace exposure.

The detailed arbitration findings and subsequent litigation record establish that VPX knowingly and materially breached these coexistence obligations in multiple, independent ways. The arbitrator concluded that VPX exceeded the scope of permissible trademark use by expanding the use of the BANG Mark beyond the contractually defined product categories and by distributing those products through channels that the Agreement was designed to exclude. These actions undermined the fundamental purpose of the coexistence framework by reintroducing precisely the forms of consumer confusion the settlement was intended to prevent.

From a trademark law standpoint, these breaches were not technical or *de minimis*. Channel-of-trade restrictions are among the most effective tools for managing confusion risk, and their violation substantially increased the likelihood that consumers will encounter competing BANG products in the same purchasing context and cause consumer confusion.[125] Likewise, misclassification of products as qualifying under the agreement eroded the contractual boundary that justified VPX's continued use of the mark in the first place. In practical terms, VPX's conduct willfully ignored the negotiated separation between the parties' respective brand uses.

Accordingly, it is my opinion that the 2010 Settlement Agreement operated as a binding trademark coexistence agreement; that its limitations were known, material and central to the parties' bargain; and that VPX's conduct, as correctly determined in arbitration and as reflected in the record, constituted material breaches of those coexistence obligations. Those breaches eliminated the contractual justification for VPX's expanded use of the BANG Mark and re-exposed the marketplace to the confusion risks the 2010 Settlement Agreement was expressly designed to avoid.

### g. "Creatine-based" was intended and understood as a substantive, functional product classification, not a branding construct.

In my opinion, based on trademark law, the term "creatine-based," as used in the 2010 Settlement Agreement, was intended and understood by both OBI and Mr. Owoc/VPX as a substantive, functional product classification grounded in product composition and use, not as a flexible branding or marketing construct. This interpretation is consistent with trademark and unfair

competition doctrine, with the structure and purpose of the Agreement itself, and with how consumers encounter and evaluate products in the marketplace.

Trademark law is not formalistic about labels or promotional language. Sections 32 and 43(a) of the Lanham Act are expressly directed at misleading representations precisely because words and branding claims can distort consumer understanding of a product's true nature, composition, or source. Courts therefore look beyond how a product is described in marketing materials and instead examine what the product is, how it functions, and how consumers perceive it in real-world purchasing contexts. A contractual term that allocates trademark rights based on product type must be interpreted against this same substantive backdrop.

Reading "creatine-based" as a mere branding construct would permit a party to defeat the Agreement's marketplace boundaries through semantics alone, simply by invoking creatine-related language or themes regardless of whether creatine played a meaningful role in the product's formulation. Such an interpretation would undermine the consumer-protection function of trademark law and would be inconsistent with the very rationale for coexistence agreements, which is to prevent confusion by maintaining real, enforceable separation between competing uses of the same mark.

Under both Ninth Circuit and Eleventh Circuit likelihood-of-confusion jurisprudence, courts evaluate consumer confusion by focusing on the actual goods in commerce and the conditions under which consumers encounter them. This analysis includes the nature and similarity of the products, their composition and purpose, and the channels of trade through which they are sold. A classification term used to separate permissible trademark use by product category and channel must therefore be interpreted in a manner consistent with marketplace reality. It cannot be treated as a loophole controlled by advertising copy or creative labeling choices.

The structure of the 2010 Settlement Agreement reinforces this conclusion. The Agreement used product classification as a gating mechanism for trademark permission, with "creatine-based" functioning as a substantive threshold condition. That condition only serves its intended role if it refers to products in which creatine plays a real, functional role in formulation and consumer use, rather than products that merely reference creatine as a marketing concept. Interpreting the term otherwise would collapse the negotiated distinction between product categories and render the Agreement's channel-of-trade limitations ineffective.

The record further reflects that VPX fully understood and intended the "creatine-based" limitation to operate in this substantive manner. The dispute history, discovery materials, and arbitration findings show that disagreements centered on whether products met the Agreement's functional criteria, not on whether VPX had used creatine-related language in branding. This confirms that the parties' shared understanding was anchored in product composition and classification, not in semantic branding flexibility. It is clear that the jury agreed in the distinct False Advertising Litigation.

Accordingly, it is my opinion that "creatine-based," as used in the 2010 Settlement Agreement, was intended and understood as an objective, functional product classification tied to formulation and marketplace reality. Treating the term as a mere branding construct would be inconsistent

40

with trademark doctrine, contrary to the Agreement's structure and purpose, and incompatible with the consumer-confusion analysis that trademark law is designed to enforce. VPX and Mr. Owoc were well-aware of these facts before and after at least September 4, 2018.

> **h.      Distribution through mainstream retail channels materially increased confusion risk and is the type of conduct trademark law treats as highly significant.**

Trademark law treats channels-of-trade as a core determinant of consumer confusion. Courts in both the Ninth and Eleventh Circuits expressly evaluate whether goods bearing similar marks are sold through the same retail outlets, marketed through the same advertising media, and encountered by the same classes of purchasers. Channel convergence is not a peripheral consideration. It is one of the principal mechanisms through which confusion arises in real-world commerce.

The 2010 Settlement Agreement reflects this same trademark logic. By limiting non-creatine nutritionally fortified BANG products to specialty channels, that Agreement preserved marketplace separation between VPX's products and mainstream energy beverages. That separation was not aesthetic or incidental. It was a functional confusion-avoidance mechanism grounded in sound trademark doctrine.

The record reflects that BANG products were sold extensively through mainstream retail channels, including convenience stores, grocery stores, and other mass-market beverage outlets. Once BANG products were placed in those environments, consumers encountered them alongside competing energy drinks in precisely the contexts trademark law treats as confusion-enhancing. The arbitrator found this conduct to have been established by the evidence and concluded that VPX breached the 2010 Settlement Agreement by distributing non-creatine BANG products outside the permitted channels of trade.

From a trademark perspective, that breach was material because it eliminated the very separation upon which the coexistence framework depended on. The record confirms a clear settlement framework existed and that disputes escalated to major adjudications (jury verdict and judgment) in the Monster False Advertising Litigation.

> **i.      VPX's intentional rebranding and marketplace positioning of Bang Energy further exceeded the permissible scope of coexistence.**

Trademark coexistence agreements do not freeze brand presentation at a purely formal level. They operate against the backdrop of evolving marketplace realities. When a party materially alters the branding, packaging, and promotional tone of its products in a way that increases proximity to another party's goods, those changes can undermine the assumptions on which coexistence was negotiated.

The record reflects that following the 2010 Settlement Agreement, Bang Energy evolved from narrowly positioned supplement-oriented products into mass-market energy beverages, accompanied by changes in packaging, visual identity, and marketing emphasis. These changes

41

increased Bang Energy's resemblance to mainstream energy drinks and altered how consumers perceived and encountered the BANG Mark in commerce.

From a trademark standpoint, such rebranding is legally significant because likelihood of confusion is assessed based on how marks function in the marketplace as consumers experience them. A coexistence framework that depends on product differentiation and channel separation cannot remain effective if one party's branding strategy ignores those distinctions. The record supports the conclusion that VPX's post-settlement branding evolution contributed to increased confusion risk and exceeded the contemplated scope of permitted use.

### j.  VPX's use of the BANG Mark immediately constituted trademark infringement once it exceeded contractual limitations.

From a risk-management perspective, conduct that exposes a company to infringement liability carries materially different governance implications than remote or speculative claims. Here, the record reflects that the BANG products at issue did not qualify as "creatine-based" within the meaning and intent of the 2010 Settlement Agreement and were, in addition, distributed through mainstream retail channels that the agreement expressly excluded. These departures were not isolated or technical deviations. They represented a fundamental breakdown of the product and channel separation that formed the basis of the coexistence framework negotiated by the parties.

From a trademark law perspective, those deviations are legally significant and material because they reintroduced the precise confusion drivers the agreement was designed to neutralize. When products share overlapping functional characteristics, are sold through the same retail outlets, are marketed to the same classes of purchasers, and are promoted in similar advertising contexts, the likelihood that consumers will mistakenly believe the products originate from the same source or are affiliated materially increases. Trademark doctrine treats these factors as central to confusion analysis, not peripheral considerations.

By distributing non-qualifying BANG products through mass-market retailers, VPX placed its products directly into the same purchasing environment as competing beverages. Consumers encountering those products would have no reliable marketplace cues signaling that the products were subject to different trademark permissions or contractual limitations. Instead, consumers would encounter identical branding applied to functionally similar beverages offered in the same channels—a scenario that trademark law recognizes as presenting heightened confusion risk.

Once VPX exceeded the 2010 Settlement Agreement's product classification and channel-of-trade limitations, its continued use of the BANG Mark ceased to enjoy contractual insulation. At that point, trademark use had to be evaluated under ordinary infringement principles, without regard to the coexistence framework that had previously allocated risk and permitted limited use. In other words, the Agreement no longer functioned as a shield once its core conditions were violated.

The same marketplace facts that established material breach also support infringement exposure under Sections 32 and 43(a) of the Lanham Act. The overlap in product type, channels-of-trade, purchasers, and marketing context is precisely the type of convergence courts examine when assessing likelihood of confusion. In my opinion, the erosion of contractual boundaries and the

42

reemergence of these confusion factors rendered VPX's continued use of the BANG Mark legally vulnerable, both as a matter of contract and under federal trademark law.

### k.    VPX's marketing and distribution practices violated contractual trademark constraints in a systemic manner.

The record does not reflect isolated or accidental deviations from the Settlement Agreement by VPX with respect to this conduct.  Rather, it reflects a sustained pattern of conduct involving product formulation, marketing claims, branding evolution, and distribution expansion that collectively and intentionally undermined the coexistence framework.  Notably, the record in the OBI Trademark Dispute makes clear that Mr. Owoc never told his marketing employees, sales staff, or distributors about Settlement Agreement's restrictions.[126]

Trademark coexistence agreements function as integrated systems.   Product classification, marketing messaging, and channels of trade operate together to preserve separation.   When multiple elements move in the same direction, away from the agreed boundaries, the result is not a technical breach but a functional collapse of the confusion-avoidance structure.

Based on the record, Mr. Owoc's, and therefore VPX's, conduct reflected a coordinated and intentional approach to expanding the commercial reach of the BANG Mark beyond the scope permitted by the Settlement Agreement.

### l.    "Super Creatine" claims directly affected trademark classification and the scope of permissible use.

Ingredient claims can function as trademark-adjacent representations because they shape consumer understanding of what a product is and why it belongs in a particular market category.  Under Section 43(a) of the Lanham Act, false or misleading statements about product composition or benefits are legally actionable because they distort marketplace meaning.

The Super Creatine branding appropriated the semantic field of creatine to convey product attributes and performance benefits associated with that ingredient.  The Trademark and False Advertising Disputes rejected the premise that Bang Energy products contained creatine or delivered creatine-related benefits.  The jury's verdict and the entry of permanent injunctive relief confirm that these representations were misleading and material to consumer decision-making.

From a trademark perspective, this matters because VPX relied on creatine-related branding to justify expanded trademark use.  Once those claims were adjudicated false, they could not support classification of Bang Energy products as "creatine-based" or justify broader use of the BANG Mark.  False advertising thus narrowed, rather than expanded, the scope of permissible trademark use.

From a consumer standpoint, such product composition and marketing claims exposed VPX to substantial risk such as a class action for consumer fraud.

43

**m.    Probability of Adverse Liability Determinations in the Trademark and False Advertising Disputes**

For all the reasons discussed herein, as of at least September 4, 2018, the probability of adverse liability determinations in the Trademark and False Advertising Disputes was substantial.

For the OBI Trademark Dispute, liability risk was elevated because the dispute involved:

- a written coexistence agreement with defined restrictions;
- persistent and ongoing conduct rather than isolated events; and
- core products distributed nationally through major retail channels.

For the False Advertising Litigation, liability risk was elevated because:

- falsity or misleadingness could be established through objective product composition and scientific evidence;
- liability did not require proof of intent or consumer confusion; and
- the challenged representations invoked the semantic meaning of a widely understood ingredient.

From a governance perspective, these features placed both disputes well beyond the category of remote or speculative litigation risk; liability was instead all but a foregone conclusion.

**n.    Probability of Enterprise-Material Remedies**

If liability were found in either of the Trademark and False Advertising Disputes, the probability of enterprise-material remedies was nearly certain.  Across both trademark and false advertising theories, foreseeable remedies included:

- injunctive relief restricting product classification, labeling, or marketing claims;
- corrective advertising or compliance obligations;
- monetary damages or disgorgement measured at enterprise scale;
- ongoing royalty payments; and/or
- other ongoing operational constraints affecting future product positioning and distribution.

Because the challenged conduct was embedded in VPX's core business model, adverse outcomes were highly likely to impair operational liquidity, disrupt revenue streams, and constrain strategic flexibility.

From a governance standpoint, the risk of forward-looking injunctive relief was particularly significant.  Injunctions affecting branding, labeling, or marketing claims would directly impair future revenue independent of any major damages award.

**o.    Downstream and Correlated Risk**

The trademark and false advertising risks were also governance-significant because they created foreseeable downstream exposure to other claims.

44

The challenged marketing practices were consumer-facing by design and scale. Adverse findings concerning falsity or noncompliance were reasonably capable of triggering:

- consumer class action litigation;
- regulatory scrutiny or enforcement actions, and/or
- parallel proceedings by additional competitors or rightsholders.

These downstream risks materially increased enterprise exposure by introducing the possibility of aggregated claims, expanded damages theories, and concurrent proceedings arising from the same underlying conduct.

### p.      Governance Assessment

From a governance perspective, trademark and false advertising exposure should have been evaluated as a unified category of brand-integrity risk. The disputes did not arise independently. They were rooted in the same underlying course of conduct involving product formulation, creatine-related marketing claims, branding strategy, and distribution practices.

In governance practice, correlated risks materially elevate enterprise exposure because adverse findings in one proceeding increase the probability, severity, or consequences of adverse outcomes in others. During the Relevant Time Period, reasonable fiduciaries would have evaluated all of these matters as an interconnected portfolio of litigation risk rather than as isolated disputes.

Accordingly, the trademark and false advertising claims presented a non-remote and enterprise-significant risk profile that, when viewed alongside copyright and contract exposure, contributed materially to VPX's overall high-risk litigation posture.

45

## VIII.   COPYRIGHT INFRINGEMENT RISK ASSESSMENT

In addition to (and separate from) the trademark and false advertising cases, during the Relevant Time Period, VPX and its principal executive Mr. Owoc were also defendants in multiple independent copyright infringement actions brought by major music rightsholders.  These disputes arose from VPX's use of copyrighted sound recordings and musical compositions in social-media advertising, particularly on TikTok and related platforms, without obtaining licenses for commercial use.[127]

By 2019, VPX was increasingly relying on social-media marketing, particularly TikTok and influencer-driven content, as a primary channel for promoting Bang Energy products.[128]  Between 2019 and 2020, VPX approved or controlled promotional videos incorporating copyrighted music as part of brand advertising.  This led to the following lawsuits by the copyright holders:

- *Atl. Recording Corp. v. Vital Pharms., Inc.,* Case No. 1:22-cv-22951-RS (S.D. Fla.);

- *UMG Recordings, Inc. v. Vital Pharms., Inc.*, Case No. 1:21-cv-60914-WPD (S.D. Fla.); and

- *Sony Music Ent. v. Vital Pharms., Inc.*, Case No. 1:21-cv-22825-WPD (S.D. Fla.).

### a.      Relevant Facts Concerning the Copyright Infringement Dispute

Between March and October 2020, VPX received internal and external warnings that copyrighted music cannot be used in commercial social-media content without proper licensing, including communications from platform representatives and rights holders.  By late 2020, despite notice, VPX allegedly continued posting promotional videos using copyrighted sound recordings outside of licensed commercial music libraries.

In 2021, Sony Music Entertainment filed suit in the Southern District of Florida, alleging willful copyright infringement based on unauthorized use of copyrighted music in VPX's social-media advertising.[129]

Also in 2021, UMG Recordings and affiliated Universal Music entities filed a separate action in the Southern District of Florida ("UMG Recordings") asserting similar infringement claims arising from the same marketing practices.[130]  Both copyright actions sought statutory damages on a per-work basis, injunctive relief, and attorneys' fees, asserting exposure tied to the volume of infringing content rather than a single transaction.[131]

In July 2022, in the UMG Recordings action, the court entered summary judgment on liability, finding unauthorized use of copyrighted works in a substantial number of promotional videos.[132]

In August 2022, the court also imposed spoliation sanctions in the UMG Recordings case, authorizing adverse presumptions concerning approximately 100 additional unpreserved videos.[133]

46

### b.      Nature of the Exposure

The copyright claims were not isolated enforcement actions by a single rightsholder.  They reflected parallel litigation brought by separate copyright owners asserting similar theories of liability based on the same underlying marketing practices.  As a result, the exposure was patterned rather than idiosyncratic.

The challenged conduct involved VPX's reliance on social-media marketing as a primary, and at times exclusive, advertising channel for Bang Energy products.  Plaintiffs alleged that VPX caused or authorized the dissemination of promotional videos incorporating copyrighted music, and that these videos functioned as commercial advertising rather than user-generated content.  The alleged infringement was therefore tied directly to core business operations rather than ancillary activity.  There were no meritorious defenses asserted.

Further, the copyright exposure assessed herein arose from a documented and repeated marketing practice, rather than isolated infringement.  Beginning in 2019, VPX relied heavily on social-media advertising incorporating copyrighted music as part of its core promotional strategy.  By 2020, VPX had received internal and external notices that such use required commercial licensing, yet the challenged conduct allegedly continued, resulting in parallel infringement actions by multiple major rightsholders.

The existence of independent suits asserting similar claims materially increased the likelihood that at least one proceeding would result in adverse liability and enterprise-material remedies.[134]

### c.      The copyright disputes presented statutory damages exposure capable of scaling rapidly and injunction-driven risk affecting a primary marketing channel.

My opinions regarding the governance significance of the copyright disputes are based on the specific statutory damages sought and the injunctive relief pursued by the plaintiffs.

The copyright plaintiffs sought statutory damages of up to $150,000 per infringed work, together with attorneys' fees and costs, and injunctive relief prohibiting further unauthorized use of copyrighted music in commercial advertising.  Because the alleged infringement involved numerous promotional videos and repeated marketing practices, statutory damages exposure could reach many millions of dollars, depending on the number of works at issue and any findings of willfulness.  Substantial evidence supported a finding of willfulness, and no meritorious defenses were mounted.  In addition, in at least one case, plaintiffs alleged spoliation of evidence.[135]

Unlike compensatory damages, statutory copyright damages do not require proof of actual economic loss and are inherently scalable.  As a result, exposure could increase rapidly with continued conduct, independent of revenue generated by any individual advertisement.  The existence of parallel actions by multiple rightsholders further increased the likelihood that VPX would face substantial cumulative liability.

In addition to monetary exposure, plaintiffs sought injunctive relief restricting VPX's ability to use copyrighted music in social-media advertising.  Because social media platforms were a

primary marketing channel for Bang Energy, the risk of injunctive relief threatened future revenue generation independent of any damages award.

From a governance perspective, litigation presenting multi-million-dollar statutory exposure combined with the risk of marketing-channel restrictions is enterprise-material even where individual awards might vary. Accordingly, these disputes clearly warranted treatment as material contingent liability risks during the Relevant Time Period. From a review of the record, it appears that VPX was fully exposed to these outcomes without a good faith defense.

### d.    Probability of Adverse Liability Determinations

As of the Relevant Time Period, the probability of adverse liability determinations in the copyright actions was substantial.

Copyright liability in these matters did not turn on unsettled legal doctrine or subjective intent. It turned on well-established principles governing ownership, copying, and unauthorized commercial use. Plaintiffs alleged ownership of the asserted works and identified specific promotional videos that incorporated copyrighted music without license.

The record reflects that VPX received contemporaneous notices that copyrighted music could not be used in commercial social media advertising absent proper licensing. Plaintiffs alleged that internal communications, third-party warnings, and direct communications from rightsholders put VPX on notice that the availability of music on social media platforms did not confer a license for brand advertising. Despite this notice, the challenged conduct was alleged to have continued.

The existence of parallel actions by independent rightsholders asserting similar claims further elevated liability risk. From a governance perspective, the likelihood that at least one action would result in an adverse liability determination was non-remote and reasonably foreseeable during the Relevant Time Period.

### e.    Probability of Enterprise-Material Remedies

If liability were found, the probability of enterprise-material remedies was nearly certain.

The copyright plaintiffs sought statutory damages on a per-work basis, injunctive relief prohibiting further infringement, and recovery of attorneys' fees and costs. Because statutory damages may be assessed per infringed work, exposure scaled with the volume of infringing content rather than a single transaction or contract. This feature materially increased downside risk where numerous promotional videos were alleged.

In addition to monetary exposure, injunctive relief posed significant enterprise-level risk. An injunction restricting the use of copyrighted music in social media advertising would have required immediate and substantial changes to VPX's primary marketing strategy, potentially disrupting brand visibility, consumer engagement, and sales momentum.

From a governance perspective, the risk of forward-looking operational constraint was at least as significant as the risk of monetary liability.

48

### f.    Governance-Relevant Risk Indicators

Several indicators present during the Relevant Time Period elevated the governance significance of the copyright exposure:

- the challenged conduct involved core marketing practices rather than isolated or historical acts;
- VPX received repeated notice that its interpretation of music licensing rights was disputed and likely incorrect;
- independent rightsholders brought parallel actions asserting similar claims;
- the claims were asserted against Mr. Owoc personally, as well;
- liability exposure was document-driven and scalable with continued conduct; and
- remedies sought included both monetary damages and operationally restrictive injunctive relief.

These indicators collectively increased the probability that continued litigation would result in enterprise-material consequences, even apart from any ultimate damages awards.

### g.    Governance Assessment

From a corporate governance perspective, the copyright disputes reflected a serious risk arising from an embedded business practice.  The exposure did not depend on novel legal theories or aggressive extensions of copyright law.  It arose from the commercial use of copyrighted works without license in a core marketing channel.

Accordingly, during the Relevant Time Period, these matters should have been evaluated as presenting a non-remote probability of adverse liability determinations with the potential for material operational and financial impact by Mr. Owoc, and therefore VPX.  When viewed alongside trademark, false advertising, and contract exposure, the copyright disputes materially contributed to VPX's known high-risk litigation posture.

49

## IX.     STRATEGIC DISTRIBUTION DISPUTE (PEPSICO) RISK ASSESSMENT

Separate from the intellectual property disputes, VPX faced enterprise-level exposure arising from its unilateral termination of its exclusive distribution agreement with PepsiCo.  The PepsiCo dispute spawned the following litigations starting on November 23, 2020:

- *PepsiCo, Inc. v. Vital Pharms., Inc.*, AAA Case 01-20-0015-8060 (filed Nov. 23, 2020);

- *Vital Pharms., Inc. v. PepsiCo, Inc.*, Case No. 0:20-cv-62415-RAR (S.D. Fla., filed Nov. 25, 2020);

- *Quash Seltzer, LLC v. PepsiCo, Inc.*, No. 21-CV-60191-RAR (S.D. Fla., filed Jan. 26, 2021);

- *PepsiCo, Inc. v. Vital Pharms., Inc.*, No. 0:22-cv-60805-RAR (S.D. Fla., filed Apr. 27, 2022);

- *JHO Intell. Prop. Holdings, LLC, Elite IP Holdings, LLC, and VitalPharm., Inc., v. PepsiCo, Inc.*, No. 2:22-cv-00353 (D. Ariz., filed Jan. 28, 2022);

- *Vital Pharms., Inc. v. PepsiCo, Inc.*, No. 2:22-cv-00593 (D. Ariz., filed Apr. 11, 2022); and

- *Vital Pharms., Inc. v. PepsiCo, Inc.*, No. 2:22-cv-00591 (D. Ariz., filed Apr. 11, 2022).

### a.     Relevant Facts Concerning the Pepsi Dispute

#### i.     2019–2020:   Formation of National Distribution Relationship with PepsiCo

In late 2019, VPX first entered discussions with PepsiCo concerning a nationwide distribution relationship for Bang Energy products.[136]  VPX had previously relied on a network of independent distributors but sought to accelerate Bang Energy's growth through a large-scale, national distribution partner.[137]

In March 2020, VPX and PepsiCo executed a written distribution agreement (the "Pepsi Distribution Agreement") under which PepsiCo agreed to distribute specified Bang Energy products across designated channels in the United States.[138]  The Pepsi Distribution Agreement included transition requirements, performance obligations, termination provisions, and a mandatory arbitration clause governing disputes arising from the relationship.[139]

### ii. Spring–Fall 2020: Performance Disputes and Deterioration of Relationship

Shortly after the distribution transition began, VPX asserted that PepsiCo failed to meet performance expectations, including alleged understocking, reduced shelf space, out-of-stock conditions, and preferential promotion of competing PepsiCo-owned energy drink brands.[140] VPX contended that these issues resulted in declining sales and an erosion of Bang Energy's market position.[141]

Throughout 2020, VPX raised concerns regarding PepsiCo's performance and asserted that PepsiCo did not use commercially reasonable efforts to distribute Bang Energy products as contemplated by the agreement.[142]

### iii. October 23, 2020: Termination of PepsiCo Distribution Agreement

On October 23, 2020, VPX formally terminated the Distribution Agreement.[143]   Following termination, disputes arose immediately concerning the effect of termination, including PepsiCo's continued assertions of exclusive distribution rights.[144]

### iv. Late 2020: Competing Arbitration and Federal Court Proceedings Begin

After termination, PepsiCo initiated arbitration proceedings pursuant to the Distribution Agreement's arbitration clause.[145]   PepsiCo sought relief based on its interpretation of the agreement and the consequences of VPX's termination.[146]

Concurrently, on November 25, 2020, VPX filed an action in the Southern District of Florida seeking injunctive relief in aid of arbitration.[147]   VPX alleged that PepsiCo engaged in tortious interference by communicating with retailers and distributors and asserting continued exclusive distribution rights despite termination.  VPX sought preliminary and permanent injunctive relief to prevent PepsiCo from interfering with VPX's efforts to transition to successor distributors.[148]

### v. December 2020: Interim Arbitration Award and Confirmation Proceedings

In December 2020, an arbitrator issued an interim arbitration award in favor of PepsiCo.[149] PepsiCo promptly filed an expedited motion in the Southern District of Florida to confirm the interim arbitration award.[150]

The district court granted PepsiCo's motion and confirmed the interim arbitration award on December 21, 2020.[151]  The court declined to grant VPX's requested injunctive relief and deferred to the arbitration process for resolution of the parties' substantive contractual disputes.[152]

51

### vi. 2021: Motion Practice, Dismissal, and Fee Litigation with PepsiCo

Following confirmation of the interim arbitration award, PepsiCo moved to dismiss VPX's federal court claims.[153] In March 2021, the court granted the motion to dismiss in part, narrowing the federal court proceedings substantially.[154]s

PepsiCo then sought recovery of attorneys' fees incurred in connection with confirmation of the arbitration award.[155] After extensive briefing, a magistrate judge recommended that PepsiCo be awarded a substantial portion of its requested fees.[156] In August 2021, the district court adopted the recommendation in part and awarded PepsiCo attorneys' fees exceeding $100,000.[157] VPX appealed the fee award to the Eleventh Circuit Court of Appeals.[158]

### vii. 2022: Parallel Arizona Litigation and Arbitration Administration Disputes

In 2022, additional actions were filed in the District of Arizona involving VPX, affiliated JHO entities, and PepsiCo.[159] These included complaints and petitions relating to arbitration administration, appointment of an arbitrator, and disputes over the scope and continuation of arbitration proceedings arising from the terminated Distribution Agreement.[160]

These Arizona filings reflected ongoing procedural conflict over arbitration mechanics and enforcement, rather than resolution of the underlying commercial dispute.

### viii. July 2022: Appellate Resolution and Final Dismissal

In July 2022, the Eleventh Circuit affirmed the district court's authority to award attorneys' fees to PepsiCo in connection with confirmation of the interim arbitration award, while vacating and remanding the amount determination for further proceedings.[161] Ultimately, the parties entered into a Confidential Settlement Agreement, effective June 21, 2022, establishing a structured Transition Period through December 31, 2022.[162]

Shortly thereafter, the parties stipulated to dismissal of the Southern District of Florida action with prejudice.[163] The district court entered a final order dismissing the case in June 2022, effectively closing the federal court litigation related to the PepsiCo–VPX distribution dispute.[164]

### b. Nature of the Exposure

Under the Distribution Agreement, PepsiCo functioned as VPX's national distribution infrastructure. The emergency arbitrator granted interim relief restricting VPX from bypassing PepsiCo's exclusive distribution rights, transitioning customers or territories, and making public statements inconsistent with PepsiCo's continuing rights. From a governance perspective, emergency relief of this nature is a material adverse development. It reflects a preliminary determination that the claimant has demonstrated a likelihood of success and results in enforceable operational constraints.

The dispute therefore implicated not only damages exposure measured in tens of millions of dollars, but also structural access to national distribution capacity. Loss or impairment of that

52

relationship would have required VPX to replicate nationwide infrastructure under compressed timelines and potentially inferior commercial terms. The risk was operational and enterprise-wide, not merely monetary.

Ultimately, the parties entered into a Confidential Settlement Agreement, effective June 21, 2022, establishing a structured Transition Period through December 31, 2022.

The settlement converted open-ended damages exposure into defined commercial obligations, including guaranteed minimum margins per case, minimum purchase commitments, defined payment mechanics, and secured lien protections within VPX's capital structure.

While the settlement resolved the dispute, it confirms the magnitude of the exposure that was objectively apparent during the Relevant Time Period. These documents are not cited as hindsight validation, but as evidence of the seriousness of the risk confronting VPX at the time.

> **c. The PepsiCo distribution dispute presented enterprise-material risk based on the remedies sought and the scale of potential economic disruption.**

In my experience, distributor disputes are contract-driven and document-based. Liability typically turns on written termination provisions, exclusivity clauses, notice compliance, and course-of-performance evidence. These disputes are fact-intensive but doctrinally straightforward.

Here, VPX unilaterally terminated a national exclusive distributor. From a governance standpoint, termination of a major infrastructure-level agreement without an airtight contractual basis carries a high probability of counterclaims and enforcement proceedings, particularly when the counterparty is a sophisticated, well-capitalized multi-national enterprise.

The PepsiCo distribution platform represented a material component of VPX's revenue-generating infrastructure. Disruption of that channel directly implicated liquidity, operational continuity, and enterprise value. Unlike isolated tort claims, this exposure threatened the mechanism through which VPX accessed the market.

> **d. Probability of Adverse Contractual Findings**

In my opinion, during the Relevant Time Period, VPX faced approximately an eighty percent (80%) probability of adverse liability exposure arising from the PepsiCo distribution matters.

This assessment reflects:

- the predominance of written contractual terms;
- the absence of unsettled legal doctrine;
- the presence of interim arbitral relief;
- the scale of foreseeable lost-distribution damages; and
- the strong economic incentive for a sophisticated counterparty to enforce its rights.

This probability is modestly lower than the intellectual property disputes only because contract cases often involve granular factual disputes regarding notice, cure, waiver, and course of dealing. Contract disputes frequently turn on performance evidence and credibility determinations developed in discovery. By contrast, intellectual property disputes often present more structured statutory frameworks and established doctrinal tests.

Accordingly, while heavily document-driven and materially predictable, contract disputes warrant a slightly wider band of outcome variability than intellectual property claims.

### e.    Probability of Enterprise-Material Consequences

If adverse findings occurred, the probability of enterprise-material consequences was high.

The dispute involved core distribution infrastructure rather than ancillary services. Remedies were not limited to damages. They included continued performance obligations, structural restrictions, fee-shifting exposure, and the risk of impaired market access. The most serious risk was structural: destabilization of the distribution platform itself.

Loss or impairment of the PepsiCo relationship would have required VPX to secure alternative national distribution under compressed timelines, likely on economically inferior terms. Replication at equivalent scale and efficiency was uncertain. The exposure therefore extended beyond damages to liquidity pressure, operational disruption, and long-term enterprise-value impairment.

### f.    Governance-Relevant Risk Indicators

Several indicators present during the Relevant Time Period made this exposure governance critical:

- the risk of substantial monetary damages;
- the relationship involved core distribution infrastructure rather than ancillary services;
- alleged breaches implicated ongoing operational coordination and strategic alignment;
- the counterparty possessed significant leverage arising from its role in VPX's supply and distribution chain;
- remedies included termination and structural relief in addition to damages; and
- the dispute overlapped temporally with other litigation, supply-chain disputes, and liquidity pressures.

These indicators materially increased the probability that adverse outcomes would have enterprise-wide consequences.

g.      **Governance Assessment**

From a governance perspective, the PepsiCo dispute represented a distinct category of enterprise risk.  Unlike disputes resolvable through monetary payment alone, this exposure implicated the infrastructure through which VPX generated revenue at scale.

Sophisticated governance recognizes material exposure when:

- termination rights are disputed under written agreements;
- a national distribution relationship collapses;
- interim relief constrains operations; and
- counterclaims are foreseeable and substantial.

During the Relevant Time Period, a reasonably prudent fiduciary would have recognized the PepsiCo distribution dispute as a material contingent liability risk affecting liquidity, operational continuity, and enterprise value.  When viewed alongside concurrent trademark, false advertising, and manufacturing disputes, the termination materially increased VPX's cumulative enterprise risk profile.

Accordingly, the PepsiCo exposure warranted heightened governance attention and conservative risk management during the Relevant Time Period.

## X.      DISTRIBUTION CONTRACT DISPUTE RISK ASSESSMENT

Starting in February 2020, in addition to the dispute with PepsiCo, VPX also faced material litigation and arbitration exposure arising from its failed contract manufacturing and distribution relationships.  These disputes were brought by multiple third-party beverage manufacturers and counterparties and arose from long-term agreements governing production capacity, minimum purchase obligations, and reliance investments necessary to supply Bang Energy at national scale.

These disputes include:

- *Se. Cold Fill, LLC v. Vital Pharms., Inc.*, No. 4:20-cv-00776 (D.S.C. Mar. 24, 2020);

- *Am. Bottling Co. v. Vital Pharms., Inc.*, No. 1:20-cv-01268 (D. Del. Nov. 20, 2020); and

- *Dairy Farmers of Am., Inc. v. Vital Pharms., Inc.*, No. 4:20-cv-00760 (W.D. Miss. Sept. 23, 2020).

a.      **Relevant Facts Concerning the Distribution Contracts**

In early 2019, VPX entered into long-term contract manufacturing arrangements with multiple third-party producers to support rapidly expanding national demand for Bang Energy products, including agreements with Southeast Cold Fill and Dairy Farmers of America.[165]  Between January and March 2019, these manufacturing partners allocated dedicated production capacity and, in

55

some cases, made substantial capital investments in reliance on VPX's volume forecasts and minimum purchase commitments.[166]  For example, in mid-2019, Southeast Cold Fill installed a dedicated can-packer and additional equipment to meet VPX's production specifications, incurring reliance expenditures exceeding $3 million.[167]

By mid-to-late 2019, VPX allegedly began reducing purchase volumes materially below contracted minimums, resulting in unused reserved capacity and escalating disputes with manufacturing partners.[168]  By late 2019 to early 2020, manufacturing disputes escalated.[169]  By September through November 2019, Southeast Cold Fill sent written notices to VPX regarding purchase shortfalls and lack of forecasting communication.  VPX cited operational and supply-chain constraints, but did not restore volumes.[170]  In November 2019, VPX purported to terminate the Southeast Cold Fill agreement, citing alleged specification noncompliance, after that manufacturer had already made substantial reliance investments.[171]  In February 2020, litigation commenced in the District of South Carolina as Southeast Cold Fill filed suit alleging breach of contract, wrongful termination, and recovery of reliance and liquidated damages.[172]  Separately, Dairy Farmers of America initiated litigation in the Western District of Missouri seeking approximately $14 million in unpaid minimum volume or capacity-reservation fees relating to 2019 production commitments.[173]  Also in 2020, American Bottling Company filed suit in the District of Delaware alleging breach of minimum purchase and capacity reservation obligations under a manufacturing agreement supporting Bang Energy production.[174]

### b.    Nature of the Exposure

Although asserted by different counterparties and litigated in different forums, the disputes shared common structural features.  They involved allegations that VPX committed to specified production volumes or capacity reservations, induced manufacturers to allocate labor, equipment, and capital in reliance on those commitments, and then materially reduced orders or sought to exit contractual relationships in their entirety before satisfying minimum obligations.

These disputes did not concern isolated shipment failures or short-term commercial disagreements. They concerned sustained performance obligations embedded in VPX's core supply chain model during a period of rapid growth and national distribution.

Each of these factual indicators was known or reasonably knowable to Mr. Owoc, and therefore to VPX, during the Relevant Time Period and materially informed the governance-level probability assessments expressed herein.

### c.    The distributor and contract manufacturing disputes involved substantial aggregated damages claims tied to core supply chain commitments.

My opinions concerning the additional distributor and contract manufacturing disputes are based on the specific monetary damages alleged, their aggregation across multiple counterparties, and the operational consequences of adverse outcomes.  The record reflects that manufacturing partners asserted claims for unpaid minimum volume or capacity-reservation fees, reliance damages associated with unrecovered capital investments, liquidated damages, lost profits, and attorneys' fees.  Individual claims included demands exceeding $10 million, $14 million, and

56

multiple millions of dollars per counterparty, with total asserted exposure across manufacturing disputes reaching tens of millions of dollars.

These damages demands were not speculative. They were grounded in written agreements containing defined minimums, capacity commitments, and reliance-based compensation structures. Multiple counterparties asserted similar claims based on overlapping conduct, including sustained under-ordering and early termination after manufacturers had invested in dedicated equipment and facilities.

From a governance standpoint, the aggregation of these damages claims materially increased the probability that at least one dispute would result in a significant monetary judgment. In addition, adverse outcomes carried foreseeable indirect costs, including higher replacement manufacturing expenses, supply disruption, and loss of favorable pricing terms—none of which would be captured fully by damages awards alone.

Accordingly, these disputes presented a non-remote risk of material cash outflows and operational impairment that a prudent board would recognize as enterprise-material during the Relevant Time Period.

### d. Probability of Adverse Liability Determinations

As of the Relevant Time Period, the probability of adverse liability determinations in the manufacturing and distribution disputes was meaningful and non-remote.

The claims were grounded in written agreements with defined minimum volume, capacity reservation, and termination provisions. Alleged breaches involved ongoing under-ordering, disputed terminations, and failure to satisfy contractual minimums rather than ambiguous or discretionary performance standards.

However, again, unlike the intellectual property disputes, which largely turned on discrete legal standards and a fixed documentary record, the contract disputes depended to a greater degree on potentially disputed facts concerning performance, interpretation, and the parties' respective conduct over time. As a result, even where the governing agreements were not ambiguous, the ultimate litigation risk was more sensitive to evidentiary development and credibility determinations. For that reason, in reassessing these disputes at later stages, I continued to view the range of potential outcomes in the contract matters as modestly broader than in intellectual property matters, reflecting factual variability rather than a change in the underlying legal merits.

From a governance perspective, several factors elevated liability risk:

- the agreements allocated production capacity and risk expressly, limiting interpretive uncertainty;
- multiple counterparties asserted similar theories of breach based on the same operational decisions;
- the alleged nonperformance was sustained rather than episodic; and

- liability exposure turned on documentary evidence of forecasts, orders, and contractual commitments.

These features placed the disputes beyond the category of routine commercial friction and into the realm of foreseeable contractual liability exposure.

### e.    Probability of Enterprise-Material Remedies

If liability were found, the probability of enterprise-material remedies was high.

The manufacturing plaintiffs sought recovery of unpaid minimum volume or capacity-reservation fees, reliance damages tied to unrecovered capital investments, and, in some instances, liquidated damages or lost profits.  These claims were cumulative in nature and scaled with the duration and magnitude of under-ordering rather than turning on a single breach event.

Because the agreements governed production on a national scale, the asserted damages were not trivial relative to VPX's operating costs or liquidity during the Relevant Time Period.  In addition, adverse outcomes posed the risk of operational disruption, including loss of manufacturing capacity, strained supplier relationships, and the need to secure replacement production under compressed timelines and potentially less favorable economic terms.

From a governance standpoint, the risk of operational constraint and supply chain instability was as significant as the risk of monetary liability.

### f.    Governance-Relevant Risk Indicators

Several indicators present during the Relevant Time Period made these disputes governance-relevant and non-remote:

- the alleged breaches involved core supply-chain commitments rather than ancillary services;
- multiple manufacturers asserted similar claims, indicating systemic exposure rather than counterparty-specific issues;
- the agreements were long-term and capital-intensive, amplifying reliance damages;
- the disputes overlapped temporally with other litigation and liquidity pressures; and
- the challenged conduct was tied directly to VPX's growth strategy and forecasting practices.

These indicators collectively increased the probability that one or more disputes would result in material financial liability or operational disruption.

### g.    Governance Assessment

From a corporate governance perspective, the contract manufacturing and distribution disputes reflected structural exposure arising from VPX's reliance on external production partners to support national distribution and rapid growth.  Once sustained order reductions occurred against

58

Docusign Envelope ID: CA8ED9B9-DE24-4C87-088E-98FB1D5ED9CA

reserved capacity and minimum commitments, the resulting exposure to claims for contract damages and reliance losses was reasonably foreseeable.

Accordingly, during the Relevant Time Period, these matters should have been evaluated collectively as a potentially material contingent liability arising from embedded supply chain obligations, rather than as isolated instances of routine commercial disagreement.  When viewed alongside trademark, false advertising, and copyright exposure, the manufacturing and distribution disputes materially compounded VPX's overall litigation and operational risk profile.

## XI.    GOVERNANCE CONCLUSIONS

Viewed individually, each dispute confronting VPX during the Relevant Time Period reflected a high-risk litigation and contractual exposure profile arising from conduct embedded in the company's core business model.    The trademark and false advertising claims, copyright infringement actions, contract manufacturing disputes, and strategic distribution exposure did not arise in isolation.  They stemmed from overlapping branding, marketing, formulation, forecasting, and distribution practices that were central to VPX's growth strategy and revenue generation.

Across these categories, the probability of adverse liability determinations was substantial based on facts known or reasonably knowable to Mr. Owoc, and therefore to VPX, at the time.  The legal theories asserted were mature and well established, and the disputes were grounded in objective, document-driven evidence rather than novel doctrine or speculative claims.  In each category, if liability were found, the likelihood of enterprise-material consequences was high given the scope of potential monetary exposure, the prevalence of forward-looking injunctive or compliance relief, and the risk of operational disruption affecting core revenue streams.

Accordingly, at least as of September 4, 2018, when the False Advertising Litigation was initiated, and throughout the Relevant Time Period, VPX faced a risk posture in which the probability of at least one enterprise-material adverse outcome impairing liquidity, operations, or enterprise value materially exceeded the threshold at which prudent governance requires recognition and risk mitigation.  This conclusion does not depend on hindsight, jury behavior, or the ultimate resolution of any particular proceeding.  It reflects how a reasonably prudent board or senior management team, informed by contemporaneous indicators, would assess the likelihood and magnitude of downside exposure arising from embedded business practices.

Subsequent arbitration awards, court rulings, settlements, and injunctive relief did not create these risks retroactively.  They confirm that the exposure present during the Relevant Time Period was real, durable, and capable of producing enterprise-material consequences.  My opinions address how these risks should have been recognized and evaluated *ex ante*, consistent with established principles of corporate governance and risk oversight.  I reserve the right to supplement or amend these opinions should additional materials become available.

60

## XII.  HIGH-LEVEL VALUATION ASSESSMENT OF VPX'S NON-PATENT INTELLECTUAL PROPERTY PORTFOLIO

### a.  Purpose of the Valuation Analysis

In conducting the valuation analysis, I reviewed information reflected in Section XV (Materials Considered), including but not limited to certain schedules filed in the bankruptcy matter: (i) Schedule AB 60 of Trademarks, and (ii) Schedule AB 61 of Internet Domain Names, (the "Schedules"), as well as VPX's Consolidated Financial Statements dated December 31, 2018; 2019; 2020; and 2021 (collectively, "VPX's Consolidated Financial Statements").[175]

VPX's Consolidated Financial Statements indicate that the intangible assets' valuation primarily reflected administrative costs associated with trademark registration and maintenance.[176] Because such accounting entries typically record filing and prosecution costs rather than fair market value, the amounts reflected in the Schedules do not necessarily represent the economic value of the underlying brand assets.

Accordingly, the purpose of this section is to provide a high-level economic assessment of VPX's Intellectual Property Portfolio based on available information and accepted principles used in the valuation of intangible assets.

For purposes of this analysis, I refer collectively to VPX's trademarks, customer data, internet domain names, and social-media-driven marketing assets as the VPX's **"Intellectual Property Portfolio."** These assets collectively formed part of VPX's broader brand ecosystem and supported the commercial identity associated with the BANG Brand. I will separately address and discuss VPX's U.S. patents and patent applications as VPX's "Patent Portfolio."

Intellectual property law across jurisdictions can be complex and evolving. Certain items identified in VPX's Schedules, such as foreign trademark applications, internet domain names, or customer lists, may not all qualify as "intellectual property" in the strict legal sense under every applicable legal regime. For purposes of this analysis, however, I consider these assets collectively because they functioned together as components of VPX's broader brand and marketing infrastructure.

In economic terms, these assets formed part of an integrated portfolio supporting VPX's product marketing, distribution relationships, and consumer recognition in the marketplace. Accordingly, although individual components of the portfolio may differ in their legal status or transferability, they are analyzed collectively here as elements of VPX's Intellectual Property Portfolio.

The valuation analysis in this section considers the price that a hypothetical willing buyer would have paid for VPX's Intellectual Property Portfolio in an arm's-length transaction during the Relevant Time Period, as an estimate of fair market value. Consistent with standard valuation principles, this analysis assumes a hypothetical market participant capable of exploiting the assets and evaluates the economic potential of the portfolio while incorporating the legal, reputational, and commercial risks affecting the assets at that time. The legal, reputational, and commercial

61

risks facing VPX, due to the pending litigations constitutes a "distressed" scenario that would impair the value and marketability of VPX's Intellectual Property Portfolio.

Because the purpose of this report is to provide a high-level economic assessment rather than a full financial valuation model, the analysis presented here does not attempt to construct a detailed discounted cash flow model or perform a comprehensive royalty-rate analysis. Instead, the analysis applies accepted valuation principles and available economic information to estimate a reasonable range of potential value for the portfolio under the circumstances present during the Relevant Time Period.

### b.    Valuation Framework for Distressed Intellectual Property Assets

In assessing the value of VPX's Intellectual Property Portfolio, I considered generally accepted approaches used in the valuation of intangible assets. These approaches commonly include the income approach, the market approach, and the cost approach.

Given the limited availability of reliable forward-looking financial projections and the distressed circumstances surrounding VPX at the relevant time, a traditional income approach, such as a royalty-relief model or discounted cash flow analysis, could not be reliably applied.

Similarly, the historical accounting values reflected in VPX's financial statements represent administrative costs associated with trademark registration and maintenance rather than market value, making a cost-based approach unsuitable as a measure of economic value.

Accordingly, my analysis primarily relies on a **market-informed benchmark approach,** examining observable transactions and outcomes involving distressed beverage brands and similar consumer product intellectual property portfolios.

This type of benchmark analysis is commonly used where complete financial information is unavailable but sufficient information exists to assess the relative economic value of comparable assets.

### c.    Benchmark Evidence from Distressed Beverage Brand Transactions

Consumer product brands, including beverage brands, often derive most of their economic value from brand recognition, trademark rights, and associated domain names. When companies in the beverage industry experience financial distress or bankruptcy, transactions involving brand assets frequently occur at substantial discounts relative to peak enterprise valuations.

For example, distressed consumer brands with previously significant market penetration have often sold for relatively modest sums when separated from their operating infrastructure, distribution networks, and marketing apparatus. In such situations, purchasers typically acquire only the residual brand equity reflected in trademark rights, domain names, and associated goodwill.

Based on my review of comparable distressed brand transactions and the scope of VPX's Intellectual Property Portfolio, the available evidence suggests that the residual market value of VPX's intellectual property assets would likely fall within a **low-to-mid single-digit million-dollar range.**

### d.     Summary of Valuation Opinion

It is my opinion, based on the materials reviewed, the valuation principles described in this report, and the economic characteristics of VPX's brand assets during the Relevant Time Period, that VPX's Intellectual Property Portfolio retained measurable but significantly impaired economic value due to the legal, reputational, and financial risks facing VPX due to the then-pending litigations. The BANG Brand maintained substantial consumer recognition during the Relevant Time Period.

In forming this opinion, I considered the historical commercial scale of the BANG Brand, the role of VPX's trademarks and related brand assets in supporting that commercial activity, and the legal, reputational, and financial risks affecting the assets during the relevant period.

Applying a risk-adjusted valuation framework consistent with commonly accepted approaches used in the valuation of intellectual property assets, and considering the distressed circumstances surrounding VPX's business at the time; specifically, the material-enterprise risks facing VPX due to the pending litigations, it is my opinion that a hypothetical willing buyer in an arm's-length transaction would likely have valued VPX's Intellectual Property Portfolio in a range of approximately **$2.5 million to $3.5 million**.

This range reflects the residual economic value that a hypothetical purchaser might attribute to the portfolio in a distressed or liquidation context, where the brand assets would likely be separated from the operating business and its prior distribution network.

Assets such as domain names and secondary marks would likely contribute only modest incremental value, while the primary brand trademarks would account for the majority of the portfolio's estimated value.

*See* Table 1 below:

| Asset Category | Estimated Value | Basis for Opinion |
|---|---|---|
| International BANG Trademark Portfolio | $2,500,000 – $3,500,000 | Based on a risk-adjusted market approach incorporating distressed brand transaction benchmarks, residual consumer recognition of the BANG Brand in international markets, and potential licensing or relaunch opportunities associated with existing registrations. |
| Domain Name Portfolio[177] | Included within above valuation range | Domain names derive most of their economic value from association with the underlying trademarks and brand recognition and therefore contribute to the overall trademark portfolio value rather than possessing significant standalone value. |
| Remaining Intellectual Property Assets | *De minimis* | Remaining assets lack independent commercial viability following the cessation of brand operations and the loss of VPX's U.S. trademark rights and distribution infrastructure. |

*See* also Table 2 below:

**Estimated Value of VPX's Intellectual Property Portfolio**

$3.5M ⊣ ■■■■■■■■■■■■■■■■■■

$3.0M ⊣ ■■■■■■■■■■■■■■■

$2.5M ⊣ ■■■■■■■■■■■■■

$0 ⊣ ■ Other IP (*de minimis*)

64

*See also* Table 3 below:



**Illustrative Valuation Waterfall**

Historical Brand Revenue Scale
(Consumer recognition / goodwill)

Less: Litigation Risk
(BANG trademark disputes,
Super Creatine litigation)

Less: Financial Distress
(Bankruptcy environment,
or other operational disruption)

Less: Brand Reputational Risk
(Market uncertainty regarding
future commercialization)

------------------------------------------
Estimated Fair Market Value
$2.5M – $3.5M
------------------------------------------

Each of these factors materially reduces the value that a hypothetical buyer would attribute to the brand portfolio relative to its historical operating value.

### e.      Composition of the Intellectual Property Portfolio

VPX's Intellectual Property Portfolio consisted primarily of several categories of assets that together supported the company's branding, marketing, and commercial activities. These assets included trademarks, customer data, internet domain names, and social-media-driven marketing assets.

### i.      International Trademark Portfolio

VPX owned numerous trademarks associated with the BANG brand and related product lines. These trademarks functioned as the primary source identifiers for VPX's energy drink and nutritional supplement products and represented the core branding assets of the business.

Specifically, the trademark portfolio included registrations and applications for a variety of BANG-related marks such as "BANG," "BANG BOX," "BANG ENERGY," and "BANG

65

REVOLUTION," as well as other marks including "FUEL YOUR DESTINY," "MELTDOWN," "POTENT BRAIN AND BODY FUEL," "REDLINE," "SHOTGUN," "SOUR HEADS," "SUPER CREATINE," and "VPX."[178]

These marks were primarily associated with products in **International Class 5**,[179] which includes dietary supplements and nutritional products, and **International Class 32**,[180] which includes energy drinks, sports drinks, and other non-alcoholic beverages.

At various points in time, these marks were registered or pending in the United States and in foreign jurisdictions, including registrations pursued through international filing mechanisms such as the **Madrid Protocol.**[181]

*See* Table 4 below:

| Category | Core Marks Included | Approx. Portfolio Scope | Example Entries |
|---|---|---|---|
| U.S. Trademark Registrations | BANG, BANG ANTI-DIET, BANG BOX, BANG REVOLUTION, BANGSTER BERRY, STRAIGHT 8, REDLINE, MELTDOWN | ~20+ registrations | BANG Reg. No. 5,884,629 (2019); BANG REVOLUTION Reg. Nos. 5,921,375 and 6,211,414 |
| U.S. Trademark Applications | BANG BABE, BANG BASH, BANG BLADES, BANG GAMING, BANG GAMES, BANG ULTRAVERSE, STOKED ENERGY, STONED | ~30+ applications | BANG BLADES App. 97/107,194 (later abandoned); BANG BABE App. 88/457,164 (later abandoned) |
| Foreign Trademark Registrations | BANG, BANG ENERGY, BANG REVOLUTION, REDLINE, MELTDOWN, STOKED | 100+ registrations globally | BANG – EUIPO Reg. 16902157; BANG – Mexico Reg. 1154995; BANG – Australia Reg. 1445561 |
| Foreign Trademark Applications | BANG REVOLUTION, MELTDOWN, STOKED, etc. | dozens of filings | BANG REVOLUTION filings across Latin America and Europe |

Taken together, these trademarks represented the principal branding assets associated with VPX's consumer products.

66

### ii.    Customer Lists and Consumer Data

VPX also maintained customer lists and related consumer information reflecting relationships with retailers, distributors, and, in certain circumstances, direct consumers.

Customer lists can possess economic value when they provide actionable information regarding purchasing relationships, distribution channels, and patterns of consumer demand.  In consumer products businesses, such information may facilitate marketing, distribution planning, and product placement strategies.

However, the economic value of customer lists often depends on the continued operation of the business and the ability to maintain existing commercial relationships.

### iii.    Internet Domain Names

The intellectual property portfolio also includes approximately eighty Internet domain names associated with the BANG brand family, legacy beverage brands such as REDLINE and MELTDOWN, corporate VPX domains, and numerous marketing, promotional, and defensive registrations.  These domains function primarily as marketing assets, brand protection tools, and product-specific websites rather than independent revenue-generating digital properties.

*See* Table 5 below:

| Domain Type | Approximate Count |
|---|---|
| Core BANG brand domains | ~10 |
| Product brand domains | ~20 |
| Promotional / campaign domains | ~15 |
| Corporate domains | ~10 |
| Defensive / strategic domains | ~15 |
| Miscellaneous / experimental domains | ~15 |
| **Total domain portfolio** | **~80 domains** |

VPX's domain name portfolio likely possesses independent but relatively limited economic value. Domain names associated with consumer brands frequently sell for amounts ranging from several thousand to several hundred thousand dollars depending on brand recognition and market demand.[182]  Domain names associated with well-known consumer brands frequently retain modest secondary market value due to residual traffic, brand recognition, and potential use by successor brand owners.

Based on the available information, the domain name portfolio would likely contribute only a small portion of the overall estimated valuation range.

67

####    iv.    Social Media and Influencer Marketing Assets

VPX also invested heavily in social-media-based marketing and influencer promotion. This strategy relied on digital marketing campaigns and the use of online personalities to promote brand visibility and consumer engagement across social media platforms.[183]   According to VPX's Consolidated Financial Statements, they invested amounts from $10 million to over $40 million per year in such marketing efforts.[184]

Such marketing networks may contribute to brand awareness and product promotion.  However, the economic value of influencer-based marketing assets generally depends on the continued operation of the underlying business and the ongoing participation of individual promoters.  The transferability of such value independent of the broader business operations is typically extremely limited or *de minimis.*

####    f.    Accounting Treatment of the Intellectual Property Portfolio

VPX's Consolidated Financial Statements reflect that VPX recorded the value of the trademark portfolio based solely on historical registration costs and related administrative expenses.  For example, Notes for Intangible Assets for Fiscal Year ending in 2018 in VPX's Consolidated Financial Statements listed **$372,710** in trademark and patent-related costs[185] and for 2019-2020, VPX noted **$648,957** in such costs.[186]  These expenses were amortized accordingly.

Accounting standards generally require internally developed trademarks and similar intangible assets to be recorded at cost rather than at fair market value.[187]  As a result, the accounting value of trademarks frequently differs substantially from their potential economic significance.  In many circumstances, the costs associated with obtaining and maintaining trademark registrations represent only a small fraction of the economic value that a successful brand may generate in the marketplace.  As a general economics rule in intellectual property valuation, "cost does not equal value."[188]

The cost approach for trademarks provides an indication of value by aggregating all of the costs necessary to re-create the property under study. In the case of trademarks, these would include salary and benefits for marketing and advertising personnel, along with expenses associated with selecting trademarks, creating advertising campaigns, designing packaging, buying media time, and legal registration of the trademark.  The resulting value might be thoroughly determined but, as previously discussed, would fail to take into account important factors such as profits from commercialization, investment risk, and earnings growth potential.[189]

I have not conducted an independent audit of the costs associated with creating, registering or maintaining VPX's Intellectual Property Portfolio and VPX's Consolidated Financial Statements. However, given the number of assets and the international scope of the registrations and applications reflected in the Schedules, an aggregate annual administrative cost estimate in the range of approximately $500,000 is reasonable.

At the same time, the recorded cost accounting value provides only a very limited reference point when assessing the actual economic value of VPX's Intellectual Property Portfolio.    The

administrative costs associated with registering trademarks reflect only the legal process required to secure protection for a mark; they do not measure the commercial value that the mark may acquire through consumer recognition, marketing investment, and marketplace success.

By way of illustration, the cost of registering the trademark portfolio associated with a well-known global brand such as GOOGLE would likely represent only a small fraction of the economic value associated with that brand.   While the administrative costs required to obtain trademark registrations worldwide might be measured in a few million dollars, the economic value of the GOOGLE brand itself has been estimated in the tens of billions of dollars.[190]   The disparity between registration costs and economic value reflects the fact that trademark value arises primarily from consumer recognition and marketplace goodwill rather than from the administrative costs of securing legal protection.

Accordingly, the cost accounting value reflected in VPX' Schedules should be understood primarily as a record of historical registration and protection expenses rather than as an estimate of the fair market value of the underlying brand assets.

### g.   Methodological Framework for Economic Valuation

The analytical framework applied in this section reflects principles commonly used in the economic valuation of intellectual property assets as well as research addressing the valuation of distressed or impaired trademark portfolios.

In valuation analysis, legal determinations regarding trademark impairment or abandonment address the scope of enforceable legal rights, but do not necessarily determine the economic value of the underlying brand asset.[191]   The presence of legal or market impairment affecting a trademark does not automatically eliminate its economic value.   Rather, such impairment affects the probability and magnitude of potential future economic returns, which must be incorporated into the valuation analysis through appropriate risk adjustments.

Accordingly, the valuation analysis applied in this report treats legal impairment as one factor affecting the expected economic performance of the asset rather than as an automatic indication that the asset has no economic value.   Economic valuation requires an assessment of the expected future economic benefits associated with the asset, adjusted for legal risk, market conditions, and the probability that those benefits can actually be realized.

Consistent with this approach, the analytical framework used in this report proceeds through four general steps.   The valuation principles applied in this report are consistent with commonly accepted intellectual property valuation practices and standard economic approaches used by valuation professionals when assessing the value of intangible assets.

### i.      Step One: Determine Legal Status

The first step evaluates the legal environment affecting the intellectual property assets, including potential limitations arising from litigation exposure, enforcement uncertainty, and challenges to trademark validity or scope.  This step establishes the legal conditions under which the intellectual property assets could potentially be exploited by a market participant in an arm's-length transaction.

### ii.     Step Two: Identify Potential Economic Pathways

The second step identifies potential avenues through which the intellectual property assets could generate economic benefit to a third party.  Possible pathways may include continued use of the marks in commerce, acquisition and relaunch of the brand, licensing arrangements, or defensive acquisition by competitors seeking to control or neutralize the marks.  The purpose of this step is to identify plausible economic scenarios in which the intellectual property assets could generate value.[192]

### iii.    Step Three: Apply Accepted Valuation Methodologies

The third step applies recognized intellectual property valuation approaches.  These include income-based valuation methods such as relief-from-royalty analysis, as well as market-based benchmarks that consider transactions involving comparable brand assets.[193]

These methodologies are widely used in the valuation of trademarks and other intangible assets because they estimate the economic contribution of brand recognition to the revenue generated by a business.  Each of these discrete methodologies applies a different approach, but all share one thing in common: "goodwill, going concern and trademarks are valued together as a unit."[194]   In many consumer brand transactions, the economic value of trademarks, goodwill, and going-concern elements are evaluated together because these components collectively contribute to the brand's ability to generate revenue.

While income-based valuation methods such as royalty-relief analysis or discounted cash flow modeling are commonly used to estimate trademark value, those approaches require reliable projections of future revenue or licensing activity.  In the present distressed context, such projections were not available with sufficient reliability.  Accordingly, market-based benchmarks and economically informed valuation ranges provide a more appropriate basis for estimating value.

### iv.     Step Four: Adjust for Legal and Market Risk

The final step incorporates litigation risk, reputational considerations, financial distress, and other market conditions into the valuation assumptions.

These risks may affect valuation by:

- reducing projected revenue associated with the brand
- increasing discount rates applied to future economic benefits

70

- shortening the expected economic life of the asset
- reducing the probability that a potential buyer could successfully relaunch or exploit the brand.

By incorporating these factors into the valuation analysis, this framework allows legal and commercial risks to be reflected in the estimated value of the intellectual property portfolio while recognizing that impaired trademarks may still retain residual economic significance.   The resulting valuation therefore reflects a probability-weighted assessment of potential economic outcomes rather than a binary assumption that the brand either retains full value or no value.

### h.    Application of Framework to VPX

### i.    Step 1:  Economic and Legal Status of VPX's Brand Assets

During the Relevant Time Period, Debtors' products generated substantial revenue under the BANG Brand and related trademarks. Public reporting and litigation records indicate that the business generated **hundreds of millions of dollars in annual sales** during periods of peak commercial activity.[195]

The scale of these revenues reflects the historical commercial significance of VPX's brand assets and the central role that the trademarks played in differentiating VPX's products in the marketplace.  In consumer products industries, trademarks often serve as key drivers of product recognition, brand loyalty, and repeat customer purchasing behavior.

However, during the Relevant Time Period, the economic and branding environment surrounding VPX's brand portfolio changed substantially.  As discussed in Sections IV–XI, VPX faced significant litigation exposure, reputational challenges, and financial distress.   These circumstances materially affected the commercial outlook for the brand portfolio and would likely have influenced the price that a potential purchaser would have been willing to pay for the VPX's intellectual property assets.

In particular, ongoing legal disputes involving the BANG Brand and its primary ingredient "Super Creatine" created uncertainty regarding the future use and enforceability of certain trademarks.  At the same time, VPX's financial difficulties and declining commercial position may have affected market perceptions of the brand and reduced the likelihood that a purchaser could successfully relaunch or reposition the brand in the marketplace.

Further, as discussed *supra* in detail, the BANG Brand was subject to strict limitations based on a coexistence agreement with OBI.

These factors do not necessarily eliminate the economic value of the underlying Intellectual Property Portfolio.  Consumer brands may retain residual goodwill, consumer recognition, and potential economic value even when litigation risk, reputational impairment, or operational disruption substantially affects their commercial prospects.

71

Even where a brand has been seriously impaired by litigation or reputational challenges, residual consumer recognition and historical market presence could allow the marks to retain some degree of economic significance. However, such circumstances would likely lead market participants to apply vast discounts when assessing the potential value of the brand assets.

Accordingly, any valuation of VPX's Intellectual Property Portfolio must account both for the historical commercial scale of the brand and for the significant legal, reputational, and financial risks affecting the brand at the relevant time.

### ii. Steps 2 and 3: Economic Pathways for Valuation of Specific Asset Categories

VPX's Intellectual Property Portfolio consisted of several categories of assets that contributed in varying degrees to the overall economic significance of the brand ecosystem. These assets included the trademark portfolio, customer lists and consumer data, internet domain names, and social media marketing assets. Although these assets were interconnected in practice, their individual economic characteristics differ and therefore warrant separate discussion. Each has separate legal status as well as pathways to revenue.

### 1. Domestic and International Trademark Portfolio

VPX's trademark portfolio represented the most economically significant component of VPX's Intellectual Property Portfolio. Trademarks associated with widely distributed consumer products can acquire economic value through consumer recognition, brand loyalty, and the goodwill generated through sustained marketing and commercial activity. In consumer packaged goods markets in particular, trademarks often function as the primary mechanism through which consumers identify and differentiate products, and they can therefore represent a substantial portion of the overall enterprise value of a branded product line.

VPX's marks, particularly those associated with the BANG Brand, functioned as the primary identifiers of the company's products in the marketplace. Through widespread distribution in retail outlets, online sales channels, and extensive promotional campaigns, these marks became associated with specific products and brand attributes in the minds of consumers. As a result, the trademarks themselves embodied a portion of the goodwill developed through VPX's marketing expenditures, distribution network, and historical sales. In a typical consumer beverage or supplement business, such brand-associated goodwill can represent a significant intangible asset capable of generating value through continued product sales, licensing, or acquisition by a strategic buyer seeking to leverage existing brand recognition.

In assessing the value of VPX's trademark portfolio, a market-based and risk-adjusted approach is appropriate. Valuation authorities recognize that trademarks and consumer brands are frequently valued using the market approach, which relies on pricing evidence from comparable transactions involving similar intangible assets. In consumer packaged goods industries such as beverages and nutritional supplements, where brand equity is a primary driver of product demand, transaction participants often evaluate brands with reference to revenue-based multiples, particularly where

the value of the asset derives from its ability to generate sales rather than from tangible assets or established earnings streams.

Observed revenue multiples in brand and trademark transactions vary significantly depending on factors such as brand recognition, growth prospects, distribution scale, competitive position, and legal or operational risks. Valuation literature further recognizes that lower multiples are typically associated with smaller, distressed, or asset-only transactions, including transactions involving trademark portfolios rather than fully integrated operating businesses.

Consistent with these valuation principles, and considering VPX's risk profile and the asset-only nature of the transaction, I applied a conservative revenue-multiple range of approximately 0.2× to 0.5× of relevant annual revenues in assessing the market value of VPX's trademark portfolio.[196] Public reporting and litigation materials indicate that the BANG product line generated hundreds of millions of dollars in annual revenue during its peak period. Applying distressed revenue multiples to a substantially reduced estimate of sustainable brand revenue yields valuation figures consistent with the range identified in this report. Because VPX were no longer operating at their historical scale during the Relevant Time Period, the analysis assumes a substantially reduced level of sustainable brand revenue reflecting the distressed circumstances surrounding the business.

Public information regarding VPX's historical sales indicates that the BANG product line achieved substantial revenue levels during its peak commercial period. Applying conservative revenue multiples that reflect distressed conditions and legal uncertainty produces a significantly discounted brand valuation relative to what might be expected for a stable consumer brand.

However, by the relevant period, the economic value of these trademarks was likely substantially affected by the legal disputes surrounding the brand as well as VPX's deteriorating financial condition. Litigation exposure, uncertainty regarding VPX's continued right to use or enforce certain marks, and reputational issues affecting the brand would likely have reduced the price that a hypothetical purchaser would have been willing to pay for the trademark portfolio. These factors would have increased the perceived risk associated with acquiring and commercializing the marks, thereby reducing their market value. In distressed intellectual property sales, it is common for such legal encumbrances and operational uncertainty to result in substantial valuation discounts relative to the brand's historical revenue performance.

Taking these factors into account, a hypothetical purchaser evaluating VPX's trademark portfolio would likely have applied a substantial discount to reflect litigation risk, brand uncertainty, and the possibility that additional legal proceedings could impair or restrict use of certain marks. After applying such discounts to the estimated brand value derived from industry transaction benchmarks, the resulting fair market value of VPX's trademark portfolio would reasonably fall within a range of approximately **$2.5 million to, at most, $3.5 million** during the Relevant Time Period.[197] This range reflects both the continued consumer recognition associated with the BANG products and the significant legal and financial risks affecting their future commercial exploitation.

73

### 2.    Customer Lists

VPX maintained customer lists and related consumer information reflecting relationships with distributors, retailers, and, in some instances, direct consumers.  Such information can possess economic value when it reflects established commercial relationships or provides insight into purchasing patterns and distribution channels.  Customer lists may in some circumstances qualify as protectable confidential business information or trade secrets, but their economic value is typically closely dependent on the continued operation of the underlying business.[198]

If the business ceases operations or experiences substantial disruption, the value of the associated customer relationships may decline significantly.[199]  In liquidation scenarios customer list value frequently collapses because distribution relationships are not transferable.

In the context of VPX's financial distress, the standalone value of the customer lists would likely have been *de minimis*.  Without the broader operational infrastructure of the business, including sales personnel, distribution networks, and product availability, the practical ability to monetize these lists independently would be in serious doubt.

### 3.    Domain Names

Domain names can possess economic value when they are associated with recognizable brands or function as entry points directing consumer traffic to commercial websites.  Domains tied to a well-known product line or corporate brand may derive value from their ability to capture consumer search traffic, reinforce brand identity, and redirect users to a company's principal commercial websites or e-commerce platforms.

In appraising VPX's domain name portfolio, it is important to recognize that many of the domains appear to have been registered solely for defensive or promotional purposes (for example, country-code variants, giveaway domains, or marketing campaign domains).  Such domains typically have limited independent resale value outside the context of VPX's broader brand portfolio because their use is constrained by trademark considerations, or their value depends on the continued operation of the associated brand.

By contrast, a smaller subset of domains containing generic or descriptive terms (such as those referencing beverages, supplements, or nutrition products) may have some independent market value because they could potentially be repurposed by third parties.  In secondary domain markets and liquidation contexts, portfolios of this type generally derive most of their value from a limited number of core domains, while the majority of defensive or campaign-specific registrations have minimal standalone value.[200]

Taking these factors into account, and assuming a liquidation or public auction scenario rather than a strategic sale of the entire brand portfolio, the standalone liquidation value of VPX's domain name portfolio is reasonably estimated at approximately $25,000 to $50,000, although in practice most of that value would likely be realized as part of a transaction involving the broader trademark portfolio.

### 4. Social Media and Influencer Marketing Efforts

VPX invested heavily in social media marketing and influencer-based promotional strategies. These marketing efforts relied on digital platforms and individual online personalities to promote brand visibility, awareness, and consumer engagement.[201] Such strategies can contribute to brand awareness, consumer trust, and broader brand equity by leveraging social media relationships and audience engagement.[202]

However, the economic value of influencer networks and social media marketing assets may be difficult to transfer independently of the broader business operations that support them. Many marketing assets are relational and firm-specific, meaning their value depends on ongoing organizational capabilities, continued marketing investment, and active customer relationships.[203]

Influencer relationships, in particular, may depend on personal arrangements with specific individuals and the credibility those individuals maintain with their audiences. The effectiveness of social media campaigns may likewise depend on continued marketing investment, operational continuity, and the availability of products or services being promoted.[204] As a result, the standalone value of such marketing assets in a distressed or liquidation context may be limited.[205]

Taken together, these considerations suggest that VPX's trademark portfolio likely represented the primary economic component of their intellectual property assets, and the remaining categories of marketing-related assets may have contributed only modestly to the overall value of the portfolio.

### iii. Step 4: Adjusting for Risk, Benchmark Transactions Involving Distressed Beverage Brands

Distressed brands are heavily discounted in the marketplace. As an additional reasonableness check, I considered whether the valuation range identified in this report is directionally consistent with publicly reported transactions involving distressed or impaired beverage and consumer product brands. Case-study comparisons are not used here as a primary valuation methodology because directly comparable transactions involving distressed beverage intellectual property portfolios are limited and often involve different combinations of trademarks, inventory, manufacturing assets, distribution relationships, and other operating assets. Nevertheless, such transactions can provide useful contextual evidence regarding how market participants value impaired consumer brands.

Publicly reported distress transactions in the beverage industry demonstrate that brands that once supported substantial commercial activity may still retain residual economic value even after the operating business has experienced significant financial distress, operational disruption, or reputational damage. In bankruptcy and restructuring contexts, however, the prices paid for such brand assets frequently reflect substantial discounts relative to the scale of the brand's historical revenue during periods of peak commercial performance.

These discounts arise because a purchaser of distressed brand assets often must rebuild key elements of the commercial infrastructure necessary to exploit the brand successfully, including distribution relationships, retailer placement, marketing investment, and operational capabilities.

75

As a result, distressed transactions typically reflect the value of the remaining brand goodwill and trademark rights together with the risks and costs associated with relaunching or repositioning the brand in the marketplace.

The following transactions are not presented as direct comparables to VPX's intellectual property portfolio.  Rather, they provide illustrative benchmarks demonstrating that consumer brands frequently retain measurable economic value even after severe financial distress or operational collapse.

*See* Table 6 below:

| Brand / Company | Year | Distress Context | Transaction Outcome | Reported Consideration | Relevance |
|---|---|---|---|---|---|
| **Bang Energy (Vital Pharmaceuticals)**[206] | 2023 | Chapter 11 following litigation exposure and financial distress | Sale of substantially all assets to Monster Beverage Corporation | ~$362 million | Upper-bound reference transaction involving strategic buyer and all operating assets |
| **Typhoo Tea**[207] | 2024 | Administration following declining sales and financial losses | Sale of brand and related assets to Supreme PLC | ~£10.2 million | Example of a long-established beverage brand sold in insolvency at an impaired value |
| **Green Flash / Alpine Beer Brands**[208] | 2018–2022 | Financial distress and lender foreclosure followed by resale of brand assets | Green Flash sold to WC IPA LLC; brands later sold to Tilray | ~$5.1 million (2022 transaction) | Illustrates depressed pricing for distressed craft beverage brand assets |
| **Thrifty Ice Cream (Rite Aid)**[209] | 2025 | Chapter 11 restructuring and auction process | Sale of brand assets and production facilities to Hilrod Holdings | ~$19.2 million | Example of a distressed consumer brand sale including intellectual property |
| **Strike Brewing Company**[210] | 2023 | Chapter 7 liquidation after cessation of operations | Liquidation of brewery assets including brand-related assets | Undisclosed | Illustrates that distressed beverage brands may end in liquidation rather than command substantial going-concern value |

76

Similar valuation volatility has occurred in the beverage industry when companies experience financial distress or distribution failures. For example, New Age Beverages, which owned several branded beverage lines including Marley Beverage and Bucha Live Kombucha, underwent significant financial distress and ultimately sold substantially all of its assets following restructuring efforts.[211]

Even recognizable beverage brands with established retail distribution may experience significant valuation declines when operating performance deteriorates. Reed's, Inc., a producer of branded craft sodas and ginger beer beverages, has reported recurring financial distress and restructuring efforts despite maintaining established consumer brand recognition.[212]

Beverage brands may also experience rapid valuation declines when growth expectations fail to materialize. For example, Jones Soda, once a widely recognized specialty beverage brand, experienced a substantial decline in market valuation after early growth expectations failed to materialize.[213]

Although these transactions are not directly comparable to VPX's Intellectual Property Portfolio, they provide directional evidence regarding the economic behavior of distressed consumer beverage brands.

In general, many distressed consumer brands frequently retain residual value even after the collapse of the underlying operating business. For example, during the 2013 Hostess Brands bankruptcy (the first of two bankruptcy filings), the Twinkies and related brand portfolio were sold for approximately $410 million despite the shutdown of the company's manufacturing operations.[214]

Similar outcomes have occurred across consumer industries. For example, the POLAROID brand and related intellectual property were sold out of bankruptcy proceedings in 2009 for approximately $87 million, demonstrating that brand recognition alone can retain measurable economic value even when the original operating company has failed.[215]

Beverage brands can also experience dramatic valuation declines when market conditions or brand positioning deteriorate. The SNAPPLE brand, for example, was acquired by Quaker Oats for approximately $1.7 billion in 1994, but was sold only three years later for roughly $300 million after the brand's market position weakened.[216]

Several observations emerge from all these transactions.

First, consumer-facing beverage brands may retain measurable residual value even after the underlying operating business has experienced severe financial distress or ceased operations entirely. This residual value often arises from the continued consumer recognition of the brand and the possibility that a third party may relaunch or reposition the product in the marketplace.

Second, distressed transactions frequently occur at prices that represent a substantial discount relative to the scale of the brand during healthier periods of commercial performance. This outcome is economically intuitive. A purchaser of distressed brand assets typically must recreate

or repair the surrounding commercial ecosystem required to monetize the brand, including distribution channels, marketing support, and retailer relationships.

Third, where the brand is associated with litigation exposure, reputational impairment, or operational disruption, as was the case for VPX during the Relevant Time Period, the market may apply even deeper discounts to reflect the uncertainty associated with the brand's future commercial prospects.

Taken together, these reference transactions are broadly consistent with the conservative valuation framework applied in this report. They illustrate that distressed beverage brands may retain residual economic value while trading at significant discounts relative to their historical revenue levels. This pattern is consistent with the valuation range identified above for VPX's trademark portfolio.

### i. Limitations of the Analysis

The valuation analysis presented in this section is intended as a high-level economic assessment of VPX's Intellectual Property Portfolio based on the materials available and the scope of the engagement. It does not constitute a comprehensive financial valuation of VPX's business or a full appraisal of each of the discrete intellectual property assets. The estimated range reflects the residual economic value of VPX's brand assets independent of the operating business, distribution relationships, and marketing infrastructure that historically supported the brand.

In particular, the analysis does not attempt to construct a detailed discounted cash flow model, perform a comprehensive royalty rate study, or identify and analyze specific comparable transactions involving similar intellectual property portfolios. Such analyses typically require extensive financial projections, licensing data, and detailed market information that were beyond the scope of the materials available for this report.

This analysis is based on the information available to me at the time of preparing this Report. I did not have access to complete marketing data, brand licensing agreements, or detailed revenue attribution information that might permit a more granular valuation using a royalty-relief or income-based model.

Accordingly, the valuation presented here should be understood as a **high-level economic estimate**, not a full investment-bank style brand valuation.

Nevertheless, the approach used here is consistent with accepted valuation practice when detailed financial information is unavailable and where assets are being evaluated in a distressed or litigation context as the analysis applies accepted principles used in the valuation of intangible assets and considers the economic characteristics of VPX's brand assets, the historical commercial scale associated with those assets, and the legal and market risks affecting the portfolio at the relevant time.

In addition, the analysis assumes a hypothetical market participant evaluating VPX's Intellectual Property Portfolio in an arm's-length transaction during the Relevant Time Period. Fair market

78

value in this context refers to the price at which the assets would change hands between a willing buyer and a willing seller, neither being under compulsion to transact and both having reasonable knowledge of the relevant facts.  The valuation range identified in this report reflects the economic potential of the assets under those conditions and incorporates the uncertainties associated with litigation exposure, reputational challenges, and VPX's financial distress.

Because valuation of distressed intellectual property assets necessarily involves uncertainty regarding future economic performance and legal conditions, the use of a valuation range rather than a single point estimate is appropriate.  This valuation reflects the intellectual property assets alone and does not reflect the value of VPX's former operating business as a going concern.  In distressed or litigation-affected brand environments, valuation frequently reflects substantial uncertainty regarding the probability and magnitude of future economic benefits.  The resulting estimate therefore represents a reasonable range of expected economic value rather than a precise single-point valuation.

Finally, the conclusions presented in this section are based on the information reviewed and the assumptions described above.  Additional information regarding VPX's financial performance, licensing history, or potential market transactions could affect the precise valuation of the intellectual property portfolio.

Taking into account the scope of VPX's trademark portfolio, the associated domain name assets, the historical consumer recognition of the BANG Brand, and the substantial legal, reputational, and financial risks affecting the brand during the Relevant Time Period, it is my opinion that a hypothetical willing buyer in an arm's-length transaction would likely have valued VPX's intellectual property portfolio in a range of approximately $2.5 million to $3.5 million.

## XIII.  HIGH-LEVEL VALUATION OF VPX'S PATENT PORTFOLIO

The intellectual property schedule produced in discovery identifies a portfolio of patents and patent applications owned by JHO Intellectual Property Holdings, LLC relating primarily to beverage formulations, nutritional supplements, and beverage packaging technologies.  The identified assets include multiple issued United States patents as well as several pending applications and provisional filings. The issued patents in the portfolio include:

- U.S. Patent No. 8,372,821, entitled "Stable aqueous compositions comprising bioactive creatine species," issued Feb. 12, 2013;
- U.S. Patent No. 8,435,963, entitled "WEIGHT LOSS COMPOSITIONS AND USES THEREOF," issued May 7, 2013;
- U.S. Patent No. 8,445,466, entitled "STABLE AQUEOUS COMPOSITIONS COMPRISING AMIDE-PROTECTED BIOACTIVE CREATINE SPECIES AND USES THEREOF," issued May 21, 2013 (including Reexamination Application 90/013,933 and Reissue Application 16/549,396);
- U.S. Patent No. 8,857,665, entitled "BEVERAGE CONTAINER WITH SECONDARY INTERNAL DISPENSING CHAMBER," issued Oct. 14, 2014;
- U.S. Patent No. 9,114,150, entitled "Stable aqueous compositions comprising bioactive creatine species," issued Aug. 25, 2015;
- U.S. Patent No. 9,468,645, entitled "HIGHLY SOLUBLE PURINE BIOACTIVE COMPOUNDS AND COMPOSITIONS THEREOF," issued Oct. 18, 2016; and
- U.S. Patent No. 9,642,825, entitled "BIO-AVAILABLE N-ACETYL CREATINE SPECIES AND COMPOSITIONS THEREOF," issued May 9, 2017.

The portfolio also includes the following pending patent applications and provisionals, as identified in the Debtors' schedules:

- U.S. Application No. 17/699,947 (Publ'n No. 2022-0211640), entitled "MEDICINAL COMPOSITIONS OF CANNABINOIDS AND XANTHINES," filed Mar. 21, 2022, published July 7, 2022;
- U.S. Provisional Application No. 63/038,403, entitled "Nutritional Supplement Containing L-alpha-Glycerophosphorylcholine," filed June 12, 2020;
- U.S. Application No. 17/346,621 (Publ'n No. 2021/0386692), entitled "Nutritional Supplement Containing L-alpha-Glycerophosphorylcholine," filed June 14, 2021;
- U.S. Application No. 17/380,107 (Publ'n No. 2023-0044870), entitled "Improved Bottle for Storage of Small Volumes of Carbonated Beverages," filed July 20, 2021;
- U.S. Provisional Application No. 63/271,496, entitled "ELECTROLYTE SPORTS DRINK FORMULATION FOR ENHANCING HYDRATION AND REPLENISHMENT OF NUTRIENTS," filed Oct. 25, 2021;
- U.S. Application No. 18/049,089 (Publ'n No. 2023-0128454), entitled "ELECTROLYTE SPORTS DRINK FORMULATION FOR ENHANCING HYDRATION AND REPLENISHMENT OF NUTRIENTS," filed Oct. 24, 2022.

Additionally, the schedules identify a pending design patent application: U.S. Application No. 29/776,489, entitled "Shoe," owned by Elite IP Holdings, LLC.  This asset is non-core to the beverage/nutraceutical focus of the portfolio and contributes *de minimis* value.

Collectively, these patents and applications relate to technologies associated with nutritional beverages, dietary supplements, stimulant compounds, and beverage packaging.  Several of the patents appear to form a related technological family concerning stabilized creatine compounds and similar bioactive ingredients designed for use in beverage products.

### j.    Methodology

Patent portfolios are economically severable from the remainder of VPX's Intellectual Property Portfolio for valuation purposes because their market value is not negatively affected by the wider BANG product marketplace.  Utility and design patents are generally assets that can be freely bought and sold without a direct connection to goodwill or to brand equity.

Patent portfolios are typically valued using three primary approaches: the income approach, the market approach, and the cost approach.  Each method provides a different perspective on the potential economic value of intellectual property assets.  These approaches are widely recognized in intellectual property valuation practice and are commonly applied by financial experts and valuation professionals when assessing the economic value of patent portfolios.

The income approach estimates the present value of future economic benefits attributable to the patent, such as licensing royalties or incremental profits derived from the patented technology. Application of this method typically requires detailed information concerning product revenues, licensing arrangements, or other monetization of the patented technology.  Because no evidence of licensing revenue or ongoing royalty streams associated with these patents was identified in the materials reviewed, the income approach could not be reliably applied.

The cost approach estimates the value of intellectual property based on the cost required to recreate or develop the patented technology.  While the research and development costs required to develop novel beverage formulations or supplement compounds can be substantial, the cost approach frequently understates market value because it does not account for the economic value associated with legal exclusivity or market positioning.  For this reason, the cost approach is generally used only as a secondary reference point in patent valuation.

The market approach compares the subject patents to observed transactions involving comparable intellectual property assets.  Publicly reported transactions involving patents in the food, beverage, and nutraceutical industries vary widely depending on the scope of the technology, remaining patent life, and demonstrated commercial use.  Patent brokers and intellectual property transaction platforms report median transaction prices for individual patents in secondary markets generally ranging from approximately $100,000 to $200,000 per asset, although portfolios associated with established commercial products may command higher values.

Given the limited financial information available regarding commercialization or licensing of the subject patents, the market approach provides the most appropriate framework for estimating the

81

potential value of the portfolio.  See Section VII (Trademark and False Advertising Disputes Risk Assessment) for specific risks affecting this portfolio, including ongoing reexamination proceedings that may impact comparability to benchmark transactions.

### k.      Patent Portfolio Structure

The patents identified in the intellectual property schedule can be grouped into several technological categories.

First, the portfolio includes multiple patents relating to stabilized creatine compounds and related bioactive formulations intended for use in beverages or nutritional products.  These patents include U.S. Patent Nos. 8,372,821, 8,445,466, 9,114,150, and 9,642,825.  Because these patents address related technological concepts and appear to derive from similar research programs, they can reasonably be viewed as a patent family covering related creatine stabilization technologies.

Second, the portfolio includes patents relating to stimulant or supplement compounds, including U.S. Patent No. 9,468,645 relating to highly soluble purine bioactive compounds.

Third, the portfolio includes patents relating to weight loss compositions and beverage container design technologies, including U.S. Patent No. 8,435,963 and 8,857,665.

Finally, the portfolio includes multiple pending patent applications relating to nutritional supplement compositions, beverage container technologies, and electrolyte beverage formulations, including U.S. Application No. 17/380,107, 63/271,496, and 18/049,089.

The portfolio also includes a pending design patent application for a "Shoe" (U.S. 29/776,489), which falls outside the core beverage/nutraceutical technologies and is valued as de minimis in this analysis.

### l.      Remaining Patent Life

Patent value is highly dependent on the remaining term of the patent.  Under United States patent law, utility patents generally expire twenty years from the earliest effective filing date.

Several of the patents in the portfolio were issued between 2013 and 2017.  As of the Relevant Time Period (2018-2022), the remaining enforceable life of those patents was approximately 8-14 years, assuming standard 20-year terms from filing dates (typically 1-3 years prior to issuance). Shorter remaining patent life reduces potential licensing revenue and therefore reduces the overall value of the patents.

Later-issued patents in the portfolio, including those issued in 2016 and 2017, retain slightly longer remaining terms and therefore may retain comparatively greater potential economic value.

Pending patent applications may eventually issue as patents, but their value is inherently uncertain because issuance is not guaranteed and the scope of the final claims may change during examination.

### m.    Market Comparisons and Estimated Value Range

Empirical data from the secondary patent market provides a useful benchmark for estimating the potential value of the patents identified in the intellectual property schedule.  Over the period from approximately 2019 through 2022, median asking prices for brokered patent assets generally fell within the range of roughly $100,000 to $150,000 per patent asset, depending on market conditions.[217]  Data from the IAM and Richardson Oliver Brokered Patent Market Report 2023 indicates that the median asking price for brokered patent assets then declined from approximately $143,000 in 2021 to $106,000 in 2022, before increasing to approximately $125,000 in 2023, reflecting a buyer-favorable secondary patent market.[218]

These figures represent asking prices for brokered patent assets rather than confirmed transaction prices; realized sale prices may vary depending on negotiations, the strength of the underlying technology, remaining patent life, and evidence of commercial adoption.  Because the patents analyzed here are issued United States patents with several years of remaining legal life, a modest upward adjustment from the overall market median is appropriate when estimating the value of issued patents within a portfolio context.

The portfolio identified in the intellectual property schedule includes seven issued United States patents over the course of the Relevant Time Period.  Applying a conservative valuation range of approximately $150,000 to $200,000 per issued patent, which is below the median prices reported in secondary patent market studies, yields an estimated value range of approximately $1.05 million to $1.40 million.  This conservative range reflects the limited remaining patent life of several assets in the portfolio and the absence of evidence of substantial licensing revenue or widespread industry adoption.   This conservative range also accounts for specific portfolio risks, such as the reexamination of U.S. Patent No. 8,445,466 (see Section VII).

The valuation range applied here is intentionally conservative relative to the median transaction values reported in the IAM and Richardson Oliver patent market study.  Several of the patents in the portfolio were issued between 2013 and 2017 and therefore have a shorter remaining term than newly issued patents, which tends to reduce market value.  In addition, the materials reviewed do not identify substantial licensing revenue or widespread third-party adoption of the patented technologies, both of which are factors that commonly increase the price of patent assets in secondary market transactions.

The portfolio also includes several pending patent applications and provisional filings.  Because patent applications have uncertain outcomes and may ultimately issue with narrower claims than originally filed, applications typically transact at lower values than issued patents in secondary patent markets.  These applications therefore contribute only modest incremental value to the overall portfolio.

Taking these factors into account, a reasonable estimated value range for the overall patent portfolio is approximately **$1.0 million to $1.4 million.**[219]  This range reflects a conservative adjustment relative to median secondary patent market transaction prices due to the limited remaining patent life of several assets and the absence of evidence of significant licensing revenue.

For context, the most recent IAM/Richardson Oliver report (covering 2024 data) shows median asking prices rising to approximately $163,000 per asset and $286,000 per U.S. issued patent, though actual sales remain lower and the market favors litigated/high-adoption technologies.

### n. Distressed Sale Considerations

The valuation range discussed above reflects a hypothetical orderly transaction between a willing buyer and seller under normal market conditions. Intellectual property assets sold in bankruptcy proceedings or other distressed contexts frequently transact at materially lower prices.

Distressed sales of intellectual property often occur under compressed timelines and with limited marketing exposure, which can significantly reduce the pool of potential buyers. In addition, purchasers in bankruptcy contexts frequently demand discounts to compensate for legal uncertainties relating to title, potential encumbrances, and the costs associated with enforcing intellectual property rights after acquisition.

Market data concerning distressed intellectual property sales indicates that realized transaction prices often fall materially below values observed in ordinary secondary patent markets. Discounts of approximately fifty percent or more relative to orderly market value are commonly observed in distressed transactions involving intellectual property portfolios.[220]

Applying such a distressed-sale adjustment to the valuation range described above yields an estimated liquidation value for the patent portfolio of approximately **$500,000 to $1 million**.

### o. Patent Validity and Enforcement Risk

The value of patent assets depends on the enforceability and legal strength of the underlying patent claims. Patent valuation therefore incorporates uncertainty relating to potential invalidity challenges, claim interpretation disputes, and the costs associated with enforcement litigation.

Patents covering nutritional supplements, beverage formulations, and related consumer product technologies frequently operate in fields with substantial prior art and crowded patent landscapes. As a result, the ultimate enforceability of such patents may be subject to challenge through administrative proceedings before the United States Patent and Trademark Office or through litigation in federal courts.

In this portfolio, the creatine stabilization patents (e.g., U.S. Patent Nos. 8,445,466, 8,372,821, 9,114,150, and 9,642,825) face heightened validity risks due to prior art challenges in a crowded field. Notably, U.S. Patent No. 8,445,466 underwent reexamination (Control No. 90/013,933), resulting in rejection of all claims in 2018, with a PTAB appeal (2019-001597) affirming the invalidation. A reissue application (16/549,396) was filed but does not resolve the underlying issues. This litigation history relating to the "Super Creatine" patents introduces substantial uncertainty regarding the enforceability of the related patent family.

In addition, the economic value of a patent depends in significant part on the ability of the patent holder to identify and enforce claims against potential infringers. Enforcement litigation can be

84

costly and uncertain, and in some circumstances the costs associated with litigation may exceed the potential economic recovery.

These factors introduce uncertainty into any patent valuation and may materially reduce the price that a rational purchaser would be willing to pay for the assets. Accordingly, the valuation range presented above reflects a range of potential outcomes rather than a precise prediction of the price that would necessarily be realized in any specific transaction.

## XIII. MATERIALS CONSIDERED

In forming the opinions expressed in this Report, I considered the following materials, together with the facts, data, authorities, and materials cited elsewhere in the Report. The materials listed below were considered individually and collectively, as appropriate.

### a. Bankruptcy and Adversary Proceeding Materials

1. *VPX Liquidating Tr. v. John H. Owoc et al.*, No. 22-17842-PDR (Bankr. S.D. Fla.), including docket materials referenced in the Report, including the Declaration of John C. DiDonato and related filings.
2. *VPX Liquidating Trust v. John H. Owoc, et al.*, Adv. Pro. No. 24-01009 (Bankr. S.D. Fla.), including the Second Amended Complaint and Answer.
3. *Vital Pharms., Inc., et al. v. John H. Owoc and Megan E. Owoc*, Adv. Pro. No. 23-01051-PDR (Bankr. S.D. Fla.), including the Declaration of John C. DiDonato filed March 14, 2023.
4. *In re Vital Pharms., Inc.*, No. 22-17842-PDR (Bankr. S.D. Fla.), including the Notice of Assignment of Contracts and Leases in Connection with Sale.
5. Bankruptcy schedules and trademark schedules for the VPX entities referenced in the Report.
6. Declaration of Zurama Sury Rodriguez dated March 13, 2026.

### b. Orange Bang / OBI Trademark Arbitration and Settlement

7. *Orange Bang, Inc. v. Vital Pharms., Inc.*, AAA No. 01-20-0005-6081, including:

   - Final Arbitration Award
   - Settlement Agreement resolving the 2009 trademark dispute
   - Related documentary materials described in the Award

### c. Monster Energy False Advertising Litigation

8. *Monster Energy Co. v. Vital Pharms., Inc.*, including materials from the proceedings in the United States District Court for the Central District of California, including:

   - Complaint

- Verdict Form
- Trial transcripts cited in the Report
- Order Denying Defendants' Motion for New Trial
- Appellate proceedings before the Ninth Circuit

### d.    Copyright Litigation

9.  *UMG Recordings, Inc., et al. v. Jack Owoc*, No. 0:21-cv-60914 (S.D. Fla.), including:

- Amended Complaint
- Summary judgment orders
- Omnibus order addressing spoliation sanctions
- Related filings described in the Report.

10.  *Sony Music Ent., et al. v. Vital Pharms.*, No. 1:21-cv-22825 (S.D. Fla.), including the Complaint and related pleadings.

### e.    PepsiCo Distribution Dispute

11.  *PepsiCo, Inc. v. Vital Pharms., Inc.*, AAA Case No. 01-20-0015-8060, including the Final Partial Arbitration Award.
12.  Channel Transition Agreement between VPX and PepsiCo dated March 6, 2020.
13.  *Vital Pharms., Inc. v. PepsiCo, Inc.*, No. 0:20-cv-62415-RAR (S.D. Fla.), including pleadings, orders, attorney's fee rulings, and mandate referenced in the Report.
14.  Related litigation between VPX and PepsiCo filed in the District of Arizona.
15.  Confidential settlement agreement between PepsiCo and VPX dated June 21, 2022.

### f.    Other Commercial Litigation Involving VPX

16.  *Se. Cold Fill, LLC v. Vital Pharms. Inc.*, No. 4:20-cv-00776 (D.S.C.), including the Amended Complaint and exhibits.
17.  *Dairy Farmers of Am., Inc. v. Vital Pharms., Inc.*, No. 4:20-cv-00760 (W.D. Miss.).
18.  *Am. Bottling Co. v. Vital Pharms., Inc.*, No. 1:20-cv-01268 (D. Del.).

### g.    Trademark Registration and Classification Materials

19.  Federal trademark registration materials relating to the BANG Mark referenced in this Report.
20.  World Intellectual Property Organization, Nice Classification (13th ed. 2026), including Class 5 and Class 32 explanatory materials.

86

21.  Protocol Relating to the Madrid Agreement Concerning the International Registration of Marks

### h.    Financial Statements and Accounting Materials

22.  Daszkal Bolton, *Vital Pharms., Inc. Consol. Fin. Statements* (Dec. 31, 2018).
23.  Daszkal Bolton, *Vital Pharms., Inc. Consol. Fin. Statements* (Dec. 31, 2019).
24.  Grant Thornton, *Vital Pharms., Inc. Consol. Fin. Statements and Indep. Auditor's Report* (Dec. 31, 2020).
25.  Grant Thornton, *Vital Pharms., Inc. Consol. Fin. Statements and Indep. Auditor's Report* (Dec. 31, 2021).
26.  Accounting guidance relating to internally generated intangible assets, including Financial Accounting Standards Board guidance and IAS 38.

### i.    Legal Authorities

27.  Federal statutes cited in the Report, including provisions of the Lanham Act and the Copyright Act.
28.  Restatement provisions cited in the Report, including the Restatement (Second) of Contracts and Restatement (Third) of Unfair Competition.
29.  Judicial authorities cited in the Report relating to trademark priority, likelihood of confusion, coexistence agreements, copyright infringement, contract interpretation, waiver, damages, and related legal principles.

### j.    Treatises and Secondary Authorities

30.  J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* (5th ed.).
31.  Russell L. Parr, Gordon V. Smith & David V. Parr, *Intellectual Property: Valuation, Exploitation, and Infringement Damages*.
32.  Robert F. Reilly & Robert P. Schweihs, *Valuing Intangible Assets*.
33.  Shannon P. Pratt, *Valuing a Business: The Analysis and Appraisal of Closely Held Companies*.
34.  Additional academic and empirical literature cited in the Report relating to litigation risk assessment, jury evaluation, brand valuation, intangible assets, and influencer marketing.

### k.    Market and Industry Materials

35.  Public sources cited in the Report relating to distressed intellectual property transactions and comparable brand transactions.
36.  Domain name valuation and domain industry reports cited in the Report.
37.  Intellectual property market reports cited in the Report.

Docusign Envelope ID: CA8ED9B9-DE24-4C87-888E-98FB1D5ED9CA

# EXPERT DECLARATION

I, Joseph C. Gioconda, Esq. declare as follows:

1.  I have been retained as an expert in the above-captioned matter.
2.  I have prepared the foregoing Expert Report. The opinions expressed in the report are my own and are based upon my education, training, experience, and review of the materials identified in the report.
3.  The statements contained in this report are true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 16, 2026.

DocuSigned by:

60D5DD8467C8429...

Joseph C. Gioconda, Esq.

88

## XIV.   END NOTES

---

[1] This Report generally uses the term "VPX" to refer to the debtors ("Debtors"): (i) Vital Pharmaceuticals, Inc.; (ii) Bang Energy Canada, Inc; (iii) JHO Intellectual Property Holdings, LLC; (iv) JHO Real Estate Investment, LLC; (v) Quash Seltzer, LLC; (vi) Rainbow Unicorn Bev LLC; and (vii) Vital Pharmaceuticals International Sales, Inc. both individually and collectively, as appropriate.

[2] *See* 15 U.S.C.A. § 1051.

[3] 2 J. McCarthy, Trademarks and Unfair Competition § 16:1 (5th ed. 2026) ("The basic rule of trademark ownership in the United States is priority of use…. first-in-time, first-in-right.").

[4] *See* 15 U.S.C. § 1057(c) (providing that the filing of an application for registration on the Principal Register constitutes constructive use of the mark, conferring a right of priority contingent on registration); *see also Zazu Designs v. L'Oréal, S.A.*, 979 F.2d 499, 504 (7th Cir. 1992) (constructive use priority under section 7(c) requires issuance of registration); *Aktieselskabet AF 21. Nov. 2001 v. Fame Jeans Inc.*, 525 F.3d 8, 18–19 (D.C. Cir. 2008) (explaining that a trademark application is constructive use contingent on registration of a mark).

[5] *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 142–43 (2015) (citation modified).

[6] *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769 (1992) (explaining that liability under section 43(a) of the Lanham Act requires proof of the likelihood of confusion).

[7] *See Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1145–54 (9th Cir. 2011) (emphasizing that likelihood-of-confusion analysis turns on the context in which the mark is encountered, including marketing channels, purchaser sophistication, and how consumers experience the goods in the marketplace); *Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242, 1255–56, 1261 (11th Cir. 2016) (confusion analysis evaluates similarity of products, channels of trade, advertising, and consumer perception in real-world marketplace conditions).

[8] *See* 2 J. McCarthy, Trademarks and Unfair Competition § 18:79 (5th ed. 2026) (explaining that in a consent to use agreement, a party's usage may be defined in terms of mark format, line of goods or services, or territory, and such defined usage is acknowledged as not likely to cause confusion).

[9] *In re E. I. DuPont DeNemours & Co.*, 476 F.2d 1357, 1361–62 (C.C.P.A. 1973) (identifying consent agreements as a factor in likelihood-of-confusion analysis).

[10] *See In re Mastic Inc.*, 829 F.2d 1114, 1116–17 (Fed. Cir. 1987) (explaining that a consent is "evidence which enters into the likelihood of confusion determination" and emphasizing that greater weight is warranted only where the agreement reflects "the reality of no likelihood of confusion in the marketplace").

---

[11] *See id.* (distinguishing "naked" consents—entitled to little weight—from "clothed" consents containing concrete undertakings that reflect actual marketplace conditions rather than conclusory assertions or private arrangements).

[12] *See id.* at 1117–18 (discounting conclusory consent agreements that fail to explain how confusion will be avoided).

[13] *See Brennan's Inc. v. Dickie Brennan & Co. Inc.*, 376 F.3d 356, 364, 367 (5th Cir. 2004) (holding that "one who exceeds the scope of the license is potentially liable not just for breach of the license agreement but also for trademark infringement," and that "with regard to unauthorized uses, the contract by its terms cannot be set up as a defense, and thus a trademark action is allowed").

[14] *See Am. Eagle Outfitters, Inc. v. Payless Shoesource, Inc.*, No. 07-1675, 2007 WL 9723295, at *11–12 (E.D.N.Y. Dec. 20, 2007) (holding that although a coexistence agreement defines the parties' permissible uses, conduct that exceeds the agreement's scope may support Lanham Act claims, and assessing infringement by asking whether the defendant's post-agreement conduct increased the likelihood of confusion beyond the "*status quo* under the Agreement").

[15] *See Fuddruckers, Inc. v. Fudpucker's, Inc.*, 436 F. Supp. 2d 1260, 1272–74 (N.D. Fla. 2006) (interpreting a trademark coexistence agreement's mutual release as operative only "[f]or so long as the provisions of this Agreement are adhered to in good faith").

[16] *See FCOA LLC v. Foremost Title & Escrow Servs. LLC*, 57 F.4th 939, 947, 954 (11th Cir. 2023) (holding that similarity of trade channels and customer overlap are key factors in the likelihood of confusion analysis because "the greater the overlap, the greater the likelihood that consumers will be exposed to both marks and become confused").

[17] 17 U.S.C. § 102(a).

[18] 17 U.S.C. §§ 201(a), (b).

[19] 17 U.S.C. § 101; *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 738 (1989).

[20] *See Asset Mktg. Sys., Inc. v. Gagnon*, 542 F.3d 748, 754–56 (9th Cir. 2008).

[21] 17 U.S.C. § 106.

[22] *See, e.g.*, *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991) (articulating a two-part infringement inquiry without reference to intent).

[23] *See Cmty. for Creative Non-Violence v. Reid,* 490 U.S. 730, 751–52 (1989) (applying common-law agency principles to determine whether a hired party is an "employee" for purposes of the work-for-hire doctrine and identifying factors including, but not limited to, the hiring party's control over the work, method of payment, provision of employee benefits, and tax treatment).

90

---

[24] 17 U.S.C. § 504.

[25] *See On Davis v. The Gap, Inc.*, 246 F.3d 152, 166–67 (2d Cir. 2001).

[26] 17 U.S.C. § 504(b).

[27] *See Sheldon v. Metro-Goldwyn Pictures Corp.,* 309 U.S. 390, 402–03, 406 (1940) (holding that "[w]here there is commingling of gains, [the infringer] must abide the consequences, unless he can make a separation of the profits so as to assure to the injured party all that justly belongs to him").

[28] 17 U.S.C. § 504(c).

[29] *See F.W. Woolworth Co. v. Contemp. Arts, Inc.*, 344 U.S. 228, 233 (1952) (holding that statutory damages may be imposed "to sanction and vindicate the statutory policy" even for "uninjurious and unprofitable invasions of copyright").

[30] 17 U.S.C. § 502.

[31] 17 U.S.C. § 505.

[32] *See Mergens v. Dreyfoos*, 166 F.3d 1114, 1117 (11th Cir. 1999) (citation omitted) ("A party is bound by, and a court is powerless to rewrite, the clear and unambiguous terms of a voluntary contract."); *Qantum Commc'ns Corp. v. Star Broad., Inc.*, 473 F. Supp. 2d 1249 (S.D. Fla. 2007) (citation omitted) ("[W]hen the terms of a contract are clear an unambiguous, the contracting parties are bound to those terms and may not rewrite the contract to make to more advantageous or reasonable for one of the contracting parties.").

[33] *See Qantum Commc'ns*, 473 F. Supp. at 1261, 1272 (holding that defendant's "subjective beliefs about whether or not the discussions amounted to negotiations is irrelevant" where exclusivity covenant's prohibition on solicitation and negotiation was "crystal-clear," and emails and term sheets objectively demonstrated prohibited conduct).

[34] Restatement (Second) of Contracts § 241.

[35] *See Sweet Additions Ingredient Processors, LLC v. Meelunie Am., Inc.*, 139 F.4th 1217, 1228 (11th Cir. 2025) (citation omitted) (holding that under Florida law, "unless specially negated, course of dealing inform the meaning of the words used in a contract," and that both course of dealing and course of performance establish "a common basis of understanding for interpreting [the parties'] expressions and other conduct); *Burger King Corp. v. E-Z Eating, 41 Corp.*, 572 F.3d 1306, 1315 (11th Cir. 2009) (citation omitted) (establishing that, under Florida law, "[c]onduct may constitute waiver of a contract term, but such an implied waiver must be demonstrated by clear evidence").

[36] Restatement (Second) of Contracts § 347.

91

[37] *Nebula Glass Int'l, Inc. v. Reichhold, Inc.*, 454 F.3d 1203, 1213 (11th Cir. 2006) ("It is settled under Florida law that lost profit damages, like all damages, cannot be speculative and must be proved with reasonable certainty.").

[38] Restatement (Second) of Contracts § 351.

[39] *In re Vital Pharms., Inc.*, No. 22-17842-PDR ("Main Case Dkt."), at 23, DiDonato Decl. ¶ 26 ("Historically, John H. Owoc, the founder and sole shareholder of the Company, *had served as the sole director or member*, as well as the Chief Executive Officer or managing member, as applicable, of the each of the Debtor entities" (emphasis added)).

[40] *See id*.

[41] *See* Declaration of Zurama Sury Rodriguez dated March 13, 2026 at ¶¶ 7-9 ("All corporate decisions, including payments to vendors, distributors, and other third parties, required Jack's express approval. No individual other than Jack had signatory authority over VPX's bank accounts, and all internal and external payments required his authorization. Jack was also the only person with authority to enter into contracts on VPX's behalf. Jack Owoc routinely told me and other employees that no one could spend the Company's money without his approval, and he personally approved all of the Company's expenditures. When Jack Owoc gave an order, employees were expected to follow it. Jack acted as both the CEO and Chief Financial Officer ("CFO"), making all the Company's decisions. Jack did not share control of the Company. The Company did not have a CFO until around the time of VPX's bankruptcy filing (October 2022), when Greg Robbins was promoted to that role.").

[42] *Id*.

[43] *See generally* Michaela Keet, Heather Heavin, and John Lande, LITIGATION INTEREST AND RISK ASSESSMENT: HELP YOUR CLIENTS MAKE GOOD LITIGATION DECISIONS (Am. Bar Ass'n, 2020); *See* Jennifer K. Robbennolt, *Evaluating Juries by Comparison to Judges: A Benchmark for Judging?*, 32 Fla. St. U. L. Rev. 469, 479–80, 507–08 (2005) (reviewing empirical studies documenting measurable disagreement between judges and juries and noting that cases proceeding to trial frequently lack clear answers); George L. Priest & Benjamin Klein, *The Selection of Disputes for Litigation*, 13 J. Legal Stud. 1 (1984) (theorizing that cases proceeding to trial are disproportionately those in which expected outcomes are uncertain and the parties' assessments diverge); Kevin M. Clermont & Theodore Eisenberg, *Litigation Realities*, 88 Cornell L. Rev. 119 (2002) (demonstrating empirically that adjudicative outcomes vary significantly across case types and forums).

[44] *See infra* Expert Report of Joseph Gioconda, Esq., dated March 16, 2026 ("Expert Report"), Sections VII(a)(iv)–(ix) (2010–2018 evolution, Monster false-advertising filing, and June 2020 OBI arbitration); VIII (copyright disputes); IX (PepsiCo termination and distribution dispute).

[45] *VPX Liquidating Trust v. John H. Owoc, et al.*, Adv. Pro. No. 24-01009, Dkt. No. 148 ("Second Amended Compl.") ¶¶ 84–87 (alleging OBI's senior use and ownership of the BANG Mark); *see also* BANG!, U.S. Patent No. 1,220,228 (filed Feb. 6, 1981); *id*., Registration Certificate (filed

Dec. 14, 1982) (indicating date of first use was Aug. 3, 1971); BANG!, U.S. Patent No. 1,223,619 (filed Feb. 6, 1981); *id.*, Registration Certificate (filed Jan. 11, 1983) (indicating date of first use was Aug. 3, 1971).

[46] *See* OBI Final Arb. Award at 9–10 (describing VPX's 2008 launch of Bang Pre-Workout as a nutritional supplement marketed as the "WORLD'S ONLY STABLE LIQUID CREATINE!" and sold under a Class 5 registration).

[47] *See id.* at 9 (describing Bang Pre-Workout as VPX's first BANG-branded product); *id.* at 107 n.31 (noting that VPX's 2010 sales were approximately $155,000).

[48] *See id.* at 9–10 (describing Bang Pre-Workout as VPX's BANG-branded product during the 2008–2013 period and discussing the bottle labeling and ingredient disclosures, including the back-label panel).

[49] *See id.*

[50] *See id.* at 59 (quoting Bang Pre-Workout bottle language stating that "BANG! is the world's only Clinically Proven Water- Stable Creatine, Patent Pending!").

[51] *See id.* at 9–10 (describing VPX's early website representations characterizing Bang Pre-Workout as a stable liquid creatine product and detailing the Bang Pre-Workout bottle labeling, including the proprietary blend and milligram quantities reflected on the supplement panel).

[52] *Id.*

[53] *Id.* at 10.

[54] *Id.*

[55] *Id.*

[56] *Id.* at 11.

[57] *Id.*

[58] *See Orange Bang, Inc. v. Vital Pharms., Inc.*, AAA No. 01-20-0005-6081 ("OBI Settlement Agreement") ¶ 1 (reciting that "[o]n or about September 9, 2009 ORANGE BANG filed a complaint … against VITAL PHARMACEUTICALS" alleging trademark infringement and related claims).

[59] *See id.* ¶¶ 1–2 (reciting the September 9, 2009 trademark infringement action involving OBI's Class 32 BANG registrations); *see also* OBI Final Arb. Award at 12–29 (discussing the 2009 dispute and 2010 settlement).

[60] *See id.* ¶¶ 1–2 (reciting the September 9, 2009 trademark infringement action involving OBI's Class 32 BANG registrations); *see also* OBI Final Arb. Award at 12–29 (discussing the 2009 dispute and 2010 settlement); Second Amended Compl. ¶¶ 83–91 (alleging pre-2010 trademark dispute resolved by settlement); *VPX Liquidating Trust v. John H. Owoc, et al.*, Adv. Pro. No. 24-01009, Dkt. No. 156 ("Answer") ¶¶ 83–91 (admitting in part the existence of the dispute and settlement).

[61] *See* OBI Settlement Agreement ¶ 1 (reciting that Orange Bang filed a complaint alleging infringement of its U.S. BANG registrations, false designation of origin under 15 U.S.C. § 1125(a), cancellation of registrations, and unfair competition claims).

[62] *See* OBI Final Arb. Award at 9–13 (describing the parties' respective commercial activities and the 2009 cease and desist letters); *id* at 33–37 (discussing VPX's 2015 release of Bang Energy RTD and its expansion into the general beverage marketplace); *id.* at 76–77 (finding that the parties' marketing channels converged because both sell BANG-marked products in convenience stores, with 80% of VPX's BANG Energy RTD sales and one-third of OBI's sales occurring in that channel).

[63] *See id.* at 9–13, 24–28 (describing the parties' dispute concerning VPX's use of the BANG mark on ingestible products and OBI's concern regarding overlap with its Class 32 beverage registrations and related marketplace confusion issues).

[64] *See generally* OBI Settlement Agreement; *see also* OBI Final Arb. Award at 15–28 (describing the parties' negotiated 2010 settlement resolving the 2009 trademark dispute).

[65] *See* OBI Settlement Agreement at 10.

[66] *See id.* ¶ 7(A)–(D).

[67] *Id.*

[68] *Id.*

[69] *Id.* ¶ 7(A).

[70] *See* OBI Final Arb. Award at 22–23, 45–48 (summarizing negotiation history in which OBI proposed "creatine-based" as a "higher and more exacting standard" than VPX's "creatine-containing" language and interpreting "creatine-based" to require creatine as "a fundamental, a main or a carrying ingredient" that provides the functional "benefits of creatine to the human body"); *see also* Second Amended Compl. ¶¶ 88–91 (describing the OBI Settlement Agreement's creatine-based product restriction as limiting the use of the BANG Mark to products that are nutritionally fortified, creatine-based).

94

[71] *See, e.g.*, OBI Final Arb. Award at 15–21, 30–32 (showing that the arbitrator relied upon extensive documentary communications between the parties and their counsel regarding the structure, intent and meanings in the 2010 Settlement Agreement).

[72] Second Amended Compl. ¶¶ 115–123, 133–136 (alleging false advertising findings regarding "Super Creatine" claims and disputing whether products were "creatine-based" under the Settlement Agreement); *see also* Answer ¶¶ 119, 123 (admitting jury findings and judgment in Monster Energy false advertising litigation).

[73] OBI Settlement Agreement ¶ 7(D).

[74] *Id.* (stating that VPX could continue to use the BANG Mark for non-creatine-based beverages, provided that such beverages or dietary supplement are marketed and sold only through vitamin and nutritional supplement stores, gyms and health clubs, or the vitamin and dietary supplement sections of convenience or other stores).

[75] OBI Settlement Agreement ¶ 7(D).

[76] *See* OBI Final Arb. Award at 19 (explaining that the 2010 Settlement Agreement precluded sales by VPX at convenience stores, restaurants, supermarkets, and mass retailers); *id.* at 21 (stating that VPX was required to limit BANG to sections where supplements and vitamins were separate from the general beverage areas).

[77] *See id.* at 28 (describing the purpose of the 2010 Settlement Agreement's restrictions as maintaining separation between the parties' respective BANG products).

[78] *See id.* at 30 (outlining the marketing and sales restrictions under Paragraph 7(D) of the 2010 Settlement Agreement).

[79] *See id.* at 19–23 (describing the negotiation of the channel-based framework as a central component of the parties' co-existence agreement to avoid confusion).

[80] *See id.* at 64–66 (describing VPX's shift from marketing BANG products to athletes and workout enthusiasts to marketing Bang Energy ready-to-drink beverages as "lifestyle" products to mainstream consumers outside the defined Nutritional Channel).

[81] *See id.* at 65–66 (discussing VPX's social media marketing campaign, which used influencers to promote VPX products as "lifestyle" products and attract mainstream consumers).

[82] *See id.* at 65–67 (finding that VPX impermissibly sold products outside the Nutritional Channel in violation of the 2010 Settlement Agreement); *id.* at 77 (stating that 80% of sales of Bang Energy, VPX's best-selling product, occur in convenience stores).

[83] *See id.* (finding that VPX sold and marketed Bang Energy in convenience stores, gas stations, and other mainstream retail locations outside the defined "Nutritional Channel," in violation of Paragraph 7(D)).

[84] *See id.* at 32–33, 64–66 (describing VPX's systemic failure to adhere to or communicate the VPX marketing and sales restrictions and VPX's consistent sale of BANG products outside the "Nutritional Channel" over an extended period, thereby eroding the separation central to the coexistence framework).

[85] *See generally Monster Energy Co. v. Vital Pharms., Inc.*, No. 5:18-cv-01882 (C.D. Cal. 2019), Dkt. No. 61 ("False Advert. Compl."); *see also* Second Amended Compl. ¶¶ 115, 168.

[86] *See generally* False Advert. Compl.; Second Amended Compl. ¶ 168.

[87] *See* False Advert. Compl. ¶ 122.

[88] *See generally Monster Energy Co. v. Vital Pharms., Inc.,* No. 5:18-cv-01882 (C.D. Cal. 2019), Dkt. No. 890 (False Advert. Verdict Form).

[89] *See id.* at 1.

[90] *See generally Monster Energy Co. v. Vital Pharms., Inc.*, No. 8:18-cv-01882 (C.D. Cal. 2018), Dkt. No. 1050 ("False Advert. Order Denying Defs.' Mot. for New Trial").

[91] *See generally Monster Energy Co. v. Vital Pharms., Inc.*, Nos. 23-55451 & 24-244 (9th Cir. Apr. 15, 2025).

[92] *See* OBI Final Arb. Award at 45–57 (addressing whether Bang Energy products satisfied the "creatine-based" standard under the 2010 Settlement Agreement and evaluating evidence regarding ingredient composition, dosage, including whether the products delivered the physiological benefits of creatine).

[93] *See id.* at 55–56 (finding that VPX's in-house study was unable to break creatyl-L-leucine ("CLL") into free creatine, that CLL remains intact during digestion, and that multiple human and animal studies demonstrated that CLL does not increase creatine levels in blood, muscles, or brain and thus does not produce an efficacious response in the human body).

[94] *See id.*

[95] *See id.* at 55–57 (concluding that BANG products are not "creatine-based" because they contain only 25 milligrams of CLL—an amount far below the 3,000-milligram minimum effective dosage threshold—and therefore cannot qualify as "creatine-based" within the meaning of the Settlement Agreement).

[96] *See id.*

96

[97] *See id.* at 57 (concluding that BANG products are not "creatine-based" within the meaning of the 2010 Settlement Agreement).

[98] *See id.* at 65–66, 72, 125 (explaining that BANG products were marketed and sold in mainstream retail channels in violation of the 2010 Settlement Agreement).

[99] *Id.* at 65–66 (outlining the undisputed testimony of VPX employees concerning the sale and marketing of the BANG products).

[100] *Id.* at 176.

[101] Second Amended Compl. ¶ 140.

[102] *Id.* ¶ 141.

[103] *Id.* ¶ 142.

[104] *See supra* Expert Report Sections VII(a)(ii)–(iv) (product classification and post-2010 evolution); VII(a)(v) (Monster false advertising); *see Orange Bang, Inc. v. Vital Pharms., Inc.*, AAA No. 01-20-0005-6081 ("OBI Final Arb. Award"), at 12–15 (finding that OBI sent VPX cease-and-desist letters and that VPX's CEO Jack Owoc discussed the settlement terms with counsel during months of negotiations before signing the 2010 Settlement Agreement); *id.* at 32–37 (finding that VPX "did essentially nothing" to ensure compliance and instead built distribution agreements requiring "*the exact opposite* of the VPX Marketing and Sales Restriction," and that the "BANG mark was, and is, the centerpiece of VPX's marketing strategy which … has generated billions of dollars in sales"); *id.* at 64–66 (finding that VPX's breach was pervasive, including that BANG products were "not once" found in the permitted vitamin or supplement sections, and that VPX shifted to a "life-style" brand to attract mainstream customers); *id.* at 78–79 (finding that VPX demonstrated "a culpable disregard for the risks" when it flooded the marketplace with advertising for its BANG products despite having "actual of constructive knowledge" of OBI's superior rights).

[105] *See* OBI Final Arb. Award at 35 (describing VPX's 2016 distributor presentation touting Bang Energy RTD as the world's first energy sports drink with water-stable creatine, as well as Jack Owoc's 2016 social media post proclaiming, "#SuperCreatine – THE KEY TO EXPONENTIAL MUSCLE GROWTH").

[106] *See* Trial Tr. ("False Advert. Tr.") at 5:18–6:6, 56:5–12, Sept. 1, 2022; 161:13–16, Sept. 7, 2022 (Q. "And Mr. Owoc is the one who decided to put only 25 milligrams of Super Creatine in the Bang Energy drink, right?" A. "Yes.").

[107] *See* False Advert. Tr. 10:6–11, Sept. 1, 2022 (Q: Mr. Owoc…in addition to being the CEO, you were also the chief scientific officer, correct? A. Yes."); 161:13–162:3, Sept. 7, 2022 (admitting that Jack Owoc decided to put 25 milligrams of Super Creatine in the Bang Energy drink and acknowledging that VPX does not tell consumers how much Super Creatine is in Bang).

---

[108] *See, e.g., id.* at 151:10–152:5, Sept. 6, 2022 (directing creatine marketing messaging); 56:8–12, Sept. 1, 2022 (admitting that he personally oversees graphics and media for VPX); *id.* at 55:18–24 (demonstrating Jack Owoc's granular involvement in labeling decisions).

[109] *See, e.g., id.* at 42:10–17, Sept. 1, 2022 (Q. "Mr. Owoc, does VPX market its Bang branded products as creatine based?" A. "Yes, it says, quote/unquote, 'Super Creatine' prominently displayed in all capital, huge letters on the top center of every can, which is the most prominent position you can have on a can." Q. "Those are your words, right, sir?" A. "Correct, sir.").

[110] *Id.* at 45:24–46:1.

[111] *See id.* at 138:9–12, Sept. 1, 2022 (admitting that he has no idea whether Super Creatine provides any benefits for consumers); 70:10–21 (admitting that he has never studied what an effective dose of Super Creatine would be).

[112] *See id.* at 161:13–24, Sept. 7, 2022.

[113] *See id.* at 160:2–11, Sept. 6, 2022; 168:4–15, Aug. 26, 2022 (admitting that, despite being second-in-command, Eugene Bukovi was not involved in marketing or graphics and had no scientific basis to support the claim that Super Creatine in Bang improves muscle growth).

[114] *Id.* at 68:17–69:12, 72:23–73:17, Sept. 13, 2022 (explaining that Bang consumers were significantly more likely to believe that Super Creatine provided the alleged health benefits before receiving any information about the energy drink and opining that VPX's advertising about Super Creatine was therefore effective).

[115] *Monster Energy Co. v. Vital Pharms., Inc.,* No. 8:18-cv-01882, Order Denying Defs.' Mot. for New Trial at 16–17 (C.D. Cal. Oct. 6, 2023) (noting testimony that the challenged benefits messaging was "not specific but implied" and explaining that the jury could consider implied claims supported by the record in sustaining the false advertising verdict).

[116] False Advert. Tr. 114:3–6, Sept. 23, 2022 (noting that Bang consumers were "more likely to see the other advertising on social media, on the website, and blog posts," which supports the conclusion that off-can advertising influenced consumer beliefs about creatine's effects).

[117] *Id.* at 114:23–115:1.

[118] *See generally id.* at 51:5–106:25, Sept. 27, 2022 (summarizing evidence during closing argument that Bang consumers were exposed to and influenced by off-can advertising and marketing, including social media posts, website content and retail displays, all promoting false claims about Super Creatine's benefits).

[119] *Id.* at 52:25–53:14.

[120] *Id.* at 54:2–25.

98

[121] *See id.* at 85:5–25 (arguing that VPX placed "Super Creatine" on the top rim of the can—"their prime advertising space" and the "Super Bowl ad"—because it was Bang's "point of difference" from competing energy drinks and what VPX "really want[ed] consumers to know" at the moment of purchase).

[122] *See id.* at 75:15–16, Sept. 27, 2022; *id.* at 70:10–74:15 (emphasizing in closing argument that no witness testified that claims equating Super Creatine with creatine were true and that defendants presented no scientific data establishing bioavailability or physiological effect).

[123] *See id.* at 16:10–14, 39:25–40:7, Aug. 31, 2022 (explaining that it would not be scientifically accurate to describe Super Creatine as creatine and that no scientific evidence was presented showing that Super Creatine increases creatine levels in the body or provides the muscle, performance, or cognitive benefits attributed to creatine); 231:21–232:12 (stating that defendants failed to produce "one study, one piece of evidence" supporting claims equating Super Creatine with creatine).

[124] *See id.* at 221:17–23, Aug. 30, 2022 (testifying that the evidence "clearly" shows that Super Creatine does not increase creatine levels in blood, does not affect muscle tissue, and does not affect brain function in humans); 70:10–74:15, Sept. 27, 2022 (emphasizing in closing argument that no witness testified that claims equating Super Creatine with creatine were true and that defendants presented no scientific data establishing bioavailability or physiological effect).

[125] *See, e.g.*, *Field & Stream Licenses Co. v. Sportsman's Warehouse, Inc.*, 294 F.3d 383 (2d Cir. 2002) (recognizing that a coexistence agreement allocating rights to use the "FIELD & STREAM" mark defined the permissible scope of use and limited trademark infringement and unfair competition claims to breaches of the agreement's contractual terms); *see also In re E.I. du Pont de Nemours & Co.,* 476 F.2d 1357, 1361 (C.C.P.A. 1973) (identifying, as part of the likelihood-of-confusion analysis, "market interface" factors including agreements between trademark owners concerning concurrent use, which may weigh against confusion when the agreed limitations are observed); *AWGI, L.L.C. v. Atlas Trucking Co.*, 381 F. Supp. 3d 832 (E.D. Mich. 2019) (noting that coexistence agreements reflect the parties' negotiated assessment of confusion risks and that conduct exceeding agreed restrictions may support Lanham Act claims where the limitations were material to avoiding confusion), *aff'd*, No. 20-1726, 2021 WL 1976303 (6th Cir. May 18, 2021).

[126] *See* OBI Final Arb. Award at 78 (finding that "there was plenty of convincing evidence presented of VPX's cavalier attitude about adhering to the VPX Marketing and Sales Restrictions of paragraph 7 D within the 2010 Settlement Agreement (which VPX obviously knew about because its CEO J. Owoc participated in its negotiation by having conversations [undisclosed conversations] with his attorneys and because he signed it after 11 months of negotiation) inasmuch as J. Owoc testified that he never told his marketing employees or his distributors, such as Pepsi, about the 2010 Settlement Agreement and his marketing and other employees testified that they were never told about these all-important restrictions either, demonstrating an intent of cavalier indifference about honoring the rights of the senior user as embodied in the 2010 Settlement agreement").

[127] *See generally UMG Recordings, Inc., et al. v. Jack Owoc*, No. 0:21-cv-60914 (S.D. Fla. 2024), Dkt. No. 317 (UMG Recordings Amended Compl.); *Sony Music Ent., et al. v. Vital Pharms.*, No. 1:21-cv-22825 (S.D. Fla. 2024), Dkt. No. 1 (Sony Music Compl.).

[128] *See generally UMG Recordings, Inc., et al. v. Jack Owoc*, No. 0:21-cv-60914 (S.D. Fla. 2024), Dkt. No. 317 (UMG Recordings Amended Compl.); *Sony Music Ent., et al. v. Vital Pharms.*, No. 1:21-cv-22825 (S.D. Fla. 2024), Dkt. No. 1 (Sony Music Compl.); *see also Vital Pharms., Inc., et al. v. John H. Owoc and Megan E. Owoc*, Adv Pro No. 23−01051−PDR (S.D. Fla., filed Mar. 14, 2023), Dkt. No. 3 (DiDonato Decl.) ¶¶ 5–7 (outlining the company's use of various social media platforms since as early as 2010).

[129] *See generally Sony Music Ent., et al. v. Vital Pharms.*, No. 1:21-cv-22825 (S.D. Fla. 2024), Dkt. No. 1 (Sony Music Compl.) (suing for copyright infringement).

[130] *See UMG Recordings, Inc., et al. v. Jack Owoc*, No. 0:21-cv-60914 (S.D. Fla. 2024), Dkt. No. 317 (UMG Recordings Amended Compl.) (suing for copyright infringement).

[131] *See id.* ¶¶ 62, 70; *Sony Music Ent., et al. v. Vital Pharms.*, No. 1:21-cv-22825 (S.D. Fla. 2024), Dkt. No. 1 §§ (b)–(c) (Sony Music Compl.).

[132] *See UMG Recordings, Inc., et al. v. Jack Owoc*, No. 0:21-cv-60914 (S.D. Fla. 2024), Dkt. No. 204 (Summ. J. Order) at § IV(1) (granting plaintiffs' motion for summary judgment as to Counts I and II—liability for direct copyright infringement).

[133] *See id.* Dkt. No. 261 (Omnibus Order) at 4 ("The undersigned finds that Defendants' actions, taken as a whole, more than satisfy the bad faith standard for spoliation regarding the deleted videos.").

[134] *See supra* Expert Report Section VIII(a) (discussing the Universal Music action, including summary judgment and spoliation findings, and the Sony Music complaint).

[135] *See generally UMG Recordings, Inc. v. Owoc*, No. 0:21-cv-60914 (S.D. Fla. 2022), Dkt. No. 261 (Omnibus Order) (granting plaintiffs' motion for spoliation sanctions and holding that, upon proof of song ownership, plaintiffs were entitled to a rebuttable presumption that the deleted videos contained the copyrighted music and that defendants were liable for its use); *UMG Recordings, Inc., et al. v. Jack Owoc*, No. 0:21-cv-60914 (S.D. Fla. 2024), Dkt. No. 317 ¶¶ 8–9, 58–59, 62, 70 (UMG Recordings Amended Compl.) (referencing prior summary judgment on infringement of 105 copyrighted works and spoliation sanctions for approximately 100 unpreserved videos, and seeking maximum statutory damages).

[136] *See PepsiCo, Inc., v. Vital Pharms., Inc.*, AAA Case No. 01-20-0015-8060 ("Pepsi Final Partial Award"), dated Nov. 17, 2021.

[137] *Id.* at 28 ("Prior to PepsiCo, VPX's distribution network consisted of contacts with over 300 independent distributors (many of them beer distributors) and its own small self-distribution system.").

100

---

[138] *See generally* Channel Transition Agreement Between VPX and Pepsi ("Pepsi Distrib. Agreement") § IV(B), dated Mar. 6, 2020.

[139] *See generally id.* at 1–5.

[140] Pepsi Final Partial Award at 83 (discussing VPX's allegations that PepsiCo failed to fulfill its duties, including by understocking products and allowing out-of-stock conditions); *Vital Pharms., Inc. v. PepsiCo, Inc.*, No. 0:20-cv-62415-RAR (S.D. Fla., filed Nov. 25, 2020), Dkt. No. 1 ¶ 27 (Compl.) (alleging that PepsiCo had reduced shelf space to promote a competing energy drink).

[141] *Vital Pharms., Inc. v. PepsiCo, Inc.*, No. 0:20-cv-62415-RAR (S.D. Fla., filed Nov. 25, 2020), Dkt. No. 1 ¶¶ 29–30 (Compl.) (alleging a decline in sales).

[142] Pepsi Final Partial Award at 78 (discussing VPX's claim that PepsiCo breached its obligations under the Distribution Agreement to use commercially reasonable efforts to distribute Bang Energy products).

[143] *See id.* § IV (D).

[144] *See generally id.*

[145] *See generally* Pepsi Final Partial Award.

[146] *See id.* at 21 (stating that PepsiCo disagrees with VPX's interpretation of the Distribution Agreement).

[147] *See generally Vital Pharms., Inc. v. PepsiCo, Inc.*, No. 0:20-cv-62415-RAR (S.D. Fla., filed Nov. 25, 2020) Dkt. No. 1 ¶ 7 (Compl.).

[148] *See id* at 7 (noting that VPX sought injunctive relief to prevent PepsiCo from interfering with VPX's prospective business relationships).

[149] *See id.* at 2–4 (describing the interim award issued on Dec. 7, 2020).

[150] *See generally Vital Pharms., Inc. v. PepsiCo, Inc.*, No. 0:20-cv-62415-RAR (S.D. Fla., filed Nov. 25, 2020) Dkt. No. 14 (Defs.' Mot. to Confirm Arb. Award).

[151] *See generally Vital Pharms., Inc. v. PepsiCo, Inc.*, No. 0:20-cv-62415-RAR (S.D. Fla., filed Nov. 25, 2020) Dkt. No. 43 (Order Granting Defs.' Mot. to Confirm Arb. Award).

[152] *See id.* at 7–11.

[153] *See generally Vital Pharms., Inc. v. PepsiCo, Inc.*, No. 0:20-cv-62415-RAR (S.D. Fla., filed Nov. 25, 2020) Dkt. No. 49 (Defs.' Mot. to Dismiss).

[154] *See generally id.* Dkt. No. 78 (Order Granting in Part Defs.' Mot. to Dismiss).

[155] *See generally id.* Dkt. No. 66 (Defs.' Mot. for Att'y Fees).

[156] *See generally id.* Dkt. No. 79 (R. & R. for Att'y Fees).

[157] *See id.* Dkt. No. 87 (Order Granting Defs.' Mot. for Att'y Fees) (awarding PepsiCo $111,684.81 in attorney's fees).

[158] *See id.* Dkt. No. 94, at 2 (Mandate) (stating that VPX appealed the district court's decision to award PepsiCo $116,684.81 in attorney's fees).

[159] *See generally Vital Pharms., Inc. v. PepsiCo, Inc.*, No. 2:22-cv-00593 (D. Ariz., filed April 11, 2022); *Vital Pharms., Inc. v. PepsiCo, Inc.*, No. 2:22-cv-00591 (D. Ariz., filed April 11, 2022).

[160] *See generally id.*

[161] *See generally Vital Pharms., Inc. v. PepsiCo, Inc.*, No. 0:20-cv-62415-RAR (S.D. Fla., filed Nov. 25, 2020) Dkt. No. 94 (Mandate).

[162] *See generally* Pepsi/VPX Confidential Settlement Agreement, dated June 21, 2022.

[163] *See generally PepsiCo, Inc. v. Vital Pharms. Inc.*, No. 0:22-cv-60805-RAR (S.D. Fla., filed Apr. 27, 2022), Dkt. No. 45 (PepsiCo v. Vital Joint Stipulation of Dismissal).

[164] *See generally id.* Dkt. No. 46 (PepsiCo v. Vital Order of Dismissal).

[165] *See generally Se. Cold Fill, LLC v. Vital Pharms. Inc.*, No. 4:20-cv-00776 (D.S.C. Mar. 24, 2020), Dkt. No. 13 (Cold Fill Amended Compl.), Exs. 1 and 2.

[166] *See id.* ¶¶ 12, 19 (describing Southeast's reliance damages including the purchase and installation of a new can packer and an additional equipment investment of about $800,000 to meet the new specifications provided by VPX).

[167] *Id.*

[168] *See id.* ¶¶ 13–14.

[169] *See id.* ¶¶ 26–28 (alleging that after VPX submitted no purchase orders for October through December 2019, it sent a termination notice on November 25, 2019—just 33 minutes after Southeast's counsel requested a status update).

[170] *See id.* ¶¶ 21–29 (alleging that Southeast sent VPX a letter on September 17, 2019 detailing purchase shortfalls and lack of communication; that VPX responded on October 17, 2019 blaming its can supplier and "tightness in the aluminum market" while assuring production would resume; that VPX then submitted no purchase orders for October, November, or December 2019; and that on November 25, 2019, Southeast's counsel requested a status update, to which VPX responded 33 minutes later with a termination notice).

[171] *Id.* ¶¶ 28–29.

Docusign Envelope ID: CA8ED9B9-DE24-4C87-988E-98FB1D5ED9CA

---

[172] *See Se. Cold Fill, LLC v. Vital Pharms. Inc.*, No. 4:20-cv-00776 (D.S.C. Mar. 24, 2020) Dkt. No. 1 (Cold Fill Notice of Removal).

[173] *See generally Dairy Farmers of Am., Inc. v. Vital Pharms., Inc.*, No. 4:20-cv-00760 (W.D. Miss. Sept. 23, 2020) Dkt. No. 1 (Dairy Farmers Compl.).

[174] *See generally Am. Bottling Co. v. Vital Pharms., Inc.*, No. 1:20-cv-01268 (D. Del. Nov. 20, 2020) Dkt. No. 18 (Am. Bottling Amended Compl.).

[175] *See* Daszkal Bolton, *Vital Pharms., Inc. Consol. Fin. Statements* (Dec. 31, 2018), VPXTrust_0000029859 (the "2018 Financial Statement"); Daszkal Bolton, *Vital Pharms., Inc. Consol. Fin. Statements* (Dec. 31, 2019), VPXTrust_0000031740 (the "2019 Financial Statement"); Grant Thornton, *Vital Pharms., Inc. Consol. Fin. Statements and Report of Indep. Certified Pub. Accts.*, (Dec. 31, 2019 and 2020), VPXTrust_ 0000033153 (the "2020 Financial Statement"); and Grant Thornton, *Vital Pharms., Inc. Consol. Fin. Statements and Report of Indep. Certified Pub. Accts.*, (Dec. 31, 2020 and 2021), VPXTrust0000617273 (the "2021 Financial Statement").

[176] *See* 2018 Financial Statement at 8; 2019 Financial Statement at 9; 2020 Financial Statement at 11; and 2021 Financial Statement at 11.

[177] The domain name portfolio contributes modest incremental value to the trademark portfolio as a supporting digital asset.  In a liquidation scenario, the domains might command approximately $25,000–$50,000 in aggregate resale value, but in the context of a portfolio transaction their value is primarily reflected within the overall trademark portfolio valuation.

[178]  *See In re Vital Pharms., Inc.*, No. 22-17842-PDR (Bankr. S.D. Fla.), Dkt. No. 12 at Schedule AB 60 Trademarks Attachment.

[179] *See* World Intell. Prop. Org., *Nice Classification, Class 5* (13th ed. 2026), available at https://nclpub.wipo.int/enfr/?basic_numbers=show&class_number=5&explanatory_notes=show &lang=en&menulang=en&mode=flat&notion=&pagination=yes&version=20260101.

[180] *See* World Intell. Prop. Org., *Nice Classification, Class 32* (l3th ed. 2026), available at https://nclpub.wipo.int/esen/?basic_numbers=show&class_number=32&explanatory_notes=sho w&gors=&lang=en&menulang=en&mode=flat&notion=&pagination=no&version=20260101.

[181] World Intell. Prop. Org., *Protocol Relating to the Madrid Agreement Concerning the International Registration of Marks*, art. 2(1) (as amended on November 12, 2007), available at https://www.wipo.int/wipolex/en/text/283484#P50_2769.

[182] *See* Domain Name Indus. Brief, *Quarterly Report*, Vol. 20, Issue 4 (Nov. 2023), available at https://www.dnib.com/media/downloads/reports/pdfs/2023/domain-name-report-Q32023.pdf.

[183] *See Vital Pharms., Inc., et al. v. John H. Owoc and Megan E. Owoc*, Adv. Pro. No. 23-01051-PDR (Bankr. S.D. Fla.), Dkt. No. 3 (Mar. 14, 2023 Declaration of John C. DiDonato in Support of Debtors' Emergency Motion for Temporary Restraining Order) ("DiDonato Decl.") ¶¶ 5–7.

[184] *See* 2018 Financial Statement at 10 ($9,555,000 in advertising and promotional expenses; 2019 Financial Statement at 10 ($32,175,057 in advertising and promotional expenses); 2020 Financial Statement at 13 ($49,275,178 in advertising and promotional expenses); and 2021 Financial Statement at 14 ($43,314,772 in advertising and promotional expenses).

[185] *See* 2018 Financial Statement at 12.

[186] *See* 2020 Financial Statement at 16.

[187] Fin. Acct. Standards Bd., *Financial Accounting Series, Accounting Standards Update, Intangibles—Goodwill and Other (Topic 350), Acct. Alternative for Evaluating Triggering Events*, No. 2021-03 (Mar. 2021), https://storage.fasb.org/ASU%202021-03.pdf; IRFS Found., *IAS 38, Intangible Assets* ¶¶ 63–64 (2022), https://www.ifrs.org/content/dam/ifrs/publications/pdf-standards/english/2022/issued/part-a/ias-38-intangible-assets.pdf?bypass=on (prohibiting recognition of internally generated brands, mastheads, publishing titles, customer lists, and similar items as intangible assets).

[188] Russell L. Parr, Gordon V. Smith & David V. Parr, *Intellectual Property: Valuation, Exploitation, and Infringement Damages* 84 (5th ed. 2018) ("Parr & Smith").

[189] *Id*. at 134.

[190] *Id*. at 4.

[191] *See* William M. Landes & Richard A. Posner, *Trademark Law: An Economic Perspective*, 30 J. L. & Econ. 265, 268–70 (1987), available at https://doi.org/10.1086/467138 (explaining that trademarks function primarily as legal mechanisms protecting goodwill and consumer information, which generate the economic value associated with brands); Robert G. Bone, *Hunting Goodwill: A History of the Concept of Goodwill in Trademark Law*, 86 B.U. L. Rev. 547, 552–60 (2006), available at https://escholarship.org/uc/item/66h0v2tr (discussing the historical development of trademark law as a system designed to protect business goodwill rather than the mark itself as an independent source of value).

[192] *See generally* Parr & Smith.

[193] *Id.*

[194] *See* J. Thomas McCarthy, 1 McCarthy on Trademarks and Unfair Competition § 2:21 (5th ed. Mar. 2026) ("McCarthy").

[195] *See generally* Debtors' Consolidated Financial Statements.

[196] *See* Robert F. Reilly & Robert P. Schweihs, *Valuing Intangible Assets* 312 (2d ed. 2016) (explaining that trademarks and trade names are commonly valued using the market approach based on comparable transactions involving similar intangible assets); Smith & Parr, 147–83 (2005) (describing the use of comparable transactions and market multiples in valuing trademark and brand assets); Shannon P. Pratt, *Valuing a Business: The Analysis and Appraisal of Closely*

*Held Companies* 299–334 (6th ed. 2022) (noting that transaction multiples must be adjusted to reflect differences in size, risk, and asset composition).

[197] *See infra*, Table 6 (outlining comparable sales of distressed intellectual property).

[198] *See* Restatement (Third) of Unfair Competition § 39 cmt. f (Am. L. Inst. 1995) (recognizing that customer lists may qualify as trade secrets when they provide a competitive advantage through confidential business relationships), available at https://www.wipo.int/wipolex/en/legislation/details/7478.

[199] *See Morlife, Inc. v. Perry*, 56 Cal. App. 4th 1514, 1521–22 (1997) (customer lists may constitute trade secrets where they reflect confidential information about customers and provide a competitive advantage).

[200] R. Moro Visconti, *Domain Name Valuation: Internet Traffic Monetization and IT Portfolio Bundling* 8–12 (SSRN Working Paper No. 3028534, 2017), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3028534 (explaining that domain name portfolios often derive most economic value from a limited subset of high-quality domains, while many defensive or campaign-specific registrations have minimal independent market value).

[201] Hanna Reinikainen, *Fostering Organizational Intangible Assets Through Strategic Social Media Influencer Communication*, JYU Dissertations 509 (2022), https://jyx.jyu.fi/jyx/Record/jyx_123456789_80762.

[202] R. Haider et al., *Assessing the Impact of Influencer Marketing on Brand Value and Business Revenue: An Empirical and Thematic Analysis*, 16(02) Int'l J. of Sci. and Rsch. Archive 471, 475 (2025), available at https://clok.uclan.ac.uk/id/eprint/56648/ ("Haider").

[203] Dan Andrews & Alvaro De Serres, *Intangible Assets, Resource Allocation and Growth: A Framework for Analysis*, OECD Econ. Dep't Working Papers No. 989 (2012), available at https://www.oecd.org/content/dam/oecd/en/publications/reports/2012/09/intangible-assets-resource-allocation-and-growth_g17a21ac/5k92s63w14wb-en.pdf.

[204] *See* Haider at 475.

[205] *See* Mohammad Moradi, *Effects of Marketing Decisions on Post-Bankruptcy Performance*, 1 Acad. Bus. Rsch. 55 (2021), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3873024.

[206] *See In re Vital Pharms., Inc.*, No. 22-17842-PDR, Dkt. No. 1751, *Notice of Assignment of Contracts and Leases in Connection with Sale* (Bankr. S.D. Fla. July 31, 2023).

[207] *Typhoo*, Wikipedia, https://en.wikipedia.org/wiki/Typhoo (last visited Mar. 9, 2026) (reporting that Typhoo Tea entered administration in November 2024 and was acquired in December 2024 by consumer goods company Supreme for approximately £10.2 million).

[208] Lori Weisberg, *Green Flash, Awash in Debt, Is Sold to Investment Firm*, San Diego Union-Tribune (Apr. 3, 2018), https://www.sandiegouniontribune.com/2018/04/03/green-flash-awash-in-debt-is-sold-to-investment-firm-2/; Jessica Infante, *Tilray Acquired Green Flash and Alpine for $5.1M*, Brewbound (Jan. 10, 2022), https://www.brewbound.com/news/tilray-acquired-green-flash-and-alpine-for-5-1m-dissolves-anheuser-busch-inbev-jv/.

[209] Clara Geoghegan, *Rite Aid Cleared To Sell Thrifty Ice Cream For $19.2M In Ch. 11*, Law360 (June 30, 2025), https://www.law360.com/real-estate-authority/articles/2359157/rite-aid-cleared-to-sell-thrifty-ice-cream-for-19-2m-in-ch-11.

[210] Kirk O'Neil *Award-Winning Beer Company Files Chapter 7 Bankruptcy Liquidation*, Yahoo! Fin. (Nov. 27, 2025), https://finance.yahoo.com/news/award-winning-beer-company-files-153700421.html.

[211] Brad Avery, *NewAge Declares Bankruptcy, Claiming Almost $150M in Debts [Updated]*, BevNET (Aug. 31, 2022 4:00 PM), https://www.bevnet.com/news/2022/newage-declares-bankruptcy-claiming-almost-150m-in-debts/.

[212] Reed's, Inc. (Form 10-K) (Dec. 31, 2024), at 1.

[213] Melissa Allison, *Jones Soda Stock to be Delisted*, The Seattle Times (Sept. 18, 2012), https://www.seattletimes.com/business/jones-soda-stock-to-be-delisted/.

[214] Press Release, Apollo, *Apollo Global Management and Metropoulos & Co. Sign Agreement to Acquire Certain Hostess Snack Brands and Bakeries* (Jan. 30, 2013), https://ir.apollo.com/news-events/press-releases/detail/342/apollo-global-management-and-metropoulos-co-sign#:~:text=NEW%20YORK%20&%20GREENWICH%2C%20Conn.,of%20the%20U.S.%20Bankruptcy%20Code.

[215] Michael J. de la Merced, *Hilco Wins Auction for Polaroid Brand*, N.Y. Times DealBook (Apr. 16, 2009).

[216] Barnaby J. Feder, *Quaker to Sell Snapple for $300 Million*, N.Y. Times (Mar. 28, 1997), https://www.nytimes.com/1997/03/28/business/quaker-to-sell-snapple-for-300-million.html.

[217] *See* IAM Media & Richardson Oliver Insights, *The Brokered Patent Market 2023* (2024), at 12 (Table 3) available at: https://static1.squarespace.com/static/629f7d07feb53a43f4a5ce17/t/66b116110bfdd063c93117a6/1722881558841/It+was+a+Great+Time+to+Buy+Patents+in+2023+-+The+Brokered+Patent+Market+2023+-+IAM+Media+-+20240410.pdf.

[218] *See id.*

---

[219] See Ocean Tomo, *Ocean Tomo Bid-Ask Market Update on the Public Intellectual Property Brokerage Platform* (2021), available at https://oceantomo.com/media-center-item/ocean-tomo-bid-ask-market-update-on-the-public-intellectual-property-brokerage-platform/; Richardson Oliver Insights, *2023 Patent Market Report* (2023), available at https://static1.squarespace.com/static/629f7d07feb53a43f4a5ce17/t/66b116110bfdd063c93117a6/1722881558841/It+was+a+Great+Time+to+Buy+Patents+in+2023+-+The+Brokered+Patent+Market+2023+-+IAM+Media+-+20240410.pdf

[220] *See* Parr & Smith (noting that intellectual property sold in distressed or forced transactions frequently realizes substantially lower prices than negotiated market transactions).

# APPENDIX A

## Curriculum Vitae of Joseph C. Gioconda, Esq.

---

## Professional Qualifications

Joseph C. Gioconda is an intellectual property attorney with more than twenty-five years of experience in trademark and copyright litigation, brand protection, and intellectual property valuation analysis. He has represented major international brands in litigation involving trademark infringement, counterfeiting, unfair competition, and related intellectual property disputes. Mr. Gioconda has also served as an expert in matters involving trademark valuation, brand goodwill, consumer perception, and damages arising from trademark infringement, dilution, counterfeiting, and unfair competition.

Mr. Gioconda has extensive experience managing domestic and international trademark portfolios, including trademark clearance, prosecution, and registration strategy before the United States Patent and Trademark Office and trademark authorities in numerous foreign jurisdictions. His work also includes the valuation, commercialization, and monetization of intellectual property assets, including the analysis of brand value and residual goodwill associated with dormant or revived trademarks.

---

## Areas of Expertise

- Trademark valuation and goodwill analysis
- Consumer perception and brand recognition analysis
- Dormant brand revival and legacy brand value
- Trademark infringement, dilution, and unfair competition damages
- Copyright infringement and damages analysis
- Intellectual property asset valuation and brand monetization
- Trademark clearance, prosecution, and international portfolio management
- Consumer survey methodology
- Online counterfeiting and digital piracy enforcement
- Cybersquatting and domain name enforcement
- Brand protection in digital marketplaces and social media platforms

---

# Professional Experience

## Gioconda Law Group PLLC

New York, New York and Newtown, Pennsylvania
Founder and Managing Attorney
December 2009 to Present

Founder of intellectual property boutique law firm focused on trademark litigation, brand protection, investigation, enforcement strategy, and intellectual property consulting.

Representative activities include:

- Trademark litigation and brand protection
- Trademark valuation analysis
- Anti-counterfeiting enforcement involving online marketplaces and social media platforms
- Cybersquatting and domain name enforcement actions
- Advising companies regarding brand revival, licensing, and brand strategy

Clients represented include Hermès of Paris, Burberry, Tiffany & Co., Michael Kors, Moncler, Salvatore Ferragamo, and lululemon. Enforcement matters have included litigation against large networks of online counterfeiters and domain name operators.

## New Slice Ventures LLC

Newtown, Pennsylvania
Chairman, General Counsel, and Secretary
April 2016 to Present

Served as Chairman, General Counsel, and Secretary of a startup consumer beverage company formed to relaunch the historic SLICE soda brand as a natural beverage product line. The company ultimately divested its portfolio of trademarks and related intellectual property assets.

Representative activities included:

- Oversaw legal and strategic matters relating to the acquisition, licensing, development, and commercialization of trademark portfolios and associated intellectual property assets
- Negotiated and structured licensing agreements involving beverage trademarks and related brand assets
- Conducted financial and market analysis relating to the valuation of trademark portfolios, brand goodwill, and related intellectual property assets
- Handled litigation matters, intellectual property disputes, and consulting work relating to brand enforcement and protection

- Performed due diligence relating to intellectual property acquisitions, partnerships, and commercial transactions
- Participated in development of technology and digital platforms supporting brand commercialization and licensing initiatives
- Assisted in evaluating strategic partnerships and commercialization opportunities involving the SLICE brand and related intellectual property

---

## DLA Piper LLP (US)

New York, New York
Equity Partner, Intellectual Property Department
November 2006 to December 2009

Litigated trademark, trade dress, and copyright matters involving major corporations through trial and appeal.

---

## Kirkland & Ellis LLP

New York, New York

Partner, Intellectual Property Department
October 2003 to November 2006

Associate, Intellectual Property Department
September 1997 to October 2003

Represented major corporations in intellectual property litigation and developed global trademark protection strategies.

---

## United States Attorney's Office, Southern District of New York

Clinical Intern, Major Crimes Unit
September 1996 to May 1997

Assisted federal prosecutors with criminal investigations and indictments.

---

Docusign Envelope ID: CA8ED9B9-DE24-4C87-888E-98FB1D5ED9CA

## United States Senate Judiciary Committee

Clinical Intern
Washington, D.C.
May 1995 to September 1995

Worked on drafting federal legislation addressing emerging intellectual property issues.

---

# Education

## Yale Law School

Juris Doctor, 1997

Senior Editor, Yale Journal on Regulation
Junior Editor, Yale Journal of Law and the Humanities
Visiting Editor, Harvard Journal of Law and Public Policy

---

## State University of New York at Stony Brook

Bachelor of Arts, Political Science, 1994

Magna Cum Laude
Phi Beta Kappa
Dean's List with 4.0 GPA for nine semesters

---

# Bar Admissions and Court Admissions

Admitted to practice in:

New York and Pennsylvania

Member in good standing of:

United States Supreme Court
United States Court of Appeals for the Third Circuit
United States Court of Appeals for the Ninth Circuit
United States District Court for the Southern District of New York
United States District Court for the Eastern District of New York

United States District Court for the Eastern District of Michigan

# Publications

Publications have been cited in legal scholarship and commentary addressing trademark valuation, brand abandonment, counterfeit enforcement, and intellectual property policy. The article *Measuring the Value of a Zombie Brand: A Survey-Based Model* has been referenced in academic discussions concerning trademark abandonment and the valuation of dormant brands.

## Law Review Articles

Gioconda, Joseph C., *From Brands to Memes: Absurdity and Institutional Breakdown in the Trademark Registration Process*, 30 U.S.F. Intell. Prop. & Tech. L.J. (forthcoming 2026) (accepted for publication).

Gioconda, Joseph C., *School Nicknames and Acronyms as Trademarks: Kicking the Band Off the Bandwagon*, 8 Ariz. St. Sports & Ent. L.J. 1 (2018).

Gioconda, Joseph C., *Measuring the Value of a Zombie Brand: A Survey-Based Model*, 58 IDEA: J. Franklin Pierce Ctr. for Intell. Prop. 117 (2017).

Gioconda, Joseph C., *Can Intellectual Property Laws Stem the Rising Tide of Art Forgeries?*, 31 Hastings Comm. & Ent. L.J. 47 (2008).

## Books and Book Chapters

Gioconda, Joseph C., Contributing Author, *Fashion Law*, Second Edition (2014).

Gioconda, Joseph C., and Joseph M. Forgione, Co-Authors, "Chapter 1: Conflicts: Causes, Prevention, and Controlling Counterfeiting," in *Corporate Intellectual Property Operations and Implementation* (John Wiley & Sons 2011).

## Professional Commentary

Gioconda, Joseph C., *Counterfeiting Perspectives*, World Trademark Review, August/September 2013

## Selected Articles and Commentary

Mr. Gioconda has authored or been quoted in numerous publications relating to intellectual property law, counterfeiting, trademark policy, and brand protection, including:

The Wall Street Journal
The New York Times
Los Angeles Times
Reuters
Bloomberg News
CNBC
National Law Journal
Entrepreneur Magazine
Women's Wear Daily
Law360
World Intellectual Property Review
National Public Radio

These publications address topics including online counterfeiting, brand enforcement, art forgery law, trademark policy, and digital piracy.

---

# Expert Testimony and Consulting Experience

Engagements have involved issues including trademark valuation, brand goodwill analysis, consumer perception, likelihood of confusion, and damages arising from trademark infringement and unfair competition.

Mr. Gioconda has served as an expert witness in intellectual property and trademark matters in the following cases:

*A-Sha Foods USA Co., Inc. v. Momo Orchard Holdings, Inc., et al.*
Case No. 2:25-cv-07140
United States District Court for the Central District of California
Expert for Defendant/Counterclaimant

*Estate of Jacqueline Nelson et al. v. MillerKnoll, Inc.*
Case No. 23-cv-464
United States District Court for the Western District of Michigan
Expert for Defendant

*Guru Denim LLC v. Sweet People Apparel, Inc.*
Case No. 2:24-cv-00407 MEMF MMA
United States District Court for the Central District of California
Expert for Plaintiff

*RTW Retailwinds, Inc. et al. v. Colucci & Umans et al.*
Index No. 150794/2020
Supreme Court of the State of New York, County of New York
Expert for Defendants

Additional expert consulting engagements available upon request.

## Representative Litigation Matters

Mr. Gioconda has served as counsel in numerous intellectual property cases including:

*Hermès of Paris Inc. v. Lederer de Paris Fifth Avenue, Inc.*
*Playboy Enterprises v. OnLine Entertainment*
*Burberry Limited v. John Does*
*Tiffany & Co. v. BitchinBagz LLC*
*Lululemon Athletica v. John Does*
*Thomson Licensing LLC v. Westinghouse Digital LLC*
*Runberg Inc. v. Victoria's Secret Stores*
*La Quinta Worldwide v. Q.R.T.M. S.A. de C.V.*
*Pfizer Inc. v. Save On Drugs LLC*
*Valentino S.p.A. v. Mario Valentino S.p.A.*

## Professional Presentations and Affiliations

International Trademark Association (INTA)
American Bar Association (ABA)
New York State Bar Association (NYSBA)
Pennsylvania Bar Association (PBA)

Guest lecturer or speaker at:

Harvard Law School
Yale Law School
New York University School of Law
Benjamin Cardozo School of Law
New York Law School

## Pro Bono Activities

Representation of claimants before the September 11 Victim Compensation Fund.

Represent Tuesday's Children, a non-profit organization that provides healing and resilience for military families of the fallen and families affected by Tuesday, September 11, 2001, turning pain into purpose while honoring their legacies.

Docusign Envelope ID: CA8ED9B9-DE24-4C87-088E-98FB1D5ED9CA

Organize annual fundraising events supporting Autism Speaks, a nonprofit charitable organization.

Pro bono service with the Kings County District Attorney's Office (Brooklyn, New York), Appeals Bureau, serving as Special Assistant District Attorney responsible for appellate briefing, oral argument, and legal research involving serious felony convictions and post-trial criminal appeals.

*(vi) Affidavit of Steven Balasiano*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**
**www.flsb.uscourts.gov**

| | |
|---|---|
| VPX LIQUIDATING TRUST, by and through its Liquidating Trustee,<br><br>*Plaintiffs*,<br><br>v.<br><br>JOHN H. OWOC, MEGAN ELIZABETH OWOC, ELITE ISLAND LLC, JHO GA-1 INVESTMENT, LLC, JHO NV-1 INVESTMENT LLC, SHERIDAN REAL ESTATE INVESTMENT A, LLC, SHERIDAN REAL ESTATE INVESTMENT B, LLC, and SHERIDAN REAL ESTATE INVESTMENT C, LLC,<br><br>*Defendants*. | Case No. 22-17842 (PDR)<br>(Jointly Administered)<br><br><br>Adv. Pro. No. 24-01009 (PDR)<br><br><br>**AFFIDAVIT OF**<br>**STEVEN BALASIANO** |

Under 28 U.S.C. § 1746, Steven Balasiano hereby affirms as follows under the penalty of perjury:

## I.    BACKGROUND AND QUALIFICATIONS.

1.    I am the Liquidating Trustee of the VPX Liquidating Trust (the "Liquidating Trust") of Vital Pharmaceuticals, Inc. ("VPX") and certain of its affiliates in connection with the above-captioned chapter 11 cases (the "Chapter 11 Cases").   I submit this affidavit (the "Affidavit") solely in my capacity as Liquidating Trustee for the Liquidating Trust.

2.    I submit this Affidavit on behalf of the Liquidating Trust and in support of the *ex parte* relief requested in the *Ex Parte Emergency Motion for a Temporary Restraining Order and Preliminary Injunction* (the "Motion") being simultaneously filed herewith.   This Affidavit

addresses only why the Liquidating Trust is entitled to *ex parte* relief—that is, why Elite Island LLC ("Elite Island") should not be afforded advance notice and an opportunity to be heard before this Court rules on the Motion.

3.      Unless otherwise indicated herein, all facts set forth in this Affidavit are based upon my personal knowledge, information learned from my review of relevant documents and information, and my experience as Liquidating Trustee.  If called upon to testify, I could and would testify competently to the facts set forth herein on that basis.

4.      Providing advance notice of this Motion to Elite Island would create a substantial risk of harm to the Liquidating Trust because it would allow Elite Island the opportunity to mortgage or otherwise encumber the Overseas Highway Property, Elite Island's only asset, before this Court can hear and rule on the Motion.

5.      I am aware that in recent court hearings, and filings, Mr. and Mrs. Owoc have stated that they intend to obtain financing secured by the Overseas Highway Property in order to pay for their own attorneys and attorneys for other entities owned by Mr. Owoc.  If they are permitted to mortgage or obtain a lien against the property, that will impair the Liquidating Trust's ability to recover on its claims against Elite Island because, to the best of my knowledge, Elite Island does not have any other assets against which the Liquidating Trust may recover if it is successful on its claims.

6.      I authorized the Liquidating Trust's counsel to obtain an appraisal of the Overseas Highway Property.  The appraisal confirms that the harm posed to the Liquidating Trust is irreparable because the Liquidating Trust's claims against Elite Island exceed the current value of the Overseas Highway Property by more than $1 million.

7. In addition, the suspicious circumstances surrounding Elite Island's recent reinstatement heighten the risk. Elite Island was administratively dissolved for approximately six months. Yet within two days of the lis pendens being discharged, Elite Island was reinstated with two new members who had never before appeared in Elite Island's corporate filings. This rapid change in ownership structure, combined with the Owocs' expressed intent to obtain financing, suggests a coordinated effort to place the Overseas Highway Property beyond the Liquidating Trust's, and any other creditor's, reach.

8. Moreover, Elite Island's historical conduct suggests that it cannot be relied upon to preserve the Overseas Highway Property. Elite Island failed to pay property taxes on the Overseas Highway Property dating back to 2023, which nearly resulted in the property being sold at a tax deed sale. I authorized the Liquidating Trust to expend $166,258.82 to pay those overdue taxes and prevent the loss of the property. Elite Island's willful neglect of the property further supports the conclusion that, if given notice of this Motion, Elite Island would not act to preserve the property but rather would move to encumber or dispose of it.

9. For these reasons, I believe that immediate and irreparable injury will result to the Liquidating Trust before Elite Island can be heard in opposition to the motion. Providing notice of this Motion would effectively invite the very harm the Liquidating Trust seeks to prevent—the encumbrance, dissipation, transfer, and/or disposition of Elite Island's sole asset available to satisfy the Liquidating Trust's fraudulent transfer claims.

-3-

-4-

I affirm under penalty of perjury under the laws of the United States of America that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Dated: March 30, 2026

By:_____
STEVEN BALASIANO

# EXHIBIT B

# EXHIBIT C



Department of State  /  Division of Corporations  /  Search Records  /  Search by Entity Name  /

# Detail by Entity Name

Florida Limited Liability Company

ELITE ISLAND, LLC

**Filing Information**

| | |
|---|---|
| **Document Number** | L20000254428 |
| **FEI/EIN Number** | APPLIED FOR |
| **Date Filed** | 08/26/2020 |
| **Effective Date** | 08/26/2020 |
| **State** | FL |
| **Status** | ACTIVE |
| **Last Event** | REINSTATEMENT |
| **Event Date Filed** | 03/21/2026 |

**Principal Address**

6278 N Federal Hwy
#220
Fort Lauderdale, FL 33308

Changed: 03/21/2026

**Mailing Address**

6278 N Federal Hwy
220
Fort Lauderdale, FL 33308

Changed: 03/21/2026

**Registered Agent Name & Address**

Owoc, John H.
6278 N Federal Hwy
Suite 200
#220
Weston, FL 33326

Name Changed: 10/16/2023

Address Changed: 03/21/2026

**Authorized Person(s) Detail**

**Name & Address**

Title Authorized Member

Proprietary Property LLC
5203 Juan Tabo Blvd. NE
Suite 2A
Albuquerque, NM 87111

Title Authorized Member, Manager

Borrelli, Paul
6278 N Federal Hwy
#220
Fort Lauderdale, FL 33308

Title Manager

Owoc, John
6278 N Federal Hwy
220
Fort Lauderdale, FL 33308

### Annual Reports

| Report Year | Filed Date |
|---|---|
| 2024 | 04/29/2024 |
| 2025 | 03/21/2026 |
| 2026 | 03/21/2026 |

### Document Images

| | |
|---|---|
| 03/21/2026 -- REINSTATEMENT | View image in PDF format |
| 04/29/2024 -- ANNUAL REPORT | View image in PDF format |
| 10/16/2023 -- AMENDED ANNUAL REPORT | View image in PDF format |
| 09/28/2023 -- REINSTATEMENT | View image in PDF format |
| 01/07/2022 -- REINSTATEMENT | View image in PDF format |
| 08/26/2020 -- Florida Limited Liability | View image in PDF format |

Florida Department of State, Division of Corporations

Case 24-01009-PDR    Doc 452    Filed 03/31/26    Page 253 of 289

DIVISION OF CORPORATIONS



Department of State  /  Division of Corporations  /  Search Records  /  Return to Detail Screen  /

Return to Detail Screen

# Events

**ELITE ISLAND, LLC**

| | |
|---|---|
| **Document Number** | L20000254428 |
| **Date Filed** | 08/26/2020 |
| **Effective Date** | 08/26/2020 |
| **Status** | Active |

| Event Type | Filed Date | Effective Date Description |
|---|---|---|
| REINSTATEMENT | 03/21/2026 | |
| ADMIN DISSOLUTION FOR ANNUAL REPORT | 09/26/2025 | |
| REINSTATEMENT | 03/21/2026 | 03/21/2026 |
| ADMIN DISSOLUTION FOR ANNUAL REPORT | 09/26/2025 | |
| REINSTATEMENT | 09/28/2023 | |
| ADMIN DISSOLUTION FOR ANNUAL REPORT | 09/22/2023 | |
| REINSTATEMENT | 09/28/2023 | 09/28/2023 |
| ADMIN DISSOLUTION FOR ANNUAL REPORT | 09/22/2023 | |
| REINSTATEMENT | 01/07/2022 | |
| ADMIN DISSOLUTION FOR ANNUAL REPORT | 09/24/2021 | |
| REINSTATEMENT | 01/07/2022 | 01/07/2022 |
| ADMIN DISSOLUTION FOR ANNUAL REPORT | 09/24/2021 | |

Return to Detail Screen

Florida Department of State, Division of Corporations

# EXHIBIT D

**IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT**
**IN AND FOR BROWARD COUNTY, FLORIDA**

CASE NO. **CACE24002312**   DIVISION: **09**   JUDGE: **Levenson, Jeffrey R. (09)**

**Stag Development, LLC**

Plaintiff(s) / Petitioner(s)

v.

**Tropical Sunset 117, LLC**

Defendant(s) / Respondent(s)

_____/

## ORDER DENYING JOHN H. OWOC'S MOTION TO INTERVENE AND TO DISSOLVE OR MODIFY INJUNCTION AND/OR DISCHARGE RECEIVER

This cause came before the Court on John H. Owoc's Motion to Intervene and To Dissolve or Modify Injunction and/or Discharge Receiver ("Jack Owoc's Motion to Dissolve"). The Court, after receiving evidence and hearing testimony and argument of counsel during an in-person Evidentiary Hearing on April 11–12, 2024, and after reviewing (1) Jack Owoc's Motion to Dissolve and the attachments thereto (2) Jack Owoc's Reply to Plaintiff's Response to Owoc's Motion to Dissolve or Modify Injunction and to Discharge Receiver and the attachments thereto ("Jack Owoc's Reply") (Jack Owoc's Motion to Dissolve and Jack Owoc's Reply, collectively "Jack Owoc's Papers"), (3) Plaintiff Stag Development LLC's ("Stag") Verified Response to Intervenor, Jack Owoc's Motion To Dissolve Injunction And Discharge Receiver And Integrated Motion to Strike And Prohibit use of Jonathan Owoc's 2004 Examination Filed In Violation of Federal Court Order and attachment's thereto ("Stag's Response"), and (4) Plaintiff Stag Development, LLC's Verified Ex-Parte Emergency Motion for Preliminary Status-Quo Injunction and Appointment of a Receiver and attachments thereto ("Stag's Verified Motion") (Stag's Verified Motion and Stag's Response, collectively "Stag's Papers"), and having reviewed and considered other items in the record, such as (1) Intervenor VPX Liquidating Trust's ("VPX") Response In Opposition To John H. Owoc's Motion To Dissolve Injunction and Discharge Receiver ("Trust Response") and (2) Non-Party Monster Energy Company's ("Monster") Statement Re: John H. Owoc's

Verified Motion to Intervene and To Dissolve or Modify Injunction and/or Discharge Receiver ("Monster Statement"), and being otherwise fully advised in the premises, hereby **ORDERS and ADJUDGES** as follows:

### Brief Background

1. On February 20, 2024, following an emergency ex-parte evidentiary hearing, the Court granted Stag's Verified Motion and entered the Order Granting Plaintiff's Verified Ex-Parte Emergency Motion for Preliminary Status-Quo Injunction and Appointing a Receiver ("Order Appointing Receiver"), which put Tropical Sunset 117, LLC and all of its subsidiaries (collectively, "TS117") into receivership.

2. On February 21, 2024, the Court appointed Receiver, **Glenn Waldman, Esq**., filed his Notice of Acceptance, and the Receivership proceeded per the Order Appointing Receiver.

3. On April 4, 2024, John H. "Jack" Owoc ("Jack Owoc") filed Jack Owoc's Motion to Dissolve.

4. On April 5, 2024, Jack Owoc requested an expedited hearing pursuant to Florida Rule of Civil Procedure 1.610.

5. In opposition to Jack Owoc's Motion to Dissolve, Plaintiff filed Stag's Response, Intervenor VPX Liquidating Trust filed the Trust Response, and Non-Party Monster Energy Company filed the Monster Statement.

6. Pursuant to Jack Owoc's request, on April 11, 2024, and April 12, 2024, the Court held a trial-like evidentiary hearing. The Court heard opening statements from counsel, took documentary and electronic evidence, and heard testimony from Jack Owoc; Scott Reynolds, Esq.; Jack Owoc's proffered expert, Paul Vidas, CPA; and Jonathan W. Owoc. The Court then heard closing arguments from counsel and statements from counsel for VPX and Monster without objection.

### Holding

7. In light of the evidence presented, relevant authorities, and argument of counsel, the Court incorporates and reaffirms the findings in its Order Appointing Receiver. The parties agree that, following the Receiver's Notice of Acceptance, the injunction is dissolved by the terms of the February 20, 2024, Order, and there is no longer a need to address that issue.

8. In addition, the Court finds that Plaintiff has far exceeded its burden to prove that a Receiver is necessary under Florida Statute § 605.0702(1)(b)(2), (3), and (4). Florida Statute § 605.0704(1) permits the Court to appoint a receiver in a dissolution action if Plaintiff demonstrates the factors in just one of the preceding

Case Number: CACE24002312

sections. The Court finds that at each and every level, Plaintiff has exceeded its burden to prove that a Receiver is necessary under all three sections.

9. Specifically, the Court finds, for the reasons revealed at the hearing, stated on the record, in Stag's Papers, and previously outlined in the Order Appointing Receiver that (1) it is not reasonably practicable to carry on TS117's activities and affairs in conformity with the articles of organization and the operating agreement; and (2) Jack Owoc has acted, is acting, and is reasonably expected to act in a manner that is illegal or fraudulent; and (3) TS117's assets are being misappropriated or wasted, causing injury to TS117 and its members. By way of example, and as noted on the record, the Court finds that Jack Owoc's intent to, and belief that he is legally permitted to, characterize what would otherwise be distributions from TS117 as salary for the purpose of avoiding creditors is incorrect and improper, and his refusal to allow the closing of the 3 Pelican Dr. Property pursuant to a contract with a bona-fide purchaser was also incorrect and improper. The Court also notes that Receivership is necessary to preserve and prevent Jack Owoc from dissipating TS117's assets.

10. After considering the arguments, authorities, and evidence, and for the reasons stated herein, on the record, in the Order Appointing Receiver, and in Stag's Papers, the Court hereby **DENIES** Jack Owoc's Motion to Dissolve except to the extent that the Court granted Jack Owoc's request to intervene to pursue his Motion to Dissolve. **The Court GRANTS Plaintiff Stag Development LLC's request for the Court to reaffirm the Order Appointing Receiver.**

**DONE AND ORDERED** in Chambers at Broward County, Florida on 18th day of April, 2024.

CACE24002312 04-18-2024 3:54 PM

CACE24002312 04-18-2024 3:54 PM
Hon. Jeffrey Levenson
**CIRCUIT COURT JUDGE**
Electronically Signed by Jeffrey Levenson

**Copies Furnished To:**
Brett M Amron , E-mail : bamron@bastamron.com
Brett M Amron , E-mail : kszolis@bastamron.com
Brett M Amron , E-mail : jdepina@bastamron.com
Charles M. Tatelbaum , E-mail : hbb@trippscott.com
Charles M. Tatelbaum , E-mail : eService@trippscott.com
Charles M. Tatelbaum , E-mail : cmt@trippscott.com
Eyal Berger , E-mail : jeanette.martinezgoldberg@akerman.com
Eyal Berger , E-mail : kimberly.shinder@akerman.com

Eyal Berger , E-mail : eyal.berger@akerman.com
Glenn J Waldman , E-mail : mnewman@gunster.com
Glenn J Waldman , E-mail : gwaldman@gunster.com
Jeremy Hart , E-mail : jhart@bastamron.com
Jordan Alexander Shaw , E-mail : jshaw@zpllp.com
Jordan Alexander Shaw , E-mail : lgrealy@zpllp.com
Jordan Alexander Shaw , E-mail : mlomastro@zpllp.com
Lauren Nicole Palen , E-mail : lpalen@zpllp.com
Marc J. Gottlieb , E-mail : marc.gottlieb@akerman.com
Marc J. Gottlieb , E-mail : joyce.gutierrez@akerman.com
Michael I. Goldberg , E-mail : michael.goldberg@akerman.com
Michael I. Goldberg , E-mail : charlene.cerda@akerman.com
Michael I. Goldberg , E-mail : kimberly.smiley@akerman.com
Paul O. Lopez , E-mail : pol@trippscott.com
Peter Joseph Klock II , E-mail : mdesvergunat@bastamron.com
Peter Joseph Klock II , E-mail : pklock@bastamron.com
Peter Joseph Klock II , E-mail : peter.j.klock@gmail.com
Ryan H. Lehrer , E-mail : rhl@trippscott.com
Scott Mager , E-mail : Service@MPJustice.com
Scott Mager , E-mail : Yonathan@MPJustice.com
Scott Mager , E-mail : Aitor@MPJustice.com
Todd S Payne , E-mail : mguerrero@zpllp.com
Todd S Payne , E-mail : soquendo@zpllp.com
Todd S Payne , E-mail : tpayne@zpllp.com
Zachary Dean Ludens , E-mail : ZLudens@zpllp.com

# EXHIBIT E



| | Michael A. Kaplan<br>Partner | One Lowenstein Drive<br>Roseland, New Jersey 07068 |
|---|---|---|
| | | T: (973) 597-2302<br>F: (973) 597-2303<br>E: mkaplan@lowenstein.com |

January 27, 2026

**VIA EMAIL**

Joel M. Aresty, Esq.
309 1st Ave S
Tierra Verde, FL 33715
Aresty@Mac.com

Re:     **Cease and Desist - Unauthorized Demand for Release of Escrowed Funds Relating
to the Sale of 20311 and 20421 Sheridan Street**

Dear Mr. Aresty,

We write on behalf of our client, the VPX Liquidating Trust (the "Trust"), successor in interest to the bankruptcy estates of Vital Pharmaceuticals, Inc., et al. (the "Debtors") pending in the United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court"), in response to your client John H. Owoc's ("Jack Owoc") attempt to have First American Title Insurance Company ("First American") release the escrowed funds (the "Funds") of approximately $2,216,249.19.

**Demand to Cease and Desist**

The Trust hereby demands that Mr. Owoc and you, as his counsel, immediately cease and desist from any and all efforts to obtain the unilateral release of the Funds from escrow. Any further attempts to secure the release of these funds without the Trust's consent or a court order will be viewed as a willful violation of the Stipulation (defined below) and may result in appropriate legal action.

**The Stipulation Prohibits Unilateral Release**

As you should be are aware, the Funds are governed by the *Stipulation for Escrow of Certain Proceeds of the Sale of Sheridan Properties*, filed with the Bankruptcy Court on August 18, 2023 (Dkt. No. 1834) (the "Stipulation"). A true and correct copy of the Stipulation is attached hereto as **Exhibit A**. The Stipulation was entered into between the Debtors and the Sheridan Parties, including Mr. Owoc, Sheridan Real Estate Investment A, LLC ("Sheridan A"), and Sheridan Real Estate Investment C, LLC ("Sheridan C," collectively with Mr. Owoc and Sheridan A, the "Sheridan Parties").

Joel M. Aresty, Esq.                                                    January 27, 2026
                                                                                    Page 2

Under Paragraph 6 of the Stipulation, the Funds "shall not be used or disbursed absent (a) joint written instructions delivered to First American (or in the event such funds have been deposited with a third party bank as escrow agent, to such bank escrow agent), signed by counsel for each of the Parties authorizing the disbursement of the funds in accordance with those instructions, or (b) further order of the Bankruptcy Court, after a hearing on not less than ten (10) business days' notice."

Mr. Owoc's unilateral request for release of these Funds plainly violates the express terms of the Stipulation.  Neither condition for release has been satisfied: (1) the Trust has not provided, and will not provide, joint written instructions authorizing disbursement; and (2) no order of the Bankruptcy Court authorizing disbursement of the Funds has been entered.

**<u>The Funds are the Subject of Active Litigation</u>**

Additionally, the Funds are the subject of ongoing litigation in the adversary proceeding styled as *VPX Liquidating Trust v. Owoc, et al.*, No. 24-01009-PDR (the "<u>Adversary Proceeding</u>") pending before the Bankruptcy Court.  In its *Second Amended Complaint* (Dkt. No. 229), the Trust has asserted claims directly relating to the Funds, including but not limited to, a claim for declaratory judgment that the Funds belong to the Trust.  *See* Dkt. No. 229, Count 33.  Until the Bankruptcy Court has adjudicated the Trust's claims in the pending Adversary Proceeding, the Funds must remain in escrow in accordance with the Stipulation.  Moreover, Mr. Owoc's recent email to First American purported to seek various documents from both the Trust and First American.  Mr. Owoc's email from January 23, 2026 is attached hereto as **Exhibit B**.  Mr. Owoc cannot circumvent the Federal Rules of Civil Procedure by seeking discovery from the Trust outside of the Adversary Proceeding.

Any further attempts by Mr. Owoc to obtain release of the Funds outside of the procedures mandated by the Stipulation will be considered a breach of that agreement and may expose him to additional claims and sanctions.  The Trust reserves all rights and remedies available at law and in equity.

Please govern yourself accordingly.

Very truly yours,

/s/ *Michael A. Kaplan*

Michael A. Kaplan

317431640.1



# EXHIBIT A

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

In re:                                                      Chapter 11 Cases

VITAL PHARMACEUTICALS, INC., *et al.*,[1]                   Case No.: 22-17842-PDR

Debtors.                                                    (Jointly Administered)
_____/

**NOTICE OF FILING STIPULATION FOR ESCROW OF CERTAIN PROCEEDS OF
THE SALE OF SHERIDAN PROPERTIES**

Vital Pharmaceuticals, Inc., Bang Energy Canada, Inc., JHO Intellectual Property

Holdings, LLC, JHO Real Estate Investment, LLC, Quash Seltzer, EEC, Rainbow Unicorn Bev

LLC, and Vital Pharmaceuticals International Sales, Inc. (collectively, the "Debtors"), by and

through their undersigned counsel, file the attached, *Stipulation for Escrow of Certain Proceeds*

*Of The Sale Of Sheridan Properties*.

Dated: August 18, 2023                         Respectfully submitted,
        Miami, Florida
                                               */s/ Michael J. Niles*
George A. Davis (admitted *pro hac vice*)       Jordi Guso
Liza L. Burton (admitted *pro hac vice*)        Florida Bar No. 863580
Jonathan J. Weichselbaum (admitted *pro hac vice*)  Michael J. Niles
**LATHAM & WATKINS LLP**                        Florida Bar No. 107203
1271 Avenue of the Americas                     **BERGER SINGERMAN LLP**
New York, NY 10020                              1450 Brickell Avenue, Suite 1900
Telephone:  (212) 906-1200                      Miami, FL 33131
Email:  george.davis@lw.com                     Telephone:  (305) 755-9500
        liza.burton@lw.com                      Email:  jguso@bergersingerman.com
        jon.weichselbaum@lw.com                         mniles@bergersingerman.com

– and –

Andrew D. Sorkin (admitted *pro hac vice*)

---

[1]  The address of the Debtors is 1600 N. Park Drive, Weston, FL 33326.  The last four digits of the Debtors' federal tax identification numbers are: (i) Vital Pharmaceuticals, Inc. (8430); (ii) Bang Energy Canada, Inc. (5454); (iii) JHO Intellectual Property Holdings, LLC (0010); (iv) JHO Real Estate Investment, LLC (9394); (v) Quash Seltzer, LLC (6501); (vi) Rainbow Unicorn Bev LLC (2254); and (vii) Vital Pharmaceuticals International Sales, Inc. (8019).

12377650-1

**LATHAM & WATKINS LLP**
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004
Telephone: (202) 637-2200
Email: andrew.sorkin@lw.com

– and –

Joseph Celentino (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Telephone: (312) 876-7700
Email: joe.celentino@lw.com

*Co-Counsel for the Debtors*

12377650-1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

IN RE:                                                    Chapter 11 Case

VITAL PHARMACEUTICALS, INC., *et al.*,[1]                  Case No.: 22-17842-PDR

      Debtors.                                            (Jointly Administered)

_____/

**STIPULATION FOR ESCROW OF CERTAIN PROCEEDS**
**OF THE SALE OF SHERIDAN PROPERTIES**

    **THIS STIPULATION** is entered into by and between Vital Pharmaceuticals, Inc. ("VPX") and certain of its affiliates, as debtors and debtors in possession (collectively, including the parties listed in note 1, hereinafter the Debtors"), on the one hand, and John H. Owoc ("Owoc"), Sheridan Real Estate Investment A, LLC ("Sheridan A") and Sheridan Real Estate Investment C, LLC ("Sheridan C" together with Owoc and Sheridan A, the "Sheridan Parties"), on the other hand. The Sheridan Parties and VPX are referred to, collectively, as the "Parties".

    1.  On October 10, 2022, the Debtors filed voluntary petitions for relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court").

    2.  On or about July 27, 2023, Sheridan A sold certain real property located at 20311 Sheridan Street, Bldg. A, Pembroke Pines, FL 33332 ("Sheridan A Property").

    3.  On or about July 27, 2023, Sheridan C sold certain real property located at 20421

---

[1] The address of the Debtors is 1600 N. Park Drive, Weston, FL 33326.  The last four digits of the Debtors' federal tax identification numbers are: (i) Vital Pharmaceuticals, Inc. (8430); (ii) Bang Energy Canada, Inc. (5454); (iii) JHO Intellectual Property Holdings, LLC (0010); (iv) JHO Real Estate Investment, LLC (9394); (v) Quash Seltzer, LLC (6501); (vi) Rainbow Unicorn Bev LLC (2254); and (vii) Vital Pharmaceuticals International Sales, Inc. (8019).

12377642-1

Sheridan Street. Bldg. C, Pembroke Pines, Florida 33332 ("Sheridan C Property" with Sheridan A Property, the "Sheridan Properties").

4.   At such time, the Debtors made a demand for $2,216,249.19 (the "Reserved Funds") of the Net Proceeds from the sale of the Sheridan Properties which they asserted was due pursuant the Final Order dated January 12, 2023 approving postpetition financing [ECF No. 638, the "Final DIP Order"].   Sheridan Parties dispute such, which the Debtors contest.  However, to facilitate the closing of the sale of the Sheridan Properties without disruption, and without prejudice to all Parties rights, the Debtors and the Sheridan Parties agreed that the Reserved Funds were to be escrowed by First American Title Insurance Company ("First American"), the escrow agent at the closing on the Sheridan Properties.

5.   On or about August 4, 2023, while the dispute regarding each party's entitlement to the Reserved Funds was pending, and without written authorization from the Parties, First American delivered the Reserved Funds to VPX.

6.   Given the foregoing, upon execution of the within Stipulation, VPX and the Sheridan Parties hereby agree that VPX shall immediately return the Reserved Funds to First American to hold in escrow either directly or upon written agreement of the Parties, through a third party bank as escrow agent agreed upon by the Parties (which shall be independent and unrelated to the Parties and subject cases), which shall not be used or disbursed absent (a) joint written instructions delivered to First American (or in the event such funds have been deposited with a third party bank as escrow agent, to such bank escrow agent), signed by counsel for each of the Parties authorizing the disbursement of the funds in accordance with those instructions, or (b) further order of the Bankruptcy Court, after a hearing on not less than ten (10) business days' notice.

2

12377642-1

7.     Each of the undersigned counsel represents that he is authorized to execute this Stipulation on behalf of his respective client(s).

8.   This Stipulation is binding on the Parties hereto, and their respective heirs, administrators, executors, personal representatives, successors and permitted assigns.

9.     Neither this Stipulation nor any of the provisions hereof can be changed, waived, discharged or terminated, except by an instrument in writing signed by all Parties.

10.  This Stipulation may be executed in multiple counterparts and all counterparts, together, shall be deemed but one agreement.

Stipulated and agreed to between the Parties on August 18, 2023.

| **Berger Singerman LLP** | **Mayer Brown LLP** |
|---|---|
| By: s/*Jordi Guso* | By: s/*Douglas E. Spelfogel* |
| Jordi Guso, Esq | Douglas E. Spelfogel, Esq. |
| 1450 Brickell Avenue, Suite 1900 | 1221 Avenue of the Americas |
| Miami, Florida 33131 | New York, New York 10020 |
| Telephone: (305) 755-9500 | Telephone: (212) 506-2500 |
| Email: jguso@bergersingerman.com | Email: dspelfogel@mayerbrown.com |
| **Counsel for Vital Pharmaceuticals, Inc., et al.** | **Counsel For: John H. Owoc; Sheridan Real Estate Investment A, LLC; and Sheridan Real Estate Investment C, LLC** |

3

12377642-1

# EXHIBIT B

| | |
|---|---|
| **From:** | jackowoc.ceo |
| **Sent:** | Friday, January 23, 2026 5:56 PM |
| **To:** | Mannix, Erica G.; Anna Louise Smith; megliz |
| **Cc:** | drew@melville.law; Kaplan, Michael A.; Cohen, Jeffrey L.; Chafetz, Eric S.; Julceus, Markiana J.; aresty |
| **Subject:** | Re: 20311 & 20421 Sheridan Street |

**Erica, Louise,**

This email constitutes a **formal demand for production of documents** and **notice of imminent litigation** arising from the wrongful diversion and continued retention of $2,216,249.19 in Seller proceeds from the July 27, 2023 Sheridan Properties closing.

---

**To Erica (for Vital Pharmaceuticals, Inc.):**

Please promptly produce **all documents, communications, and records** relied upon, referenced, or used by Vital Pharmaceuticals, Inc. in asserting and formulating the $2,216,249.19 "Miscellaneous Disbursement – Sources & Uses to Vital Pharmaceuticals Inc." line item added to the closing statement, including but not limited to:

• All invoices, receipts, and vendor statements
• All proof of payment (wire confirmations, cancelled checks, bank statements)
• All internal spreadsheets, summaries, or accounting schedules
• All correspondence (internal or external) referencing reimbursement, offsets, or carrying costs
• All documents purporting to support entitlement under the DIP Order
• All parcel-specific cost allocations for the Sheridan Properties
• All communications with Truist Bank or First American regarding this claim
• All drafts and revisions of closing statements reflecting the Vital reimbursement line item

---

**To Louise (for First American Title Insurance Company):**

Please promptly produce **all documents, communications, and records** relied upon or reviewed by First American in:

• Accepting Vital Pharmaceuticals, Inc.'s last-minute reimbursement demand
• Adding the $2,216,249.19 disbursement line item to the settlement statement
• Agreeing to escrow the Seller's funds
• Continuing to retain the escrowed funds
• Declining to release escrow to the Seller

1

Including but not limited to:

• All escrow instructions and internal policies
• All emails, memoranda, notes, and transaction logs
• All communications with Vital Pharmaceuticals, Inc. and Truist Bank
• All legal guidance or internal approvals authorizing these actions
• All versions of the settlement statement
• All documents relating to the August 3, 2023 wire / escrow handling
• All documents relating to the August 30, 2023 Escrow Agreement

---

**Additional Notice**

Please copy **Josh Cohen** on this correspondence.
My wife spoke with Mr. Cohen today and advised him that we intend to file suit against First American Title Insurance Company for breach of fiduciary duty, escrow breach, conversion, and related claims arising from this transaction.

---

**Litigation Hold Notice**

Vital Pharmaceuticals, Inc. and First American Title Insurance Company are hereby placed on **formal litigation hold notice**.

You must preserve all documents, emails, messages, metadata, backups, transaction records, and internal communications relating to:

• The Sheridan Properties closing
• The $2,216,249.19 reimbursement demand
• The escrowed Seller proceeds
• The DIP Order reimbursement theory
• All communications between Vital, First American, and Truist
• All internal deliberations regarding escrow or disbursement

Any destruction or spoliation of evidence will result in additional claims and sanctions.

---

Please confirm in writing within **48 hours** that you are preserving all responsive documents and will produce them promptly.

Regards,
**John H. Owoc**
6278 N Federal Hwy #220
Fort Lauderdale, FL 33308

2

954-632-7226
Jackowoc.ceo@gmail.com

---

**From:** Mannix, Erica G. <EMannix@lowenstein.com>
**Date:** Friday, January 23, 2026 at 1:25 PM
**To:** Anna Louise Smith <alsmith@firstam.com>
**Cc:** jackowoc.ceo <jackowoc.ceo@gmail.com>, drew@melville.law <drew@melville.law>, Kaplan, Michael A. <MKaplan@lowenstein.com>, Cohen, Jeffrey L. <JCohen@lowenstein.com>, Chafetz, Eric S. <EChafetz@lowenstein.com>, Julceus, Markiana J. <MJulceus@lowenstein.com>, aresty <aresty@mac.com>
**Subject:** RE: 20311 & 20421 Sheridan Street

Good afternoon Ms. Smith –

Copying in Mr. Owoc's counsel, Joel Aresty.

This firm represents the VPX Liquidating Trust (the "Trust") in connection with the bankruptcy estates of Vital Pharmaceuticals, Inc. et al.  The Trust **does not** consent to the release of escrow funds, which are currently the subject of litigation.

Thank you,
Erica

**Erica G. Mannix**
Counsel
Lowenstein Sandler LLP

T: (212) 419-6020
M: (732) 674-1495

 



---

**From:** Chafetz, Eric S. <EChafetz@lowenstein.com>
**Sent:** Friday, January 23, 2026 12:45 PM
**To:** Anna Louise Smith <alsmith@firstam.com>
**Cc:** jackowoc.ceo <jackowoc.ceo@gmail.com>; drew@melville.law; Kaplan, Michael A. <MKaplan@lowenstein.com>; Cohen, Jeffrey L. <JCohen@lowenstein.com>; Mannix, Erica G. <EMannix@lowenstein.com>
**Subject:** Re: 20311 & 20421 Sheridan Street

Looping in a few others and moving Andy to Bcc.

**Eric S. Chafetz**
Partner
Lowenstein Sandler LLP

3

T: (646) 414-6886
M: (646) 345-1466

 



On Jan 23, 2026, at 11:55 AM, Anna Louise Smith <alsmith@firstam.com> wrote:

Thank you.  I have added Mr. Owoc and have removed Mr. Schoeppl, as he does not currently represent Mr. Owoc.
Louise

**Louise Smith**
Commercial Escrow Officer



First American Title Insurance Co
101 S. Hanley Road, Suite 575, St. Louis, MO 63105
http://www.firstam.com | NYSE: FAF

Direct: 314-898-1649
Mobile: 314-710-8018 Fax: 866-493-5434
Email: alsmith@firstam.com

*Please note that when we send funds via wire transfer we require verification of the authenticity of wire instructions by telephoning a trusted individual.  The safety of your funds is important to us and with wire fraud on the rise we do want to add a layer of protection.*

---

**From:** Andrew.Sorkin@lw.com <Andrew.Sorkin@lw.com>
**Sent:** Friday, January 23, 2026 10:52 AM
**To:** Anna Louise Smith <alsmith@firstam.com>
**Cc:** drew@melville.law; carl@schoeppllaw.com; EChafetz@lowenstein.com
**Subject:** [External] RE: 20311 & 20421 Sheridan Street

Thank you Anna.  I am looping in Eric Chafetz, who represents the liquidating trust (i.e., the bankruptcy estate), who can speak for the Vital Pharmaceuticals side.

**Andrew Sorkin**

**LATHAM & WATKINS** LLP
555 Eleventh Street, NW | Suite 1000 | Washington, D.C. 20004-1304
1271 Avenue of the Americas | New York, NY 10020
Direct Dial: +1.202.637.3302
Mobile: +1.315.427.8901

Email: andrew.sorkin@lw.com
https://www.lw.com

---

**From:** Anna Louise Smith <alsmith@firstam.com>
**Sent:** Friday, January 23, 2026 7:47 AM
**To:** Sorkin, Andrew (DC) <Andrew.Sorkin@lw.com>
**Cc:** Drew Melville <drew@melville.law>; Carl Schoeppl <carl@schoeppllaw.com>
**Subject:** FW: 20311 & 20421 Sheridan Street

Good morning.
You may or may not remember, but I assisted with this closing in Josh's absence.
We have been contacted by the seller to release the funds we are holding in escrow.  Per Section 3. a) of the Escrow Agreement we will either need joint written instructions signed by counsel for each party, or a further order of the Bankruptcy Court.
Please advise as soon as possible.
Thank you,
Louise

**Louise Smith**
Commercial Escrow Officer



First American Title Insurance Co
101 S. Hanley Road, Suite 575, St. Louis, MO 63105
http://www.firstam.com | NYSE: FAF

Direct: 314-898-1649
Mobile: 314-710-8018 Fax: 866-493-5434
Email: alsmith@firstam.com

*Please note that when we send funds via wire transfer we require verification of the authenticity of wire instructions by telephoning a trusted individual.  The safety of your funds is important to us and with wire fraud on the rise we do want to add a layer of protection.*

**********************************************************************************
*****
This message may contain confidential or proprietary information intended only for the use of the addressee(s) named above or may contain information that is legally privileged.
If you are not the intended addressee, or the person responsible for delivering it to the intended addressee, you are hereby notified that reading, disseminating, distributing or copying this message is strictly prohibited.
If you have received this message by mistake, please immediately notify us by replying to the message and delete the original message and any copies immediately thereafter.

If you received this email as a commercial message and would like to opt out of future commercial messages, please let us know and we will remove you from our distribution list.

5

Thank you.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*
FAFLD

_____

This email may contain material that is confidential, privileged and/or attorney work product for the sole use of the intended recipient.  Any review, disclosure, reliance or distribution by others or forwarding without express permission is strictly prohibited.  If you are not the intended recipient, please contact the sender and delete all copies including any attachments.

Latham & Watkins LLP or any of its affiliates may monitor electronic communications sent or received by our networks in order to protect our business and verify compliance with our policies and relevant legal requirements. Any personal information contained or referred to within this electronic communication will be processed in accordance with the firm's privacy notices and Global Privacy Standards available at www.lw.com.

---

This message contains confidential information, intended only for the person(s) named above, which may also be privileged. Any use, distribution, copying or disclosure by any other person is strictly prohibited. In such case, you should delete this message and kindly notify the sender via reply e-mail. Please advise immediately if you or your employer does not consent to Internet e-mail for messages of this kind.

6

# EXHIBIT F

**IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA**

CASE NO. <u>**CACE24002312**</u>   DIVISION: <u>**09**</u>   JUDGE: <u>**Levenson, Jeffrey R (09)**</u>

**Stag Development, LLC**

Plaintiff(s) / Petitioner(s)

v.

**Tropical Sunset 117, LLC**

Defendant(s) / Respondent(s)

_____/

## <u>ORDER DECLARING JOHN H. JACK OWOC TO BE A VEXATIOUS LITIGANT AND REQUIRING PREFILING INJUNCTION AND SECURITY</u>

THIS CAUSE came before the Court on Plaintiff, Stag Development, LLC's ("Plaintiff" or "Stag"), February 6, 2026, Motion to Declare Intervenor Jack Owoc a Vexatious Litigant Pursuant to Rule 68.093, and to Require Prefiling Injunction and Security ("Stag Motion"). The Court having reviewed the filings, the docket, and having heard argument and received evidence at an evidentiary hearing on February 12, 2026, the Court orders and adjudges as follows:

### I. Findings of Fact

On February 12, 2026, the Court heard arguments and took evidence from Counsel for Stag Development. Counsel for the Receiver and the VPX Liquidating Trust were also present. The hearing was coordinated with all interested parties, including John H. "Jack" Owoc, who is an intervenor in this action. The hearing was duly noticed to all parties and intervenors, including Jack Owoc, and proceeded accordingly. Jack Owoc did not appear and instead filed a "Notice of Non-Appearance." Jack Owoc did not file any formal opposition to the Stag Motion and did not present substantive arguments in opposition. The arguments, evidence, court docket, and observations confirm the following facts:

This case is an action by Stag, a minority member of Tropical Sunset 117, LLC ("TS117"), against TS117. Stag sought and this Court issued an ex-parte order placing TS117 into a receivership. The predicate for the receivership was and remains misconduct by TS117's majority member, John H. "Jack" Owoc, which this Court described as "illegal or fraudulent conduct." Consistent with other filings in this case, this order will refer to John H. "Jack" Owoc as "Jack Owoc" to avoid confusion with Jonathan W. Owoc, who is Jack Owoc's son and a member of Stag.

Following the issuance of the ex-parte Order, Jack Owoc, through counsel, moved for and was granted intervention for the purpose of moving to dissolve the receivership. Jack Owoc, through counsel, did, in fact, seek to dissolve the receivership. Following a trial like evidentiary hearing, the Court denied Jack Owoc's motion to dissolve the receivership and in doing so reaffirmed and expanded upon its findings in the original ex-parte Order. Jack Owoc's counsel then withdrew from the case.

This withdrawal marked the start of intermittent pro se litigation by Jack Owoc. Following his initial stint as a pro se litigant, Jack Owoc then retained another law firm. However, despite being represented, Jack Owoc frequently interrupted counsel, both his own counsel and counsel for the other parties, with sudden outbursts and insults directed at Plaintiff's counsel, the Receiver, the Receiver's counsel, and others. During this time, the Court approved a settlement and plan for the receivership to finalize the TS117's affairs, complete ongoing projects, and otherwise wind up TS117's affairs and distribute assets accordingly.

Jack Owoc then subsequently fired his second counsel in the middle of a hearing, and the Court later entered an order confirming the withdrawal. Jack Owoc then attempted to hire another lawyer. However, that counsel's formal appearance was never solidified, and Jack Owoc began what has now been his longest stretch as a pro se litigant. He remains pro se as of the date of this Order.

Jack Owoc is also proceeding pro se in at least two other litigations in Florida. The first pending in the United States Bankruptcy Court for the Southern District of Florida before Judge Peter Russin, stemming from the Bankruptcy of Vital Pharmaceuticals, Jack Owoc's former company ("Bankruptcy Matter"); the second pending in the United States District Court for the Southern District of Florida before Judge Patrick Hunt, which is a case that Jack Owoc filed against Stag's counsel following Stag's success in maintaining the receivership ("Stag Counsel Matter").

Important to the instant considerations is the fact that in the Bankruptcy Matter, Jack Owoc was found by the Court to have engaged in a pattern of frivolous, vexatious, unsupported filings that disrupted the judicial process. These filings caused Judge Peter Russin to issue an order declaring Jack Owoc was a vexatious litigant. That declaration did not stop Jack Owoc from engaging in continued frivolity in the Bankruptcy Matter, sparking Judge Russin to enter a pre-filing injunction against Jack Owoc.

The record and evidence before the Court demonstrate that Jack Owoc has engaged in the same or similar conduct in this case. More specifically, in the first 40 days of 2026, alone Jack Owoc, acting pro se, has filed: (1) an emergency motion seeking to declare the receivership void ab initio; (2) an expedited motion to intervene on all matters and opportunity to be heard; (3) a "bench memorandum"; (4) a motion to compel the Receiver to produce documents already produced; (5) an emergency objection and motion to strike a notice of parental leave unavailability; (6) a February 5, 2026, Motion to Disqualify this Court; (7) a Verified Supplemental Memorandum and Addendum in Support of Verified Motion to Disqualify; (8) a Verified Motion to Stay the Proceedings; and (9) a Notice of Non-appearance, which confirmed both that Jack Owoc had notice of the hearing and argued, albeit frivolously, that it could not proceed unless and until Jack Owoc was granted the relief he sought.

Despite their "emergency" or "expedited" designation, none of Jack Owoc's filings were emergent. Instead, the filings contained nothing more than attempts to relitigate decided issues, mis-citations and applications of law, unsupported accusations, and ramblings about alleged misfortunes having little or nothing to do with the issues in this case. Ironically too, Jack Owoc also complained of the attorneys' fees incurred by the Receiver—fees which have been no doubt significantly exacerbated by Jack Owoc's vexatious litigation.

Prior to his most recent filings and emails, Jack Owoc, acting pro se, also filed a motion, which in part asked the Court to give TS117's assets to the IRS to satisfy Jack Owoc's personal IRS debts; and a motion to compel discovery despite no discovery being served. The above formally filed motions are in addition to Jack Owoc's ore tenus motions, which have occurred at a majority of the hearings and case management conferences and include repeated motions for sanctions against Plaintiff's counsel; Repeated motions for sanctions against the Receiver's counsel; Repeated motions for sanctions against the Plaintiff; Repeated motions for sanctions against the Receiver; Repeated motions to dissolve the receivership; Repeated attempts to eliminate the Court approved

settlement; and Repeated threats of legal action and recusal directed at the Court.

These ore tenus motions number too many to count and are often characterized by sudden outbursts, including loudly calling Stag's owners "clowns", interruptions, and prolonged, incendiary monologues, which recently resulted in Jack Owoc's removal from the Courtroom by an armed deputy, following his refusal to heed the Court's instructions and the unarmed bailiff's instructions. Jack Owoc even alludes to this misconduct, almost proudly, in one of his recent filings where he alleges that he refused to be silenced by the Court during a hearing. This conduct is in addition to other seemingly retaliatory conduct, which appears to be aimed at gaining advantage in this litigation such as the filing of Florida Bar Complaints against the Receiver and a federal lawsuit against counsel for Stag, both of which Jack Owoc has repeatedly reminded the Court about. Jack Owoc's most recent attempts to further expand the scope of his intervention and seemingly interfere with TS117, the receivership, and this case, sparked the filing of the Stag Motion that is the subject of this Order.

## II. Conclusions of Law

### a. Legal Framework

The right to access to Court is of paramount importance, however, as outlined by Judge Russin in his orders in the Bankruptcy Matter, that access is not unlimited nor unfettered. Florida law provides limitations. Pursuant to Florida Statute § 68.093(2)(c)(2-5), a "Vexatious litigant" means a person, as defined in s. 1.01(3), proceeding pro se, who:

. . .

2. After an action has been finally and adversely determined against the person, repeatedly relitigates or attempts to relitigate either the validity of the determination against the same party as to whom the action was finally determined or the cause of action, claim, controversy, or any of the issues of fact or law determined by the final and adverse determination against the same party as to whom the action was finally determined;

3. Repeatedly files pleadings, requests for relief, or other documents that have been the subject of previous rulings by the court in the same action;

4. Repeatedly files unmeritorious pleadings, requests for relief, or other documents; conducts unnecessary discovery; or engages in other tactics that are frivolous or solely intended to cause unnecessary delay in any action; **or**

5. Has been previously found to be a vexatious litigant pursuant to this section or by another state court or a federal court.

§ 68.093(2)(c)(2-5), Fla. Stat.

In the event a pro se litigant is deemed to be a vexatious litigant, the Court may protect the other parties to the litigation against further vexatious conduct.

(3)(a) In any action pending in any court of this state, any party may move the court, upon notice and hearing, for an order requiring an opposing party to furnish security. The motion shall be based on the grounds, and supported by a showing, that the opposing party subject to the motion is a vexatious litigant and is not reasonably likely to prevail on the merits of the action against the moving party.

(b) At the hearing for an order to post security, the court shall consider any evidence, written or oral, by witness or affidavit, which may be relevant to the consideration of the motion. No

determination made by the court in such a hearing shall be admissible on the merits of the action or deemed to be a determination of any issue in the action. If, after hearing the evidence, the court determines that the opposing party subject to the motion is a vexatious litigant and is not reasonably likely to prevail on the merits of the action against the moving party, the court shall order the vexatious litigant to furnish security to the moving party in an amount and within such time as the court deems appropriate.

If so required, a bond required by the Court must be sufficient to cover the other parties' attorneys' fees and litigation costs—in this case Stag and the Receiver.

(b) "Security" means an undertaking by a vexatious litigant to ensure payment to a party in an amount reasonably sufficient to cover the party's anticipated, reasonable expenses of litigation, including attorney fees and taxable costs.

§ 68.093, Fla. Stat. Ann.

If, after being required by the Court, no bond is posted, the action or motion may be dismissed, stricken, or denied.

(c) If the vexatious litigant fails to post security required by an order of the court under this section and the vexatious litigant is:

1. A plaintiff or petitioner, the court shall immediately issue an order dismissing the action with prejudice as to the moving party for whose benefit the security was ordered;

or

2. A defendant or respondent, the court may immediately issue an order imposing one or more of the following sanctions, as appropriate:

a. Denial of the vexatious litigant's request for relief;

b. Striking of the vexatious litigant's pleading or other document or part thereof;

**or**

c. Rendition of a judgment by default against the vexatious litigant.

(d) If the motion for an order to post security is filed before the trial in an action, the action shall be automatically stayed and the moving party need not plead or otherwise respond to the vexatious litigant's complaint, pleading, request for relief, or other document until 10 days after the motion for an order to post security is denied. If the motion for an order to post security is granted, the moving party shall respond or plead no later than 10 days after the required security has been furnished.

§ 68.093(3)(c)(1-2) and (d)

The Court may also enter a pre-filing injunction, as additional protection against vexatious litigation by a pro se party.

(4) In addition to any other relief provided in this section, the court in any judicial circuit may, on its own motion or on the motion of any party, enter a prefiling order prohibiting a vexatious litigant from commencing, pro se, any new action in the courts of that circuit without first obtaining leave of the court. Disobedience of such an order may be punished as contempt of

court. Leave of court shall be granted by the court only upon a showing that the proposed action is meritorious and is not being filed for the purpose of delay or harassment. The court may condition the filing of the proposed action upon the furnishing of security as provided in this section.

(5) The clerk of the court may not file any new action by a pro se vexatious litigant against whom a prefiling order has been entered unless the vexatious litigant has obtained an order from the court allowing such filing. If the clerk of the court mistakenly allows a pro se vexatious litigant to file any new action in contravention of a prefiling order, any party to that action may file with the clerk and serve on the vexatious litigant and all other parties a notice stating that the vexatious litigant is subject to a prefiling order. The filing of such a notice shall automatically stay the litigation against all parties to the action. The court shall automatically dismiss the action with prejudice within 10 days after the filing of such notice unless the vexatious litigant files a motion for leave to file the new action. If the court issues an order granting leave, the pleadings or other responses to the complaint need not be filed until 10 days after the date of service by the vexatious litigant of a copy of the order granting leave.

(6) The clerk of a court must provide copies of all prefiling orders to the Clerk of the Florida Supreme Court, who must maintain a registry of all vexatious litigants.

(7) An automatic stay imposed under this section remains in effect until the court:

> (a) In its discretion, vacates the stay;

> (b) Rules, as applicable, on the motion for an order to post security under paragraph (3)(d) or the motion for leave under subsection (5); or

(c) Dismisses the action under subsection (5).

(8) The relief provided under this section shall be cumulative to any other relief or remedy available under the laws of this state or the rules of court, including, but not limited to, the relief provided under s. 57.105.

§ 68.093(4-8), Fla. Stat.

Prefiling security, as well as pre-filing injunctions are proper, constitutional, and should be utilized to protect others against vexatious litigants. *Smith v. Fisher*, 965 So. 2d 205, 206–11 (Fla. 4th DCA 2007); *Mistivar v. Broward Cnty. Sheriff's Office*, 2025 WL 3648777, at *2 (Fla. 4th DCA Dec. 17, 2025); s*ee, alsoBrown v. Miami-Dade County*, 319 So.3d 81 (Fla. 3rd DCA 2021).

### b. Jack Owoc is a Vexatious Litigant Under § 68.093(2)(c)(2).

Jack Owoc is a vexatious litigant under § 68.093(2)(c)(2). Other than the carrying out of the Court approved Settlement Agreement, there is little left for Jack Owoc, nor the parties to litigate. This case is settled and aside from managing claims that may flow from the winding up of TS117's affairs, Jack Owoc's challenges to the receivership have been fully and finally adjudicated and are no longer subject to appeal. Of course, an intervenor's claims are in recognition of and subordinate to the primary proceeding. In this case the primary proceeding is settled as between the parties and is in the process of the Court approved plan of settlement. Nonetheless, both through various frivolous "emergency" or "expedited" filings, and oral demands, Jack Owoc has moved this Court time, after time, to vacate prior orders, dissolve the receivership, and vacate the settlement. He has repeatedly attempted to relitigate matters that are fully and finally adjudicated. Each time raising the same

arguments that have been rejected by this Court time, and time, again as being unsupported by fact or law.

### c. Jack Owoc is a Vexatious Litigant Under § 68.093(2)(c)(3).

For the same reasons outlined in the previous section, even if Jack Owoc were not a vexatious litigant under section § 68.093(2)(c)(3), he is most certainly a vexatious litigant under (c)(3). As detailed above, Jack Owoc has sought to relitigate—via filing and ore tenus motions—his motion to dissolve the receivership and his objection to the Court approved settlement time, after time, after time.  Most recently, on February 3, 2026, Jack Owoc sought to declare the receivership void. Prior to that, he moved ore tenus to dissolve the receivership at an in-person case management conference. Prior to that, Jack Owoc made the same or similar request in most, if not all of the hearings during which he spoke on record. Each time, raising the exact same arguments and cites to the exact same "evidence" that has been repeatedly rejected by this Court.

### d. Jack Owoc is a Vexatious Litigant Under § 68.093(2)(c)(4).

Jack Owoc is also a vexatious litigant under § 68.093(2)(c)(4). In addition to the repeated requests to relitigate his prior attempts to dissolve the receivership and remove the Receiver, Jack Owoc has filed motions to compel discovery when no discovery has been served, filed a motion to strike notices of unavailability for parental leave, sought sanctions, ore tenus, more times than one can count, and has engaged in and frivolous and unacceptable conduct. At a recent hearing, the Receiver's counsel was forced to argue against Jack Owoc's motion to compel production of documents, which were never formally requested in discovery but nonetheless were previously produced by the Receiver. When asked by the Court to conclude his argument to allow for the orderly administration of the case, Jack Owoc started a diatribe about his first amendment rights, refusing to heed the Court's instructions and requiring the court bailiff's intervention. Jack Owoc's monologue persisted despite the bailiff's instruction to leave the courtroom, which sparked the court bailiff to radio for an armed deputy who escorted Jack Owoc and his wife out of the Courtroom. Jack Owoc's wife, Megan Owoc, often joins Jack Owoc in his courtroom outbursts. While Jack Owoc have been granted great leeway, there is a limit, and Jack Owoc has reached it.

### e. Jack Owoc is a Vexatious Litigant Under § 68.093(2)(c)(5).

Finally, having been emphatically deemed a vexatious litigant in the Bankruptcy Matter, and having seemingly failed to be deterred thereby, Jack Owoc is also a vexatious litigant under § 68.093(2)(c)(5). On April 23, 2025, Judge Peter Russin of the United States Bankruptcy Court for the Southern District of Florida entered not one, but two orders designating Jack Owoc and his wife as Vexatious Litigants.

Judge Russin warned Jack Owoc of the potential for a pre-filing injunction and held that "Mr. Owoc clearly harassed the Court and the other parties with his conduct at the hearing, and he is clogging and abusing this proceeding's docket with his frivolous and vexatious filings." That same day, Judge Russin held, inter alia, "the Owocs' filings are frivolous, vexatious, and an abuse of the bankruptcy process."

On June 27, 2025, following Jack Owoc's Motion for Reconsideration of the Court's Vexatious Litigant designation, Judge Russin held:

> The Owocs' Motion for Reconsideration1 asks the Court not to disturb its legal rulings, but to reconsider the words used to describe the Movants' litigation conduct— words like "frivolous," "vexatious," and "abusive." The Court chose those words carefully. They were conclusions drawn from a record replete with repetitive, inflammatory, and unsupported filings that burdened the estate, the Court, and the integrity of these proceedings.

> When, Jack Owoc continued his vexatious litigation, on July 17, 2025, Judge Russin reaffirmed the

Vexatious Litigant designation and issue a prefiling Injunction, holding, inter alia:

> Mr. Owoc — joined at times by his wife, Megan E. Owoc (together, the "Movants") — has engaged in a campaign of litigation that has long since ceased to serve any constructive purpose. This includes filing twenty-six frivolous motions, coupled with threatening and inflammatory behavior at hearings. In a series of orders, this Court has addressed — patiently and at length — the many accusations and grievances raised by the Movants. In doing so, the Court has repeatedly explained why their claims are legally and factually unfounded, has denied their motions on the merits, and has warned — clearly and repeatedly — that continued misuse of the process would not be tolerated.

> Despite those warnings, the filings have continued. The latest motions — seeking vacatur of a prior order and yet another recusal of the undersigned — raise nothing new. They simply recycle the same arguments that have already been rejected. They mischaracterize the record, ignore the procedural avenues provided to them to resolve their concerns, and impose yet more unnecessary cost and delay on the estate and this Court.

> The Court's prior orders have already found that this pattern of filings is frivolous, vexatious, and an abuse of the judicial process.10 The Court's Vexatious Designation Order warned: "should Mr. Owoc persist in filing frivolous, duplicative, or abusive motions, the Court may decline to set them for hearing and may impose reasonable filing restrictions, including requiring prior leave of court."

> In the time since the Vexatious Designation Order was entered on April 23, 2025, Mr. Owoc has filed nine more frivolous and duplicative motions. The latest filings do not merely fail to disprove the Court's finding that Mr. Owoc is a vexatious litigant — they strengthen it. They provide yet another illustration of the very conduct that has led this Court to conclude that additional measures are necessary to protect the integrity of these proceedings.

The Bankruptcy Court then issued the following pre-filing injunction:

> Effective immediately, John H. Owoc (a.k.a. Jack Owoc) and Megan E. Owoc are enjoined from filing any further motions, pleadings, or papers on the docket in this Chapter 11 case, without first obtaining leave of Court.

> To seek leave, the Movants must file a written request titled "Request for Leave to File," attach the proposed filing, and certify under penalty of perjury that the proposed filing is made in good faith, is not repetitive of prior arguments, and is not intended to harass any party or to burden the Court.

Despite Judge Russin's injunction in the Bankruptcy Matter, Jack Owoc's conduct in this matter has gotten progressively worse. The frequency of his filings has increased, as has the impropriety, frivolity, and vexatiousness of their content. It is clear to this Court that more than an injunction is necessary.

### III. Holding

For the reasons stated herein, the Stag Motion is **GRANTED,** as follows:

1. The Court finds that, for the reasons stated herein, Jack Owoc is a vexatious litigant. The Clerk of Court is hereby directed to take all steps necessary and consistent with such designation, including submission of this Order to the Florida Supreme Court so that John H. Owoc a/k/a Jack Owoc is included in the Florida Supreme Court's registry of vexatious litigants.

2. The Court hereby enters a pre-filing injunction requiring that Jack Owoc seek leave of Court before filing any motion or action, and attest, under penalty of perjury that the proposed filing is made in good faith, is not repetitive of prior arguments, and is not intended to harass any party or to burden the Court.

3. Within 20 days, Jack Owoc must post a bond in the amount of $65,000.00, as a pre-requisite to filing any new action or motion, or seeking any other relief from this Court. The Court finds that, in light of the issues, complexity, and content of Jack Owoc's filings, and the frequency thereof, the bond amount is appropriate and necessary to cover the anticipated attorneys' fees and litigation costs of the parties.

4. The bond must be posted prior to Jack Owoc seeking a hearing or ruling on his pending motions. In the event the bond is not posted within 20 days, any pending but not heard motions are, by operation of this Order, deemed to be denied. In the event Jack Owoc seeks to refile those motions after posting the bond, he may move the Court for leave in accordance with the pre-filing injunction, but only after providing confirmation that the bond has been duly posted.

5. Nothing in this Order shall be construed as a limitation on Jack Owoc's right to appeal.

**DONE AND ORDERED** in Chambers at Broward County, Florida on <u>13th day of February, 2026</u>.

CACE24002312 02-13-2026 4:04 PM

<u>CACE24002312 02-13-2026 4:04 PM</u>
Hon. Jeffrey Levenson
**CIRCUIT COURT JUDGE**
Electronically Signed by Jeffrey Levenson

**Copies Furnished To:**
Andrew L. Mann , E-mail : mann@mannplyler.com
Anthony J Carriuolo , E-mail : acarriuolo@bergersingerman.com
Anthony J Carriuolo , E-mail : drt@bergersingerman.com
Anthony J Carriuolo , E-mail : mnewland@bergersingerman.com
Brett M Amron , E-mail : kszolis@bastamron.com
Brett M Amron , E-mail : jdepina@bastamron.com
Brett M Amron , E-mail : bamron@bastamron.com
Charles Brady , E-mail : Filings@CharlesBradyLaw.com
Charles Brady , E-mail : Charles@CharlesBradyLaw.com
Charles Brady , E-mail : Admin@CharlesBradyLaw.com
Charles M. Tatelbaum , E-mail : aaa@trippscott.com
Charles M. Tatelbaum , E-mail : cmt@trippscott.com
Charles M. Tatelbaum , E-mail : eService@trippscott.com
Christian A. Petersen , E-mail : pleadings@olivejudd.com
Christian A. Petersen , E-mail : cpetersen@olivejudd.com
Christian A. Petersen , E-mail : mdoss@olivejudd.com
Christian Leto , E-mail : cleto@olivejudd.com
David Krempa , E-mail : jschiavone@pbattorneys.com
David Krempa , E-mail : dkrempa@pbattorneys.com
Erica Wynne Stump , E-mail : Erica@ericawstump.com
Erica Wynne Stump , E-mail : trademarks@ericawstump.com
Erica Wynne Stump , E-mail : caneslaw@aol.com

Case Number: CACE24002312

Eyal Berger , E-mail : jeanette.martinezgoldberg@akerman.com
Eyal Berger , E-mail : kimberly.shinder@akerman.com
Eyal Berger , E-mail : eyal.berger@akerman.com
Glenn J Waldman , E-mail : nsaez@gunster.com
Glenn J Waldman , E-mail : gwaldman@gunster.com
Hector Enrique Lora , E-mail : hectorlora@bellsouth.net
Hector Enrique Lora , E-mail : hector@feinsteinlaw.net
James M Buis , E-mail : jbuis@olivejudd.com
Jeremy F Tyler, Esq. , E-mail : jeremy@gft.law
Jeremy F Tyler, Esq. , E-mail : larry@gft.law
Jeremy Hart , E-mail : jmiranda@bastamron.com
Jeremy Hart , E-mail : jhart@bastamron.com
John H Owoc , E-mail : megliz@superstructures.miami
John H. Owoc , E-mail : jackowoc.ceo@gmail.com
John Owoc , E-mail : megliz.legal@gmail.com
Jordan Alexander Shaw , E-mail : lgrealy@shawlewenz.com
Jordan Alexander Shaw , E-mail : kackerman@shawlewenz.com
Jordan Alexander Shaw , E-mail : jshaw@shawlewenz.com
Lauren Nicole Palen , E-mail : mlomastro@shawlewenz.com
Lauren Nicole Palen , E-mail : lpalen@shawlewenz.com
Marc J. Gottlieb , E-mail : marc.gottlieb@akerman.com
Marc J. Gottlieb , E-mail : joyce.gutierrez@akerman.com
Michael I. Goldberg , E-mail : charlene.cerda@akerman.com
Michael I. Goldberg , E-mail : michael.goldberg@akerman.com
Michael I. Goldberg , E-mail : kimberly.smiley@akerman.com
Michael L Feinstein , E-mail : michael@feinsteinlaw.net
Michael L Feinstein , E-mail : service@feinsteinlaw.net
Michael L Feinstein , E-mail : paralegal@feinsteinlaw.net
Nicole Santoro , E-mail : nds@trippscott.com
Paul O Lopez , E-mail : sxc@trippscott.com
Paul O. Lopez , E-mail : pol@trippscott.com
Peter Joseph Klock II , E-mail : mdesvergunat@bastamron.com
Peter Joseph Klock II , E-mail : pklock@bastamron.com
Peter Joseph Klock II , E-mail : peter.j.klock@gmail.com
Ryan H. Lehrer , E-mail : rhl@trippscott.com
Samantha Roque , E-mail : sroque@bastamron.com
Scott Mager , E-mail : Service@MPJustice.com
Scott Mager , E-mail : Yonathan@MPJustice.com
Scott Mager , E-mail : Aitor@MPJustice.com
Suzan Prince , E-mail : sprince@bergersingerman.com
Todd S. Payne , E-mail : mrodriguez@shawlewenz.com
Todd S. Payne , E-mail : tpayne@shawlewenz.com
Zachary Dean Ludens , E-mail : ZLudens@shawlewenz.com
Zachary Dean Ludens , E-mail : mlomastro@shawlewenz.com

# EXHIBIT G

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 11 Cases |
| VITAL PHARMACEUTICALS, INC., *et al.*,[5] | Case No.: 22-17842-PDR |
| Debtors. | (Jointly Administered) |
| _____/ | |
| VPX LIQUIDATING TRUST, by and through its Liquidating Trustee, | |
| Plaintiff, | |
| | Adv. Pro. No. 24-01009-PDR |
| v. | |
| JOHN H. OWOC, MEGAN ELIZABETH OWOC, ELITE ISLAND LLC, JHO GA-1 INVESTMENT, LLC, JHO NV-1 INVESTMENT LLC, SHERIDAN REAL ESTATE INVESTMENT A, LLC, SHERIDAN REAL ESTATE INVESTMENT B, LLC, and | |

---

[5] The address of the Debtors is 1600 N. Park Drive, Weston, FL 33326. The last four digits of the Debtors' federal tax identification numbers are: (i) Vital Pharmaceuticals, Inc. (8430); (ii) Bang Energy Canada, Inc. (5454); (iii) JHO Intellectual Property Holdings, LLC (0010); (iv) JHO Real Estate Investment, LLC (9394); (v) Quash Seltzer, LLC (6501); (vi) Rainbow Unicorn Bev LLC (2254); and (vii) Vital Pharmaceuticals International Sales, Inc. (8019).

4924-5058-6012, v. 4

SHERIDAN REAL ESTATE INVESTMENT C, LLC,

      Defendants.

_____ /

**ORDER GRANTING LIQUIDATING TRUSTEE'S MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE LIQUIDATING TRUSTEE TO FILE EMERGENCY *EX PARTE* MOTION OF THE VPX LIQUIDATING TRUST FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AGAINST ELITE ISLAND LLC UNDER SEAL, AND (II) GRANTING RELATED RELIEF**

This matter came before the court upon the Liquidating Trustee's Motion for Entry of an Order (I) Authorizing the Liquidating Trustee to File Emergency *Ex Parte* Motion of the VPX Liquidating Trust for a Temporary Restraining Order and Preliminary Injunction against Elite Island LLC Under Seal, and (II) Granting Related Relief [Dkt. No. ___] (the "Motion").  The Court has considered the Motion, the record, and is otherwise fully informed.  Accordingly, it is hereby ORDERED that:

1.     The Motion is **GRANTED**;

2.     The Liquidating Trustee is directed to file its *Emergency Ex Parte Motion for a Temporary Restraining Order and Preliminary Injunction against Elite Island, LLC* (the "Emergency Motion") under seal;

3.     The Emergency Motion shall be maintained under seal until such time as the Court has entered its ruling upon same and any relief granted in connection therewith has been effectuated; and

4.     The Court shall retain jurisdiction over all matters arising from or related to the implementation or interpretation of this Order.

# # #

Submitted by:
BAST AMRON LLP
Brett M. Amron (FBN 0148342)

4924-5058-6012, v. 4

Peter J. Klock, II (FBN 103915)
One Southeast Third Avenue, Suite 2410
Miami, Florida 33131
Telephone: (305) 379-7904
Facsimile: (786) 206-8740
Email: bamron@bastamron.com
Email: pklock@bastamron.com

-and-

LOWENSTEIN SANDLER LLP
Jeffrey L. Cohen, Esq.
Eric Chafetz, Esq.
Michael A. Kaplan, Esq.
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 262-6700
Facsimile: (212) 262-7402
Email: jcohen@lowenstein.com
Email: echafetz@lowenstein.com
Email: mkaplan@lowenstein.com

Copies to:
*Attorney Peter Klock, who shall serve interested parties and file a certificate of service reflecting same.*

4924-5058-6012, v. 4