

**ORDERED in the Southern District of Florida on May 5, 2026.**



**Peter D. Russin, Judge**
**United States Bankruptcy Court**

_____

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

| | |
|---|---|
| In re: | Chapter 11 Case |
| **VITAL PHARMACEUTICALS, INC., et al.**, | Case No. 22-17842-PDR |
| Debtors. | |
| _____/ | |
| **VPX LIQUIDATING TRUST**, | |
| Plaintiff, | Adv. Pro. 24-01009-PDR |
| v. | |
| **JOHN H. OWOC, et al.**, | |
| Defendants. | |
| _____/ | |

**MEMORANDUM OPINION GRANTING**
**PRELIMINARY INJUNCTION AGAINST ELITE ISLAND LLC**

Between July 2020 and October 2022, while facing hundreds of millions of dollars in litigation exposure, the former sole owner and CEO of Vital Pharmaceuticals, Inc. caused the company to transfer nearly ten million dollars of its funds to acquire and maintain a luxury property on a private island in the Florida Keys — property that was titled not in the company's name but in the name of a shell entity he controlled. VPX received nothing in return. VPX's creditors, now represented by the VPX Liquidating Trust, seek to recover that property as a fraudulent transfer.

The question before the Court at the preliminary injunction stage is whether the Trust has demonstrated a sufficient likelihood of success on its fraudulent transfer claims to justify restraining the shell entity — Elite Island LLC — from encumbering or transferring the property before those claims are tried. The answer is yes.

The preliminary injunction hearing was held on April 22, 2026 (the "PI Hearing"), on the *Motion of the VPX Liquidating Trust for a Temporary Restraining Order and Preliminary Injunction Against Elite Island LLC* (the "TRO/PI Motion").[1] The Court received into evidence stipulated exhibits, the *Amended Stipulation of Undisputed Facts for Preliminary Injunction Hearing* (the "Amended Stipulation"),[2] and the *de bene esse* deposition transcript of Soneet R. Kapila.[3]  The Court heard the live testimony of Joseph

---

[1] Dkt. No. 452.

[2] Dkt. No. 525. The parties initially filed a *Stipulation of Undisputed Facts for Preliminary Injunction Hearing* [Dkt. No. 524] on April 20, 2026, and subsequently filed the operative Amended Stipulation. The Court's citations to the stipulated record are to the Amended Stipulation.

[3] Dkt. No. 532.

C. Gioconda, Esq., the Trust's litigation risk expert, and the testimony of Defendant John H. Owoc. At the close of the hearing, the Court ruled from the bench that a preliminary injunction would issue and entered a short form order the following day (the "PI Order").[4] This Opinion sets forth the findings of fact and conclusions of law in support of that ruling.

## I.  Jurisdiction

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (H), and (O). Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## II.  Procedural History and Factual Findings

The following background is drawn from the stipulated record, the exhibits admitted into evidence at the PI Hearing, and the testimony received at that hearing. The facts relevant to the preliminary injunction fall into three categories: the procedural history leading to this proceeding and to the injunctive relief already entered; the nature and circumstances of the transfers at issue; and the financial condition of VPX at the time those transfers were made. The Court addresses each in turn, reserving for Section IV its legal analysis of the preliminary injunction factors.

### A.  Procedural History

The Trust commenced this adversary proceeding on January 18, 2024.[5] Counts Twenty-Eight through Thirty-One of the operative *Second Amended Complaint*, filed

---

[4]Dkt. No. 534.

[5]Dkt. No. 1.

September 16, 2024, are addressed to Defendant Elite Island LLC ("Elite Island") and seek to avoid and recover, as fraudulent transfers under 11 U.S.C. §§ 544, 548, and 550 and the Florida Uniform Fraudulent Transfer Act ("FUFTA"), Fla. Stat. §§ 726.105 and 726.108, transfers of approximately $9.7 million in Vital Pharmaceuticals, Inc. ("VPX") funds.[6]

On June 21, 2024, the Trust recorded a Notice of Lis Pendens against the Overseas Highway Property in connection with its claims seeking recovery of that property.[7] Under Florida law, that *lis pendens* expired automatically on January 18, 2025—one year after the filing of this adversary complaint, the Trust having sought no extension.[8] As a practical matter, however, the *lis pendens* remained of record and continued to cloud title. On February 18, 2026, Owoc moved to dissolve it.[9] The Court denied Owoc's motion for lack of standing but, recognizing that the *lis pendens* had expired by operation of law, *sua sponte* discharged the *lis pendens* pursuant to Fla. Stat. § 48.23(2).[10]

What followed was a rapid series of events. Just days before the *sua sponte* discharge order was entered, on March 21, 2026, Elite Island's 2026 Florida LLC Reinstatement was filed with the Secretary of State, despite Elite Island having been administratively dissolved since September 2025.[11] The reinstatement filings added

---

[6]*Second Amended Complaint*, Dkt. No. 224.

[7]Dkt. No. 106.

[8]Fla. Stat. § 48.23(2).

[9]Dkt. No. 405.

[10]Dkt. No. 433.

[11]Ex. 23.

two new authorized members—Proprietary Property LLC and Paul Borrelli, a former VPX employee and current business associate of Owoc—who had not previously appeared in Elite Island's corporate filings.

On March 25, 2026, Owoc—joined by his wife and co-defendant Megan Owoc, who were proceeding *pro se* at the time—filed an *Emergency Motion for Extension of Time to Retain Successor Counsel* (the "Extension Motion"), in which the Owocs expressly confirmed their intent to "arrange and close financing" secured by the Overseas Highway Property.[12] In response, the Trust filed the TRO/PI Motion on March 31, 2026, seeking emergency relief to prevent the Property from being encumbered, transferred, or otherwise disposed of before the Trust's fraudulent-transfer claims could be adjudicated.[13]

The Court held the TRO hearing on April 2, 2026, and granted the temporary restraining order from the bench. The TRO Order was entered on April 3, 2026, and initially set the evidentiary hearing on the preliminary injunction for April 15, 2026—within the fourteen-day window required under Rule 65(b)(2).[14] The Court subsequently continued the preliminary injunction hearing to April 22, 2026, because Elite Island had recently retained counsel on a limited basis and because of scheduling difficulties involving the Trust's in-person witnesses. In advance of the PI

---

[12] Dkt. No. 437 at 2.

[13] Dkt. No. 452.

[14] Dkt. No. 460.

Hearing, the Court entered a pre-hearing order identifying several threshold legal issues the parties were directed to brief.[15]

At the PI Hearing on April 22, 2026, the Court received into evidence the parties' stipulated exhibits,[16] the Amended Stipulation, and Mr. Kapila's *de bene esse* deposition transcript. The Court heard the live testimony of Mr. Gioconda and the testimony of Mr. Owoc subject to the Trust's reserved objection based on lack of prior disclosure. At the conclusion of the hearing, the Court ruled from the bench that a preliminary injunction would issue and entered a short form order the following day setting forth the operative restraints and indicating that this fuller opinion would follow.[17]

### B. The Overseas Highway Property and the Transfers at Issue

VPX was a Florida corporation that manufactured and marketed sports nutrition products and energy drinks, including its flagship Bang energy drink. VPX was founded by Defendant John H. Owoc ("Owoc"), who at all relevant times served as its sole shareholder, sole director, and Chief Executive Officer.[18] On October 10, 2022 (the "Petition Date"), VPX and its affiliates filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. A plan of liquidation was ultimately

---

[15]Dkt. No. 451.

[16]The parties stipulated to the admissibility of Exhibits 1, 3, 4, 5, 6, 7, 9, 10, 16, 17, 18, 22, 23, 53, 54, 55, 56, 57, 58, and 59 for all purposes at the PI Hearing. Other listed exhibits were identified for reference only. The Court has not considered exhibits not admitted into evidence.

[17]Dkt. No. 534.

[18]Ex. 54, Resps. to Requests for Admission Nos. 1, 2, 4.

confirmed, and the VPX Liquidating Trust (the "Trust" or "Plaintiff") was established as successor to the Debtors' estates.

Elite Island was organized as a Florida limited liability company, with Owoc as its sole member and manager at the time of formation.[19] Elite Island is not, and has never been, part of VPX's corporate structure or operations.[20] Yet Elite Island's address on the recorded Warranty Deed is 1600 North Park Drive, Weston, Florida— the same address as VPX's corporate office.[21]

On July 29, 2020, VPX transferred $250,000 to Kalis Kleiman & Wolfe concerning real property located at 72100 Overseas Highway, Islamorada, Florida (the "Overseas Highway Property" or the "Property").[22] On August 31, 2020, Solid Investment Group 7 LLC conveyed the Overseas Highway Property to Elite Island by Warranty Deed.[23] The Overseas Highway Property is Elite Island's sole asset.[24]

The entire purchase price for the Overseas Highway Property was paid by VPX. On August 31, 2020, at Owoc's direction, VPX wired $8,304,171.78 from its PNC Bank operating account to the escrow account of the Torrens Law Firm PLLC at TD Bank, the closing agent for the transaction.[25] The originator-to-beneficiary-

---

[19]Amended Stipulation ¶¶ 1–2.

[20]Amended Stipulation ¶ 3.

[21]Ex. 18 (Warranty Deed, recorded Sept. 8, 2020, Doc. No. 2280700, Monroe Cnty. O.R. Bk. 3042, Pg. 1859).

[22]Ex. 9.

[23]Ex. 18; Amended Stipulation ¶¶ 6–7. The Property consists of Lots 5, 6, 7, 8, and 9 of Craig Cay, as recorded in Plat Book 3, Page 73 of the Public Records of Monroe County, Florida.

[24]Amended Stipulation ¶ 8.

[25]Ex. 4; Amended Stipulation ¶ 5.

information field on the wire identified the purpose of the transfer as "File # 20-025A Prop. Location: 72100 Overseas Highway Islamorada FL 33036."[26] The documentary stamp tax paid on recordation of the Warranty Deed was $58,129.40, which at Florida's rate of $0.70 per $100 of consideration corresponds to a purchase price of approximately $8,304,200.[27] Title vested in Elite Island.[28]

Owoc's control over Elite Island is further established by contemporaneous recorded instruments. On the date of acquisition, Owoc executed—as "Manager" of Elite Island—a recorded Assignment of Development Rights, Approvals, Permits, and Contracts pertaining to the Overseas Highway Property.[29] On December 28, 2021, Owoc signed, as "Manager" of Elite Island, a Monroe County Dwelling Unit Lock-Out Deed Restriction pertaining to the Overseas Highway Property, which was recorded January 19, 2022.[30]

In addition to the initial $250,000 transfer and the $8.3 million purchase price, Owoc directed VPX to pay substantial additional sums for construction, renovation, maintenance, and other carrying costs associated with the Overseas Highway Property.[31] Those payments include, among others: (i) three wire transfers to KMR Construction Management, Inc. totaling $855,291.28 between October 2, 2020 and

---

[26] Ex. 4.

[27] Ex. 18.

[28] Ex. 18; Amended Stipulation ¶ 7.

[29] Ex. 18 (Assignment of Development Rights, recorded Sept. 8, 2020, Doc. No. 2280701).

[30] Ex. 18 (Dwelling Unit Lock-Out Deed Restriction, Doc. No. 2357558).

[31] Ex. 9; Amended Stipulation ¶¶ 9–12.

November 24, 2021 for construction work on the Property;[32] (ii) five payments to Affiniti Architects Holding, LLC totaling $225,191.00 between December 10, 2020 and September 21, 2021 for architectural services;[33] (iii) two payments to Keys Engineering Services totaling $60,927.00 in January and July 2021 for engineering services;[34] (iv) two payments to the Monroe County Tax Collector totaling $51,161.82 for the 2020 and 2021 property taxes;[35] and (v) nineteen monthly payments to the Florida Keys Aqueduct Authority for water services, continuing from January 8, 2021 through October 1, 2022—just nine days before VPX's Chapter 11 petition.[36] In the aggregate, between July 29, 2020 and October 1, 2022, VPX transferred $9,747,727.82 to third parties in connection with the Overseas Highway Property and Elite Island (collectively, the "Elite Island Transfers").[37]

Every one of the Elite Island Transfers was recorded in VPX's general ledger to a single account—Account 304000, titled "Distributions."[38] VPX's books repeatedly refer to the Overseas Highway Property as "Jack's house."[39] Owoc's personal approval of specific payments appears in his own email correspondence.[40] Nothing flowed

---

[32]Amended Stipulation ¶ 9(a); Ex. 5; Ex. 9.

[33]Amended Stipulation ¶ 9(b); Ex. 9.

[34]Amended Stipulation ¶ 9(c); Ex. 9.

[35]Amended Stipulation ¶ 9(d); Ex. 6; Ex. 9.

[36]Amended Stipulation ¶ 9(e); Ex. 9.

[37]Amended Stipulation ¶ 11; Ex. 9.

[38]Ex. 9; Amended Stipulation ¶ 12.

[39]Ex. 9 (general ledger entries for monthly water-bill payments, each bearing the descriptive header "Water bill-Jacks house-Fl Key").

[40]Ex. 7.

back—Elite Island never transferred money or property to VPX in connection with the Elite Island Transfers or otherwise.

Owoc exercised plenary authority over the Elite Island Transfers of VPX funds during the relevant period.[41] Significantly, Owoc has admitted, in response to the Trust's Request for Admission No. 165, that he "used the Debtors' funds to purchase the Overseas Highway Property."[42]

### C.  The Company's Financial Condition

The Trust's fraudulent transfer claims turn on VPX's solvency at the time of the Elite Island Transfers, and insolvency was the central contested issue at the PI Hearing. This subsection sets out the evidence relevant to that question. The Court's analysis and conclusions on insolvency follow in Section IV.A below, where insolvency is treated as an element of the Trust's fraudulent transfer claims.

Four dates frame the analysis. First, October 10, 2022, the Petition Date, which is the endpoint for both the federal and FUFTA lookback periods. Second, October 10, 2020, the date two years before the Petition Date that marks the outer boundary of the federal two-year lookback under 11 U.S.C. § 548. Third, July 29, 2020, the date of the first Elite Island Transfer: the $250,000 VPX wired to Kalis Kleiman & Wolfe. Fourth, August 31, 2020, the date of the principal Elite Island Transfer—the $8,304,171.78 wire used to acquire the Overseas Highway Property.

Of the $9,747,727.82 in Elite Island Transfers, the $250,000 initial transfer, the $8,304,171.78 principal wire, and the October 2 wire to KMR Construction

---

[41]Ex. 54, Resps. to Requests for Admission Nos. 10, 85, 87; Amended Stipulation ¶ 13.

[42]Ex. 54, Resp. to Request for Admission No. 165.

Management were made before October 10, 2020; the remaining transfers—further construction payments, architectural and engineering fees, property taxes, and water-service payments—were made after October 10, 2020 and run through October 1, 2022.

### 1.  The Litigation Exposure Preceding the Transfers

On September 4, 2018—approximately two years prior to the principal Elite Island Transfer—Monster Energy Company ("Monster") filed suit against VPX in the Central District of California, alleging willful and deliberate false advertising of VPX's flagship Bang energy drink (the "False Advertising Litigation").[43] Monster alleged that VPX's marketing was predicated on a falsehood—that Owoc and VPX engaged in false advertising by propagating false claims that a molecule VPX branded as "Super Creatine" produced a host of health benefits. The complaint put Owoc and VPX on notice that the core marketing proposition underlying the Bang product had been challenged as false. The False Advertising Litigation proceeded through discovery, trial, post-trial motions, and ultimately a $271,924,174 jury verdict against VPX, with express findings that the false advertising was both willful and deliberate. The jury was instructed that "VPX and/or Mr. Owoc acted willfully if they knew that their advertising was false or misleading or if they acted with indifference to whether their advertising was false or misleading."[44]

---

[43]*Monster Energy Co. v. Vital Pharms., Inc.*, No. 5:18-cv-01882-JGB-SHK (C.D. Cal., filed Sept. 4, 2018).

[44]Jury Instructions, *Monster Energy Co. v. Vital Pharms., Inc.*, No. 5:18-cv-01882-JGB-SHK (C.D. Cal.), Trial Tr. 28:23–29:5. The Court takes judicial notice of the jury instructions and final judgment in the Monster litigation as court records of another proceeding whose accuracy cannot reasonably be questioned. *See* Fed. R. Evid. 201(b)(2), (c)(1).

Owoc testified at the PI Hearing—over the Trust's reserved objection—that at the time the False Advertising Litigation was filed he believed there was "a 0 percent chance . . . that we would lose," and that he therefore set aside no money for the contingent liability the lawsuit represented.[45]

The False Advertising Litigation was not the only significant contingent liability VPX faced at the time of the Elite Island Transfers. The Bang trademark—for beverages, including isotonic energy drinks—had originally belonged to Orange Bang, Inc. ("OBI"), which had alleged that VPX's use of the Bang mark infringed OBI's rights. To resolve that dispute, VPX and OBI entered into a 2010 written settlement and coexistence agreement that permitted VPX to continue using the Bang mark, but only under specified conditions: in particular, VPX could sell its Bang-branded products in certain channels of trade only if the product was creatine-based.[46] On June 16, 2020—approximately ten weeks before the principal Elite Island Transfer—OBI initiated an arbitration against VPX (the "OBI Arbitration") alleging that Bang was not creatine-based within the meaning of the 2010 agreement, that VPX had therefore violated the channel-of-trade restrictions by selling broadly, and that the resulting infringement entitled OBI to disgorgement of VPX's profits, which totaled hundreds of millions of dollars.[47]

---

[45]Hearing Testimony, Apr. 22, 2026 (Owoc testimony).

[46]Hearing Testimony, Apr. 22, 2026 (Gioconda testimony describing the parties' dispute, the resulting 2010 settlement and coexistence agreement, and the channel-of-trade limitations).

[47]Hearing Testimony, Apr. 22, 2026 (Gioconda testimony); Kapila Depo at 31:21–32:7.

VPX faced yet another significant contingent liability, though it arose shortly after the principal Elite Island Transfer. On October 23, 2020, VPX terminated its national distribution agreement with PepsiCo without cause, precipitating arbitration proceedings (the "Pepsi Arbitration") in which PepsiCo asserted breach of contract and related claims seeking damages measured in the hundreds of millions of dollars—an exposure that, on Mr. Gioconda's analysis, ultimately translated to a recognized contingent liability for VPX of approximately $141.6 million.[48] While the Pepsi exposure postdates the principal August 31, 2020 Elite Island Transfer, it predates all but one of the carrying cost transfers identified in the Amended Stipulation.

Accordingly, at the time of the principal Elite Island Transfer, two of the three major contingent liabilities that Mr. Kapila ultimately analyzed were already in place: Monster had been pending for nearly two years, and OBI had been initiated ten weeks earlier. As to the carrying cost transfers made on or after October 23, 2020, all three contingent liabilities were in place.

### 2. Mr. Kapila's Balance-Sheet Analysis

Soneet R. Kapila, the Trust's financial expert, was qualified at his deposition as an expert in insolvency accounting without objection.[49] Mr. Kapila is a CPA, Certified Fraud Examiner, Certified Insolvency and Restructuring Advisor, and federal bankruptcy panel trustee, and he serves as the sitting chairman of the

---

[48]Hearing Testimony, Apr. 22, 2026 (Gioconda testimony); Kapila Depo at 30:15–23, 32:8–22.

[49]Kapila Depo at 5:10–9:22.

American Bankruptcy Institute board of directors.[50] Based on his review of VPX's audited financial statements and other materials, he concluded that VPX was continuously insolvent from September 4, 2018 through the Petition Date.[51] His methodology applied fair value adjustments to VPX's audited financial statements and used the standard insolvency frameworks under both state and federal law, principally the Balance Sheet Test (fair value of assets compared to total liabilities) and the Cash Flow Test (whether the debtor is generally not paying its debts as they become due).[52]

Mr. Kapila made four principal fair value adjustments to the Company's reported balance sheets. First, he excluded variable interest entity real property assets that had been titled away from VPX but acquired with VPX funds, without any offsetting reduction in the corresponding liabilities because VPX remained obligated on the underlying debt.[53] Second, he reduced leasehold improvement and construction in progress values to zero where tied to variable interest entity real estate or otherwise not monetizable.[54] Third, he made an upward adjustment of intangibles to $5 million, based on Mr. Gioconda's valuation opinion; Mr. Kapila adopted the high end of Mr. Gioconda's $3.5 million–$5 million range to resolve any

---

[50] Kapila Depo at 5:10–8:4.

[51] Kapila Depo at 11:16–19.

[52] Kapila Depo at 11:25–13:14. The Balance Sheet Test compares the fair value of the debtor's assets to the total of its liabilities. *See* Fla. Stat. § 726.103(1); 11 U.S.C. § 101(32)(A). The Cash Flow Test asks whether the debtor is generally not paying its debts as they become due. *See* Fla. Stat. § 726.103(2).

[53] Kapila Depo at 20:6–22:18, 71:25–73:8.

[54] Kapila Depo at 19:14–20:21.

valuation doubt in favor of solvency.[55] Fourth, he recognized contingent litigation liabilities for the Monster, OBI, and PepsiCo matters, using probability factors supplied by Mr. Gioconda to discount each gross claim.[56]

Mr. Kapila's year-end balance sheet deficit calculations are: approximately $137.6 million at December 31, 2018; approximately $150.6 million at December 31, 2019; approximately $697.6 million at December 31, 2020; and approximately $548.6 million at December 31, 2021.[57] He further concluded that VPX remained insolvent on the Petition Date, with the Debtors' schedules reflecting approximately $709 million in assets against approximately $1.1 billion in liabilities.[58]

Applying the Cash Flow Test, Mr. Kapila opined that VPX's revenue concentration was extreme—approximately 95% of sales came from the single Bang product[59]—and that the litigation exposure threatening that revenue stream undermined the Company's ability to generate sufficient cash flow to meet its debts as they came due.[60]

---

[55]Kapila Depo at 19:6–13, 22:14–25:8, 70:3–71:2.

[56]Kapila Depo at 25:15–28:15, 29:1–30:23.

[57]Kapila Depo. at 10:10–11:19, 15:16–17:15, 16:19–17:10, 34:5–34:23, 38:25–39:1. The Court relies on Mr. Kapila's admitted deposition testimony concerning Plaintiff's Exhibit 12, including the balance-sheet schedule attached as Exhibit B to his report, which Mr. Kapila identified and explained during his testimony. The report itself was premarked as Plaintiff's Exhibit 12 for identification during the deposition, and Mr. Kapila testified that it was his March 16, 2026 expert report and that having it available would assist him in describing his opinions.

[58]Kapila Depo at 34:5–38:5, 38:25–39:1.

[59]Kapila Depo at 39:24–40:1, 41:13–19.

[60]Kapila Depo at 41:2–43:17.

On cross-examination, Mr. Kapila confirmed three points relevant here. First, his year-end 2018 and 2019 insolvency conclusions depend on recognition of the Monster contingent liability; if that liability is not recognized, or is recognized at a probability factor below approximately 50%, VPX would not have been insolvent under the Balance Sheet Test at year-end 2019.[61] Second, he saw no evidence that VPX became solvent at any point between December 31, 2019 and December 31, 2020.[62] Third, by year-end 2020, the recognized contingent liabilities of approximately $521.5 million were not necessary to the insolvency conclusion: even excluding all three contingent liabilities, VPX's adjusted balance sheet would have shown approximately $176 million of insolvency at year-end 2020.[63]

### 3. Mr. Gioconda's Testimony

Mr. Gioconda testified live at the PI Hearing. He is an attorney with approximately twenty-nine years of experience in intellectual property litigation, the founder of the Gioconda Law Group PLLC, and a former Chairman of the Board and General Counsel of New Slice Ventures LLC, a beverage industry enterprise built around acquired intellectual property assets.[64] He has provided expert testimony on intellectual property valuation and litigation risk matters on a number of prior occasions. The Defendant did not object to Mr. Gioconda's qualification as an expert in intellectual property law or in the valuation of intellectual property assets. It did,

---

[61]Kapila Depo at 46:1–25, 55:12–56:2, 62:8–63:14, 69:6–20.

[62]Kapila Depo at 82:6–13.

[63]Kapila Depo at 60:10–61:4.

[64]Hearing Testimony, Apr. 22, 2026 (Gioconda direct examination).

however, object to his qualification to opine on probabilities of adverse litigation outcomes; the Court reserved on that objection at the hearing. The Court rules on it in Section IV.A below, where the issue is presented as part of the merits analysis.

Mr. Gioconda described his methodology as adopting the posture of a reasonable fiduciary assessing the risks presented by pending litigation at the time it arose—evaluating the underlying facts as then known or reasonably knowable, the applicable law, and the full range of potential remedies—to arrive at a probability of adverse liability and a separate probability that any such liability, if found, would be enterprise material, meaning that it would threaten the very existence of the company.[65]

Applied to the False Advertising Litigation, Mr. Gioconda opined that as of September 2018—when the Monster complaint was filed—and continuing throughout the relevant period, the probability that VPX would suffer adverse liability was approximately 85%, and that any such adverse liability carried a 95% probability of being enterprise material in scale.[66] He further opined that by August 2020 the Monster adverse liability probability was "closer to 90% than 85%." He applied a similar framework to the OBI Arbitration (85%/95%) and the Pepsi Arbitration (80%/85%). Mr. Kapila adopted those probability factors and recognized contingent liabilities of approximately $231.1 million for Monster (recognized as of

[65]Hearing Testimony, Apr. 22, 2026.

[66]Hearing Testimony, Apr. 22, 2026.

2018 forward), $148.75 million for OBI (recognized as of year-end 2020), and $141.6 million for PepsiCo (recognized as of year-end 2020).

### III.  Threshold Legal Issues

The Court's pre-hearing scheduling order identified several threshold legal issues the parties were directed to address before reaching the four preliminary injunction factors. The Court takes them in order and concludes that none bars the relief the Court has granted.

#### A.  *Grupo Mexicano* Does Not Bar the Relief Sought

In *Grupo Mexicano*,[67] the Supreme Court held that a federal court has no authority to issue a preliminary injunction preventing a defendant from disposing of its assets pending adjudication of a contract claim for money damages where the plaintiff claims no lien or equitable interest in the defendant's property.[68] The Court's reasoning was grounded in the historical limitations on equity jurisdiction.[69] But the *Grupo Mexicano* Court distinguished *Deckert v. Independence Shares Corp.*,[70] in which the Supreme Court upheld a preliminary injunction to preserve assets pending an action for rescission and restitution. Justice Scalia explained that *Deckert* was "not on point" because there "the bill state[d] a cause [of action] for equitable relief."[71] Under *Deckert*, when a plaintiff's underlying claims are equitable in nature, a

---

[67]*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999).

[68]*Id.* at 333.

[69]*Id.* at 318.

[70]*Deckert v. Indep. Shares Corp.*, 311 U.S. 282 (1940).

[71]*Grupo Mexicano*, 527 U.S. at 325 (quoting *Deckert*, 311 U.S. at 288).

preliminary injunction to preserve a specific *res* pending final adjudication remains within the court's equitable authority.[72]

The Trust's claims fall within the *Deckert* exception. The Eleventh Circuit addressed the legal or equitable character of fraudulent conveyance actions in *Pettigrew v. Graham (In re Graham).*[73] There, the court drew a clear line: "the courts of this country have long held that an action by a creditor or trustee-in-bankruptcy to set aside a fraudulent conveyance is an equitable action, while an action by a creditor or trustee-in-bankruptcy seeking money damages is an action at law."[74] The court classified the trustee's action as equitable because the trustee sought to set aside a conveyance of real property—and because, as the court observed, real property is "not a depreciating asset whose value when returned to the trustee would be substantially less than its value at the time of the subject conveyance," making monetary damages neither appropriate nor adequate.[75]

This framework is consistent with the Supreme Court's analysis in *Granfinanciera, S.A. v. Nordberg.*[76] While *Granfinanciera* held that a Section 548 action seeking to recover "a determinate sum of money" is a legal claim,[77] the Court endorsed the principle that the legal or equitable determination turns on the nature of the property transferred. Quoting Glenn's treatise on fraudulent conveyances, the

---

[72]*Deckert*, 311 U.S. at 289–90.

[73]*Pettigrew v. Graham (In re Graham)*, 747 F.2d 1383 (11th Cir. 1984).

[74]*Id.* at 1387–88.

[75]*Id.* at 1388.

[76]*Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989).

[77]*Id.* at 46.

Court explained: "If the subject matter is a chattel . . . an action in trover or replevin would be the trustee's remedy; and if the fraudulent transfer was of cash, the trustee's action would be for money had and received. . . . If, on the other hand, the subject matter is land or an intangible, or the trustee needs equitable aid for an accounting or the like, he may invoke the equitable process."[78]

Here, the Trust seeks to avoid transfers that funded Elite Island's acquisition of a specific parcel of real property and to recover that property under Section 550. Under *Graham*, an action to set aside a fraudulent conveyance of real property is equitable. Under the Glenn framework endorsed by *Granfinanciera*, when the subject matter of the fraudulent transfer is land, the trustee may invoke the equitable process. Because the Trust's claims are equitable in nature, the *Deckert* exception applies, and *Grupo Mexicano* does not bar the relief.[79]

### B.  This Is Injunctive Relief Under Rule 65, Not Prejudgment Attachment Under Rule 64

Rule 64 governs the seizure of property "to secure satisfaction of the potential judgment."[80] It applies when a plaintiff with no claim to specific property seeks to attach a defendant's general assets as security for a future money judgment. That is not what is happening here. The Trust claims an equitable interest in the Overseas Highway Property itself—property purchased entirely with estate funds, held by a shell entity, and directly traceable to the transfers the Trust seeks to avoid. When

---

[78]*Id.* at 44 (quoting 1 Glenn, Fraudulent Conveyances and Preferences § 98, at 183–84 (rev. ed. 1940)).

[79]*See Rubin v. Pringle (In re Focus Media Inc.)*, 387 F.3d 1077, 1085 (9th Cir. 2004); *United States ex rel. Rahman v. Oncology Assocs., P.C.*, 198 F.3d 489, 498 (4th Cir. 1999).

[80]Fed. R. Civ. P. 64(a).

the relief sought is to preserve a specific *res* pending adjudication of equitable claims, Rule 65 governs.[81]

### C.  No Bond Is Required Under Bankruptcy Rule 7065

Federal Rule of Bankruptcy Procedure 7065 incorporates Rule 65 into adversary proceedings but exempts debtors, trustees, and debtors in possession from the bond requirement of Rule 65(c).[82] The Trust, as the successor to the Debtors' estates under the confirmed plan of liquidation, is a trustee for Rule 7065 purposes.[83] No bond is required.

### IV.  Preliminary Injunction Standard

To obtain a preliminary injunction, the movant must demonstrate: (1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunction issues; (3) that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) that the injunction would not be adverse to the public interest.[84] The movant bears the burden of persuasion on each factor, and failure to establish any one is

---

[81]*See Deckert*, 311 U.S. at 289–90; *Rahman*, 198 F.3d at 496–97.

[82]Fed. R. Bankr. P. 7065.

[83] The Trust is the plan-appointed representative of the Debtors' estates under 11 U.S.C. § 1123(b)(3)(B), vested with authority to prosecute estate avoidance and recovery claims for the benefit of creditors. *See Nordberg v. Sanchez (In re Chase & Sanborn Corp.)*, 813 F.2d 1177, 1180 n.1 (11th Cir. 1987). Moreover, the Court need not even decide whether that status alone makes the Trust a "trustee" within Rule 7065's bond exception because, even assuming Rule 65(c) applies, the proper amount of security in this instance is zero. Rule 65(c) requires security only "in an amount that the court considers proper," and the Eleventh Circuit recognizes that a court may require no security at all. *BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 971 (11th Cir. 2005).

[84]*Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc); *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995).

fatal.[85] A preliminary injunction does not adjudicate the ultimate rights of the parties; "the purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."[86] A finding of substantial likelihood of success is not a determination that the movant will prevail; it is a threshold assessment that the claims are sufficiently meritorious to warrant preserving the status quo pending full adjudication.[87]

### A.  Substantial Likelihood of Success on the Merits

The Trust asserts four fraudulent transfer claims against Elite Island in the Second Amended Complaint: Count Twenty-Eight (constructive fraud under FUFTA § 726.105(1)(b), brought through Bankruptcy Code § 544(b)); Count Twenty-Nine (constructive fraud under 11 U.S.C. § 548(a)(1)(B)); Count Thirty (actual fraud under FUFTA § 726.105(1)(a), brought through § 544(b)); and Count Thirty-One (actual fraud under 11 U.S.C. § 548(a)(1)(A)).

The applicable lookback periods differ. Section 548 reaches transfers made on or within two years before the Petition Date.[88] With a Petition Date of October 10, 2022, Section 548 reaches only transfers made on or after October 10, 2020. Section 544(b), by contrast, permits the trustee to avoid any transfer voidable under applicable state law by a creditor holding an unsecured claim; the "applicable law" here is FUFTA, which carries a four-year limitations period.[89] The principal August

---

[85]*Siegel*, 234 F.3d at 1176.

[86]*Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).

[87]*See id.*; *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

[88]11 U.S.C. § 548(a)(1).

[89]11 U.S.C. § 544(b)(1); *see* Fla. Stat. § 726.110.

31, 2020 wire falls forty days outside the federal two-year window but is well within the four-year FUFTA window. As a result, the two FUFTA counts (Twenty-Eight and Thirty) reach all the Elite Island Transfers, including the principal wire; the two Section 548 counts (Twenty-Nine and Thirty-One) reach only the subsequent Elite Island Transfers made on or after October 10, 2020.

Insolvency is an element of the Trust's constructive fraud counts (Counts Twenty-Eight and Twenty-Nine) and is a badge of fraud relevant to the Trust's actual fraud counts (Counts Thirty and Thirty-One). Because the insolvency analysis is shared across all four counts, the Court addresses it before turning to each count.

### i.  Insolvency

The central contested issue at the PI Hearing was insolvency. As described in Section II.C, three principal sources bear on the question: Mr. Kapila's balance sheet analysis, Mr. Gioconda's probability assessments of VPX's contingent litigation liabilities, and the willfulness finding entered against VPX and Owoc in the False Advertising Litigation. Before applying these to the relevant dates, the Court resolves a threshold issue: whether Mr. Gioconda is qualified to opine on probabilities of adverse litigation outcomes, an objection on which the Court reserved at the PI Hearing.

Mr. Gioconda's qualification. Federal Rule of Evidence 702 permits expert testimony where the proffered expert is qualified by knowledge, skill, experience, training, or education; the testimony rests on sufficient facts or data; the testimony is the product of reliable principles and methods; and the expert has reliably applied

those principles and methods to the facts of the case.[90] The trial court's gatekeeping role is to ensure that expert testimony is both relevant and reliable, and the standard of reliability is "flexible" when applied to non-scientific expertise.[91]

Mr. Gioconda has practiced intellectual property litigation for nearly thirty years, including service as a partner at two major law firms heading their trademark litigation groups before founding his own firm. He has served as Chairman of the Board and General Counsel of a beverage industry enterprise built around acquired intellectual property assets, which involved his direct evaluation of pending and threatened intellectual property and commercial disputes. He has provided opinions on litigation risk—including in writing, with quantified probability assessments—to clients in his ordinary professional practice on a regular basis and has provided expert testimony on litigation outcomes in connection with attorney malpractice cases on a number of occasions. His methodology, as he described it, involves identifying the legal claims asserted, the underlying factual record as it would have been known or knowable to a reasonable fiduciary at the relevant time, the applicable substantive law, and the available remedies; arriving at probability ranges grounded in those inputs; and acknowledging the inherent uncertainty by adopting the lower end of any range. He cited, as foundational reference material for that approach, ABA published risk assessment methodology.

---

[90]Fed. R. Evid. 702. The Court applies the same Rule 702 framework to non-scientific expert testimony, with the *Daubert* reliability factors adapted to fit the discipline. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150–51 (1999); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593–94 (1993).

[91]*Kumho Tire*, 526 U.S. at 150; *see also United States v. Frazier*, 387 F.3d 1244, 1260–62 (11th Cir. 2004) (en banc).

The Court has considered the Defendant's objection. The Defendant does not contend that Mr. Gioconda lacks experience evaluating intellectual property disputes; it contends that he lacks the requisite experience evaluating litigation risk, and that his probability percentages are subjective judgments rather than the output of a quantitative model. As to Mr. Gioconda's experience in this regard, he testified that he has provided such assessments numerous times to numerous clients. The Court accepts this testimony and does not discredit his expertise. And the Defendant's observation about the nature of the percentages is accurate, but it does not disqualify the testimony. Litigation risk assessment is an exercise in informed judgment rather than mathematical derivation. The reliability question under Rule 702 is whether the expert's methodology is one a reasonable practitioner would apply, not whether it produces a single algorithmically determinate answer.[92]

Defendant suggested at the PI Hearing that Mr. Gioconda's methodology is impermissibly hindsight driven—that he leveraged later developments, most prominently the jury's willfulness finding in the False Advertising Litigation, to characterize what a reasonable fiduciary would have perceived years earlier. The objection misunderstands what hindsight bias is and what the methodology calls for. Litigation risk assessment necessarily evaluates the strength of the underlying merits as the merits were known and/or knowable at the time of assessment. The willfulness finding bears on Mr. Gioconda's 2018 risk assessment not because that finding existed in 2018, but because the finding is evidence of a fact about 2018:

---

[92]*See Kumho Tire*, 526 U.S. at 152.

namely, that VPX and Owoc were, at that time, engaged in advertising that was false or misleading and that they knew was false or misleading or were indifferent to whether it was false or misleading. The jury's finding is admissible historical evidence of a 2018 state of facts; the methodology then asks what a reasonable fiduciary, looking at those same facts in 2018, would have estimated as the probability of an adverse outcome. That is not hindsight. It is the routine use of present-day evidence to find historical fact.

The Court accordingly overrules Defendant's objection and qualifies Mr. Gioconda as an expert under Rule 702 on probabilities of adverse litigation outcomes in intellectual property and related commercial disputes, in addition to the qualifications to which Defendant did not object. The weight to be given to specific probability figures Mr. Gioconda offered, however, is a separate question, addressed in the analysis below.

The willfulness finding and the reasonable fiduciary standard. In the Monster False Advertising Litigation, the jury was instructed that "VPX and/or Mr. Owoc acted willfully if they knew that their advertising was false or misleading or if they acted with indifference to whether their advertising was false or misleading." Applying that instruction, the jury found in favor of Monster on the willful and deliberate false advertising claim and returned a $271,924,174 verdict. The finding—that Owoc and VPX knew, or were indifferent to whether, the advertising of Bang was false or misleading—reaches back in time. To find willful conduct, the jury necessarily found that Owoc had the requisite mental state at the time the

advertising was occurring, not at some later moment after Monster filed suit. And the false advertising, by the jury's finding, had been ongoing for years.

What follows from that finding is straightforward. A reasonable fiduciary served with the Monster complaint in September 2018, who knew the advertising of his enterprise's flagship product was false or misleading or who was indifferent to whether it was false or misleading, would not have set a reserve at zero. Such a fiduciary would have recognized—and owed a duty to recognize—that a substantial contingent liability was present from the day of the complaint. The precise percentage that fiduciary would have assigned is not the point. The point is that a reserve of zero, which VPX maintained throughout the relevant period, is not the posture of a reasonable fiduciary who had the mental state the jury later found Owoc had.

It is important to note here that the amount of the potential liability would have been calculated based on the profits of VPX during the time the false advertising was occurring. Mr. Owoc, as the principal of VPX, is deemed to have been aware of the profits of his company. Mr. Owoc testified that he had available to him a multitude of professionals available to assist him in determining the potential liability.[93] A reasonable fiduciary certainly would have done so.

Owoc's testimony at the PI Hearing—that he believed there was "a 0 percent chance . . . that we would lose," and that he therefore set aside no reserve—cannot be reconciled with the jury's willfulness finding. A fiduciary who knew the advertising was false or who was indifferent to whether it was false could not, on any rational

---

[93]Hearing Testimony, Apr. 22, 2026 (Owoc testimony).

view, have sincerely believed there was no chance of losing a litigation challenging the truth of that advertising. The Court does not credit the 0% figure; it serves only to diminish Mr. Owoc's credibility and to illustrate his failure to act as a reasonable fiduciary in the face of significant litigation exposure.

The Court resolves here the objection on which it reserved at the PI Hearing. Mr. Owoc's testimony regarding his belief in the studies and his assessment of litigation risk was admitted not as proof that the studies existed, were reliable, or established what he represented them to establish, but as evidence of his subjective state of mind at the relevant time. The Court does not credit that testimony as proof of the studies' contents or reliability. Whatever subjective belief Mr. Owoc held, a belief is not a defense when it is irreconcilable — as this one is — with the jury's finding that he knew or was indifferent to whether the advertising was false.

There is also a more fundamental point regarding that exposure. This was not inconsequential litigation that simply threatened the Company with a large judgment; the dispute went to the heart of VPX's business. Its revenues were overwhelmingly concentrated in a single product, Bang, that accounted for approximately 95% of its sales, and that product's marketing proposition depended on advertising that the jury would later find was false or misleading and that Owoc knew was false or misleading or was indifferent to whether it was. That economic premise underlies Mr. Kapila's analysis, and it is part of why the contingent liabilities at issue here are not abstract or speculative. They are tied directly to the engine of the enterprise.

The contingent liability framework and the time of transfer issue. Contingent liabilities occupy a distinctive place in balance sheet insolvency analysis. Because the obligation has not yet been liquidated, the liability cannot be recognized at full face value. The accepted methodology, which Mr. Kapila described and the Court accepts as a starting framework, is to multiply the gross exposure by a probability factor reflecting the likelihood of an adverse outcome.[94] The probability factor is itself a matter of informed professional judgment rather than mathematical derivation, and the weight accorded to any specific percentage must be calibrated to reflect that limitation.

The Defendant's most important argument on insolvency proceeds from this point. It correctly observes that contingent liabilities must be measured as of the date of the challenged transfer based on information available at that time, not at face value and not with the benefit of hindsight.[95] From that premise, Elite Island argues that Mr. Kapila's analysis fails to satisfy the time of transfer requirement because he prepared year-end balance sheets at December 31, 2018, 2019, 2020, and 2021, but did not prepare a bespoke balance sheet keyed to August 31, 2020 (the date of the principal Elite Island Transfer) or to any of the carrying cost transfer dates.

---

[94]Kapila Depo at 26:1–29:6.

[95]Defendant relied principally on *In re America-CV Station Group, Inc.*, 666 B.R. 395, 409 (Bankr. S.D. Fla. 2024), at the PI Hearing for the proposition that solvency must be measured at the time of the challenged transfer based on information then available, and not at face value or with the benefit of hindsight. The Court accepts that principle, made clear in 11 U.S.C. § 548(a)(1) itself, which requires that the debtor "was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation" 11 U.S.C. § 548(a)(1)(B)(ii)(I).

The Court accepts the legal premise. Insolvency for fraudulent transfer purposes is measured as of the date of the challenged transfer, and the measurement must rest on facts known or reasonably knowable at that time. But the legal premise does not carry the conclusion the Defendant draws from it. At the preliminary injunction stage, the Trust does not need to prove insolvency beyond the possibility of doubt; it need only show a substantial likelihood that the Trust will succeed in proving insolvency at trial. And on the record presently before the Court, Mr. Kapila's methodology supplies that showing notwithstanding the absence of a bespoke transfer date balance sheet. He produced two snapshots—year-end 2019 and year-end 2020—that bracket the principal Elite Island Transfer; both show insolvency; and he testified that he saw no evidence VPX returned to solvency at any point between them. Those bookend findings, together with his unrebutted testimony that solvency was nowhere observed in the intervening period, are sufficient at the preliminary stage to support an inference that VPX was insolvent in the eight months that fall inside the bookends. Whether at trial Mr. Kapila will need to perform a more granular transfer date analysis to prevail under the controlling cases is an issue the Court does not decide today. The Trust may need more to prevail at trial, but it has carried its burden at this stage.

The probability figures. The Court qualifies Mr. Gioconda but does not adopt his specific probability figures wholesale. A single probability number—here, 85% for the False Advertising Litigation—held constant across the multi-year life of a complex commercial litigation is difficult to defend mechanically. Litigation risk does

not proceed that smoothly; it varies based on developments that occur during the litigation. The Court accordingly treats the Gioconda probability figures as one data point in the insolvency analysis and not as the determinative finding. The result here is determined, instead, by the willfulness finding and by the bookend insolvency described above.

Conclusions on insolvency at each relevant date. With these components in hand, the Court can address insolvency at each relevant date.

Year-end 2018 and 2019. Mr. Kapila's year-end 2018 and 2019 balance sheet deficits are approximately $137.6 million and $150.6 million, respectively. Those figures reflect the Monster contingent liability alone—recognized at 85% of the gross claim, per Mr. Gioconda's factor—and do not include OBI or PepsiCo, neither of which had yet been initiated. At cross-examination, Mr. Kapila confirmed that for these years, the insolvency conclusion depends on the contingent liability recognition; without the Monster contingent liability, or at a probability factor below approximately 50%, VPX would not have been balance sheet insolvent at year-end 2019. That testimony was forthright. But it does not alter the insolvency conclusion. The 50% floor is significant only if Mr. Gioconda's 85% is not merely wrong but wrong by almost half—and the jury's willfulness finding makes such an aggressive discount untenable. A reasonable fiduciary in Owoc's position, who knew the advertising of the Company's flagship product was false or misleading or was indifferent to whether it was, would not have estimated the probability of adverse outcome below 50%. The Court finds that VPX was insolvent at year-end 2018 and at year-end 2019.

Year-end 2020 and 2021. For these years, the insolvency conclusion stands independent of any contingent liability recognition. Mr. Kapila testified, and the Court finds, that at year-end 2020 VPX's balance sheet deficit was approximately $697.6 million, of which approximately $521.5 million was attributable to the three recognized contingent liabilities combined. Strip out all three contingent liabilities and VPX's year-end 2020 insolvency is still approximately $176 million. Similarly, at year-end 2021, the deficit of approximately $548.6 million reflects approximately $372.8 million of contingent liabilities, leaving approximately $176 million of insolvency independent of any probability assessment. The insolvency conclusion for these years thus rests on the fair value adjustments themselves—principally the exclusion of variable interest entity real property assets and the leasehold and intangibles adjustments—and not on the Gioconda probabilities at all.

July 29, 2020 (the initial wire date) and August 31, 2020 (the principal wire date). The initial Elite Island Transfer and the principal Elite Island Transfer fall between Mr. Kapila's year-end snapshots of December 31, 2019, and December 31, 2020. Defendant correctly notes that Mr. Kapila did not perform a bespoke balance sheet analysis for those dates. As discussed above, however, that gap does not defeat the Trust's showing at the preliminary injunction stage. Mr. Kapila's year-end 2019 and year-end 2020 analyses both show insolvency; he saw no evidence of intervening solvency; and the willfulness finding supports the contingent liability recognition that drives his 2019 deficit. The bookends, together with the unrebutted testimony that

no evidence of intervening solvency exists, support the inference that VPX was insolvent on July 29, 2020 and August 31, 2020.

The subsequent Elite Island Transfers. The carrying cost Elite Island Transfers were made on or after October 2, 2020 and run through October 1, 2022.[96] The first two carrying cost transfers fall within the period bracketed by year-end 2019 and year-end 2020; the remaining carrying cost transfers fall within the period bracketed by year-end 2020 and the Petition Date. VPX was insolvent at year-end 2019, year-end 2020, and the Petition Date. The same bookend reasoning applies, and the year-end 2020 deficit—even excluding all contingent liabilities—reflects approximately $176 million of insolvency. VPX was insolvent on each date on which the carrying cost Elite Island Transfers were made.

Summary. For these reasons, the Trust has established a substantial likelihood that VPX was insolvent on July 29, 2020, August 31, 2020, on each of the dates of the subsequent Elite Island Transfers, at year-end 2018 through year-end 2021, and on the Petition Date. The Court's finding does not depend on a bespoke August 31, 2020, balance sheet or on adopting Mr. Gioconda's 85% figure wholesale. It rests principally on Mr. Kapila's analysis, the fair value adjustments independent of any probability assessment, the bookend insolvency findings at year-end 2019 and year-end 2020, and the jury's willfulness finding.

---

[96]Amended Stipulation ¶¶ 9, 11; Ex. 9.

Elite Island offered no expert testimony, no accounting analysis, and no documentary evidence bearing on VPX's solvency at any relevant date. The insolvency record before the Court is accordingly unrebutted.

### ii. Count Twenty-Eight: FUFTA Constructive Fraudulent Transfer

Under FUFTA § 726.105(1)(b), a transfer is fraudulent as to a creditor—whether the creditor's claim arose before or after the transfer—if the debtor made the transfer without receiving reasonably equivalent value in exchange and the debtor "was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction," or "intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due."[97] Asserted through § 544(b), the claim reaches all of the Elite Island Transfers, including the July 29 and August 31, 2020 wires.

The transfers. There is no genuine dispute that VPX transferred $9,747,727.82 to or for the benefit of Elite Island in connection with the Overseas Highway Property between July 29, 2020, and October 1, 2022.[98] Each transfer constituted a transfer of an interest in an asset within the meaning of FUFTA.[99]

---

[97]Fla. Stat. § 726.105(1)(b).

[98]Amended Stipulation ¶ 11; Ex. 9.

[99]"Transfer" is defined under FUFTA to mean "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance." Fla. Stat. § 726.102(14).

No reasonably equivalent value. The record establishes a substantial likelihood that VPX received nothing of reasonably equivalent value in exchange for any of the Elite Island Transfers. Title to the Overseas Highway Property vested in Elite Island, not in VPX.[100] Elite Island never made direct monetary payments to VPX in connection with the transactions at issue.[101] There is no documented loan agreement, promissory note, lease, or other instrument reflecting any obligation of Elite Island to VPX. And Owoc has admitted that he used the Debtors' funds to purchase the Property.[102]

Unreasonably small capital and inability to pay debts as they came due. As established in the insolvency analysis above, VPX was insolvent on August 31, 2020, and remained insolvent throughout the period during which the Elite Island Transfers were made. A corporation whose liabilities exceed the fair value of its assets by approximately $137 million at the end of 2018, $150 million at the end of 2019, and $697 million[103] at the end of 2020 is, by definition, a corporation engaged in business "for which the remaining assets . . . were unreasonably small" and one that should reasonably have believed it would incur debts beyond its ability to pay as they came due. The two alternative statutory prongs of § 726.105(1)(b) are therefore satisfied on this record, and the Court need not choose between them for preliminary injunction purposes.

---

[100]Ex. 18; Amended Stipulation ¶¶ 6–7.

[101]Amended Stipulation ¶ 14.

[102]Ex. 54, Resp. to Request for Admission No. 165.

[103]Even excluding contingent liabilities entirely, VPX's liabilities exceeded its assets by approximately $176 million at the end of 2020. Kapila Depo. at 60:10–61:4.

The Trust has demonstrated a substantial likelihood of success on Count Twenty-Eight as to all the Elite Island Transfers, including the July 29, 2020 initial wire, the August 31, 2020 principal wire, and each of the subsequent transfers detailed in Section II.B.

### iii.  Count Twenty-Nine: Section 548(a)(1)(B) Constructive Fraudulent Transfer

Section 548(a)(1)(B) of the Bankruptcy Code permits the trustee to avoid any transfer made on or within two years before the petition date that was made for less than reasonably equivalent value, where the debtor (among other alternatives) was insolvent at the time or became insolvent as a result, was engaged in business for which its remaining capital was unreasonably small, or intended to incur debts beyond its ability to pay as they matured.[104] The elements of the federal constructive fraud claim are materially similar to those of FUFTA § 726.105(1)(b), except that federal law independently recognizes balance sheet insolvency as a sufficient alternative element.

Because the July 29, August 31, and October 2, 2020 wires fall outside the two-year lookback, Count Twenty-Nine does not reach those transfers. The count does, however, reach the subsequent Elite Island Transfers made on or after October 10, 2020. The reasonably equivalent value analysis in Section IV.A.ii applies in full: VPX received nothing in exchange for any of the post–October 10, 2020 Elite Island Transfers. As to insolvency, the Court's analysis in Section IV.A.i applies; VPX was insolvent on each date on which the carrying cost transfers were made. The Trust has

---

[104] 11 U.S.C. § 548(a)(1)(B).

demonstrated a substantial likelihood of success on Count Twenty-Nine as to the Elite Island Transfers made on or after October 10, 2020.

### iv.  Count Thirty: FUFTA Actual Fraudulent Transfer

FUFTA § 726.105(1)(a) permits avoidance of any transfer made with "actual intent to hinder, delay, or defraud" a creditor.[105] Asserted through § 544(b), the claim reaches all Elite Island Transfers within the four-year FUFTA lookback. Because direct evidence of fraudulent intent is rarely available, courts evaluate actual intent through circumstantial evidence known as "badges of fraud." The statute enumerates eleven non-exclusive badges.[106] Four of them are directly supported by this record: (a) transfer to an insider; (b) receipt of no reasonably equivalent value; (c) insolvency at the time of the transfers; and (d) transfer after suit filed or threatened. The remaining badges are not at issue on this record or do not add independent weight; the Court does not rely on them.

Transfer to an insider. FUFTA treats as an "insider" of an entity debtor any director, officer, or person in control of the debtor, and by extension and by settled case law, an entity that is itself controlled by a statutory insider of the debtor.[107] At

---

[105] Fla. Stat. § 726.105(1)(a).

[106] Fla. Stat. § 726.105(2). The eleven enumerated badges are: (a) the transfer or obligation was to an insider; (b) the debtor retained possession or control of the property transferred after the transfer; (c) the transfer or obligation was not disclosed or was concealed; (d) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (e) the transfer was of substantially all the debtor's assets; (f) the debtor absconded; (g) the debtor removed or concealed assets; (h) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (i) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (j) the transfer occurred shortly before or shortly after a substantial debt was incurred; and (k) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

[107] Fla. Stat. § 726.102(8)(b) (FUFTA definition of "insider"); *See Stermer v. Old Republic Nat'l Title Ins. Co. (In re ATIF, Inc.)*, 160 F.4th 1124, 1141 (11th Cir. 2025) ("A corporation may qualify as

the time of the Elite Island Transfers, Elite Island was a single member LLC whose sole member and manager was Owoc—VPX's CEO, sole shareholder, and sole director.[108] Elite Island was, accordingly, an entity fully under the control of an individual who was the very apex of VPX's corporate structure. It follows that Elite Island is a non-statutory insider of VPX. Owoc's denials in response to certain Requests for Admission regarding his membership in Elite Island[109] are contradicted by the recorded instruments—the Warranty Deed, the Assignment of Development Rights, and the Dwelling Unit Lock-Out Deed Restriction—each of which identifies him as "Manager" of Elite Island on the date of acquisition and, in the case of the Lock-Out Deed Restriction, sixteen months later.[110] The insider badge is established.

Receipt of no reasonably equivalent value. For the reasons discussed in Section IV.A.ii, the Trust has shown that VPX received nothing of reasonably equivalent value in exchange for any of the Elite Island Transfers.

Insolvency at the time of the transfers. For the reasons discussed in Section IV.A.i, the Court has found that VPX was insolvent on July 29, 2020, and remained insolvent throughout the period from October 2, 2020 (the date of the first carrying cost transfer) through October 1, 2022 (the date of the last carrying cost transfer).

---

an insider of another corporation by statute or if the two entities share a close relationship. An example of a close relationship between corporations is when both corporations are under the control of the same officers and directors.")

[108]Amended Stipulation ¶¶ 1–2; Ex. 54, Resps. to Requests for Admission Nos. 1, 2, 4.

[109]Ex. 54, Resps. to Requests for Admission Nos. 17–19.

[110]Ex. 18.

<u>Transfer after suit filed or threatened.</u> At the time of the August 2020 principal wire, VPX had been a defendant in the False Advertising Litigation for nearly two years, and the OBI Arbitration had been commenced ten weeks earlier.[111] VPX was thus exposed to litigation carrying, on the record developed at the PI Hearing, a high probability of a judgment in the hundreds of millions of dollars. For the carrying cost transfers made on or after October 23, 2020, the Pepsi Arbitration was added to the litigation picture as well. Each Elite Island Transfer was made against the backdrop of pending litigation that exposed VPX to hundreds of millions of dollars in contingent liability.

The concurrence of these four badges—insider status, absence of reasonably equivalent value, insolvency at the time of the transfers, and pending litigation—supports a strong inference of actual fraudulent intent for preliminary injunction purposes.[112] The Trust has demonstrated a substantial likelihood of success on Count Thirty as to all of the Elite Island Transfers, including the July 29, 2020 initial wire, the August 31, 2020 principal wire, and each of the subsequent transfers.

### v.  Count Thirty-One: Section 548(a)(1)(A) Actual Fraudulent Transfer

Section 548(a)(1)(A) of the Bankruptcy Code permits the trustee to avoid any transfer made on or within two years before the petition date that was made "with actual intent to hinder, delay, or defraud" any entity to which the debtor was or

---

[111]Kapila Depo at 31:4–24; Hearing Testimony, Apr. 22, 2026 (Gioconda testimony).

[112]*See In re Ramsurat*, 361 B.R. 246, 253 (Bankr. M.D. Fla. 2006); *In re XYZ Options, Inc.*, 154 F.3d 1262, 1271 (11th Cir. 1998).

became indebted.[113] Courts applying Section 548(a)(1)(A) use the same badges of fraud framework that governs the parallel FUFTA actual fraud provision.[114] The analysis in Section IV.A.iv therefore applies to Count Thirty-One as to the Elite Island Transfers made on or after October 10, 2020. For the reasons already stated, each of the four badges is present for those transfers. Because the July 29, August 31, and October 2, 2020 wires fall outside the two-year lookback, Count Thirty-One does not reach those transfers. The Trust has demonstrated a substantial likelihood of success on Count Thirty-One as to the carrying cost transfers identified in Section II.B that were made on or after October 10, 2020.

### vi.  The Defendant's Distribution Defense

Elite Island contends that the Elite Island Transfers were legitimate shareholder distributions from a Subchapter S corporation, and that Owoc paid the corresponding tax. The defense fails for two independent reasons.

First, even taken on its face, the distribution theory does not defeat the Trust's claims. A distribution from an insolvent company to its sole shareholder—or to an entity owned and controlled by that shareholder—for no reasonably equivalent value is precisely the type of transaction that Section 548(a)(1)(B) and FUFTA §§ 726.105(1)(b) are designed to reach. Whether the transfer is styled as a dividend, a distribution, a bonus, or a loan to a shareholder, the question under FUFTA and § 548 is the same: did the debtor receive reasonably equivalent value? If not, and if the

---

[113]11 U.S.C. § 548(a)(1)(A).

[114]*See In re XYZ Options, Inc.*, 154 F.3d at 1271; *In re Model Imperial, Inc.*, 250 B.R. 776, 791 (Bankr. S.D. Fla. 2000).

debtor was insolvent, the transfer is avoidable. The "distribution" label describes how the Company accounted for the transaction; it does not establish that the Company received value.

Second, and more fundamentally, the defense misdescribes the actual transactions at issue. The "distribution" characterization in VPX's general ledger is bookkeeping; the substantive transfers were not, technically speaking, payments to Owoc. The $8,304,171.78 wire on August 31, 2020 went to the Torrens Law Firm PLLC closing-agent escrow account, and the property it funded was conveyed by warranty deed to Elite Island. The carrying cost payments went directly to KMR Construction, Affiniti Architects, Keys Engineering, the Monroe County Tax Collector, and the Florida Keys Aqueduct Authority—each for work or services benefiting Elite Island's property. No portion of the Elite Island Transfers was disbursed to Owoc personally. The transferee of the substantive transactions, in each case, was Elite Island. Courts evaluating fraudulent transfer claims look to the substance of the transaction, not the label affixed by the transferor's accounting.[115]

The defense does not undermine the Trust's substantial likelihood of success on the merits.

### B.  Irreparable Harm

To establish irreparable harm, the movant must demonstrate an injury that "cannot be undone through monetary remedies" and that is "neither remote nor

---

[115]*See Boyer v. Crown Stock Distrib.*, 587 F.3d 787, 793 (7th Cir. 2009) ("[F]raudulent conveyance doctrine . . . is a flexible principle that looks to substance, rather than form, and protects creditors from any transactions the debtor engages in that have the effect of impairing their rights. . .").

speculative, but actual and imminent."[116] The Trust has met this burden, for two related reasons.

First, the Trust's claims seek to recover a specific parcel of real property. Real property is unique; no other parcel can be substituted for it, and no money judgment can make whole a plaintiff who had a right to the particular land itself.[117] The Trust's equitable interest in the Overseas Highway Property arose at the moment of the wrongful transfers and is preserved through the Trust's claims under 11 U.S.C. § 550. Any encumbrance of the Property with a mortgage would directly and permanently diminish the Trust's ability to recover the very property that is the subject of its equitable claims. The harm is not just the loss of a dollar value that could be made up with a substitute judgment; it is the loss of the specific *res* itself.

Second, the threat is concrete and imminent. In the Extension Motion, the Owocs confirmed their intent to "arrange and close financing" secured by the Overseas Highway Property. At the TRO hearing on April 2, 2026, Owoc confirmed on the record that Elite Island had lenders ready, that a loan could close in as little as two weeks, and that the proceeds would be used to fund litigation defense.[118] The Owocs subsequently filed the *Motion for Leave to Obtain Financing to Retain Counsel*, making express what the TRO hearing had already established.[119] These are not

---

[116]*Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990); *Siegel*, 234 F.3d at 1176.

[117]*See Henry v. Ecker*, 415 So. 2d 137, 140 (Fla. 5th DCA 1982).

[118]TRO Order [Dkt. No. 460] ¶ D.

[119]Dkt. No. 494.

speculative assertions; they are admissions by the party opposing the injunction that the very harm the Trust fears is imminent.

The Property is valued at approximately $8.5 million.[120] Elite Island has no other assets.[121] If the Property is mortgaged such that the equity is fully or substantially consumed, the Trust's equitable remedy is permanently impaired. That constitutes irreparable harm.

### C.  Balance of Hardships

The balance of hardships favors the Trust. On one side, the Trust—and by extension the creditors of the VPX estate—faces the permanent loss of its equitable interest in specific real property, which is unique and is the only identified asset available to satisfy the fraudulent transfer claims against Elite Island. On the other side, Elite Island faces a temporary restraint on its ability to borrow against the Overseas Highway Property. Elite Island is a single-asset entity with no independent operations, no employees, and no ongoing business activities that would be disrupted by the injunction.

The Court acknowledges that the hardship to Elite Island is not negligible. Elite Island has retained counsel, but counsel has made clear that his engagement is for a limited purpose and that he does not intend to represent Elite Island at trial. Without replacement counsel, Elite Island faces the prospect of being effectively without representation through trial. A limited liability company cannot appear in federal court through a non-attorney member or manager; it must be represented by

---

[120]Amended Stipulation ¶ 17; Ex. 1.

[121]Amended Stipulation ¶ 8.

licensed counsel.[122] If Elite Island cannot secure trial counsel—because it cannot access its only asset to fund that retention—it faces the prospect of being unable to adequately represent itself despite the fact that it has the wherewithal to retain counsel. Elite Island's inability to secure trial counsel through its own resources is a genuine hardship, and the Court does not minimize it. The Court takes this hardship seriously and has addressed it with its financing carveout in the PI Order.[123]

Elite Island's interest in funding litigation does not, however, override the Trust's equitable interest in preserving the specific Property it seeks to recover. The injunction is not a permanent bar; it preserves the status quo pending full adjudication. If the Defendant prevails at trial, the restraint dissolves. On balance, the hardships favor the Trust.

### D. Public Interest

The public interest likewise favors the injunction. The orderly administration of bankruptcy estates and the protection of creditors' recoveries are core purposes of the Bankruptcy Code, and courts have recognized a public interest in preserving estate property pending adjudication of avoidance claims.[124] When a debtor's property has been transferred to an insider entity for no consideration while the debtor was insolvent, and that property is the only identified source of recovery on the claims

---

[122]*Palazzo v. Gulf Oil Corp.*, 764 F.2d 1381, 1385 (11th Cir. 1985); *Rowland v. Cal. Men's Colony, Unit II Men's Advisory Council*, 506 U.S. 194, 201–02 (1993).

[123]Dkt. No. 534 ("the Court will consider granting relief from the preliminary injunction to permit Elite Island LLC to obtain financing secured by the Overseas Highway Property for the limited purpose of retaining and paying counsel to represent Elite Island LLC in this adversary proceeding.")

[124]*See In re Focus Media Inc.*, 387 F.3d at 1085–86; *Rahman*, 198 F.3d at 502.

against the transferee, the public interest in preserving that asset pending adjudication is strong. Creditors of the VPX estate have a substantial interest in the orderly resolution of these fraudulent transfer claims. Allowing the sole recoverable asset of Elite Island to be substantially encumbered or dissipated before the claims are tried would undermine the purposes the Bankruptcy Code is designed to serve.

Accordingly, all four preliminary injunction factors are met, and the preliminary injunction entered on April 23, 2026, is supported by the findings and conclusions set forth above.

### V.  Conclusion

For the reasons set forth in this Opinion, the Court's entry of the preliminary injunction on April 23, 2026 is supported by the Trust's demonstration of: (i) a substantial likelihood of success on the merits of Count Twenty-Eight (FUFTA constructive fraud) and Count Thirty (FUFTA actual fraud) as to all of the Elite Island Transfers, and of Count Twenty-Nine (Section 548(a)(1)(B) constructive fraud) and Count Thirty-One (Section 548(a)(1)(A) actual fraud) as to the Elite Island Transfers made on or after October 10, 2020; (ii) irreparable harm in the form of threatened dissipation of a specific *res* to which the Trust holds an equitable claim; (iii) a balance of hardships favoring the Trust; and (iv) a public interest in the orderly administration of the bankruptcy estate.

# # #

Copies To:
All Parties in Interest.