UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

| | |
|---|---|
| In re:<br><br>VITAL PHARMACEUTICALS, INC., *et al.*,[1]<br><br>        Debtors. | Chapter 11 Cases<br><br>Case No.: 22-17842-PDR<br><br>(Jointly Administered) |
| VPX LIQUIDATING TRUST, by and through its Liquidating Trustee,<br><br>        Plaintiff,<br>v.<br><br>JOHN H. OWOC, MEGAN ELIZABETH OWOC, ELITE ISLAND LLC, JHO GA-1 INVESTMENT, LLC, JHO NV-1 INVESTMENT LLC, SHERIDAN REAL ESTATE INVESTMENT A, LLC, SHERIDAN REAL ESTATE INVESTMENT B, LLC, and SHERIDAN REAL ESTATE INVESTMENT C, LLC,<br><br>        Defendants. | Adv. Pro. No. 24-01009-PDR |

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNTS 13–21, 28–29, 30–40, AND 46–50 OF THE SECOND AMENDED COMPLAINT**

---

[1] The address of the Debtors is 1600 N. Park Drive, Weston, FL 33326.  The last four digits of the Debtors' federal tax identification numbers are: (i) VPX (8430); (ii) Bang Energy Canada, Inc. (5454); (iii) JHO Intellectual Property Holdings, LLC (0010); (iv) JHO Real Estate Investment, LLC (9394); (v) Quash Seltzer, LLC (6501); (vi) Rainbow Unicorn Bev LLC (2254); and (vii) Vital Pharmaceuticals International Sales, Inc. (8019).

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................ iii

I. LEGAL STANDARD ........................................................................................ 2

II. PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT ON THE ACTUAL FRAUDULENT TRANSFER CLAIMS (COUNTS 15–16, 20–21, AND 30–31) AND ON THE ELEMENTS OF ITS CONSTRUCTIVE FRAUDULENT TRANSFER CLAIMS OTHER THAN INSOLVENCY (COUNTS 13–14, 18–19, and 28–29) ........................................................................................ 3

    A. VPX Transferred Funds to, or for the Benefit of, Mr. Owoc, Elite Island, and the Owoc Real Estate Enterprise. ........................................ 4

        i. Elite Island Transfers ...................................................... 6

        ii. Real Estate Transfers ...................................................... 6

        iii. Owoc Personal Transfers ................................................ 7

    B. The Transfers are Avoidable Even if They Were Booked as Distributions to Mr. Owoc. ........................................................................................ 9

    C. The Transfers Are Avoidable As Actual Fraudulent Transfers Because Numerous Badges of Fraud Are Present (Counts 15–16, 20–21 and 30–31) .......... 9

        i. The Transfers Were to Insiders ...................................... 11

        ii. VPX Did Not Retain Possession or Control of Property Transferred ........................................................................................ 11

        iii. The Transfers Were Made While VPX Was Facing Active Litigations and Thus The Transfers Occurred Before or After VPX Incurred Substantial Debts ............................................ 12

        iv. Transfers Were Concealed .............................................. 15

        v. VPX Did Not Receive Reasonably Equivalent Consideration for the Transfers and the Totality of the Circumstances Support a Finding of Actual Fraud ............................................................ 16

    D. The Transfers Are Alternatively Avoidable as Constructive Fraudulent Transfers Because VPX Did Not Receive "Reasonably Equivalent" Value For Any of the Transfers (Counts 13, 14, 18, 19, and 28-29) ............... 17

III. THE COURT SHOULD GRANT SUMMARY JUDGMENT FOR PLAINTIFF ON ITS AVOIDANCE AND RECOVERY OF PREFERENTIAL TRANSFERS CLAIM (COUNT 17) ........................................................................................ 19

IV. LATE-FILED CLAIMS ARE BARRED BY THE BAR DATE ORDER (COUNTS 32, 37, 38, AND 39) ........................................................................................ 21

V. THE ORIGINAL OWOC CLAIMS, LATE CLAIMS, THE OWOC UNLIQUIDATED CLAIM, AND THE RENT-RELATED CLAIMS SHOULD

BE DISALLOWED FOR LACK OF SUPPORTING DOCUMENTATION UNDER 11 U.S.C. § 502(B), (E), AND (J)............................................................25

VI.    EQUITABLE SUBORDINATION OF ALL FILED AND SCHEDULED CLAIMS IS WARRANTED AS A MATTER OF LAW IN LIGHT OF THE COUNT THREE ORDER AND OTHER CONDUCT BY MR. OWOC (COUNTS 46–50). ..............................................................................................................29

VII.    THE LATE CLAIMS ARE DUPLICATIVE AND MUST BE EXPUNGED (COUNT 37) ........................................................................................................33

VIII.    DISALLOWANCE OF ALL CLAIMS UNDER 11 U.S.C. § 502(D)............................34

IX.    DISALLOWANCE OF THE AMENDED AND SUPERSEDED ORIGINAL OWOC CLAIMS (COUNT 36).......................................................................35

X.    DECLARATORY RELIEF IS WARRANTED (COUNTS 32–34) ................................36

    a.    Declaratory Judgment That the Disputed Sheridan Funds Belong to Plaintiff Is Warranted (Count 33)..................................36

    b.    Declaratory Judgment That the Commercial LLCs Are Limited to the Amounts and Priorities of the Scheduled Claims to the Extent Such Claims Are Not Equitably Subordinated (Count 32)................................................................38

    c.    Declaratory Judgment That JHO Real Estate LLC Is Not a Claimant Is Warranted (Count 34)..................................................39

XI.    CONCLUSION..................................................................................................39

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 1 Glob. Cap. Collections, et al.*,
No. 18-19121-RAM (Bankr. S.D. Fla. Feb. 18, 2020) .......................................................34, 36

*Allen v. Tyson Foods, Inc.*,
121 F.3d 642 (11th Cir. 1997) .........................................................................................2

*In re Ameri P.O.S. Inc.*,
355 B.R. 876 (Bankr. S.D. Fla. 2006) ............................................................................21

*In re Banco Latino Intern.*,
310 B.R. 780 (S.D. Fla. 2004), *aff'd*, 404 F.3d 1295 (11th Cir. 2005).................................24

*In re Bankest Cap. Corp.*,
374 B.R. 333 (Bankr. S.D. Fla. 2007) ............................................................................19

*In re Bateman*,
331 F.3d 821 (11th Cir. 2003) .......................................................................................26

*Bhogaita v. Altamonte Heights Condo. Ass'n, Inc.*,
765 F.3d 1277 (11th Cir. 2014) .......................................................................................2

*In re Bifani*,
580 F. App'x 740 (11th Cir. 2014) ................................................................................ *passim*

*In re Biscayne Inv. Grp., Ltd.*,
264 B.R. 765 (Bankr. S.D. Fla. 2001) ............................................................................32

*In re Cinemex Holdings USA, Inc.*,
No. 20-14696-LMI (Bankr. S.D. Fla. Aug. 2, 2021) .......................................................34, 35

*In re Comput. Universe, Inc.*,
58 B.R. 28 (Bankr. M.D. Fla. 1986) ...........................................................................18, 19

*In re Custom Dock & Repair, Inc.*,
No. 03-2402-9P7, 2004 WL 2924171 (Bankr. M.D. Fla. Sept. 30, 2004) .............................21

*In re Daly*,
655 B.R. 255 (Bankr. S.D. Fla. 2023) ............................................................................28

*Diasonics, Inc. v. Ingalls*,
121 B.R. 626 (Bankr. N.D. Fla. 1990)..............................................................................32

*In re Eddy*,
 572 B.R. 774 (Bankr. M.D. Fla. 2017) ................................................................30, 31, 32, 33

*In re Grove Peacock Plaza, Ltd.*,
 142 B.R. 506 (Bankr. S.D. Fla. 1992) ................................................................................21

*Horne v. Potter*,
 392 F. App'x 800 (11th Cir. 2010) ....................................................................................39

*Inskeep v. Baccus Glob., LLC*,
 No. 20-cv-82127, 2024 WL 416357 (S.D. Fla. Feb. 5, 2024) ..................................................23

*In re Jimenez*,
 472 B.R. 106 (Bankr. S.D. Fla. 2012) ................................................................................27

*In re Kane & Kane*,
 479 B.R. 617 (Bankr. S.D. Fla. 2012) ..................................................................................4

*Laboss Transp. Servs. v. Global Liberty Ins. Co.*,
 208 F. Supp. 3d 1268 (S.D. Fla. 2016) ................................................................................36

*Matter of Lemco Gypsum, Inc.*,
 108 B.R. 831 (Bankr. M.D. Fla. 1988) ................................................................................30

*In re Lemco Gypsum, Inc.*,
 911 F.2d 1553 (11th Cir. 1990) ........................................................................................30

*In re MacFarland*,
 462 B.R. 857 (Bankr. S.D. Fla. 2011) ................................................................................29

*In re McMillin*,
 482 F. App'x 454 (11th Cir. 2012) ....................................................................................12

*MDS (Canada), Inc. v. Rad Source Techs., Inc.*,
 822 F. Supp. 2d 1263 (S.D. Fla. 2011) ................................................................................36

*In re Metiom, Inc.*,
 318 B.R. 263 (S.D.N.Y. 2004) ..........................................................................................34

*In re Mobile Steel Co.*,
 563 F.2d 692 (5th Cir. 1977) ............................................................................................30

*Monster Energy Co. v. Vital Pharms., Inc.*,
 No. 8:18-cv-01882 (C.D. Cal.) ..........................................................................................13

*In re Moreno*,
 341 B.R. 813 (Bankr. S.D. Fla. 2006) ................................................................................28

*In re N & D Props., Inc.*,
   799 F.2d 726 (11th Cir. 1986) .................................................................................30

*In re Northlake Foods, Inc.*,
   715 F.3d 1251 (11th Cir. 2013) ..............................................................................7, 8

*In re Pearlman*,
   472 B.R. 115 (Bankr. M.D. Fla. 2012) ....................................................................12

*In re Pearlman*,
   515 B.R. 887 (Bankr. M.D. Fla. 2014) ....................................................3, 4, 18, 19

*Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*,
   507 U.S. 380 (1993).................................................................................24, 25, 39

*In re PSI Indus., Inc.*,
   306 B.R. 377 (Bankr. S.D. Fla. 2003) .....................................................................15

*In re Pursley*,
   451 B.R. 213 (Bankr. S.D. Fla. 2011) ................................................................26, 28

*In re Red Dot Scenic, Inc.*,
   313 B.R. 181 (Bankr. S.D.N.Y. 2004).....................................................................35

*In re Red Lobster Mgmt. LLC, et al.*,
   No. 6:24-bk-02486-GER (Bankr. M.D. Fla. Nov. 13, 2024)....................................36

*In re Saco Local Dev. Corp.*,
   30 B.R. 862 (Bankr. D. Me. 1983)...........................................................................34

*In re Shank*,
   315 B.R. 799 (Bankr. N.D. Ga. 2004) .....................................................................26

*In re Silva*,
   No. 2:11-cv-282, 2012 WL 2996742 (M.D. Fla. July 23, 2012)..............................24

*Simon v. Leaderscape LLC*,
   No. 06-80797-CIV, 2007 WL 1879393 (S.D. Fla. June 26, 2007)...........................23

*Sorenson v. United States*,
   521 F.2d 325 (9th Cir. 1975) ..................................................................................20

*In re Taylor*,
   363 B.R. 303 (Bankr. M.D. Fla. 2007) .........................................................26, 27, 28

*In re Thornburg*,
   596 B.R. 766 (Bankr. M.D. Fla. 2018) ....................................................................28

*In re Toy King Distribs.*,
    256 B.R. 1 (Bankr. M.D. Fla. 2000) ................................................................ *passim*

*In re Univ. Health Care Grp., Inc.*,
    560 B.R. 594 (Bankr. M.D. Fla. 2016) .................................................................18

*Universal Express, Inc. v. SEC*,
    177 F. App'x 52 (11th Cir. 2006) .........................................................................39

*Vital Pharms., Inc. v. Orange Bang, Inc.*,
    AAA Case No. 01-20-0005-6081 .........................................................................13

*Walker v. Darby*,
    911 F.2d 1573 (11th Cir. 1990) .............................................................................2

*Wiand v. Lee*,
    753 F.3d 1194 (11th Cir. 2014) ..................................................................... *passim*

*In re Wiley*,
    238 B.R. 895 (Bankr. M.D. Fla. 1999) ................................................................20

*In re Winn-Dixie Stores, Inc.*,
    414 B.R. 764 (M.D. Fla. 2009) ............................................................................24

*In re Winstar Commc'ns, Inc.*,
    554 F.3d 382 (3d Cir. 2009) .................................................................................34

*In re World Vision Ent., Inc.*,
    275 B.R. 641 (Bankr. M.D. Fla. 2002) .................................................................5

*In re XYZ Options, Inc.*,
    154 F.3d 1262 (11th Cir. 1998) ......................................................................11, 15

**Statutes**

11 U.S.C. § 101(31)(B)..........................................................................................4, 11

11 U.S.C. §501................................................................................................................38

11 U.S.C. § 502(e)(1)...................................................................................................26

11 U.S.C. § 509(a) ........................................................................................................26

11 U.S.C. § 544(b) ..........................................................................................................3

11 U.S.C. § 547...............................................................................................19, 20, 21

11 U.S.C. § 548(a)(1)(A)(B).......................................................3, 4, 10, 17, 18, 19

11 U.S.C. § 550 ................................................................................................................35

28 U.S.C. § 2201(a) .........................................................................................................36

U.S.C. §§ 2201–2202 .......................................................................................................38

Fla. Stat. § 605.0405(1).......................................................................................................9

Fla. Stat. § 607.0834(1).......................................................................................................9

Fla. Stat. §607.06401(3)

Fla. Stat. § 605.0405(1).......................................................................................................9

Fla. Stat. § 726.102(14).......................................................................................................4

Fla. Stat. § 726.105 .......................................................................3, 4, 10, 11, 12, 13, 15, 16, 19

**Rules**

Fed. R. Bankr. P. 3001 ................................................................................................26, 28

Fed. R. Bankr. P. 3003 ............................................................................................22, 23, 38

Fed. R. Civ. P. 56(a) .............................................................................................................1, 2

Fed. R. Evid. 201 ................................................................................................................39

Plaintiff in the above-captioned chapter 11 bankruptcy cases, through its counsel, hereby moves for partial summary judgment against the remaining Defendants[2] in this Adversary Proceeding[3] on Counts 13–21, 28–29, 30–40, and Counts 46–50[4] of the Complaint (Adv. Pro. Dkt. No. 148), and, in support thereof, states as follows:

**PRELIMINARY STATEMENT**

During the pendency of this Adversary Proceeding, Defendants produced nothing—no expert testimony, no documentary evidence, and no credible defenses—to rebut the undisputed evidence Plaintiff produced during the course of discovery.[5]  Granting this motion will substantially streamline trial by resolving certain claims in their entirety and key parts of other claims.  The undisputed record demonstrates that Plaintiff is entitled to judgment as a matter of law on the following counts:

- **Counts 15–16, 20–21, 30–31**: Summary judgment establishing all elements of Plaintiff's actual fraudulent transfer claims and granting recovery of approximately $ $134,615,119.50.
- **Counts 13–14, 18–19, 28–29**: In the alternative to the actual fraudulent transfer claims, partial summary judgment establishing that (1) Defendants received transfers of $ $134,615,119.50 from VPX and (2) VPX did not receive reasonably equivalent value for such transfers, i.e. all elements of Plaintiff's constructive fraudulent transfer claims other than insolvency.
- **Count 17**: Summary judgment on all elements of Plaintiff's preference claims for transfers made between July 11, 2022 and the Petition Date, and on all elements other than insolvency for transfers from October 10, 2021 to July 10, 2022.

---

[2] The remaining defendants ("Defendants") are: John H. Owoc ("Mr. Owoc"); Megan Elizabeth Owoc ("Mrs. Owoc," and together with Mr. Owoc, the "Owocs"); Elite Island LLC ("Elite Island"); JHO GA-1 Investment, LLC ("JHO GA"); JHO NV-1 Investment LLC ("JHO NV"); Sheridan Real Estate Investment A, LLC ("Sheridan A"); Sheridan Real Estate Investment B, LLC ("Sheridan B"); and Sheridan Real Estate Investment C, LLC ("Sheridan C").

[3] Capitalized terms not defined herein shall have the same meanings ascribed to them in the Statement of Undisputed Material Facts.

[4] This Court has previously granted summary judgment on Count Three of the Complaint.  (*See* Adv. Po. Dkt. 435 at 3–4, 11, 15, 20–21, 24 (the "Count Three Order").)  Plaintiff's motion for partial summary judgment on Count Four of Complaint is pending.  (Adv. Pro. Dkt. 390.)

[5] It is inconceivable Defendants could come forward with evidence sufficient to create a genuine dispute of material fact under Rule 56 when the Owocs are precluded from "from introducing at trial evidence that they refused to produce during discovery" pursuant to the May 7, 2026 sanctions order.  (Adv. Pro. Dkt. 552).  Contemporaneously with this motion, Plaintiff is seeking similar relief against the entity defendants.

- **Counts 32–34**: Declarations that (a) the Commercial LLCs claims are limited to the Scheduled Claims (Count 32), (b) the Disputed Sheridan Funds belong to the Liquidating Trust (Count 33), and (c) JHO Real Estate LLC is not a claimant (Count 34).
- **Count 35**: Disallowance under Section 502(d) of all claims filed by or on behalf of Mr. Owoc until avoidable transfers are repaid.
- **Count 36**: Disallowance and expungement of the Original Owoc Claims as amended and superseded by the Late Claims.
- **Count 37**: Disallowance and expungement of the Late Claims as untimely filed and duplicative of the other claims, and due to the absence of supporting documentation.
- **Counts 38–40**: Disallowance of the Owoc Unliquidated Claim (Count 38), the Rent-Related Claims (Count 39), and the Asserted Admin Claim (Count 40) due to the complete absence of supporting documentation.
- **Counts 46–50:** Equitable Subordination of the Late Claims (Count 46), Owoc Unliquidated Claim (Count 47), Rent-Related Claims (Count 48), Asserted Admin Claim (Count 49) and Scheduled Claims (Count 50) due to Mr. Owoc's breaches of fiduciary duty and inequitable conduct.

## ARGUMENT

### I.   <u>LEGAL STANDARD.</u>

Federal Rule of Civil Procedure 56(a) requires summary judgment where there is no genuine dispute of material fact and "the movant is entitled to judgment as a matter of law."  The movant bears the initial burden, and the court views the evidence in the light most favorable to the nonmovant.  *See Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).  Once met, the burden "shifts to the non-moving party . . . [to] present[] specific facts showing that such contradiction is possible," and the nonmovant cannot rely on mere allegations—"there must be enough of a showing that the jury could reasonably find for that party."  *Walker v. Darby*, 911 F.2d 1573, 1576–77 (11th Cir. 1990).

Courts may grant summary judgment on entire claims or on individual elements of claims, even where other elements remain for trial.  *See Bhogaita v. Altamonte Heights Condo. Ass'n, Inc.*, 765 F.3d 1277, 1285–86 (11th Cir. 2014).

-2-

II.    **PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT ON THE ACTUAL FRAUDULENT TRANSFER CLAIMS (COUNTS 15–16, 20–21, AND 30–31) AND ON THE ELEMENTS OF ITS CONSTRUCTIVE FRAUDULENT TRANSFER CLAIMS OTHER THAN INSOLVENCY (COUNTS 13–14, 18–19, AND 28–29).**

Plaintiff is entitled to partial summary judgment on two independent fraudulent transfer theories.  First, Plaintiff is entitled to summary judgment on its *actual* fraudulent transfer claims (Counts 15–16, 20–21, and 30–31), which do not require a finding of insolvency and may be established as a matter of law based on the undisputed badges of fraud now before the Court.  Second, Plaintiff is entitled to summary judgment on every element of its *constructive* fraudulent transfer claims (Counts 13–14, 18–19, and 28–29) other than insolvency.[6]

Section 544(b) of the Bankruptcy Code permits a bankruptcy trustee to avoid any transfer of a debtor's property that would be avoidable by an unsecured creditor under applicable state law, here, the Florida Uniform Fraudulent Transfer Act (the "FUFTA").  11 U.S.C. § 544(b).[7]  The FUFTA claims "are analogous 'in form and substance' to their bankruptcy counterparts," with the only material difference being FUFTA's four-year look-back versus the Bankruptcy Code's two-year period, and therefore "may be analyzed contemporaneously."  *In re Pearlman*, 515 B.R. 887, 894 (Bankr. M.D. Fla. 2014); *see* 11 U.S.C. § 548(a)(1).

An actual fraudulent transfer claim requires only proof that the transfer was made with "actual intent to hinder, delay, or defraud any creditor."  Fla. Stat. § 726.105(1)(a); 11 U.S.C. § 548(a)(1)(A).  It does *not* require establishing insolvency.[8]  *See Wiand v. Lee*, 753 F.3d 1194,

---

[6] If the Court later finds Plaintiff established insolvency, Plaintiff will then be entitled to judgment on the constructive fraudulent transfer claims as a matter of course.

[7] Monster and OBI are both "triggering" creditors as they have allowed claims under the confirmed *Debtors' Second Amended Joint Plan of Liquidation*.  (*See generally* Main Case Dkt. No. 1905.)

[8] Plaintiff submits that the Court can resolve the actual fraudulent transfer claims without determining insolvency, which is not an express element of those claims. If, however, the Court concludes that adjudicating whether the "distributions" were proper requires assessing the Company's solvency, the Court should make factual findings on all other elements of both the constructive and actual fraudulent transfer claims, leaving only insolvency for trial.

1200–01 (11th Cir. 2014).  Actual intent is ordinarily proven through the statutory "badges of fraud," the presence of which constitutes prima facie evidence that the transfer is void.  *Wiand*, 753 F.3d at 1200; Fla. Stat. § 726.105(2).

A constructive fraudulent transfer claim requires Plaintiff to prove that VPX (1) made the transfers, (2) without receiving "reasonably equivalent value," and (3) was insolvent at the time (or became insolvent as a result).  *Pearlman*, 515 B.R. at 894; Fla. Stat. § 726.105(1)(b); 11 U.S.C. § 548(a)(1)(B).

There is no genuine dispute that: (1) Mr. Owoc, Elite Island, and the Owoc Real Estate Enterprise received or benefitted from VPX's transfers; (2) the badges of fraud under Fla. Stat. § 726.105(2) are present in overwhelming number; and (3) VPX received no reasonably equivalent value.  Establishing these facts now will resolve the actual fraudulent transfer claims entirely and reduce the constructive fraudulent transfer claims to the single question of insolvency, which approach serves both judicial efficiency and legal clarity.[9]

**A.      VPX Transferred Funds to, or for the Benefit of, Mr. Owoc, Elite Island, and the Owoc Real Estate Enterprise.**

A "transfer" under the Bankruptcy Code includes "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with—(i) property; or (ii) an interest in property."  11 U.S.C. § 101(54)(D); *see also* Fla. Stat. § 726.102(14).

Here, the record establishes that the payments of monies to Mr. Owoc directly, or to a third party for his personal benefit, out of VPX's accounts were "transfers" of VPX's Property.  (*See* SUMF ¶¶ 33–34.)  From 2018 through the Petition Date, Mr. Owoc directed VPX's Finance

---

[9] Determinations of insolvency are more appropriately resolved by the trier of fact.  *See, e.g., In re Kane & Kane*, 479 B.R. 617, 630 (Bankr. S.D. Fla. 2012) (finding summary judgment on insolvency issue inappropriate where defendant challenged the expert's opinion, allowing trier of fact to hear how the expert "reached the conclusion that the Debtor was insolvent" and determine the appropriate weight of his testimony).

-4-

Department to send funds to his personal accounts or third parties and book those transfers as "distributions." (SUMF ¶¶ 9, 32.) VPX's former director of finance, Zurama Sury Rodriguez ("Rodriguez"), described the practice: Jack would take a distribution whenever he needed one, or ask for money from his company to be sent to him. Whenever he had a need of any type, or needed to fund his personal account, he would ask for distributions. (*Id.* ¶¶ 9–10, 13; Declaration of Zurama Sury Rodriguez ("Rodriguez Decl.") ¶¶ 14–15, 17.) Mr. Owoc would contact VPX's accounting department to pay an expense that was unrelated to VPX's business. (SUMF ¶ 13.) The accounting department would process the payment and record the payment as a "distribution" to Mr. Owoc in VPX's accounting records. (*Id.* ¶¶ 9–10.)

Between October 10, 2018 and October 10, 2022, at least $ $134,615,119 in transfers were made in this fashion. (*Id.* ¶¶ 33–34.) These transfers included payments by VPX to or for the benefit of: (1) Elite Island, a Florida LLC of which Mr. Owoc was sole managing member and 100% owner; (2) Mr. Owoc or the Real Estate LLCs in connection with the Owoc Real Estate Enterprise; and (3) Mr. Owoc for miscellaneous personal expenses ("Owoc Personal Transfers"). (*Id.* ¶¶ 37–42, 48–50, 58–62.) Each transfer is reflected in VPX's books and records, establishing the first element of both the actual and constructive fraudulent transfer claims. *In re World Vision Ent., Inc.*, 275 B.R. 641, 652, 655–66 (Bankr. M.D. Fla. 2002) (relying on commission checks from the debtor for note sales to determine that "[t]he payments constitute transfers of the debtor's property"). Thus, this Court should find, as a matter of law, that the Elite Island Transfers, the Owoc Real Estate Enterprise Transfers, and the Owoc Personal Transfers—each discussed in more detail below—were made to or for the benefit of Mr. Owoc, Elite Island, and the Owoc Real Estate Enterprise, satisfying the first element of both the actual and constructive transfer claims.

### i.    Elite Island Transfers.

VPX made $9,747,727.82 in transfers for the benefit of Elite Island between August 25, 2020 and August 2021.[10]  Elite Island used VPX funds to acquire the Overseas Highway Property for $8,304,171.78, and VPX also paid related property management, architectural, engineering, and governmental fees pertaining to the Overseas Highway Property.  (SUMF ¶¶ 39–47.) Accordingly, Plaintiff asks the Court to find, as a matter of law, that VPX made approximately $9,747,727.82 in transfers for the benefit of Elite Island, satisfying the first element of both the actual and constructive fraudulent transfer claims.

### ii.    Real Estate Transfers.

Between January 1, 2019 and August 18, 2021, VPX transferred approximately $22,866,127[11] (the "Real Estate Transfers") to third parties for the benefit of the Owoc Real Estate Enterprise, a third-party business operated by Mr. Owoc, his son, and others.  (SUMF ¶¶ 48–57; *see also* Adv. Pro. Dkt. No. 306 ("Tropical Sunset Settlement") ("[P]rior to the Petition Date, to fund the capital contributions of Tropical Sunset 117, cash in the amount of $22,866,127.00 was disbursed to Tropical Sunset from an account owned by VPX.").)[12]  Accordingly, Plaintiff asks the Court to find, as a matter of law, that VPX made approximately $22,866,127 in Real Estate Transfers to third parties for the benefit of the Owoc Real Estate Enterprise, thereby satisfying the first element of both the actual and constructive fraudulent transfer claims.

---

[10] The Elite Island Transfers were the subject of the Court's May 7, 2026 opinion and order ("PI Order") granting Plaintiff's motion for a preliminary injunction restraining Elite Island from encumbering the Overseas Highway Property.

[11] Plaintiff's Complaint alleged that there were approximately $37.5 million in Owoc Real Estate Enterprise transfers. For the purposes of this motion (only), Plaintiff addresses Counts 13–16, 18–21, and 28–31 of the Complaint with respect to Mr. Owoc for the purpose of establishing its entitlement to the approximately $22 million agreed-upon in the settlement with the Tropical Sunset defendants.

[12] Plaintiff has resolved the Tropical Sunset 117 causes of action through a court-approved settlement (*See* Adv. Pro. Dkt. 306), but release of the settlement funds is conditioned on a determination of whether the Real Estate Transfers were legitimate distributions or improper transfers of VPX assets.

### iii. Owoc Personal Transfers.

VPX also made transfers totaling at least $ 82,253,774.27 directly to Mr. Owoc and various third parties at his behest, unrelated to Elite Island and the Owoc Real Estate Enterprise. (SUMF ¶ 60.) The undisputed record establishes that these transfers fall into the following principal categories: transfers for taxes, vehicle payments, miscellaneous AMEX payments, salary and bonuses, and miscellaneous personal transfers.

*Tax Transfers.* Between October 10, 2018 and October 10, 2022, Mr. Owoc caused VPX to transfer at least $64,503,677.56 to the IRS and other tax authorities to satisfy the Owocs' personal income tax liabilities, broken down as follows: $26,028,620.72 between October 10, 2018 and October 9, 2019; $19,170,707.79 between October 10, 2019 and October 9, 2020; $17,336,177.14 between October 10, 2020 and October 9, 2021; and $1,968,171.91 between October 10, 2021 and October 10, 2022. (SUMF ¶ 60(i).) Also, on July 16, 2020, VPX transferred $9,140,000 to the United States Treasury, and on October 15, 2020, VPX transferred an additional $8,303,533. (*Id.* ¶ 60(ii).) VPX operated as a subchapter S-Corporation, which passed taxable income directly to Mr. Owoc as the sole shareholder, making him—not VPX—responsible for the resulting tax obligations. (*Id.* ¶ 3); *In re Northlake Foods, Inc.*, 715 F.3d 1251, 1253 n.2 (11th Cir. 2013) ("[T]he responsibility for the payment of taxes owed by the S corporation 'passes through' to its shareholders, who pay the tax liability in proportion to each shareholder's pro rata share of the S corporation."). No agreement ever existed between VPX and Mr. Owoc obligating VPX to pay his personal taxes. (*Id.* ¶ 38.) Each of these payments benefitted the Owocs personally and provided no value to VPX.

*American Express Payments.* VPX made $494,026.32 in payments to American Express on Mr. Owoc's Centurion Black Amex card from October 10, 2021 to October 10, 2022 for charges that, upon review, are unrelated to VPX's business operations. (*Id.* ¶ 67(i).) For example, they

include hotel charges at the Ritz Carlton in Naples, Florida, and Marina Del Ray, Florida; costs for attending a BitCoin conference in Nashville; and a stay at an AirBnB.  (*Id*.)  Rodriguez explained that the finance team reviewed American Express statements and "[i]f the accounting staff determined that a particular payment was not a business expense, then VPX would list it as a payment to [Mr. Owoc]"—i.e., a distribution.  (Rodriguez Decl. ¶ 14.)

*Bonuses and Salary.*  On December 31, 2019, Mr. Owoc also directed VPX to transfer him a "Bonus" of $14,430,000.  (*Id*. ¶ 55.)  In February 2022, after the $175 million interim award had been issued in the Orange Bang arbitration, Mr. Owoc's annual salary increased from approximately $750,000 to $1,790,530.  (SUMF ¶ 67(iv)).

*Miscellaneous Personal Transfers.*  The remaining transfers funded a wide range of Mr. Owoc's purely personal expenditures such as transfers to personal bank accounts to fund his personal spending, withdrawals of cash, payments to charitable and political organizations in Mr. Owoc's name, payments to attorneys for personal legal matters unrelated to VPX, and payments related to Mr. Owoc's personal properties that were not owned or utilized by VPX. (*See id.* ¶ 17.)[13] All such payments were "processed at [Mr. Owoc's] direction and sole discretion as they came in," and were booked as distributions.  (*Id.* ¶¶ 15, 18.)

Accordingly, Plaintiff asks the Court to find, as a matter of law, that VPX made (1) $9,747,727.82 in transfers for the benefit of Elite Island, (2) approximately $22,866,127 in Real Estate Transfers for the benefit of the Owoc Real Estate Enterprise, and (3) $80,431,455.60 in Owoc Personal Transfers directly to, or for the benefit of Mr. Owoc, thereby satisfying the first element of both the actual and constructive fraudulent transfer claims.

---

[13] Examples include $10,597.50 to Ely's Parties LLC for a personal event (Nov. 12, 2020); $51,606.10 to Hoist Fitness Systems and $24,000.10 to Gym Source USA for Mr. Owoc's home gym (Nov. 30, 2020 and Jun. 14, 2021); and a $10,000 political donation (Jan. 25, 2022).  (SUMF ¶ 23.)  Mrs. Owoc directed that charitable donations be listed as coming from "Jack and Meg Owoc, nothing to do with our company."  (Rodriguez Decl. ¶ 18(b).)

### B.   The Transfers Are Avoidable Even if They Were Booked as Distributions to Mr. Owoc.

The "distribution" label does not insulate the Transfers from avoidance.[14]  Under Florida law, neither corporations nor LLCs may issue distributions when insolvent.   Fla. Stat. § 607.06401(3) (corporations); Fla. Stat. § 605.0405(1) (LLCs).  A director who votes for or assents to such distributions is personally liable.  Fla. Stat. § 607.0834(1).  That reasoning applies to all transfers at issue, and any "distributions" made while VPX was insolvent are improper.  Accordingly, Plaintiff asks the Court to find, as a matter of law, that the characterization of any of the transfers as "distributions" alone does not insulate them from avoidance, and that any such transfers made while VPX was insolvent—which Plaintiff will establish at trial—constitute improper distributions under Fla. Stat. §§ 607.06401(3) and 605.0405(1).

### C.   The Transfers Are Avoidable as Actual Fraudulent Transfers Because Numerous Badges of Fraud Are Present (Counts 15–16, 20–21, and 30–31).

A transfer is actually fraudulent if it was made "[w]ith actual intent to hinder, delay, or defraud" a creditor of the debtor. Fla. Stat. § 726.105(1)(a); 11 U.S.C. § 548(a)(1)(A).

To determine "actual intent," courts consider the following "badges of fraud," among others: (a) the "transfer or obligation was to an insider," (b) the "debtor retained possession or control of the property transferred after the transfer," (c) the "transfer or obligation was disclosed or concealed," (d) before "the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit," (e) the "transfer was of substantially all the debtor's assets," (f) the "debtor absconded," (g) the "debtor removed or concealed assets," (h) the "value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred

---

[14] This Court has already rejected the same defense as to the Elite Island Transfers, holding that the "'distribution' label describes how the Company accounted for the transaction; it does not establish that the Company received value," and that "courts evaluating fraudulent transfer claims look to the substance of the transaction, not the label affixed by the transferor's accounting." (PI Opinion at 40–41.)

or the amount of the obligation incurred," (i) the "debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred," (j) the "transfer occurred shortly before or shortly after a substantial debt was incurred," and (k) the "debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor." *Id.* § 726.105(2); *see also Model Imperial,* 250 B.R. at 791.

Under both FUFTA and the Bankruptcy Code, courts consider the totality of the circumstances and "allow fraudulent intent to be proven through circumstantial evidence and the surrounding circumstances . . . including the badges of fraud," because "direct evidence of fraud does not always exist." *Model Imperial*, 250 B.R. at 791 (citation modified). The badges constitute prima facie evidence of voidness. *Wiand*, 753 F.3d at 1200.

Here, the undisputed record establishes the following badges: (1) the transfers were to or for the benefit of insiders (Mr. Owoc, his son, Elite Island, and the Real Estate LLCs); (2) VPX did not retain possession or control of the property; (3) the transfers were concealed and/or mischaracterized as "distributions"; (4) the transfers were made while VPX faced multiple lawsuits, including the Monster False Advertising Litigation, Orange Bang Arbitration, Pepsi action, and copyright actions; (5) VPX received no reasonably equivalent consideration; (6) certain transfers occurred shortly before or after substantial debts were incurred, including the $175 million arbitration award; and (7) the transfers were of substantial company funds. None of these badges depends on insolvency, and the Court can establish each as a matter of law now. *See* Fla. Stat. § 726.105(2); *Model Imperial*, 250 B.R. at 791–92.

### i.       The Transfers Were to Insiders.

Courts consider transfers to or for the benefit of an insider "one of the most important" badges of fraud. *In re Toy King Distribs.*, 256 B.R. 1, 128 (Bankr. M.D. Fla. 2000). This badge is "*so significant* that in some cases . . . an insolvent debtor's transfer to an insider has caused the court to make a finding of actual fraud in the absence of any other badges of fraud." *Id.* at 129 (emphasis added); *see also* 11 U.S.C. § 101(31)(B).

There is no dispute that the Transfers were made to or for the benefit of insiders of VPX— Mr. Owoc, his son, and entities affiliated with one or both, including Elite Island. (SUMF ¶¶ 2, 45–48; Answer ¶ 38.) Mr. Owoc's status alone is prima facie evidence that the Transfers are void. *Wiand*, 753 F.3d at 1200; Fla. Stat. § 726.105(2)(a). Because Mr. Owoc was Elite Island's sole member and Mr. Owoc or Jon Owoc are the sole members of each Real Estate LLC, those entities are also insiders. *See* 11 U.S.C. § 101(31)(B)(iii), (vi); *id.* § 101(41); *Toy King Distribs.*, 256 B.R. at 98. The Eleventh Circuit has recognized that transfers routed through intermediaries to insiders satisfy this badge. *In re XYZ Options, Inc.*, 154 F.3d 1262, 1274 (11th Cir. 1998) (affirming finding that "essential assets of the debtor . . . were transferred to a lienor . . . who then transferred assets to an insider" and "ended up in the hands of [the] insider . . . or persons or family controlled by him"); *see also In re Bifani*, 580 F. App'x 740, 745–46 (11th Cir. 2014) (affirming summary judgment on actual fraud based on insider transfers and other badges). The insider badge of fraud is therefore established as a matter of law.

### ii.       VPX Did Not Retain Possession or Control of Property Transferred.

VPX did not retain possession or control of the funds transferred or the real property acquired with those funds. "A debtor must have exercised 'sufficient control over the funds to warrant a finding that the funds were the debtor's property.'" *In re Pearlman*, 472 B.R. 115, 125 (Bankr. M.D. Fla. 2012) (quoting *In re Chase & Sanborn Corp.*, 813 F.2d 1177, 1180 (11th Cir.

-11-

1987)).  Sufficient control means "the power to designate which party will receive the funds," and "to actually disburse the funds . . . to that party."  *Id.* at 125–26 (citation omitted).  The Eleventh Circuit applied this test to find a debtor lacked control where its funds were transferred out of its account to a third party to purchase real property.  *In re McMillin*, 482 F. App'x 454, 457 (11th Cir. 2012) ("The Debtor . . . merely facilitated the transfer of the funds and the actual connection between the funds and the debtor was quite tangential." (citation omitted)).

The same is true here.  Once the funds left VPX's accounts, VPX retained no control.  Mr. Owoc used or directed them to pay third parties and acquire or maintain properties titled to Elite Island or the Real Estate LLCs, not VPX.  (SUMF ¶¶ 39–57); Fla. Stat. § 726.105(2)(j).  Nothing flowed back to VPX.  (SUMF ¶¶ 47, 52; *see* PI Opinion at 9–10 ("Nothing flowed back—Elite Island never transferred money or property to VPX in connection with the Elite Island Transfers or otherwise.")); *see also Bifani*, 580 F. App'x at 746 (debtor retained control where it continued to reside at transferred property and shared sale proceeds); *Wiand*, 753 F.3d at 1203 (affirming summary judgment where funds "could have been applicable to the payment of the debt due" but were transferred to third parties (citation omitted)).  The retention-of-control badge under Fla. Stat. § 726.105(2)(b) is therefore established.

### iii.    The Transfers Were Made While VPX Was Facing Active Litigations and Thus The Transfers Occurred Before or After VPX Incurred Substantial Debts.

The Transfers were also made while VPX was exposed to hundreds of millions of dollars in liability pursuant to a multitude of "bet the company" lawsuits.  First, on September 4, 2018—at the very outset of the Transfer period—Monster initiated the False Advertising Litigation against VPX in the Central District of California, *Monster Energy Co. v. Vital Pharms., Inc.*, No. 8:18-cv-01882 (C.D. Cal.).  (SUMF ¶ 22.)  Specifically, Monster alleged that VPX's advertising conveyed to consumers that Bang Energy contained creatine or provided creatine-related benefits, despite

the absence of creatine as an ingredient and the lack of evidence that "Super Creatine" delivered equivalent physiological effects.  (*Id.* ¶ 17.)  That litigation ultimately resulted in a $271,924,174 jury verdict against VPX on September 29, 2022, with the jury finding VPX's false advertising was willful and deliberate.  (*Id.* ¶ 23; Count 3 Order at 4.)

Second, on June 16, 2020, Monster and OBI initiated the OBI/Monster Arbitration, *Vital Pharms., Inc. v. Orange Bang, Inc.*, AAA Case No. 01-20-0005-6081, alleging that VPX had breached a 2010 trademark coexistence agreement (the "2010 Settlement Agreement") governing use of the BANG mark.  (SUMF ¶¶ 15–20.)  That arbitration resulted in a $175 million disgorgement of profits award issued on April 4, 2022, perpetual royalty payments equal to five percent of net sales of BANG products, and approximately $9.3 million in attorneys' fees and costs.  (*Id.* ¶ 21.)

Third, VPX's unilateral termination of its exclusive distribution agreement with PepsiCo on October 23, 2020 spawned at least seven lawsuits and arbitration proceedings.  (*Id.* ¶ 31.)  The dispute ultimately settled on June 21, 2022, with VPX owing approximately $115 million to PepsiCo.  (*Id.* ¶ 32.)  *See* Fla. Stat. § 726.105(2)(d), (j).

Throughout these litigations, Mr. Owoc continued directing transfers to himself, family members, and his controlled entities.  Each litigation caused VPX to incur substantial debt—a separate badge of fraud.  (Count 3 Order at 4 (Monster judgment of $271,924,174); SUMF ¶¶ 20–21 (OBI/Monster $175 million disgorgement plus perpetual royalties and $9.3 million in fees); *Id.* ¶ 32 (PepsiCo settlement of $115 million)); *see* Fla. Stat. § 726.105(2)(j); *In re Bifani*, 580 F. App'x at 746 (timing of transfers "calls into question [the debtor's] motive for transferring property, and thus was properly considered as a badge of fraud").

-13-

The timing of the Transfers relative to VPX's escalating litigation exposure is particularly revealing. On September 4, 2018, Monster initiated the False Advertising Litigation against VPX. In the year immediately following the commencement, Mr. Owoc made or directed numerous transfers for his own benefit. Indeed, that very same year, Mr. Owoc started the Owoc Real Estate Enterprise—purchasing its very first property on January 2, 2019—and began channeling VPX funds into real property investments held by and titled to non-debtor insider entities—a pattern that only accelerated as VPX's legal exposure became more acute. For example:

- At the time the first of the Elite Island Transfers was made on April 1, 2020, the False Advertising Litigation had been pending for nearly two years, VPX had lost a motion to dismiss, and the OBI/Monster Arbitration was initiated two months later. (*See* Kaplan Cert. ¶ 12(a), Ex. U.) Just two months after that, in August 2020, the Overseas Highway Property was acquired for approximately $8.3 million entirely using VPX funds. (SUMF ¶ 43.)

- Likewise, Mr. Owoc used VPX funds to acquire at least twelve properties, including the 167 Spyglass Property (acquired on October 16, 2020), the 6850 Melaleuca Property (acquired on July 22, 2020), and the 520 San Marco Property (acquired on February 12, 2020). (*See id.* ¶ 49; Rodriguez Decl. ¶ 29; Adv. Pro. Dkt. 306, Ex. A ¶¶ 1, 14.)

- Mr. Owoc also used VPX funds for his personal gym renovations throughout 2021. (SUMF ¶ 60(vi)–(viii).)

Other litigations were also pending. Between 2019 and 2020, VPX approved promotional videos using copyrighted music without licenses, prompting copyright actions by Sony Music Entertainment (Jan. 31, 2022), Atlantic Recording Corp. (Sept. 15, 2022), and UMG Recordings (Mar. 14, 2024), each alleging willful infringement and seeking up to $150,000 per work. (SUMF ¶¶ 24–27; s*ee also* Kaplan Cert. ¶ 12, Exs. Y–BB.) As early as October 26, 2020, Violent Music B.V. and Violent Music Publishing B.V. accused Bang of infringement for using unlicensed music on TikTok, and TikTok itself warned Bang's Chief Counsel that copyrighted songs "should never be used by a brand without consulting legal counsel." (*See* SUMF ¶¶ 24–27.) Still, VPX continued posting infringing content while Mr. Owoc directed millions in transfers to himself in

-14-

2021 alone—at the very time VPX was defending the Monster and OBI/Monster matters and facing escalating copyright exposure.

The pattern reveals a deliberate strategy to divert VPX funds to or for the benefit of Mr. Owoc and entities he controlled just when VPX's litigation exposure escalated to enterprise-threatening levels. (*Id.* ¶¶ 14–32.) The badges under Fla. Stat. § 726.105(2)(d) and (j)—that the Transfers were made while VPX had been sued or threatened with suit and shortly before or after VPX incurred substantial debts—are therefore established as a matter of law.

### iv.   Transfers Were Concealed.

The Transfers were also concealed because Mr. Owoc directed VPX to book payments to him, or to third parties on his behalf, as "distributions." (SUMF ¶¶ 10, 33–34, 36, 60–61); *see* Fla. Stat. § 726.105(2)(g). That mischaracterization enabled Mr. Owoc to "skim monies from the debtor for [his] benefit," which is itself a badge of fraud. *Toy King*, 256 B.R. at 138; *In re PSI Indus., Inc.*, 306 B.R. 377, 386–87 (Bankr. S.D. Fla. 2003) (finding clear "efforts to siphon away the assets of the company" where CEO concealed transfers and recharacterized them as "salary" payments "intentionally misapplied" in the books); *XYZ Options, Inc.*, 154 F.3d at 1274–75 (concealment satisfied where "an intent to conceal might reasonably be inferred from the complex and convoluted nature of the transfers").

Mr. Owoc also concealed VPX's true financial condition—including the existence and breaches of the 2010 Settlement Agreement and the falsity of Super Creatine—from employees and distributors, which allowed VPX to continue selling Super Creatine Products that accounted for 95% of sales. (SUMF ¶¶ 17–18; *see* PI Opinion at 28.) Rodriguez, for example, did not learn of the OBI/Monster Arbitration until late 2021/early 2022; had she known sooner, she would have reserved funds, which would have changed her view of Mr. Owoc's distributions and pay increases. (Rodriguez Decl. ¶ 54); *see Toy King*, 256 B.R. at 130–31 (concealment badge present

-15-

where principals took affirmative steps to conceal transfers and misrepresent debtor's financial condition). The concealment badge under Fla. Stat. § 726.105(2)(c) and (g) is thus established.

**v.      VPX Did Not Receive Reasonably Equivalent Consideration for the Transfers and the Totality of the Circumstances Support a Finding of Actual Fraud.**

VPX received no reasonably equivalent value—indeed, no value at all—for any of the Transfers. As detailed below in Section II.D, each of these transfers was made solely for Mr. Owoc's personal benefit to fund expenses on properties owned by the Owoc Real Estate Enterprise, his personal taxes, and other personal expenses, with no evidence of repayment to VPX. (SUMF ¶¶ 33–38, 62, 68.) This badge is therefore satisfied. *See Bifani*, 580 F. App'x at 746–47 (affirming summary judgment where debtor "admitted that [the transferee] provided no consideration").

Ultimately, there is no disputing that the summary judgment record establishes the "actual intent" required for actual fraudulent transfer claims. *See Model Imperial, Inc.*, 250 B.R. at 791. Seven of eleven badges are present:[15] Mr. Owoc, as CEO, sole director, and 100% owner, was an insider; the transfers occurred during ever-increasing litigation; and Mr. Owoc wholly controlled the Company and initiated the transfers. "[T]his confluence of factors mandates a conclusive presumption of fraudulent intent." *Id.* at 792; *see also Bifani*, 580 F. App'x at 745–46. Indeed, Mr. Owoc's insider status alone is proof of intent. *Toy King Distribs.*, 256 B.R. at 128–29 (underscoring that the transfer to an insider "badge of fraud" may, on its own, "cause[] the court to make a finding of actual fraud in the absence of any other badges of fraud"). None of these

---

[15] In connection with the Elite Island Transfers, this Court found four badges of fraud directly supported by the record: (a) transfer to an insider; (b) receipt of no reasonably equivalent value; (c) insolvency at the time of the transfers; and (d) transfer after suit filed or threatened. (PI Opinion at 37–39.) The Court concluded that "[t]he concurrence of these four badges . . . supports a strong inference of actual fraudulent intent." *Id.* at 39. The same badges, supported by the same (and now more fulsome) record, are present as to the Owoc Personal Transfers and the Real Estate Transfers.

badges requires any finding or determination regarding insolvency, and the Court should therefore establish the actual fraudulent transfer claims as a matter of law now.  The Court should therefore grant summary judgment for Plaintiff on the Mr. Owoc, Real Estate, and Elite Island AFT Claims under FUFTA § 726.105(1) and 11 U.S.C. § 548(a)(1).  To the extent any transfer must separately be evaluated as a purported "distribution," the Court may make findings that the badges of fraud are present and reserve the distribution issue for trial.

    **D.**    **The Transfers Are Alternatively Avoidable as Constructive Fraudulent Transfers Because VPX Did Not Receive "Reasonably Equivalent" Value For Any of the Transfers (Counts 13–14, 18–19, and 28-29).**

Under FUFTA § 726.105(1)(b)(2), a constructive fraudulent transfer occurs where a debtor makes a transfer or incurs an obligation "[w]ithout receiving a reasonably equivalent value" and the debtor "intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due."  The Bankruptcy Code similarly requires that the debtor "received less than a reasonably equivalent value in exchange" and (i) was insolvent or became insolvent as a result; (ii) intended or believed it would incur unpayable debts; or (iii) made the transfer to or for the benefit of an insider under an employment contract outside the ordinary course.  11 U.S.C. § 548(a)(1)(B).  The trustee may avoid such transfers made within two years of the petition, *id.* § 548(a)(1), and FUFTA provides a four-year look-back, § 726.110.

"As a general rule, an insolvent debtor receives less than a reasonably equivalent value where it transfers its property in exchange for consideration which passes to a third party.  In such cases, it ordinarily receives little or no value." *In re Comput. Universe, Inc.*, 58 B.R. 28, 30 (Bankr. M.D. Fla. 1986).  Courts consider "the good faith of the parties, the disparity between the fair value of the property and what the debtor actually received, and whether the transaction was at arm's length." *In re Univ. Health Care Grp., Inc.*, 560 B.R. 594, 602 (Bankr. M.D. Fla. 2016) (citation omitted).

Applying these factors here, this Court should find that VPX did not receive reasonably equivalent value—or any value at all—in exchange for the Elite Island Transfers, the Real Estate Transfers, or the Owoc Personal Transfers, all of which are described at length above in Section II.A.

***Elite Island Transfers.*** VPX acquired the Overseas Highway Property and paid all expenses for it, but all of the value of the Elite Island Transfers passed to Elite Island, an entity solely owned and controlled by Mr. Owoc, VPX received nothing in return. *See, e.g.*, *Pearlman*, 515 B.R. at 895 (finding debtor did not receive reasonably equivalent value for payments made on behalf of a third party where the benefit accrued solely to that third party); (Adv. Pro. Dkt. No. 553 at 5–45 (granting preliminary injunction against Elite Island LLC)).

***Owoc Real Estate Enterprise Transfers.*** The Real Estate Transfers follow the same fact pattern: VPX funded the acquisition and renovation of at least twelve properties at Mr. Owoc's direction, but title was placed in the names of the Real Estate LLCs rather than VPX, and VPX received nothing in return. (SUMF ¶¶ 47–50.)

***Owoc Personal Transfers.*** The Owoc Personal Transfers include at least $64,503,677 million paid to the IRS and other taxing authorities to satisfy the Owocs' personal tax liabilities, a self-awarded $14 million bonus paid in 2019 without any board or compensation-committee oversight, other expenditures—including transfers to his personal bank accounts, charitable and political donations made in the Owocs' individual names (such as a $10,000 political contribution), and payments for gym equipment, fishing charters and event costs—none of which were for VPX's benefit. Indeed, VPX's finance department booked the Owoc Personal Transfers (like the Real Estate and Elite Island Transfers) as "distributions" to Mr. Owoc precisely because they were not

-18-

company expenses—otherwise they would have been coded as ordinary business expenditures. (Rodriguez Decl. ¶¶ 14, 17, 26–28, 33.)

Because each category of Transfers resulted in value being provided to Mr. Owoc or third parties for his benefit while VPX received nothing in return, VPX received less than reasonably equivalent value as a matter of law. *See Comput. Universe, Inc.*, 58 B.R. at 30; *In re Bankest Cap. Corp.*, 374 B.R. 333, 344–45 (Bankr. S.D. Fla. 2007); *Pearlman*, 515 B.R. at 895. The Court should enter partial summary judgment establishing (i) that VPX made the transfers identified in Section II.A, and (ii) that VPX did not receive reasonably equivalent value in exchange—i.e., every element of the constructive fraudulent transfer claims under FUFTA § 726.105(1)(b) and 11 U.S.C. § 548(a)(1)(B) other than insolvency, leaving only that issue for trial on Counts 13–14, 18–19, and 28–29.

## III.   THE COURT SHOULD GRANT SUMMARY JUDGMENT FOR PLAINTIFF ON ITS AVOIDANCE AND RECOVERY OF PREFERENTIAL TRANSFERS CLAIM (COUNT 17).

Plaintiff is entitled to summary judgment on the preference claim against the Owocs (Count 17) for transfers between July 12, 2022 and October 10, 2022 (the 90-day "Presumption Period") and between October 9, 2021 and July 11, 2022 ("Non-Presumption Period"). Under section 547(b) of the Bankruptcy Code, a trustee can "avoid any transfer of an interest of the debtor in property" by showing that the payment was: (1) to a creditor, (2) on account of a previous debt, (3) "made while the debtor was insolvent," (4) made between 90 days and one year before the filing of the petition, if an insider, and (5) effectively enabled the creditor to receive more than it would have received (a) in a case filed by the debtors under Chapter 7 of the Bankruptcy Code, (b) had the payments not been made, and (c) if the creditor received payment of its debt to the extent provided by the Bankruptcy Code. *See* 11 U.S.C. § 547(b).

-19-

The undisputed record establishes each of these five elements as to the transfers that occurred during the Presumption Period because insolvency is presumed, and during the Non-Presumption Period because this Court has already found that the Company was insolvent from year-end 2021 through the Petition Date.  (*See* PI Order at 32–33.).

First, in the year prior to the Petition Date, VPX made approximately $2,178,497.60 in payments for the benefit of the Owocs who, at all relevant times, were insiders of VPX due to purported obligations—a fact not in dispute.  *See In re Wiley*, 238 B.R. 895, 906 (Bankr. M.D. Fla. 1999); *see also Sorenson v. United States*, 521 F.2d 325, 327–28 (9th Cir. 1975); (SUMF ¶ 63; Answer ¶¶ 38, 41; Main Case Dkt. No. 325 at 2, 53–56 (listing wages and payments to the Owocs)). During the Presumption Period, VPX made approximately $737,848.78 in payments for the benefit of the Owocs while VPX was presumptively insolvent and these insiders would not have received such sums in a Chapter 7 liquidation.  (SUMF ¶ 64.)  As to the remaining $1,440,648.82 in transfers made during the non-Presumption Period, this Court has already found that VPX was insolvent from year-end 2021 through the Petition Date.  (*See* PI Order at 32–33.)  Because the non-Presumption Period (October 10, 2021 through July 11, 2022) falls entirely within the dates on which the Court has already found VPX insolvent, the insolvency element is established for the remaining $1,440,648.82 in transfers as well.

Second, these payments were made on account of purported antecedent debts.  (SUMF ¶ 65; Main Case Dkt. No. 325 at 2, 53–56 (listing wages and payments to the Owocs).)  *See In re Custom Dock & Repair, Inc.*, No. 03-2402-9P7, 2004 WL 2924171, at *1–3 (Bankr. M.D. Fla. Sept. 30, 2004) (deferred wage payments for past services are recoverable preferences).  Third, these payments were made between October 19, 2021 and October 7, 2022, during the Presumption Period.  (SUMF ¶ 63); 11 U.S.C. § 547(f).  Fourth, the payments occurred within one year of the

-20-

Petition Date.  (SUMF ¶ 63.)  Fifth, VPX's Bankruptcy Schedules reflected approximately $709 million in assets against $1.1 billion in liabilities, so general unsecured creditors will not be fully paid on their claims.  (SUMF ¶ 69.)  "Given the low asset to claim ratio computed from the schedules, the Defendant is indeed receiving more as a result of the transfer [than] it would have under a liquidation plan."  *In re Ameri P.O.S. Inc.*, 355 B.R. 876, 882 (Bankr. S.D. Fla. 2006).  Because the Owocs held unsecured claims for salary and other compensation, every payment they received during the preference period enabled them to receive more than in a Chapter 7 action.  *See Toy King Distribs., Inc.*, 256 B.R. at 95–96; *In re Grove Peacock Plaza, Ltd.*, 142 B.R. 506, 517 (Bankr. S.D. Fla. 1992).  Finally, the Owocs offered no § 547(c) defenses—and discovery is closed.

The Court should therefore grant summary judgment for Plaintiff on this claim and (1) grant Plaintiff recovery of the $737,848.78made while VPX was presumptively insolvent during the Presumption Period and (2) recovery of the $ 1,440,648.82 in transfers that occurred between October 10, 2021 and July 11, 2022, during which time period this Court has already determined the Company was insolvent.

## IV.   LATE-FILED CLAIMS ARE BARRED BY THE BAR DATE ORDER (COUNTS 32, 37, 38, AND 39)

Section 502(b)(9) provides that a claim shall not be allowed if "proof of such claim is not timely filed." 11 U.S.C. § 502(b)(9); Fed. R. Bankr. P. 3003(c)(2), (3).  The Court entered the Bar Date Order setting December 19, 2022 as the non-governmental Bar Date.  (SUMF ¶ 71.)  Any person or entity failing to timely file "shall be forever barred, estopped, and enjoined from . . . asserting any Claim against the Debtors that (i) is in an amount that exceeds the amount, if any, that is set forth in the Schedules, or (ii) is of a different nature or in a different classification." (Bar Date Order ¶ 5.)  The Bar Date Order and accompanying notice procedures were designed to ensure

-21-

that all potential claimants, including insiders, received adequate and timely notice of the Bar Date and the requirement to file claims by that deadline.  (SUMF ¶¶ 73–75.)

Mr. Owoc was personally served with the Court-approved Bar Date notice on or around November 29, 2022. (*Id.* ¶ 76.)  Such service provided Mr. Owoc, who was represented by counsel at the time, with actual and timely notice of the Bar Date, affording him ample opportunity to assert any claims he individually—or the Commercial LLCs, which he purportedly solely owns— might have had against the Debtors' estates.  Despite this notice, the only proofs of claim timely received by the Debtors' claims and noticing agent were the Original Owoc Claims, filed solely by Mr. Owoc in his individual capacity.  (*See id.* ¶ 77.)  No other proofs of claim were filed on behalf of the Commercial LLCs by the Bar Date.  (*See id.* ¶ 78.)  As the sole shareholder and controlling party of the Commercial LLCs—who were represented by counsel on the Bar Date— Mr. Owoc was in a position to ensure that any claims the Commercial LLCs might have had were properly and timely asserted.  (*See id.* ¶¶ 76–77.)  The Commercial LLCs' failure to timely file any claims is dispositive.

Nearly seven months after the Bar Date, on July 12, 2023, Mr. Owoc filed the Late Claims (Claim Nos. 767–772) purporting to amend the Original Owoc Claims.[16]  (*Id.* ¶ 83.)  The Late Claims asserted, for the first time, secured claims in the amount of $163,424,411.61 "on behalf of" the Commercial LLCs and a nonexistent entity, "JHO Real Estate LLC."[17]  (*Id.* ¶ 87.)  The Late Claims do not effectively amend or supplement the Original Owoc Claims to add the Commercial LLCs' Claims because the Original Owoc Claims were filed solely by Mr. Owoc in his individual capacity and not for the Commercial LLCs, distinct legal entities.  *See* 11 U.S.C. §

---

[16] *See* Owoc Claims Summary at 1–3; Owoc Claims Objection Overview at 1–2.

[17] *See* Owoc Claims Summary at 4.

502(b)(9) ("[P]roof of such claim is not timely filed."); Fed. R. Bankr. P. 3003(c)(3) (a proof of claim filed after a bar date is not timely unless excused for cause). "An LLC is an autonomous legal entity, separate and distinct from its members, with its own rights, possessions, and obligations. And a person cannot pierce the corporate veil by simply declaring, without a shred of evidence, that he and the entity are (and have always been) indistinguishable." *Inskeep v. Baccus Glob., LLC*, No. 20-cv-82127, 2024 WL 416357, at *22 (S.D. Fla. Feb. 5, 2024) (citation modified); *Simon v. Leaderscape LLC*, No. 06-80797-CIV, 2007 WL 1879393, at *1 (S.D. Fla. June 26, 2007) ("[A] corporation cannot be represented in a legal action by a non-lawyer employee, officer or shareholder. Thus, a pleading signed in the corporate name by one of its agents or officials is a nullity, and must be disregarded." (citation modified)).

Just as significantly, the Late Claims set forth wholly new grounds of liability and, for the first time, assert secured status; accordingly, they do not, and cannot, relate back to the Original Owoc Claims that were filed solely by Mr. Owoc in his individual capacity. The Bankruptcy Code and Bar Date Order are clear: claims not timely filed are barred and may not be asserted against the estates, or in this case, the Liquidating Trust. *See* 11 U.S.C. § 502(b)(9); (Bar Date Order ¶ 5 (claimants who fail to timely file "shall be forever barred, estopped, and enjoined" from asserting claims in excess of scheduled amounts).) The Bar Date serves as a strict deadline to promote finality and certainty in estate administration. *See Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 389 (1993). Courts routinely enforce bar dates against insiders who deliberately fail to timely assert claims, even where the amount of such claims later becomes fixed. *See In re Banco Latino Intern.*, 310 B.R. 780, 785–86 (S.D. Fla. 2004) (holding that former officers and directors who deliberately "chose not to file" contingent proofs of claim and waited until five years after the bar date could not establish "excusable neglect" and that the bankruptcy court could

not "disregard[] the policies supporting the application of the 'excusable neglect' standard"), *aff'd*, 404 F.3d 1295, 1295 (11th Cir. 2005); *In re Silva*, No. 2:11-cv-282, 2012 WL 2996742, at *5 (M.D. Fla. July 23, 2012) ("[I]t is the clearly established law of the Circuit and this District that attempts to change the status of a claim from unsecured to secured, or the like, after the bar date and confirmation of a plan, is a new claim that does not relate back to the original filing of the claim in a different classification."); *In re Winn-Dixie Stores, Inc.*, 414 B.R. 764, 767–68 (M.D. Fla. 2009) (post-bar date amendments introducing new categories of liability are subject to heightened scrutiny and disallowance).

Similarly, two of the Late Claims contain the Rent-Related Claims, which assert that Mr. Owoc, on behalf of himself, Sheridan A, and JHO Real Estate LLC, has claims for the Postpetition Rent and the unpaid Prepetition Rent.[18] (*See* SUMF ¶¶ 93–95.) The Rent-Related Claims also do not relate back to the claims asserted in the Original Owoc Claims because they were filed seven months after the Bar Date, set forth wholly new grounds of liability, and were asserted by brand new parties.

Further, the Late Claims were improperly filed despite purporting to be filed on behalf of all the Commercial LLCs by Mr. Owoc. Each Commercial LLC failed to file its own proof(s) of claim signed by an individual or entity with signatory authority. (*See id.* ¶¶ 83, 85.) In addition, none of the Commercial LLCs filed a motion for leave to file proofs of claim after the Bar Date or demonstrated excusable neglect. *See Pioneer Inv. Servs. Co.*, 507 U.S. at 389. Nor was excusable neglect pled in the Commercial LLCs' or Mr. Owoc's Answer and Affirmative Defenses. (Adv. Pro. Dkt. Nos. 156, 157.)

---

[18] *See also* Owoc Claims Summary at 1–2; Owoc Claims Objection Overview at 2.

Because the Commercial LLCs, with full knowledge and notice of the Bar Date, did not timely assert any claims, such claims are now barred under section 502(b)(9) of the Bankruptcy Code and the express terms of the Bar Date Order.  Accordingly, Claim Nos. 767, 768, 770, 771, and 772 should be barred as late filed and expunged.

**V.      THE ORIGINAL OWOC CLAIMS, LATE CLAIMS, THE OWOC UNLIQUIDATED CLAIM, AND THE RENT-RELATED CLAIMS SHOULD BE DISALLOWED FOR LACK OF SUPPORTING DOCUMENTATION UNDER 11 U.S.C. § 502(B), (E), AND (J) (COUNTS 37–40).**

Disallowance of the Original Owoc Claims, Late Claims, the Owoc Unliquidated Claim, and the Rent-Related Claims is further warranted under 11 U.S.C. § 502(b) because Mr. Owoc and the Commercial LLCs (to the extent their proofs of claim are deemed properly filed, timely, and not equitably subordinated, which they are not) have failed to provide any documentation whatsoever to support the basis, amount, or priority of any of the claims asserted in their proofs of claim.[19]  (*See* SUMF ¶ 102.)

A proof of claim is only entitled to prima facie validity if it is "executed and filed in accordance with" the Bankruptcy Rules, including a requirement that supporting documentation be attached.  Fed. R. Bankr. P. 3001(c), (f); *see also In re Bateman*, 331 F.3d 821, 827 (11th Cir. 2003) (establishing that the burden of proof shifts to the objecting party only when a claim has been properly filed in accordance with the Bankruptcy Rules).  Where a claimant fails to provide adequate documentation, the presumption of validity does not attach, and the claimant bears both the burden of going forward and the ultimate burden of proof to establish its claim.  *See In re Shank*, 315 B.R. 799, 802 (Bankr. N.D. Ga. 2004); *In re Taylor*, 363 B.R. 303, 307–08 (Bankr. M.D. Fla. 2007); *In re Pursley*, 451 B.R. 213, 222 (Bankr. S.D. Fla. 2011).

---

[19] *See also* Owoc Claims Objection Overview at 1–2.

The Liquidating Trust served document requests specifically seeking all documents referenced in, or purportedly supporting, the Original Owoc Claims, Late Claims, the Owoc Unliquidated Claim, and the Rent-Related Claims, including any documents establishing the basis, amount, or priority of the claims. The Court ordered Mr. Owoc to respond to these requests and produce all responsive documents. (*See* Adv. Pro. Dkt. No. 415.) Despite multiple opportunities to comply, including several extensions of time and a Court order expressly warning of sanctions for noncompliance, Mr. Owoc failed to produce a single responsive document. The discovery end date was February 6, 2026. Mr. Owoc's complete failure to produce any supporting documentation for the aforementioned claims is dispositive.

The Late Claims also purport to assert claims under section 502(e)(1) of the Bankruptcy Code and equitable reimbursement under Florida law on behalf of Sheridan B, as well as subrogation claims under section 509(a) of the Bankruptcy Code and equitable subrogation under Florida law on behalf of JHO GA, Sheridan A, Sheridan C, and JHO NV, yet no documents have been produced to support any such reimbursement or subrogation rights. (*See* SUMF ¶ 102.) Significantly, all real property purportedly owned by the Commercial LLCs was purchased with VPX funds, and VPX paid all maintenance and carrying costs from the date it acquired each property to the date each property was sold. (*See id.* ¶¶ 37, 97–99, 106–07.) Accordingly, the Late Claims lack any evidentiary foundation and should be disallowed in their entirety.

Further, the Owoc Unliquidated Claim (Claim No. 663), filed against Debtor Bang Canada in an unliquidated amount, remains entirely unsubstantiated.[20] (*See id.* ¶¶ 80, 100–02.) Mr. Owoc has not provided any documents to establish the amount of the Owoc Unliquidated Claim, despite being afforded multiple opportunities to do so, including pursuant to the Court's order compelling

---

[20] *See also* Owoc Claims Summary at 3; Owoc Claims Objection Overview at 1.

discovery responses.  (*See* Adv. Pro. Dkt. No. 415); *see also* 11 U.S.C. § 502(b)(1) (claim shall be disallowed to the extent it is "unenforceable against the debtor and property of the debtor, under any agreement or applicable law"); *Taylor*, 363 B.R. at 309; *In re Jimenez*, 472 B.R. 106, 113 (Bankr. S.D. Fla. 2012).  At this juncture, he is barred from providing such evidence to the extent it exists.  (Adv. Pro. Dkt. No. 552.).

The Rent-Related Claims assert prepetition and postpetition rent obligations, yet no lease agreements, rent schedules, or other documentation have been produced to establish any such obligations.  (*See* Owoc Claims Summary at 4 (Key Observations (iv): Rent-Related Claims "premised on alleged unpaid pre- and post-petition rent under purported leases between the Debtors and entities Mr. Owoc claims to own or control"); Owoc Claims Objection Overview at 2 (Count 39 objections to Rent-Related Claims for "complete absence of supporting documentation").)  VPX funded the entire purchase price for the Sheridan A Property and paid all carrying costs, yet no lease or written agreement between VPX and Sheridan A exists.  (*See* SUMF ¶¶ 106–08.)  Likewise, the AZ property was owned by Debtor JHO Real Estate Investment LLC and was therefore property of the Debtor.  (*See id.* ¶¶ 96–97.)  Neither Mr. Owoc nor JHO Real Estate LLC has established any entitlement to pre- or postpetition rent.  At the time the Rent-Related Claims were filed, Mr. Owoc, in his individual capacity, did not have authority to assert an intercompany rent obligation; only VPX could do so, as Debtor JHO Real Estate Investment LLC owned the AZ Property.  (*See id.* ¶¶ 96–97.)  Moreover, no evidence exists that rent was ever paid by any of the Debtors to Sheridan A or Sheridan C, and no documents have been produced demonstrating that rent was ever paid in connection with any property owned by the Commercial LLCs.  (*See id.* ¶ 98.)

Without any supporting documentation, these claims cannot be allowed. *See* 11 U.S.C. § 502(b)(1) (claim shall be disallowed where "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law"); *In re Moreno*, 341 B.R. 813, 819 (Bankr. S.D. Fla. 2006) (where debtor contests the existence of the debt, "necessary documentation may include the original account agreement or at least copies of account statements evidencing the debt"); *Taylor*, 363 B.R. at 309 (disallowing claims where claimant "failed to submit any refuting evidence or otherwise substantiate the debt claimed in the proofs of the claim"); *Pursley*, 451 B.R. at 229–30 (discussing the evidentiary consequences of noncompliance with Rule 3001 documentation requirements).

Because the Liquidating Trust produced more than sufficient evidence to rebut the claims' validity, the burden shifted to the claimant to prove the validity and amount of each claim by a preponderance of the evidence. *See In re Thornburg*, 596 B.R. 766, 770 (Bankr. M.D. Fla. 2018) (once the objecting party produces "evidence at least equal in probative force to that offered by the proof of claim and which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency," the burden shifts back to the claimant); *In re Daly*, 655 B.R. 255, 261 (Bankr. S.D. Fla. 2023). Mr. Owoc produced nothing to carry that burden, discovery is closed, and he is now estopped from doing so. Critically, this is not a case in which the debtor is seeking to disallow undisputed scheduled claims based on a technical documentation deficiency. *See In re MacFarland*, 462 B.R. 857, 881 (Bankr. S.D. Fla. 2011) (distinguishing between specious objections to undisputed scheduled claims and substantive objections under § 502(b)). Rather, the Liquidating Trust raised substantive objections under section 502(b) of the Bankruptcy Code, and the claims at issue are affirmatively disputed. Mr. Owoc and the Commercial LLCs, who were represented by counsel for 26 of the 28 months this case has been pending, were given

-28-

every opportunity—including through Court-ordered discovery—to produce documentation substantiating their claims and yet produced nothing.

As such, disallowance of the Original Owoc Claims, Late Claims (Claim Nos. 767–772), the Owoc Unliquidated Claim (Claim No. 663), and the Rent-Related Claims is warranted under 11 U.S.C. § 502(b).

## VI.   EQUITABLE SUBORDINATION OF ALL FILED AND SCHEDULED CLAIMS IS WARRANTED AS A MATTER OF LAW IN LIGHT OF THE COUNT THREE ORDER AND OTHER CONDUCT BY MR. OWOC (COUNTS 46–50).

Plaintiff is entitled to summary judgment on Counts 46–50 for equitable subordination of all filed and scheduled claims as a matter of law.[21]  On March 24, 2026, this Court entered the Count Three Order, finding that Mr. Owoc breached his fiduciary duties to the Debtors by "orchestrating a false advertising campaign that a federal jury found to be willful and deliberate, resulting in a judgment approaching $300 million."  The Court's findings in the Count Three Order and Mr. Owoc's other prepetition misconduct satisfy the equitable subordination standard applicable to all claims at issue, including those purportedly held by Mr. Owoc and the Commercial LLCs (i.e., the Original Owoc Claims, the Owoc Unliquidated Claim, Late Claims, the Rent-Related Claims, Scheduled Claims, and Asserted Admin Claim).[22]

Equitable subordination requires (1) inequitable conduct by the claimant, (2) injury to creditors or unfair advantage to the claimant, and (3) consistency with the Bankruptcy Code.  11 U.S.C. § 510(c); *In re Mobile Steel Co.*, 563 F.2d 692, 700 (5th Cir. 1977); *In re Lemco Gypsum, Inc.*, 911 F.2d 1553, 1556 (11th Cir. 1990) (applying the *Mobile Steel* standard and holding that "inequitable conduct need not be related to the acquisition or assertion of a claim").  Conduct

---

[21] *See* Owoc Claims Objection Overview at 2–3.

[22] *See* Owoc Claims Objection Overview at 3.

warranting subordination includes "fraud, illegality, breach of fiduciary duty, under capitalization, and claimant's use of the debtor as a mere instrumentality." *Matter of Lemco Gypsum, Inc.*, 108 B.R. 831, 835 (Bankr. M.D. Fla. 1988) (citation modified). Insider claims are subject to rigorous scrutiny, and the burden shifts to the insider once the proponent comes forward with material evidence of unfair conduct. *In re N & D Props., Inc.*, 799 F.2d 726, 731 (11th Cir. 1986) ("the claimant then must prove the fairness of his transactions with the debtor or his claim will be subordinated"); *see also In re Eddy*, 572 B.R. 774, 781–82 (Bankr. M.D. Fla. 2017) (the party seeking to equitably subordinate an insider's claim "need only present material evidence of inequitable conduct" and the insider must then "prove both good faith and the fairness of its dealings").

There is no genuine dispute as to any element. As to the first, the Court already determined on summary judgment that Mr. Owoc engaged in inequitable conduct. (*See generally* Count Three Order.) The Order establishes that Mr. Owoc, as VPX's sole fiduciary, breached his duties of care, loyalty, and good faith by orchestrating a willful and deliberate false advertising campaign exposing VPX to a judgment approaching $300 million, and that collateral estoppel bars him from relitigating those facts. (*See id.*) Those findings alone establish the first element for the Original Owoc Claims, Late Claims, the Rent-Related Claims, Scheduled Claims, and Asserted Admin Claim.

However, the Court's findings are not limited to the Super Creatine Scheme. The record supports that Mr. Owoc engaged in additional inequitable conduct that harmed all of the Debtors' creditors, including, but not limited to: (1) establishing and operating the Owoc Real Estate Enterprise using the Debtors' funds and moving the properties outside the Debtors' possession and control (SUMF ¶¶ 49–52); (2) funneling tens of millions of dollars out of the Company to pay

personal expenses (*id.* ¶ 60); and (3) transferring and/or placing title to commercial real property in the possession of his solely-owned entities, despite VPX paying for the purchase of, and paying all carrying costs related to, each of the real properties (*id.* ¶¶ 97–99).

The first element is also satisfied, specifically with respect to the Owoc Unliquidated Claim. The litigations referenced therein, for which Mr. Owoc seeks indemnity, were either (1) caused by Mr. Owoc's own bad acts, or (2) involved harms that Mr. Owoc himself caused. (SUMF ¶¶ 20–23.) This misconduct, compounded by his repeated breaches of fiduciary duties as established by the Count Three Order, demonstrates that Mr. Owoc is not entitled to payment on account of the Owoc Unliquidated Claim, which should be equitably subordinated.

Similarly, by way of example, Mr. Owoc's remaining claims fail under the first element because they arise from his own inequitable conduct. Although all assets currently and formerly owned by the Commercial LLCs were originally paid for and maintained by VPX, they were titled in the names of the Commercial LLCs, which were solely owned and controlled by Mr. Owoc. These assets were transferred to, or acquired by, the Commercial LLCs at Mr. Owoc's direction in breach of his fiduciary duties, and neither Mr. Owoc nor the Commercial LLCs are entitled to any funds in connection with the proceeds of the sale of any of the Commercial LLCs' assets under a subrogation, contribution, or any other theory. (*See* SUMF ¶¶ 97–99.) The Debtors also do not have any obligation to pay Mr. Owoc's income tax liabilities, as Mr. Owoc is not a party to any tax sharing agreement or similar arrangement that would create such an obligation for VPX. (*See id.* ¶ 38.)

As to the second element, there is no dispute that Mr. Owoc's misconduct injured all creditors in these Chapter 11 Cases. The False Advertising Judgment alone saddled VPX with nearly $300 million in liability. (*See id.* ¶ 23; Main Case Dkt. No. 26 ¶¶ 29–44); *see also Toy King*

-31-

*Distribs.*, 256 B.R. at 201 (second element satisfied where "general creditors are less likely to collect their debts" as a result of insider's conduct); *In re Biscayne Inv. Grp., Ltd.*, 264 B.R. 765, 775 (Bankr. S.D. Fla. 2001) (insider's control and self-serving acts conferred unfair advantage warranting subordination). Without the claims being subordinated, Mr. Owoc would unfairly benefit over all other creditors by receiving distributions on account of claims arising from the very insider relationship he exploited to the Debtors' and creditors' detriment.

As to the third element, equitable subordination of all of Mr. Owoc's filed and scheduled claims is consistent with the Bankruptcy Code. Following Section 510(c)'s enactment, this element is of "minimal significance" because "Congress expressly authorized a bankruptcy court to equitably subordinate a claim, which clearly makes the concept 'consistent with bankruptcy law.'" *Eddy*, 572 B.R. at 783; *see also Diasonics, Inc. v. Ingalls*, 121 B.R. 626 (Bankr. N.D. Fla. 1990). Mr. Owoc should not be permitted to profit from his fraud on the public and his scheme to funnel money out of the Debtors in violation of his fiduciary duties.

Where, as here, the harm is "pervasive throughout the creditor body and causes such general prejudice that is difficult to quantify, a bankruptcy court has the power to subordinate the entire claim, without more." *Eddy*, 572 B.R. at 783–84; *see also Toy King Distribs.*, 256 B.R. at 206–07. The False Advertising Judgment and the OBI/Monster Arbitration Award (the latter of which is the subject of Plaintiff's pending Count 4 motion) were principal causes of the bankruptcy filing, and the resulting injury cannot readily be quantified. (*See* Declaration of John C. DiDonato (Dkt No. 26).) Accordingly, the Original Owoc Claims (Count 36) Late Claims (Nos. 767–772) (Count 37), Owoc Unliquidated Claim (No. 663) (Count 38), Rent-Related Claims (Nos. 767, 770) (Count 39), Asserted Admin Claim (No. 885) (Count 49), and Scheduled Claims should each be

-32-

equitably subordinated in their entirety under 11 U.S.C. § 510(c).[23]

## VII. THE LATE CLAIMS ARE DUPLICATIVE AND MUST BE EXPUNGED (COUNT 37).

The Late Claims (except Claim Nos. 767 and 770, which assert the Rent-Related Claims) should also be disallowed and expunged because they are duplicative.[24]  The Late Claims each assert an identical secured claim of $163,424,411.61 against six separate Debtor entities.  (SUMF ¶¶ 83–84, 87.)  Yet the Plan expressly provides that grouping the Debtors together is "solely for the purpose of describing treatment under the Plan, tabulating votes, and making distributions," and that such groupings "shall not affect any Debtor's status as a separate legal entity" and do not "constitute a substantive consolidation of any of the Debtors."  (SUMF ¶ 116.)  Because each Debtor remains a separate legal entity, identical claims filed against multiple Debtors for the same alleged debt are duplicative.  Moreover, Mr. Owoc has not (i) identified any basis upon which each Debtor-entity independently owes the full amount of $163,424,411.61, or (ii) identified the appropriate Debtor entity against which the claim is allegedly owed.  Allowing the same claim to be asserted against multiple Debtor entities for the same underlying debt would result in impermissible double (or greater) recovery and is contrary to the Plan's treatment of each Debtor as a separate legal entity.  *See In re Cinemex Holdings USA, Inc.*, No. 20-14696-LMI (Bankr. S.D. Fla. Aug. 2, 2021) (disallowing and expunging duplicative claims); *In re 1 Glob. Cap. Collections, et al.*, No. 18-19121-RAM (Bankr. S.D. Fla. Feb. 18, 2020) (Dkt. No. 2230) (same).[25]

As a result, Claim Nos. 768, 769, 771, and 772 should be disallowed and expunged as duplicative.

---

[23] *See* Owoc Claims Summary at 1–4; Owoc Claims Objection Overview at 2–3.

[24] *See* Owoc Claims Objection Overview at 2; Owoc Claims Summary at 4.

[25] Both Claim Nos. 767 and 770 assert nearly identical secured claims totaling approximately $163.4 million, but Claim Nos. 767 and 770 also assert Rent-Related Claims.

## VIII.    <u>DISALLOWANCE OF ALL CLAIMS UNDER 11 U.S.C. § 502(D) (COUNT 35).</u>

Section 502(d) of the Bankruptcy Code provides that "the court shall disallow any claim of any entity from which property is recoverable" under the avoidance provisions of the Bankruptcy Code, "or that is a transferee of a transfer avoidable" under those provisions, "unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable."  11 U.S.C. § 502(d).  Section 502(d) operates as an independent and mandatory basis for disallowance, separate from the grounds set forth in section 502(b).  The purpose of the provision is to compel the return of estate property before a transferee may participate in distributions.  *See In re Winstar Commc'ns, Inc.*, 554 F.3d 382, 413 (3d Cir. 2009).  Once the statutory prerequisites are established, the court "shall" disallow the claim.  *See In re Saco Local Dev. Corp.*, 30 B.R. 862, 866 (Bankr. D. Me. 1983); *In re Metiom, Inc.*, 318 B.R. 263, 268 (S.D.N.Y. 2004).

Because Mr. Owoc has neither repaid the avoidable transfers nor turned over the property for which he is liable in several counts, all of his claims against the Debtors' estates must be disallowed under section 502(d) and 548. The Liquidating Trust is entitled to prima facie allowance of its claims objection based solely on its allegation of an avoidable transfer.  *See In re Red Dot Scenic, Inc.*, 313 B.R. 181, 185–86 (Bankr. S.D.N.Y. 2004) ("To assure the effectuation of the purpose of this section, a claim may be disallowed at least temporarily for certain purposes, subject to reconsideration, simply upon the *allegation* of an avoidable transfer.").  The undisputed facts establish that Mr. Owoc is a transferee of transfers avoidable under sections 547 and/or 548 and recoverable under section 550 of the Bankruptcy Code.  (*See* SUMF ¶¶ 61–62.)  Mr. Owoc has not repaid these avoidable transfers nor turned over any such property. (*Id.* ¶ 62.) Accordingly, the statutory prerequisites of section 502(d) are satisfied, and all claims filed by or on behalf of Mr. Owoc—the Original Owoc Claims, Late Claims (Nos. 767–772), Owoc Unliquidated Claim

(No. 663), Rent-Related Claims (Nos. 767, 770), and Asserted Admin Claim (No. 885)—must be disallowed under § 502(d) until he repays the avoidable transfers with interest and costs. (*See* SUMF ¶¶ 83, 87, 91); 11 U.S.C. § 502(d).

## IX.    DISALLOWANCE OF THE AMENDED AND SUPERSEDED ORIGINAL OWOC CLAIMS (COUNT 36).

To the extent that the Late Claims are deemed to have properly amended the Original Owoc Claims, which they do not, the Original Owoc Claims should be disallowed and expunged as amended and superseded.[26] (*See* Answer ¶ 769 (admitting that "[a]ll of the Original Owoc Claims were amended and superseded by the Late Claims").)  Allowing the Original Owoc Claims to remain could result in Mr. Owoc receiving double recovery for the same liabilities alleged to be owed by the Debtors despite the material and unsupported differences between the claims.  Florida bankruptcy courts have routinely granted such relief. *See, e.g.*, *In re Cinemex Holdings USA, Inc.*, No. 20-14696-LMI (Bankr. S.D. Fla. Aug. 1, 2021) (disallowing and expunging amended and superseded claims); *In re 1 Glob. Cap. Collections, et al.*, No. 18-19121-RAM (Bankr. S.D. Fla. Feb. 18, 2020) (Dkt. No. 2230) (same); *In re Red Lobster Mgmt. LLC, et al.*, No. 6:24-bk-02486-GER (Bankr. M.D. Fla. Nov. 13, 2024) (same).

Therefore, if the Late Claims (Claim Nos. 767–772) are considered to have amended and superseded the Original Owoc Claims, the Original Owoc Claims should be disallowed and expunged.

---

[26] *See* Owoc Claims Summary at 1–3; Owoc Claims Objection Overview at 1.

## X.    DECLARATORY RELIEF IS WARRANTED (COUNTS 32–34).

The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). Such declarations have "the force and effect of a final judgment." *Id.*

An actual controversy exists where there is "a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Laboss Transp. Servs. v. Global Liberty Ins. Co.*, 208 F. Supp. 3d 1268, 1280 (S.D. Fla. 2016) (granting summary judgment). Declaratory relief lies within the court's sound discretion. *MDS (Canada), Inc. v. Rad Source Techs., Inc.*, 822 F. Supp. 2d 1263, 1294 (S.D. Fla. 2011).

Here, as outlined below, the Liquidating Trust is entitled to declaratory judgment in connection with its claims that (a) the Disputed Sheridan Funds belong to Plaintiff (Count 33); (b) the Commercial LLCs' claims are limited to the Scheduled Claims (Count 32); and (c) JHO "Real Estate LLC"—a non-existent entity—is not a claimant (Count 34).

### a.    Declaratory Judgment That the Disputed Sheridan Funds Belong to Plaintiff Is Warranted (Count 33)

VPX's funds were used to purchase the Sheridan A Property and VPX also paid all pre- and post-petition carrying costs, including real property taxes related to the Sheridan A Property.[27] (SUMF ¶¶ 106, 107.)   No lease or written agreement between VPX and Sheridan A exists or has ever existed. (*Id.* ¶ 108.)

---

[27] *See also* Owoc Claims Summary at 3–4.

The DIP Order required the Debtors to pay postpetition obligations related to the Sheridan A Property and Sheridan C Property. (*Id.* ¶ 109.) It also provides for Sheridan A and C to reimburse those funds: "[c]ontemporaneously with the consummation of the consensual sale of any parcel of real estate owned by a Landlord Non-Debtor Affiliate, the Prepetition Agent shall deliver or cause to be delivered to the Debtors cash proceeds in an aggregate amount equal to the actual and documented costs and expenses the Debtors funded to or on behalf of such Landlord Non-Debtor Affiliate in respect of such parcel since the Petition Date." (DIP Order ¶ 61(d).) As required by the DIP Order, the Debtors paid $2,216,249.19 of postpetition outstanding carrying costs and an insurance adjustment, and sought reimbursement from Sheridan A and C. (SUMF ¶ 113.) Those costs, which are required to be reimbursed to the Debtors under the DIP Order, have not yet been reimbursed and are being held in escrow. (*Id.* ¶ 114.) Sheridan A and Sheridan C are "Landlord Non-Debtor Affiliate[s]" as defined in the DIP Order. (DIP Order ¶ 9.) The DIP Order's terms are unambiguous: the Disputed Sheridan Funds belong to the Debtors and, by extension, the Liquidating Trust. Notably, the same reimbursement process was followed for the Lithia Springs Property, where the Company was paid $901,378.38 through the closing in accordance with the DIP Order. (SUMF ¶ 112.) Mr. Owoc signed the closing statement for the Lithia Springs Property and agreed to reimburse the Company for postpetition carrying costs, the very same obligation he now refuses to honor with respect to the Sheridan A Property and Sheridan C Property. (*See id.* ¶ 117.)

In the Sheridan Application, Sheridan A and Mr. Owoc assert that they are entitled to the Disputed Sheridan Funds, an assertion with which the Trust disagrees. (*See id.* ¶ 104.) Likewise, in the Sheridan Stipulation, Sheridan A, Sheridan C, and Mr. Owoc dispute ownership of the Disputed Sheridan Funds. (*Id.* ¶ 118.) Thus, an actual, substantial, and justiciable controversy

-37-

exists as to whether the Plaintiff is the rightful owner of the Disputed Sheridan Funds. This controversy is of sufficient immediacy to warrant judicial relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202. Plaintiff is entitled to a declaratory judgment that Plaintiff owns, and is therefore entitled to control, the Disputed Sheridan Funds and that Sheridan A, Sheridan C, and Mr. Owoc have no right to the Disputed Sheridan Funds.

> **b.      Declaratory Judgment That the Commercial LLCs Are Limited to the Amounts and Priorities of the Scheduled Claims to the Extent Such Claims Are Not Equitably Subordinated (Count 32)**

To the extent the Commercial LLC's claims are not equitably subordinated, as requested in Section VI, *supra*, those claims should be limited to the amounts on the Debtors' schedules. A timely-filed proof of claim supersedes a claim included on Chapter 11 debtor's schedules. Fed. R. Bankr. P. 3003(c)(4); *see also* Fed. R. Bankr. P. 3003(b)(1); 11 U.S.C. §501, 111(a). Absent such a filing, the scheduled claim controls and "constitute[s] prima facie evidence of the validity and amount of the claim." Fed. R. Bankr. P. 3003(b)(1).

No proper, timely proof of claim was filed by or on behalf of the Commercial LLCs to supersede the Scheduled Claims.[28] (SUMF ¶ 85.) The Late Claims untimely sought to add new parties, priorities, and theories of liability; they cannot amend or supplement the Original Owoc Claims, especially where the Commercial LLCs have neither demonstrated excusable neglect nor sought leave. *See Pioneer*, 507 U.S. at 389. Because the Scheduled Claims have not been superseded, the Court should limit the Commercial LLCs' claims to the amounts and priorities of the Scheduled Claims (to the extent not equitably subordinated) in order to uphold the integrity of the Bar Date and claims process and to ensure the fair and orderly administration of the Liquidating Trust.

---

[28] *See* Owoc Claims Summary at 3; Owoc Claims Summary at 4.

   c.  **Declaratory Judgment That JHO Real Estate LLC Is Not a Claimant Is Warranted (Count 34)**

The late attempt to assert claims on behalf of JHO Real Estate LLC creates ongoing and material uncertainty regarding the universe of claimants and the potential liabilities of the estates. (*See* SUMF ¶¶ 87–88.)

A search of the online records confirms that no entity named JHO Real Estate LLC was active in any state during the relevant time period. (*Id.* ¶ 89.) The Court may take judicial notice of this fact pursuant to Federal Rule of Evidence 201, as the nonexistence of JHO Real Estate LLC is readily verifiable from an official government source whose accuracy cannot reasonably be questioned. *See Universal Express, Inc. v. SEC*, 177 F. App'x 52, 53 (11th Cir. 2006); *Horne v. Potter*, 392 F. App'x 800, 802 (11th Cir. 2010). The attempt to assert claims on behalf of a nonexistent entity further underscores the need for prompt judicial intervention to prevent confusion, improper claims, and potential prejudice to the Liquidating Trust and its beneficiaries.

Without a declaratory judgment clarifying that JHO Real Estate LLC is not a claimant, the Liquidating Trust remains vulnerable to future litigation and administrative challenges over the validity and allowance of the late claims asserted on behalf of a non-existent entity.[29] Such exposure would not only increase the costs and complexity of administering the Liquidating Trust, but also undermine the finality and predictability that the Bar Date is intended to provide. Accordingly, declaratory relief is both necessary and warranted.

**XI.  CONCLUSION.**

WHEREFORE, based on the foregoing, the Liquidating Trust respectfully requests that this Court enter an Order granting: (i) partial summary judgment on Counts 13–21, 28–29, 30–40,

---

[29] *See* Owoc Claims Summary at 1–3; Owoc Claims Objection Overview at 2.

-39-

and 46–50 of the Complaint and (ii) for any other and further relief the Court deems just and proper.

Dated:  May 8, 2026

**LOWENSTEIN SANDLER LLP**

Jeffrey L. Cohen, Esq. (*admitted pro hac vice*)
Eric Chafetz, Esq. (*admitted pro hac vice*)
Michael A. Kaplan, Esq. (*admitted pro hac vice*)
Markiana J. Julceus (*admitted pro hac vice*)
Erica G. Mannix (*admitted pro hac vice*)
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 262-6700
Facsimile:  (212) 262-7402
Email: jcohen@lowenstein.com
Email: echafetz@lowenstein.com
Email: mkaplan@lowenstein.com

**BAST AMRON LLP**

By:  */s/ Peter J. Klock, II*
Brett M. Amron (FBN 0148342)
Peter J. Klock, II (FBN 103915)
One Southeast Third Avenue, Suite 2410
Miami, Florida 33131
Telephone: (305) 379-7904
Facsimile:  (786) 206-8740
Email: bamron@bastamron.com
Email: pklock@bastamron.com

*Counsel to the Liquidating Trust*